**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Golden | Case No. 16-40809 (ESS) |
| Debtor. | **Chapter 7** |
| _____ | Adv. Pro. No. 17-1005 (ESS) |
| Tashanna B. Golden<br>Fka Tashanna B. Pearson on behalf of<br>herself and all other similarly situated, | |
| Plaintiffs,<br>v. | |
| National Collegiate Student Loan Trust<br>2005-3, National Collegiate Student Loan<br>Trust 2006-4, GS2 2016-A, Pennsylvania<br>Higher Education Assistance Agency d/b/a<br>American Education Services, Firstmark<br>Services. | |
| Defendants. | |

**<u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT FIRSTMARK SERVICE'S MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, TO DISMISS</u>**

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ........................................................................................................... 1

II.    STANDARDS OF REVIEW............................................................................................ 4

    A.  MOTION TO COMPEL ARBITRATION .............................................................. 4

    B.  MOTION TO DISMISS........................................................................................... 5

III.    ARGUMENT .................................................................................................................. 5

    1.  The Court Should Compel Arbitration of Golden's Claims According to the Terms of her Master Student Loan Promissory Note ........................................................................ 5

        a.  The Claims Asserted in Golden's First Amended Complaint Fall within the Scope of her Agreement to Arbitrate .............................................................................. 5

        b.  The Federal Arbitration Act Deems Golden's Agreement to Arbitrate Presumptively Valid, Irrevocable, and Enforceable ........................................... 7

        c.  Circumstances Do Not Warrant Invalidating the Arbitration Agreements.............. 8

            i.  The Bankruptcy Code Does Not Prohibit the Arbitration of Claims Brought under 11 U.S.C. § 524 ....................................................................................... 9

            ii.  The Supreme Court No Longer Conducts the "Inherent Conflict" Inquiry when Deciding Whether Claims Are Capable of Being Arbitrated and, Even if the Inquiry Applied, No Inherent Conflict Exists between the Bankruptcy Code and the Federal Arbitration Act.........................................................................10

            iii.  Golden's FDCPA Claim Is Arbitrable.............................................................15

    2.  Golden's Allegations Fall Short of Basic Pleading Standards...............................16

    3.  Golden Waived Her Right to Participate in a Class Action....................................18

    4.  The Court Lacks Jurisdiction over Firstmark with Respect to Claims Asserted by Golden on Behalf of Debtors Whose Discharge Orders Were Entered by Bankruptcy Courts outside of this District .........................................................................19

    5.  Golden Cannot Obtain Damages for an Alleged Violation of the Discharge Injunction through the Instant Adversary Proceeding ..............................................................22

    6.  The Court's Discharge Order Lacks the Requisite Degree of Specificity to Support a Finding of Contempt Against Firstmark .......................................................................22

7.  Golden Fails to Plausibly Allege that Firstmark Is a "Debt Collector" Subject to the FDCPA.................................................................................................................................................25

8.  Alternatively, Golden Fails to Plead Sufficient Facts to Demonstrate that Firstmark Committed a Violation of the FDCPA ...........................................................................................28

IV.    CONCLUSION .................................................................................................................................29

# TABLE OF AUTHORITIES

Page

**Cases**

*Ackerman v. Eber*, 687 F.3d 1123 (9th Cir. 2012)..................................................................10

*Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 133 S. Ct. 2304 (2013) ..................... passim

*Antkowiak v. Taxmasters*, 455 Fed. App'x 156 (3d Cir. 2011)...........................................16

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009) ........................................................ 5

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) .........................................................7, 8

*Barrientos v. Wells Fargo Bank, N.A.*, 633 F.3d 1186 (9th Cir. 2011) ...............................20

*Beiter v. Chase Home Fin., LLC*, 554 B.R. 433 (Bankr. S.D. Ohio 2016) ...........................21

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007)...................................5, 16

*Belton v. Citigroup Inc.*, No. 15 CV 1934 (VB), 2015 U.S. Dist. LEXIS 144371 (S.D.N.Y. Oct. 14, 2015)............................................................................................... 12, 13, 14, 19, 22

*Bigelow v. Green Tree Financial Servicing Corp.*, No. CV-99-6655 REC/SMS, 2000 U.S. Dist. LEXIS 23598 (E.D. Cal. Nov. 30, 2000)...........................................................................13

*Boyd v. J.E. Robert Co.*, No. 05-CV-2455 (KAM) (RER), 2010 U.S. Dist. LEXIS 140905 (E.D.N.Y. Mar. 31, 2010) ........................................................................................................................29

*Briggs v. Wells Fargo Bank, N.A.*, No. 14-CV-1759 (RRM) (JMA), 2015 U.S. Dist. LEXIS 28145 (E.D.N.Y. Mar. 6, 2015) ........................................................................................................27

*Brown v. Sklar-Markind*, Civ. No. 14-0266, 2014 U.S. Dist. LEXIS 157891 (W.D. Pa. Nov. 7, 2014)..................................................................................................................................15

*Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006) .......................................... 7

*Burdett v. Harrah's Kan. Casino Corp.*, 260 F. Supp. 2d 1109, 1119 (D. Kan. 2003).................29

*Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 5 S. Ct. 618 (1885) ................23

*CompuCredit Corp. v. Greenwood*, 565 U.S. 95 (2012) ........................................8, 9, 11, 12

*Credit One Fin. v. Anderson*, 553 B.R. 221 (S.D.N.Y. 2016) ...............................................14

*Crippen v. Stites*, 346 B.R. 115 (Bankr. E.D. Pa. 2006) ......................................................28

*Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 105 S. Ct. 1238 (1985) ......................... 7

*Easterling v. Collecto, Inc.*, 692 F.3d 229 (2d Cir. 2012) ..........................................................................23

*Ellis v. Dunn*, 324 B.R. 175 (D. Mass. 2005) ............................................................................................24

*Essangui v. SLF V-2015 Tr.*, 573 B.R. 614 (Bankr. D. Md. 2017)............................................................21

*Ferrante v. Law Offices of Lewisohn & Lewisohn*, No. 15-cv-5473(SJF)(SIL), 2016 U.S. Dist. LEXIS 92956 (E.D.N.Y. July 15, 2016)...............................................................................................25-26

*First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 115 S. Ct. 1920 (1995) ........................................ 7

*Garrett v. Margolis, Pritzker, Epstein & Blatt, P.A.*, 861 F. Supp. 2d 725 (E.D. Va. 2012)..........16

*Gates v. Northland Grp., Inc.*, No. 1:16-cv-01492-NLH-AMD, 2017 U.S. Dist. LEXIS 23884 (D.N.J. Feb. 21, 2017) .................................................................................................................................19

*Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991)......................................... 9, 10, 11, 14

*Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 121 S. Ct. 513 (2000) .............4, 13, 14

*Grigoriou v. First Resolution Inv. Corp.*, No. 13-CV-6008 CJS, 2014 U.S. Dist. LEXIS 41288 (W.D.N.Y. Mar. 26, 2014)...........................................................................................................................29

*Haynes v. Chase Bank USA, N.A.*, Nos. 11-23212 (RDD), 13-08370-rdd, 2014 Bankr. LEXIS 3111 (Bankr. S.D.N.Y. July 22, 2014) ..........................................................................................21, 22, 25

*Hess v. N.J. Transit Rail Operations, Inc.*, 846 F.2d 114 (2d Cir. 1988)................................................23

*Hodson v. Javitch, Block & Rathbone, LLP*, 531 F. Supp. 2d 827 (N.D. Ohio 2008)....................16

*In re Azevedo*, 506 B.R. 277 (Bankr. E.D. Cal. 2014).................................................................................24

*In re Baldwin-United Corp. Litigation*, 765 F.2d 343 (2d Cir. 1985) .................................................21

*In re Cano*, 410 B.R. 506 (Bankr. S.D. Tex. 2009) ....................................................................................21

*In re Chief Exec. Officers Clubs, Inc.*, 359 B.R. 527 (Bankr. S.D.N.Y. 2007) ..............................22-23

*In re CPW Acquisition Corp.*, No. 08-14623 (AJG), 2010 Bankr. LEXIS 243 (Bankr. S.D.N.Y. Feb. 4, 2010) ...................................................................................................................................................23

*In re Haemmerle*, 529 B.R. 17 (Bankr. E.D.N.Y. 2015) ................................................................... 20, 22

*In re McKinnie*, 501 B.R. 344 (Bankr. E.D. Mich. 2013)..........................................................................23

*In re National Gypsum Co.*, 118 F.3d 1056 (5th Cir. 1997) ...................................................................12

*In re Sharak*, 571 B.R. 13 (Bankr. N.D.N.Y. 2017) ......................................................................... 20, 22

*In re Touchstone Home Health LLC*, 572 B.R. 244 (D. Colo. 2017) ....................................................10

*Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 88 S. Ct. 201 (1967) .....23

*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821 (1994)...................... 19-20, 21

*Kalikow v. Solow*, 602 F.3d 82 (2d Cir. 2010) ................................................................. 20, 22

*Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, __ U.S. __, 137 S. Ct. 1421 (2017) .............................. 8

*King v. Allied Vision, Ltd.*, 65 F.3d 1051 (2d Cir. 1995) ...........................................................23

*Kupferstein v. RCS Ctr. Corp.*, No. 03-CV-1497, 2004 U.S. Dist. LEXIS 26016 (E.D.N.Y. Aug. 11, 2004)................................................................................................................................29

*Lacey v. Ocwen Loan Servicing, LLC*, No. 6:13-cv-1418-EFM-KMH, 2014 U.S. Dist. LEXIS 86093 (D. Kan. June 25, 2014) ........................................................................................27

*Latino Officers Ass'n City of N.Y., Inc. v. City of N.Y.*, 558 F.3d 159 (2d Cir. 2009).......................23

*MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104 (2d Cir. 2006) ................................... 13, 14, 15

*Mintze v. Am. Gen. Fin. Servs., Inc.*, 434 F.3d 222 (3d Cir. 2006) ........................................10

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614 (1985) ...............................9, 11

*Mondonedo v. Sallie Mae, Inc.*, No. 07-4059, 2009 U.S. Dist. LEXIS 25497 (D. Kan. March 25, 2009)................................................................................................................................27

*Monsanto Co. v. Haskel Trading, Inc.*, 13 F. Supp. 2d 349 (E.D.N.Y. 1998) ....................................23

*Nunez v. Citibank, N.A.*, 08 Cv. 5398 (BSJ) 2009 U.S. Dist. Lexis 7783 (S.D.N.Y. Feb. 3, 2009) . 4

*O'Fallon v. Encore Receivable Mgmt., Inc.*, 466 F. App'x 325 (5th Cir. 2012) ...............................16

*Papetti v. Doe*, No. 16-2582-cv, 2017 U.S. App. LEXIS 9165 (2d Cir. May 26, 2017) ...............25

*Pascal v. JP Morgan Chase Bank, Nat'l Ass'n*, No. 09-CV-10082 (ER), 2013 U.S. Dist. LEXIS 33350 (S.D.N.Y. Mar. 11, 2013)................................................................................................26

*Preston v. Ferrer*, 552 U.S. 436, 128 S. Ct. 978 (2008)................................................................11

*Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010)........................................................... 8

*Scherk v. Alberto-Culver Co.*, 417 U.S. 506 (1974) ......................................................... 7

*Schuh v. Druckman & Sinel, L.L.P.*, 751 F. Supp. 2d 542 (S.D.N.Y. 2010) ........................................25

*Shearson/American Express v. McMahon*, 482 U.S. 228 (1987)....................................................9, 10

*Shetiwy v. Midland Credit Mgmt.*, 959 F. Supp. 2d 469 (S.D.N.Y. 2013) .................................. 15, 16

*Somlar v. Nelnet Inc.,* No. 4:16-cv-01037-AGF, 2017 U.S. Dist. LEXIS 719 (E.D. Mo. Jan. 4, 2017)....................................................................................................................................................26

*Soucy v. Capital Mgmt. Servs., L.P.*, No. 14 C 5935, 2015 U.S. Dist. LEXIS 9991 (N.D. Ill. Jan. 29, 2015)....................................................................................................................................................19

*Spano v. V & J Nat'l Enters., LLC*, No. 16-CV-06419-EAW-MWP, 2017 U.S. Dist. LEXIS 139922 (W.D.N.Y. Aug. 30, 2017) ............................................................................................................18

*Stone v. Vanderbilt Univ.*, 180 B.R. 499 (Bankr. M.D. Tenn. 1995) ...................................24

*The Whiting-Turner Contracting Co. v. Elec. Mach. Enter., Inc.*, 479 F.3d 791 (11th Cir. 2007)...................................................................................................................................................10

*Torres v. Countrywide Home Loans, Inc.,* No. CV08-4565-JFW (MANx), 2008 U.S. Dist. LEXIS 126973 (C.D. Cal. Oct. 17, 2008) ......................................................................................................17

*Torres v. United Healthcare Servs.*, 920 F. Supp. 2d 368 (E.D.N.Y. 2013) ......................................... 4

