IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Golden<br><br>      Debtor, | Chapter 7<br><br>Case No. 16-40809 (ESS) |
| Tashanna B. Golden f/k/a Tashanna B. Pearson on behalf of herself and all others similarly situated<br><br>      Plaintiffs,<br><br> v.<br><br>National Collegiate Student Loan Trust 2005-3, National Collegiate Student Loan Trust 2006-4, GS2 2016-A, Pennsylvania Higher Education Assistance Agency  d/b/a American Education Services, and Firstmark Services,<br><br>      Defendants. | Adv. Pro. No. 1-17-01005(ESS) |

**COMBINED MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS**

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................................iii-xi

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ........................................................................................................3

      A.      Evolution of § 523(a)(8) ..............................................................3

      B.      Plaintiff's Private Commercial Loans..................................................5

ARGUMENT ..............................................................................................................7

I.       STANDARD FOR MOTIONS TO DISMISS...................................................7

II.      THE COMPLAINT CLEARLY SETS FORTH CLAIMS IN COMPLIANCE WITH FED. R. CIV. PRO. 8.................................................................................7

III.    THE COURT SHOULD NOT COMPEL ARBITRATION ...............................9

      A.      Plaintiff's Claims Fall Outside the Scope of the Relevant Arbitration Provision ...............................................................10

      B.      Plaintiff's Claims are not Arbitrable under *McMahon* .........................11

            1.      The Legislative History of the Bankruptcy Code Evidences Congress's Intent to Preclude Arbitration of Claims to Enforce the Discharge Injunction ...............................................................12

            2.      There is An Inherent Conflict Between Plaintiff's Claims and Arbitration ...............................................................13

                  a.      Arbitration Is Impermissible Because It Would Strip the Bankruptcy Court of Its Power to Enforce its Own Orders...........14

                  b.      Arbitration is Impermissible Because the Financial "Fresh Start" Is a Fundamental Right Granted by the Bankruptcy Code and Arbitration of That Right Would Be Inconsistent with the Bankruptcy Code .......................................................18

                  c.      Arbitration is Impermissible Because Federal Litigation of the Claims at Issue Promotes Uniform Application of the Bankruptcy Law......................................................21

                  d.      *CompuCredit* Does Not Affect the Vitality of the Inherent Conflict Test or Even Address It ...................................22

i

  C.  Plaintiff Did Not Waive the Right to Participate in a Class Action.......................24

IV.  THE SUBJECT LOANS ARE DISCHARGEABLE BECAUSE THEY ARE NOT QUALIFIED EDUCATIONAL LOANS WITHIN THE TERMS OF § 523(A)(8)(B) OR AN "EDUCATIONAL BENEFIT" UNDER § 523 (A)(8)(A)(II).............................26

V.  DEFENDANTS CANNOT CONVERT AN UNQUALIFIED LOAN INTO A QUALIFIED LOAN BASED SOLELY UPON HOW THE LOAN IS CHARACTERIZED EITHER IN THE LOAN DOCUMENTS OR IN THE DEBTOR'S SCHEDULE F..............................................................................................31

VI.  PLAINTIFF HAS PROPERLY PLED DISCHARGE VIOLATIONS ............................32

  A.  Courts Have the Power to Enforce Discharge Injunctions through Adversary Proceedings .............................................................................................32

  B.  The Discharge Injunctions Can Support a Finding of Contempt...........................33

VII.  THIS COURT HAS JURISDICTION TO ENTERTAIN A NATIONWIDE CLASS ACTION .......................................................................................................................37

CONCLUSION.......................................................................................................................43

# TABLE OF AUTHORITIES

<u>Cases</u>

*American Express Co. v. Italian Colors Restaurant*,
   133 S. Ct. 2304 (2013) ........................................................................................................... 23

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................................... 7

*Bank United v. Manley*,
   273 B.R. 229 (N.D. Ala. 2001) ............................................................................................ 38

*Barrett v. Avco Fin. Servs. Mgmt. Co.*,
   292 B.R. 1 (D. Mass. 2003) .................................................................................................. 42

*Bear, Stearns & Co., Bear, Stearns Sec. Corp. v. 1109580 Ontario, Inc.*,
   409 F.3d 87 (2d Cir. 2005) ................................................................................................... 22

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................................... 7

*Bessette v. Avco Fin. Servs., Inc.*,
   279 B.R. 442 (D.R.I. 2002) .................................................................................................. 41

*Bessette v. Avco Financial Services, Inc.*,
   230 F.3d 439 (1st Cir. 2000) ................................................................................................ 41

*Borecki v. Raymours Furniture Co., Inc.*,
   2017 WL 5900288 (S.D.N.Y. June 21, 2017) ..................................................................... 25

*Chambers v. NASCO, Inc.*,
   501 U.S. 32 (1991) ............................................................................................................... 39

*CompuCredit Corp. v. Greenwood*,
   132 S. Ct. 665 (2012) ........................................................................................................... 22

*Cox v. Zale Delaware, Inc.*,
   239 F.3d 910 (2001) ............................................................................................................. 42

*Deep v. Copyright Creditors*,
   122 F. App'x 530 (2d Cir. 2004) ......................................................................................... 15

*Economic Development Growth Enterprise v. McDermott*,
   478 B.R. 123 (Bankr. N.D.N.Y. 2012) ............................................................................... 35

*EEOC v. Waffle House, Inc.*,
534 U.S. 279 (2002) ................................................................................. 10

*El-Bibany v. Commissioner of Internal Revenue*,
T.C. Summ. Op. 2005-18 (June 8, 2005) ................................................. 27

*Hess v. New Jersey Transit Rail Operations, Inc.*,
846 F.2d 114 (2d Cir. 1988) ................................................................... 36

*Hooks v. Acceptance Loan Co., Inc.*,
2011 WL 2746238 (M.D. Ala. July 14, 2011) ......................................... 17

*In Matter of Swenson*,
2016 WL 4480719 (Bankr. W. D. Wis. 2016) .......................................... 28

*In re Aiello*,
231 B.R. 693 (N.D. Ill. 1999) ................................................................. 38

*In re Alibatya*,
178 B.R. 335 (Bkrtcy. E.D.N.Y. 1995) .................................................... 28

*In re Anderson*,
553 B.R. 221 (S.D.N.Y. 2016) ......................................................... passim

*In re Anderson*,
550 B.R.228 (S.D.N.Y. 2016) ............................................................ 32, 33

*In re Azevedo*,
506 B.R. 277 (Bankr. E.D. Cal. 2014) .................................................... 34

*In re Belton*,
2014 WL 5819586 (Bankr. S.D.N.Y. Nov. 10, 2014) ....................... passim

*In re Bogdanovich*,
292 F.3d 104 (2d Cir. 2002) ................................................................... 19

*In re Brizinova*,
565 B.R. 488 (E.D.N.Y. 2017) ........................................................... 40, 41

*In re Campbell*,
547 B.R. 49 (Bankr. E.D.N.Y. 2016) ................................................ passim

*In re Cano*,
410 B.R. 506 (S.D. Tex. 2009) ............................................................... 38

*In re Casse*,
198 F.3d 327 (2d Cir. 1999) ................................................................... 15

*In re Chambers*,
283 B.R. 913 (N.D. Ill. 2002) ................................................... 36

*In re Chief Exec. Officers Clubs, Inc.*,
359 B.R. 527 (Bankr. S.D.N.Y. 2007) ...................................... 36

*In re Christoff*,
527 B.R. (9th Cir. B.A.P. 2015) ................................................ 28

*In re Clouser*,
2016 WL 5864493 (Bkrtcy. D. Or. 2016) ................................. 32

*In re Decena*,
549 B.R. 11 (Bankr. E.D.N.Y.) ........................................... 1, 28

*In re DiGeronimo*,
354 B.R. 625 (Bankr. E.D.N.Y. 2006) ...................................... 33

*In re Dufrane*,
566 B.R. 28 (Bankr. C.D. Cal. 2017) .................................. 28, 31

*In re Dunn*,
324 B.R. 175 (D. Mass. 2005) .................................................. 34

*In re Dyer*,
322 F.3d 1178 (9th Cir. 2003) .................................................. 34

*In re Essangui*,
573 B.R. 614 (Bankr. D. Md. 2017) .......................................... 28

*In re Extended Stay, Inc.*,
466 B.R. 188 (S.D.N.Y. 2011) .................................................. 21

*In re Fagan*,
559 B.R. 718 (Bankr. E.D. Cal. 2016) ...................................... 33

*In re Farmer*,
2017 WL 4619209 (W.D. Wash. Oct. 16, 2017) ....................... 23

*In re Grant*,
281 B.R. 721 (S.D. Ala. 2000) ........................................... 11, 17

*In re Haemmerle*,
529 B.R. 17 (Bankr. E.D.N.Y. 2015) ........................................ 34

*In re Hardy*,
97 F.3d 1384 (11th Cir. 1996) .................................................. 33

*In re Haroon*,
   313 B.R. 686 (Bankr. E.D. Va. 2004) ................................................................................. 36

*In re Harrier*,
   903 F. Supp. 2d 1281 (M.D. Fla. 2012) .......................................................................................

*In re Harris*,
   280 B.R. 876 (Bankr. S.D. Ala. 2001) ............................................................................... 38

*In re Hayes*,
   183 F.3d 162 (2d Cir. 1999) ............................................................................................... 19

*In re Haynes*,
   2014 WL 3608891 (Bankr. S.D.N.Y. July 22, 2014) ................................................. passim

*In re Jernstad*,
   2012 WL 8169889 (N.D. Ill. Aug. 2, 2012) ..................................................................... 11

*In re Jones*,
   242 B.R. 441 (Bankr. W.D. Tenn. 1999) ......................................................................... 28

*In re Jorge*,
   568 B.R. 25 (N.D. Ohio 2017) .......................................................................................... 11

*In re Kalikow*,
   602 F.3d 82 (2d Cir. 2010) ................................................................................... 32, 33, 41

*In re Kashikar*,
   567 B.R. 160, (9th Cir. B.A.P. 2017) .............................................................................. 28

*In re Krause*,
   414 B.R. 243 (S.D. Ohio 2009) ....................................................................................... 38

*In re Lehman Bros. Holdings Inc.*,
   480 B.R. 179 (S.D.N.Y. 2012) ......................................................................................... 21

*In re Lehman Bros. Holdings Inc.*,
   663 Fed. Appx. 65 (2d Cir. 2016) .................................................................................... 14

*In re Lehman Bros. Holdings, Inc., No.*,
   2015 WL 5729645 (S.D.N.Y. Sept. 30, 2015) ................................................................ 24

*In re Lonnie Davis*,
   2006 WL 2827270 (Bankr. S.D. Tex. Sept. 27, 2006) ..................................................... 42

*In re McClure*,
   210 B.R. 985 (Bankr. N.D. Tex. 1997) ....................................................................... 28, 30

*In re McFadyen*,
    192 B.R. 328 (Bkrtcy. N.D.N.Y., 1995) .................................................. 29

*In re McKenzie-Gilyard*,
    388 B.R. 474 (Bankr. E.D.N.Y 2007) ................................................ 14, 33

*In re Meinhart*,
    211 B.R. 750 (Bankr. D. Colo. 1997) ................................................... 28

*In re Meyer*,
    2016 WL 3251622 (Bankr. N. D. Ohio 2016) ........................................ 28

*In re Motichko*,
    395 B.R. 25 (Bkrtcy. N. D. Ohio 2008) ................................................. 33

*In re Murphy*,
    282 F.3d 868 (5th Cir. 2002) ............................................................... 31

*In re Nat'l Gypsum Co.*,
    118 F.3d 1056 (5th Cir. 1997) ............................................................. 16

*In re Noletto*,
    244 B.R. 845(S.D. Ala. 2000) ............................................................. 38

*In re Norman*,
    2006 WL 2818814 (Bankr. M.D. Ala. Sept. 29, 2006) ........................... 17

*In re Nunez*,
    527 B.R. 410 (Bankr. D. Ore. 2015) .................................................... 28

*In re Oh*,
    362 Fed. Appx. 576 (9th Cir. 2009) ..................................................... 34

*In re Pappas*,
    517 B.R. 708 (Bkrtcy. W.D. Tex., 2014) .............................................. 29

*In re Patrick*,
    344 B.R. 56 (Bankr. M.D. Pa. 2005) .................................................... 38

*In re Reis*,
    274 B.R. 46 (Bkrtcy. D. Mass. 2002) ................................................... 28

*In re Rogers*,
    374 B.R. 510 (E.D.N.Y. 2007) ............................................................. 27

*In re Rojas*,
    2009 WL 2496807 (Bankr. S.D. Texas Aug. 12, 2009) .......................... 37

*In re Schultz*,
    2016 WL 8808073 (Bankr. D. Minn. 2016) ........................................................................ 28

