

February 21, 2019

**VIA ECF AND FEDEX**
Hon. Elizabeth S. Stong
U.S. Bankruptcy Court, EDNY
Conrad B. Duberstein Courthouse
271-C Cadman Plaza East - Suite 1595
Brooklyn, NY 11201-1800

> Re: *Golden, et al. v. National Collegiate Student Loans Trust 2006-4, et al., No. 1:17-ap-01005-ESS (Bankr. E.D.N.Y)*

Dear Judge Stong:

We represent Plaintiff Tashanna Golden ("Golden") in the above-referenced matter and we write to request a discovery conference for the purpose of compelling certain discovery from Defendant National Collegiate Student Loan Trust 2006-4 ("NCT").

As the Court is aware, Golden claims that she properly discharged her student debt and that NCT illegally collected on that debt in violation of 11 U.S.C. § 524. Golden claims that the private student loan was not excepted from discharge because it was not qualified under § 523(a)(8)(B), as it exceeded her cost of attendance. NCT argues, and interposed as an affirmative defense, that the student loan was excepted from discharge under § 523(a)(8)(A)(i) because the loan was "made, insured or guaranteed by a government unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution." *See* NCT's Answer to Plaintiff's First



Hon. Elizabeth S. Stong
February 21, 2019
Page 2

Amended Complaint (Dkt. # 126 at 13).  In short, NCT argues that because the loan was guaranteed by The Educational Resources Institute ("TERI"), a nonprofit institution, the loan was not discharged and is collectible.  In its Motion to Dismiss, NCT argued that "[w]hether or not this loan was made under a program funded by [TERI], a non-profit, goes directly to the question of dischargeability under Section 523(a)(8)." (Dkt. # 45 at 9).

There can be no doubt that TERI's status and its relationship to NCT and the loans at issue are relevant to this case. Accordingly, Golden sought discovery from NCT about TERI.  Specifically, on November 15, 2018, Golden issued Request for Production No. 2 seeking:

> Documents related to TERI's bankruptcy, and any effect of TERI's bankruptcy on the NCSLTs, including without limitation the voiding of any TERI guarantee, and any money refunded by TERI to First Marblehead, the NCSLTs, or any Originating Bank during TERI's bankruptcy proceedings in the District of Massachusetts.[1]

This request is narrowly tailored to the scope of this litigation and the specific issue raised by NCT as to its affirmative defense.

Nonetheless, NCT has refused to produce any documents responsive to Request for Production No. 2.  On December 17, 2018, NCT objected to the request because it purports to seek "discovery that is neither relevant to any claim or defense in this litigation nor proportional to the needs of this case and therefore beyond the scope

---

[1] *See* attached document requests at Ex. A.



Hon. Elizabeth S. Stong
February 21, 2019
Page 3

permitted under Federal Rule of Civil Procedure 26(b)(1) and the corresponding Federal Rules of Bankruptcy Procedure." Then, on February 14, 2019, after a January 30, 2019 telephonic meet and confer and several email correspondences, NCT wrote that "These requests are irrelevant to plaintiff's claims at issue in this case, and therefore [NCT] will not search for and/or produce such documents, if any exist." [2]

Once a party requesting discovery has made a prima facie showing of relevance, "it is up to the responding party to justify curtailing discovery." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 284 F.R.D. 132, 134 (S.D.N.Y. 2012). "[A] party resisting discovery has the burden of showing specifically how, despite the broad and liberal construction afforded the federal discovery rules, each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive." *N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, 325 F.R.D. 36, 48 (E.D.N.Y. 2018) (internal quotation marks and citations omitted).

Discovery about TERI is relevant to the claims and affirmative defense in this case. Golden believes that the loan at issue here was not made under any program funded by a nonprofit institution, as that term is used in § 523, for several reasons.

First, TERI has itself declared bankruptcy, and received a discharge. During the course of TERI's bankruptcy, TERI rejected <u>all</u> guaranty agreements to which NCT was party, refunded <u>all</u> the guaranty fees that were paid to TERI by NCT, and thereby

---

[2] *See* attached Letter from Greg Casamento at Ex. B.

extinguished any purported guaranty that TERI had previously entered. When TERI refunded to NCT the guaranty payment on Golden's loan, the guaranty was retroactively extinguished. *National Union Ins. Co. of Pittsburgh, Pa. v. Insurance Com'r of Guam*, 1984 WL 48863, at *3 (D.Guam App.Div. 1984) ("Cancellation and rescission are not synonymous.  One is prospective, while the other is retroactive . . . to cancel a contract means to abrogate so much of it as remains unperformed.  It differs from rescission, which means to restore the parties to their former position.  The one refers to the state of things at the time of the cancellation; the other to the state of things existing when the contract was made.").  Parties in bankruptcy are not permitted to retain the benefits of their transactions, while discharging their obligations.  *In re Santos*, 561 B.R. 825, 832 (Bkrtcy.C.D.Cal. 2017) ("Because the bankruptcy process constitutes a *quid pro quo*, obtaining benefits for the fulfillment of responsibilities, Debtors' attempt to retain the benefits of the bankruptcy process, without fulfilling their corresponding duties, constitutes an unfair manipulation of the Bankruptcy Code.").

