IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Golden,<br><br>Tashanna B. Golden<br>*fka* Tashanna B. Pearson,<br><br>                         Debtor, | Chapter 7<br><br><br><br><br>Case No. 16-40809 (ESS) |
| Tashanna B. Golden<br>*fka* Tashanna B. Pearson,<br><br>                        Plaintiff,<br><br>     v.<br><br>National Collegiate Student Loan Trust 2006-4, Goal Structured Solutions Trust 2016-A, Pennsylvania Higher Education Assistance Agency d/b/a American Education Services and Firstmark Services,<br><br>                        Defendants. | Adv. Proc. No. 17-1005 (ESS) |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 4

ARGUMENT ................................................................................................................. 12

I.      DEFENDANTS CANNOT ESTABLISH THAT ANY OF THE SUBJECT LOANS
        THAT EITHER EXCEEDED THE COST OF ATTENDANCE OR WERE ISSUED
        FOR ATTENDANCE AT A NON-TITLE IV INSTITUTION COME WITHIN THE
        TERMS OF § 523(A)(8)(B) ................................................................................. 12

II.     DEFENDANTS' TERI DEFENSE IS WITHOUT MERIT ............................................ 18

        A.      TERI IS NOT AN "INSTITUTION." ............................................................... 18

                1.      The Term "Institution" as Used in the Higher Education Act and
                        Department of Education Regulations Means an Educational
                        Institution ............................................................................... 19

                2.      Legislative History of § 523(a)(8) ........................................... 21

        B.      TERI IS NOT A "NONPROFIT." ................................................................... 22

        C.      NO OTHER COURTS HAVE UNDERTAKEN THE ANALYSIS PLAINTIFF
                PRESENTS HERE .......................................................................................... 31

        D.      TERI DID NOT "FUND" EITHER THE LOAN OR PROGRAM AT ISSUE IN
                THIS PROCEEDING ....................................................................................... 32

        E.      TERI'S BANKRUPTCY ELIMINATES ANY BASIS TO ASSERT THAT
                TERI "FUNDS" OR "GUARANTEES" ANY OF THE SUJBECT LOANS .... 36

        F.      LOANS IN EXCESS OF THE COST OF ATTENDANCE WERE NOT
                FUNDED OR GUARANTEED BY TERI ........................................................... 38

III.    EACH CLASS MEMBER IS ENTITLED TO AN AWARD OF RESTITUTION OF
        ALL FUNDS PAID ON DISCHARGED DEBTS ....................................................... 39

CONCLUSION ............................................................................................................... 41

# TABLE OF AUTHORITIES

Page(s)

Cases

*American Campaign Academy v. Commissioner of Internal Revenue*,
    92 T.C. 1053 (U.S. Tax Ct. 1989) ...........................................................................30

*Baker v. Family Credit Counseling Corp.*,
    440 F. Supp. 2d 392 (E.D. Pa. 2006)......................................................................25

*Bank of China v. Huang (In re Huang)*,
    275 F.3d 1173 (9th Cir. 2002)..................................................................................16

*Bethpage Fed. Credit Union v. Furio (In re Furio)*,
    77 F.3d 622 (2d Cir. 1996).......................................................................................13

*Better Bus. Bureau, Inc. v. United States*,
    326 U.S. 279 (1945) ...........................................................................................26, 27

*Bronsdon v. Educ. Credit Mgmt. Ass'n (In re Bronsdon)*,
    435 B.R. 791 (B.A.P. 1st Cir. 2010)........................................................................13

*Campbell v. Citibank, N.A. (In re Campbell)*,
    547 B.R. 49 (Bankr. E.D.N.Y. 2016) ................................................................14, 15

*Capital Gymnastics Booster Club, Inc. v. Commissioner of Internal Revenue*,
    T.C. Memo. 2013-193, 2013 WL 4516170 (U.S. Tax Ct. 2013)..............................30

*Church of Scientology of California v. Commissioner of Internal Revenue*,
    823 F.2d 1310 (9th Cir. 1987)..................................................................................30

*City of New York v. Matamoros (In re Matamoros)*,
    605 B.R. 600 (Bankr. S.D.N.Y. Aug. 2, 2019) .......................................................39

*Crocker v. Navient Solutions, L.L.C. (In re Crocker)*,
    941 F.3d 206 (5th Cir. 2019)....................................................................................14

*Davis v. Michigan Dep't of Treasury*,
    489 US 803 (1989) ...................................................................................................18

*Dep't of Health and Human Serv. v. Smith*,
    807 F.2d 122 (8th Cir. 1986)....................................................................................14

*Doug Howle's Paces Ferry Dodge, Inc. v. Ethridge (In re Ethridge)*,
    80 B.R. 581 (Bankr. M.D. Ga. 1987) ................................................................16, 17

*EST of Hawaii v. Commissioner of Internal Revenue*,
  71 T.C. 1067 (U.S. Tax Ct. 1979) ............................................................................28

*First Georgia Bank v. Halpern (In* re Halpern),
  50 B.R. 260 (Bankr. N.D. Ga. 1985), *aff'd*, 810 F.2d 1061 (11th Cir. 1987)..........................16

*First Marblehead Corp. v. House*,
  541 F.3d 36 (1st Cir. 2008)..................................................................................10

*Francis v. Sallie Mae, Inc. (In re Francis)*,
  385 B.R. 800 (B.A.P. 10th Cir. 2008) ...................................................................37

*Giaimo v. Detrano (In re Detrano)*,
  222 B.R. 685 (Bankr. E.D.N.Y. 1998) ..................................................................16

*Golden v. JPMorgan Chase Bank (In re Golden)*,
  596 B.R. 239 (Bankr. E.D.N.Y. 2019) ...........................................................passim

*Greater Jamaica Dev. Corp., v. The New York City Comm.*,
  25 N.Y. 3d 614 (2015)................................................................................25, 29

*Greensward, Inc. v. Cietek (In re Cietek)*,
  390 B.R. 773 (Bankr. N.D.N.Y. 2008) .................................................................16

*Griffin v. U.S., (In re Griffin)*,
  108 B.R. 717 (Bankr. W.D. Ma. 1989)..................................................................39

*Grogan v. Garner*,
  498 U.S. 279 (1991) .........................................................................................13

*Grojean v. Commissioner*,
  284 F. 3d  (7th Cir. 2001) ..................................................................................36

*Harding Hospital, Inc. v. United States*,
  505 F.2d 1068 (6th Cir. 1974)............................................................................30

*Harrison Baking Co. v. Bakery and Confectionary Workers Local No. 3*,
  777 F. Supp. 306 (S.D.N.Y. 1991) ......................................................................41

*Hayhoe v. Cole (In re Cole)*,
  226 B.R. 647 (B.A.P. 9th Cir.  1998) ...................................................................16

*In re Abrams*,
  127 B.R. 239 (B.A.P. 9th Cir. 1991) ...................................................................40

*In re Adamo*,
  560 B.R. 642 (Bankr. E.D.N.Y. 2016) .................................................................13

*In re Adamo*,
   619 F.2d 216 (2d Cir. 1980)...................................................................................................19

*In re Boland*,
   287 B.R. 127 (D. Vt. 2002).....................................................................................................32

*In re Dufrane*,
   566 B.R. 28 (Bankr. N.D. Cal. 2017) .....................................................................................17

*In re Duits*,
   No. 14-05277, 2020 WL 256770 (S.D. Ind. Jan. 15, 2020)...................................................31

*In re Guo*,
   548 B.R. 396 (Bankr. E.D.N.Y. 2016) ...................................................................................13

*In re Hammarstrom*,
   95 B.R. 160 (Bankr. N.D. Cal. 1985) .....................................................................................35

*In re Haroon*,
   313 B.R. 686 (Bankr. E.D. Va. 2004) .....................................................................................13

*In re Homaidan*,
   596 B.R. 86 (Bankr. E.D.N.Y. 2019) .....................................................................................18

*In re O'Brien,*
   299 B.R. 725 (Bankr. S.D.N.Y. 2003)....................................................................................31

*In Re Oliver*,
   499 B.R. 617 (Bankr. S.D. Ind. 2013) ....................................................................................41

*In re Pilcher*,
   149 B.R. 595 (9th Cir. B.A.P. 1993) .......................................................................................35

*In re Rodriguez*,
   319 B.R. 894 (Bankr. M.D. Fla. 2005) ....................................................................................32

*In re Segal*,
   57 F.3d 342 (3d Cir. 1995).......................................................................................................18

*In re Sucre*,
   226 B.R. 340 (Bankr. S.D.N.Y. 1998).....................................................................................39

*In re Wiley*,
   579 B.R. 1 (Bankr. D. Me. 2017) ............................................................................................17

*In re Wiley*,
   589 B.R. 1 (Bankr. D. Me. 2017) ............................................................................................36

*Jean-Baptiste v. Educational Credit Management ("In re Jean-Baptiste"),*
    584 B.R. 574 (Bankr. E.D.N.Y. 2018) .......................................................................31-32, 35

*Kawaauhau v. Geiger,*
    523 U.S. 57, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998) ............................................................13

*King v. Capital One Bank,*
    No. 3:11-cv-00068, 2012 WL 5570624 (W.D. Va. Nov. 15, 2012) .........................................25

*Knaus v. Concordio Lumber Co., Inc. (In re Knaus),*
    889 F.2d 773 (8th Cir. 1989).....................................................................................................40

*Limpert v. Cambridge Credit Counseling Corp.*,
    328 F. Supp. 2d 360 (E.D.N.Y. 2004), *vacated*, 2004 WL 3395437 (Sept. 16, 2004) .............25

*Lincoln Park Comm. Credit Union v. Sinclair-Ganos (In re Sinclair-Ganos),*
    133 B.R. 382 (W.D. Mi. 1991) .................................................................................................37

*Liu v. Securities and Exchange Commission*,
    ___ U.S. ___, 2020 WL 3405845 (June 22, 2020).................................................................40

*Malone v. Norwest Fin. California, Inc.*,
    245 B.R. 389 (E.D. Cal. 2000)..................................................................................................40

*Miller v. Savings Bank of Baltimore (In re Miller),*
    10 B.R. 778 (Bankr. D. Md. 1981), *aff'd,* 22 B.R. 479 (D. Md. 1982) ...................................39

*O'Brien v. First Marblehead Educ.*, Res.,
    419 F.3d 104 (2d Cir. 2005).................................................................................................31, 35

*P.L.L. Scholarship Fund v. Commissioner of Internal Revenue,*
    82 T.C. 196 (U.S. Tax Ct. 1984) .........................................................................................28, 29

*Padilla v. Wells Fargo Home Mortg., Inc. (In re Padilla),*
    379 B.R. 643 (Bankr. S.D. Tex. 2007) .....................................................................................40

*Partners in Charity, Inc. v. Commissioner of Internal Revenue,*
    141 T.C. 151 (U.S. Tax Ct. 2013) ............................................................................................27

*Polacsek v. Debticated Consumer Counseling Inc.*,
    413 F. Supp. 2d 539 (D. MD. 2010).........................................................................................25

*Redlands Surgical Servs. v. Comm'r of Internal Revenue,*
    113 T.C. 47, 1999 WL 513862 (U.S. Tax Ct. July 19, 1999)............................................26, 27

*Renshaw v. Renshaw (In re Renshaw),*
    222 F.3d 82 (2d Cir. 2000).......................................................................................................13

*Richie v. American Council on Gift Annuities*,
943 F. Supp. 685 (N.D. Tex. 1996) .........................................................................25

*Sears, Roebuck & Co. v. Spivey*,
256 B.R. 357 (Bankr. E.D.N.Y. 2001) ....................................................................40

*Sonora Community Hosp. v. C.I.R.*,
46 T.C. 519 (Tax Ct. 1966).....................................................................................31

