## Page 1

```
 1        UNITED STATES BANKRUPTCY COURT
 2   Eastern District of New York
 3   In re Tashanna B. Golden f/k/a Tashanna B.
 4   Pearson,              Case No. 16-40809-ess
 5        Debtor           Chapter 7
 6                         Adv. Proc. No. 17-01005-ess
 7   Tashanna B. Golden f/k/a Tashanna B. Pearson
 8        Plaintiff
 9           V.
10   Nat'l Collegiate Student Loan Trust 2005-3,
11   et al.,
12        Defendants
13   ~~~~~~~~~~~~~~~~~~~~~~~~
14     30(B)(6) DEPOSITION OF THE FIRST MARBLEHEAD
15         CORPORATION THROUGH CARLIN GOLDEN
16                NOVEMBER 20, 2019
17                  1:10 P.M.
18
19                  K&L GATES
20                1 LINCOLN STREET
21           BOSTON, MASSACHUSETTS 02111
22
23
24   Stephanie Mussen, Professional Shorthand Reporter
```

## Page 2

```
 1   APPEARANCES:
 2   ON BEHALF OF THE PLAINTIFF:
             PETER N. FREIBERG, ESQ.
 3           Jones Swanson Huddell & Garrison
             601 Poydras Street, Suite 2655
 4           New Orleans, Louisiana 70130
             504.523.2500
 5           pfreiberg@jonesswanson.com
 6   ON BEHALF OF THE DEFENDANTS:
             CHRISTOPHER FONTENELLI, ESQ.
 7           Locke Lord LLP
             Brookfield Place
 8           200 Vesey Street, 20th Floor
             New York, New York 10281
 9           212.912.2730
             cfontenelli@lockelord.com
10
     ON BEHALF OF THE WITNESS:
11           DAVID E. FIALKOW, ESQ.
             K&L Gates
12           1 Lincoln Street
             Boston, Massachusetts 02111
13           617.261.3126
             david.fialkow@klgates.com
14
15   ALSO PRESENT BY TELEPHONE:
16           R.J. De Rose, III, Locke Lord, LLP
             Lynn Swanson, Jones Swanson Huddell
17           & Garrison
18
19
20
21
22
23
24
```

## Page 3

```
 1           EXAMINATION INDEX
     EXAMINATION OF CARLIN GOLDEN
 2   BY MR. FREIBERG                               5
 3
              EXHIBIT INDEX
 4
     Exhibit 1
 5       Subpoena to Testify at a Deposition in a  4
         Bankruptcy Case
 6   Exhibit 2
         First Marblehead DTC Over Borrowing       4
 7       Prevention User Guide
     Exhibit 3
 8       Over Borrowing Controls                   4
     Exhibit 4
 9       Borrowing History                         4
     Exhibit 5
10       Client Services                           4
     Exhibit 6
11       Client Services                           4
     Exhibit 7
12       Client Services                           4
     Exhibit 8
13       Client Services                           4
     Exhibit 9
14       Client Services                           4
     Exhibit 10
15       Client Services                           4
     Exhibit 11
16       Client Services                           5
     Exhibit 12
17       Amended and Restated Guaranty Agreement  27
         Between the Education Resources
18       Institute, Inc. and Bank One, National
         Association
19
20
        (Exhibits retained by Attorney Freiberg.)
21
22
23
24
```

## Page 4

```
 1   DEPOSITION OF CARLIN GOLDEN
 2   NOVEMBER 20, 2019
 3            * * * * * * * *
 4            (Exhibit 1, Subpoena to Testify at
 5   a Deposition in a Bankruptcy Case, marked for
 6   identification.)
 7            (Exhibit 2, First Marblehead DTC
 8   Over Borrowing Prevention User Guide, marked for
 9   identification.)
10            (Exhibit 3, Over Borrowing
11   Controls, marked for identification.)
12            (Exhibit 4, Borrowing History,
13   marked for identification.)
14            (Exhibit 5, Client Services,
15   marked for identification.)
16            (Exhibit 6, Client Services,
17   marked for identification.)
18            (Exhibit 7, Client Services,
19   marked for identification.)
20            (Exhibit 8, Client Services,
21   marked for identification.)
22            (Exhibit 9, Client Services,
23   marked for identification.)
24            (Exhibit 10, Client Services,
```



Page 13

1  Q.  In that time frame, say, between 2001 and
2  2005, were borrowers able to submit loan
3  applications online?
4  A.  Yes.
5  Q.  Was that through the website teri.org?
6  A.  I believe so.
7  Q.  What other means were available to
8  borrowers to submit loan applications?
9      MR. FONTENELLI:  Objection.
10  A.  They could submit a paper application.
11  Q.  Can you tell us in that time frame, say,
12  between 2001 and 2005, what percentage of
13  applications were submitted online versus paper
14  applications?
15  A.  I don't know exactly.  I know that the
16  online application, the volume was much higher than
17  the paper applications.
18  Q.  Would it be fair to state that the online
19  application process was the preferred method by
20  borrowers, if you know?
21  A.  Yes.  Actually, I have to go back.  We did
22  actually have it -- for a period, you could call and
23  put your application in as well, so we could take it
24  by phone.

