10-K 1 a06-19068_110k.htm ANNUAL REPORT PURSUANT TO SECTION 13 AND 15(D)

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

# Form 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended: **June 30, 2006**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from          to

Commission file number: **001-31825**

# THE FIRST MARBLEHEAD CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **04-3295311** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **The Prudential Tower** <br> **800 Boylston Street, 34th Floor** <br> **Boston, Massachusetts** | **02199-8157** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(617) 638-2000**

Securities registered pursuant to Section 12(b) of the Act:

| | |
|---|---|
| **Common Stock, $.01 par value** | **New York Stock Exchange** |
| (Title of each class) | (Name of each exchange on which registered) |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act (Check one):

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant (without admitting that any person whose shares are not included in the calculation is an affiliate) was approximately $1,106,000,000 based on the last reported sale price of the common stock on the New York Stock Exchange on December 30, 2005.

Number of shares of the registrant's class of common stock outstanding as of July 31, 2006: 62,805,814

**DOCUMENTS INCORPORATED BY REFERENCE**

The registrant intends to file a proxy statement pursuant to Regulation 14A within 120 days of the end of the fiscal year ended June 30, 2006. Pursuant to Paragraph G(3) of the General Instructions to Form 10-K, information required by items 10, 11, 12, 13 and 14 of Part III have been omitted from this report (except for information required with respect to our executive officers and code of ethics, which is set forth under "Executive Officers"

In connection with the transaction, we also entered into a series of agreements with respect to loan processing services, database updates and the securitization of TERI-guaranteed loans. These include a master servicing agreement and a database purchase and supplementation agreement with TERI. Pursuant to the master servicing agreement, TERI engages us to provide loan origination, pre-claims, claims and default management services. Under TERI's agreements with lenders, lenders delegate their loan origination functions to TERI, and TERI has the right to subcontract these functions. Pursuant to the database purchase and supplementation agreement, TERI provides updated information to us about the performance of the student loans it has guaranteed, so that we can continue to supplement and enhance our database.

Under the master loan guaranty agreement, we agreed to create a market for our private label clients to sell TERI-guaranteed loans through securitizations that we facilitate. Under our agreement, we must use our best efforts to cause a securitization of a limited category of TERI-guaranteed loans at least twice per year, subject to the lender having a specified minimum loan volume at the semi-annual purchase date. In October 2004, we renewed our master servicing agreement, master loan guaranty agreement and certain additional agreements with TERI, in each case for an additional term through June 2011.

The master loan guaranty agreement generally provides that the guarantee fees earned by TERI upon the disbursement of student loans are placed in a segregated reserve account which is held as collateral to secure TERI's obligation to purchase defaulted student loans. This account is held by a third-party financial institution for the benefit of the program lender until the student loans are securitized, at which point the account is pledged to the securitization trust that purchases the loans. The master loan guarantee agreement, as implemented through guaranty agreements with individual lenders, entitiles TERI to retain a portion of its guaranty fees as an administrative fee rather than place them in the pledged account.

In October 2005, we entered into a supplement to the master loan guaranty agreement. Under the terms of the 2005 supplement, for securitizations of TERI-guaranteed loans during fiscal 2006, TERI's administrative fee of 150 basis points increased, and the amount deposited by TERI into the pledged account decreased, by 90 basis points. In addition, TERI's residual interest in the trusts created at the time of the securitizations was correspondingly reduced to account for the 90 basis point reduction in the pledged account. As a result, the administrative fee for securitizations of TERI-guaranteed loans in fiscal 2006 was 240 basis points multiplied by the principal balance of the loans originated and securitized. For securitizations completed during fiscal 2006, TERI's ownership of the residual value of the TERI-guaranteed loans securitized ranged from 12 to 15 percent.

In August 2006, we entered into a supplement to the master loan guaranty agreement that provides as follows:

- For each securitization closing between August 1, 2006 and June 30, 2007, TERI will be entitled to elect to adjust the amount of its administrative fee, and adjust the amount deposited into the pledged account, within specified parameters. As a result, the amount of the administrative fee applicable to securitizations closing between August 1, 2006 and June 30, 2007 may range from

13

150 basis points to 240 basis points, at TERI's election. We have agreed to attempt in good faith to structure our securitization transactions to accommodate TERI's election.

