10-K 1 a05-15507_110k.htm 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

## Form 10-K
FOR ANNUAL AND TRANSITION REPORTS
PURSUANT TO SECTIONS 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended: June 30, 2005

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from          to

Commission file number: 001-31825

# THE FIRST MARBLEHEAD CORPORATION
(Exact name of registrant as specified in its charter)

| **Delaware** | **04-3295311** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **The Prudential Tower** **800 Boylston Street, 34th Floor** **Boston, Massachusetts** | **02199-8157** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(617) 638-2000**

Securities registered pursuant to Section 12(b) of the Act:

| **Common Stock, $.01 par value** | **New York Stock Exchange** |
|---|---|
| (Title of each class) | (Name of each exchange on which registered) |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No ☒

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2). Yes ☒   No ☐

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant (without admitting that any person whose shares are not included in the calculation is an affiliate) was approximately $1,604,000,000 based on the last reported sale price of the common stock on the New York Stock Exchange on December 31, 2004.

Number of shares of the registrant's class of common stock outstanding as of July 29, 2005: 64,911,244

**DOCUMENTS INCORPORATED BY REFERENCE**

Information set forth in items 10, 11, 12, 13 and 14 of Part III (except for information required with respect to our executive officers, which is set forth under "Executive Officers" in Item 1A of Part I of this report, and our Code of Ethics, which is set forth under "Code of Ethics" in Item 1B of Part I of this report) have been omitted from this report and are incorporated by reference to the definitive proxy statement to be filed with the Securities and Exchange Commission relating to the registrant's 2005 annual meeting of stockholders.

We used $23.3 million of net cash in investing activities during fiscal 2005. The principal use of net cash was capital expenditures related to the expansion of our loan processing facilities and corporate headquarters and, to a lesser extent, payments for loan database updates from TERI.

We used net cash of $60.0 million in financing activities in fiscal 2005. Cash used in financing activities primarily related to the repurchase of $55.7 million of our common stock in open-market transactions and the repayment of the $7.25 million note that we issued to the lead underwriter of our December 2003 securitization, offset in part by the exercise of employee stock options.

We expect that our capital expenditure requirements for fiscal 2006 will be approximately $22.6 million. We plan to utilize our equipment line of credit to finance a portion of these costs. We expect to use these funds primarily for the expansion of our loan processing operations and the purchase of computer and office equipment. We currently have capital expenditure commitments over the next 12 months of approximately $3.1 million.

*Borrowings*

In June 2001, we issued two acquisition notes to TERI totaling $7.9 million to acquire TERI's loan processing operations. Principal and interest at an annual rate of 6% is payable on these notes in 120 monthly payments of an aggregate of $87,706 commencing on July 20, 2001 and ending on June 20, 2011. At June 30, 2005, outstanding principal on these notes totaled $5.3 million as compared to $6.0 million at June 30, 2004.

In August 2003, we entered into a $10 million revolving credit facility with Fleet National Bank. Fleet National Bank was subsequently acquired by Bank of America, and our agreement related to this facility has been assigned to Bank of America. The revolving credit facility matured on August 28, 2005, and we do not intend to extend it. The revolving credit line contained financial covenants, including:

- minimum trailing 12-month up-front structural advisory fees of not less than $25 to $30 million;

- minimum tangible net worth of not less than the sum of 100% of consolidated tangible net worth with respect to the fiscal year most recently ended plus 85% of consolidated net income for the fiscal year most recently ended;

- maximum liabilities to net worth ratio of not greater than 1.15 to 1.00; and

- minimum cash flow to debt service ratio of not less than 1.50 to 1.00, as well as certain financial reporting covenants.

We met these financial and reporting requirements during the term of the revolving credit facility. This agreement restricted our ability to pay cash dividends in the event we are in default. As of June 30, 2005, we had no balance outstanding under the revolving credit facility. The maximum annual commitment fee was $25,000. Bank of America had issued on our behalf a letter of credit in the amount of $0.5 million in lieu of security deposits for the lease of office space, which reduced the amount that we could borrow under the revolving credit facility. Third party beneficiaries had not drawn upon this letter of credit.

