# The First Marblehead Corporation

Annual Report 2008

Exhibit
Exhibit No.: 8
Name: John Hupalo
Date: 11/19/18
ESQUIRE

# This has been an extraordinary year of progress and success for First Marblehead. We continued to meet the growing demand for private capital, facilitating 429,000 loans while helping students fulfill their education dreams.

The First Marblehead Corporation
800 Boylston Street, 34th Floor
Boston, Massachusetts 02199
Tel: 1.800.895.4283
www.firstmarblehead.com

September 19, 2008

Dear Stockholders,

The past year proved to be a challenging one for First Marblehead and for the entire student loan industry. Although we facilitated the securitization of over $2.0 billion in private student loans in September 2007, we were unable to complete a securitization in any subsequent quarter of the fiscal year due to the extended disruption of the credit markets.

In December, we received an initial $59.8 million in proceeds from an equity investment by affiliates of GS Capital Partners (GSCP). In February, we began implementing cost reductions and streamlining our operations. In April, The Education Resources Institute, Inc. (TERI) filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code, which had an immediate negative impact on our business and client relationships. We further reduced our expenses by approximately $200 million on an annualized basis and reduced headcount by 500 employees. TERI's bankruptcy filing also had a significant negative impact on the estimated fair value of our service receivables.

In August 2008, we received an additional $132.7 million in proceeds from completion of the equity investment by affiliates of GSCP. The purchasers' total investment of $192.5 million provides us with liquidity and financial flexibility during fiscal 2009.

Also in August, First Marblehead's Board of Directors accepted the resignation of Jack L. Kopnisky, as President, Chief Executive Officer and as a member of the Board of Directors. Daniel Meyers returned to First Marblehead and, beginning September 1, 2008, Mr. Meyers became President, Chief Executive Officer, and a Director of the company he co-founded in 1991. The Board of Directors believes that Mr. Meyers is uniquely qualified to guide the company through this challenging operating environment.

We continue to believe that private student loans are an important and growing source of college funding. College attendance is high, the overall cost of college continues to rise and government supported loans are limited. We believe that borrowers continue to need responsible private student loan solutions after exhausting all available scholarships, grants and government aid.

We recognize that fiscal 2009 will be a year of transition and continued challenges for us. Given the strong demand for private student loans and our expertise in the private student loan business, however, we believe that a sizable market opportunity exists and we are well positioned to deliver meaningful value to our shareholders over the long term.

We thank you for your continued support of First Marblehead.

Peter B. Tarr
Chairman of the Board

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

# Form 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended: June 30, 2008

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number: 001-31825

# THE FIRST MARBLEHEAD CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **04-3295311** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **The Prudential Tower**<br>**800 Boylston Street, 34th Floor**<br>**Boston, Massachusetts** | **02199-8157** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(617) 638-2000**

Securities registered pursuant to Section 12(b) of the Act:

| | |
|---|---|
| **Common Stock, $.01 par value** | **New York Stock Exchange** |
| (Title of each class) | (Name of each exchange on which registered) |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act (Check one):

Large accelerated filer ☒    Accelerated filer ☐    Non-accelerated filer ☐    Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant (without admitting that any person whose shares are not included in the calculation is an affiliate) was approximately $1,006,053,875 based on the last reported sale price of the common stock on the New York Stock Exchange on December 31, 2007. For the purposes of the immediately preceding sentence, the term "affiliate" refers to each director, executive officer and greater than 10% stockholder of the registrant as of December 31, 2007.

Number of shares of the registrant's common stock outstanding as of August 15, 2008: 98,943,063.

## DOCUMENTS INCORPORATED BY REFERENCE

The registrant intends to file a proxy statement pursuant to Regulation 14A within 120 days of the end of the fiscal year ended June 30, 2008. Pursuant to Paragraph G(3) of the General Instructions to Form 10-K, information required by items 10, 11, 12, 13 and 14 of Part III have been omitted from this report (except for information required with respect to our executive officers and code of ethics, which is set forth under "Executive Officers" and "Code of Ethics" in Part I of this report) and are incorporated by reference to the definitive proxy statement to be filed with the Securities and Exchange Commission.

The following table presents certain financial and operating information for the fiscal years ended June 30, 2008, 2007 and 2006. For additional information about our financial performance for each of the last three fiscal years, including our total assets, we refer you to the audited consolidated financial statements and accompanying notes attached as Appendix A to this annual report.

|  | Fiscal year ended June 30, | | |
|---|---|---|---|
|  | 2008 | 2007 | 2006 |
|  | (dollars in thousands) | | |
| Total revenues | $ (28,409) | $ 880,704 | $ 569,035 |
| Net income (loss) | $ (235,076) | $ 371,331 | $ 235,960 |
| Approximate number of student loan applications processed | 1,696,000 | 1,325,000 | 938,000 |
| Approximate number of schools with loans facilitated | 5,600 | 5,800 | 5,600 |
| Principal amount of student loans facilitated | $5,004,000 | $4,292,528 | $3,362,565 |
| Principal amount of student loans facilitated that were also available to us for securitization | $4,520,034 | $3,873,048 | $2,920,048 |
| Principal and accrued interest balance of student loans securitized | $2,027,079 | $3,750,043 | $2,762,368 |
| Principal balance of student loans facilitated and available to us at year end for later securitization | $3,399,483(1) | $ 831,912 | $ 663,800 |

(1) Includes $1.125 billion principal amount of loans with respect to which our purchase rights terminated subsequent to June 30, 2008 in the context of the TERI Reorganization.

