UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Golden,<br>Tashanna B. Golden<br>*fka* Tashanna B. Pearson,<br><br>Debtor, | Chapter 7<br><br>Case No. 16-40809 (ESS) |
| Tashanna B. Golden<br>*fka* Tashanna B. Pearson,<br><br>Plaintiff,<br><br>v.<br><br>National Collegiate Student Loan Trust 2006-4, Goal Structured Solutions Trust 2016-A, Pennsylvania Higher Education Assistance Agency d/b/a American Education Services and Firstmark Services,<br><br>Defendants. | Adv. Proc. No. 17-1005 (ESS) |

## **STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

Pursuant to Local Rule 7056-1, Plaintiff submits the following Statement of Material Facts Not in Dispute:

1. Plaintiff Tashanna Golden attended the University of Pennsylvania Law School from 2005 to 2008. *See* Declaration of Tashanna Golden (hereinafter "Golden Decl.") at ¶ 2.

2. During the academic year 2006 to 2007, the published cost of attendance at University of Pennsylvania Law School was $48,464. Golden Decl. at ¶ 3, Ex. A.

3. During that academic year, Plaintiff Golden borrowed $27,500 in federal guaranteed loans and received another $27,640 in scholarships and grants. Golden Decl. at ¶ 4.

4. Plaintiff Golden borrowed an additional $7,103 from BankOne or about September 23, 2006. Golden Decl. at ¶ 4.

5. The BankOne loan was later securitized into the National Collegiate Loan Trust 2006-4. Golden Decl. at ¶ 4.

6. The BankOne loan was in excess of Ms. Golden's cost of attendance after taking into account federal loans, scholarships and grants and is therefore nondischargeable. *See generally* Golden Decl.

7. The loan has been serviced by Defendant PHEAA which continues to demand payment from Ms. Golden. Golden Decl. at ¶ 10, Ex. E.

8. Plaintiff Golden graduated from Pennsylvania Law School in May 2008. Golden Decl. at ¶ 2.

9. On or about February 26, 2008, Citibank extended an $11,000 "bar loan" to Plaintiff Golden to cover her living expenses while she studied for the Pennsylvania bar exam. Golden Decl. at ¶ 5.

10. This loan was not a qualified education loan as defined by § 221(d)(1) of the Internal Revenue Code because it was not incurred to pay the cost of attendance at a Title IV institution. It, therefore, does not come within the terms of § 523(a)(8) and is fully dischargeable. Golden Decl. at ¶ 5. *See also* I.R.C. § 221(d)(1); 11 U.S.C. § 523(a)(8).

11. The Citibank loan was sold to Goldentree Asset Management on or about October 24, 2015, and then was placed in the GOAL 2016-A Trust. *See* Declaration of George F. Carpinello (hereinafter "Carpinello Decl.") at ¶ 2, Ex. A ("Letter from CitiBank").

12. The loan is serviced by Firstmark. Carpinello Decl. at ¶ 2, Ex. A.

13. On February 29, 2016, Plaintiff Golden filed a voluntary petition for relief under the Bankruptcy Code of the United States Bankruptcy Court for the Eastern District of New York. Golden Decl. at ¶ 6.

14. Ms. Golden properly listed on Schedule F certain "student loans" owed including the loans that are subject in this action. Golden Decl. at ¶ 7, Ex. B.

15. On or about August 3, 2016, this Court issued a discharge order in Ms. Golden's bankruptcy proceeding and on or about August 5, 2016, all creditors received notice of discharge. Golden Decl. at ¶8, Exs. C and D.

16. Ms. Golden did not enter into agreement with Defendants under § 524(c) of the Bankruptcy Code and none of the Defendants filed an adversary proceeding to contest discharge of the subject loans. Golden Decl. at ¶ 9.

17. Instead of treating the loans as discharged the Defendants have continued to demand and accepted payment from Ms. Golden on the discharged loans. Golden Decl. at ¶ 10.

18. None of Defendants makes any effort to determine whether any of the class members' subject loans are qualified education expenses after receiving notice of discharge in

bankruptcy. Rather, they resume collection on such loans as if discharge never occurred. *See* Carpinello Decl. at ¶ 3, Ex. B ("Deposition of Peter Sadowski") at 39:3-20; 40:1-41:6; 66:24-67:12; Carpinello Decl. at ¶ 4, Ex. C ("Deposition of Katelynn Bias") at 49:18-50:40; 53:16-60:19; 162:13-163:12; Carpinello Decl. at ¶ 5, Ex. D ("Goal's Responses to Plaintiff's Second Set of Interrogatories") at Response to Interrogatory No. 4; Carpinello Decl. at ¶ 6, Ex. E ("NCT's Responses to Plaintiff's Second Set of Interrogatories") at Response to Interrogatory No. 4.