*Vehifax Corp. v. Georgilis (In re Tires R Us Ltd.)*, No. 1-11-50395-ess, 1-15-01007-ess, 2016 Bankr. LEXIS 2324 (Bankr. E.D.N.Y. June 17, 2016) ...............................................................23

*Whitehaven S.F., LLC v. Spangler*, 663 Fed. App'x 544 (2d Cir. 2015) ............................................ 7

*Williams v. Citibank, N.A.,* 565 F. Supp. 2d 523 (S.D.N.Y. 2008).........................................................28

*Williams v. Navient Solutions, LLC*, 564 B.R. 770 (S.D. Fla. 2017) ......................13, 14-15, 19, 20

*Zirogiannis v. Seterus, Inc.*, 221 F. Supp. 3d 292 (E.D.N.Y. 2016) ............................................. 26, 27

**Statutes**

9 U.S.C. § 2 ............................................................................................................................... 7

9 U.S.C. § 3 ..........................................................................................................................7, 15

9 U.S.C. § 4 ............................................................................................................................... 8

9 U.S.C. §§ 3-4 ......................................................................................................................... 7

11 U.S.C. § 105 ..............................................................................................................20, 21, 22

11 U.S.C. § 523 ..............................................................................................................3, 21, 22

11 U.S.C. § 524 .................................................................................................................. passim

11 U.S.C. § 727 ................................................................................................................. 20, 21

15 U.S.C. § 1692................................................................................................2, 3, 26, 27, 29

20 U.S.C. § 1087ll .................................................................................................... 3

26 U.S.C. § 221 ....................................................................................................... 2

## Other Authorities

Fed. R. Bankr. P. 7008................................................................................................ 5

Fed. R. Bankr. P. 7012............................................................................................... 1

Fed. R. Civ. P. 8(a)................................................................................................5, 16

Fed. R. Civ. P. 9(b) ..................................................................................................29

Fed. R. Civ. P. 12(b)(6) ...........................................................................................1, 4

Fed. R. Civ. P. 23 ..................................................................................................9, 19

S. Rep. No. 95-382, 95th Cong., 1st Sess. (1977), reprinted in 1977 U.S.C.C.A.N. 1965, 1697-98, 1977 WL 16047 ..................................................................................................27

Defendant Firstmark Services ("Firstmark"), by and through its undersigned counsel, hereby submits this Memorandum of Law in Support of its Motion to Compel Arbitration or, in the Alternative, to Dismiss (the "Motion to Compel or Dismiss" or the "Motion") Debtor and Plaintiff Tashanna B. Golden's ("Golden") First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6)[1] for failure to state a claim upon which relief can be granted.

## I.    INTRODUCTION

This lawsuit arises out of a series of private student loans Golden obtained from various lenders between 2006 and 2008 to fund her education at the University of Pennsylvania Law School. Golden mentions several of her student loans in the First Amended Complaint, including the following: a $27,500 loan from the federal government (ECF No. 32, ¶ 29) for the 2006-2007 academic term; a $7,103 loan from National Collegiate Trust (ECF No. 32, ¶ 30); a $52,347 loan from the federal government for the 2007-2008 academic term; a $6,557 loan from JP Morgan Chase (ECF No. 32, ¶ 37); and a $9,348 loan from Citibank (the "Citibank Loan").[2] (*Id.*) According to Golden, the Citibank Loan "was subsequently sold to...GoldenTree Asset Management on or about October 24, 2015, which was later securitized into the GS2 Trust."[3] (ECF No. 32, ¶ 37 n. 1) The First Amended Complaint neither connects any of these loans to Firstmark nor attempts to explain Firstmark's involvement in this lawsuit, except to say that Firstmark "misrepresented the legal status and character of

---

[1] Fed. R. Civ. P. 12 is made applicable to this adversary proceeding by Fed. R. Bankr. P. 7012.

[2] Golden alludes to having obtained two separate loans from Citibank (ECF No. 32, ¶ 25), but repeatedly uses the singular "Citibank Loan" throughout the First Amended Complaint. Golden does not define the term "Citibank Loan" and gives no further information regarding the identity of the Citibank Loan. Despite this lack of clarity, Firstmark will, for the sake of consistency, use the same terminology as Golden.

[3] "GS2 Trust" is not a defined term in the First Amended Complaint, but Firstmark assumes that Golden intends to refer to GS2 2016-A, one of the other named defendants.

the Citibank Loan" and "used 'deceptive and misleading' representations and 'unfair means' in collecting on the Debt" on GS2 2016-A's behalf. (ECF No. 32, ¶¶ 83-84)

On February 29, 2016, Golden filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. (Case No. 16-40809 (ESS), hereinafter "Bankr. Dkt.," No. 1) Golden listed two "Student Loan[s]" owed to "FM/Slfv Tru" on Schedule F of her petition. (Bankr. Dkt. No. 1, p. 28) On August 3, 2016, the Court entered an "Order of Discharge and Final Decree" in Golden's Chapter 7 case. (Bankr. Dkt. No. 17) However, the Court's order did not specify which of Golden's student loans, if any, were subject to discharge. Golden never expressed her belief that her student loans were discharged in bankruptcy until December 6, 2016, when she requested the Court's permission to reopen her bankruptcy case for the purpose of seeking "[d]eclaratory relief that [her] private student loans…were discharged" pursuant to the Court's August 3, 2016 discharge order and "[a]n award of actual damages and sanctions for violations of the discharge injunction." (Bankr. Dkt. No. 19, p. 3) The Court granted Golden's request on January 10, 2017. (Bankr. Dkt. No. 21)

Golden initiated this adversary proceeding on January 18, 2017, when she filed the original Complaint seeking a declaratory judgment that her various private student loans had been discharged in bankruptcy. (ECF No. 1, ¶¶ 21-22) In her original Complaint, Golden also asserted claims against the holders of her private student loans, as well as against Firstmark, for allegedly violating the discharge injunction of 11 U.S.C. § 524. (ECF No. 1, ¶¶ 23-27) Finally, Golden's original Complaint contained a claim against Firstmark for violating the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*. (the "FDCPA"). (ECF No. 1, ¶¶ 28-37) On July 12, 2017, Golden filed a Motion to Amend her Complaint in order to,

among other things, convert her individual lawsuit into a nationwide class action. (ECF No. 15) Golden officially filed a First Amended Complaint on October 17, 2017. (ECF No. 32)

Golden's underlying theory of the case is that, in the aggregate, the various student loans she obtained from multiple unaffiliated lenders (including the federal government) between 2006 and 2008 exceeded her "cost of attendance" as that term is defined by 20 U.S.C. § 1087ll, and hence, they do not constitute "qualified education loans" under 11. U.S.C. § 523(a)(8)(B). Golden contends that, because her student loans were not "qualified education loans," they were automatically discharged in bankruptcy, without the need for a judicial determination as to their dischargeability or a showing of undue hardship. Golden asserts that because Firstmark (among others) continued servicing these student loans after Golden received a standard discharge, Firstmark (and others) violated the discharge injunction of 11 U.S.C. § 524, as well as the FDCPA. (ECF No. 1, pp. 6–8; ECF No. 15-4, pp. 7–9)

Notwithstanding Golden's novel theory, her claims are subject to several defenses which are both procedural and substantive in nature. First, Golden contractually agreed to arbitrate all claims asserted in the First Amended Complaint, and her agreement to arbitrate is valid, irrevocable, and enforceable. Second, the First Amended Complaint fails to state a plausible claim for relief against Firstmark under either § 524 or the FDCPA. Golden's § 524 claim fails because the discharge order it seeks to enforce is not sufficiently "clear and unambiguous" to support a finding of contempt against Firstmark. Golden's FDCPA claim likewise fails because (1) the First Amended Complaint does not adequately allege that Firstmark qualifies as a "debt collector" as defined by 15 U.S.C. § 1692a(6), (2) the First Amended Complaint does not allege sufficient facts to plausibly show that Firstmark violated § 1692e(2)(a) by falsely representing the character, amount or legal status of the Citibank

Loan, and (3) Golden never received the Court's permission to reopen her bankruptcy case for the purpose of asserting a claim under the FDCPA. Finally, Golden's attempt to convert her individual adversary proceeding into a nationwide class action is fatally flawed because (1) she contractually waived her right to participate in a class action, and (2) the Court lacks jurisdiction to enforce injunctions issued by courts outside this district. For these reasons, and as set forth in greater detail below, the Court should compel arbitration of all claims asserted against Firstmark in the First Amended Complaint or, in the alternative, dismiss them pursuant to Fed. R. Civ. P. 12(b)(6).

## II.    STANDARDS OF REVIEW

### A. MOTION TO COMPEL ARBITRATION

When analyzing motions to compel arbitration, courts ordinarily apply the same standard of review that governs motions for summary judgment. See *Torres v. United Healthcare Servs.*, 920 F. Supp. 2d 368, 372 (E.D.N.Y. 2013). As such, in considering Firstmark's Motion to Compel Arbitration, the Court may consider matters outside of the pleadings. *Id.* Notably, the "party resisting arbitration bears the burden of establishing the inadequacy of the arbitral forum for adjudication of claims of a particular genre." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 93, 121 S. Ct. 513, 523 (2000). After determining that "an arbitration agreement is valid and the claim before it is arbitrable," the Court "must stay or dismiss further judicial proceedings and order the parties to arbitrate." *Torres*, 920 F. Supp. 2d at 372 (quoting *Nunez v. Citibank, N.A.*, 08 Cv. 5398 (BSJ) 2009 U.S. Dist. Lexis 7783, at *2 (S.D.N.Y. Feb. 3, 2009).

### B. MOTION TO DISMISS

Fed. R. Civ. P. 8(a)(2)[4] provides that a complaint "must contain…a short and plain statement of the claim showing that the pleader is entitled to relief." While a complaint need not make detailed factual allegations, it must include sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). Thus, although Rule 8 does not require "detailed factual allegations," it requires more than labels and conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Id.* at 555, 127 S. Ct. at 1965-66. According to *Bell Atl. Corp. v. Twombly*, a complaint must allege facts "that are enough to raise a right to relief above the speculative level," and a complaint must contain sufficient factual allegations supporting the reasonable inference that the defendant is liable for the misconduct alleged in order to achieve facial plausibility. *Id.* at 555-56, 127 S. Ct. at 1965-66; see also *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949-50 (2009) (explaining that a complaint which pleads facts that are "merely consistent with" a finding of liability against the defendant "stops short of the line between possibility and plausibility of 'entitlement to relief'"). Lastly, in ruling on a motion to dismiss, the Court must distinguish between factual allegations, which it must assume as true, and mere legal conclusions offered as factual assertions, which it need not accept as true. *Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949-50 (2009).

### III.    ARGUMENT

**1. The Court Should Compel Arbitration of Golden's Claims According to the Terms of her Master Student Loan Promissory Note.**

*a. The Claims Asserted in Golden's First Amended Complaint Fall within the Scope of her Agreement to Arbitrate.*

---

[4] Fed. R. Civ. P. 8 is made applicable to this adversary proceeding by Fed. R. Bankr. P. 7008.

The Master Student Loan Promissory Note that established the terms of the Citibank Loan[5] contains a sweeping arbitration provision. The arbitration provision states: "EITHER YOU OR I CAN REQUIRE THAT ANY CONTROVERSY OR DISPUTE BE RESOLVED BY BINDING ARIBITRATION….ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING." (Golden Master Student Loan Promissory, attached hereto as "Exhibit A," p. 1) The arbitration provision further permits either party, "without the other's consent, [to] require that any Claims…be submitted to mandatory, binding arbitration," which "shall be governed by, and enforceable under, the Federal Arbitration Act." (*Id.*) "Claims subject to Arbitration include, but are not limited to…Claims relating to: 1) any and all aspects of my Account, including without limitation the…handling, billing, [and] servicing…of my Account; 2) any disclosures or statements relating to my Account; 3) the application, enforceability or interpretation of my Account, including this arbitration provision." (*Id.*) The arbitration provision likewise makes the following subject to arbitration: "Claims that relate to…any predecessors and successors and assigns," "Claims based on any theory of law, any contract, statute, regulation,…or any other legal or equitable ground (including any claim for injunctive or declaratory relief)," and "Claims made as part of a class action or other representative action." (Exhibit A, pp. 1-2) In determining whether a Claim is subject to arbitration, all questions "shall be resolved by interpreting this arbitration provision in the broadest way the law will allow it to be enforced." (Exhibit A, p. 1) It is thus apparent that

---

[5] As discussed below, Firstmark cannot readily identify which of Golden's student loans constitutes the Citibank Loan she refers to in the First Amended Complaint. Nevertheless, Firstmark's internal records show that substantially similar Master Student Loan Promissory Notes, all with identical arbitration and class waiver provisions, govern each of Golden's student loans maintained in Firstmark's system. As such, Firstmark has attached a copy of one such Master Student Loan Promissory Note.

Golden's FDCPA and § 524 claims fall squarely within the scope of the arbitration provision that governs the Citibank Loan.