*In re Scott*,
    287 B.R. 470 (Bankr. E.D. Mo. 2002) .............................................................................. 28

*In re Sheffield*,
    281 B.R. 24 (Bankr. S.D. Ala. 2000) ............................................................................... 38

*In re Shorts*,
    209 B.R. 818 (Bkrtcy. D.R.I. 1997) ................................................................................. 28

*In re Sims*,
    278 B.R. 457 (Bankr. E.D. Tenn. 2002) ........................................................................... 38

*In re Texaco Inc.*,
    182 B.R. 937 (Bankr. S.D.N.Y. 1995) ............................................................................. 15

*In re First Marblehead Corp. Securities Litigation*,
    639 F.Supp.2d 145 (D. Mass. 2009) ................................................................................ 30

*In re Tires R US Ltd*,
    2016 WL 3475204 (Bankr. E.D.N.Y. June 17, 2016) ...................................................... 36

*In re Torres*,
    367 B.R. 478 (Bankr. S.D.N.Y. 2007) ............................................................................. 14

*In re Wagner*,
    74 B.R. 898 (Bankr. E.D. Pa. 1987) ................................................................................. 36

*In re West*,
    2015 WL 3962569 (Bankr. N.D. Ohio June 29, 2015) ..................................................... 33

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
    512 U.S. 821 (1994) ......................................................................................................... 41

*King v. Allied Vision, Ltd.*,
    65 F.3d 1051 (2d Cir. 1995) ............................................................................................. 36

*Lehman Bros. Holdings Inc. v. Wellmont Health Sys.*,
    2014 WL 3583089 (S.D.N.Y. July 18, 2014) .................................................................. 21

*Local Loan Co. v. Hunt*,
    292 U.S. 234 (1934) ................................................................................................... 19, 20

*London–Marable v. Sterling*,
    2008 WL 2705374 (D. Ariz. 2008) .................................................................................. 28

*Matter of DePoy*,
   29 B.R. 471 (Bankr. N.D. Ind. 1983)...................................................... 35

*Matter of Roberson*,
   999 F.2d 1132 (7th Cir. 1993) ............................................................... 29

*MBNA America Bank, N.A. v. Hill*,
   436 F.3d 104 (2d Cir. 2006)................................................. 15, 19, 20, 21

*McComb v. Jacksonville Paper Co.*,
   336 U.S. 187 (1949)................................................................................ 36

*Meyer v. Kalanick*,
   185 F. Supp. 3d 448 (S.D.N.Y. 2016)............................................... 25, 26

*Meyer v. Uber Technologies, Inc.*,
   868 F.3d 66 (2d Cir. 2017).................................................................... 26

*Neilsen v. Rabin*,
   2014 WL 552805 (2d Cir. Feb. 13, 2014)............................................... 7

*Netflix, Inc. v. Relativity Media, LLC (In re Relativity Fashion, LLC)*,
   696 Fed. Appx. 26 (2d Cir. 2017)................................................... 14, 24

*PRL USA Holdings, Inc. v. United States Polo Ass'n, Inc.*,
   2015 WL 1442487 (S.D.N.Y. Mar. 27, 2015) ...................................... 15

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013)...................................................................... 7

*Shearson/American Express v. McMahon*,
   482 U.S. 220 (1987)................................................................................ 11

*U.S. Dept. of Health and Human Services v. Smith*,
   807 F.2d 122 (8th Cir. 1986) ................................................................ 29

*U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. (In re U.S. Lines, Inc.)*,
   197 F.3d 631 (2d Cir. 1999)................................................................... 14

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
   789 F.3d 29 (2d Cir. 2015)..................................................................... 36

*Walls v. Wells Fargo Bank, NA.*,
   262 B.R. 519 (Bankr. E.D. Cal. 2001) .................................................. 41

*Weber v. U.S. Trustee*,
   484 F.3d 154 (2d Cir. 2007).................................................................. 21

*Wiley v. Wells Fargo Bank (In re Wiley)*,
   2017 WL 6550418 (D. Me. Dec. 21, 2017) ............................................................... 26, 31, 35

*Williams v. United States*,
   402 F.2d 47 (10th Cir. 1967) ........................................................................................ 36

*Young v. United States ex rel. Vuitton et Fils S.A.*,
   481 U.S. 787 (1987) ...................................................................................................... 16

Statutes

11 U.S.C. § 105 .............................................................................................................. passim

11 U.S.C. § 523 .............................................................................................................. passim

11 U.S.C § 727 ............................................................................................................... 37, 39

20 U.S.C. § 1015 ............................................................................................................ 27

20 U.S.C. § 1087 ............................................................................................................ 27

26 U.S.C. § 227 .............................................................................................................. 27

28 U.S.C. § 157 .............................................................................................................. 37

28 U.S.C. § 1334 ............................................................................................................ 38

28 U.S.C. § 2201 ............................................................................................................ 42

Rules

Federal Rule of Bankrutpcy Procedure 7023 ................................................................. 37

Federal Rules of Civil Procedure 8 ................................................................................ 1, 7

Federal Rule of Civil Procedure 9 ................................................................................. 2

Federal Rules of Civil Procedure 23 .............................................................................. 37

Federal Rule of Civil Procedure 65 ............................................................................... 39

Regulations

26 C.F.R. § 1.221-1(e)(4) .............................................................................................. 26

Other Authorities

Kara Bruce, *The Debtor Class*,
   88 Tul. L. Rev. 21 (2013) ............................................................................................ 40

*Vindicating Bankruptcy Rights*,
   75 Md. Law Rev. 443 (2016).................................................................................................. 17

Plaintiff, by and through undersigned counsel, submits this combined memorandum of law in response to all of Defendants' motions to dismiss.

## PRELIMINARY STATEMENT

This proceeding involves direct-to-consumer loans made by Defendants that do not qualify for the exemption of non-dischargeability set forth in § 523 (a)(8) of the Bankruptcy Code. Defendants have attempted to collect and continue to collect on Plaintiff's loans and those of other members of the class despite the fact that these loans have been discharged in bankruptcy. In asserting that these loans are non-dischargeable, Defendants directly challenge two prior decisions of judges in this District who have held to the contrary in *In re Decena*, 549 B.R. 11 (Bankr. E.D.N.Y.) (Grossman, B.J.), *rev'd in part on other grounds*, 562 B.R. 202 (E.D.N.Y. 2016) and *In re Campbell*, 547 B.R. 49 (Bankr. E.D.N.Y. 2016) (Craig, C.B.J.), Defendants also raise a number of other grounds for dismissal of this proceeding all of which are without merit.

First, Defendants argue that the First Amended Complaint ("FAC") should be dismissed under Fed. R. Civ. Pro. 8 because it does not identify the loans at issue and the actions that Defendants took that violate § 524. This contention is without merit. Both the loans at issue and Defendants actions in violation of § 524 are set out in the FAC.

Second, PHEAA and Firstmark also argue that this adversary proceeding is barred by the arbitration clause and the class action waiver language contained in the loan documents. Several courts have held, however, that parties cannot, by private agreement, divest courts of their jurisdiction to hold creditors in contempt for violating the discharge injunction. Application of the Federal Arbitration Act ("FAA") in such a context inherently conflicts with the purposes of the Bankruptcy Code. In any event, this issue is currently before the Second Circuit Court of Appeals and a decision is expected imminently.

1

Third, PHEAA also contends that Plaintiff is estopped from challenging the dischargeability of the loans at issue, both because boilerplate language that was contained in her promissory note stated that the loans were for educational purposes and because these loans were listed as "Student Loans" in her Schedule F. Neither claim has merit. A loan that does not come within the terms of the § 523 (a)(8) exemption from dischargeability cannot become non-dischargeable by a pre-bankruptcy acknowledgement or waiver by the debtor.  Similarly, Plaintiff's indication that her debt was a "student loan" is not relevant to the determination of that debt's dischargeability.

Fourth, Defendants National Collegiate Trust 2005-3, and 2006-4 and GS2 2016-A (hereinafter the "Trust Defendants") argue that the FAC fails to satisfy the pleading requirements for a fraud cause of action as set forth in Federal Rule of Civil Procedure 9. But the FAC does not assert a cause of action for fraud; it alleges that Defendants violated the discharge injunction by seeking to collect on discharged debts.

Fifth, Firstmark and the Trust Defendants also argue that they cannot be held in contempt because the discharge order is not sufficiently clear and definite.  But discharge orders never specify which debts are discharged and which ones are not.  The burden is on the creditor to determine whether a debt has been discharged before it assumes the risk of attempting to collect on that debt. More importantly, the FAC alleges that each of these Defendants was fully aware of the fact that the loans were dischargeable under § 523 (a)(8) and nonetheless attempted to collect on the discharged debt.

Sixth, both Firstmark and the Trust Defendants argue that this Court lacks jurisdiction over a nationwide class of former debtors whose debts have been discharged on bankruptcy. But this

Court clearly has jurisdiction under §105 to enforce orders of general applicability, especially statutory orders such as § 524, as this Court has previously expressly recognized.

Seventh, Firstmark's assertion that a contempt claim can only be raised by motion has been expressly rejected by courts in the Second Circuit.

Finally, Plaintiff hereby withdraws her claim against Firstmark under the Fair Debt Collection Practices Act.

## BACKGROUND

### A.    Evolution of § 523(a)(8)

Prior to 1978, all student loans, like any typical consumer loan, could be discharged. Some students were borrowing money from the federal government to go to school and then were seeking to discharge those loans through bankruptcy when the loans came due upon graduation. To limit that practice, in 1978, Congress enacted § 523(a)(8) of Title 11 of the U.S. Bankruptcy Code. FAC ¶ 12. At that time, only the government was involved in issuing student loans and the newly enacted § 523(a)(8) was intended to protect the government from the discharge of student loans right after graduation. *Id.* Initially, § 523(a)(8)'s prohibition on discharge applied only to the attempt to discharge government loans within five years of the loan coming due. All other (i.e., non-governmental) and older student loans (i.e., loans that were more than five years old) could be discharged. FAC ¶ 13. Through later amendments of § 523 that that time period was lengthened and eventually eliminated, but the prohibition on discharge continued to apply only to government loans to students. FAC ¶ 17.

In 2005, the Bankruptcy Abuse and Consumer Protection Act was enacted. For the first time, the Bankruptcy Code's prohibition on discharge found in § 523 was extended to private lenders. However, that extension was not unlimited. In order to be non-dischargeable, the private

student loans had to meet specific criteria articulated in § 523(a)(8).  These criteria included that the money be for accredited schools and for qualified education expenses.  FAC ¶¶ 15, 16.

Initially, private lenders were able to lend within the criteria for non-dischargeability because private lenders followed the same procedures as the government; *i.e.*, they lent money to students through financial aid offices at accredited schools which retained the funds for tuition or provided them to students for qualified expenses.  The school thus served to ensure that the loans came within § 523(a)(8)'s requirements for non-dischargeability.  FAC ¶ 16.

That changed when private lenders developed programs to lend money directly to students, bypassing the schools completely.  Lenders began to market and lend to students in direct-to-consumer loan programs which is the type of loan at issue in this case.  These programs emerged for many reasons, such as the avoidance of some of the paperwork and overall bureaucracy associated with involving a school in the lending process.  However, a main reason for direct-to-consumer lending was the fact that school involvement acted as a check on the size of the lending pool because of restrictions on the types of institutions that could be accessed (i.e., only schools accredited under Title IV were eligible for protection) and the amount of money that could be lent (because Title IV schools would not certify loans that exceeded qualified expenses such as the cost of attendance).  FAC ¶¶ 17-18.  Private student loan lenders undertook direct-to-consumer lending purposefully to increase their lending pool and while doing so purposely undertook the risks of dischargeability that came with it.  While lending directly to students undoubtedly increased the total loan amounts and number of borrowers, it also removed the certification provided by school involvement that the loans would be "qualified educational loans" under § 523(a)(8) and thus exposed private lenders to the risk that the loans were not protected from discharge.

These direct-to-consumer loans were different than typical educational loans.  The direct-to-consumer loans relied on credit scores and underwriting, included co-signers, and were advertised for non-educational expenses and in fact the NCT Loan is specifically labeled as a "CONSUMER CREDIT TRANSACTION."  Dkt. No. 45-2, Ex. 1 at p. 2.

The direct-to-consumer loans were so notoriously deceptive to consumers that they were discontinued in 2008 after investigations and settlements with state Attorneys General. *See*, e.g. https://ag.ny.gov/press-release/attorney-general-cuomo-announces-groundbreaking-settlements-8-companies-market-student.