The JP Morgan guaranty under which Golden's loan was purportedly guaranteed was rejected, voided, and refunded in TERI's bankruptcy nearly 11 years ago.  That means for over a decade, NCT, a for-profit actor, has been unfairly taking advantage of the bankruptcy code to deny discharge to disadvantaged debtors by withholding material information from the bankruptcy courts.  *See* First Marblehead Corporation's 10-K, ending December 31, 2010 ("The Modified Fourth Amended Joint Plan of Reorganization of The Education Resources Institute, Inc. and the Official Committee of

Unsecured Creditors (Creditors Committee) as of August 26, 2010 (Modified Plan of Reorganization) became effective November 19, 2010. Under the Modified Plan of Reorganization, TERI rejected its guaranty agreements and settled claims with the securitization trusts, including contingent guaranty claims based on future loan defaults.").

Second, there simply is no guaranty in effect. The statute could not purport to exclude from discharge loans that are not guaranteed. Consider for example a lender that on Day 1 loans money and obtains a guaranty from a known-failing nonprofit institution. Then on Day 30 the nonprofit institution in fact fails, goes bankrupt, pays back the guaranty fees it earned and discharges its contractual obligations under the guaranty. A decade later, after the debtor discharges the debt, the lender should not be heard to argue that the loan was not discharged because it was made under a program funded by a nonprofit. An extinguished, voided, and refunded guaranty from a commercial nonprofit corporation engaged in subprime debt securitization is not within the intendment of Section 523(a)(8).

The fact that there is no guaranty here is legally significant because the determination of whether there is a guaranty is made at the time of the filing of the debtor's bankruptcy. In *In re Sinclair-Ganos*, 133 B.R. 382 (Bankr. W.D. MI 1991), the court was called upon to decide the dischargeability of student loans from a credit union that were guaranteed by the Michigan Higher Education Assistance Authority. Upon the debtor's default, the loan notes were assigned from the credit union to the guarantor,



which eventually assigned the note back to the credit union. The Court found that the assignment of the note from the guarantor back to the lender (the credit union) disqualified the loan from being non-dischargeable under Section 523(a)(8), stating:

> where a student loan was not guaranteed at the time of the filing of the bankruptcy petition, the loan does not fall within the language of § 523(a)(8) and is thus dischargeable. In the case at bar, the Assignment was dated March 29, 1989, and the case was filed on October 11, 1989. Since as of the date of the filing of this case the loan was not guaranteed, the debt owed to Lincoln Park Community Credit Union is not excepted from discharge based on the argument that this is an educational loan guaranteed by a governmental unit.

*Sinclair-Ganos*, 133 B.R. at 383.

Third, Golden intends to argue that a loan guaranteeing and funding a loan are two distinct and different things. And indeed, § 523(a)(8)(A)(i) states that a government can either guarantee or fund a loan for it to be exempt from discharge but that a nonprofit institution must "fund" the loan program to gain such or exception. There is no provision for a nonprofit to guaranty a loan program. This wording and statutory structure is purposeful. It is an attempt to mirror the structure of the NDSL and GSL loan programs created by the Higher Education Act of 1965. It is axiomatic that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Bates v. United States,* 522 U.S. 23, 29–30, 118 S. Ct. 285, 290, 139 L. Ed. 2d 215 (1997). This is especially important in this

context because exceptions to discharge must be construed narrowly, and against the creditor.