*Sonora Community Hospital v. Commissioner of Internal Revenue*,
397 F.2d 814 (9th Cir. 1968)...................................................................................30

*Taggart v. Lorenzen*,
139 S. Ct. 1795 (2019).......................................................................................40, 41

*Talbert v. Bay Bank (In re Talbert)*,
Case No. HM 89–00044, A.P. 89–0009 (W.D. Mi. Dec. 13, 1989) .......................37

*Tamasco v. Nicholls (In re Nicholls), Adv.*,
Proc. No. 10-8186, 2010 WL 5128627 (Bankr. E.D.N.Y. Dec. 10, 2010).............16

*Town of Brookline v. Gorsuch*,
667 F.2d 215 (1st Cir. 1981)...................................................................................24

*U.S. v. Dauray*,
215 F.3d 257 (2d Cir. 2000)....................................................................................18

*United Healthcare Workers v. Borsos (In re Borsos)*,
544 B.R. 201 (Bankr. E.D. Cal. 2016)....................................................................39

*Vassar Bros. Hosp. v. City of Poughkeepsie*,
97 A.D.3d 756 (2d Dep't 2012) ..............................................................................29

*Will v. Ford Motor Credit Co. (In re Will)*,
303 B.R. 357 (Bankr. N.D. Ill. 2001) .....................................................................39

*Zimmerman v. Cambridge Credit Counseling Corp.*,
409 F.3d 473 (1st Cir. 2005) .............................................................................23, 24

Statutes

11 U.S.C. § 523.................................................................................................33, 34

11 U.S.C. § 523(a)(8) ........................................................................................passim

11 U.S.C. § 523(a)(8)(A)(i) ....................................................................13, 18, 19, 32

11 U.S.C. § 523(a)(8)(A)(ii) ..............................................................................14, 17

11 U.S.C. § 523(a)(8)(B) .................................................................................... 14, 15

11 U.S.C. § 524 ...................................................................................................... 1, 3

11 U.S.C. § 524(c) ...................................................................................................... 5

20 U.S.C. § 1001 ...................................................................................................... 19

20 U.S.C. § 1001(f)(a) .............................................................................................. 19

20 U.S.C. § 1001(f)(h)(4) ......................................................................................... 19

20 U.S.C. § 1003(13) ................................................................................................ 25

20 U.S.C. § 1003(15) ................................................................................................ 20

20 U.S.C. § 1015(c)(a) .............................................................................................. 20

20 U.S.C. § 1078(c) .................................................................................................. 20

20 U.S.C.  § 1087hh ................................................................................................. 20

20 U.S.C. § 1087ll .................................................................................................... 20

20 U.S.C. § 1087-3 ................................................................................................... 21

20 U.S.C. § 1126 ...................................................................................................... 20

20 U.S.C. § 1136(a)(1) .............................................................................................. 20

20 U.S.C. § 1161h .................................................................................................... 20

20 U.S.C. § 1261u .................................................................................................... 20

26 U.S.C. § 221(d)(1) .......................................................................................... passim

26 U.S.C. § 221(d) ......................................................................................... 14, 22, 38

26 U.S.C. § 221(d)(2) ................................................................................................ 14

26 U.S.C. § 1001(a) .................................................................................................. 19

26 U.S.C. § 1001(b) .................................................................................................. 19

P.L. 94-482 ............................................................................................................... 21

P.L. 95-598 ............................................................................................................... 21

P.L. 96-56 ................................................................................................................. 21

P.L. 89-329 .................................................................................................................19

P.L. 98-353 .................................................................................................................22

Regulations

26 C.F.R. § 1.221-1(e)(4) ...........................................................................................17

32 C.F.R. § 600.5 ........................................................................................................20

34 C.F.R. § 600.2 ........................................................................................................20

34 C.F.R. § 600.4 ........................................................................................................20

34 C.F.R. § 600.6 ........................................................................................................20

34 C.F.R. § 668.1 ..................................................................................................20, 25

49 Fed. Reg. 48501 (Dec. 12, 1984) ..........................................................................20

Other Authorities

Bankruptcy Improvement Act:  Hearing on P.L. 98-353 Before the Senate Judiciary Committee (April 6, 1983) (Comments of Prof. Frank Kennedy on Subtitle I of S. 445) .........................22

Bogert & Bogert, The Law of Trusts and Trustees, § 364 (Rev. 2nd Ed. 1991) ..........................27

H.R.Rep. No. 95-595 at 133 (1987), reprinted in 1987 U.S.C.C.A.N. 5963, 6094 .....................14

Senate Report 96-230, 1979 WL 10297 (June 21, 1979)............................................................33

Plaintiff submits this Memorandum in Support of her Motion for Partial Summary Judgment on liability against Defendants Goal Structured Solutions Trust 2016-A ("Goal"), Firstmark Services ("Firstmark"), National Collegiate Student Loan Trust 2006-4 ("NCT"), and Pennsylvania Higher Education Assistance Agency, d/b/a American Education Services ("PHEAA") (hereinafter "Defendants").

## PRELIMINARY STATEMENT

Plaintiff seeks an order from this Court declaring that each loan held or serviced by Defendants that either exceeded the cost of attendance or was made to a person who was not attending a Title IV institution has been discharged by each class member's bankruptcy discharge order and that the continued collection on such loans is in violation of § 524 of the Bankruptcy Code and the applicable discharge orders.

There is no dispute that none of the loans at issue here were made, insured, guaranteed, or funded by a governmental unit as set forth in § 523(a)(8)(A)(i).  Further, this Court has already ruled that the loans at issue here are not obligations "to repay funds received as an educational benefit, scholarship or stipend" as set forth in § 523(a)(8)(A)(ii).  Finally, it is clear that every loan held or serviced by Defendants that is not a qualified education loan as defined by § 221(d)(1) of the Internal Revenue Code, *i.e.*, that exceeded the cost of attendance or was not made for attendance at a Title IV educational institution, is not nondischargeable under § 523(a)(8)(B). Defendants knew, when they made or serviced the loans, that many of the loans either exceeded the cost of attendance or were made to people who were not students at Title IV institutions.

Defendants argue that, even if their loans were not actually for qualified education expenses, they are, nonetheless, nondischargeable because of "certifications" made by the school or the borrower that the loans were used for qualified education expenses.  The "certification" that

Goal and Firstmark rely on is a meaningless statement that is unrelated to the issue of whether the loan is a qualified education loan. Thus, Goal and Firstmark have no defense to the motion for summary judgment.

The "certification" that NCT and PHEAA rely on is unenforceable as a matter of law. Nonetheless, Defendant NCT asserts that its loans are nondischargeable under § 523(a)(8)(A)(i) because they are "funded by a nonprofit institution", namely, The Educational Resources Institute ("TERI"). PHEAA, in turn, alleges the same affirmative defense as to those loans that it services that had any relationship with TERI. This defense is lacking in merit for five reasons:

*First*, TERI is not an "institution" as that term is used in the Bankruptcy Code. That term is derived from the Higher Education Act which has consistently used the term to refer solely to educational institutions. TERI is not, and has never been, an educational institution.

*Second*, TERI is not a nonprofit institution because it fails the most fundamental test under the common law for such a nonprofit. TERI, since its takeover by First Marblehead Corporation ("FMC") in 2001, has operated almost exclusively as a commercial business assisting FMC in competing with other for-profit corporations in the provision of private student loans. Thus, TERI is not operated for a public benefit, but rather, for the purely private benefit of assisting FMC in a commercial enterprise.

*Third*, TERI has not "funded" any of the loans that are the subject of this litigation. It is clear from the structure of § 523(a)(8)(A)(i) and that provision's legislative history that Congress used the term "fund" to mean something entirely different than the term "guarantee." TERI did not fund these loans: at most, it guaranteed these loans from default (and, actually, did not even do that). If Congress had intended § 523(a)(8)(A)(i) to include within its ambit loans that were guaranteed by a nonprofit institution, it would have expressly said so and, indeed, it used the word

2

"guaranteed" with regard to the government, but not with regard to a nonprofit institution.  The legislative history also establishes that Congress drew a clear distinction between "funding" an educational loan and "guaranteeing" an educational loan.  Governments "fund" and "guarantee" loans; nonprofit institutions—by which Congress clearly meant post-secondary schools—"fund" loans.  No part of the Higher Education Act contemplates guarantees being made by nonprofit institutions.  That is why § 523(a)(8)(A)(i) speaks only of governmental guarantees.

*Fourth*, since TERI was granted a discharge in bankruptcy in 2010 and rejected all of its obligations under its various guarantees in its bankruptcy proceeding, the loans of all class members who filed bankruptcy after the date the guarantees were extinguished were discharged.  There was no TERI guarantee in place when those class members filed their petitions in bankruptcy.

*Finally*, TERI, by virtue of its own contractual arrangements with the lenders originating the subject loans, specifically disclaimed any guarantee for any loan that was not a "qualified education loan."   Therefore, by definition, all the class members' loans that exceed the cost of attendance or were not for education at a Title IV institution (which encompasses the entire class) were not guaranteed by TERI.

Plaintiff seeks an order from this Court declaring that any loan held or serviced by Defendants that either exceeded the cost of attendance or was issued to someone not attending a Title IV institution has been discharged and that the continued collection on such a loan is a violation of § 524 of the Bankruptcy Code and the discharge orders.  Plaintiff further seeks an order requiring Defendants to return the funds collected on all such loans, with interest, to the class.

## STATEMENT OF FACTS

**Plaintiff Tashanna Golden**

Plaintiff Tashanna Golden attended the University of Pennsylvania Law School ("Penn") from 2005 to 2008. *See* Declaration of Tashanna Golden (hereinafter "Golden Decl.") at ¶ 2. During the 2006-2007 academic year, the published Cost of Attendance at Penn Law School during that term was $48,464. *Id.* at ¶ 3, Ex. A. During this academic year, Ms. Golden borrowed $27,500 in federal guaranteed loans and received another $21,640 in scholarships and grants. *Id.* at ¶ 4. Ms. Golden also borrowed an additional $7,103 from BankOne on or about September 28, 2006. *Id.* The BankOne loan was later securitized into the NCT Trust. This loan was in excess of Ms. Golden's cost of attendance after taking into account federal loans, scholarships and grants and is therefore nondischargeable. The loan has been serviced by PHEAA which continues to demand payment from Plaintiff Golden.

Plaintiff Golden graduated from Penn Law School in May 2008. On or about February 26, 2008, Citibank extended an $11,000 "bar loan" to Plaintiff Golden to cover her expenses while she studied for the Pennsylvania Bar Exam. *Id.* at ¶ 5. This loan was not a qualified education loan as defined in § 221(d)(1) of the Internal Revenue Code because it was not incurred to pay the cost of attendance at a Title IV institution. It, therefore, does not come within the terms of § 523(a)(8) and is fully dischargeable. The Citibank loan was sold to Goldentree Asset Management on or about October 24, 2015, and was then placed into the Goal Trust. The loan is serviced by Firstmark. *See* Declaration of George F. Carpinello (hereinafter "Carpinello Decl.") at ¶ 2, Ex. A ("Letter from CitiBank").

On February 29, 2016, Plaintiff Golden filed a voluntary petition for relief under the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of New York.

Golden Decl. at ¶ 6.  Ms. Golden properly listed on Schedule F certain "student loans" owed, including the loans that are the subject of this action.  Golden Decl. at ¶ 7, Ex. B.  On or about August 3, 2016, this Court issued a discharge order in Ms. Golden's bankruptcy proceeding (Golden Decl. at ¶ 8, Ex. C) and, on or about August 5, 2016, all creditors received notice of discharge.  Golden Decl. at ¶ 8, Ex. D.  Ms. Golden did not enter into an agreement with Defendants under § 524(c) of the Bankruptcy Code and none of the Defendants filed an adversary proceeding to contest discharge of the subject loans.  Golden Decl. at ¶ 9.