Page 14

1  Q.  Online, paper, and call?
2  A.  Correct.
3  Q.  But the online application process was
4  used -- and I understand you can't give us an exact
5  figure, but most of the time by the borrowers?
6  A.  I couldn't say most of the time.  I don't
7  know the actual numbers.
8  Q.  How did the borrower submit paper
9  applications?
10  A.  They would mail them in and maybe fax.
11  Probably fax as well.  It's been a while.
12  Q.  They could also do it by way of phone?
13  A.  Correct.
14  Q.  I'm going to jump ahead a little bit here.
15      Let me ask you this:  Were the applications
16  essentially all the same; that is the online
17  application, the paper application, and the call-in
18  applications requested all of the same information?
19  A.  The criteria was the same.
20  Q.  The criteria that the borrower had to
21  submit?
22  A.  Correct.
23  Q.  What type of criteria did the borrower have
24  to submit?

Page 15

1  A.  So once the application was submitted, we
2  would pull a credit report in most instances
3  depending on the program guidelines.  The system --
4  the credit decision system would make a decision or
5  send the loan to review.  So basically, it was
6  credit criteria that had to be met.  If they passed
7  the credit criteria, they would have to send in
8  documentation such as income documentation.
9  Q.  You said the credit decision system?
10  A.  Yes.
11  Q.  There was essentially -- tell me if I'm
12  wrong here -- kind of an application that
13  automatically reviewed borrower's applications?
14  A.  Correct.
15  Q.  By that, I mean a computer application.
16  A.  Exactly.
17  Q.  Did the criteria that the borrowers were
18  required to submit include information about other
19  student loans that they had applied for or received
20  for the same school year?
21      MR. FONTENELLI:  Objection.
22  A.  On the application, no.
23  Q.  Was there any additional criteria that was
24  requested of the borrowers after their application

Page 16

1  that requested information about other loans that
2  the borrower had obtained for that particular school
3  year?
4      MR. FIALKOW:  Just objection.  Are
5  you speaking of applications generally, or any
6  particular types of applications at this point?  I
7  just want the answers to be accurate.
8  Q.  Let me backtrack.  A second ago, you said
9  that the -- please correct me if I'm wrong, the
10  initial criteria that the borrower had to submit did
11  not include whether or not the borrower had other
12  student loans for that particular year?
13      MR. FONTENELLI:  Objection.
14  A.  So the application data that was submitted
15  did not require them to enter anything about other
16  loans or sources of funding.
17  Q.  Was there anything following the initial
18  application that a borrower submitted whereby FMER
19  would ask for information related to other loans
20  that the borrower had?
21      MR. FONTENELLI:  Objection.
22  A.  We didn't -- so let's see.  So we didn't
23  request from the borrower anything about other loans
24  that they had.



Page 17

1  Q.  Correct.  After the initial application was
2  submitted by the borrower.
3          MR. FONTENELLI:  Objection.
4  A.  It would depend on the loan program.
5  Q.  What do you mean by that?
6  A.  So for a school-certified loan, the school
7  would certify the cost of attendance less than any
8  other types of funding sources.  A direct consumer
9  loan, we would obtain enrollment verification but
10  also check our system to confirm that they didn't
11  exceed what was documented in the program guidelines
12  for the year.
13  Q.  Okay.  For purposes of having a clean
14  record, when you say "school-certified loan," what
15  do you mean by that?
16  A.  That means once the borrowers received --
17  once the borrowers submitted all their
18  documentation, we were good from the borrower's
19  perspective and received all the underwriting
20  documentation needed and the loan was ready to
21  progress, meaning we wanted to approve it, we send a
22  certification request to the school, and the school
23  would actually have to certify the student's need.
24  Q.  And the school's certification to FMER