- For each securitization for which TERI elects to adjust the administrative fee, we will make a corresponding adjustment to our relative ownership percentages of the residual interests in the applicable securitization trust. To the extent TERI elects to increase the amount of its administrative fee above 150 basis points, such an adjustment would result in an increase in our ownership percentage and a decrease in the ownership interest of TERI, by a percentage that will result in an equivalent dollar reduction in the fair value of TERI's residual ownership interest at the time of the securitization, using a 12 percent discount factor.

TERI has elected to receive an administrative fee of 175 basis points for the securitization transaction we plan to complete in the first quarter of fiscal 2007.

Through June 2006, we paid TERI a monthly fee of approximately $62,000 pursuant to the database purchase and supplementation agreement. Beginning in July 2006, monthly payments pursuant to the database sale and supplementation agreement were reduced to approximately $21,000. TERI also maintains a perpetual right to access the data we own solely for use in its guarantee business.

and deceptive practices acts could impose liability on a securitization trust holding the loan or create defenses to the enforceability of the loan.

*In structuring and facilitating securitizations of our clients' loans and as holders of rights to receive residual cash flows in those trusts, we may incur liabilities to investors in the asset-backed securities those trusts issue.*

We have facilitated and structured a number of different special purpose trusts that have been used in securitizations to finance student loans that our clients originate. Under applicable state and federal securities laws, if investors incur losses as a result of purchasing asset-backed securities that those trusts issue, we could be deemed responsible and could be liable to those investors for damages. If we failed to cause the trusts to disclose adequately all material information regarding an investment in the asset-backed securities or if the trust made statements that were misleading in any material respect in information delivered to investors, it is possible that we could be held responsible for that information or omission. In addition, under various agreements entered into with underwriters or financial guarantee insurers of those asset-backed securities, we are contractually bound to indemnify those persons if investors are successful in seeking to recover losses from those parties and the trusts are found to have made materially misleading statements or to have omitted material information.

If we are liable for losses investors incur in any of the securitizations that we facilitate or structure and any insurance that we may have does not cover this liability or proves to be insufficient, our profitability or financial position could be materially adversely affected.

*If our relationship with TERI terminates, our business could be adversely affected.*

In June 2001, we purchased the loan processing operations of TERI and entered into a series of agreements to govern future securitizations of TERI-guaranteed loans. TERI continues to provide private student loan guarantee, education information and counseling services for students, and is the exclusive third-party provider of borrower default guarantees for our clients' private label loans. We have entered into an agreement to provide various services for TERI and received fees from TERI for services performed of $106.1 million, or 19% of total service revenue, for fiscal 2006, and $78.2 million or 19% of total service revenue, for fiscal 2005. In addition, we have agreed to undertake on a best-efforts basis to arrange or facilitate securitizations for a limited category of TERI-guaranteed loans and have the right to receive structural advisory and other fees in connection with these securitizations. We also have entered into an agreement to receive from TERI updated information about the performance of the student loans it has guaranteed, to allow us to supplement our database. Each of these agreements with TERI had an initial term through June 2006. In October 2004, we exercised our option to renew each agreement for an additional five-year term, through June 2011. If our agreements with TERI terminate for any reason, or if TERI fails to comply with its obligations, our business would be adversely affected and the value of our intangible assets could be impaired for the following reasons:

- we may not be able to offer our clients guarantee services from another guarantor and, accordingly, our access to loans and our opportunities to structure securitization transactions may diminish significantly;

- we may not be successful in establishing an arrangement with a third-party to provide the warranties that TERI currently provides to lenders related to origination services. In such case, we may be required to provide such warranties; and

- if TERI is unable to provide guarantee services, any financial guarantee insurance coverage we obtain in securitization transactions could be more costly, if it is available at all.

In such events, demand for our services, including opportunities to structure and facilitate securitization transactions, could decline, which would adversely affect our business. In addition, the value of the loans in the securitization transactions we facilitate could decline and the value of our residuals could be reduced.