In December 2003, we issued a $7.25 million note to the lead underwriter of our December 2003 securitization to monetize a substantial portion of the second up-front structural advisory fee payment which we received in July 2004. We repaid the note in full with the first $7.25 million of that payment.

In January 2005, we entered into an equipment financing lease agreement which we will use to finance the purchases of furniture and equipment. The agreement allows us to finance up to $20.0 million worth of furniture and equipment purchased before December 30, 2005. We expect to repay amounts drawn down on the lease in terms ranging from three to five years. As of June 30, 2005, we had drawn $10.5 million from this line of credit.

In December 2004, we entered into an operating lease for the use of a corporate aircraft for basic annual rent of approximately $1.4 million through 2009. This operating lease was structured as a capital lease for tax purposes.

**Off-Balance Sheet Transactions**

We structure and facilitate the securitization of loans for our clients through a series of bankruptcy remote, qualified special purpose trusts. We do not utilize these trusts as a means to transfer assets or liabilities from our balance sheet to those of the trusts because we are not the originator of the securitized student loans or the issuer of the related debt. We do not serve as lender, guarantor or loan servicer. Specifically, these trusts purchase such student loans from third-party financial institutions, the financing of which is provided through the issuance of asset-backed securities.

The principal uses of these trusts are to:

- generate sources of liquidity for our clients' assets sold into such trusts and to reduce their credit risk;
- make available more funds to students and colleges; and
- leverage the capital markets to reduce borrowing costs to students.

See "Application of Critical Accounting Policies and Estimates—Consolidation" for a discussion of our determination to not consolidate these securitization trusts.

**Recent Accounting Pronouncements**

On December 16, 2004, the FASB issued FASB Statement No. 123 (revised 2004), "Share-Based Payment" (Statement 123R), which is a revision of FASB Statement No. 123, "Accounting for Stock-Based Compensation." Statement 123R supersedes APB Opinion No. 25, "Accounting for Stock Issued to Employees," and amends FASB Statement No. 95, "Statement of Cash Flows." Statement 123R requires an entity to measure the cost of employee services received in exchange for an award of equity instruments, including stock options and restricted stock units, based on the grant-date fair value of the award, with limited exceptions. That cost will be recognized over the period during which the employee is required to provide service in exchange for the award, which is typically the vesting period. Statement 123R eliminates the alternative to use Opinion 25's intrinsic value method of accounting for stock options that was provided in Statement 123 as originally issued.

We adopted Statement 123R on July 1, 2005 using the modified prospective method discussed below. Statement 123R permits public companies to adopt its requirements using one of two methods:

1. A "modified prospective" method in which compensation cost is recognized beginning with the effective date (a) based on the requirements of Statement 123R for all share-based payments granted after the effective date and (b) based on the requirements of Statement 123 for all awards granted to employees prior to the effective date of Statement 123R that remain unvested on the effective date.

2. A "modified retrospective" method which includes the requirements of the modified prospective method described above, but also permits entities to restate their previously issued financial statements to include in their income statements previously recognized under Statement 123 for purposes of pro forma disclosures for either (a) all prior periods or (b) prior interim periods of the year of adoption.

49

As permitted by Statement 123, we accounted for share-based payments to employees using Opinion 25's intrinsic value method through June 30, 2005, and, as such, generally recognized no compensation cost for employee stock options. The adoption of Statement 123R's fair-value method will impact our results of operations, although the impact of adoption of Statement 123R cannot be predicted at this time because it will depend on levels of share-based payments granted in the future. However, had we adopted Statement 123R in prior periods, the impact of that standard would have had approximately the same impact as Statement 123, as described in the disclosure of pro forma net income and earnings per share in Note 2 to these financial statements. Statement 123R also requires that the benefits of tax deductions in excess of recognized compensation cost be reported as a financing cash flow, rather than as an operating cash flow as previously required under EITF Issue No. 00-15 "Classification in the Statement of Cash Flows of the Income Tax Benefit Received by a Company upon Exercise of a Nonqualified Employee Stock Option." This requirement will reduce net operating cash flows and increase net financing cash flows in periods after adoption. While we cannot estimate what the impact on the