In February 2008, we announced a reduction in our overall cost structure on an annualized basis by approximately 15 to 20 percent, which included a reduction in force of 120 employees. As a result of the expected reduction in facilitated loan volumes, we took significant further steps to reduce our expense structure. In May 2008, we reduced headcount by approximately 500 additional employees, which coupled with other cost-saving initiatives, is expected to result in further cost-savings on an annualized basis of approximately $200 million.

We have recently developed alternatives to the loan guaranty and loan origination services that TERI has historically provided to our clients. We have developed a private label loan program that would not require a guaranty from a third party, and we have begun to offer outsourced loan origination services, marketing services and portfolio management services on a fee-for-service, stand-alone basis. These initiatives will be critical in order to grow our revenues and client base in the future. Compared to past TERI-guaranteed loan programs, the new private label loan program has been designed to have more selective underwriting criteria, higher borrower pricing and a greater proportion of immediate-repayment loans, or loans for which payment of principal and interest begins shortly after final disbursement, and interest-only loans, or loans for which payment of interest begins shortly after disbursement but payment of principal is deferred during enrollment. We are uncertain of the level of interest from former, current or prospective clients with regard to the new program or the offered services. Union Federal is not, as of August 28, 2008, able to meaningfully fund loan origination in the private label loan program due to its current lack of funding capacity.

*Private Student Lending Overview*

The lifecycle of a private student loan, which can be over 20 years long, consists of a series of processes and involves many distinct parties. Because the activities of these parties are largely uncoordinated but heavily regulated, the processes associated with designing, implementing, financing and administering student loan programs are complex, resource intensive and costly.

requirements beyond fiscal 2009, particularly in the event of a prolonged dislocation in the private student loan ABS market. Insufficient funds could require us to delay, scale back or eliminate certain of our programs and to further scale back our expenses.

### Risks Related to the TERI Reorganization

*The TERI Reorganization has had, and will likely continue to have, a negative effect on our client relationships, which will adversely affect our revenue and results of operations.*

We have historically structured and supported private student loan programs for commercial banks, including JPMorgan Chase, Bank of America and RBS. Structural advisory fees and residuals from securitization of JPMorgan Chase loans represented approximately 34% of our total securitization-related fees from the trusts used to securitize student loans during fiscal 2008 and approximately 29% of our total revenue for fiscal 2007. Structural advisory fees and residuals from securitization of Bank of America loans represented approximately 20% of our total securitization-related fees from the trusts used to securitize student loans during fiscal 2008 and approximately 15% of total revenue for fiscal 2007. We also historically structured and supported private student loan programs for companies such as NextStudent Inc. that assisted lenders such as RBS in marketing their programs to customers. Structural advisory fees and residuals from securitization of RBS loans, including loans funded by RBS but marketed by third parties on behalf of RBS, represented approximately 23% of our total securitization-related fees from the trusts used to securitize student loans during fiscal 2008 and approximately 24% of total revenue for fiscal 2007. Loans originated by JPMorgan Chase, Bank of America and RBS represented approximately 26%, 18% and 27%, respectively, of our total principal amount of loans facilitated and available for securitization for fiscal 2008.

Certain of our client agreements provided for termination rights in the event of the filing by TERI of a voluntary petition under federal bankruptcy laws. In April 2008, we received notice that Bank of America elected to terminate its agreements with us due to the TERI Reorganization. We also received notice that RBS elected to terminate certain agreements with our clients and us. In July 2008, our note purchase agreement with JPMorgan Chase was terminated in the context of the TERI Reorganization. As a result of those terminations, we no longer have rights to purchase certain program loans. In total, loans subject to the terminated note purchase agreements represented approximately 22% of our loans available for securitization for the fiscal year ended June 30, 2008.

Certain of our clients that have not terminated their agreements have suspended their marketing of TERI-guaranteed loan programs as a result of the TERI Reorganization. These actions, together with the tightening of our clients' loan underwriting criteria, resulted in a significant reduction in our facilitated loan volumes during the fourth quarter of fiscal 2008. In addition, we expect that the guaranty agreements and loan origination agreements that most or all of our clients have with TERI will be terminated in the context of the TERI Reorganization. Termination of the client's guaranty agreement or loan origination agreement with TERI would generally result in the termination of our agreements with the client.

The termination of our agreements with Bank of America, RBS and JPMorgan Chase will, and the termination of guaranty agreements or loan origination agreements between TERI and our other clients would further, materially reduce the overall volume of loans we facilitate, which will be difficult to replace. Our revenue, business and financial results will suffer as a result.

*Our Master Servicing Agreement, Master Loan Guaranty Agreement and Database Sale and Supplementation Agreement, with TERI terminated effective as of May 31, 2008.*

TERI has historically been the exclusive third party provider of borrower default guarantees for our clients' private label loans. In addition, we had an agreement to provide various loan origination services for TERI and an agreement to receive from TERI updated information about the performance of the student loans it had guaranteed, to allow us to supplement our database. In June 2008, in the context of the TERI Reorganization, the Bankruptcy Court entered an order approving a motion by