19. TERI, when originating its direct-to-consumer loans, did not seek certification from the school that the loan was within the cost of attendance nor did it seek to determine what other scholarships, grants or loans the student received. Carpinello Decl. at ¶ 7, Ex. F ("Deposition of Carlin Golden") at 16:8-20:16; 22:18-23:2; 82:2-9; 87:7-88:14.

20. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Carpinello Decl. at ¶ 8, Ex. G ("FM-Golden 1511-1521") at 1512.

21. After 2001, when it entered into an agreement with FMC, TERI performed application services, loan origination, disbursing loan servicing and loan securitization for FMC. Carpinello Decl. at ¶ 12, Ex. K ("Deposition of Richard Neely") at 82:4-84:10.

22. As part of its business, FMC securitized the loans it obtained on behalf of private banks and created the NCT trust which were composed of loans originated by FMC on behalf of banks. Carpinello Decl. at ¶ 13, Ex. L ("Deposition of John Hupalo") at 42:15-18; 44-22:24; Carpinello Decl., Ex. L at 12:15-19; 20:7-20:22; 23:24-24:3; 24:21-24; 25:1-28:13.

23. TERI arranged for investors to purchase an interest in the trusts and received dividends based upon the performance of the student loan portfolio in the trust. Carpinello Decl., Ex. K at 31:10-20.

24. FMC acquired TERI for the purpose of providing a guarantee to the loans placed in the trusts. This enabled FMC to compete in the commercial securitization market where most of TERI's competing guarantors were for-profit commercial enterprises. Carpinello Decl., Ex. L at 59:7-60:21; 81:18-82:6.

25. As part of its agreements with FMC, TERI transferred substantially all of its employees to FMER and TERI agreed to make an annual payment to FMC to cover their salaries. Carpinello Decl., Ex. K at 38:8-19; 88:3-12.

26. TERI moved its offices to the building that housed FMER. Carpinello Decl., Ex. K at 35:9-37:4; 38:10-39:18.

27. As part of the 2001 agreement, FMC paid TERI $1 million in cash and gave TERI promissory notes totaling $7.9 million. Carpinello Decl., Ex. K at 85:15-86:14. In addition, TERI received a 25% residual interest in each trust created by FMC. Carpinello Decl. at ¶ 15, Ex. N ("FMC Form 10-K for the fiscal year ending June 30, 2006") at 13; Carpinello Decl., Ex. K at 92:9-93:12.

28. Before FMC entered into its relationship with TERI, FMC struggled to obtain necessary financing and it was in a precarious financial situation until the successful acquisition of TERI. *First Marblehead Corp. v. House*, 541 F.3d 36, 40 (1st Cir. 2008).

29. TERI was the entity that guaranteed the student loans. This was critical for securitization since the investors needed the assurance that there would be a guarantee behind those

student loans that defaulted. One hundred percent of FMC's securitized loans were guaranteed by TERI. Carpinello Decl., Ex. L at 32:2-7.

30. FMC's financial health was directly dependent on TERI's. Carpinello Decl., Ex. L at 74:8-12; Carpinello Decl., Ex. K at 97:13-17; 99:8-11.

31. TERI's financial health was used by rating agencies to evaluate the default likelihood of the trust created by FMC. Carpinello Decl., Ex. L at 46:13-18.

32. FMC warned investors in 2006 that if its agreements with TERI terminated for any reason or if TERI failed to comply with its obligations, FMC's business would be adversely affected, and the value of its intangible assets could be impaired. Carpinello Decl. at ¶ 16, Ex. O ("FMC Form 10-K for the fiscal year ending June 30, 2005") at 49.

33. Because TERI was registered as a charitable organization under Massachusetts law and the Internal Revenue Code, FMC could assert that the loans FMC made were "funded" by a "nonprofit institution" within the meaning of § 523(a)(8)(A)(i). Carpinello Decl., Ex. L at 36:2-15; 39:6-20; 47:4-6; 48:18-49:13; 50:8-15; 57:11-18; 58:17-20; 68:17-22.

34. FMC acknowledged in public filings with the Securities and Exchange Commission that it was TERI's status as a purported nonprofit that gave it competitive advantage vis-à-vis other private student lenders because it purported to give FMC the ability to collect on private student loans even after bankruptcy discharge. Asserted FMC, "[b]ecause TERI is a non-for-profit corporation, defaults on TERI-guaranteed student loans have been held as nondischargeable in bankruptcy proceedings." Carpinello Decl. at ¶ 17, Ex. P ("Amendment No. 2 to Form S-1 for FMC, dated October 14, 2003").