> b.  *The Federal Arbitration Act Deems Golden's Agreement to Arbitrate Presumptively Valid, Irrevocable, and Enforceable.*

Congress enacted the Federal Arbitration Act in order "to promote arbitration" by "embod[ying] [a] national policy favoring arbitration" and thereby "revers[ing] centuries of judicial hostility to arbitration agreements." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)); *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 533 (1974).  The Federal Arbitration Act "reflects the overarching principle that arbitration is a matter of contract," and "courts must 'rigorously enforce' arbitration agreements according to their terms." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 133 S. Ct. 2304, 2309 (2013) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221, 105 S. Ct. 1238 (1985)); see also *Whitehaven S.F., LLC v. Spangler*, 663 Fed. App'x 544, 546 (2d Cir. 2015) (explaining that, when determining whether an arbitration agreement is valid, "courts 'should apply ordinary state-law principles that govern the formation of contracts'") (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S. Ct. 1920 (1995)).

Pursuant to Section 2 of the Federal Arbitration Act, a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds"—which Golden has not alleged—"as exist at law or in equity for the revocation of any contract." See 9 U.S.C. § 2. Where, as here, a suit is brought in federal court "upon any issue referable to arbitration under an agreement in writing for such arbitration," the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. Further, the Federal Arbitration Act authorizes

Firstmark, as a "party aggrieved by the failure, neglect, or refusal of another to arbitrate under a written agreement," to petition the Court "for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

Golden has asserted claims that clearly fall within the scope of her arbitration agreement, and Firstmark has elected to resolve those claims through arbitration, as expressly provided for in Golden's Master Student Loan Promissory Note. The Federal Arbitration Act dictates that, under these circumstances, the Court should compel arbitration of Golden's claims, dismiss the instant lawsuit, or, alternatively, stay proceedings "until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. §§ 3-4.

### c. Circumstances Do Not Warrant Invalidating the Arbitration Agreement.

The Supreme Court has steadfastly recognized the breadth of the Federal Arbitration Act by rejecting repeated attempts to challenge the enforceability of arbitration agreements. See, e.g., *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, __ U.S. __, 137 S. Ct. 1421 (2017); *Italian Colors*, 133 S. Ct. 2304; *CompuCredit Corp. v. Greenwood*, 565 U.S. 95 (2012); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011); *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010). The presumptive validity, irrevocability, and enforceability of Golden's arbitration agreement extends to any "claims that allege a violation of a federal statute, unless the [Federal Arbitration Act's] mandate has been 'overridden by a contrary congressional command.'" *Italian Colors*, 133 S. Ct. 1309 (quoting *CompuCredit*, 565 U.S. at 98). Thus, absent a clear congressional command disfavoring arbitration, courts must enforce an arbitration agreement as written. Although a strain of jurisprudence supports the idea that courts may also refuse to enforce arbitration agreements if they "inherently conflict" with the statutory

right being vindicated, that line of reasoning has fallen out of favor with the Supreme Court and, even if it remained relevant, would not justify nullifying Golden's arbitration agreement.

### i.  *The Bankruptcy Code Does Not Prohibit the Arbitration of Claims Brought under 11 U.S.C. § 524.*

To the extent Golden resists Firstmark's election to arbitrate her claims, she bears the burden of "show[ing] that Congress intended to preclude a waiver of judicial remedies of the statutory rights at issue." *Shearson/American Express v. McMahon*, 482 U.S. 228, 227 (1987). Yet neither the text nor the legislative history of the Bankruptcy Code evince any intent to preclude arbitration. See *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473, U.S. 614, 628 (1985) ("We must assume that if Congress intended the substantive protection by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from the text or legislative history.") It is not enough to show that the Bankruptcy Code "further[s] important social policies," serves a "remedial and deterrent function," advances some "public interest," or involves complex factual and legal issues. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 27 (1991); *Mitsubishi Motors*, 473 U.S. at 633-34; *McMahon*, 482 U.S. at 232, 240. Instead, Congress must have expressed its intent to render a statutory claim non-arbitrable with a high degree of "clarity." *CompuCredit*, 565 U.S. at 103-04.

As the Federal Arbitration Act predates the modern Bankruptcy Code by more than a half century, Congress had ample opportunity to consider the interplay between the two statutes. See *Italian Colors*, 133 S. Ct. at 2308 (enforcing terms of arbitration agreement that barred class arbitration of antitrust claims where the relevant federal antitrust statutes "were enacted decades before the advent of Federal Rule of Civil Procedure 23," and neither antitrust statute "make[s] [any] mention of class actions"). Had Congress deemed it

appropriate, it could have simply clarified that claims arising under the Bankruptcy Code were non-arbitrable. However, Congress has remained completely silent on the arbitrability of claims arising under the Bankruptcy Code. Indeed, numerous courts have noted the absence of any such congressional command against arbitration from the Bankruptcy Code's text or legislative history. See *In re Touchstone Home Health LLC*, 572 B.R. 244, 273-74 (D. Colo. 2017); *Ackerman v. Eber*, 687 F.3d 1123, 1129 (9th Cir. 2012); *The Whiting-Turner Contracting Co. v. Elec. Mach. Enter., Inc.*, 479 F.3d 791, 796 (11th Cir. 2007); *Mintze v. Am. Gen. Fin. Servs., Inc.*, 434 F.3d 222, 231 (3d Cir. 2006). Given the dearth of evidence that Congress intended for Golden's § 524 claim to be non-arbitrable, the Court should enforce the arbitration agreement as written.

> ii. *The Supreme Court No Longer Conducts the "Inherent Conflict" Inquiry when Deciding Whether Claims Are Capable of Being Arbitrated and, Even if the Inquiry Applied, No Inherent Conflict Exists between the Bankruptcy Code and the Federal Arbitration Act.*

More than three decades ago, the Supreme Court suggested that Congress's intent to prohibit arbitration of certain statutory claims might nevertheless be inferred—even without a clear congressional command—if arbitration would create "an inherent conflict" with "the statute's underlying purpose." See *McMahon*, 482 U.S. at 227. The Supreme Court postulated that such an "inherent conflict" could arise in the rare instance where arbitration would be fundamentally "irreconcilable" with a particular statute. *Id.* at 239 (holding that neither "complexity" nor "public interest" were sufficient bases for rendering arbitration "irreconcilable" with RICO claims). Moreover, the Supreme Court has explained that an "inherent conflict" only exists where arbitration would prevent a claimant from "effectively vindicat[ing] their [statutory] claim." *Id.* at 242; see also *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28, 111 S. Ct. 1647 (1991) ("[S]o long as the prospective litigant effectively

may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function.") (quoting *Mitsubishi Motors*, 473 U.S. at 637).

In the three decades since, the Supreme Court has given short shrift to the "inherent conflict" inquiry, and has never recognized it as a basis for refusing to enforce an arbitration agreement. See, e.g., *Preston v. Ferrer*, 552 U.S. 436, 356, 128 S. Ct. 978 (2008) (concluding that "there is no inherent conflict between the [California Talent Agencies Act] and arbitration as a dispute resolution mechanism"); *Gilmer*, 500 U.S. at 30-33 (finding that, *inter alia*, "unequal bargaining power" between contracting parties and claimants' inability to pursue class actions in arbitration do not furnish a basis for refusing to compel arbitration). In fact, the Supreme Court appears to have wholesale abandoned the "inherent conflict" inquiry. For instance, Justice Scalia's majority opinion in *CompuCredit Corp. v. Greenwood*, which was joined by five other justices, looked exclusively to whether the Credit Repair Organization Act's express language or legislative history evinced a clear congressional intent to preclude arbitration. 565 U.S. at 100-03. Upon deciding that no such congressional intent could be discerned from the four corners of the statute's text or history, the majority's analysis abruptly concluded. *Id.* at 104 ("Because the CROA is silent on whether claims under the Act can proceed in an [arbitral] forum, the [Federal Arbitration Act] requires the arbitration agreement to be enforced according to its terms.") Justice Sotomayor was forced to write a concurrence, joined only by Justice Kagan, arguing that the "inherent conflict" inquiry—although not applicable to the facts of *CompuCredit*—remained valid. *Id.* at 109-110. Tellingly, just one year later in *American Express v. Italian Colors*, Justice Kagan's dissent

overlooked the "inherent conflict" inquiry altogether.[6] The inquiry has not been resuscitated by the Supreme Court in any subsequent cases.

Still, Firstmark is mindful that lower courts have clung to the "inherent conflict" rubric even as it became a relic of Supreme Court jurisprudence. See, e.g., *In re National Gypsym Co.*, 118 F.3d 1056, 1067-69 (5th Cir. 1997) (establishing a complex, multifaceted framework for determining the existence of an "inherent conflict" that first looks to whether "the underlying nature of the proceeding…derives exclusively from the provisions of the Bankruptcy Code" and, if so, whether policy considerations justified abrogating the arbitration agreement); see also *Belton v. Citigroup Inc.*, No. 15 CV 1934 (VB), 2015 U.S. Dist. LEXIS 144371, at *17 (S.D.N.Y. Oct. 14, 2015) (requiring a showing that arbitration would "necessarily" and "seriously" jeopardize the Bankruptcy Code's objectives in order to apply the "inherent conflict" exception to the Federal Arbitration Act). Firstmark respectfully posits that this approach—especially in the wake of *CompuCredit* and *Italian Colors*—is wrong. But even if the Court chooses to engage in the "inherent conflict" analysis, the same outcome should result because (1) Golden's ability to achieve a "fresh start" would not be at all impaired by arbitration, (2) Golden's First Amended Complaint, which purports to assert claims on behalf of a nationwide class of debtors, lacks the direct connection to her own bankruptcy case that would justify refusing to compel arbitration, and (3) the standard,

---

[6] Justice Kagan's dissent instead focused on whether a class action waiver incorporated into an otherwise-valid arbitration agreement could be enforced in light of the "effective vindication" exception to the Federal Arbitration Act. *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 133 S. Ct. 2304, 2313-20 (2013). The "effective vindication" exception applies, if ever, when an arbitration agreement actually impedes one's "*right to pursue*" certain statutory remedies, such as where "an arbitration forbid[s] the assertion of certain statutory rights" or "perhaps" where "filing and administrative fees attached to arbitration…are so high as to make access to the [arbitral] forum impracticable." *Id.* at 2310-11. As Golden's arbitration agreements do not in any way restrict her "right to pursue" any statutory remedies, the "effective vindication" exception is not at issue in this case.

uniform discharge order upon which Golden's claim is based does not require unique or special interpretation by the issuing court. See *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 109 (2d Cir. 2006) (identifying these three factors as relevant to the determination of whether an "inherent conflict" exists between arbitration and the Bankruptcy Code); see also *Williams v. Navient Solutions, LLC*, 564 B.R. 770 (S.D. Fla. 2017) (granting motion to compel arbitration of § 524 claim); *Belton*, 2015 U.S. Dist. LEXIS 144371 (same); *Bigelow v. Green Tree Financial Servicing Corp.*, No. CV-99-6655 REC/SMS, 2000 U.S. Dist. LEXIS 23598, at *14 (E.D. Cal. Nov. 30, 2000) (same).

First, arbitration would not impede Golden's ability to achieve a "fresh start" by enforcing the Court's discharge injunction. See *Hill*, 436 F.3d at 109-110 (noting that arbitration may be inappropriate where it would "interfere with or affect the distribution of the estate" or "an ongoing reorganization" in the midst of bankruptcy proceedings). The arbitration agreement expressly authorizes the arbitrator to hear any claims "based on any theory of law, any contract, statute, [or] regulation," as well as "any claim for injunctive or declaratory relief." (Exhibit A, p. 1) The arbitration agreement further provides that "[t]he arbitrator will have the power to award to a party any damages or other relief provided for under applicable law." (Exhibit A, p. 2) Thus, every claim and every accompanying category of relief sought by Golden remains available in arbitration. Golden's arbitration agreement cannot be disregarded simply because the discharge injunction safeguards debtors' right to a "fresh start," as "even claims arising under a statute designed to further important social policies may be arbitrated." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90, 121 S. Ct. 513 (2000). "So long as the prospective litigant effectively may vindicate [his or her]

statutory cause of action in the arbitral forum, the statute serves its functions." *Id.* (quoting *Gilmer*, 500 U.S. at 28) (internal quotation marks omitted).

Second, the fact that Golden has amended her Complaint to assert her § 524 claim on behalf of a nationwide class of debtors "tend[s] to show that the claim is not integral to her individual bankruptcy proceedings." *Credit One Fin. v. Anderson*, 553 B.R. 221, 233 (S.D.N.Y. 2016) (citing *Hill*, 436 F.3d at 110). "By tying her claim to a class of allegedly similarly situated individuals," presumably none of whom are still "in bankruptcy proceedings, she demonstrates the lack of close connection between the claim and her own underlying bankruptcy case." *Hill*, 436 F.3d at 110. That the claims asserted in Golden's First Amended Complaint lack a "close connection" to "her own underlying bankruptcy case" is further reinforced by her inclusion of a cause of action concerning a non-core matter (i.e., her allegation that Firstmark purportedly violated the FDCPA).[7] This glaring "lack of direct connection weigh[s] in favor of arbitration." *Anderson*, 553 B.R. at 233; see also *Belton*, No. 15-cv-1934-VB, 2015 U.S. Dist. LEXIS 144371, at *21 ("[B]ringing her claim as part of a putative class action underscored the fact that the claim was not 'integral' to her own bankruptcy case.").