Lenders such as Defendants knew that their loans were dischargeable.  For example, a National Collegiate Student Loan Trust 2007-4 prospectus dated September 17, 2007, specifically warned investors:

> Under current law, private student loans that are guaranteed by non-profit entities **or that do not exceed the borrower's cost of attendance**, less other financial aid, are generally not dischargeable by a borrower in bankruptcy under the U.S. Bankruptcy Code; however, they can become dischargeable if the borrower proves that keeping the loans non-dischargeable would impose an undue hardship on the debtor and the debtor's dependents.  (emphasis added)

FAC ¶ 25.

## B.    Plaintiff's Private Commercial Loans

Plaintiff Tashana B. Golden is and has been resident of the State of New York at all times relevant to this action.  FAC ¶ 6.  During the 2006-7 academic year, Golden attended the University of Pennsylvania Law School.  The published cost of attendance at the law school during that term was $53,500.  During that academic year, Golden borrowed $27,000 from the federal government in student loans and received another $22,440 in scholarships and grants.  Thus, Golden was entitled to borrow an additional $3,560 in qualified education loans.  Any amount borrowed in

excess of that amount would not qualify as qualified educational loans under § 523(a)(8)(B). Yet, Bank One leant Golden $7,103 on September 28, 2006 in a direct-to-consumer loan that was not qualified through the law school. Plaintiff was never issued a 1098-E tax form to deduct the interest made on that loan because it was not a "qualified educated expense" under § 221(d)(2) of the Internal Revenue Code. FAC ¶¶ 27-33.

During the 2007-8 academic year, Golden also attended Penn Law School. The published cost of attendance for that term was $56,380. During that year, Golden borrowed $52,347 from the federal government and received another $12,850 in scholarships and grants. Thus, Golden's federal loans and scholarships already exceeded the cost of attendance at Penn Law School. However, during that year, Citibank gave Golden a direct-to-consumer loan of $9,348. This loan (and another loan by JPMorgan Chase, which is no longer the subject of this litigation) were in excess of cost of attendance at Penn Law School. Citibank never issued Plaintiff a 1098-E tax form to deduct the interest made on the Citibank loan. FAC ¶¶ 38-39.

On February 29, 2016, Golden filed a voluntary petition for relief under Chapter 7 of the bankruptcy in the United States Bankruptcy Courts for the Eastern District of New York. On or about August 3, 2016, this Court issued a discharge order in Golden's bankruptcy proceedings. On or about August 5, 2016, all creditors received notice of discharge. Golden did not enter in an agreement under § 524(c) of the Bankruptcy Code. None of Defendants filed an adversary proceeding to contest discharge of the subject loans. However, instead of treating the loans as discharged, Defendants by and through their agents resumed collection efforts after the discharge was entered and fraudulently informed Plaintiff that the debts were not discharged and demanded payment. FAC ¶¶ 39-44.

## ARGUMENT

## I.    STANDARD FOR MOTIONS TO DISMISS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal,* 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  "The plausibility standard is not akin to a probability requirement . . ." *Iqbal,* 556 U.S. at 678 (internal quotation marks omitted).  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,556 (2007) (citations omitted); *Neilsen v. Rabin,* 2014 WL 552805, at *2 (2d Cir. Feb. 13, 2014).  "In addressing the sufficiency of a complaint [the Court] accept[s] as true all factual allegations and drawls] from them all reasonable inferences . . ." *Rothstein v. UBS AG,* 708 F.3d 82, 94 (2d Cir. 2013).  At the pleading stage, the Court need only consider whether the complaint includes factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 556.  The FAC adequately states a claim under this standard.

## II.    THE COMPLAINT CLEARLY SETS FORTH CLAIMS IN COMPLIANCE WITH FED. R. CIV. PRO. 8

Although Defendants have done their utmost to obfuscate the contents of the FAC, Defendants know what two loans are at issue in this proceeding and what they are alleged to have done.  The first loan is the NCT Loan, which was originated by Bank One, N.A. on September 26, 2006, in the amount of $7,103 and thereafter was transferred to either Defendants National Collegiate Student Loan Trust 2005-3 or 2006-4 or both. For this reason, those two entities were substituted in for the National Collegiate Trust by a so-ordered stipulation in which it was recited that those two Defendants held loans made to Plaintiff.  *See* Dkt. No. 11.  The NCT Loan has been serviced by Defendant Pennsylvania Higher Education Assistance Agency ("PHEAA").

The second loan at issue is the Citibank Loan, which was originated by Citibank in 2007, in the amount of $9,348, and is now owned by Defendant Goal Structured Solutions Trust 2016 – A, sued as GS2 2016-A Trust. That Trust was brought in, also by stipulation, when GS2 acknowledged that it holds Plaintiff's loans. *See* Dkt. No. 7. The Citibank loan has been serviced by Defendant Firstmark Services ("Firstmark").

The FAC also clearly alleges what conduct the Defendants committed.  The FAC clearly alleges that both of these loans were in excess of Plaintiff's cost of attendance at the University of Pennsylvania Law School and therefore do not qualify as non-dischargeable loans under § 523 (a)(8)(B). It also alleges that Defendants, lenders and servicers of the two subject loans have nonetheless continued to collect on the loans and have demanded payment from Plaintiff, as they have from other class members, despite the fact that these loans were discharged on or about August 3, 2016.  The FAC further alleges that Defendants were aware that these loans were not exempted by § 523(a)(8) and were therefore discharged, but they continued to collect on them after discharge.

Firstmark claims that the FAC does not allege that the Citibank Loan was serviced by Firstmark.  This is true, although Firstmark has, in effect, conceded that it is servicing the Citibank Loan because, in response to a request for production regarding the Citibank Loan, it has provided 94 pages of documents in discovery showing the payment history on that very loan.  In addition, the FAC alleges that Firstmark is a "debt collector" and that Firstmark misrepresented the legal status and character of the Citibank Loan in collecting on the Citibank debt.  FAC ¶¶ 77-84.  Thus, there can be no confusion that Firstmark is sued herein for collecting on a discharged debt.[1]

---

[1] The Trust Defendants note that the boilerplate language in the NCT Loan references the possibility that it is either funded in whole or in part by the Education Resources Institution Inc. ("TERI") or is a qualified education loan under the Internal Revenue Code.  Trust Br. at 9-10, and

## III.        THE COURT SHOULD NOT COMPEL ARBITRATION

Firstmark argues that this Court should stay this action and refer the matter to arbitration, but Firstmark fails to present to the Court a declaration of someone with knowledge establishing that Plaintiff actually signed a note with an arbitration agreement contained therein.  Instead, Firstmark simply provides an attorney's declaration attaching what purports to be the "Golden Master Student Loan Promissory Note."  *See* Dkt. 48 and Exhibit A thereto.  But counsel provides no basis for personal knowledge as to whether this master loan was, in fact, signed by the Plaintiff. Without such evidence, Firstmark's motion to compel arbitration should be rejected outright.

In any event, the issue of whether adversary proceedings seeking orders of contempt for violation of the discharge injunction of § 524 should be sent to arbitration is currently before the Second Circuit Court of Appeals in *In re Anderson*, Case No. 16-2496 (2d Cir.).  In that case, both the bankruptcy court and the district court held that allowing such claims to go to arbitration would clearly conflict with the purposes of the Bankruptcy Code.  *See In re Anderson*, Adv. Proc. No. 15-8214 (RDD) (Bankr. S.D.N.Y. May 14, 2015) (attached hereto as Appendix B), and *In re Anderson*, 553 B.R. 221 (S.D.N.Y. 2016).  Nonetheless, should the Court wish to address the issue, despite Firstmark's clear absence of proof, and before the Second Circuit rules, we set forth below the reasons why Firstmark's Motion to Compel Arbitration should be rejected because the

---

that the check issued by Chase references TERI on its face. But, the Trust Defendants do not move to dismiss on this ground, but merely cite this as creating further ambiguity as to which loan is at issue in the case. There is no such ambiguity.  TERI is a guarantor, not a funder, and whether or not these funds were issued under a program guaranteed in whole or in part by TERI is, of course, a question of fact.  TERI has noted in public documents that it does not guarantee loans that exceed the cost of attendance.  *See* Appendix A hereto. These loans clearly exceed the cost of attendance. Moreover, even if TERI were involved, there is some question as to whether TERI is, in fact, a bonafide nonprofit institution or is, in reality, merely a division of First Marblehead Corporation, a for-profit entity, whose employees do most, if not all of TERI's work and in whose facilities TERI is housed, and whether TERI was enlisted in the First Marblehead's securitization program for the sole purpose of taking advantage of non-profit exemption of § 523(a)(8)(A)(i).

bankruptcy court retains jurisdiction to adjudicate its own contempt powers, unaffected by contractual agreements between the parties, and because arbitration is inappropriate here as indicated by the legislative intent to have a § 524 claims adjudicated in bankruptcy court and by the inherent conflict between arbitration and § 524's underlying purposes.

### A.    Plaintiff's Claims Fall Outside the Scope of the Relevant Arbitration Provision.

Firstmark asserts that Plaintiff's claims must be sent to arbitration pursuant to the arbitration agreement contained in Plaintiff's loan documentation.  But such a private agreement cannot — and did not purport to — bind the bankruptcy court to relinquish its jurisdiction to adjudicate a contempt of that court's orders, and no reading of the arbitration agreements supports such a conclusion.

Simply put, the nature of this proceeding renders it outside the scope of the parties' arbitration agreement, even given its broad language.  Where, as here, a debtor brings a claim under §§ 524 and 105(a) alleging that the creditor has violated the discharge injunction issued by the bankruptcy court, an arbitration clause between the debtor and the creditor is not implicated. This case involves the invocation of the bankruptcy court's contempt powers, not private contractual claims by Plaintiff.  *See In re Haynes*, Adv. Pro. No. 13-08370-rdd, 2014 WL 3608891, at *8 (Bankr. S.D.N.Y. July 22, 2014) ("The Court has its own contempt power [and] also has § 105(a), which goes beyond its own contempt power.").  Defendants have violated the bankruptcy court's injunction and it is the bankruptcy court's equitable powers under § 105 and its contempt powers that provide the means through which the violation can be remedied.  Yet, the bankruptcy court was not a party to the arbitration agreement and it is black letter law that "a contract [to arbitrate] cannot bind a nonparty." *EEOC v. Waffle House, Inc.,* 534 U.S. 279, 293-94 (2002) (cited in *In re Belton*, Adv. P. No. 14-08223 (RDD), 2014 WL 5819586 at *4 (Bankr. S.D.N.Y.

Nov. 10, 2014)), ("*Belton I*") rev'd by *In re Belton* ("*Belton II*"), 15-CV-1934, 2015 WL 6163083

(S.D.N.Y. Oct. 14, 2015), petition for mandamus pending, *In re Belton*, No. 16-833 (2d Cir.).

Courts considering whether a § 524 claim is within the scope of an arbitration agreement

have found the same. For example, in *In re Jorge*, 568 B.R. 25 (N.D. Ohio 2017), the court held

that "Mr. Jorge and Verizon's agreement to arbitrate claims arising out of or relating to the

Contract is wholly inapplicable to Mr. Jorge's claims for violation of . . . the discharge injunction."

*Id*. at 31 (citing *In re Jernstad*, No. 11 C 7974, 2012 WL 8169889 (N.D. Ill. Aug. 2, 2012) and *In*

*re Harrier*, 903 F.Supp.2d 1281 (M.D. Fla. 2012)).

In *In re Haas*, Case No. 16-03175-H2-ADV, Dkt. No. 88 at 11-18 (Bankr. S.D. Tex. Jan.

9, 2017) (Appendix C), the court denied a motion to compel arbitration of a § 524 claim noting

that the court was not a party to the arbitration agreement: "Well, now wait a minute. The

discharge injunction is something I enforce. I'm not a party to the Note. That discharge injunction

is my Order." (Appendix C at 11.) Similarly, the court in *In re Grant*, 281 B.R. 721 (S.D. Ala.

2000), held that the court was not bound by the parties' private agreement:

> This Court entered those [discharge] orders. This Court is a party to
> those orders and the Court is an entity offended if the orders are not
> obeyed. A party who has not agreed to arbitration of its claim cannot
> be forced to arbitrate. This Court does not agree to arbitrate the
> claims. Therefore, the arbitration clause cannot require arbitration
> of the claims alleging violations of §§ 362 and 524 of the Code.

281 B.R. at 724.

### B.    Plaintiff's Claims are not Arbitrable under *McMahon*.

In *Shearson/American Express v. McMahon*, 482 U.S. 220, 226-27 (1987), the Supreme

Court stated that "[l]ike any statutory directive the [Federal Arbitration Act's] mandate may be

overridden by a contrary congressional command." *Id*. *McMahon* goes on to state that a party can

demonstrate that a contrary congressional command exists by making a showing of Congress'

express or inherent intent "to limit or prohibit waiver of a judicial forum for a particular claim . . . deducible from the statute's text or legislative history, or from an inherent conflict between arbitration and the statute's underlying purposes." *Id*. at 227. Thus, under *McMahon*, a party may rely on (1) a statute's text; (2) its legislative history; or (3) an inherent conflict between arbitration and the statute's underlying purposes to demonstrate that Congress intended that particular claims should not be arbitrated. Here, the legislative history of the Bankruptcy Code demonstrates Congress's intent to have § 524 claims adjudicated in bankruptcy court and, moreover, there is an inherent conflict between arbitration and § 524's underlying purposes.