Fourth, unlike traditional nonprofits, TERI was—until its bankruptcy in 2008 — a corporate entity that partnered with the First Marblehead Corporation and other private student lenders to service and securitize student-loan asset-backed securities. TERI was even housed in First Marblehead's corporate offices in Boston, and in 2001 First Marblehead absorbed 161 of TERI's employees. First Marblehead in fact purchased all of TERI's operating assets in 2001, and pursuant to the operating agreement would "manage TERI portfolio risk profile and recommend guarantee fee structures." Processing fees paid by TERI represented 32% of First Marblehead's revenue, and on the day TERI declared bankruptcy in 2008, First Marblehead's stock dropped 37%. Grouping such a corporate entity with traditional nonprofit institutions such as colleges, churches, or charities strains the elasticity of the English language. TERI, until its bankruptcy in 2008, was little more than a corporate shell capitalized and operated to remove risk from private student lender's balance sheets and enhance the credit rating of various student loan asset-backed securities. *In re The First Marblehead Corp. Sec. Litig.,* 639 F. Supp. 2d 145, 158–59 (D. Mass. 2009) ("First Marblehead's Form 10–K for the period ending June 30, 2006, for example, demonstrated that First Marblehead and TERI had a close, mutually beneficial business relationship: In June 2001, [First Marblehead] purchased the loan processing operations of TERI and entered into a series of agreements to govern future securitizations of TERI-guaranteed loans. TERI continues

**BSF**

Hon. Elizabeth S. Stong
February 21, 2019
Page 8

to provide private student loan guarantee[s], education information and counseling services for students, and is the exclusive third-party provider of borrower default guarantees for [First Marblehead's] clients' private label loans. [First Marblehead] ha[s] entered into an agreement to provide various services for TERI and received fees from TERI for services performed of $106.1 million, or 19% of total service revenue, for fiscal 2006, and $78.2 million or 19% of total service revenue, for fiscal 2005.... [First Marblehead] also ha[s] entered into an agreement to receive from TERI updated information about the performance of the student loans it has guaranteed, to allow [First Marblehead] to supplement [its] database. Each of these agreements with TERI had an initial term through June 2006. In October 2004, [First Marblehead] exercised [its] option to renew each agreement for an additional five-year term, through June 2011."); Stempel, Jonathan. FIRST MARBLEHEAD SINKS, GUARANTOR IS BANKRUPT, REUTERS (April 9, 2008); *available at,* https://www.reuters.com/article/us-firstmarblehead/first-marblehead-sinks-guarantor-is-bankrupt-idUSN0833823520080409.

Fifth, it is also significant that there is no guarantor in this case seeking to enforce the debt. In *In re O'Brien*, 419 F.3d 104 (2d. Cir. 2005), it was actually TERI that was enforcing the debt and that fact was crucial to the Second Circuit. Since the time of the *O'Brien* case, however, TERI has itself declared bankruptcy, and received a discharge. Thus, O'Brien is distinguishable and not controlling here.

NCT has asserted that whatever happened after the date on which TERI purportedly guaranteed the loan is irrelevant. However, whether they are right or wrong

does not affect the standard for discovery. They interposed the affirmative defense and made discovery concerning TERI relevant to the claims and defenses.

Indeed, while NCT is refusing to produce this information to Golden here, it is simultaneously arguing in another case how and why TERI's bankruptcy did not affect the guarantees at all. *See Mata v. National Collegiate Student Loan Trust 2006-1, et. al.,*, Adv. Pro.18-01089-MH (Bank. C. D. Cal. 2019). NCT should not be permitted to litigate this issue against debtors while withholding the relevant records and documents from Golden.

Last, NCT has been making inconsistent statements regarding TERI's bankruptcy. For example, during NCT's corporate representative's deposition in this case, NCT denied that it received any cash payment in TERI's bankruptcy. However, in a recent summary judgment motion in the Central District of California, NCT acknowledged that it accepted a cash settlement in TERI's bankruptcy. *See Mata v. National Collegiate Student Loan Trust 2006-1*, Adv. Pro. No. 18-01089-MH, Reply Memorandum In Support of Summary Judgment, (Dkt # 56) (Bank. C. D. Cal. Feb 13, 2019) ("Defendants acknowledge that the majority of TERI's guaranty obligations were eventually fulfilled through payments, settlements, and cash distributions to Defendants based on Defendants' rights under the Guaranty Agreements, during the pendency of TERI's Chapter 11 Bankruptcy which commenced on April 7, 2008 and closed on March 8, 2016. *See In Re The Education Resources Institute, Inc.*, No. 08-12540 (Bankr. D. Mass) ("TERI Ch. 11.")").

BSF

Golden is entitled to analyze the documents in NCT's possession, custody and control related to "TERI's bankruptcy, and its effect on any purported guaranty and money refunded by TERI to First Marblehead, the NCSLTs, or any Originating Bank."

For these reasons, Golden respectfully requests a conference or hearing on the already scheduled March 7 hearing date regarding compelling this discovery.

                                                  Respectfully Submitted,

                                                  */s/ Adam R. Shaw*
                                                  Adam R. Shaw

ARS/lmh

cc via ecf: All counsel on record