However, instead of treating the loans as discharged, Defendants continued to demand, and accepted, payment from Ms. Golden on the discharged loans.  Golden Decl. at ¶ 10.

**Defendants' Collection of Discharged Debts**

Defendants' treatment of Plaintiff Golden's loans is reflective of how they have treated all class members' loans.  It is undisputed that none of Defendants makes any effort to determine whether the subject loans are qualified education expenses after receiving notice of discharge in bankruptcy.  Rather, they resume collections on such loans as if discharge never occurred.  *See* Carpinello Decl. at ¶ 3, Ex. B ("Deposition of Peter Sadowski") at 39:3-20; 40:1-41:6; 66:24-67:12; Carpinello Decl. at ¶ 4, Ex. C ("Deposition of Katelynn Bias") at 49:18-50:40; 53:16-60:19; 162:13-163:12; Carpinello Decl. at ¶ 5, Ex. D ("Goal's Responses to Plaintiff's Second Set of Interrogatories") at Response to Interrogatory No. 4; Carpinello Decl. at ¶ 6, Ex. E ("NCT's Responses to Plaintiff's Second Set of Interrogatories") at Response to Interrogatory No. 4.

It is also undisputed that TERI, when originating its direct-to-consumer loans, did not seek certification from the school that the loan was within the cost of attendance nor did it seek to determine what other scholarships, grants or loans the student received.  Carpinello Decl. at ¶ 7, Ex. F ("Deposition of Carlin Golden") at 16:8-20:16; 22:18-23:2; 82:2-9; 87:7-88:14. ████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████  Carpinello Decl. at ¶ 8, Ex. G ("FM-Golden 1511-1521") at 1512.  Thus, TERI knowingly issued loans that exceeded the cost of attendance.

Defendants assert that these loans are, nonetheless, nondischargeable because of "certifications" they receive from the school or the borrower.

With regard to Golden's bar loan and similar loans, Defendant Goal asserts that any such loan "required a certification from the educational institution that they attended certifying that the borrower had expenses associated with the bar examination during the period for which the loan was requested  (*see e.g.*, Citi-Golden_00007), or additional documentation evidencing that the borrower was registered for a board review course or was graduating and pursuing a medical or dental residency or internship."  Carpinello Decl., Ex. D at Response to Interrogatory No. 1; *see also* Carpinello Decl. at ¶ 9, Ex. H ("2016A_Golden_000007")[1].  However, as Plaintiff's Bar Loan Application reveals, no such certification was present.  Carpinello Decl. at ¶ 10, Ex. I ("Plaintiff's Bar Loan Application").

Defendant NCT, for its part, asserts that it relies upon a certification by the student borrower that it claims Plaintiff Golden (and other borrowers) have made on their loan application that her loan "was and is a qualified education loan."  Carpinello Decl., Ex. E at Response to Interrogatory No. 1.

---

[1] It should be noted that not even this meaningless certification has actually been provided since the document that the trust references does not contain the certification of the school.  *See* Carpinello Decl., Ex. G.

NCT also relies on its contracts with National Collegiate Funding LLC ("NCF") in which NCF made representations and warranties that the sellers of the loans *i.e.*, the original lending institutions, represented and warranted that every loan they were selling was guaranteed by TERI and further that TERI stated that it would only guarantee education loans that were "qualified education loans" under the tax code. *Id.*

**TERI's Involvement in the NCT Trusts**

Until it filed for bankruptcy in 2008, TERI devoted virtually all its assets and personnel to further the private financial interests of FMC, a commercial originator and securitizer of private student loans.

TERI was originally organized in 1985 to educate students and their families, especially those of limited means, about access to college and the methods of financing a college education. It also started a loan guarantee program to encourage banks in the Boston area to make loans to students who otherwise did not have the financial resources to attend college. *See* Carpinello Decl. at ¶ 11, Ex. J ("Motion of JPMorgan Chase for Order Authorizing Debtor to Enter into Stipulation, May 28, 2018") at ¶ 5.

TERI's activities changed dramatically in 2001 when it entered into a series of agreements with FMC by which TERI transferred substantially all of its loan-related assets to FMC and outsourced its loan origination staff and funding to FMC. Carpinello Decl. at ¶ 12, Ex. K ("Deposition of Richard Neely") at 82:4-84:10. FMC was in the business of designing and marketing student loans to private lending institutions. It performed application services, loan origination, disbursements, loan servicing, and, starting in 2001, loan securitization. Carpinello Decl. at ¶ 13, Ex. L ("Deposition of John Hupalo") at 42:15-18; 44-22:24. In essence, FMC offered one-stop services to private banks that wished to get into the business of making private loans to students. As part of its business, FMC securitized the loans it obtained on behalf of private banks

and created the NCT Trusts, which were composed of loans originated by FMC on behalf of the banks. Carpinello Decl., Ex. L at 12:15-19; 20:7-20:22; 23:24-24:3; 24:21-24; 25:1-28:13. TERI, through an FMC subsidiary, First Marblehead Education Resources ("FMER"), acted as loan originator for private banks and as servicer of the loans. Carpinello Decl., Ex. K at 31:10-20. TERI then arranged for investors to purchase an interest in the trusts and received dividends based upon the performance of the student loan portfolio in the trust. A critical part of FMC's securitization plan was to guarantee performance on the loans to insure against default. Carpinello Decl., Ex. L at 32:2-34:6; 36-2:15; 37:22-38:10. FMC acquired TERI for this very purpose because TERI agreed to guarantee the performance of all of the student loans in the trusts. This enabled FMC to compete in the commercial securitization market, where most of TERI's competing guarantors were for-profit commercial enterprises. Carpinello Decl., Ex. L at 59:7-60:21. As FMC stated in a public filing, "in 2001, we entered into a "strategic relationship" with TERI, intended to enhance significantly our risk management and loan processing capabilities." Carpinello Decl. at ¶ 14, Ex. M ("FMC Form 10-K for the fiscal year ending June 30, 2004") at 12.

> FMC describes its strategic relationship with TERI as follows:
>
> In connection with the transaction, we also entered into a series of agreements with respect to loan processing services, database updates and the securitization of TERI-guaranteed loans. These include a master servicing agreement and a database purchase and supplementation agreement with TERI. Pursuant to the master servicing agreement, TERI engages us to provide loan origination, pre-claims, claims and default managing services. Under TERI's agreements with lenders, lenders delegate their loan origination functions and TERI has the right to subcontract these functions. Pursuant to the database purchase and supplementation agreement, TERI provides updated information to us about the performance of the student loans that it guarantees, so that we can continue to supplement and enhance our database.

*Id.*

FMC also stated that, as part of its relationship with commercial banks, there is a "form of loan origination agreement between TERI and the prospective lender pursuant to which the lender delegates its loan origination functions through TERI, and TERI agrees to receive loan applications, perform underwriting according to the standards in the program guidelines and approve and deny applications." *Id.* at 13. "TERI has agreed to subcontract these loan origination functions to [FMC] pursuant to the master servicing agreement described above." *Id.*

As part of its agreements with FMC, TERI transferred substantially all of its employees to FMER and TERI agreed to make an annual payment to FMC to cover their salaries. Carpinello Decl., Ex. K at 38:8-19; 88:3-12. All the TERI functions described above were performed by FMER employees. Carpinello Decl., Ex. M at 12-13. TERI also moved its offices to the building that housed FMER. Carpinello Decl., Ex. K at 35:9-37:4; 38:10-39:18.

Although characterized as a "strategic partnership," the transaction was in essence an asset purchase whereby FMC acquired essentially all of TERI's business in loan origination and loan guarantees and its entire database. Carpinello Decl., Ex. L at 81:18-82:6. As part of the arrangement, FMC paid $1 million in cash to TERI and gave promissory notes to TERI totaling $7.9 million. Carpinello Decl., Ex. K at 85:15-86:14. In addition, TERI received a 25% residual interest in each trust created by FMC. Carpinello Decl. at ¶ 15, Ex. N ("FMC Form 10-K for the fiscal year ending June 30, 2006") at 13; Carpinello Decl., Ex. K at 92:9-93:12. This residual interest is the amount remaining in each trust after all the loans are paid and all the investors' interests are paid off. Carpinello Decl., Ex. K at 92:9-93:12.

FMC's control of TERI was critical to FMC's business model and profitability. Before FMC entered into its relationship with TERI, FMC "struggled to obtain necessary financing and it was in a precarious financial situation until the successful acquisition of TERI in 2001 and the

company's initial public offer of new stock." *First Marblehead Corp. v. House*, 541 F.3d 36, 40 (1st Cir. 2008). TERI performed two critical functions for FMC: First, TERI was the entity that guaranteed the student loans. This was critical for securitization since the investors needed the assurance that there would be a guarantee behind those student loans that defaulted. One hundred percent of FMC's securitized loans were guaranteed by TERI. Carpinello Decl., Ex. L at 32:2-7. Thus, FMC's financial health was directly dependent on TERI's (*Id.* at 74:8-12; Carpinello Decl., Ex. K at 97:13-17; 99:8-11) and TERI's financial health was used by the rating agencies to evaluate the default likelihood for the trusts created by FMC. Carpinello Decl., Ex. L at 46:13-18. FMC warned its investors in 2006 that if its "agreements with TERI terminate for any reason, or if TERI fails to comply with its obligations, [FMC's] business would be adversely affected and the value of [its] intangible assets could be impaired." Carpinello Decl. at ¶ 16, Ex. O ("FMC Form 10-K for the fiscal year ending June 30, 2005") at 49.

Equally important, TERI provided purported nonprofit status. Because TERI was registered as a charitable organization under Massachusetts law and the Internal Revenue Code, FMC could assert that the loans FMC made were "funded" by a "nonprofit institution" within the meaning of § 523(a)(8)(A)(i). Carpinello Decl., Ex. L at 36:2-15; 39:6-20; 47:4-6; 48:18-49:13; 50:8-15; 57:11-18; 58:17-20; 68:17-22. FMC acknowledged in public filings with the Securities and Exchange Commission that it was TERI's status as a purported nonprofit that gave it competitive advantage *vis-à-vis* other private student lenders because it purported to give FMC the ability to collect on private student loans even after bankruptcy discharge. Asserted FMC, "[b]ecause TERI is a not-for-profit corporation, defaults on TERI-guaranteed student loans have been held to be non-dischargeable in bankruptcy proceedings." Carpinello Decl. at ¶ 17, Ex. P ("Amendment No. 2 to Form S-1 for FMC, dated October 14, 2003").

After TERI ceded virtually all its assets and control to FMC, FMC's business grew dramatically.  Carpinello Decl. at ¶ 18, Ex. Q ("FMC Form 10-Q 2003") at 23.  From 2002 to 2008, TERI paid FMER substantial sums in reimbursement for FMER's operation of what were supposedly TERI functions.  This amount was slightly over $14 million in fiscal year 2002 Item but it increased to over $106 million by 2006.  *See* Carpinello Decl., Ex. N at 39, Item 6, comparing "Processing fees from TERI" from 2002-2006.  These payments constituted a substantial portion of FMC's net revenues. *See, e.g.*, Carpinello Decl., Ex. Q at 6 ("In the first quarter of fiscal 2004, processing fees from TERI represented approximately 83% of total service revenue.  The Company did not recognize more than 10% of total service revenue from any other customer.").