Page 18

1  included the cost of attendance for the school less
2  other loans that that borrower had obtained?
3          MR. FONTENELLI:  Objection.
4  A.  You would have to look at program
5  guidelines to confirm exactly what the school was
6  certifying.
7  Q.  But the school was certifying what the cost
8  of attendance was; is that correct?
9          MR. FONTENELLI:  Objection.
10  A.  Correct.
11  Q.  I understand it depends upon the particular
12  loan program, but generally speaking, did the school
13  certification also let FMER know what other loans
14  the borrower had obtained for that school year?
15          MR. FONTENELLI:  Objection.
16  A.  The school would make the determination on
17  what the cost of attendance was for that year based
18  on what's in the program guidelines.
19  Q.  To your understanding, would the school
20  make that decision -- that determination based upon
21  other loans that the student had for that year?
22  A.  My understanding is if they had any other
23  types of funding sources for the year, that would be
24  subtracted from the cost, and they would only

Page 19

1  certify the balance.
2  Q.  As part of the school certification
3  process?
4  A.  Correct, but that would be up the
5  individual school.
6  Q.  The other, I guess, you could say subset of
7  loans are what we refer to as direct-to-consumer
8  loans.  Are you familiar with that term?
9  A.  Correct.
10  Q.  For a direct-to-consumer loan, when --
11  maybe you can just tell me what a direct-to-consumer
12  loan is.
13  A.  A direct-to-consumer loan was a loan for
14  educational purposes that was funded directly to the
15  borrowers.
16  Q.  Meaning the disbursement was made directly
17  to the borrowers?
18  A.  Correct.
19  Q.  And for a direct-to-consumer loan that is
20  disbursed directly to the borrowers, generally, what
21  type of information did the -- did FMER obtain
22  before disbursing that loan?
23          MR. FONTENELLI:  Objection.
24  A.  They -- so they would have to submit an

Page 20

1  application online.  We would do the credit
2  underwriting based on all the credit criteria.  We'd
3  obtain income documentation from the creditworthy
4  applicants, potentially ID documentation,
5  identification, driver's license, things like that,
6  and enrollment verification.
7  Q.  For direct-to-consumer loans, was the
8  enrollment verification obtained from the school or
9  from the borrower?
10  A.  From the borrower.
11  Q.  For these types of direct-to-consumer
12  loans, was the borrower ever required to submit
13  information about other loans than he or she had for
14  that particular school year?
15          MR. FONTENELLI:  Objection.
16  A.  The borrower was not required.
17  Q.  Did FMER do any type of research,
18  investigation, something along those lines to
19  determine whether or not the borrower had other
20  loans for that particular school year?
21          MR. FONTENELLI:  Objection.
22  A.  Internally we did to see if it was a loan
23  that we originated.
24  Q.  Did FMER do any type of external search or



Page 21
1  investigation to determine whether or not there were
2  other loans that the borrower had for that year that
3  FMER had not originated?
4          MR. FONTENELLI:  Objection.
5    A.  I don't recall.
6    Q.  So for example, if a borrower applied for a
7  loan through FMER and -- one of the loan programs,
8  and he or she also had a loan for that year from
9  Navient, for example -- are you familiar with
10 Navient?
11   A.  Uh-huh.
12   Q.  -- would FMER know about the Navient loan?
13         MR. FONTENELLI:  Objection.
14         MR. FIALKOW:  You can answer if
15 you understand.
16   Q.  Let me try to rephrase it differently,
17 break it down a little bit.
18       So FMER had knowledge or knew about other
19 loans that the borrower had that it had originated?
20   A.  Correct.
21   Q.  So if a borrower had a loan from Navient
22 for that year, that same year, would FMER know about
23 it?
24   A.  No.

Page 22
1          MR. FIALKOW:  Just for
2  clarification, are you speaking only of the DTC
3  loans right now?
4          MR. FREIBERG:  Correct.  We're
5  talking about the DTC loans.  Thank you for that,
6  David.
7    Q.  If a borrower had -- in the same situation,
8  if a borrower had a loan from a state agency, would
9  FMER know about that other loan?
10         MR. FONTENELLI:  Objection.
11   A.  No.
12   Q.  If a borrower had a loan from -- a
13 federally-backed loan -- and again, we're talking
14 about the direct-to-consumer loans -- would FMER
15 know about that upon origination?
16         MR. FONTENELLI:  Objection.
17   A.  No.
18   Q.  Would it be correct to state, and please
19 correct me if I'm wrong, but for these
20 direct-to-consumer loans, FMER did not have in its
21 possession when it disbursed the loans any
22 information about other loans that the borrowers
23 have?
24         MR. FONTENELLI:  Objection.