cash flow statement will be in the future (because they depend on, among other things, when employees exercise stock options and the amount of expense recognized related to the value of stock options), the amount of operating cash flows recognized in prior periods for such excess tax deductions were $34.3 million during fiscal 2005 and $29.9 million during fiscal 2004. We recognized no operating cash flows for such excess tax deductions in fiscal 2003.

**Inflation**

Inflation was not a material factor in either revenue or operating expenses during the periods presented.

**Factors That May Affect Future Results**

This annual report on Form 10-K includes forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act. For this purpose, any statements contained herein regarding our strategy, future operations, financial position, future revenues, projected costs, prospects, plans and objectives of management, other than statements of historical facts, are forward-looking statements. The words "anticipates," "believes," "estimates," "expects," "intends," "may," "plans," "projects," "will," "would" and similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain these identifying words. We cannot guarantee that we actually will achieve the plans, intentions or expectations expressed or implied in our forward-looking statements. There are a number of important factors that could cause actual results, levels of activity, performance or events to differ materially from those expressed or implied in the forward-looking statements we make. These important factors include our "critical accounting estimates" and the risk factors set forth below. Although we may elect to update forward-looking statements in the future, we specifically disclaim any obligation to do so, even if our estimates change, and readers should not rely on those forward-looking statements as representing our views as of any date subsequent to the date of this annual report.

50

**Risk Factors**

***We derive a significant portion of our revenue and substantially all of our income from structuring securitization transactions; our financial results and future growth would be adversely affected if we are unable to structure securitizations.***

Securitization refers to the technique of pooling loans and selling them to a special purpose, bankruptcy remote entity, typically a trust, which issues securities to investors backed by those loans. As of the date of this Annual Report, we have provided structural advisory and other services for 27 loan securitizations since our formation in 1991, and we receive fees for these services. In connection with securitizations, we receive compensation in the form of structural advisory fees, residuals and administrative fees for management of the trusts. The amount and timing of the fees we recognize are affected, in part, by the size and composition of loan pools to be securitized, the return expectations of investors and assumptions we make regarding loan portfolio performance, including defaults, recoveries, prepayments and the cost of funding. Revenue from new securitizations constituted 76% of our total service revenue for fiscal 2005, 78% of our total service revenue for fiscal 2004 and 73% of our total service revenue for fiscal 2003. Substantially all of our net income in those fiscal periods was attributable to securitization-related revenue.

***The timing of our securitization activities will greatly affect our quarterly financial results.***

Our quarterly revenue, operating results and profitability have varied and are expected to continue to vary significantly on a quarterly basis. In fiscal 2005, we recognized 5%, 37%, 29% and 29% of our total service revenue in the respective fiscal quarters of fiscal 2005. In fiscal 2004, we recognized 5%, 39%, 5% and 51% of our total service revenue in the respective fiscal quarters of 2004. Our quarterly revenue varies primarily because of the timing of the securitizations that we structure. In fiscal 2004, we facilitated one securitization in the second quarter and two securitizations in the fourth quarter, but none in the first or third quarters. In fiscal 2005, we facilitated one securitization in the second quarter, one securitization in the third quarter, and three securitizations in the fourth quarter, but none in the first quarter. The timing of our securitization activities is affected to some degree by the seasonality of student loan applications and loan originations. Origination of student loans is generally subject to seasonal trends, with the volume of loan applications increasing with the approach of tuition payment dates. In fiscal 2005, we processed 39% of our total loan facilitation volume in the first quarter ended September 30, 2004, and 21%, 24%, and 17% of our total loan facilitation volume in the respective