35. From 2002 to 2008, TERI paid FMER substantial sums in reimbursement for FMER's operation of what were supposedly TERI functions. This amount was slightly over $14

million in fiscal year 2002 but it increased over $106 million by 2006.  Carpinello Decl., Ex. N at 39, Item 6.

36. These payments constituted a substantial portion of FMC's net revenues.  In the first quarter of fiscal 2004, processing fees from TERI represented approximately 83% of total service revenue.  The Company did not recognize more than 10% of total service revenue from any other customer.  Carpinello Decl., Ex. Q at 6

37. FMC acknowledged in public filings that if for whatever reason TERI failed to maintain its nonprofit status FMC's competitive advantage would be adversely affected. Carpinello Decl., Ex. Q at 34; Carpinello Decl., Ex. N. (FMC 10K 2006) at 26.

38. Over time, TERI guaranteed approximately $10 billion in loans securitized by FMC.  Carpinello Decl., Ex. L at 84:19-85:8.

39. In 2008, TERI declared bankruptcy because its reserves were insufficient to cover the guarantees that it made to various commercial banks to cover the defaults on private student loans.  *In Re The Education Resources Institute, Inc.*, Case No. 08-12540(HB) (Bankr. D. Mass. 2008)

40. In the course of the bankruptcy proceedings, TERI rejected the guarantees and agreed to pay over to the participating banks and trusts (including Defendant NCT) the reserves it held to cover those guarantees.  TERI ceased making guarantees going forward.  Carpinello Decl. ¶ 33, Ex. FF ("Modified Fourth Amended Plan of Reorganization in Case No. 082540" (Dkt. No. 1139) at 34 § 6.2(c) and 6.2(c)(vii).

41. As a result of TERI's bankruptcy, FMC's profits dropped 50% and revenues which has reached its high as $100 to $125 million per year dropped more than $50 million.  Carpinello Decl., Ex. L at 102:14-24; Carpinello Decl., Ex. K at 127:4-21.

42. FMC dramatically reduced its workforce by 620 employees and is now a significantly smaller operation that still originates and services student loans, but no longer creates student loans trusts as it did in from 2001 to 2008. Carpinello Decl., Ex. R (FMC Form 10K 2008) at 2.

43. In its initial application to the IRS for § 501(c)(3) status, TERI represented that it would devote a significant portion of its operating budget to charitable purposes and that it would make 100 scholarships in its first year, 200 scholarships in its second year, and 300 scholarships in its third year. Carpinello Decl. at ¶ 29, Ex. BB ("TERI IRS Application") at 36-37, 43.

44. In 2007, TERI's revenue was $502,335,683.00, but its only charitable contributions consisted of $192,937.00 in grants, amounting to 0.038% of its revenue. Carpinello Decl. at ¶ 30, Ex. CC ("2006-2007 Audited Financial Statement") at 3. In 2006, TERI reported revenue of $316,590,040.00 and paid $87,474.00 in grants, representing 0.028% of its revenue. Carpinello Decl. at ¶ 31, Ex. DD ("2006-4_Golden_000979"). And in 2005, TERI reported $ 251,424,286.00 in revenue and only paid $54,196.00 in grants, representing 0.022% of its revenue. *Id.*

45. The number of individuals who are in the proposed class, that is, those individuals who have loans owned or serviced by Defendants, who have proceeded through bankruptcy and whose loans were not within the cost of attendance at a Title IV school easily exceeds 10,000. *See* Declaration of John DeBois.

Dated:  July 13, 2020                                  Respectfully submitted,

                                              **BOIES SCHILLER FLEXNER LLP**

                                By:    */s/ George F. Carpinello*
                                         George F. Carpinello
                                         Adam R. Shaw
                                         30 South Pearl Street
                                         Albany, NY  12207
                                         (518) 434-0600

**SMITH LAW GROUP**
Austin C. Smith, Esq.
3 Mitchell Place, Suite 5
New York, NY 10017

**JONES, SWANSON, HUDDELL & GARRISON, L.L.C.**
Lynn E. Swanson (admitted *pro hac vice*)
Peter Freiberg (admitted *pro hac vice*)
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130

**FISHMAN HAYGOOD LLP**
Jason W. Burge (admitted *pro hac vice*)
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170

**LAW OFFICES OF JOSHUA B. KONS, LLC**
Joshua B. Kons (Ct. Bar No. 29159)
50 Albany Turnpike, Suite 4024
Canton, Connecticut 06019

*Counsel for Plaintiffs*