Third, submitting Golden's § 524 claim to an arbitrator instead of a bankruptcy court does not jeopardize Golden's right to a "fresh start," because adjudication of Golden's claim will simply require the arbitrator to interpret and enforce statutory language. See *Hill*, 436 F.3d at 110. That is, the arbitrator will need to "interpret a federal statute incorporated" into the discharge order, rather than the "provisions of the discharge order itself." *Williams v.*

---

[7] It appears that in those cases where courts have refused to compel arbitration of § 524 claims—cases which Firstmark maintains were wrongly decided—the § 524 claims stood alone, unaccompanied by other, non-Bankruptcy Code statutory claims, as is the case here.

*Navient Solutions, LLC*, 564 B.R. 770, 783 (S.D. Fla. 2017). Specifically, the arbitrator must determine whether Firstmark violated the prohibitions of § 524 by employing any "process" or "act" to "collect, recover or offset" any debt that was discharged in bankruptcy. See 11 U.S.C. § 524(a)(2). In this respect, Golden's § 524 claim resembles the type of statutory debt collection claims routinely resolved in arbitration. See, e.g., *Shetiwy v. Midland Credit Mgmt.*, 959 F. Supp. 2d 469, 471-75 (S.D.N.Y. 2013) (granting motion to compel arbitration of FDCPA claims); *Hill*, 436 F.3d at 110 ("Arbitration is presumptively an appropriate and competent forum for federal statutory claims."). This factor also favors arbitration.

In light of the foregoing, the Court should grant Firstmark's Motion to Compel Arbitration whether or not it conducts the "inherent conflict" inquiry. And, even if such an "inherent conflict" theoretically exists, the Court should decline to exercise its discretion to refuse to compel arbitration, as the oft-cited considerations of centralizing bankruptcy proceedings and protecting parties from piecemeal litigation are not implicated here. Golden's bankruptcy case ended more than a year ago, and each claim Golden asserts in her First Amended Complaint is, ultimately, unique to each defendant. Accordingly, arbitration of Golden's § 524 claim is proper, and the Court should dismiss Golden's First Amended Complaint or, alternatively, stay this action pending arbitration. See 9 U.S.C. § 3.

### *iii.  Golden's FDCPA Claim Is Arbitrable.*

It is widely accepted that "the FDCPA is silent with regard to arbitration of claims brought under its auspices," and "the overwhelming majority of cases to consider the matter have, not surprisingly, compelled arbitration of FDCPA claims finding such claims not categorically exempt from the FAA's reach." *Brown v. Sklar-Markind*, Civ. No. 14-0266, 2014 U.S. Dist. LEXIS 157891, at *30 (W.D. Pa. Nov. 7, 2014); see also *Shetiwy*, 959 F. Supp. 2d at

475 (granting motion to compel FDCA claim); *Garrett v. Margolis, Pritzker, Epstein & Blatt, P.A.*, 861 F. Supp. 2d 725 (E.D. Va. 2012) (same); *Antkowiak v. Taxmasters*, 455 Fed. App'x 156 (3d Cir. 2011) (same); *O'Fallon v. Encore Receivable Mgmt., Inc.*, 466 F. App'x 325 (5th Cir. 2012) (same); *Hodson v. Javitch, Block & Rathbone, LLP*, 531 F. Supp. 2d 827, 831 (N.D. Ohio 2008) (same). As a result, the Court should similarly compel Golden to arbitrate her FDCPA claim and dismiss the First Amended Complaint or, alternatively, stay this action pending arbitration.

### 2.    Golden's Allegations Fall Short of Basic Pleading Standards.

The First Amended Complaint does not provide Firstmark with the basic information needed to investigate or respond to Golden's claims, as required by Fed. R. Civ. P. 8(a). *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007) (requiring that a complaint "give the defendant fair notice of what…the claim is and the grounds upon which it rests"). Save for a few conclusory allegations in Count Three of the First Amended Complaint, Golden does not establish any grounds for Firstmark's involvement in this action. Although Golden references a handful of loans she borrowed from the federal government, National Collegiate Trust, JP Morgan Chase, and Citibank, (ECF No. 32, ¶¶ 29, 37) she does *not* allege that Firstmark originated or serviced any of the loans at issue in this action.[8] The First Amended Complaint does not even address Firstmark until paragraph 78, where it baldly asserts that Firstmark "is a 'debt collector'" within the meaning of the FDCPA. It goes on—again, in unadorned fashion—to accuse Firstmark of "misrepresent[ing] the legal status and character of the Citibank Loan" and using "'deceptive and misleading' representations

---

[8] Golden's omission of any reference to Firstmark as a servicer of her student loans contrasts with her explicit contention that Pennsylvania Higher Education Assistance Agency d/b/a American Education Services ("AES") acts as the servicing agent with respect to the loan originated by National Collegiate Trust. (ECF No. 32, ¶ 31)

and 'unfair means' in collecting on the Debt."[9] (ECF No. 32, ¶¶ 83-84) These represent the sum total of Golden's allegations directed against Firstmark. The remainder of the First Amended Complaint relies on imprecise and impermissible collective pleading against "Defendants" as a group, despite the fact that they are almost entirely discrete and unrelated. See *Torres v. Countrywide Home Loans, Inc.*, No. CV08-4565-JFW (MANx), 2008 U.S. Dist. LEXIS 126973, at *7-8 (C.D. Cal. Oct. 17, 2008) ("Plaintiffs improperly lump diverse and unrelated defendants together and assert general claims against each group. Plaintiffs do not allege which specific defendants engaged in which type of wrongful conduct, even though each of Plaintiff's alleged claims arise out of materially different factual circumstances…").

Even setting aside fact that Firstmark's role in perpetrating the entire scheme alleged by Golden remains hazy at best, Golden also fails to adequately identify the underlying loans she believes were discharged in her bankruptcy. For example, Firstmark cannot ascertain which of the many student loans listed in Schedule F of Golden's bankruptcy petition constitutes the so-called Citibank Loan, which, apparently, is the only loan in this action that implicates Firstmark. In fact, Golden's Schedule F makes no mention of Citibank or GS2 2016-A (the trust into which Golden alleges the Citibank Loan was securitized). Golden's Schedule F does include two student loans purportedly owed to "Fm/Slfv Tru," and Golden lists Firstmark's address in connection with these loans, but she leaves Firstmark to guess which one, if either, is the mysterious Citibank Loan. (Bankr. Dkt. No. 1, p. 28) This confusion is exacerbated by the fact that the amounts Golden reported owing on these two student loans—$8,828 and $356.00, respectively—do not correspond with the $9,348 amount she

---

[9] Although it is capitalized in paragraph 84, the term "Debt" is nowhere defined in the First Amended Complaint. It appears that Golden may be using the term "Debt" interchangeably with the term "Citibank Loan," which, as discussed above, is also undefined and unclear.

claims to have borrowed from Citibank. (*Id.*) Without any clear idea from Golden concerning which precise student loans she believes were discharged, what capacity Firstmark served in connection with those allegedly discharged student loans, and how each of her student loans should be applied toward her "cost of attendance," it is impossible for Firstmark to mount a proper defense to any of Golden's claims.

### 3. Golden Waived Her Right to Participate in a Class Action.

Even if the Court does not compel arbitration of Golden's claims,[10] it should still enforce Golden's waiver of her right to participate in a class action. Golden's class action waiver—incorporated into the terms of her Master Student Loan Promissory Note— explicitly applies to both civil litigation and arbitration. Specifically, Golden's Master Student Loan Promissory Note provides: "Notwithstanding anything else that may be in this arbitration provision, no class action, private attorney general action or other representative action may be pursued in arbitration, *nor may such action be pursued in court if any party has elected arbitration*." (Exhibit A, p. 2) (emphasis added). The Master Student Loan Promissory Note includes this language under a section labeled, in boldface print, "**No consolidation or joinder of parties.**" (*Id.*) (emphasis in original)

As evidenced by Firstmark's concurrent Motion to Compel Arbitration, a "party has elected arbitration."[11] And, as set forth in greater detail in section III.1.a, *supra*, the causes of action asserted in Golden's First Amended Complaint constitute "Claims," as that term is defined by Golden's Master Student Loan Promissory Note. Further, Golden has not

---

[10] See *Spano v. V & J Nat'l Enters., LLC*, No. 16-CV-06419-EAW-MWP, 2017 U.S. Dist. LEXIS 139922, at *41 (W.D.N.Y. Aug. 30, 2017) (enforcing class action waiver contained in same agreement as arbitration clause, despite finding the arbitration provisions to be unenforceable).

[11] Golden's class action waiver anticipates that an election to arbitrate might be denied by the Court—it specifically reiterates that it remains applicable "in court." Thus, a denial of Firstmark's Motion to Compel should not invalidate the class action waiver.

attempted to invalidate her class action waivers. Therefore, the Court should enforce Golden's class action waivers according to their terms by dismissing and/or striking all of Golden's class allegations.

Recent Supreme Court jurisprudence mandates such a straightforward operation of Golden's class action waivers. See *Italian Colors*, 570 U.S. 228, 133 S. Ct. 2304, 2310 (2013). Nothing in the statutory text or legislative histories of the Bankruptcy Code or FDCPA suggests that Congress intended to preclude class action waivers, nor would the enforcement of Golden's class action waivers prevent her from "effectively vindicating" any of her purported statutory rights. See *id.* at 2310-12 (rejecting argument that "federal law secures a nonvwaivable opportunity to vindicate federal policies" via the class action device provided for by Fed. R. Civ. P. 23); see also *Williams v. Navient Sols., LLC*, 564 B.R. 770, 783 (Bankr. S.D. Fla. 2017) (enforcing class action waiver clause in putative class action arising under § 524 of the Bankruptcy Code); *Gates v. Northland Grp., Inc.*, No. 1:16-cv-01492-NLH-AMD, 2017 U.S. Dist. LEXIS 23884, at *6 (D.N.J. Feb. 21, 2017) (enforcing class action waiver clause in putative class action arising under the FDCPA); *Soucy v. Capital Mgmt. Servs., L.P.*, No. 14 C 5935, 2015 U.S. Dist. LEXIS 9991, at *15 (N.D. Ill. Jan. 29, 2015) (same). Thus, the Court should dismiss and/or strike all class allegations in the First Amended Complaint and, to the extent the Court allows any of Golden's claims to survive the instant motion, it should be on an individual basis only.

### 4. The Court Lacks Jurisdiction over Firstmark with Respect to Claims Asserted by Golden on Behalf of Debtors Whose Discharge Orders Were Entered by Bankruptcy Courts outside of this District.

Golden's nationwide class allegations are also precluded by the fact that, as a procedural matter, injunctions must be enforced by the issuing court. See, e.g., *Int'l Union,*

*United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) ("[C]ivil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct.") The obligatory nature of the discharge injunction—it is authorized by statute and is routinely entered at the conclusion of every bankruptcy case—does not exempt it from this rule. See *Wiliams v. Navient Solutions, LLC*, 564 B.R. 770, 783 (Bankr. S.D. Fla. 2017) ("The fact that the order of discharge is a form does not make it any less an order of this Court."). As the bankruptcy discharge only becomes effective upon the entry of a court-ordered injunction, each such injunction is unique to the issuing court. See generally 11 U.S.C. § 727(a)-(b) (instructing the court to affirmatively "grant the debtor a discharge" when it examines the facts and determines that certain factors exist, and providing that the discharge has force once entered). Further, the violation of a court-ordered injunction must be enforced, if at all, through a contempt proceeding. *In re Sharak*, 571 B.R. 13, 18 (Bankr. N.D.N.Y. 2017) ("A motion to enforce the discharge injunction under §§ 105(a) and 524(a)(2) is a stand-alone contempt proceeding."); *In re Haemmerle*, 529 B.R. 17, 25 (Bankr. E.D.N.Y. 2015) ("Although § 524 does not include an explicit mechanism to enforce this injunction, § 105 of the Bankruptcy Code has been widely accepted as providing statutory authority to enforce the discharge injunction by holding a party who violates the conjunction in contempt, and assessing appropriate punishment."); *Kalikow v. Solow*, 602 F.3d 82, 93 (2d Cir. 2010) (holding that a debtor cannot enforce a violation of the discharge injunction, which constitutes a "contested matter," through an adversary proceeding, and must instead request relief "by motion"); *Barrientos v. Wells Fargo Bank, N.A.*, 633 F.3d 1186, 1188 (9th Cir. 2011) (same). A party attempting to enforce a court-ordered injunction must use this exclusive procedural mechanism irrespective of the

type of relief sought. See 11 U.S.C. § 105(a) (authorizing bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code).