### 1. The Legislative History of the Bankruptcy Code Evidences Congress's Intent to Preclude Arbitration of Claims to Enforce the Discharge Injunction.

Firstmark claims that the legislative history of the Bankruptcy Code does not "evince any intent to preclude arbitration." Firstmark Br. at 9. Contrary to Firstmark's claim, the legislative history of the Bankruptcy Code shows that Congress intended for bankruptcy courts to enforce the discharge. In fact, Congress ultimately enacted the discharge injunction in order to prevent creditors from filing state court actions seeking to collect on previously discharged debts. This had been a common practice of creditors and unsuspecting former debtors would often default in those state court lawsuits. Unless they appeared in the action and raised the discharge as an affirmative defense, they would default and have to pay on discharged debts, which undermined the efficacy of the bankruptcy discharge. 4 Collier on Bankruptcy P 524.LH[1] (15th rev. ed., Lawrence P. King ed. 2000).

The legislative history of § 14(f) of the Bankruptcy Act, which is the predecessor to § 524 of the Bankruptcy Code, demonstrates that Congress enacted it to stop creditors from bringing such suits in state court by ensuring that bankruptcy courts enforce the discharge. The House Committee on the Judiciary stated that "the major purpose of the proposed legislation is to

effectuate, more fully, the discharge in bankruptcy by rendering it less subject to abuse by harassing creditors," who it noted "bring suit in State courts after a discharge in bankruptcy has been granted . . . in the hope the debtor will not appear in that action, relying to his detriment upon the discharge." *Id.*; *see also id.* (quoting floor statement of Rep. Wiggins that under § 14(f), "the bankruptcy court would be vested with authority to determine not only the bankrupt's right to a discharge but also the effect of a discharge when granted"). Moreover, "[t]he reasons behind the enactment of § 524(a), which is certainly comparable to and, in effect, amounts to a continuation of § 14f of the Act, include those that originally prompted the enactment of § 14f itself." *Id.*

Thus, the legislative history demonstrates that Congress's intent was that bankruptcy courts would enforce the discharge and former debtors would not have to defend harassing actions in state court:

> Accordingly, if a creditor brings a collection suit after discharge, and obtains a judgment against the debtor, the judgment is rendered null and void by § 524(a). The purpose of the provision is to make it absolutely unnecessary for the debtor to do anything at all in the collection action. Before the enactment of § 14f, a debtor could not safely ignore a post discharge collection action; the discharge had to be pled as an affirmative defense.

> Moreover, because the provisions of the discharge order take the form of an automatic injunction, if they are violated by a creditor subject to the order, ***the creditor will be subject to citation for contempt in the bankruptcy court*** upon application of the debtor.

*Id.* (emphasis added).

Thus, the legislative history supports a finding that Congress did not intend for § 524 claims to be determined in any other forum, including in arbitration.

### 2. There is An Inherent Conflict Between Plaintiff's Claims and Arbitration.

In a bankruptcy action, the inherent conflict test requires a determination of whether "any underlying purpose of the Bankruptcy Code would be adversely affected by enforcing an

arbitration clause." *Netflix, Inc. v. Relativity Media, LLC (In re Relativity Fashion, LLC)*, 696 Fed. Appx. 26, 30 (2d Cir. 2017) (quoting *U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. (In re U.S. Lines, Inc.)*, 197 F.3d 631, 641 (2d Cir. 1999)). If arbitration would "seriously jeopardize the objectives of the [Bankruptcy] Code," the arbitration clause should not be enforced. *U.S. Lines*, 197 F.3d at 641. *In re Lehman Bros. Holdings Inc.*, 663 Fed. Appx. 65, 68 (2d Cir. 2016).

Here, there is an inherent conflict between the arbitration of Plaintiff's claims and the underlying purposes of the Bankruptcy Code because (i) bankruptcy courts have the undisputed power to interpret and enforce their own orders and delegating that power to private arbitrators would jeopardize the underlying purposes of the Bankruptcy Code; (ii) providing and protecting the financial "fresh start" is a fundamental, if not <u>the</u> fundamental, purpose of the Bankruptcy Code and the discharge injunction is the mechanism through which the fresh start is achieved; thus, the central purpose of the Code would be frustrated by leaving enforcement of that purpose in the hands of privately-chosen arbitrators; and (iii) uniform application of bankruptcy law would be jeopardized by arbitration of violation of discharge orders.

### a.  Arbitration Is Impermissible Because It Would Strip the Bankruptcy Court of Its Power to Enforce its Own Orders.

The nature of Plaintiff's claims makes them unsuitable for arbitration. Claims for violation of § 524 are civil contempt claims. *See, e.g., In re Torres*, 367 B.R. 478, 490 (Bankr. S.D.N.Y. 2007); *In re McKenzie-Gilyard*, 388 B.R. 474, 481-82 (Bankr. E.D.N.Y 2007) (Stong, J.). Thus, in order to prevail, Plaintiff must satisfy the standard for civil contempt sanctions by proving that Defendants had actual or constructive knowledge of the discharge injunctions of the bankruptcy courts and willfully violated them by continuing with the activity complained of. *Id*. This type of

claim, which insures the integrity of the court, protects the fresh start, and is adjudicated under the civil contempt standard, is exactly the type of claim that should not go to arbitration.

As the *Anderson* district court held, the discharge injunction is "an affirmative order of the bankruptcy court" and bankruptcy courts have "undisputed power" to enforce their own affirmative orders. *In re Anderson*, 553 B.R. 221, 233 (S.D.N.Y. 2016) (citing *MBNA America Bank, N.A. v. Hill*, 436 F.3d 104, 108-09 (2d Cir. 2006)). Indeed, "courts in the Second Circuit consistently recognize the unique power of a bankruptcy court to interpret its own orders." *Id.* (citing *Deep v. Copyright Creditors,* 122 F. App'x 530, 533 (2d Cir. 2004) (citing *In re Casse*, 198 F.3d 327, 333 (2d Cir. 1999) ("The bankruptcy court [is] in the best position to interpret its own orders.")); *In re Texaco Inc.,* 182 B.R. 937, 947 (Bankr. S.D.N.Y. 1995) ("A bankruptcy court is undoubtedly the best qualified to interpret and enforce its own orders including those providing for discharge and injunction")). The *Anderson* district court found that this consideration supported its refusal to compel arbitration.

The *Anderson* district court's findings are supported by overwhelming precedent and academic authority. Indeed, it is elemental that federal courts have the exclusive power to enforce their orders and, equally important, to determine the proper remedy for violation of those orders. That power to enforce orders — the power of contempt — cannot be delegated or outsourced to private parties. Placing that contempt power in the hands of private arbitrators is repugnant to our judicial system. *See, e.g., PRL USA Holdings, Inc. v. United States Polo Ass'n, Inc.*, No. 14–cv–764 (RJS), 2015 WL 1442487, at *6 (S.D.N.Y. Mar. 27, 2015) ("Federal courts, and federal courts alone, possess the inherent authority to enforce their judgments, and the FAA may not be construed to divest courts of their traditional powers to police their own orders. A pending arbitration cannot prevent this judicial function, regardless of what the parties may have privately agreed.") (internal

quotation and citation omitted).  *See also Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798-99 (1987).  A contempt of a court order, which can be punished both civilly and criminally, cannot be left in the hands of an arbitrator who cannot provide the constitutional protections required for such a proceeding, and the integrity of a bankruptcy judge's order should not be at the mercy of a private arbitrator.  Only a court should have the power to determine contempt of a court order.

Because it is an underlying purpose of the Bankruptcy Code that bankruptcy judges have the ability to interpret and enforce court orders, especially in a contempt setting, courts have held that sending § 524 claims to arbitration conflicts with the Bankruptcy Code.  For example, the Fifth Circuit held that claims to enforce the discharge injunction are not arbitrable.  *In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1071 (5th Cir. 1997) ("We are convinced that arbitration of a core bankruptcy adversary proceeding brought to determine whether [defendant's] collection efforts were barred by the § 524(a) discharge injunction . . . would be inconsistent with the Bankruptcy Code.").

Similarly, a bankruptcy court in the Southern District of Texas recently denied a motion to compel arbitration on this ground in a student loan case against Navient.  *In re Haas*, Appendix C at 44-45.  The court was clear that a claim to enforce the discharge injunction in § 524 is a form of contempt.  *Id*. at 16 ("They're essentially seeking to have you held in contempt.  A discharge injunction is my Order.  They're seeking to hold you responsible for violating my Order.  That's contempt.").  Moreover, the court emphasized that enforcement of the discharge injunction is at the heart of the bankruptcy process.  *Id*. at 20-21 ("No, but you're going to the very heart of the integrity of the bankruptcy process itself.  I mean, I took an oath to defend and enforce the bankruptcy system.  And if the conduct that is alleged turns out to be true, I mean, how can folks

come in here and ask for a discharge . . . and if they don't have any confidence that the discharge that they get is going to be enforced, then what's the process worth at that point?"). The court denied the motion to compel arbitration, stating that the defendant's argument was "about as frivolous as it gets;" that "the motion ha[d] no foundation in the applicable law;" and that denying the motion was "not even a close call." *Id*. at 16, 44.

Other courts have made similar holdings. *See, e.g., Hooks v. Acceptance Loan Co., Inc*., 2011 WL 2746238 (M.D. Ala. July 14, 2011), at \*5 ("It would seem anomalous to allow an arbitrator to construe a court's order in a contempt setting. As a general matter, allowing arbitration of contempt proceedings would effectively strip the courts of their primary enforcement mechanism."); *In re Grant*, 281 B.R. 721, 724-25 (Bankr. S.D. Ala. 2000) ("Allowing arbitrators to resolve a contempt matter would present a conflict with the Bankruptcy Code in that it would allow an arbitrator to decide whether or how to enforce a federal injunction under §§ 362 and 524"); *In re Norman*, Adversary No. 06-1133, 2006 WL 2818814 (Bankr. M.D. Ala. Sept. 29, 2006) at \*2 ("The question of whether a discharge injunction issued by the Federal Bankruptcy Court has been violated ought to be decided by a Bankruptcy Judge and not by an arbitrator.")*; see also* Kara J. Bruce, *Vindicating Bankruptcy Rights*, 75 Md. Law Rev. 443, 473-74 (2016) (discussing the fact that "courts and commentators have widely recognized that it would be improper" to allow arbitration of claims, such as § 524 claims, that are either remediable through contempt sanctions or enforceable by operation of the court's equitable authority under § 105 of the Bankruptcy Code).

      **b.**     **Arbitration is Impermissible Because the Financial "Fresh Start" Is a Fundamental Right Granted by the Bankruptcy Code and Arbitration of That Right Would Be Inconsistent with the Bankruptcy Code.**

The discharge injunction, and the ability of debtors to enforce it before the bankruptcy court, is central to enabling the fresh start, the core purpose of bankruptcy and, as such, cannot be enforced piecemeal in arbitration. As the bankruptcy court in *Belton* stated, "nothing is more fundamental to the adjustment of debtor/creditor relations than the discharge, an event that is not derived from the parties' pre-bankruptcy conduct but, rather, is the bankruptcy case's culminating event." *Belton I*, 2014 WL 5819586 at *9. The *Belton* bankruptcy court emphasized that it, rather than a private arbitrator, "sees hundreds of individual debtors in bankruptcy every month." *Id*. at *7. Each debtor makes the very difficult decision to file bankruptcy as "a last resort" in return for the promise of a fresh start. *Id*. "The discharge is why they subject themselves to everything else. If a party subsequently violates the discharge, the debtor's reason for seeking relief and enduring all of the constraints imposed by Congress in the Bankruptcy Code go for nothing. Indeed, if the violation persists the case itself can be said to have been for nothing, which, of course, means that the effectiveness of bankruptcy as a fair, collective remedy for creditors and a fresh start for debtors is eviscerated." *Id*. at *8. These words make it clear that the *Belton* bankruptcy court found it incongruous that this most important function of the Bankruptcy Code would be relegated to a private arbitrator.

For this reason, the *Anderson* district court reached the same conclusion as the *Belton* bankruptcy court, concluding that the fresh start "is predominantly achieved through the discharge, and, therefore, the question of whether a discharge injunction has been violated is essential to proper functioning of the Bankruptcy Code, and arbitration is inadequate to protect such core, substantive rights granted by the Code." *In re Anderson*, 553 B.R. at 232. Key to Judge Roman's

conclusion was the fact that "the discharge is so fundamentally related to a debtor's fresh start." *Id.* at 233.