These public filings consistently acknowledged that TERI was critical to FMC's operation and that if TERI should terminate its agreement with FMC for any reason, FMC's business would be adversely affected because it might not be able to offer its clients guarantee services from another guarantor.  *See, e.g.*, Carpinello Decl., Ex. N. (FMC 10K 2006) at 26 ("If our relationship with TERI terminates, our business could be adversely affected.").  It also acknowledged that TERI's nonprofit status provided FMC with a "competitive advantage."  *See* Carpinello Decl., Ex. Q at 34  ("Our business could be adversely affected if TERI's ratings are downgraded, if TERI fails to maintain its not-for-profit status or if TERI's not-for-profit status ceased to be a competitive advantage.").  Over time, TERI guaranteed approximately $10 billion in loans securitized by FMC. Ex. L at 84:19-85:8.

In 2008, TERI declared bankruptcy because its reserves were insufficient to cover the guarantees that it had made to various commercial banks to cover the defaults on private student loans.  *See In Re The Education Resources Institute, Inc.*, Case No. 08-12540(HB) (Bankr. D. Mass. 2008).  In the course of the bankruptcy proceedings, TERI rejected the guarantees and

agreed to pay over to the participating banks and trusts (including Defendant NCT) the reserves it held to cover those guarantees. TERI also ceased making guarantees going forward. This bankruptcy was fatal to FMC's securitization business. Carpinello Decl., Ex. L at 90:16-91:1; 91:17-91:20; 95:5-96:4; Carpinello Decl. at ¶ 19, Ex. R ("FMC 10K June 30, 2008") at 33; Carpinello Decl. at ¶ 20, Ex. S ("FMC 10K June 30, 2009") at 2. On the day TERI declared bankruptcy, FMC's stock price dropped 37%. As a result of TERI's bankruptcy, FMC profits dropped 50% (Carpinello Decl., Ex. L at 102:14-24) and revenues, which had reached as high as $100-125 million per year, dropped more than $50 million. Carpinello Decl., Ex. K at 127:4-21. Immediately following TERI's bankruptcy, FMC reduced its workforce by 620 employees and is now a significantly smaller operation that still originates and services student loans, but no longer creates student loan trusts as it did from 2001 to 2008. *See* Carpinello Decl., Ex. R (FMC Form 10K 2008) at 2.

## ARGUMENT

I. **DEFENDANTS CANNOT ESTABLISH THAT ANY OF THE SUBJECT LOANS THAT EITHER EXCEEDED THE COST OF ATTENDANCE OR WERE ISSUED FOR ATTENDANCE AT A NON-TITLE IV INSTITUTION COME WITHIN THE TERMS OF § 523(A)(8)(B).**

Pursuant to 11 U.S.C. § 523(a)(8), educational loans are non-dischargeable only if they come within one of three categories:

- (A)(i) an education benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

- (A)(ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

- (B) any other educational loan that is a qualified education loan, as defined in § 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual . . . .

11 U.S.C. § 523(a)(8).

In order to effectuate the Bankruptcy Code's remedial purpose, exceptions to discharge should be narrowly construed and, where ambiguous, resolved in favor of the debtor. *Bethpage Fed. Credit Union v. Furio* (*In re Furio*), 77 F.3d 622, 624 (2d Cir. 1996). Further, exceptions to discharge "should be confined to those plainly expressed." *Kawaauhau v. Geiger*, 523 U.S. 57, 62, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998); *Golden v. JPMorgan Chase Bank* (*In re Golden*), 596 B.R. 239, 260 (Bankr. E.D.N.Y. 2019) (Stong, J.).

Defendants bear the burden of establishing whether any of their direct-to-consumer loans are non-dischargeable under the terms of the § 523(a)(8). *Grogan v. Garner*, 498 U.S. 279, 283 (1991) (referring to the burden a creditor must meet to avoid dischargeability); *Renshaw v. Renshaw* (*In re Renshaw*), 222 F.3d 82, 86 (2d Cir. 2000) ("creditor [must] prove by a preponderance of the evidence that its claim is one that is not dischargeable."); *Bronsdon v. Educ. Credit Mgmt. Ass'n* (*In re Bronsdon*), 435 B.R. 791, 796 (B.A.P. 1st Cir. 2010) ("creditor bears the initial burden of establishing that the debt is of the type excepted from discharge under § 523(a)(8)."); *In re Haroon*, 313 B.R. 686, 688 (Bankr. E.D. Va. 2004) ("in the case of a student loan, [creditor] bears the initial burden of proving that the debt was incurred for educational purposes."); *In re Adamo*, 560 B.R. 642, 648 (Bankr. E.D.N.Y. 2016) ("[t]he burden of proof in an action to determine dischargeability is on the creditor to prove the elements of its nondischargeability complaint by a preponderance of the evidence."); *In re Guo*, 548 B.R. 396, 401 (Bankr. E.D.N.Y. 2016) ("the creditor objecting to dischargeability bears the burden of proof by a preponderance of the evidence.").

There is no valid basis to argue that the Goal loans at issue here come within the terms of § 523(a)(8)(A)(i). The loans were not issued by a governmental unit nor were they funded in

whole or in part by a non-profit institution.[2]  In addition, this Court held in its decision of January 31, 2019, *In re Golden*, 596 B.R. at 260-65, that these loans do not come within the terms of § 523(a)(8)(A)(ii) because they are not obligations to "repay funds received as an educational benefit, scholarship or stipend."  The same conclusion was recently reached by the Fifth Circuit in a similar proceeding against these same Defendants, *Crocker v. Navient Solutions, L.L.C.* (*In re Crocker*), 941 F.3d 206, 217-24 (5th Cir. 2019) (analyzing § 523(a)(8)(A)(ii)).

Defendants claim, nonetheless, that their loans are non-dischargeable under § 523(a)(8)(B). That section makes "education loans" dischargeable if they are a "qualified education loan," within the terms of IRS code § 221(d).  Section 221(d)(1), in turn, defines qualified education loan as "any indebtedness incurred by the taxpayer solely to pay qualified higher education expenses. . ." IRS code § 221(d)(2) defines "qualified higher education expenses" as "the cost of attendance at an. . . eligible educational institution."  *See generally In re Golden*, 596 B.R. at 267-69.

As noted above, Defendants, at the time they were notified of discharge, made no effort to determine whether any of these loans were "qualified education loans" as defined by § 221(d)(1) of the IRS Code.  They did not seek certification from the institution the debtor attended and they made no inquiry as to whether any particular loan exceeded the cost of attendance.[3]

---

[2] The TERI defense of Defendants NCT and PHEAA is addressed in Point II below.

[3] In making this argument, Plaintiff does not concede that *any* of Defendants' private loans are nondischargeable under §523(a)(8)(B) because some of them are not "education loans" at all. "[E]ducational loans are different from most loans.   They are made without business considerations, without security, without co-signors, and relying for repayment solely on the debtor's future increased income resulting from the education."  *Dep't of Health and Human Serv. v. Smith*, 807 F.2d 122, 125 (8th Cir. 1986), *quoting* H.R.Rep. No. 95-595 at 133 (1987), *reprinted in* 1987 U.S.C.C.A.N. 5963, 6094;

This Court in *Campbell v. Citibank, N.A.* (*In re Campbell*), 547 B.R. 49, 60 (Bankr. E.D.N.Y. 2016) noted that a Citibank bar loan, the same one at issue here, did not have the typical characteristics of an education loan:  "These considerations are simply not relevant when the loan

Instead, Defendants appear to rely upon boilerplate language in their promissory notes that they claim renders the loans nondischargeable despite the fact that they either exceeded the cost of attendance or were issued for attendance at a non-Title IV institution.

Defendants Goal and Firstmark apparently rely upon the alleged certification by an educational institutional that the bar loan applicants attended the educational institution that they claim to have attended and that the borrower has expenses associated with the bar exam. That certification, of course, is meaningless because it is not a loan for qualified education expenses at a Title IV institution and is therefore outside § 523(a)(8)(B).

Defendants NCT and PHEAA apparently rely upon boilerplate that they claim is in their loan applications to the effect that Plaintiff Golden and all other borrowers acknowledge that their loan was a "qualified education loan."[4] First, it should be noted that the documents that Defendants cite to, 2006-4 Golden 001139-001153, do not contain any certification. Second, the language they rely upon is unenforceable as a matter of law. Previously, on the Motion to Dismiss, Defendants pointed to self-serving boilerplate that was purportedly contained the credit agreement with Plaintiff Golden or any other borrowers. This boilerplate reads as follows:

---

at issue is a consumer loan extended by a for-profit actor. Defendants' Bar Loan application describes itself as a 'consumer credit application' and states that 'applications are evaluated through a credit scoring model. A satisfactory credit history will be viewed favorably, but does not guarantee the loan application will be approved.' In this way, the Bar Loan differs significantly from government guaranteed loans and conditional grants, which are often made available to students without regard to their credit scores or other underwriting considerations.'" 547 B.R. at 60.

[4] NCT's reliance on its contracts with NCF is, of course, misplaced. Whatever agreement existed between TERI, NCF, the originators of the loans and the Trust is irrelevant to the issues before the Court. It is clear that Plaintiff Golden's loan exceeded the cost of attendance but was, nonetheless, placed in the Trust (despite the language in the contracts) and for each class member the operative question is whether their loans exceeded the cost of attendance or were issued to pay for education at a non-Title IV institution without regard to any representations or warranties made by the various contracting parties to each other.

> I understand and agree that this loan is an education loan and certify that it will be used only for costs of attendance at the School.  I acknowledge that the requested loan is subject to the limitations on dischargeability in bankruptcy contained in Section 523(a)(8) of the United States Bankruptcy Code because either or both of the following apply:  (a) this loan was made pursuant to a program funded in whole or in part by The Education Resources Institute, Inc. ("TERI") a non-profit institution, or (b) this is a qualified education loan as defined in the Internal Revenue Code.  This means that if, in the event of bankruptcy, my other debts are discharged, I will probably still have to pay this loan in full.

*See* Carpinello Decl. at ¶ 21, Ex. T ("Ex. 2 to Declaration of Gregory T. Casamento") at 3-4, ¶ 12.

This Court has already held that this language is unenforceable because "[i]f that language alone were sufficient, then it is hard to see what role would be left for Congress or the courts in drafting, interpreting, and applying these sections of the Bankruptcy Code." *In re Golden*, 596 B.R. at 267.

This holding is supported by substantial case law that holds that language that is a pre-bankruptcy waiver of discharge is unenforceable as against public policy. *Tamasco v. Nicholls* (*In re Nicholls*), Adv. Proc. No. 10-8186, 2010 WL 5128627, at *2 (Bankr. E.D.N.Y. Dec. 10, 2010); *Giaimo v. Detrano* (*In re Detrano*), 222 B.R. 685, 688-89 (Bankr. E.D.N.Y. 1998); *Bank of China v. Huang* (*In re Huang*), 275 F.3d 1173, 1177 (9th Cir. 2002); *Greensward, Inc. v. Cietek* (*In re Cietek*), 390 B.R. 773, 779 (Bankr. N.D.N.Y. 2008); *Hayhoe v. Cole* (*In re Cole*), 226 B.R. 647, 651-52 (B.A.P. 9th Cir.  1998); *First Georgia Bank v. Halpern* (*In re Halpern*), 50 B.R. 260, 262 (Bankr. N.D. Ga. 1985), *aff'd,* 810 F.2d 1061 (11th Cir. 1987); and *Doug Howle's Paces Ferry Dodge, Inc. v. Ethridge* (*In re Ethridge*), 80 B.R. 581, 586 (Bankr. M.D. Ga. 1987).

The reason for this public policy is obvious:  If a creditor could obtain a waiver of dischargeability either by including boilerplate language in every promissory note to that effect or by reciting boilerplate facts that would establish non-dischargeability, then every creditor would

do so (as Defendants did here) and thereby nullify the bankruptcy court's powers under §§ 727 or 1328. *Ethridge*, 80 B.R. at 586.