Page 23
1    A.  Not unless it was an internal originated
2  loan.
3    Q.  I should maybe clarify that question.  Any
4  external loans that the borrower had.
5    A.  No.
6    Q.  So the only information about other loans
7  that FMER had was loans that it had also originated?
8    A.  Correct.
9    Q.  Ms. Golden, are you familiar with the term
10 "cost of attendance"?
11         MR. FONTENELLI:  Objection.
12   A.  Yes.
13   Q.  What is the cost of attendance?
14         MR. FONTENELLI:  Objection.
15   Q.  What is your understanding of what the cost
16 of attendance means?
17   A.  The amount it costs to go to school for a
18 period of time.
19   Q.  The cost of attendance is generally
20 calculated by a school year; is that fair to state?
21   A.  I would think so.
22   Q.  Who determines what the cost of attendance
23 is at a particular university --
24         MR. FONTENELLI:  Objection.

Page 24
1    Q.  -- or school?
2    A.  In relation to these loans?
3    Q.  Correct.
4          MR. FONTENELLI:  Objection.
5    A.  The -- I guess the guidelines would have
6  dictated.
7    Q.  Let me step back for one second.  The
8  series of questions I was just asking you about,
9  FMER knowing of other school loans --
10   A.  Right.
11   Q.  -- did that apply generally to all of the
12 loan programs that FMER was implementing in this
13 time frame of, say, 2001 to 2010?
14         MR. FONTENELLI:  Objection.
15   A.  So knowing -- so us knowing about external
16 loans?
17   Q.  Yes.
18   A.  So again, there's a distinction between
19 school channel and direct to consumer.  So school
20 channel loans would -- I should say likely that
21 would have been taken into account for any loan
22 period that the school was certifying.  For
23 direct-to-consumer loans, because they were direct
24 to consumer, that would not have been taken into



Page 81

1 Bates-numbered 1442. There's a screen that talks
2 about why check for over-borrowing. And by the way,
3 Ms. Golden, this document we're looking at, if I'm
4 reading correctly, it's a loan origination training
5 presentation --
6    A. Correct.
7    Q. -- for the analysts to use?
8    A. Yes.
9    Q. In the screen, it talks about why check for
10 over-borrowing. The first thing says, "We check for
11 over-borrowing for all loans to make sure borrowers
12 are not exceeding either the annual or aggregate
13 borrowing limits."
14       And the annual and aggregate borrowing
15 limits that you're referring to are those contained
16 in the loan program guidelines; correct?
17    A. Yes.
18    Q. In this period of time, June of 2005, did
19 First Marblehead check for over-borrowing to make
20 sure that the borrowers were not exceeding the
21 cost -- the published cost of attendance at their
22 schools?
23       MR. FONTENELLI: Objection.
24    A. We check for over-borrowing to ensure that

Page 82

1 we're following the program guidelines.
2    Q. But did it do an independent check to make
3 sure that the borrowers weren't borrowing more than
4 what the school says it cost to go -- as the school
5 published as its cost of attendance?
6       MR. FONTENELLI: Objection.
7    A. We were utilizing the -- we were checking
8 to make sure they were not exceeding what was
9 documented in the program guidelines.
10    Q. The second bullet point says, "Preventing
11 over-borrowing is critical towards maintaining our
12 overall asset quality, which in turn has a direct
13 impact on the securitization process." What does
14 that mean?
15    A. To me, what does that mean?
16    Q. If you can tell us what that means in a
17 corporate capacity.
18       MR. FIALKOW: I'm going to object
19 because I think it's related as it goes to
20 over-borrowing, but when it starts to get into the
21 securitization process, I think that's different
22 than the topics here.
23       So if you know the answer, you can give it,
24 but if it goes to securitization, I think that's

Page 83

1 outside of what she's here for.
2    Q. Let me just ask you this: When it says
3 "maintaining overall asset quality" -- "Preventing
4 over-borrowing is critical towards maintaining our
5 overall asset quality," what does that mean?
6       MR. FIALKOW: Same objection.
7    A. So the program guidelines document what the
8 asset should look like, and it's up to us to ensure
9 that we follow the guidelines to originate an asset
10 that's documented in the program guidelines.
11    Q. If over-borrowing occurs, is that -- that
12 was considered a processing error -- a serious
13 processing error?
14       MR. FIALKOW: Objection.
15       MR. FONTENELLI: Objection.
16       MR. FIALKOW: You can answer.
17    A. We were tasked with following the program
18 guidelines. Our analysts are tasked with following
19 the program guidelines, so any error they made that
20 wasn't following the program guidelines was
21 classified as probably serious.
22    Q. Was there some way by which FMER tracked
23 the errors that were made by the analysts, the
24 processing errors?