Here, Golden impermissibly seeks to pursue claims for alleged violations of both (1) the specific discharge injunction issued by this Court in her individual bankruptcy case and (2) every other discharge injunction issued against Firstmark (and the other defendants named in the First Amended Complaint) by every other bankruptcy court nationwide in unrelated debtor's bankruptcy cases. Allowing Golden to prosecute her § 524 claim on behalf of a nationwide class would ignore the rule which designates the "offended judge" as the one "solely responsible for identifying, prosecuting, adjudicating, and sanctioning" violations of court orders. See *Bagwell*, 512 U.S. at 831; see also *Beiter v. Chase Home Fin., LLC*, 554 B.R. 433, 439-440 (Bankr. S.D. Ohio 2016) (dismissing nationwide class action for alleged discharge injunction violation because "[a] contempt proceeding resulting form a violation of an order or injunction may only be maintained in the court that issued the order or injunction that was violated.").[12]

---

[12] Firstmark acknowledges a line of cases followed by, among others, Judge Drain of the United States Bankruptcy Court for the Southern District of New York. This line of cases treats enforcement of the discharge injunction as "not 'issuing court' specific." *Haynes v. Chase Bank USA, N.A.*, Nos. 11-23212 (RDD), 13-08370-rdd, 2014 Bankr. LEXIS 3111, at *21-25 (Bankr. S.D.N.Y. July 22, 2014) (citing *In re Baldwin-United Corp. Litigation*, 765 F.2d 343 (2d Cir. 1985)); *In re Cano*, 410 B.R. 506, 550-54 (Bankr. S.D. Tex. 2009). Instead, these cases look to the "fundamental difference between the normal injunction issued by a court after considering the factors required to be applied in issuing an injunction order and the injunction created by Congress in Section 524(a) to support the discharge under Section 727 of the Bankruptcy Code." *Haynes*, 2014 Bankr. LEXIS 3111, at *21. That is, unlike other "handcrafted" court orders and injunctions, "the bankruptcy discharge order is a form, a national form, which is issued in every case." *Id.* at *21-22. Judge Drain explained: "[A]lthough I review every order that comes before me, I make one exception, the discharge orders. Those are entered routinely on my behalf and on behalf of every judge in this district and I believe every judge in the nation." *Id.* at *22. Essentially, this line of cases views the bankruptcy discharge as a special type of "statutory injunction," the interpretation of which does not require any insight into the mental impressions of the judge who issued it. The Court should reject this logic, as it ignores the fundamental jurisdictional limits imposed by Article III. Moreover, by assuming that every judge will interpret the discharge injunction identically, these cases ignore a deep split among courts nationwide over what student loans are excluded from discharge pursuant to 11 U.S.C. § 523(a)(8)(A). See, e.g., *Essangui v. SLF V-2015 Tr.*, 573 B.R. 614, 621 (Bankr. D. Md. 2017) (discussing a "division among courts" over

### 5. Golden Cannot Obtain Damages for an Alleged Violation of the Discharge Injunction through the Instant Adversary Proceeding.

As part of her § 524 claim, Golden requests that Firstmark "be cited for civil contempt and ordered to pay damages." (ECF No. 29, ¶ 76) Rather than actually moving for contempt, Golden asserts her § 524 claim as part of the instant adversary proceeding. The relief Golden seeks is not available in this adversary proceeding. See *In re Sharak*, 571 B.R. at 18 ("A motion to enforce the discharge injunction under §§ 105(a) and 524(a)(2) is a stand-alone contempt proceeding."); *In re Haemmerle*, 529 B.R. at 25 ("Although § 524 does not include an explicit mechanism to enforce this injunction, § 105 of the Bankruptcy Code has been widely accepted as providing statutory authority to enforce the discharge injunction by holding a party who violates the conjunction in contempt, and assessing appropriate punishment."); *Kalikow v. Solow*, 602 F.3d at 93 (requiring a debtor to enforce a violation of the discharge injunction "by motion" for contempt, rather than by commencing an adversary proceeding). As a result, the Court should dismiss Golden's § 524 claim.

### 6. The Court's Discharge Order Lacks the Requisite Degree of Specificity to Support a Finding of Contempt Against Firstmark.

A court may only exercise its inherent power to hold a party in civil contempt if, among other things, the court order purportedly violated by the enjoined party was sufficiently "clear and unambiguous." *In re Chief Exec. Officers Clubs, Inc.*, 359 B.R. 527, 535

---

whether student loans constitute "educational benefits," and recognizing that a majority of the decisions "have taken a broad and somewhat liberal approach to interpreting the statutory language" which "basically includes any loan used at least in part for educational purposes—whether a public or private loan—within the purview of section 523(a)(8)."). However, to the extent the Court finds the rationale from *Haynes* persuasive, and to the extent it conducts the "inherent conflict" analysis in connection with Firstmark's Motion to Compel Arbitration, the Court should weigh the standard, uniform, statutory nature of the discharge injunction in favor of arbitration. See *Belton v. Citigroup Inc.*, No. 15 CV 1934 (VB), 2015 U.S. Dist. LEXIS 144371, at *22 (S.D.N.Y. Oct. 14, 2015) (explaining that arbitration of § 524 claims "would not necessarily or seriously jeopardize the goal of having bankruptcy courts enforce their own orders" because "the Bankruptcy Court is not uniquely able to interpret" the discharge order).

(Bankr. S.D.N.Y. 2007) (citing *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)).

An order is "clear and unambiguous" when it "enables the enjoined party to ascertain from

the four corners of the order precisely what acts are forbidden." *Id.* (quoting *Monsanto Co. v.*

*Haskel Trading, Inc.*, 13 F. Supp. 2d 349, 363 (E.D.N.Y. 1998)) (internal quotation marks

omitted). In other words, it must leave "no uncertainty in the minds of those to whom it was

addressed." *Hess v. N.J. Transit Rail Operations, Inc.*, 846 F.2d 114, 116 (2d Cir. 1988); see also

*Vehifax Corp. v. Georgilis (In re Tires R Us Ltd.)*, No. 1-11-50395-ess, 1-15-01007-ess, 2016

Bankr. LEXIS 2324, at *16 (Bankr. E.D.N.Y. June 17, 2016) (describing the movant's burden

to demonstrate an enjoined party's willful violation of "a clear and unequivocal court order").

Any doubts about whether an order is sufficiently "clear and unambiguous" must be

"resolved in favor of the alleged contemnor." *In re CPW Acquisition Corp.*, No. 08-14623 (AJG),

2010 Bankr. LEXIS 243, at *6-8 (Bankr. S.D.N.Y. Feb. 4, 2010). This is because "a contempt

order is a potent weapon that is inappropriate if there is a fair ground of doubt as to the

wrongfulness of the defendant's conduct." *Latino Officers Ass'n City of N.Y., Inc. v. City of N.Y.*,

558 F.3d 159, 164 (2d Cir. 2009) (quoting *Int'l Longshoremen's Ass'n v. Phila. Marine Trade*

*Ass'n*, 389 U.S. 64, 76, 88 S. Ct. 201 (1967) and *Cal. Artificial Stone Paving Co. v. Molitor*, 113

U.S. 609, 618, 5 S. Ct. 618 (1885)) (internal quotation marks omitted) (internal citations

omitted).

Clarity as to whether a debt has been discharged is especially necessary to support a

finding of contempt against a student loan servicer such as Firstmark, because it is axiomatic

that "[s]tudent loans are presumptively nondischargeable in bankruptcy." *Easterling v.*

*Collecto, Inc.*, 692 F.3d 229, 231 (2d Cir. 2012); see also *In re McKinnie*, 501 B.R. 344, 346

(Bankr. E.D. Mich. 2013) ("Because '[s]ection 523(a)(8) is self-activating, an educational loan

can be nondischargeable without a judicial determination on nondischargeability during the bankruptcy case.'") (quoting *Stone v. Vanderbilt Univ.*, 180 B.R. 499, 501 (Bankr. M.D. Tenn. 1995)). However, the discharge order entered by this Court in Golden's bankruptcy case was not "clear and unambiguous" with respect to the issue of whether the Citibank Loan fell within the scope of the discharge injunction. The "four corners" of that order did not reasonably enable Firstmark to ascertain whether it was prohibited form resuming servicing activities in connection with the Citibank Loan. See *Ellis v. Dunn*, 324 B.R. 175, 180 (D. Mass. 2005) ("If it is not clear whether the debtor's discharge affected a particular debt or a particular creditor, actual knowledge simply of the existence of that order by itself may not be sufficient to presume a deliberate violation of that order."); *In re Azevedo*, 506 B.R. 277, 285-87 (Bankr. E.D. Cal. 2014) (denying motion for contempt where creditor, despite being aware of the fact that a discharge order had been entered, did not know or understand that a particular debt was encompassed by that order). Instead of containing the type of clear, unambiguous, and unequivocal language ordinarily needed to sustain a finding of contempt, the discharge order in Golden's bankruptcy case was imprecise and equivocal, as it relied heavily on the use of caveats and qualifiers. For example, the discharger order warned that "[m]ost, but not all, types of debts are discharged," but also assured that "[d]ebts for most student loans" constitute one "of the common types of debts which are <u>not</u> discharged in a chapter 7 bankruptcy case." (Bankr. Dkt. No.  17, p. 2) (emphasis in original) The discharge order concludes with a disclaimer that proves Firstmark's point: "This information is only a general summary of the bankruptcy discharge. There are exceptions to these general rules. Because the law is complicated, you may want to consult an attorney to determine the exact effect of the discharge in this case." (*Id.*)

In the First Amended Complaint, Golden seems to agree that the discharge order was not "clear and unambiguous." For example, Golden recognizes "the confusion that could exist even for sophisticated parties with regard to the dischargeability of private student loans." (ECF No. 32, ¶ 26) She even concedes that, without "a judicial determination on this question," Firstmark lacked any notice (whether actual or constructive) that the Citibank Loan was supposedly discharged, and in fact asserts that Firstmark "**had no way of knowing** whether" the Citibank Loan had been discharged. (ECF No. 32, ¶ 84) (emphasis added) Furthermore, by affirmatively seeking a determination as to the dischargeability of her student loans (including the Citibank Loan), Golden implicitly acknowledges that, even today, she herself does not consider the discharge order to be "clear and unambiguous"; if it were, such a determination by the Court would be unnecessary. It follows that Firstmark cannot be held in contempt for violating the discharge injunction, because the discharge order was not "clear and unambiguous."[13]

### 7. Golden Fails to Plausibly Allege that Firstmark Is a "Debt Collector" Subject to the FDCPA.

The FDCPA regulates the conduct of debt collectors. *Papetti v. Doe*, No. 16-2582-cv, 2017 U.S. App. LEXIS 9165, at *5 (2d Cir. May 26, 2017). Accordingly, under the FDCPA, a complaint must allege sufficient facts to plausibly show, among other things, that the defendant is a "debt collector" within the meaning of the FDCPA. See *Schuh v. Druckman & Sinel, L.L.P.*, 751 F. Supp. 2d 542, 548 (S.D.N.Y. 2010); *Ferrante v. Law Offices of Lewisohn &*

---

[13] Firstmark does not intend to argue that the standard discharge order—which follows a "national form" and "is not a handcrafted order," *Haynes v. Chase Bank USA, N.A.*, Nos. 11-23212 (RDD), 13-08370- rdd, 2014 Bankr. LEXIS 3111, at *21-22 (Bankr. S.D.N.Y. July 22, 2014), is always insufficiently "clear and unambiguous" regardless of circumstance. Rather, Firstmark's argument addresses the narrow circumstances presented in this specific case, especially in light of the novel legal theory advanced by Golden.

*Lewisohn*, No. 15-cv-5473(SJF)(SIL), 2016 U.S. Dist. LEXIS 92956, at *7 (E.D.N.Y. July 15, 2016). Golden's Amended Complaint fails to plausibly allege that Firstmark is a debt collector as defined by the FDCPA.

The FDCPA defines a "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a(6). Importantly, the FDCPA excludes from the definition of debt collector "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person."  15 U.S.C. § 1692a(6)(F)(iii).