The *Belton* bankruptcy court and *Anderson* district court are undoubtedly correct, given that ensuring the fresh start through the discharge injunction is at the heart of the bankruptcy court's function. Every single adjudication by the bankruptcy court of a violation of § 524 involves the court's application of bankruptcy law and policy. The court considers the context of the debtor's entire bankruptcy, all other creditors involved in the bankruptcy, and the policies underlying the Bankruptcy Code in determining whether there is a violation and the appropriate remedy for that violation. A claim to enforce the discharge injunction is not merely a dispute between two parties, and it cannot be parceled off from the bankruptcy and ceded to an arbitrator who has none of the context of the bankruptcy or the institutional knowledge of a bankruptcy court.

Firstmark relies on the Second Circuit's decision in *MBNA America Bank, N.A. v. Hill*, 436 F.3d 104, 107 (2d Cir. 2006), to support its argument that Plaintiff's claim is arbitrable. Firstmark Br. at 12-14. However, to the contrary, *Hill* supports the conclusion that plaintiff's claim is *not* arbitrable. As the *Anderson* district court held, *Hill* "confirmed [a] central objective of the Bankruptcy Code – providing debtors with a fresh start – which also has been recognized consistently by Second Circuit courts." *In re Anderson*, 553 B.R. at 233 (citing *Hill*, 436 F.3d at 109; *In re Bogdanovich,* 292 F.3d at 107 ("Congress made it a central purpose of the [B]ankruptcy [C]ode to give debtors a fresh start in life and a clear field for future effort unburdened by the existence of old debts."); *In re Hayes*, 183 F.3d 162, 167 (2d Cir. 1999) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)) ("one of the primary purposes of the bankruptcy act is to ... permit [the honest debtor] to start afresh") (alteration in original)). The *Anderson* district court further concluded that the fresh start "is predominantly achieved through the discharge, and,

therefore, the question of whether a discharge injunction has been violated is essential to proper functioning of the Bankruptcy Code, and arbitration is inadequate to protect such core, substantive rights granted by the Code." *Id.* Key to the court's conclusion was the fact that "the discharge is so fundamentally related to a debtor's fresh start." *Id.*[2] As the bankruptcy court noted in *Belton I*, the Second Circuit in *Hill* compelled arbitration expressly because the case before it did not involve a threat to a debtor's fresh start. *Belton I*, 2014 WL 5819586, at *9.

In *Hill*, the Second Circuit allowed the plaintiff's § 362 claim for violation of the automatic stay provision to go to arbitration under the unique facts of that case. There, the bankruptcy proceedings had ended; the violation was related to the automatic stay, which had ceased to operate under the terms of the statute once the proceedings ended; and MBNA had already agreed to repay the $159.01 that had been collected in violation of the automatic stay. Thus, the bank's conduct had no implications for the plaintiff's ability to get a fresh start and arbitration would not inherently conflict with the underlying purpose of the Bankruptcy Code. 436 F.3d at 110. The *Hill* facts are fundamentally different from the putative class's claims here, which involve the discharge injunction, and not the automatic stay, and in which Defendants' actions directly to threaten the fresh start of Plaintiff and the putative class.

Here, the putative class continues to need the protection of the discharge injunction to ensure their fresh starts. Defendants' continued efforts to collect discharged debt have been persistent and based on company-wide practices. Compl. at ¶¶ 53-61. Those practices have

---

[2] Although Firstmark fails to acknowledge as much in its brief, as discussed *supra*, the *Anderson* and *Belton* district courts are split on the issue of whether discharge violations should be arbitrated and the issue is on appeal to the Second Circuit in the *Anderson* action. For all the reasons set forth here and in the appellee's brief in the *Anderson* appeal, the *Belton* district court decision is wrongly decided. *See In re Anderson*, No. 16-2496 (2d Cir.), Dkt. No. 117.

threatened the putative class members' ability to move on with their lives, free of the discharged

debts.  Thus, *Hill* is clearly distinguishable.

> **c.      Arbitration is Impermissible Because Federal Litigation of the Claims at Issue Promotes Uniform Application of the Bankruptcy Law.**

The goal of uniform application of the bankruptcy law also prohibits arbitration of

Plaintiff's claims here.  Uniform application of the bankruptcy laws is an important purpose of the

Bankruptcy Code, one which has long been recognized.  *In re Anderson*, 553 B.R. at 234 (the

bankruptcy court "emphasized the importance of the uniform application of bankruptcy law, which

has been recognized consistently in courts throughout this district") (citing *In re Lehman Bros.*

*Holdings Inc.*, 480 B.R. 179, 196 (S.D.N.Y. 2012); *In re Extended Stay, Inc.,* 466 B.R. 188, 207

(S.D.N.Y. 2011)).  It is particularly important to create precedent to promote uniform application

of the bankruptcy laws, where, as the Second Circuit has noted, there has been a historical lack of

consistent, reliable precedent.  *Weber v. U.S. Trustee*, 484 F.3d 154, 158 & n.1 (2d Cir. 2007)

(discussing the "paucity of settled bankruptcy-law precedent").

This purpose is best achieved through litigation in the bankruptcy court, which creates

transparency, as well as binding legal precedents, and thus encourages consistent outcomes.  *Id.*

(citing *Lehman Bros. Holdings Inc. v. Wellmont Health Sys*., No. 14 CIV. 01083 LGS, 2014 WL

3583089, at *1 (S.D.N.Y. July 18, 2014) (finding that uniformity in the administration of

bankruptcy laws weighs in favor of leaving the case in bankruptcy court, noting that although the

claims are principally private and contractual in nature, "they are brought within the context of

similar disputes arising out of various [] agreements"); *Belton I*, 2014 WL 5819586, at *10 (there

is a need for "complete and consistent relief," which "is more likely to occur if [the disputes are]

determined by … a bankruptcy court [rather] than on an arbitration-by-arbitration basis of separate

alleged violations of the discharge")).

As the *Anderson* district court further reasoned, arbitration would undermine the Code's purpose of achieving uniformity and could in fact produce "wildly inconsistent results." 553 B.R. at 234. This is because in that action, as here, each member of the putative class asserts a virtually identical claim against these creditors. If Plaintiffs were forced to arbitrate each claim individually, it is "certainly plausible, if not probable" that the arbitrations would reach disparate outcomes, especially given that arbitrators have broad discretion as to whether to apply collateral estoppel offensively. *Id.* (citing *Bear, Stearns & Co., Bear, Stearns Sec. Corp. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 92 (2d Cir. 2005) ("In view of differing results reached by different panels, the arbitrators had discretion to apply collateral estoppel or not."). For this reason, the *Anderson* district court concluded that "multiple violations of a discharge injunction by one creditor are more efficiently and uniformly decided by federal litigation." *Id.*

This is especially true in the student loan context where there are a number of older, conflicting decisions on dischargeability. That conflict will eventually be resolved through the courts reaching a consensus on a majority view or through appellate rulings. If the issue were left to arbitration, however, there would be no mechanism to form a consensus and debtors and creditors would lose all predictability on this critical issue.

> **d.** *CompuCredit* **Does Not Affect the Vitality of the Inherent Conflict Test or Even Address It.**

Firstmark suggests that the Supreme Court "no longer conducts the 'inherent conflict' inquiry" set forth in *McMahon*. Firstmark Br. at 10. It relies on *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665 (2012), in support of its argument, but *CompuCredit* stands for nothing of the sort. *CompuCredit* addressed only the issue of whether the text of a statute exempts a claim from arbitration. *CompuCredit* did not address situations in which Congress's intent to exempt a claim from arbitration is evident from the legislative history of the statute or, as here, from an inherent

conflict between arbitration and underlying purposes of the statute. As such, *CompuCredit* does not address the inherent conflict test and it does not cast doubt on that test.

The district court in *Belton* properly analyzed and rejected the reading of *CompuCredit* that Firstmark proposes here. The court stated that *CompuCredit* "cannot be read as impliedly overruling *McMahon*" and noted that "Justices Sotomayor and Kagan, who concurred in the judgment in *CompuCredit,* did 'not understand the majority opinion to hold that Congress must speak so explicitly in order to convey its intent to preclude arbitration of statutory claims. We have never said as much, and on numerous occasions have held that proof of Congress' intent may also be discovered in the history or purpose of the statute in question.'" *Belton II*, 2015 WL 6163083 at *5 (quoting 132 S. Ct. at 675 (Sotomayor and Kagan, J.J., concurring)). Moreover, as the *Belton* district court explained, 'respondents in *CompuCredit* did not rely on the [relevant statute]'s legislative history, nor did they make an 'inherent conflict' argument; '[c]onsequently, the sole question for the Court [wa]s whether the text of the [statute] precludes arbitration with sufficient clarity to override the operation of the FAA.'" *Id.* (quoting petitioners' brief in *CompuCredit,* 2011 WL 2533009, at *18 (June 23, 2011)).

This argument has also been rejected in *In re Farmer*, Case No. C17-0764, 2017 WL 4619209, at *1–2 (W.D. Wash. Oct. 16, 2017): "Navient argues that Supreme Court jurisprudence has evolved since *McMahon* and no longer includes the inherent conflict factor. . . . this Court finds that the bankruptcy court's consideration of the inherent conflict factor was appropriate."

In addition to *Belton II* and *Farmer*, the Second Circuit and lower courts in this Circuit have continued to apply the inherent conflict test following *CompuCredit*, as well.[3] *See, e.g.,*

---

[3] Firstmark also asserts that the Supreme Court's decision in *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013), demonstrates that it has "effectively abandoned" the inherent conflict test. Firstmark Br at 11-12. This is not true. *Italian Colors* does not address the

*Netflix*, 696 Fed. Appx. at 30 ("[A] bankruptcy court may retain jurisdiction over a core proceeding in spite of a mandatory arbitration provision if, in the exercise of its discretion, it concludes that any underlying purpose of the Bankruptcy Code would be adversely affected by enforcing an arbitration clause") (internal citation omitted); *In re Lehman Bros. Holdings, Inc.*, No. 14 Civ. 7643, 2015 WL 5729645, at *14 (S.D.N.Y. Sept. 30, 2015) (affirming bankruptcy court's finding of inherent conflict and denial of motion to compel arbitration), *aff'd by In re Lehman Bros. Holdings, Inc.*, 663 Fed. Appx. 65, 67 (2016) ("If arbitration would severely conflict with the text, history, or purposes of the Bankruptcy Code, the bankruptcy court has discretion to compel or to stay the arbitration."). Thus, *McMahon's* inherent conflict test remains unaffected by *CompuCredit* (or *Italian Colors*) and should be applied here.

### C.    Plaintiff Did Not Waive the Right to Participate in a Class Action.

Firstmark argues that, even if its motion to compel arbitration is denied, the class action allegations should be dismissed because Plaintiff waived all class action rights in her loan contract. Firstmark Br. at 18. Of course, Firstmark has failed to produce the actual loan documents signed by Plaintiff so this aspect of Firstmark's motion should be dismissed outright.

Even if the Court were to assume the standard promissory note attached to the Seniawski Declaration (Dkt. No. 48) is the agreement that Plaintiff signed, it is clear that the class action waiver is part and parcel of the unenforceable agreement to arbitrate. The first relevant language appears under the section entitled "Arbitration of Disputes" and reads in capital letters as follows:

---

inherent conflict test at all, but rather the separate "effective vindication doctrine." As described above, the inherent conflict test is a method of determining congressional intent—whether Congress intended a particular claim to be arbitrable or not. *McMahon*, 482 U.S. at 226-27. By contrast, the effective vindication doctrine is a "judge-made exception" to the FAA, in which courts will invalidate, on public policy grounds, arbitration agreements that "operate . . . as a prospective waiver of a party's right to pursue statutory remedies." *Italian Colors*, 133 S. Ct. at 2310 (internal quotation omitted).

> Arbitration replaces the right to go to court, including the right to a jury and the right to participate in a class action or similar proceeding.    In arbitration, a dispute is resolved by a neutral arbitrator instead of a judge or jury.

Dkt. 48, Ex. A at 1.

Firstmark relies on different language in the boilerplate and seems to imply to the Court that the class action waiver is independent of the arbitration provisions.  But Firstmark fails to recite the provision in its entirety.  The language, which appears on the second page of the boilerplate under the heading "No Consolidation or Joinder of Parties," actually reads as follows:

> All parties to the *arbitration* must be individually named.  Claims by persons other than individually names parties shall not be raised or determined.  Notwithstanding anything else that may be in this arbitration provision, no class action, private attorney general action, or other representative action may be pursued in *arbitration*, nor may such action be pursued in court ***if any party has elected arbitration***.  Unless consented to by all parties *to the arbitration*, Claims of two or more persons may not be joined, consolidated or otherwise brought together *in the same arbitration* (unless those persons are applicants, co-applicants on a single Account and/or related Accounts or parties in a single transaction or related transactions); this is so whether or not the Claims (or any interest in the Claims) may have been assigned.