Moreover, a creditor cannot bootstrap itself into one of the provisions of § 523(a)(8) by getting a debtor to concede that one of the provisions applies or to concede facts that would place the loan within one of those provisions. Either the loan, as a matter of fact, meets those qualifications or it does not. *See In re Dufrane*, 566 B.R. 28, 40 (Bankr. N.D. Cal. 2017) ("the fact that SunTrust provided in each of the promissory notes evidencing the SunTrust Private Loans that the loan proceeds would be used to pay educational and living expenses, as alleged by SunTrust, does not make the SunTrust Private Loans the type of 'obligation to repay funds received as an educational benefit' that Congress sought to make non-dischargeable under § 523(a)(8)(A)(ii)."); *see also In re Wiley*, 579 B.R. 1, 7 (Bankr. D. Me. 2017) (stating that preprinted language in a promissory note which states that an education loan is nondischargeable is not demonstrative of nondischargeability absent evidence that the loan fits within § 523(a)(8)).

Thus, Defendants only defense is to affirmatively demonstrate that, for each loan, after considering all federal loans, financial assistance and scholarships and any school-certified loans made prior to Defendants' loans, the loan at issue did not exceed the cost of attendance and was made to a student that attended a Title IV institution. *Golden*, 596 B.R. at 267-69. If a loan does not meet these criteria it is not a "qualified education loan" because, by definition, it would not be used "*solely* to pay qualified higher education expenses." IRS Code § 221(d)(1) (emphasis added).[5]

---

[5] The IRS, in its interpretative regulations, gives the example of a loan which is given to a student, part of which is for the purpose of home improvement and part of which is for the purpose of education. The IRS points out that the loan is not a qualified education expense because the loan is not used "solely" for purposes of education. 26 C.F.R. § 1.221-1(e)(4), Example 6. See Carpinello Decl. ¶ 22, Ex. U.

For each loan that Defendants cannot establish was within the cost of attendance at a Title IV institution, the debt should be declared discharged. *Golden*, 596 B.R. at 269. An order entered by the Court to this effect will streamline the litigation and clarify issues remaining to be tried.

## II.    DEFENDANTS' TERI DEFENSE IS WITHOUT MERIT.

Defendants NCT and PHEAA assert that all of NCT's and some of PHEAA's loans are nonetheless nondischargeable under § 523(a)(8)(A)(i) because they are funded by a nonprofit institution, namely, TERI. This defense has no merit because TERI is not an institution; it is not a nonprofit; it did not fund any of the loans at issue in this proceeding; it rejected all of its guarantee obligations in 2010 as part of its bankruptcy; and by its own contracts it expressly did not guarantee any loans that were in excess of the cost of attendance.

### A.    TERI IS NOT AN "INSTITUTION."

Whether or not TERI is an "institution" pursuant to § 523(a)(8) presents a question of statutory construction. Because the term "institution" is not defined in the Bankruptcy Code, the Court should consider the statute's legislative history, which revels that § 523(a)(8)(A)(i) is derived directly from the Higher Education Act. *In re Segal*, 57 F.3d 342, 346 (3d Cir. 1995); *see also U.S. v. Dauray*, 215 F.3d 257, 261 (2d Cir. 2000) (stating that where a term is undefined and its ordinary meaning is not dispositive, courts should consider also consider the word's "placement and purpose" in the statutory scheme); *In re Homaidan*, 596 B.R. 86, 101 (Bankr. E.D.N.Y. 2019) ("And equally important is, of course, the plain text of the statute. But that does not mean that a court must read the words with blinders on. Rather, as the Supreme Court has observed, it is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'") (quoting *Davis v. Michigan Dep't of Treasury*, 489 US 803, 809 (1989)).

This history reveals that "institution" is a term of art that has been used in the Higher Education Act since 1965 to mean an educational institution, *i.e.*, a school, college or university, and § 523 (a)(8)(A)(i) is derived directly from the Higher Education Act. *See In re Adamo*, 619 F.2d 216, 221 n.7 (2d Cir. 1980). When Congress moved the provision dealing with the nondischargeability of certain student loans from the Higher Education Act to the Bankruptcy Code, it carried over the term "institution" as used in the Higher Education Act. And everywhere in that Act where the term "institution" is used, it means an educational institution.

### 1. The Term "Institution" as Used in the Higher Education Act and Department of Education Regulations Means an Educational Institution.

When the Higher Education Act was adopted it provided for federal guarantees of student loans and direct federal student loans to students at "institutions of higher education." Section 801 of the Higher Education Act, P.L. 89-329 (Nov. 8, 1969) (emphasis added), attached as Carpinello Decl. ¶ 23, Ex. V. That term included "public or other nonprofit institution[s]" that were accredited to provide post-secondary education. *Id*. Ultimately, however, the Act was expanded to provide aid to students who attended proprietary institutions and post-secondary vocational institutions. Thus, the current version  of the Higher Education Act (20 U.S.C. § 1001) covers not only "institutions of higher education," which are defined as "public or other nonprofit institution[s]" that have accredited educational programs (§ 1001(a)), but also "[a]dditional institutions" such as proprietary and vocational schools and certain "[i]nstitution[s] outside the United States" §§ 1001(b); 1002(a)(1), (2).   Throughout the Higher Education Act, the term "institution" is used to refer to an educational institution.[6] Thus, for example, when defining the cost of attendance, the Act refers to fees charged by "the institution":

---

[6] *See, e.g*., 20 U.S.C. § 1001(f)(a) (setting forth the requirement that any "institution [that] is owned or controlled by foreign source or receives a gift or enters into a contract with a foreign source. . . the institution shall file a disclosure report with the [secretary of education].");  20 U.S.C. §

> For the purposes of this subchapter…the term cost of attendance means:    (1) tuition and fees normally assessed a student carrying the same academic workload as determined by the institution…. (2) an allowance for books, supplies, transportation…as determined by the institution. . . .

20 U.S.C. § 1087ll.

In contrast, when not referring specifically to schools, the Act uses terms such as "nonprofit organizations" (20 U.S.C. § 1161h); "nonprofit consortium, association, alliance or collaboration" (20 U.S.C. § 1261u); "nonprofit agencies" (20 U.S.C. § 1087hh); "nonprofit private libraries" and "nonprofit educational organizations" (20 U.S.C. § 1126).

The regulations promulgated by the Department of Education reflect this same language and usage.   Since 1984, the regulations have expressly defined the term "institution" as "(1) An institution of higher education as defined in 34 C.F.R. § 600.4; (2) A proprietary institution of higher education as defined in 32 C.F.R. § 600.5; and (3) A postsecondary vocation institution as defined in 34 C.F.R. § 600.6."   All of the cited sections reference only educational institutions. *See* 49 Fed. Reg. 48501 (Dec. 12, 1984), Ex. W to Carpinello Decl.; 34 C.F.R. § 668.1.  Similarly, 34 C.F.R. § 600.2, the general definition section of the regulations under the Higher Education Act defines "eligible institution" as "an institution that – (1) qualifies as – (i) An institution of higher education, as defined in § 600.4; (ii) A proprietary institution of higher education as defined in § 600.5; or (iii) A postsecondary vocational institution as defined in § 600.6; and (2) Meets all the

---

1001(f)(h)(4) (defining "institution" for the purposes of § 1011(f) as a public or private institution that is authorized to provide a program of education); 20 U.S.C. § 1003(15) (defining school or department of divinity as "an institution, or department or branch of an institution,  the program of instruction of which is designed for the education of students. . . to prepare the students to become ministers of religion. . . ."; 20 U.S.C. § 1015(c)(a) (stating that nothing in the Higher Education Act shall require the maintenance of any database of students receiving financial aid "attending institutions receiving assistance under this chapter."); 20 U.S.C. § 1078(c) (setting forth the determination of the amount of the Stafford loan "by an eligible institution"); and 20 U.S.C. § 1136(a)(1) (providing that the secretary of education "shall award program grants to each of the institutions listed in subsection (b)(1)", referring to historically black colleges and universities.

other applicable provisions of this part."  Nowhere do the Department of Education regulations use the term "institution" to mean anything other than an educational institution.

### 2.  Legislative History of § 523(a)(8)

The meaning of the term "institution" as used in the Higher Education Act is critical because the law exempting certain student loans from discharge was originally added in 1976 to the Higher Education Act itself, not the Bankruptcy Act.  It provided that loans "insured or guaranteed under the authority of this part" shall not be dischargeable.  20 U.S.C. § 1087-3, P.L. 94-482, October 12, 1976, attached as Ex. X to Carpinello Decl.  That provision referred specifically to loans that were federally guaranteed or insured under the Higher Education Act.  As part of the adoption of the Bankruptcy Code in 1978 and made effective in October 1979, the language was moved over to § 523.

The first version of § 523(a)(8) that was placed in the Bankruptcy Code exempted from discharge debts "to a governmental unit, or a nonprofit institution of higher education, for an educational loan."  P.L. 95-598, Nov. 6, 1978, attached as Ex. Y to Carpinello Decl.  This provision, by its terms, covered only debts owed directly to a governmental unit or a nonprofit institution of higher education.  That provision was criticized in Congress as too narrow and as creating anomalies that are further discussed below.  *See* p. 32, *infra*.  Thus, the next year the section was expanded to include loans "made, insured, or guaranteed by a governmental unit" and loans "made under a program funded in whole or in part by a governmental unit or nonprofit institution of higher education."  P.L. 96-56, Aug. 14, 1979, attached as Ex. Z to Carpinello Decl.

In 1984, as part of a "technical" bill, the Code was amended to remove the "term of higher education" to eliminate ambiguity as to which educational institutions were "of higher education":

"[D]eleting 'of higher education' enlarges the scope of the nondischargeability exception and is therefore substantive to that extent.  It is a modest enlargement,

however, in that the claimant must be a nonprofit institution and the loan must be one for an educational loan.  The change eliminates litigation over the question whether a seminary, for example, is an institution of higher education.  The amendment is thus to some extent at least clarifying.

Carpinello Decl. ¶ 28, Ex. AA ("Bankruptcy Improvement Act:  Hearing on P.L. 98-353 Before the Senate Judiciary Committee (April 6, 1983) (Comments of Prof. Frank Kennedy on Subtitle I of S. 445) at 328.

This legislative history demonstrates that this "modest enlargement," was clearly designed to deal with a very limited issue—removing ambiguity as to what type of institution was of "higher education" for dischargeability purposes—and was not intended to dramatically broaden nondischargeability to cover any private loan that involved a nonprofit entity of any kind.  There is simply no legislative history to support such an intent or the meaning of the term.

Indeed, extending nondischargeability to private loans could not have been the purpose of the 1984 change because, in 2005, Congress extended nondischargeability to private loans, but only to the extent that they met the strict requirements of qualified education loans as defined in I.R.C. § 221(d).  *See* § 523(a)(8)(B).  It would make no sense for Congress to strictly limit nondischargeability of private loans to only those that are made within the cost of attendance at Title IV schools (thereby ensuring that loans have some relationship to the cost and nature of the education) and yet, in the same section, extending nondischargeability to *all* private loans, simply because they were funded by a nonprofit corporate entity.

Because the term "institution" as used in the Higher Education Act and § 523(a)(8)(A)(i) means only educational institutions, it is clear that TERI is not an "institution" for purposes of § 523(a)(8)(A)(i).

## B.    TERI IS NOT A "NONPROFIT."

Even if TERI were an "institution" (which it is not), it still fails to qualify as a "nonprofit" as that term is used in § 523(a)(8)(A)(i).  Since 2001, TERI has operated almost exclusively to

further the private interest of FMC's commercial business, and not to further any public purpose. Moreover, TERI has allowed FMC to control its assets to further that private purpose.