Page 84

1    A. Yeah. We had a quality process.
2    Q. Okay. What was the quality process?
3    A. The quality process was we had a quality
4 group that reviewed loans in various statuses -- I
5 don't recall, you know, what statuses -- to verify
6 that program guidelines were followed when
7 originating loans.
8    Q. How often did that occur?
9    A. It was ongoing. I don't exactly recall if
10 it was done daily, weekly, monthly, but it was
11 ongoing. I wasn't part of the quality group. It
12 was kind of behind the scenes, like an internal, you
13 know, quality audit.
14    Q. Were you advised of what the audits
15 revealed?
16    A. Yes.
17    Q. I know this may be a difficult question to
18 answer, but generally, what did the audits reveal in
19 terms of the analysts checking for over-borrowing
20 and preventing over-borrowing?
21    A. Honestly, it's been so long. I don't
22 recall what that -- what the quality reflected.
23    Q. Was over-borrowing a problem?
24    A. Not to my --



Page 85

1  MR. FONTENELLI: Objection.
2  A. Not to my recollection, but again, it's
3  been so long.
4  Q. In the next page, this is what we were
5  talking about a moment ago, that the disbursement
6  date controlled which academic year the loan was
7  counted towards.
8  A. Uh-huh.
9  Q. I'm going to ask you to take a look at the
10 page on the bottom that's numbered 1459.
11 A. Okay.
12 Q. So there were special rules for the
13 continuing education loans --
14 A. Yeah.
15 Q. -- that you described earlier?
16 A. Yes.
17 Q. It says here, "TERI continuing education
18 loans are considered part of the school-based" --
19 A. Based channel.
20 Q. -- "channel rules, and therefore, the TERI
21 continuing education loans would not be calculated
22 as part of the annual direct-to-consumer limit."
23 What does that mean?
24 A. So my recollection was TERI CEL loans, I

Page 86

1  believe, the -- generally speaking, the limits were
2  less, the continuing education loans for TERI. So
3  loans originated under the TERI CEL program would
4  not count towards the DTC loan limit annually or
5  aggregate.
6  Q. Why not?
7  MR. FONTENELLI: Objection.
8  A. They were different loan programs, and
9  again, that would have been outlined in the program
10 guidelines.
11 Q. Was there any consideration given -- when
12 the TERI CEL loans, C-E-L loans, were not calculated
13 towards the direct-to-consumer limit, was there any
14 consideration given for what the costs -- the actual
15 costs of attendance was for the student --
16 MR. FONTENELLI: Objection.
17 Q. -- for that school?
18 A. I'm sorry. I'm not following.
19 Q. It wasn't a very clear question. I'll try
20 to ask it again.
21 So the TERI CEL limits were less than --
22 A. Generally speaking.
23 Q. -- generally speaking, so if I'm reading
24 this correctly, if a borrower had -- already had

Page 87

1  loans of $30,000 but needed a TERI continuing
2  education loan, that borrower would get that loan?
3  MR. FONTENELLI: Objection.
4  MR. FIALKOW: Objection.
5  A. Depending on what the program guidelines
6  said.
7  Q. So did it -- when this was going on, did
8  FMER ever look to what the cost of attendance was at
9  the particular institution to determine whether or
10 not adding the continuing education loan -- the TERI
11 continuing education loan would have bumped the
12 borrower above the cost of attendance?
13 MR. FONTENELLI: Objection.
14 A. So we're talking about if you had DTC loans
15 at your max --
16 Q. Yes.
17 A. -- and somebody came in for a TERI CEL
18 loan?
19 Q. Yes.
20 A. Based on this and based on what most of the
21 guidelines or some of the guidelines, my
22 recollection about TERI CEL, it was -- our
23 responsibility was not to count one against the
24 other for purposes of annual limits.

Page 88

1  Q. Was FMER prohibited -- not allowed to count
2  the two loans together even if -- strike the
3  question.
4  What you just said was FMER was allowed to
5  not count the continuing education loan towards the
6  annual borrowing limit?
7  A. For DTC.
8  Q. For DTC. So the person could get
9  additional continuing education loan even if it
10 was -- he or she was already maxed on the DTC limit
11 of, say, for example, $30,000?
12 MR. FONTENELLI: Objection.
13 MR. FIALKOW: Objection.
14 A. If that's what the program guidelines say.
15 Q. Would the borrower be able to get the TERI
16 continuing education loan on top of the DTC loan,
17 loan limit, even if that was more than what the
18 school needed or was required to pay for the
19 education?
20 MR. FONTENELLI: Objection.
21 Q. What I'm getting at is --
22 A. If the guidelines don't prohibit it. We
23 were carrying out what the guidelines reflected.
24 Q. If the guidelines didn't prohibit the two