Consistent with this exclusion found in § 1692a(6)(F)(iii), courts regularly recognize that loan servicers are not debt collectors.  See, e.g., *Pascal v. JP Morgan Chase Bank, Nat'l Ass'n*, No. 09-CV-10082 (ER), 2013 U.S. Dist. LEXIS 33350, at *9 (S.D.N.Y. Mar. 11, 2013) ("Mortgage servicers are therefore not covered by the FDCPA if the debt at issue was acquired before a customer default. That is, the FDCPA only covers servicers who obtain a mortgage that is *already* in default."); *Zirogiannis v. Seterus, Inc.*, 221 F. Supp. 3d 292, 303 (E.D.N.Y. 2016) (granting motion to dismiss where plaintiff's complaint failed to specifically allege that defendant "began servicing his loan when it was in default"); *Somlar v. Nelnet Inc.*, No. 4:16-cv-01037-AGF, 2017 U.S. Dist. LEXIS 719, at *6 (E.D. Mo. Jan. 4, 2017) ("a defendant is not a debt collector if the defendant is servicing, rather than collecting, the plaintiff's debt"). The exclusion of loan servicers from the FDCPA also finds support from the legislative history of § 1692a(6), which provides that "[t]he primary persons intended to be covered

are independent debt collectors," not "mortgage service companies and others who service outstanding debts for others, so long as the debts were not in default when taken for servicing." S. Rep. No. 95-382, 95th Cong., 1st Sess. (1977), reprinted in 1977 U.S.C.C.A.N. 1965, 1697-98, 1977 WL 16047. "Under this so-called default exception [in § 1692a(6)(F)(iii)], courts have consistently held that agencies such as Sallie Mae that are involved in the administration and servicing of student loans are 'not debt collectors.'" *Mondonedo v. Sallie Mae, Inc.*, No. 07-4059, 2009 U.S. Dist. LEXIS 25497, at *3 (D. Kan. March 25, 2009) (citations in footnote omitted).

In her First Amended Complaint, Golden fails to allege facts sufficient to show that Firstmark, a student loan servicer, qualifies as a "debt collector" within the meaning of the FDCPA. Golden does not allege, for instance, her debt was in default at the time Firstmark obtained it for servicing. *Zirogiannis*, 221 F. Supp. at 302-03 (indicating that, in order to state a claim against a servicer under the FDCPA, a plaintiff must explicitly allege that the debt was in default at the time the servicer obtained it and, furthermore, may even need to allege facts supporting the characterization of the debt as in default); *Lacey v. Ocwen Loan Servicing, LLC*, No. 6:13-cv-1418-EFM-KMH, 2014 U.S. Dist. LEXIS 86093, at *7-8 (D. Kan. June 25, 2014) ("As servicers of the note, Ocwen and GMAC are not 'debt collectors' unless they acquired the note when it was in default. Here, Plaintiff fails to allege that Ocwen or GMAC acquired the loan after it was in default....The FDCPA claim must be dismissed."). Golden's mere legal conclusion, offered as factual assertion, that Fisrtmark is a "debt collector" (Doc. 32, ¶ 78) is simply insufficient. See *Zirogiannis*, 221 F. Supp. at 302-03; *Briggs v. Wells Fargo Bank, N.A.*, No. 14-CV-1759 (RRM) (JMA), 2015 U.S. Dist. LEXIS 28145, at *14 (E.D.N.Y. Mar. 6, 2015) ("While Briggs offers a conclusory allegation that Wells Fargo is a debt collector in his

complaint, he sets forth no specific facts to support this conclusion."); *Crippen v. Stites*, 346 B.R. 115, 118 (Bankr. E.D. Pa. 2006) (dismissing complaint that relied on "bald assertions" of defendant's status as a debt collector); *Williams v. Citibank, N.A.*, 565 F. Supp. 2d 523, 530 (S.D.N.Y. 2008) ("Plaintiff's Amended Complaint does not allege facts indicating that either defendant was a 'debt collector' subject to the FDCPA, as is necessary to state a claim."). Accordingly, because Golden fails to adequately allege that Firstmark is a "debt collector," the Court should dismiss her FDCPA claim.

### 8. Alternatively, Golden Fails to Plead Sufficient Facts to Demonstrate that Firstmark Committed a Violation of the FDCPA.

Even if Golden had adequately alleged that Firstmark qualified as a "debt collector," her FDCPA claim would still warrant dismissal because the First Amended Complaint fails to plausibly allege any facts supporting the conclusion that Firstmark committed a statutory violation. For example, Golden asserts that Firstmark "fraudulently informed" her that the Citibank Loan was "not discharged and demanded payment and accepted payment." (ECF No. 32, ¶ 44) Golden also alleges that Firstmark "used 'deceptive and misleading' representations and 'unfair means' in collecting on" the disputed debt by "representing...that the Citibank Loan had not been discharged." (ECF No. 32, ¶ 84)  She contends that Firstmark "misrepresented the legal status and character of the Citibank Loan as a non-dischargeable student loan in order to induce payment after the entry of discharge." (ECF No. 32, ¶ 84) Yet, Golden fails to provide any details regarding the circumstances constituting the purported fraud. Specifically, Golden does not identify any of the following: (1) the time or date on which Firstmark made the allegedly fraudulent statements; (2) the mode of communication

used by Firstmark to transmit the allegedly fraudulent statements;[14] or (3) the specific content of Firstmark's allegedly fraudulent statements. By omitting such basic information, Golden fails to state a facially plausible claim under the FDCPA, much less a claim backed by the requisite degree of "particularity." See *Kupferstein v. RCS Ctr. Corp.*, No. 03-CV-1497, 2004 U.S. Dist. LEXIS 26016, at *5 (E.D.N.Y. Aug. 11, 2004) (imposing heightened pleading standard of Fed. R. Civ. P. 9(b) where FDCPA claim is premised on allegations of "false representations and deceptive means"); *Grigoriou v. First Resolution Inv. Corp.*, No. 13-CV-6008 CJS, 2014 U.S. Dist. LEXIS 41288, at *19 n. 15 (W.D.N.Y. Mar. 26, 2014) (dismissing FDCPA claim arising under § 1692e(2)(a) where, among other defects, the complaint failed to plead the "exact contents" of the purportedly false and deceptive letter with "particularity"); *Boyd v. J.E. Robert Co.*, No. 05-CV-2455 (KAM) (RER), 2010 U.S. Dist. LEXIS 140905, at *16-17 (E.D.N.Y. Mar. 31, 2010) (analyzing an FDCPA claim and requiring the plaintiff to "adequately specify the statements it claims were false or misleading" by "giv[ing] particulars as to the respect in which plaintiff contends the statements were fraudulent, stat[ing] when and where the statements were made, and identify[ing] those responsible for the statements"). Moreover, Golden never alleges when Firstmark purportedly committed any FDCPA violations, preventing Firstmark from determining whether her FDCPA claim is barred by the applicable one-year limitations period. See 15 U.S.C. § 1692k(d); see also *Burdett v. Harrah's Kan. Casino Corp.*, 260 F. Supp. 2d 1109, 1119 (D. Kan. 2003) (ordering plaintiff to file an amended complaint "specifically identif[ying] each FDCPA violation, the

---

[14] Elsewhere in the First Amended Complaint, Golden alleges that Firstmark used "dunning letters, emails, text messages, and phone calls" to recover the disputed debt. (ECF No. 32, ¶¶ 53, 75) However, this allegation bears no relationship to Golden's allegations of fraud, deception, and/or misrepresentation. According to Golden, Firstmark used "dunning letters, emails, text messages, and phone calls" for the purpose of recovering the disputed debt, *not* for transmitting any fraudulent or deceptive statements.

party who committed the violation, and the date of the violation"). For these reasons, in addition to Golden's failure to plead that Firstmark is a "debt collector," the Court should dismiss Golden's FDCPA claim.

**IV.    CONCLUSION**

For the reasons set forth above, the Court should compel arbitration of all claims asserted by Golden in the First Amended Complaint, dismiss this entire action with prejudice or, alternatively, stay this action pending arbitration. In the alternative, the Court should dismiss Golden's First Amended Complaint in its entirety with prejudice for failure to state a claim, and should order such further relief as the Court deems just, necessary, and proper.

Dated:    December 8, 2017                **THE SENIAWSKI LAW FIRM PLLC**

By:    _/s/Barbara L. Seniawski_
Barbara L. Seniawski
1460 Broadway FL 4
New York, New York 10036
Tel. 212-595-4536
Fax. 917-591-4692
Email: barbara@seniawskilaw.com
*Attorney for Defendant Firstmark Services*

# EXHIBIT A

## Master Student Loan Promissory Note / Borrower's Copy                                           25136

The words "I", "me", "my", "us" and "mine" mean the Borrower (the student-applicant) and co-signer (the guarantor), except where otherwise indicated. The words "you", "your", and "yours" mean Citibank, N.A., its successors, and assigns including any insurance company acquiring this Master Student Loan Promissory Note ("Note") by payment of an insurance claim.

For the purpose of determining my eligibility for credit, I authorize Citibank, N.A. (the Bank), its agents, and assigns to gather credit information about me and to give information about my application to others in accordance with applicable laws. I understand that you normally obtain credit reports for all loan applicants and cosigners. Upon my request, you will inform me if a report has been obtained and will give me the name and address of the agency furnishing the report. I understand that future reports may be ordered on me in connection with any review, renewal or extension of credit under this Note without further notice to me. I authorize my school to receive, provide, and confirm information regarding my attendance, financial aid, and enrollment status during the term of this Note. I understand that the proceeds of the initial or any subsequent Loan, if approved, must be used for educational purposes and that disbursements will be sent to my School on my behalf by check or electronic funds transfer.

**DEFINITIONS - "Academic Year"** is the period of time, not to exceed 12 consecutive months, which your school defines as its "Academic Year".

**The "Disbursement Date"** is the date or dates, as noted on the check or Electronic Funds Transfer (EFT) record, on which you lend money in consideration for my promise to repay you according to the terms of this Note. It will be the date a Loan, or any part of it, is advanced to me or to my school on my behalf.

**"Note"** means, collectively, this Master Student Loan Promissory Note, each and every application or request for credit under the Master Student Loan Promissory Note, Conditional Approval Letter, and disclosures relating to the credit received by me under the Master Student Loan Promissory Note, unless specifically excluded.

The **"Interim Period"** is a time period which begins on the first Disbursement Date and ends six months after I graduate or cease to be enrolled at least part time at an approved school. The Interim Period will never exceed ten (10) years plus six (6) months for undergraduate study and four (4) years plus six (6) months for graduate study.

**"Loan" or "Loan(s)"** means the principal sum(s) disbursed during a standard academic year plus accrued interest and fees and other charges, if any, due on such disbursed sums.

**"Loan Fee(s)"** means a guaranty fee that you may charge me to compensate you against the risk of default. The terms of my Loan, as set forth in a Conditional Approval Letter, will specify whether the Loan Fee is to be charged to me or my Loan balance upon approval of a Loan, upon disbursement of an advance made under any Loan, at the commencement of the repayment phase, or at some other time. This fee may be added to the principal amount of any Loan(s).

The **"Repayment Period"** is a time period which begins on the date the Interim Period ends. The **"Standard Repayment Period"** is a period of 240 months.

The **"Total Loan Amount"** is the aggregate amount of all disbursements and advances made by you on all Loans subject to the terms of this Note.

References to **"School"** mean the educational or academic institution which you attend, or plan to attend and in connection which you have sought a Loan or Loans from us to defray your educational costs.

**PROMISE TO PAY** - I promise to pay to Citibank, N.A., its successors, assigns, and any other holder of this Note all sums disbursed under the terms of this Master Student Loan Promissory Note, together with interest at the rate(s) provided in the Note, late payment charges, Loan Fees and any other fees or charges owed under the terms of this Note, including any allowable reasonable attorneys fees and other costs you incur in collecting amounts owed on this Note, all according to the terms of this Note. I will not sign the application before reading this Note even if otherwise advised. The terms and conditions set forth in the Note constitute the entire agreement between you and me. I am entitled to an exact copy of this Note. My signature certifies that I read, understand, and agree to the terms of this Note.

I understand and agree that you may make multiple Loans under this Note during the course of my attendance at one or more Schools, and I agree that each such Loan (which may consist of one or more advances or disbursements to my School) will be subject to the terms of this Note. I further understand that individual Loan(s) may have different Loan Fees and Variable Rates as disclosed in the "Interest" section below and/or the Conditional Approval Letter to be sent with respect to each such Loan. I understand that the terms of any Conditional Approval Letter sent to me with respect to a Loan are incorporated by reference into this Note.

I agree that no subsequent Loans will be made under this Note after the earliest of the following dates: (i) the date you receive my written notice that no further Loans may be disbursed under this Note; (ii) one year after the date of my signature on this Note if no disbursement is made during such twelve month period; or (iii) five years after the date of my signature on this Note.

**LOAN AMOUNT DISCLOSURE STATEMENT** - You have the right not to make a Loan or to lend me an amount less than the amount that I requested. I agree that the number of disbursements with respect to an individual Loan will be limited to one per term and four per Academic Year. You will send me a disclosure statement telling me the amount of any disbursement(s) and other information including any separate notices to co-signer required by applicable law. I will review the disclosure statement and other documents upon receiving them and will contact you if I have any questions.

My obligation to repay amounts advanced for my benefit occurs upon my receipt, or my School's receipt on my behalf, of funds disbursed by you, or a disbursement of the amount of any Loan Fee that I may owe you under any Loan.