Dkt. No. 48, Ex. A at 2. (emphasis added.)

By its very terms, the class action waiver only comes into play "if any party has elected arbitration."  Thus, if the arbitration agreement itself is not enforceable (which it is not), then the class action waiver within that agreement is not enforceable either.  *Borecki v. Raymours Furniture Co., Inc*., 2017 WL 5900288, at *5 (S.D.N.Y. June 21, 2017) ("Because the Agreement's class action waiver is applicable only to arbitrable claims, and because . . . The Arbitration Agreement does not require [Plaintiff] to arbitrate his TCPA claim, [Plaintiff's] TCPA claim may be asserted as a class action."); *Meyer v. Kalanick*, 185 F. Supp. 3d 448 (S.D.N.Y. 2016) (holding that the class action waiver was unenforceable because it was an integral part of the arbitration provision

which defendant had waived; court also held that, in any event, the class action waiver was unconscionable under California law), *rev'd on other grounds, Meyer v. Uber Technologies, Inc.*, 868 F.3d 66 (2d Cir. 2017).

Firstmark's citation to *Spano v. V&J Nat'l Enters.*, 364 F. Supp. 3d 440 (W.D.N.Y. 2017) is misplaced.  In *Spano*, the class action waiver was before both the NLRB and the district court in an arbitration and court action between the parties.  Even though the district court recognized that class action waivers may be enforceable, it declined to rule on the issue, noting that both it and the NLRB were "choos[ing] to deter entering judgment upon the validity and enforceability of this class action waiver because the Supreme Court has granted certiorari . . . to directly address [it]." *Id*. at 460.

## IV.    THE SUBJECT LOANS ARE DISCHARGEABLE BECAUSE THEY ARE NOT QUALIFIED EDUCATIONAL LOANS WITHIN THE TERMS OF § 523(a)(8)(B) OR AN "EDUCATIONAL BENEFIT" UNDER § 523 (a)(8)(A)(ii).

PHEAA argues that the FAC fails to allege that the Bank One loan does not meet the standards of §§ 523 (a)(8)(B) or (a)(8)(A)(ii) of the Bankruptcy Code. Neither argument has merit.

PHEAA suggests that the FAC fails to allege non-compliance with §523(a)(8)(B) because Plaintiff "fails to allege any plausible facts establishing that her loan proceeds were used for non-education expenses."  PHEAA Br. at 14. This argument is wrong for two reasons:  <u>First</u>, how Plaintiff used the proceeds does not make the loan non-dischargeable if it otherwise does not meet the express criteria of §523(a)(8)(B).  And PHEAA itself concedes this fact.  PHEAA Mem. at 18 (arguing that the use of the proceeds does not determine if it is a qualified educational loan).[4]

---

[4] IRS regulations suggest that if Plaintiff <u>did not</u> use the proceeds of the loan for educational purposes, that would be an independent reason to find that these loans are not excepted from dischargeability under § 523(a)(8)(B).  26 C.F.R. § 1.221-1(e)(4), Example 6, cited in *Wiley v. Wells Fargo Bank* (*In re Wiley*), 2017 WL 6550418, at *7 (D. Me. Dec. 21, 2017).  But Plaintiff need not make that showing because these loans do not qualify under that section for the independent reason that they exceed "cost of attendance" as explained in the text.

Section 523(a)(8)(B) exempts from dischargeability a qualified education loan as defined by §221(d)(1) of the Internal Revenue Code. Under that section, a qualified education loan is an "indebtedness incurred by the taxpayer solely to pay qualified higher education expenses." "Qualified higher education expenses," in turn, are defined by § 221(d)(2) as the "cost of attendance" as defined by 20 U.S.C. § 1087. That section defines "cost of attendance" as tuition, fees, certain supplies, etc. all "as determined by the institution." An institution's determination of "cost of attendance" must be collected, reported and made available to the public pursuant to 20 U.S.C. § 1015(a)(3)(A)(ii), 1015 (a)(3)(C) and 1015(a).

The FAC alleges that the Bank One loan clearly exceeded the "cost of attendance" for Plaintiff as determined by the University of Pennsylvania Law School. Therefore, it is not a qualified education loan. *See In re Rogers*, 374 B.R. 510, 515-516 (E.D.N.Y. 2007) (cost of attendance determined by institution); *see also El-Bibany v. Commissioner of Internal Revenue*, T.C. Summ. Op. 2005-18 (June 8, 2005) (cost of attendance is defined by the statute, not the amount of expenses actually incurred).

There is a good policy reason for the limitations contained in § 523(a)(8)(B). By limiting the exception to "cost of attendance", Congress has sought to protect students from an inordinate debt load offered to them by direct-to-consumer lenders. Surely, Defendants cannot contend that they could loan someone $5 million and then assert that the loan is non-dischargeable because the borrower was a student or because the borrower said she would use the proceeds for school expenses. Defendants are coming into court demanding that the exception to discharge be limitless. It is not.

_____

Second, even if it were relevant how Plaintiff used the proceeds, that is obviously a question of fact that cannot be determined on a motion to dismiss. Insofar, PHEAA seems to be arguing that the FAC has misstated the cost of attendance at the University of Pennsylvania (and it is not at all clear what PHEAA is arguing), that also is a question of fact that is not properly determined on a motion to dismiss.

PHEAA also argues that Plaintiff has failed to properly allege that the Bank One loan does not come within the terms of §523(a)(8)(A)(ii) because the loan is "an obligation to repay funds received as an educational benefit." The FAC expressly alleges that the loans here are not "education grants" under § 523(a)(8). Moreover, PHEAA's argument was recently considered and rejected – twice – by bankruptcy judges in this very District in *In re Campbell,* 547 B.R. at 49 (Bankr. E.D.N.Y. 2016) (Craig, C.B.J.) and in *In re Decena,* 549 B.R. at 11 (Bankr. E.D.N.Y.) (Grossman, B.J.), *rev'd in part on other grounds*, 562 B.R. 202 (E.D.N.Y. 2016). Many courts have come to the same conclusion and this is now the prevailing interpretation of § 523(a)(8)(A)(ii). *See In re Kashikar,* 567 B.R. 160, (9th Cir. B.A.P. 2017); *In re Essangui*, 573 B.R. 614 (Bankr. D. Md. 2017); *In re Dufrane,* 566 B.R. 28 (Bankr. C.D. Cal. 2017).[5] This Court should follow suit.[6]

_____

[5] *See also In re Christoff*, 527 B.R. at 624 (9th Cir. B.A.P. 2015); *In Matter of Swenson*, 2016 WL 4480719, at *3 (Bankr. W. D. Wis. 2016); *In re Schultz*, 2016 WL 8808073, at *1 (Bankr. D. Minn. 2016); *In re Meyer*, 2016 WL 3251622, at *2 (Bankr. N. D. Ohio 2016); *In re Nunez*, 527 B.R. 410, 415 (Bankr. D. Ore. 2015); *London–Marable v. Sterling*, 2008 WL 2705374, *6 (D. Ariz. 2008); *In re Scott,* 287 B.R. 470, 474 (Bankr. E.D. Mo. 2002); *In re Reis*, 274 B.R. 46, 50 (Bkrtcy. D. Mass. 2002); *In re Jones*, 242 B.R. 441, 444 (Bankr. W.D. Tenn. 1999); *In re Meinhart*, 211 B.R. 750, 751 (Bankr. D. Colo. 1997); *In re McClure*, 210 B.R. 985, 987 (Bankr. N.D. Tex. 1997); *In re Shorts*, 209 B.R. 818, 819 (Bkrtcy. D.R.I. 1997); *In re Alibatya*, 178 B.R. 335, 340 (Bkrtcy. E.D.N.Y. 1995).

[6] Defendants make the dubious assertion that its position is the majority view. While it is true that courts have split on the issue, Defendants ignore the fact that a majority of recent cases – including cases from this very District - favor Plaintiff's position.

Finally, it is likely that the subject loans do not even qualify as "educational loans" under § 523(a)(8) at all.  They are simply direct-to-consumer loans, subject to the same discharge rules as any other consumer debt.

A creditor has the burden to show that debt is an "educational loan." *In re Pappas*, 517 B.R. 708, 717–18 (Bkrtcy. W.D. Tex., 2014); *In re McFadyen*, 192 B.R. 328, 331 (Bkrtcy. N.D.N.Y., 1995). The term "educational loan" is not defined anywhere in the Bankruptcy Code but courts have repeatedly held that educational loans differ from consumer loans because they are made to directly to schools on the student's behalf, without credit or collateral considerations, without business considerations, at low or subsidized interest rates (often as low as 2.5%), in order to further a public good.  *See Matter of Roberson*, 999 F.2d 1132, 1135–36 (7th Cir. 1993) ("Educational loans are different from most loans. They are made without business considerations, without security, without cosigners, and rely [ ] for repayment solely on the debtor's future increased income resulting from the education."); *U.S. Dept. of Health and Human Services v. Smith,* 807 F.2d 122, 126 (8th Cir. 1986) (same); *In re Campbell*, 547 B.R. 49, 60 (same).

The subject loans lack the traditional characteristics of "educational loans." First, the instruments were made under Defendants' direct-to-consumer lending programs.  As this was a direct-to-consumer program, it was not conducted through the financial aid offices of eligible schools (as are all government lending programs and most private lending programs), and thus was not limited as to the amount of money that could be lent above and beyond the published cost of attendance.  FAC ¶¶ 17, 18.

Moreover, the loans were assigned an adjustable interest rate at the time of origination, the same as any commercial loan.  (Dkt. No. 45-2, Ex. 1 at 5; 48, Ex. 1 at 1).  Bank One itself refers to the loan as a "consumer credit transaction."  (Dkt No. 45-2, Ex. 1 at 2) and requires a co-signer.

(*Id*.)  Defendants should not be able to behave like commercial lenders while simultaneously receiving the same protection in bankruptcy as governmental student lending programs.[7]

Such lending behavior is inconsistent with a traditional educational lending program. These direct-to consumer debts were consumer loans, similar to those as were then being made in the mortgage industry.  As noted above, Defendants had available to them a straightforward way to ensure that its loans were qualified educational loans (and thus protected from discharge under the Bankruptcy Code) by lending through the financial aid offices of accredited schools.  Instead, Defendants chose to bypass the schools entirely by lending direct-to consumer.  While that strategy no doubt drastically expanded the lending pool, it also cast aside the protections that came with lending through qualified educational institutions.[8]  Defendants made their choice to accept the risk of non-dischargeability and should not be permitted to avoid that risk with impunity to the fresh start and discharge injunction.

---

[7]  "Direct-to-Consumer" lending programs were largely the creation of the First Marblehead Corporation ("FMC").  FMC partnered with JP Morgan Chase and number of other banks to create these direct-to-consumer lending programs, whereby the commercial bank originated the debt and then FMC purchased the loans.  FMC then securitized the loans into National Collegiate Student Loan Trusts.  FMC quickly massaged its lending criteria to originate more debt to feed the securitization market.  *See In re The First Marblehead Corp. Securities Litigation,* 639 F.Supp.2d 145, 149–50 (D. Mass. 2009) (describing allegations in a securities action that FMC aggressively sought to expand the student lending pool and systematically lowered or ignored its own credit lending standards).

[8] *See, e.g., In re McClure*, 210 B.R. 985, 988 (Bkrtcy. N.D. Tex. 1997) ("ACT offers loans in order to broaden its base of potential customers. This is akin to a furniture store which extends credit to high risk debtors in order to sell more furniture. Although many of the credit risks pay up, some do not. That is a risk a business must take if it thinks that the benefit outweighs the risk. This court declines to offer ACT protection under an umbrella created by Congress in order to protect government programs designed to allow individuals to further their education who otherwise might not be able to do so.").

**V.      DEFENDANTS CANNOT CONVERT AN UNQUALIFIED LOAN INTO A
QUALIFIED LOAN BASED SOLELY UPON HOW THE LOAN IS
CHARACTERIZED EITHER IN THE LOAN DOCUMENTS OR IN THE
DEBTOR'S SCHEDULE F.**

As noted above, Defendants' loans are not qualified loans within the terms of §§

523(a)(8)(A)(ii) or (a)(8)(B).  Defendants cannot convert their loans into qualified student loans

merely by placing boilerplate in the loan documents stating that the loan is for educational

purposes.