The fact that TERI has registered as a not-for-profit entity under Massachusetts law or has registered as a § 501(c)(3) entity under the Internal Revenue Code, is not determinative of whether TERI qualifies as a nonprofit under § 523(a)(8)(A)(i). The case law is clear that the term "nonprofit" as used in a federal statute does not mean simply registered as a nonprofit. For example, in *Zimmerman v. Cambridge Credit Counseling Corp.*, 409 F.3d 473 (1st Cir. 2005) the Court interpreted the meaning of the phrase "any nonprofit organization which is exempt from taxation under § 501(c)(3)" of the Internal Revenue Code as used in the Federal Credit Report Organizations Act, as requiring two separate criteria: First, the organization had to be a "nonprofit," and second, also had to be exempt from taxation under § 501(c)(3). *Id.* The Court further held that if Congress intended for the test for "nonprofit" under the act to be solely § 501(c)(3) registration, it would not have separately required that the entity be a "nonprofit." *Id.*

Notably, the Court also held that it had the power to determine the organization's nonprofit status separate and apart from its designation as a § 501(c)(3) entity by the IRS. In so holding, the Court explained that the "IRS usually grants section 501(c)(3) status based solely on representations made by the applying entity" and that the IRS notification that an entity has so qualified "contains a disclaimer stating that the IRS has made its determination based solely on representations provided to it by the party seeking the status." 409 F.3d at 476-77.

Thus, an entity's 501(c)(3) status is not determinative of its nonprofit status for purposes of the relevant statute and it is "common for courts and administrative agencies to examine whether an entity actually operates as a nonprofit, irrespective of its tax-exempt status." *Id.* at 478. The First Circuit noted that the term "nonprofit," under the common law, typically meant that the entity

did not distribute profits to stockholders or others.  *Id.* (citing *Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir. 1981)).

In *Gorsuch*, the court noted that how the term "nonprofit" would be defined under the Clean Air Act depended in part upon the purpose of the federal law in which the term is used. Gorsuch, 667 F.2d at 221.  In that case, the question was whether an electric utility created and operated by Harvard University was exempt under the Clean Air Act.  The *Gorsuch* court held that the utility was a nonprofit even though it engaged in what would otherwise be a commercial enterprise because it was created solely to meet the needs of Harvard and six affiliated teaching hospitals, all of which were nonprofit charitable entities.  *Id.* at 223-224.  Thus, not only was there no distribution of profits to shareholders, but the entity was actually operated for a charitable purpose, *i.e.*, to serve the needs of Harvard and the teaching hospitals.  In so holding, the court said that Massachusetts laws defining which entities could organize as nonprofits were not determinative of the entity's nonprofit status under the Clean Air Act.  *Id.* at 222.  The court also rejected the argument that the entity was not a nonprofit because it had the potential to sell power to existing public utilities and that Harvard actually had discussions with a utility about that possibility.  *Id.*  The court held that this was not determinative primarily because such sales had not taken place and there was little likelihood that sales would occur in the future.  *Id.*  Further, the court cautioned that if, in fact, such sales did occur, "they might at that time affect the institution's exempt status.  *Id.*

Thus, determining whether an entity is a "nonprofit" as that term is used in a federal statute requires an analysis of whether the entity operates to further a public purpose as opposed to a private interest; its status as a § 501(c)(3) registrant is not determinative.  Cases which follow or are consistent with the *Zimmerman* holding that § 501(c)(3) status is not determinative include

*King v. Capital One Bank*, No. 3:11-cv-00068, 2012 WL 5570624, at *1 n.3 (W.D. Va. Nov. 15, 2012); *Polacsek v. Debticated Consumer Counseling Inc*., 413 F. Supp. 2d 539, 549-50 (D. MD. 2010); *Baker v. Family Credit Counseling Corp*., 440 F. Supp. 2d 392, 404-06 (E.D. Pa. 2006); and *Richie v. American Council on Gift Annuities*, 943 F. Supp. 685, 689-92 (N.D. Tex. 1996); *see also Greater Jamaica Dev. Corp., v. The New York City Comm*., 25 N.Y. 3d 614, 627-28 (2015) (holding that the fact that an entity is registered as a 501(c)(3) entity does not create a presumption that it is entitled to exemption as a charitable organization for purposes of a property tax exemption); *but see Limpert v. Cambridge Credit Counseling Corp*., 328 F. Supp. 2d 360, 365 (E.D.N.Y. 2004) (assuming entity was nonprofit because it was allegedly registered as a 501(c)(3)), *vacated*, 2004 WL 3395437 (Sept. 16, 2004) (finding that the court erroneously dismissed defendants who had not yet obtained 501(c)(3) status).

The term "nonprofit" is not defined in the Bankruptcy Code but it is defined in the Higher Education Act. As applied to "a school, agency, organization, or institution [the term "nonprofit"] means a school, agency, organization, or institution owned and operated by one or more nonprofit corporations or associations no part of the net earnings of which inures, or may lawfully inure, to the benefit of any private shareholder or individual." 20 U.S.C. § 1003(13). As applied to an "institution," as that term is defined by the regulations under the Higher Education Act, its meaning is clear—a traditional nonprofit college or university as contrasted with a proprietary, for-profit institution. *See* 34 C.F.R. § 668.1.

But even apart from the Higher Education Act, the common law draws a distinction between those entities that operate for a private benefit and those that operate for a public benefit. This test is consistent with the test the IRS uses to determine whether an entity should obtain or

maintain § 501(c)(3) status under the Internal Revenue Code, which essentially looks at whether the organization is operated for a public or private benefit.[7]

In order to maintain § 501(c)(3) status, an organization must not only be organized as a nonprofit, but must actually *operate* as a nonprofit. This means that the organization must operate "exclusively" for an exempt purpose, such as a charitable or educational purpose, and any "substantial" private purpose will render the organization not qualified. *See Redlands Surgical Servs. v. Comm'r of Internal Revenue*, 113 T.C. 47, 1999 WL 513862 (U.S. Tax Ct. July 19, 1999), *aff'd* 242 F.3d 904 (9th Cir. 2001). "The presence of a single non-exempt purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly exempt purposes." *Redlands*, 1999 WL 513862 at *18 (quoting *Better Bus. Bureau, Inc. v. United States*, 326 U.S. 279, 283 (1945)) (internal brackets and quotation marks omitted).

Further, the organization must not benefit private interests more than incidentally. *Id.* at *70. The private benefit test looks not only at whether shareholders or those organizing the entity personally profit from the enterprise, but also whether the organization benefits a private group of individuals, even if those individuals are independent of the organization. "The proscription against private benefit encompasses not only benefits conferred on insiders having a personal and private interest in the organization, but also benefits conferred on unrelated or disinterested persons." *Id.* at *74. Further, "[a]n organization's property may be impermissibly devoted to a private use where private interests have control, directly or indirectly, over its assets and thereby secure non-incidental private benefits." *Id.* at *74.

---

[7] Although TERI's status as a 501(c)(3) organization is not determinative, it is important to note that TERI failed to advise the IRS of its takeover in 2001 by FMC.

In *Redlands*, the court held that a subsidiary of a hospital organization was not a § 501(c)(3) charitable organization because it had entered into a partnership with a for-profit organization to operate a surgical center which was run for profit and because the not-for-profit entity had effectively ceded control of the operation of the center to the for-profit enterprise. *Id.* Even though the non-profit entity did not itself earn a profit, it ceded control of the center to the for-profit partner to operate the surgical center for a profit. Said the court, "It is not charity to aid a business enterprise." *Id.* at *78 (quoting *Bogert & Bogert*, *The Law of Trusts and Trustees,* § 364 (Rev. 2nd Ed. 1991)). The court concluded that "[b]ased on the totality of factors described below. . . . petitioner has in fact ceded effective control of the partnerships' and the Surgery Center's activities to for-profit parties, conferring on them significant private benefits, and, therefore, is not operated exclusively for charitable purposes within the meaning of § 501(c)(3)." *Id.* at *78.

Numerous other cases reach the same conclusion. In a case factually relevant to this case, *Partners in Charity, Inc. v. Commissioner of Internal Revenue*, 141 T.C. 151 (U.S. Tax Ct. 2013), the court denied nonprofit status to an entity that purported to provide financial assistance to low income individuals who could not otherwise afford to own their own home. The company provided a grant to individuals to assist them with the down payment. The court found that the company was not a nonprofit for several reasons. First, the company did not establish that it actually catered to low income individuals; rather, it appeared to provide grants to any individual who applied. Second, the grants were reimbursed by the seller so that the entity was not actually out-of-pocket for the grant. Third, it was clear that the company was organized primarily to generate business for itself and "broker as many transactions as possible and thus to generate significant net profits, regardless of whether the transactions achieved a charitable end." 141 T.C. at 170. Concluded the court, "[n]o entity accumulates profits of $3.6 million in two years by

accident.  Those profits are strong evidence that PIC's commercial activities with sellers were its primary purpose."

In *EST of Hawaii v. Commissioner of Internal Revenue*, 71 T.C. 1067 (U.S. Tax Ct. 1979), the IRS denied § 501(c)(3) status to a Hawaiian nonprofit organization devoted to the teaching of "est" a body of knowledge and techniques for personal development.  The court found that the Hawaiian entity was not entitled to tax exemption because it paid substantial licensing fees to a for-profit national organization for the right to use the materials and techniques developed by the for-profit entity.  71 T.C. at 1082.  The Tax Court emphasized that, although the Hawaiian entity was not formally controlled by the same individuals as the international entity, the later entity "exerts considerable control over petitioner's activities" and thus is the ultimate beneficiary of the success of the Hawaiian organization.  71 T.C. at 1080-81.  The court also emphasized that the for-profit nature of the Hawaiian entity did not depend upon whether the payments were reasonable or excessive.  "Regardless of whether the payments made by petitioner to International were excessive, International and EST, Inc., benefited substantially from the operation of petitioner." *Id.* at 1081.  Finally, the court noted that the Hawaiian entity operated much like a commercial enterprise, requiring trainers and organizations to sign non-compete agreements and that the organization did not rely upon donations but rather upon tuition and lecture fees.  Concluded the Court, "[p]etitioner is part of a franchise system which is operated for private benefit and its affiliation with the system taints it with a substantial commercial purpose."  *Id.* at 1080.

In *P.L.L. Scholarship Fund v. Commissioner of Internal Revenue*, 82 T.C. 196 (U.S. Tax Ct. 1984) the court held that a scholarship fund created to distribute money to needy students who were attending universities in the State of Iowa was not entitled to 501(c)(3) status because the primary means by which it raised funds was through bingo games held solely at a particular

restaurant, and the purpose and effect of the organization's efforts were to increase the profits for that restaurant. "[I]t appears that more than an insubstantial purpose of the petitioner's activities was to attract persons, by the way of the bingo games, on to the premises of the Pastime Lounge expecting that they would purchase food and beverages while participating in the games. In fact, it appears that petitioner's activities were, in substantial part, designed to enhance the profitability of the Pastime Lounge." 82 T.C. at 199-200. Thus, despite the fact that the scholarship fund was ostensibly a nonprofit and distributed all its profits to charity, it was denied § 501(c)(3) status because a substantial purpose of the organization was to generate of profits for the restaurant. Said the court, "[a] realistic look at the operations of these two entities, however, shows that the activities of petitioner and the Pastime Lounge were so interrelated as to be functionally inseparable. Separate accountings of receipts and disbursements does not change that fact." *Id.* at 200.

In *Matter of Greater Jamaica*, the court declined to apply a real property tax exemption to a parking garage operated by a not-for-profit community development corporation because the economic benefit of the parking garage, although providing below-market rate parking, "inures to the benefit of private enterprise and cannot be said to further any charitable purpose." 25 N.Y. 3d at 629. In so holding, the Court cited *Matter of Vassar Bros. Hosp. v. City of Poughkeepsie*, 97 A.D.3d 756 (2d Dep't 2012) in which the court denied tax exemption for parking spaces that the nonprofit hospital set aside for employees and patients of "*private* medical clinics." Said the *Jamaica* court, "[t]he same can be said for the uses of parking facilities in this instance. They are commercial lots that exist to promote economic development in downtown Jamaica, providing easy access to local retail stores and government buildings. . . . the *uses* of these facilities are not *incidental* to Greater Jamaica's charitable purposes." 25 N.Y. 3d at 630-31 (emphasis in original).