**BORROWER'S RIGHT TO CANCEL** - If I am not satisfied with the terms of my Loan as approved, I may cancel any Loan and any disbursements. To cancel any disbursement under this Note, I must contact you in writing within 15 days of receiving the disclosure statement or co-signer notice, notify my School, not endorse any Loan check, and ensure that any Loan

disbursements are returned to you. Cancellation of a disbursement does not alter my obligation to repay amounts advanced to me or to my School on my behalf or to terminate this Note with respect to prior Loans. I understand that I may also cancel or reduce the size of any disbursement by informing you in writing within 15 days of receiving the approval letter, disclosure statement or any subsequent disbursement. I may also cancel any Loan by informing you in writing within 15 days of receiving the Conditional Approval Letter, disclosure statement or any subsequent disbursement and by arranging for all disbursements to be returned to you.

If all or any portion of any Loan funds disbursed are returned to you by the School or me within 30 days of the Disbursement Date, you will charge no interest or charges on the funds returned. I understand that if a Loan is canceled, I will have to reapply to obtain a new Loan.

I also fully understand that failure to complete the education program undertaken by me, as the Borrower, does not relieve me of any obligation on this Note.

**INTEREST** - Interest on each Loan under the Note will be calculated at the Variable Rate (as defined below) beginning on the first Disbursement Date on the principal balance advanced and on any unpaid interest added to principal according to the Terms of Repayment below until the Note is paid in full. Interest will be calculated based on the actual calendar days in any year and upon the actual number of calendar days from the Disbursement Date until the Note is paid in full.

The "Variable Rate" for each Loan made under the Note is the sum of the Prime Rate published in The Wall Street Journal under the "Money Rates" section for the day which is 30 days prior to the first day of January, April, July and October of each year (the "Index") plus or minus the percentage, as identified on the applicable Conditional Approval Letter that I received in connection with the Loan, which is hereby incorporated into this Note, per annum (the "Margin"), rounded to the nearest hundredth (.04%), but in no event greater than the maximum allowed by law. The Variable Rate will change quarterly on the first day of January, April, July, and October of each year (each a "Change Date"). For example, the Variable Rate for any January Change Date will be determined by using the Index published in The Wall Street Journal for the preceding December 2nd. If The Wall Street Journal is not published or the Index is not given, then the Index will be determined by using the immediately preceding published Index. In the event that more than one Prime Rate is published, the Index will be the highest rate published. If the Index ceases to be available, you will choose a comparable Index.

I understand that the total interest due on the Note will be the aggregate amount of the interest due on each Loan made under the Note.

**TERMS OF REPAYMENT** - I may, but am not required to make payments during the Interim Period. If I choose to make voluntary payments during this period, I understand that all interest must be paid before the principal can be reduced.

You will add all unpaid interest to the principal balance of each Loan at the end of the Interim Period. During the Interim Period, you will send account statements on my Loan(s) at least quarterly to me. During my Repayment Period, I will make consecutive monthly payments based on the amounts and on the due dates shown on my monthly statements. I understand that as the Variable Rate on my Loan(s) adjusts, the monthly payment amount may increase or decrease or the number of scheduled payments may increase or decrease to be sufficient to fully repay all of the principal, interest, and other charges which are owed on this Note within the remaining repayment term. I understand that I will receive one billing statement which will separately identify and include all Loans made to me under the Note.

Before the beginning of the Repayment Period I may receive a notice allowing me to choose from alternative repayment options. My choice will dictate the amount of the monthly payments and the timing of periodic changes in the monthly payment amount. If I do not return this notice to you, I will be billed throughout the Repayment Period using the Standard Repayment Period. Regardless of the Total Loan Amount the monthly payment will never be less than $50, (unless the amount owed under this Note is less than $50). In addition, if I have other loans payable to you under other notes, my total monthly payment for all of my loans to you, including any Loan made under this Note, will never be less than $50 (unless the amount owed under all of my loans is less than $50).

If any portion of a monthly payment remains unpaid for a period of more than 10 days after the due date, you may charge and I will pay a late payment charge of up to 5% per delinquent payment, but never more than the maximum amount allowed by law. I will pay only one late payment charge per monthly payment regardless of the number of days it is late.

Loan payments will be applied first to charges, next to unpaid interest, and then to principal. I have the right to repay all or any part of any Loan subject to this Note at any time without penalty. If I have more than one Loan and do not provide instructions as to which Loan a prepayment is to be applied, you may determine how to apply it at your discretion.

If I am unable to repay my Loan(s) according to the terms of the Note, I may request that you modify the terms of repayment. I understand that such modification will be at your discretion and that if such modification results in a postponement or forbearance of payments for any period, interest will continue to accumulate during that period. Any unpaid interest at the end of the forbearance period will be added to the principal balance of my Loan(s). My obligation to repay all Loans made under this Note will remain in force even if I become totally and permanently disabled or die.

I may prepay my Loan(s) at any time without penalty.

**PRIVACY** - You will give me notice of your policies regarding the disclosure of nonpublic information regarding me to your affiliates and unrelated third parties and I will give the right to restrict such disclosures as provided by law. I authorize you and any school I attend to transfer such information as may be necessary to complete and reconcile the disbursement of proceeds, maintain accurate account records, and certify my continuing enrollment status.

I must update the information on my application whenever you ask me to do so. I authorize you to furnish information about any Loan made under this Note to consumer reporting agencies and to others legally allowed to receive such information. I authorize you to obtain credit information about me, now and in the future, for any legitimate purpose associated with the

application or any Loan. If my application is declined, you will send an adverse action notice, which may include specific reasons, to me, as required by applicable law. I understand that if I default on my Loan(s), disclosure of information about my loan to consumer reporting agencies may adversely affect my credit rating.

For the purpose of learning my current address and telephone number, I authorize you to release information and make inquiries to the individuals I have listed on my application.

**DEFAULT** - To the extent permitted by law, I will be in default and you will have the right to give me notice that the whole outstanding principal balance, accrued interest and all other amounts due to you under the terms of the Note are due and payable at once, subject to any law which may give me the right to cure my default, if (i) I fail to make my monthly payment to you when due, (2) I fail to notify you of a change in my name, address, or school enrollment status within 30 days after a change occurs, (3) I break any of my other promises in this Note, (4) any bankruptcy proceeding is begun by or against me, (5) if I assign any of my assets for the benefit of my creditors, (6) I make any false written statement in applying for this loan or in any communication concerning this loan, (7) I fail to remit to you any proceeds of any loan made to you, or (8) I default under the terms of any other loan made by you to me.

In the event of my death, you may cancel any remaining (future) disbursements, and the Interim Period immediately in the case of the Borrower's death, and make a claim against the estate of the decedent for payment of the amount due on the Note, whether in repayment or not, without releasing the surviving Borrower or co-signer from obligations on the Note, subject to any law subject to this Note.

If I default under any Loan subject to this Note, I will be required to pay interest at the contract rate(s) provided for said Loan(s) which accumulates after default according to the terms of this Note. The interest rate after default or after notice of demand for payment in full will be subject to adjustment in the same manner as prior to the default. If I default, I will also be responsible to pay reasonable collection costs, including reasonable attorney's charges, court costs and collection charges to the extent allowed by law.

**Notice:** The following "Notice" is provided to you under federal law to warn you of the negative impact that your defaulting on your obligations under this Note may have on your credit rating.

We may report information about your Loan(s) and this Note to credit bureaus. Late payments, missed payments, or other defaults on your Loan(s) may be reflected in your credit report.

**INSURANCE; ASSIGNMENT OF NOTE** - I understand that you may obtain insurance to insure payment of any Loan made under this Note upon default. If any insurance company, its subsidiaries, or assignees are required under any insurance agreement to repay any and all Loans subject to this Note, such company will become the holder of this Note and will have all the rights of the original lender to enforce this Note.

**ARBITRATION OF DISPUTES** - PLEASE READ THIS ARBITRATION PROVISION CAREFULLY. IT PROVIDES THAT EITHER YOU OR I CAN REQUIRE THAT ANY CONTROVERSY OR DISPUTE BE RESOLVED BY BINDING ARBITRATION (EXCEPT FOR MATTERS THAT ARE EXCLUDED FROM ARBITRATION AS SPECIFIED BELOW). ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. IN ARBITRATION, A DISPUTE IS RESOLVED BY A NEUTRAL ARBITRATOR INSTEAD OF A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN RULES APPLICABLE IN COURT.

**Definitions.** As used in this arbitration provision, the following definitions will apply:

- "Claim" means any case, controversy, dispute, tort, disagreement, lawsuit or claim now or hereafter existing between you and me arising out of or in connection with my loan.

- "Account" means any agreement with you as evidenced by the loan application and Note along with any and all records or transactions related thereto.

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the loan application and Note, you and I further agree as follows:

**Agreement to arbitrate:** You and I agree that either you or I may, without the other's consent, require that any Claims between you and me be submitted to mandatory, binding arbitration except for certain matters excluded below. This arbitration provision is made pursuant to a transaction involving interstate commerce, and shall be governed by, and enforceable under, the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ et seq., and (to the extent State law is applicable), the State law governing this transaction.

**Claims subject to Arbitration include, but are not limited to:**

- Claims relating to: 1) any and all aspects of my Account including without limitation the origination, establishment, terms, treatment, operation, handling, billing, servicing, limitations on or termination or acceleration of my Account; 2) any disclosures or statements relating to my Account; 3) the application, enforceability or interpretation of my Account, including this arbitration provision. Any questions about what Claims are subject to arbitration shall be resolved by interpreting this arbitration provision in the broadest way the law will allow it to be enforced.

- Claims made directly by me as well as Claims made by anyone connected with me or claiming through me, such as a co-applicant or co-signer on my Account, my agent, representative or heirs, or a trustee in bankruptcy. Similarly, Claims subject to arbitration include not only Claims that relate directly to you, a parent company, affiliated company and any predecessors and successors and assigns (and the employees, officers and directors of all of these entities), but also Claims for which you may be directly or indirectly liable, even if you are not properly named at the time the Claim is made.

- Claims based on any theory of law, any contract, statute, regulation, ordinance, tort (including fraud or any intentional tort), common law, constitutional provision, respondeat superior, agency or other doctrine concerning liability for other persons, custom or course of dealing or any other legal or equitable ground (including any claim for injunctive or declaratory relief).

- Claims that arise in the past, or arise in the present or future. Claims are subject to arbitration whether they are made independently of with other claims in proceedings involving you, me or others.

• Claims are made as counterclaims, cross-claims, third-party claims, interpleaders or otherwise, and a party who initiates a proceeding in court may elect arbitration with respect to any Claim(s) advanced in the lawsuit by any other party or parties.

• Claims made as part of a class action or other representative action, and the arbitration of such Claims must proceed on an individual (non-class, non-representative) basis. If you or I require arbitration of a particular Claim, neither you, me, nor any other person may pursue the Claim in any litigation, whether as a class action, private attorney general action, other representative action or otherwise.

**Claims Excluded from Arbitration:**

• Any Claims if they are filed by you or me in a small claims court, so long as the matter remains in such court and advances only an individual (non-class, non-representative) basis.

**Initiation of Arbitration:** The party filing an arbitration must choose one of the following three administrators ("Arbitration Administrators"); National Arbitration Forum; American Arbitration Association; or JAMS. These Arbitration Administrators are independent from you, and you and I must follow their rules and procedures for initiating and pursuing an arbitration. If I initiate the arbitration, I must also notify you in writing at the address listed on my most recent billing statement. If you initiate the arbitration, you must notify me in writing at my then current billing address or (if my Account is closed) the last address at which you contacted me. Any arbitration hearing that I attend will be held at a place chosen by the arbitrator or Arbitration Administrator in the same county wherein the U.S. District Court for my District is located or at some other place to which you and I agree in writing. You and I may obtain copies of the current rules of each of the three Arbitration Administrators named above, and other related materials, including forms and instructions for initiating an arbitration, by contacting the Arbitration Administrators. I may contact you for the current telephone numbers and addresses of the Arbitration Administrators.

**Procedures and law applicable in arbitration:** A single, neutral arbitrator will resolve Claims. The arbitrator will either be a lawyer with at least ten years experience or a retired or former judge. The arbitrator will be selected in accordance with the rules of the arbitration administrator. The arbitration will be conducted under the applicable procedures and rules of the arbitration administrator that are in effect on the date the arbitration is filed unless this arbitration provision is inconsistent with those procedures and rules, in which case this Agreement will prevail. These procedures and rules may limit the amount of discovery available to you or me. The arbitrator will apply applicable substantive law consistent with the FAA and applicable statutes of limitations, and will honor claims of privilege recognized at law. I may choose to have a hearing and be represented by counsel. The arbitrator will take reasonable steps to protect customer Account information and other confidential information, including the use of protective orders to prohibit disclosure of the arbitration, if requested to do so by you or me. The arbitrator will have the power to award to a party any damages or other relief provided for under applicable law, and will not have the power to award relief to, against, or for the benefit of, any person who is not a party to the proceeding. The arbitrator will make any award in writing but need not provide a statement of reasons unless requested by a party. Upon a request by you or me, the arbitrator will provide a brief statement of the reasons for the award.