In support of its position, PHEAA cites *In re Murphy*, 282 F.3d 868 (5th Cir. 2002) which

holds that an education loan's purpose, not the debtor's use of the funds, determines whether the

loan comes within § 523(a)(8).  Further, PHEAA argues that the loan documents recite that they

are for an educational purpose.  But *Murphy* does not support PHEAA's position.  All that case

holds is that a loan that would otherwise qualify as non-dischargeable under § 523(a)(8) does not

become dischargeable merely because the debtor used the funds for purposes other than for

education.  In analyzing whether debtor's use of funds for living expenses constituted an

educational purpose, the *Murphy* court noted the fact that he was using the funds as "part of his

broader effort to obtain his education," and that, in the promissory notes, he acknowledged that he

was borrowing the funds for educational purposes.  282 F.3d at 873.  But as the court in *In re*

*Dufrane*, 566 B.R. 28, 40 (Bankr. S.D. Cal. 2017) pointed out, the purported purpose for which a

loan is given cannot "be used to elevate a non-qualified educational loan into a qualified

educational loan."  *Id*. at 41. (emphasis original) The fact that the notes here indicated that the

proceeds would be used for education and living expenses did not convert an unqualified loans

into a qualified ones.  *Id.  See also Wiley v. Wells Fargo Bank, N.A*., 2017 WL 6550418, at *4-5

(D. Me., Dec. 21, 2017) ("pre-printed portions of the Agreement do not mandate that the Loans were, in fact, made under a program funded by a nonprofit institution.")

Similarly, the court in *Lancaster v. Educational Financial Services* (*In re Goodacre*) Case No. 16-80315-JTG (Bankr. W.D. Mich. Nov. 8, 2017), at 13 (Appendix D) rejected the argument that including the subject loan as a "student loan" on the Schedule F estopped the Plaintiff from arguing that the loan was dischargeable.. *See also In re Clouser*, 2016 WL 5864493, at *2 (Bkrtcy. D. Or. 2016) ("It is true that Debtor's description in his schedules is consistent with the Loan Documents, which describe the transaction as an 'Education Loan.' However these labels are not binding on the Court. Perhaps more importantly, even though Debtor's schedules do constitute an admission, this admission is not enough to carry NCSLT's evidentiary burden because the terms 'student loan' and 'education loan' are not coextensive with *nondischargeable loans* covered by § 523(a)(8). To cite just one hypothetical: a bank loan that is used to pay secondary school tuition, but which is neither made nor guaranteed by a nonprofit or governmental agency, would qualify in common parlance as a student loan, but would not fit under any of the three subparagraphs of § 523(a)(8).") (internal citations omitted)

## VI.    PLAINTIFF HAS PROPERLY PLED DISCHARGE VIOLATIONS

### A.    Courts Have The Power To Enforce Discharge Injunctions through Adversary Proceedings.

Firstmark argues that Plaintiff cannot seek a remedy for discharge violations through an adversary proceeding because there is no private right of action for violation of a discharge injunction. Firstmark Mem. At 22. That argument is a red herring. There is no question that bankruptcy courts have the power to enforce discharge injunctions regardless of any specified private right of action. *In re Kalikow,* 602 F.3d 82, 96 (2d Cir. 2010) (court may invoke §105(a) as well as its inherent contempt powers to enforce § 524); *In re Anderson,* 550 B.R. at 239 ("The

Bankruptcy Court is correct, therefore, that the argument 'there's no private right of action under 524 is essentially a red herring' because bankruptcy courts can invoke §105 to enforce a discharge injunction.").

Likewise, an action to enforce a discharge injunction may be maintained in an adversary proceeding. *See In re Anderson,* 550 B.R. at 240 (finding "no ground for substantial dispute" that actions for enforcement of discharge injunctions may be brought through adversary proceedings).[9] Thus, there is no question that this is a proper action to address the alleged discharge injunction violations.

**B.      The Discharge Injunctions Can Support A Finding Of Contempt.**

Defendants' second argument – that the discharge order issued by this Court is too vague to support a contempt finding – is also wrong.   For civil contempt based on a violation of a discharge injunction, the only questions a court must ask are whether the defendant (1) knew of the discharge violation; and (2) intended the action that violated the discharge. *In re DiGeronimo,* 354 B.R. 625, 642 (Bankr. E.D.N.Y. 2006).  *See also In re McKenzie-Gilyard*, 388 B.R. at 482. Importantly, a creditor's subjective belief that a debt was not discharged is irrelevant.  *Id.* ("[M]istaken belief that a debt at issue was not discharged . . . does not negate a finding that a

---

[9] The district court in *Anderson* read the Second Circuit's decision in *Kalikow* as an endorsement of the adversary proceeding as a vehicle for enforcement of discharge injunctions. *Anderson,* 550 B.R. at 240 ("The Court agrees with the Bankruptcy Court that a careful reading of *Kalikow* and § 105 demonstrate that an adversary proceeding is an appropriate vehicle to enforce a discharge injunction.")  *See also Kalikow,* 602 F.3d at 93; *In re Hardy*, 97 F.3d 1384 (11th Cir. 1996) (allowing the adversary proceeding and holding that the bankruptcy court could issue contempt ruling under § 105 and award sanctions, attorney fees and costs in an adversary proceeding); *In re Fagan,* 559 B.R. 718, 727 (Bankr. E.D. Cal. 2016) (bankruptcy court has discretion to allow contempt claims to proceed in adversary proceeding); *In re Motichko*, 395 B.R. 25, 29–30 (Bkrtcy. N. D. Ohio 2008) ("[§] 524 provides no private cause of action in the Sixth Circuit.  However, this rule does not prohibit Debtors from bringing the instant adversary proceeding"); *In re West*, 2015 WL 3962569, at *3 (Bankr. N.D. Ohio June 29, 2015) ("courts routinely hear contempt actions brought as adversary proceedings, notwithstanding the fact that the traditional method of bringing such matters before the court is by motion to show cause") (citations omitted).

creditor willfully violated the discharge injunction."). Those two elements have been plead here. FAC ¶¶ 43-44.

Discharge injunctions are unambiguous and may be enforced through contempt. *See In re Oh*, 362 Fed. Appx. 576, at *1 (9th Cir. 2009) ("Nor was the discharge injunction vague and indefinite. The terms of the discharge injunction were unambiguous and fixed by statute"); *In re Dyer*, 322 F.3d 1178, 1191 (9th Cir. 2003) ("Because the metes and bounds of the automatic stay are provided by statute and systematically applied to all cases there can be no doubt that the automatic stay qualifies as a specific and definite court order") (internal citations omitted). *See also In re Haemmerle*, 529 B.R. 17, 25 (Bankr. E.D.N.Y. 2015) ("Section 524(a)(2) of the Bankruptcy Code, which creates the discharge injunction, is unambiguous…").[10]

Because all discharge injunctions are the same, Defendants' argument here would strip the Court's power to enforce its own discharge orders through contempt proceedings. Taken to its logical extreme, Defendants' argument is that there could never be a contempt of a discharge order because every discharge order is vague. Firstmark sheepishly acknowledges the impact of its argument, but then inexplicably says that this argument only applies to "the narrow circumstances presented in this specific case, especially in light of the novel legal theory advanced by Golden." Firstmark Mem. at 25, n. 13. But Defendants were aware of this "novel legal theory" because investors in student loans were specifically warned about the dischargeability of direct-to-consumer loans that exceeded the cost of attendance. FAC ¶ 25.

---

[10] Firstmark's cases on this point are inapposite because they involved questions about whether the debt at issue was even listed on the bankruptcy schedules. *In re Dunn*, 324 B.R. 175, 180 (D. Mass. 2005) (failure to schedule the debt may have deprived defendant of notice of the bankruptcy); *In re Azevedo*, 506 B.R. 277, 281 (Bankr. E.D. Cal. 2014) (questions as to whether debt had been scheduled and whether notice given, as debtor had used fake names for previous business ventures). That is not the case here. *See* FAC ¶40.

Prior attempts to make this same argument have all been rejected in the student loan context.  In *Ferguson v. Navient Solutions, LLC*, currently pending in the bankruptcy court in the District of Minnesota, Judge Kressel found that the discharge order was not too vague.  *See Ferguson v. Navient Solutions, LLC*, Adv. Pro. 17-5051, Hearing on Motion to Dismiss, at 14 (Bankr. D. Minn. Aug. 17, 2017) (attached as Appendix E).  Likewise, Judge David Jones of the Bankruptcy Court of the Southern District of Texas, found that Defendants' decision not to seek a determination of dischargeability for those loans was a risk that they took themselves.  *See Haas v. Navient Solutions Inc.,* Adv. Pro. No. 16-03175, Hearing on Motion for Preliminary Injunction and Limited Class Certification, at 68 (Bankr. S.D. Tex. Mar. 23, 2017) ("Navient engaged or didn't engage in collection activities without seeking a determination of the dischargeability.  They did that at their own peril.") (attached as Appendix F).

It is a creditor's burden to establish the discharge status of debts post-discharge. *In re Wiley*, 2017 WL 6550418 (Bkrtcy. D.Me. Dec. 21, 2017) ("As the creditor, Wells Fargo bears the burden of showing that the debtor's obligations are of the type excepted from discharge under section 523(a)(8). . . . Because the subsections of section 523(a)(8) are written disjunctively, a debt is not dischargeable (in the absence of undue hardship) if it falls within any one of the statute's subsections.) (citations omitted)*; see Economic Development Growth Enterprise v. McDermott,* 478 B.R. 123, 127-128 (Bankr. N.D.N.Y. 2012).   If the creditor is unsure whether its debt is discharged, it may apply to the court for guidance through an adversary proceeding.  *See Matter of DePoy,* 29 B.R. 471, 476 (Bankr. N.D. Ind. 1983) (creditor "could have sought a clarification from the bankruptcy court" about the scope and his failure to do so was a "calculated risk under the threat of contempt in making his own determination of what the stay order means.")  Otherwise, the creditor bears the risk that post-discharge collections violate the discharge injunction and

expose it to the possibility of a finding of contempt.  *See McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 192 (1949) (ignorance is no defense to contempt finding where party could have sought guidance from the court); *In re Haroon,* 313 B.R. 686, 689 (Bankr. E.D. Va. 2004) ("The [debt] status, although perhaps unknown to the parties or disputed by them, was fixed by the discharge order."); *In re Wagner*, 74 B.R. 898, 904 (Bankr. E.D. Pa. 1987) ("By taking matters into his own hands, rather than seeking clarification from this court as to his status and the scope of the automatic stay, [creditor] undertook a calculated risk under threat of contempt that his legal judgment was correct.").  *In re Chambers*, 283 B.R. 913, 915 (N.D. Ill. 2002) ("The party seeking to establish an exception to the discharge of a debt bears the burden of proof . . . that the expenses incurred by the debtor qualify as a loan under § 523 (a)(8).*"), aff'd*, 290 B.R. 328 (N.D. Ill. 2003); *4 Collier on Bankruptcy*, ¶ 523.04 (15th ed. 2004) ("under subsection 523(a)(8), once the creditor establishes that the debt is the type governed by that paragraph," the burden shifts to Plaintiff to prove undue burden).

The cases Defendants cite do not help their position.  Most do not even involve discharge injunctions and stand for the unremarkable obligation that particularized court orders need be clear enough to support contempt findings.[11]

---

[11] *See U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.,* 789 F.3d 29 (2d Cir. 2015) (permanent injunction against violation of trademark); *King v. Allied Vision, Ltd.,* 65 F.3d 1051 (2d Cir. 1995) (consent decree related to use of author's name for film adaptation); *Williams v. United States*, 402 F.2d 47 (10th Cir. 1967) (injunction was sufficiently clear and definite to support criminal contempt finding); *In re Chief Exec. Officers Clubs, Inc.,* 359 B.R. 527 (Bankr. S.D.N.Y. 2007) (pre-conversion order regarding diversion of bankruptcy estate); *Hess v. New Jersey Transit Rail Operations, Inc.,* 846 F.2d 114 (2d Cir. 1988) (violation of court order to make a bona fide settlement offer); *In re Tires R US Ltd*, No. 1-11-50395-ESS, 2016 WL 3475204, at *2 (Bankr. E.D.N.Y. June 17, 2016) (violation of a party stipulation) (Stong, J.) [cited by Firstmark].

**VII.     THIS COURT HAS JURISDICTION TO ENTERTAIN A NATIONWIDE CLASS ACTION.**

Defendants misunderstand subject matter jurisdiction when they claim that the Court lacks subject matter jurisdiction to adjudicate nationwide violations of the discharge injunction.  They also ignore the clear difference between enforcing specialized, judge-specific orders and enforcing the statutory orders at issue here.

Notably, Judge Drain addressed the same arguments Defendants assert here and held that the court "has the statutory power and subject matter jurisdiction to decide this nationwide class action."  *In re Haynes,* 2014 WL 3608891, at *9 (Bankr. S.D.N.Y. July 22, 2014).