Other cases in which courts have held that the entity was not entitled to tax emption status because it conferred a private benefit on either a related or unrelated party or engaged in an essentially commercial enterprise include *Capital Gymnastics Booster Club, Inc. v. Commissioner of Internal Revenue*, *T.C. Memo.* 2013-193, 2013 WL 4516170 (U.S. Tax Ct. 2013); *American Campaign Academy v. Commissioner of Internal Revenue*, 92 T.C. 1053 (U.S. Tax Ct. 1989); *Church of Scientology of California v. Commissioner of Internal Revenue*, 823 F.2d 1310 (9th Cir. 1987); *Harding Hospital, Inc. v. United States*, 505 F.2d 1068 (6th Cir. 1974); and *Sonora Community Hospital v. Commissioner of Internal Revenue*, 397 F.2d 814 (9th Cir. 1968).

Here, it is undisputed that TERI's operations overwhelmingly favored FMC in its commercial activities and that providing a commercial and private benefit to FMC was not only a "substantial purpose" of TERI, but was *the* overwhelming purpose after its takeover by FMC. TERI was not engaged in a charitable or educational endeavor:  TERI (through FMC's employees) was unequivocally and almost completely engaged in furthering FMC's competitive advantage as a commercial lender and securitizer of private student loans.  As such, it provided critical support and funding to FMC as it competed directly with other commercial enterprises such as JPMorgan Chase, Citibank, Wells Fargo, and other originators of private loans.  In its initial application to the IRS for § 501(c)(3) status, TERI represented that it would devote a significant portion of its operating budget to charitable purposes and that it would make 100 scholarships in its first year, 200 scholarships in its second year, and 300 scholarships in its third year.  *See* Carpinello Decl. at ¶ 29, Ex. BB ("TERI IRS Application") at 36-37, 43.  Following TERI's de facto merger with FMC, the reality became much different.  The amount spent by TERI on actual charitable work, such as advising prospective students and families about access to funding for college, was *de minimus*, and amounted to less than 1% of its expenditures.  By 2007, TERI's revenue was ***$498***

*million*, Carpinello Decl. at ¶ 30, Ex. CC ("TERI 2007 Form 990") at 13.  TERI's only charitable contributions consisted of $ 192,937 in grants (0.03% of revenue) in 2007, for a charitable contribution of 0.039%.  Thus, TERI was not operated as a "nonprofit" entity.  Carpinello Decl. at ¶ 31, Ex. DD ("2007 Audited Financial Statement") at 3.  *See Sonora Community Hosp. v. C.I.R.*, 46 T.C. 519, 526 (Tax Ct. 1966) (nonprofit hospital loses its exemption where less than 1% of aid was given for free).

### C.   NO OTHER COURTS HAVE UNDERTAKEN THE ANALYSIS PLAINTIFF PRESENTS HERE.

Plaintiff is aware of decisions that have assumed, without analysis, TERI's status as a "nonprofit institution."  *See O'Brien v. First Marblehead Educ. Res.*, 419 F.3d 104 (2d Cir. 2005) and *In re Duits*, No. 14-05277, 2020 WL 256770 (S.D. Ind. Jan. 15, 2020).  In *O'Brien*, however, the plaintiff did not challenge TERI's status as either a nonprofit or as an institution, but instead only argued that TERI did not "fund" her loan.  *See* 419 F.3d at 105.  As a result, neither the bankruptcy court, district court, nor the Second Circuit had occasion to analyze TERI's status.  *See O'Brien*, 419 F.3d at 105 ("[t]here is *no dispute* that the Appellant's Loan was funded through a program . . . which was funded by a nonprofit institution, the Appellee [*i.e.*, TERI]."); 299 B.R. 725, 728 ("the parties *do not dispute* . . . that TERI guaranteed the loan at issue, or that TERI is a § 523(a)(8) nonprofit institution.") (emphasis added).  Further, this Court noted that the Second Circuit's conclusion in *O'Brien* "was based on the 'undisputed' and 'uncontested' fact, as noted by the district court, that the loan at issue was made by a program funded at least in part by TERI, and that the loan at issue was exempt from discharge pursuant to Bankruptcy Code Section 523(a)(8)A)(i).  The Second Circuit did not address, or need to consider, whether the particular loan at issue was, in fact, funded by TERI."  *In re Golden*, 596 B.R. at 266. *Cf. Jean-Baptiste v.*

*Educational Credit Management* ("*In re Jean-Baptiste*"), 584 B.R. 574, 584 (Bankr. E.D.N.Y. 2018) ("it is *undisputed* that Access is a non-profit institution. . .") (emphasis added).

Plaintiff is also aware of cases where the court held that the debtor did not present evidence sufficient to challenge TERI's status or where the court simply refused to look beyond TERI's § 501(c)(3) filing.  *See, e.g., In re Rodriguez*, 319 B.R. 894 (Bankr. M.D. Fla. 2005) and *In re Boland*, 287 B.R. 127 (D. Vt. 2002).  These and other cases also assume the term "institution" means any entity whatsoever.  However, none of those cases undertook either the analysis of the legislative history of the meaning of "institution" or analyzed the undisputed facts showing that TERI was not operated as a nonprofit.  To hold that TERI is a nonprofit institution without undertaking that analysis or reviewing those undisputed facts is contrary to the Congressional intent that the funding party actually be a "nonprofit institution."  This is necessarily so because any exception to dischargeability must be narrowly construed and the burden must be placed on the party asserting nondischargeability.  Defendants cannot establish that TERI, *in fact*, is a nonprofit institution.

### D.    TERI DID NOT "FUND" EITHER THE LOAN OR PROGRAM AT ISSUE IN THIS PROCEEDING.

Section 523(a)(8)(A)(i) exempts from discharge loans "made, insured, or *guaranteed by a governmental* unit, or made under a program *funded* in whole or in part by a governmental unit or a *nonprofit institution*."  (emphasis added).  The statute clearly draws a distinction between the first part, which covers loans "made, insured, or guaranteed by a governmental unit" and the second part, which deals with programs "funded in whole or in part by a governmental unit or a nonprofit institution."  Thus, from the very structure of the statute, it is clear that a program guaranteed by a nonprofit institution does not come within the terms of the statute.  To suggest

that the word "funded" includes "guaranteed" is to render the term "guaranteed" in the first part of the statute superfluous.

Moreover, the legislative history illuminates why the word "guaranteed" is used in the first part but only "funded" is used in the second part. As noted above (*supra* at 21), the original wording of § 523(a)(8) had created certain anomalies. That language exempted from discharge only those education loans held by governmental units or nonprofit institutions of higher education. The government at the time provided student assistance pursuant to two basic loan programs. The first was under the Guaranteed Student Loan Program ("GSL Program"). Under this program, the federal government provided guarantees, insurance and subsidies to participants who received their loans from commercial lenders, educational institutions, state agencies or nonprofits. The second group of loans were made under the National Direct Student Loan Program ("NDSL Program"). These loans were made directly by educational institutions from a revolving trust of capital that was 90% funded by the federal government and 10% funded by the school itself.

The anomaly was created because the GSL Program guaranteed loans made by commercial banks, schools and other entities. If such a loan were owed to an institution of higher education, the loan would be exempt from discharge. But if the same type of loan were held by a bank at the time the debtor declared bankruptcy, it would be fully dischargeable. *See* Senate Report 96-230, 1979 WL 10297 (June 21, 1979). In addition, an NDSL Program loan made by a nonprofit educational institution would be exempt from discharge under the original § 523(a)(8) but an NDSL loan made by a for-profit educational institution would not be.

To deal with these anomalies, Congress expanded § 523 in two ways: First, it was expanded to cover educational loans not only "made," but also "insured" and "guaranteed" by a

governmental unit.  With this change, all education loans insured or guaranteed by the government, whether held by banks or institutions of higher education, would be exempt from discharge.  The "guaranteed" language came into the section specifically to cover the GSL Program and to ensure that loans guaranteed by federal or state governments would be exempt from discharge whether made by a proprietary or nonprofit institution or made by a bank or other commercial entity.  The term "guarantee" was used only with reference to a governmental unit because it was expressly designed to cover government guaranteed loans.  *See* Carpinello Decl., ¶ 32, Ex. EE ("U.S. Dep't of Ed. Federal Student Loan Programs Data Book, Appendix II") at 5-6 ("This Act amended the Bankruptcy Act. . . to apply these provisions to a larger group of student loans, including all GSLs, NDSLs, and Health Education Assistance Loan ("HEAL").

Second, § 523 was expanded so that it covered any loan program that was funded in whole or part by the federal government.  That was specifically designed to cover the NDSL Program, the loans of which would be exempt from discharge whether they were made by a non-profit educational institution or by a for-profit educational institution.  *Id.*  The word "funded" was used because the government provided 90% of the funds loaned under the NDSL Programs.  In addition, as provided for in the earlier provision, loans "funded" by nonprofit institutions of higher education continued to be exempt from discharge.  Significantly, loans made by proprietary or vocational institutions that were not part of a program funded or guaranteed by a governmental were not exempt from discharge.

There is no indication from the legislative history that Congress was attempting to apply § 523 to loans simply guaranteed by nonprofit institutions since that was not the problem that the amendment to § 523 was designed to solve.  The term "guaranteed" came into the act specifically to ensure that loans guaranteed by the government under the GSL Program were made

nondischargeable.  *Id.* It was never part of the Congressional intent nor expectation that the discharge exemption would apply to loans simply guaranteed by nonprofit institutions as opposed to those "funded" by such institutions.  And it was also clear that Congress intended for the terms "funded" and "guaranteed" to refer to two different concepts.  There is no evidence of Congressional intent either to expand § 523(a)(8) to cover loans merely "guaranteed" by nonprofit institutions of higher education or, even more radically, to cover private loans made by commercial organizations or other types of nonprofit entities that were not government insured, funded, or guaranteed.

The Second Circuit in *O'Brien* had none of this legislative history before it.  Moreover, the *O'Brien* case itself was *sui generis* since, in that case, TERI had actually assumed responsibility for the loan and was the party seeking repayment on the loan.  Under those circumstances, the Court held that O'Brien's student loan "was made under a program that was funded in whole or in part by a nonprofit institution." *O'Brien*, 419 F.3d at 107.  Significantly, the Second Circuit did not hold that "funded" includes within its terms "guaranteed."  *See also In re Jean-Baptiste*, 584 B.R. at 578, where the nonprofit contractually agreed to purchase all the loans, and therefore arguably "funded" the loans.  As in *O'Brien*, it was the nonprofit that was seeking collection on the loans.

Other cases that hold that "funded" means any "meaningful participation" in a loan program, *see e.g., In re Hammarstrom*, 95 B.R. 160 (Bankr. N.D. Cal. 1985)[8] or any participation at all, *see e.g., In re Pilcher*, 149 B.R. 595 (9th Cir. B.A.P. 1993), simply ignore how the terms

---

[8] *Hammarstrom* is factually distinguishable from this case because, in that case, the nonprofit immediately purchased loans made by the bank, and thus, arguably "funded" the loans.  95 B.R. at 165.

"funded" or "guaranteed" came into the statute.  *Compare In re Wiley*, 589 B.R. 1, 7 (Bankr. D. Me. 2017) ("The existence of a guarantee from a nonprofit institution is not, by itself, enough.").