**Costs:** If you file the arbitration, you will pay the initial filing fee. If I file the arbitration, I will pay the initial filing fee unless I seek and qualify for a fee waiver under the applicable rules of the Arbitration Administrator. You will reimburse me for the initial filing fee if I paid it and I prevail. If there is a hearing, you will pay any fees of the arbitrator and Arbitration Administrator for the first day of that hearing. All other fees will be allocated in keeping with the rules of the Arbitration Administrator and applicable law. However, you will advance or reimburse filing fees and other fees if the Arbitration Administrator or arbitrator determines there is good reason for requiring you to do so, or I ask you and you determine there is good cause for doing so. Each party will bear the expense of that party's attorneys, experts, and witnesses, and other expenses, regardless of which party prevails, except that the arbitrator shall apply any applicable law in determining whether a party should recover any or all expenses from another party.

**No consolidation or joinder of parties:** All parties to the arbitration must be individually named. Claims by persons other than individually named parties shall not be raised or determined. Notwithstanding anything else that may be in this arbitration provision, no class action, private attorney general action or other representative action may be pursued in arbitration, nor may such action be pursued in court if any party has elected arbitration. Unless consented to by all parties to the arbitration, Claims of two or more persons may not be joined, consolidated or otherwise brought together in the same arbitration (unless those persons are applicants, co-applicants on a single Account and/or related Accounts or parties to a single transaction or related transactions); this is so whether or not the Claims (or any interest in the Claims) may have been assigned.

**Enforcement, finality, appeals:** You or I may bring an action, including a summary or expedited motion, to compel arbitration of Claims subject to arbitration, or to stay the litigation of any Claims pending arbitration, in any court having jurisdiction. Such action may be brought at any time, even if any such Claims are part of a lawsuit, unless a trial has begun or a final judgment has been entered. Failure or forbearance to enforce this arbitration provision at any particular time, or in connection with any particular Claims, will not constitute a waiver of any rights to require arbitration at a later time or in connection with any other Claims. Any additional or different agreement between you and me regarding arbitration must be in writing.

Within fifteen days after an award by the single arbitrator, any party may appeal the award by requesting in writing a new arbitration before a panel of three neutral arbitrators designated by the same Arbitration Administrator. The panel will consider all factual and legal issues anew, follow the same rules that apply to a proceeding using a single arbitrator, and make decisions based on the vote of the majority. Costs will be allocated in the same way they are allocated for arbitration before a single arbitrator. An award by a panel is an award by a single arbitrator after fifteen days has passed, shall be final and binding on the parties, subject to judicial review that may be permitted under the FAA. An award in arbitration will be enforceable as provided by the FAA or other applicable law by any court having jurisdiction. Judgment upon any arbitration award may be entered in any court having jurisdiction. An award in arbitration shall determine the rights and obligations between the named parties only, and only in respect of the Claims in arbitration, and shall not have any bearing on the rights and obligations of any other person, nor on the resolution of any other dispute or controversy.

**Severability, survival:** This shall survive: (i) acceleration, termination or modification of the Note and the relationship between you and me concerning the Note; (ii) the bankruptcy of any party; and (iii) any transfer or assignment of my loan or the Note, or any amounts owed on my Account, to any other person. If any portion of this arbitration provision is deemed invalid or unenforceable, the remaining portions shall nevertheless remain in force. In the event my loan or the Note, or any amounts owed on my Account are assigned by you to any other person, including any insurance company acquiring this Note by payment or an insurance claim, the terms of these arbitration provisions shall be binding upon and inure to the benefit of the assignee and me in the same manner and to the same extent as though such assignee were you.

**ADDITIONAL AGREEMENTS:** My responsibility for repaying this Note is unaffected by the liability of any other person to me or by your failure to (or) notify me that a required payment has not been made. Without losing any of your rights under this Note you may accept late payments and/or partial payments, even if marked "paid in full". Unless you and I enter into an express written agreement, no restrictive endorsement on any payment will be an accord and satisfaction of the balance due under the Note. You may delay, fail to exercise, or waive any of your rights on any occasion without losing your entitlement to exercise such rights at any future time or on any future occasion. You will not be obligated to make any demand upon me, send me any notice, present this Note to me for payment or make protest of nonpayment to me before suing to collect this Note if I am in default, and to the extent permitted by applicable law, I hereby waive any right I might otherwise have to require such actions.

This Note will be deemed to have been made in the State of Nevada and your decision on whether to lend me money will be made in Nevada. Consequently, the provisions of this Note will be governed by federal laws and the laws of the State of Nevada, without regard to conflict of laws rules.

I may not assign this Note or any of its benefits or obligations. You may assign this Note, any amounts owed on my Account and any security interest hereunder at any time without notice to me.

If any provision of this Note is held invalid or unenforceable, that provision will be considered omitted from this Note without affecting the validity or enforceability of the remainder of the Note.

Except for the forbearance or deferment of payments, which will be deemed accepted by me unless I object in writing, you and I must jointly agree in writing to modify any provision of the Note. No modification will affect the validity or enforceability of the remainder of the Note.

**SECURITY INTEREST** - I understand that the proceeds of this loan are to be used for specific educational expenses. I grant you a security interest in any refunds of the proceeds of the loan given to me by any educational institution or any other party. Collateral security for other loans, other than those loans secured by my principal dwelling, which I may have with you will also secure this loan.

**NOTICES** - I will send written notice to you within 30 days after any change in my name, address, telephone number or school enrollment.

Any notice you are required to give me will be considered effective when mailed by first class mail to the most recent address you have for me or delivered electronically if I have requested electronic delivery.

**ENTIRE AGREEMENT** - The terms and conditions of my Application, this Note and the Conditional Approval Letter(s) constitute the entire agreement between you and me. The terms of the Conditional Approval Letter regarding your interest rate(s) for each loan subject to the terms of this Note are hereby incorporated into this Note.

**STATE LAW NOTICES - ARIZONA:** I agree to pay an effective rate of interest equal to the rate of interest applicable to this Note, as set forth in "interest" above, plus any additional rate of interest resulting from any other fees or charges paid or payable by me in connection with this Note that may be deemed to be interest under applicable law.

**CALIFORNIA RESIDENTS:** As required by law, I am hereby notified that a negative credit report reflected on my credit record may be submitted to a credit reporting agency if I fail to fulfill the terms of my credit obligations.

**GEORGIA:** I waive any right to require the Lender to take action against the principals as provided in O.C.G.A. § 10-7-24.

**IOWA, KANSAS, AND MAINE: NOTICE TO CONSUMER: 1. Do not sign this agreement before you read it. 2. You are entitled to a copy of this agreement. 3. You may prepay the unpaid balance at any time without penalty and may be entitled to receive a refund of unearned charges in accordance with law.**

**MAINE, NEW YORK, AND VERMONT:** Citibank, N.A. may obtain a consumer report (credit report) about me from a consumer reporting agency (credit bureau). Upon my request, I will be informed whether or not Citibank, N.A. obtained a consumer report about me and if so the name and address of the consumer reporting agency that furnished the report. If my application is approved subsequent consumer reports may be requested or used without further notice to me in connection with (a) renewal or extension of the credit for which I have applied, (b) reviewing my loan, (c) taking collection action on my loan, or (d) other legitimate purposes associated with my loan.

**INDIANA AND MAINE:** The provisions of this Note regarding the payment of collection agency costs and court costs and where lawsuits must be filed do not apply in Maine or Indiana residents.

**MISSOURI ORAL LOAN AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF SUCH DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.**

**OHIO:** The Ohio laws against discrimination require that all creditors make credit equally available to all creditworthy customers and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

**OKLAHOMA:** If I am in default and the total amount disbursed under this Note is greater than $3,400 or any higher dollar amount established by law for the payment of such fees, I agree to pay the Lender's court costs.

**TEXAS RESIDENTS:** To contact the Lender about this account call 1-800-538-8492. This contract is subject in whole or in part to Texas law which is enforced by the Consumer Credit Commissioner, 2601 North Lamar Boulevard Austin, TX 78705-4207, phone 1-512-479-1265 or 1-800-538-1579. Contact the Commissioner relative to any inquiries or complaints.

**UTAH BORROWERS AND CO-SIGNERS:** As required by law, I am hereby notified that a negative credit report reflecting on my credit record may be submitted to a credit reporting agency if I fail to fulfill the terms of my credit obligations.

**WEST VIRGINIA RESIDENTS:** The provisions of this Note releasing the Lender from liability for any claim arising from the use of information provided to the Lender by others or arising from the Lender providing information to others and the provisions of this Note regarding the payment of collection agency costs do not apply.

**WISCONSIN RESIDENTS:** For married Wisconsin residents, my signature confirms that this loan obligation is being incurred in the interest of my marriage or family. No provision of a marital property agreement (pre-marital agreement), a unilateral statement under Section 766.59 of the Wisconsin Statutes, or a court decree under Section 766.70 adversely affects the interest of the creditor unless, prior to the time the credit is granted, the creditor is furnished a copy of the marital property agreement, statement, or decree or has actual knowledge of the adverse provision when the obligation to the creditor is incurred. If the loan for which I am applying is granted, my spouse will also receive notification that credit has been extended to me.

**VERMONT: NOTICE TO CO-SIGNER: YOUR SIGNATURE ON THIS NOTE MEANS THAT YOU ARE EQUALLY LIABLE FOR REPAYMENT OF THIS LOAN. IF THE BORROWER DOES NOT PAY THE LENDER HAS A LEGAL RIGHT TO COLLECT FROM YOU.**

**NEW YORK:** By signing as a Co-signer I am acting as a "guarantor" and if there is a default on any of the Borrower's obligations under the terms of the Note, I agree to pay all sums due as set forth in the Note. This sum could include the principal amount owed, plus interest and other fees/charges, plus reasonable attorney fees and collections costs as provided under the terms of the Note which I acknowledge receiving a copy prior to signing as a guarantor or co-signer. I also agree that you can collect this debt from me without first trying to collect from the Borrower.

**NORTH CAROLINA:** By signing as a Co-signer I waive any right I have to require the Lender to proceed in accordance with the provisions of N.C.G.S. §§26-7 through 26-9 and acknowledge that the Lender may proceed directly against me without first proceeding against the Borrower or any collateral for the Loan.

**WISCONSIN BORROWERS AND CO-SIGNERS:** The provisions of this Note regarding default do not apply. Instead, I will be in default (a) if the interval between scheduled payments is two months or less, and I permit to be outstanding an amount exceeding one full payment which has remained unpaid for more than 10 days after its scheduled due date or deferred due date, or I fail to pay the first payment or the last payment within 40 days of its scheduled due date or deferred due date, or (b) if the interval between scheduled payments is more than two months, I permit to be outstanding all or any part of one scheduled payment which has remained unpaid for more than 60 days after its scheduled due date or deferred due date, I will also be in default if I fail to observe any other provision of this Note, the breach of which materially impairs my ability to pay the amounts due under this Note.

**CALIFORNIA: Notice to Co-signer (Spanish translation) AVISO PARA EL FIADOR (Spanish Translation Required By Law)**

Se le está pidiendo que garantice esta deuda. Piénselo con cuidado antes de ponerse de acuerdo. Si la persona que ha pedido este prestamo no paga la deuda, usted tendrá que pagarla. Esté seguro de que usted podrá pagar si se obligado a pagarla y de que usted desea aceptar la responsabilidad.

Si la persona que ha pedido el prestamo no paga la deuda, es posible que usted tenga que pagar la suma total de la deuda, mas los cargos por tardarse en el pago o el costo de cobranza, lo cual aumenta el total de esta suma.

El acreedor (financiero) puede cobrarle a usted sin, primeramente, tratar de cobrarle al deudor. Los mismos métodos de cobranza que pueden usarse contra el deudor, podran usarse contra usted, tales como presentar una demanda en corte, quitar parte de su sueldo, etc. Si alguna vez no se cumpla con la obligación de pagar esta deuda, se puede incluir esa información en la historia de credito de usted.

Este aviso no es el contrato mismo en que se le echa a usted la responsabilidad de la deuda.

**FEDERAL NOTICE TO CO-SIGNER - The co-signer is being asked to guarantee this debt. Think carefully before agreeing to do this. If the Borrower doesn't pay this debt, the co-signer will have to. Be sure the co-signer can afford to pay if necessary, and that the co-signer wants to accept this responsibility. The co-signer may have to pay up to the full amount of the debt if the Borrower does not pay. The co-signer may also have to pay late charges or collection costs, which increase this amount. The lender or holder of this loan can collect this debt from the co-signer without first trying to collect from the Borrower. The lender or holder of this loan can use the same collection methods against the co-signer that can be used against the Borrower, such as suing the co-signer, garnishing wages, etc. If this debt is ever in default, that fact may become part of the co-signer's credit record.**

This notice is not the contract that makes the co-signer liable for the debt.

Version 332 - Borrower's Copy
10/01/2006