Subject matter jurisdiction here is provided by 28 U.S.C. § 1334(b) which gives the district court's jurisdiction of all civil proceedings arising under Title 11.  The enforcement of the discharge injunction here is a core bankruptcy matter that arises under 11 U.S.C §§ 727, 524 and 105.  Once federal subject matter jurisdiction is proper in the district court as to a core bankruptcy matter arising under the Bankruptcy Code, subject matter jurisdiction is proper in the bankruptcy court to which the matter is referred under 28 U.S.C. § 157.

Subject matter jurisdiction is not lost or limited merely because the action is brought as a class action.  Class action proceedings are expressly allowed in the Federal Rules of Bankruptcy Procedure.  *See* Fed. R. Bankr. P. 7023 ("Rule 23 F. R. Civ. P. applies in adversary proceedings").  *See In re Rojas,* No. 09-07003, 2009 WL 2496807, at *1 (Bankr. S.D. Texas Aug. 12, 2009) ("[N]othing in the jurisdictional statute limits the District Court's subject matter

jurisdiction (and by extension, the matters that can be referred to the bankruptcy judges) to claims filed by debtors with bankruptcy cases pending in this District.").[12]

The cases relied on by Defendants for limiting the scope of a bankruptcy court's jurisdiction for class actions misread the basis for subject matter jurisdiction. While bankruptcy court jurisdiction is often founded on "related to" jurisdiction over the *in rem* debtor's estate, that is not the only basis for jurisdiction. As Judge Drain explained in *In re Haynes*, actions under 11 U.S.C. §§ 524 and 727 have to do with prohibiting the collection of *in personam* debts and have nothing to do with the debtor's estate or *in rem* jurisdiction. *In re Haynes*, 2014 WL 3608891, at *7. Subject matter jurisdiction here is not based on "related to" or *in rem* jurisdiction and the cases that rely on that basis to limit the scope of the court's jurisdiction are inapt here.

Similarly, bankruptcy jurisdiction founded on 28 U.S.C. § 1334 (e), which states that the court where a case is commenced has exclusive jurisdiction over the "debtor's property" and "estate", is not implicated here. "Again, however, the present class action does not involve a debtor's interests in property or property of the estate. . . . It is an action to enforce the discharge, that is, to protect a statutory right prohibiting collection of *in peronam* claims against the members of the debtor class that arose pre-bankruptcy." *In re Haynes*, 2014 WL 3608891, at *7.

---

[12] *See also In re Cano,* 410 B.R. 506 (S.D. Tex. 2009); *In re Krause,* 414 B.R. 243 (S.D. Ohio 2009); *In re Patrick,* 344 B.R. 56 (Bankr. M.D. Pa. 2005); *In re Sims,* 278 B.R. 457 (Bankr. E.D. Tenn. 2002); *Bank United v. Manley,* 273 B.R. 229 (N.D. Ala. 2001); *In re Harris,* 280 B.R. 876 (Bankr. S.D. Ala. 2001); *In re Noletto,* 244 B.R. 845(S.D. Ala. 2000); *In re Sheffield,* 281 B.R. 24 (Bankr. S.D. Ala. 2000); *In re Aiello,* 231 B.R. 693 (N.D. Ill. 1999).

Judge Drain also carefully analyzed and rejected the other argument made here: that only the judge who issued the discharge order can enforce it. Judge Drain concluded – as have many other courts – that discharge injunctions under § 524 are fundamentally different from other specific, judge-crafted injunctions or orders and bankruptcy courts do not lack subject matter jurisdiction to enforce them.

Firstmark erroneously contends that there is a "prudential, Article III limitation that is separate and distinct from statutory subject-matter jurisdiction" which precludes a class action here. Firstmark Mem. at 21, n. 12. According to Defendants, contempt can only be adjudicated by the judge whose order was defied. While it is true that judges have inherent power to control their cases and proceedings and to sanction behavior that interferes with their lawful orders, *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991), this case is not seeking contempt for violation of a judge-crafted order. This case seeks contempt for violation of statutory injunction, an important distinction that was explained by Judge Drain in *Haynes*:

> There is, however, a fundamental difference between the normal injunction issued by a court after considering the factors required to be applied in issuing an injunction order and the injunction created by Congress in § 524(a) to support the discharge under § 727 of the Bankruptcy Code.

*In re Haynes*, 2014 WL 3608891, at *8.

The discharge orders in this case are not unique to any particular judge and the power to enforce them comes from § 105. Moreover, the discharge orders at issue are made on identical standardized forms that are used for all debtors nationwide. *Id*. at *8 ("It is not a handcrafted order"). And because the discharge orders are statutorily created, a debtor seeking to enforce them need not establish the factors ordinarily required under for an injunction under Rule 65. *Id.* ("By statute, in 524(a)(2), it operates as an injunction. For the discharge injunction to be granted, the debtor does not have to prove the factors required for an injunction under Federal Rule of Civil

Procedure 65."). [13]  All that is required is to show that the debt was subject to discharge and not specifically declared to be non-dischargeable.  *Id.*

Indeed, in *In re Brizinova,* 565 B.R. 488 (E.D.N.Y. 2017) (Stong, B.J.), which the Trust Defendants disingenuously cite as supporting their position (Trust Defs.' Mem. at 18), this Court specifically recognized the important distinction between unique court orders and "purely statutory" orders.  In *Brizinova,* a claim for sanctions arose from statements made in a motion to dismiss that arguably violated an order issued in a different court.  This Court noted the general rule that judge specific orders be enforced by the issuing judge (and ultimately ruled that the judge-specific order in *Brizinova* follow that rule), but contrasted other situations in which more general enforcement would be acceptable.  Specifically, this Court stated:

> That is not to say that it is never appropriate for one judge to enforce an order that was entered by another judge in a different case. For example, in the bankruptcy context, courts may distinguish between whether they are asked to enforce a "purely statutory order" such as the automatic stay contained in Bankruptcy Code § 362 or the discharge injunction set forth in Bankruptcy Code § 524, on the one hand, and an injunction individually crafted by the bankruptcy judge, on the other.

---

[13] This reasoning is consistent with scholarly analysis on the issue.  For example, then-professor Elizabeth Warren and Jay L. Westbrook also take the position that contempt of a statutory injunction must be treated different than contempt of a local court order when considering the jurisdiction to enforce such orders nationwide jurisdiction analysis.  They criticize cases – like those cited by Defendants – that limit redress for statutory injunctions to the "issuing court" because, in effect, there is no issuing court.  Elizabeth Warren & Jay L. Westbrook, Class Actions for Post-Petition Wrongs: National Relief Against National Creditors, Am. Bankr. Inst. J. March 2003, at 14, 46-47.  *See also* Kara Bruce, The Debtor Class, 88 Tul. L. Rev. 21, 25,71-74 (2013) (surveying the law and concluding that "courts generally should not hesitate, on jurisdictional grounds, to certify nationwide classes of consumer debtors asserting violations of bankruptcy law" and that rather than limiting § 524 contempt cases to the issuing court, a "court may instead (1) interpret § 524 to provide an implied right of action to enforce its violation, (2) interpret § 105 to permit nationwide class relief for discharge-injunction violations, or (3) find that the limitations on judicial contempt power do not apply with equal force for statutory injunctions.").

*Id.* at 503 (citations omitted).  The same analysis should guide the Court gain in this instance.

The First Circuit followed the same reasoning in *Bessette v. Avco Financial Services, Inc.,* 230 F.3d 439 (1st Cir. 2000), when it ruled claims for violations of discharge injunctions under § 524 could be brought as a nationwide class.[14]  *Bessette* found that § 105 empowered the district court to exercise its equitable powers to facilitate the implementation of other Bankruptcy Code provisions and noted the important distinction between statutory and inherent powers.  *Id.* at 445 ("§ 105 provides a bankruptcy court with statutory contempt powers, in addition to whatever inherent contempt powers the court may have" including the power to sanction for contempt.)  *Accord In re Kalikow,* 602 F.3d 82, 97 (2d Cir. 2010).  *Bessette* rejected the argument that only the issuing judge could enforce a discharge injunction.  According to the Court:

> Appellant seeks enforcement of the statutory injunction set forth in §524, not one individually crafted by the bankruptcy judge, in which that judge's insights and thought processes may be of particular significance.  Thus, few of the practical reasons for confining contempt proceedings to the issuing tribunal apply here.

*Id.* at 446.  *See also id.* at 445 (noting the significance of "dealing, as here, with violation of a purely statutory order.")  *See also Walls* v. *Wells Fargo Bank, NA.,* 262 B.R. 519, 528 (Bankr. E.D. Cal. 2001) ("The [automatic stay and discharge] injunctions . . .  are Code created, statutory injunctions . . . . Their extent does not depend on individual judges for injunctive relief fashioned by individual bankruptcy judges.")

---

[14]  On remand, the district court did not abide by the First Circuit's mandate approving a nationwide class under §§ 105 and 524 and inexplicably narrowed the First Circuit's ruling to apply to only a district-wide class.   *See Bessette v. Avco Fin. Servs., Inc*., 279 B.R. 442, 449 (D.R.I. 2002).   That ruling was not appealed.

Most of Defendants' cases ignore the distinction., see e.g. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821 (1994) (involving adjudication of a specific judge crafted order). While *Barrett v. Avco Fin. Servs. Mgmt. Co*., 292 B.R. 1, 11 (D. Mass. 2003) and *Cox v. Zale Delaware, Inc.,* 239 F.3d 910 (2001) involve statutory discharge injunctions, they also involved reaffirmation agreements that added jurisdiction-specific issues.[15]

As Judge Drain also noted, the position that discharge injunctions can be enforced by other judges within a particular district, but not judges from a different district is logically inconsistent. If the rationale for restricting jurisdiction to a district-wide class is that only the judge who issued the order can adjudicate contempt of it, then it makes no sense to allow judges in the same district to enforce discharge injunctions issued by other judges within the district.  In other words, why would a district-wide class be permissible to adjudicate § 524 claims, but a nationwide class be impermissible?  Both seemingly run afoul of the rationale that only the judge who issued the order can adjudicate contempt of it. *See In re Haynes,* 2014 WL 3608891, at *9 (rejecting the district-wide approach and finding nationwide jurisdiction for enforcement of discharge injunctions).

To be sure, many cases repeat the principle that a only the  judge who issued an order can adjudicate contempt of it and some bankruptcy courts have applied that reasoning to limit class actions seeking enforcement of discharge injunctions.  Respectfully, those courts fail to appreciate the underlying scope of subject matter jurisdiction and the rationale for limiting enforcement of a judge's specifically crafted order and the application of that rationale to statutory injunctions.

---

[15]  The *Barrett* court cited that fact specifically as a reason nationwide jurisdiction would not be found.  *See Barrett,* 292 B.R. at 11 (existence of reaffirmation agreements weighed against nationwide class because "dramatic legal differences exist from district to district as to what is an acceptable binding reaffirmation, to what extent reliance on the reaffirmation form is an element, and to what extent post-discharge payments made after a failed reaffirmation attempt are able to be characterized as voluntary.")

It should also be noted that, in any event, the nationwide class allegations would still be available for Plaintiff's claims for declaratory judgment under 28 U.S.C. § 2201.  That claim seeks a declaration that Plaintiff's Tuition Answer Loans were not protected by § 523(a)(8) and were discharged in bankruptcy.

Finally, Defendants' argument that this action would re-open bankruptcies across the country misunderstands the class action device.  Class actions are always based in one court that adjudicates the claims of absent class members outside of that court.  Adjudication of a class here does not cause absent class members to re-open their bankruptcies, just as any other class action does not cause absent class members to file lawsuits to participate in the class.

Accordingly, the Court has subject matter jurisdiction to entertain a nationwide class.

**<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiff respectfully requests that Defendants' motion to Dismiss or Stay this proceeding be denied in their entirety.

Dated: January 8, 2018                          Respectfully Submitted,

                                        */s/ George F. Carpinello*
                                        George F. Carpinello
                                        Adam R. Shaw
                                        Robert Tietjen
                                        Boies Schiller Flexner LLP
                                        30 South Pearl St., 11th Floor
                                        Albany, New York 12207
                                        Telephone:  518.434.0600
                                        Facsimile:   518.434.0665
                                        E-mail:      gcarpinello@bsfllp.com
                                                     ashaw@bsfllp.com

rtietjen@bsfllp.com

—and—

Austin Smith
Smith Law Group
3 Mitchell Place
New York, New York 10017
Telephone:  917.992.2121
E-mail:       austin@acsmithlawgroup.com

*Counsel for Tashanna B. Golden*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the foregoing document was served by the Court's ECF system on all parties of record this 8th day of January, 2018.

/s/ George F. Carpinello