Separate and independent from both the structure of § 523(a)(8)(A)(i) and its legislative history, it is clear  that a guarantor is not the same as a lender, as a matter of law and common usage.  *See Grojean v. Commissioner*, 284 F. 3d 572 (7th Cir. 2001) (holding that a taxpayer cannot recharacterize what was in substance a guarantee as a loan).  A lender makes the funds available in the first instance.  The guarantor does not provide funds but puts itself at risk and thereby reduces the lender's risk.  They may both be necessary for a transaction to occur, but they perform distinct roles that are not interchangeable.  *Grojean*, 284 F.3d at 573-74.

## E.    TERI'S BANKRUPTCY ELIMINATES ANY BASIS TO ASSERT THAT TERI "FUNDS" OR "GUARANTEES" ANY OF THE SUJBECT LOANS.

Not a single loan at issue in this case is backed by a TERI guarantee.  And there has not been a TERI guarantee in place for a decade.  TERI filed bankruptcy in 2008 and, in 2010, as part of that bankruptcy, TERI rejected any obligation under any previous guarantee that might apply to Plaintiff Golden's loans or to any loans held by any member of the class.  As part of the bankruptcy proceeding, TERI was released from those guarantees in return for payment of funds held by TERI to meet its obligations under those guarantees.  *See* Carpinello Decl. ¶ 33, Ex. FF ("Modified Fourth Amended Plan of Reorganization in Case No. 082540" (Dkt. No. 1139) at § 6.2(c) and especially 6.2(c)(vii)) (relating to rejection of the guarantee contracts).  As part of the plan, the various NCT Trusts received over $281 million in funds they had previously paid to TERI as a guarantee fee to cover TERI's guarantee obligations, including almost $20 million paid to Defendant NCT Trust 2006-4.  Thus, the parties expressly dissolved the guarantee relationship.

A creditor should not be able to get the benefit of nondischargeability merely because it engages the services of a guarantor where that relationship has ended and the guarantor is no longer

obligated to guarantee any default under the applicable program.  Thus, for every class member whose bankruptcy occurred after TERI was released, there is no viable nonprofit guarantor.  The Goal of § 523(a)(8)(A)(i) is to deny dischargeability so as to maintain the financial viability of public student loan lenders.  That Goal cannot be achieved in this case because the guarantor is no longer participating in this program.  *See Lincoln Park Comm. Credit Union v. Sinclair-Ganos* (*In re Sinclair-Ganos*), 133 B.R. 382 (W.D. Mi. 1991) (status of guarantor determined at time student debtor seeks discharge); (*citing Talbert v. Bay Bank (In re Talbert),* Case No. HM 89–00044, A.P. 89–0009 (W.D. Mi. Dec. 13, 1989) (holding in a bench ruling that where a student loan was not guaranteed at the time of the filing of the bankruptcy petition, the loan does not fall within the language of § 523(a)(8) and is thus dischargeable).[9]

The fact that a guarantee can disappear also explains the fundamental difference between "guaranteeing" a loan and "funding" a loan.  A party who funds a loan retains that status even if the loan is sold to another party.  Thus, a government-funded loan will always be a government-funded loan even if a third party buys out the government's interest.  A guarantee, in contrast, is ephemeral.  The guarantee exists only so long as the guarantor agrees to stand behind the guarantee.  The role of funder and guarantor are fundamentally different which is why Congress chose different words to describe different types of relationships.

---

[9] The decision in *Francis v. Sallie Mae, Inc.* (*In re Francis*), 385 B.R. 800 (B.A.P. 10th Cir. 2008) is not to the contrary.  In that case, the debtor argued that the loan was not funded by a nonprofit organization because it was transferred to Sallie Mae.  The Court disagreed, holding that the loan was originally made by a nonprofit organization.  The Court had no occasion to consider a situation like the one here where the alleged guarantee had, by court order, lapsed at the time the debtor sought discharge.  Mere assignment should not change the character of a loan but if a loan's nondischargeability status is dependent upon a guarantee that no longer exists, the purpose of the statute can no longer be met.

### F.    LOANS IN EXCESS OF THE COST OF ATTENDANCE WERE NOT FUNDED OR GUARANTEED BY TERI.

Even if TERI is held to be a nonprofit institution, and even if its bankruptcy did not affect its status as guarantor of the class members' loans, and even if "funded" is determined to mean "guaranteed," Plaintiff Golden's and all of the class members' loans are outside of the TERI guarantee because TERI's condition for guaranteeing any loans from any commercial lender was a program requirement that all loans be "qualified education loans" within the means of § 221(d) of the Internal Revenue Code.  *See* Carpinello Decl., Ex. E at Response to Interrogatory No. 1: "TERI will only guarantee an education loan if it satisfies TERI's program guideline standards. The TERI program guidelines, and therefore the loan originators' program guidelines, require that each TERI-guaranteed loan is a 'qualified education loan' under the tax code."  Consistent with this, ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████ Carpinello Decl. at ¶ 34, Ex. GG ("Guarantee Agreement") at ¶ 2.2(b). ████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████   █████████████████████████████████████████████████████

██████████████████████████████████████████ *Id.* at 5.

Thus, it is clear that from NCT's own admission that loans that either exceed the cost of attendance or are for students who are not attending Title IV schools (*i.e.*, the entire class's loans) are not guaranteed by TERI.

III.     **EACH CLASS MEMBER IS ENTITLED TO AN AWARD OF RESTITUTION OF ALL FUNDS PAID ON DISCHARGED DEBTS.**

For each loan which Defendants cannot establish did not exceed the cost of attendance of a Title IV institution, the debtors are entitled to the return of all funds paid on the discharged debt, including interest.  A creditor may not retain funds wrongfully obtained in violation of a discharge order.  *See United Healthcare Workers v. Borsos* (*In re Borsos*), 544 B.R. 201, 205-206 (Bankr. E.D. Cal. 2016) (holding that creditor must restore funds garnished in violation of discharge injunction, even though garnishment was made pursuant to a court decision later reversed on appeal); *Griffin v. U.S.*, (*In re Griffin*), 108 B.R. 717, 720 (Bankr. W.D. Ma. 1989) (creditor required to return funds garnished on discharged student debt in violation of § 524 even though issue was one of first impression and creditor would not be assessed punitive damages or attorney's fees); *In re Sucre*, 226 B.R. 340, 348 (Bankr. S.D.N.Y. 1998) ("upon learning of a bankruptcy filing, a creditor has an affirmative duty to return the debtor to the status quo position as of the time of the filing of the petition"); *City of New York v. Matamoros* (*In re Matamoros*), 605 B.R. 600, 615-616 (Bankr. S.D.N.Y. Aug. 2, 2019) (finding that although city stopped garnishment of wages upon learning of the filing of the bankruptcy petition, it, nonetheless, violated the automatic stay by failing to immediately return the funds that it had collected through the garnishment.); *Miller v. Savings Bank of Baltimore* (*In re Miller*), 10 B.R. 778, 780 (Bankr. D. Md. 1981), *aff'd,* 22 B.R. 479 (D. Md. 1982) (holding that creditor's repossession of an automobile without knowledge of the automatic stay was not contempt but creditor's repossession was void *ab inintio* and creditor was obligated to restore the debtor to the status quo; failure to do so was contempt.); *Will v. Ford Motor Credit Co*. (*In re Will*), 303 B.R. 357, 365-66 (Bankr. N.D. Ill. 2001) (same); *see also In re Eisenberg*, 7 B.R.683, 688 (E.D.N.Y. 1980) (holding that once respondents were advised of the bankruptcy filing, they had a duty to withdraw their tax lien on

debtor's property); *Knaus v. Concordio Lumber Co., Inc.* (*In re Knaus*), 889 F.2d 773, 775 (8th Cir. 1989) (holding that property legally seized prior to the filing of the bankruptcy petition must nonetheless be turned over to the bankruptcy estate.); *In re Abrams*, 127 B.R. 239 (B.A.P. 9th Cir. 1991) (same).

This Court has broad power under § 105, including ordering restitution of funds paid or collected in violation of the Bankruptcy Code, the Bankruptcy Rules or an order of the Court. *Malone v. Norwest Fin. California, Inc.*, 245 B.R. 389, 395 (E.D. Cal. 2000) ("It seems plain that no one should be permitted to retain funds obtained in violation of law.  Accordingly, a creditor ought not be permitted to retain funds obtained in violation of § 524.  It thus follows that a judgment of disgorgement is an appropriate order, and accordingly, a cause of action seeking such a judgment lies."); *Padilla v. Wells Fargo Home Mortg., Inc.* (*In re Padilla*), 379 B.R. 643, 667-668 (Bankr. S.D. Tex. 2007) (holding that under § 105 a court could order disgorgement of fees and expenses obtained in violation of Rule 2016(a) and in violation of a confirmed plan).

Section 105 "bestows on bankruptcy courts a specific equitable power to act in accordance with principles of justice and fairness."  *Sears, Roebuck & Co. v. Spivey*, 256 B.R. 357, 372 (Bankr. E.D.N.Y. 2001). In exercising this equitable power, courts have "broad latitude." *Id.*  The Supreme Court has just recently held that restitution, *i.e.*, requiring the wrongdoer to give up its wrongful profits, by whatever name it is called, "has been a mainstay of equity courts." *Liu v. Securities and Exchange Commission*, ___ U.S. ___, 2020 WL 3405845, at *5 (June 22, 2020).

Defendants cannot avoid restitution by relying on *Taggart v. Lorenzen*, 139 S. Ct. 1795 (2019).  *Taggart* deals with the question of when a party may be subject to contempt for violation of a discharge order.  It does not address at all the question of whether funds received on a discharged debt must be returned.  Indeed, the respondent creditor in *Taggart* expressly

acknowledged in its brief before the Supreme Court that the question of whether the creditor was required to return improperly obtained funds was separate from the issue of whether a creditor should be held in contempt. *Taggart v. Lorenzen*, No. 18-489, Brief for Respondents at 29-30. ("This does not mean that a debtor has no remedy for violation of a discharge order. A court may order the creditor to comply with the discharge order (by, for example, returning property the creditor has collected)."). The case law is clear that where a court order is violated the court can order relief to make a party whole without making a finding of contempt. *In Re Oliver*, 499 B.R. 617, 626 (Bankr. S.D. Ind. 2013) (holding that where school violated the discharge injunction by withholding former student's transcript to coerce payment of tuition that was not protected by § 523(a)(8), school is ordered to issue the transcript, even though "the Court does not believe Ball State should be punished for proceeding in good faith."); *see also Harrison Baking Co. v. Bakery and Confectionary Workers Local No. 3*, 777 F. Supp. 306, 311 (S.D.N.Y. 1991) (ordering reinstatement and back pay where party violated court order but finding that the party should not be held in contempt).

## CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests that summary judgment on the issue of liability be granted against all Defendants.


Dated: July 13, 2020                    Respectfully submitted,

                                          **BOIES SCHILLER FLEXNER LLP**

                By:    */s/ George F. Carpinello*
                        George F. Carpinello
                        Adam R. Shaw
                        30 South Pearl Street
                        Albany, NY  12207

**SMITH LAW GROUP**
Austin C. Smith, Esq.
3 Mitchell Place, Suite 5
New York, NY  10017

**JONES, SWANSON, HUDDELL & GARRISON, L.L.C.**
Lynn E. Swanson (admitted *pro hac vice*)
Peter Freiberg (admitted *pro hac vice*)
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130

**FISHMAN HAYGOOD LLP**
Jason W. Burge (admitted *pro hac vice*)
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170

**LAW OFFICES OF JOSHUA B. KONS, LLC**
Joshua B. Kons (Ct. Bar No. 29159)
50 Albany Turnpike, Suite 4024
Canton, Connecticut 06019

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I, George F. Carpinello, hereby certify that on the 13th day of July, 2020, I served the forgoing document on all counsel of record via ECF and electronic mail.

*/s/ George F. Carpinello*
George F. Carpinello
