**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re: Tashanna B. Golden ) | |
| *fka* Tashanna B. Pearson ) | |
| ) | |
| ) | Case No. 16-40809 (ESS) |
| Debtor, ) | |
| ) | |
| Tashanna B. Golden ) | Chapter 7 |
| *fka* Tashanna B. Pearson on behalf of herself ) | |
| and all others similarly situated ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adv. Proc. No. 17-1005 (ESS) |
| ) | |
| Firstmark Services LLC, GS2 2016-A ) | |
| (GS2), National Collegiate Student Loan ) | |
| Trust 2006-4 (NCT 2006), Pennsylvania ) | |
| Higher Assistance Agency, d/b/a ) | |
| American Education Services, ) | |
| ) | |
| ) | |
| Defendants. ) | |
| ) | |

**PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY MEMORANDUM**
**OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY**
**JUDGMENT**

MCDERMOTT WILL & EMERY LLP
Attorneys for Defendant Pennsylvania
Higher Education Assistance Agency
340 Madison Avenue
New York, NY 10173

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS .........................................................................................2

ARGUMENT ...........................................................................................................8

POINT I    Ms. Golden Is Not Entitled to Summary Judgment Because the
Owners of the Loans Are Necessary Parties to Any
Adjudication regarding Discharge and Disgorgement......................................8

POINT II    Plaintiff May Not Use a Motion Under Rule 56 to Obtain An
Advisory Opinion About the Scope of Section 523(a)(8) ..............................18

POINT III There are Material Issues of Disputed Fact as to Whether Ms.
Golden's Loan Exceeded the Cost of Attendance for the  2006-
2007 Academic Year..........................................................................22

        A.    The Exceptions from Discharge under Section
523(a)(8) ................................................................................22

        B.    There is Disputed Evidence regarding Ms. Golden's
Cost of Attendance for 2006-2007 Academic Year............................24

        C.    There Is Disputed Evidence regarding the Amount of
Ms. Golden's Scholarships and Grants................................................28

        D.    There Is Disputed Evidence regarding Whether Ms.
Golden's Loan Exceeded the Cost of Attendance for the
2006-2007 Academic Year ................................................................30

        E.    There Is Disputed Evidence regarding Whether Ms.
Golden's September 2006 Loan Was Issued by a
Program Funded by a Not for Profit Institution..................................32

POINT IV As a Matter of Law, TERI Is a Not for Profit Institution under
Section 523(a)(8)(A)(i). .................................................................34

        A.    This Court Is Required to Hold that a TERI Guaranty Is
Funding by a Not for Profit Institution under Section
523(a)(8)(i)..........................................................................35

        B.    TERI's Bankruptcy Did Not Void its Guaranty of Ms.
Golden's Loan..........................................................................42

POINT V   There Are Material Issues of Disputed Fact that Preclude
          Summary Judgment Regarding Ms. Golden's Entitlement to
          Restitution. ...................................................................................................44

CONCLUSION...............................................................................................................45

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*2 Montauk Highway LLC v. Global Partners LP*,
  296 F.R.D. 94 (E.D.N.Y. 2013) ............................................................11

*Aalabdulrasul v. ACS*,
  No. 11-09089, 2012 WL 1597277 (Bankr. N.D. Iowa May 27, 2012).............................13, 14

*Andrews University v. Merchant*,
  958 F.2d 738 (6th Cir. 1992) ..................................................19

*Berkeley Acquisitions, LLC v. Mallow, Konstam and Hager, PC.*,
  262 F.R.D. 269 (S.D.N.Y. 2009) ............................................11

*Christoffersen v. V. Marchese, Inc.*,
  No. 19-CV-1481, 2020 WL 4926663 (E.D. Wis. Aug. 21, 2020)..........................................21

*Crouse-Hinds Co. v. InterNorth, Inc.*,
  634 F.2d 690 (2d Cir. 1980)..................................................12

*In re Dana Corp.*,
  574 F.3d 129 (2d Cir. 2009)..................................................2

*DDK Hotels, LLC v. Williams- Sonoma, Inc.*,
  No. 19-CV-00226, 2020 WL 4194195 (E.D.N.Y. July 20, 2020)..........................................16

*Delcon Construction Corp. v. United States Department of Housing, and Urban
  Development*,
  205 F.R.D. 145 (S.D.N.Y. 2002) ............................................12

*In re Duits*,
  No. 14-05277-RLM-13, 2020 WL 256770 (Bankr. S.D. Ind. Jan. 15, 2020).............36, 41, 43

*E&T Skyline Construction, LLC v. Talisman Casualty Insurance Company, LLC*,
  No. 19-CV-08069 (AT)(SN), 2020 WL 6531108 (S.D.N.Y. Jul. 30, 2020) ..........................17

*Edrich v. Festinger*,
  No. 12-CV-4069 (MKB), 2017 WL 3575238 (E.D.N.Y. Aug. 17, 2017)..............................16

*Ente Nazionale Idrocarburi v. Prudential Securities Group, Inc.*,
  744 F. Supp. 450 (S.D.N.Y. 1990) ............................................12

*Global Discount Travel Services, LLC V. Trans World Airlines, Inc.*,
  960 F. Supp. 701 (S.D.N.Y. 1997) ............................................12

*In re Grabis*,
    No. 13-10669-JLG, 2018 WL 6132045 (Bankr. S.D.N.Y. Nov. 20, 2018)............................24

*Grabis v. Navient Solutions, LLC*,
    No. 13-10669-JLG, 2018 WL 1508754 (Bankr. S.D.N.Y. Mar. 26, 2018)............................13

*In re Greer-Allen*,
    602 B.R. 831 (Bankr. D. Mass. 2019) ............................................................................37, 41

*In re Hammarstrom*,
    95 B.R. 160 (Bankr. N.D. Cal. 1989) ...................................................................................38

*Jones v. Coughlin*,
    45 F.3d 677 (2d Cir. 1995)...................................................................................................36

*Kish v. Verniero*,
    221 B.R. 118 (Bankr. D.N.J. 1998) .....................................................................................14

*KM Enterprises, Inc. v. McDonald*,
    518 Fed. Appx. 12 (2d Cir. 2013) ........................................................................................20

*Known Litigation Holdings, LLC v. Navigators Insurance Co.*,
    934 F. Supp. 2d 409 (D. Conn. 2013) ..................................................................................12

*Lajkem v. JP Morgan Chase Bank*,
    No. 11-5060, 2011 WL 3236085 (Bankr. N.D. Cal. Jul. 27, 2011).........................................15

*In re Lavigne*,
    114 F.3d 379 (2d Cir. 1997)................................................................................................43

*Lewis v. Pennsylvania Higher Education Assistance Agency*,
    No. 17-5317, 2018 U.S. App. LEXIS 1873 (6th Cir. Jan. 24, 2018).......................................19

*Liberty Mutual Insurance Company v. Sterling Insurance Company*,
    No. 19-CV-3374 (LDH)(CLP), 2020 WL 6699872 (E.D.N.Y. Nov. 12, 2020).....................17

*Maine Community Health Options v. United States*,
    140 S. Ct. 1308 (2020)........................................................................................................42

*In re Mata*,
    No. 6:13-BK-30625-MH, 2020 WL 5543716 (Bankr. C.D. Cal. July 31, 2020) ............ *passim*

*In re McClain*,
    272 B.R. 42 (Bankr. D.N.H. 2002) ...............................................................................37, 41

*In re Medina*,
    No. 19-90065-LT, 2020 WL 5553451 (Bankr. S.D. Cal. Sept. 10, 2020)...................... *passim*

*Nassau & Suffolk County Taxi Owners Association, Inc. v. State of New York*,
    336 F. Supp. 3d 50 (E.D.N.Y. 2018) ....................................................................16

*National Labor Relations Board v. Bildisco and Bildisco*,
    465 U.S. 513 (1984)............................................................................................43

*O'Brien v. First Marblehead Education Resources*,
    419 F.3d 104 (2d Cir. 2005)........................................................... *passim*

*Packer v. Raging Capital Management, LLC*,
    No. 19-2703 (2d Cir. Nov. 23, 2020)...................................................................2

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,
    469 U.S. 189 (1985)............................................................................................42

*Ragan Henry Broadcast Group, Inc. v. Hughes*,
    Civ. A. No. 91-CV-6157, 1992 WL 151308 (E.D. Pa. June 19, 1992) ...................10

*In re Rezendes*,
    324 B.R. 689 (Bankr. N.D. Ind. 2004)..................................................................23

*In re Roberts*,
    149 B.R 547 (C.D. Ill. 1993) ..............................................................................41

*In re Rodriguez*,
    319 B.R. 894 (Bankr. M.D. Fla. 2005) .................................................................38

*In re Rosen*,
    179 B.R. 935 (Bankr. D. Or. 1995)................................................................39, 40

*Srinivasan v. Sallie Mae, Inc.*,
    No. 10-1545(RTL), 2010 WL 3633062 (Bankr. D.N.J. Sept. 7, 2010)............13, 14

*Sunset Homeowners Association, Inc. v. DeFrancesco*,
    386 F. Supp. 3d 299 (W.D.N.Y. 2019) ................................................................12

*Taggart v. Lorenzen*,
    139 S.Ct. 1795, 1801 (2019) ..............................................................................44

*In re Taratuska*,
    2008 WL 4826279 (D. Mass. Aug. 25, 2008) ................................................37, 41

*Tessema v. United Steel*,
    No. 2:13–CV–01782–APG–VCF, 2015 WL 3441176 (D. Nev. May 29, 2015) ...................20

*Town of Huntington v. American Manufacturers Mutual Insurance Co.*,
    267 F.R.D. 449 (E.D.N.Y. 2010) ........................................................................12

*Travelers Indemnity Co. v. Household International, Inc.*,
775 F. Supp. 518 (D. Conn. 1991) ...................................................................................11, 12

*In re Traversa*,
444 Fed. Appx. 472 (2d Cir. 2011) .........................................................................................19

*In re Tucker*,
560 B.R. 206 (Bankr. W.D.N.Y. 2016) ...................................................................................23

*Valero Energy Corp. v. U.S. Department of Energy*,
509 F. Supp. 644 (W.D. Tex. 1980)........................................................................................21

*In re Varma*,
149 B.R. 817 (N.D. Tex. 1992)................................................................................................41

*Ward v. Deavers*,
203 F.2d 72 (D.C. Cir. 1953) ............................................................................................10, 11

*In re Wiley*,
579 B.R. 1 (Bankr. D. Me. 2017)......................................................................................37, 38

*In re WorldCom, Inc.*,
2006 WL 693370 (Bankr. S.D.N.Y. Mar. 13, 2006) .............................................................36

*Zammit v. Shire US, Inc.*,
No. 05-70247, 2005 WL 8155121 (E.D. Mich. May 11, 2005) ........................................20, 21

*Zimmerman v. Cambridge Credit Counseling Corp.*,
409 F.3d 473 (1st Cir. 2005)...................................................................................................39

**Statutes**

20 U.S.C. § 1087ll.....................................................................................................................24

Bankruptcy Code Chapter 7.......................................................................................................6, 7

Bankruptcy Code Section 365 ................................................................................................42, 43

Bankruptcy Code Section 523 .....................................................................................................14

Bankruptcy Code Section 523(a) ................................................................................................22

Bankruptcy Code Section 523(a)(8) .................................................................................... *passim*

Bankruptcy Code Section 523(a)(8)(B) ............................................................................... *passim*

Federal Judgeship Act of 1984, Pub. L. No. 98–353, § 454(a)(2), 98 Stat. 333
(Supp.1984).............................................................................................................................42

Internal Revenue Code Section 221, 26 U.S.C. § 221....................................................................23

**Other Authorities**

*Federal Education Data*. May 9, 2013,
    http://educationbythenumbers.org/content/the-accuracy-of-federal-education-
    data_119/.......................................................................................................................27

Federal Rules of Civil Procedure Rule 19 ............................................................... *passim*

Federal Rules of Civil Procedure Rule 19(a)........................................................... *passim*

Federal Rules of Civil Procedure Rule 19 (a)(1) .........................................................15

https://wcet.wiche.edu/ .................................................................................................27

*Modern Trends*, WCET Frontiers, Sept. 25, 2014,
    https://wcetfrontiers.org/2014/09/25/ipeds/..........................................................27

Presentation of The American Association of Collegiate Registrars and
    Admissions Officers, May 17, 2016,
    https://www.aacrao.org/resources/newsletters-blogs/aacrao-connect/article/is-
    your-ipeds-data-accurate- .....................................................................................27

## PRELIMINARY STATEMENT

Defendant Pennsylvania Higher Education Assistance Agency ("PHEAA") submits this memorandum of law in opposition to the Motion for Partial Summary Sentence submitted by plaintiff Tashanna B. Golden.

Plaintiff's motion is an audacious and unjustified attempt to obtain an invalid and meritless victory against PHEAA and the other defendants in this adversary proceeding. Plaintiff's motion suffers from innumerable flaws, each of which bars this Court from granting any relief under Rules 7056 and 56.

First, plaintiff improperly seeks an advisory opinion regarding the meaning and scope of Section 523(a)(8), untethered to the facts or claims by any individual (including Ms. Golden). Rule 56 does not empower the Court to grant such relief.

Second, plaintiff seeks relief against innumerable loan owners, asking the Court to hold that their loans have been discharged and no longer are enforceable, without those parties being present. Rule 19(a) of the Federal Rules of Civil Procedure bars the Court from granting relief unless and until all the affected loan owners are joined to the action by plaintiff.

Third, every one of plaintiff's arguments are crippled by the existence of innumerable issues of disputed fact. As set forth below, there are issues of fact regarding the amount of loans and grants obtained by Ms. Golden, her cost of attendance and whether the loan that PHEAA services exceeded the cost of attendance. Moreover, the purported Statement of Material Undisputed Facts submitted by plaintiff is fundamentally bogus, as virtually none of the factual assertions made therein (especially with respect to TERI) have any factual support.

Finally, plaintiff improperly asks this Court to disregard and to act contrary to the controlling authority from the Second Circuit Court of Appeals regarding the status of TERI as a not-for-profit institution under section 523(a)(8)A)(1) of the Bankruptcy Code.

This motion is an unnecessary and inexcusable burden imposed on defendants and this Court.  Plaintiff should never have moved for partial summary judgment.  Based on the factual record as well as the legal analysis set forth below, this Court should deny plaintiff's motion in its entirety.

## STATEMENT OF FACTS[1]

PHEAA is a student loan servicer for federal and private student loans.  Declaration of H. Peter Haveles ("Haveles Decl."), Ex. 1 (Deposition of Todd Mosko, at 12:8-13:12); *id.*, Ex. 2, (Deposition of Tashanna Golden, at 172:11-14).  American Education Services ("AES") is the trade name of the division of PHEAA that services private student loans.  *Id.*, Ex. 1, (Mosko Dep. Tr. at 17:24-18:22).  PHEAA does not own the loans that it services, including the loan to Ms. Golden at issue in this proceeding that PHEAA serviced (which is described below).  *Id.*, Ex. 1 (Mosko Dep. Tr. 20:8-23); *id.*, Ex. 2 (Golden Dep. Tr. at 171:6-9, 172:11-14).  PHEAA services the loans and interacts with borrowers pursuant to the loan owner's servicing guidelines.  *Id.*, Ex. 1 (Mosko Dep. Tr. 22:3-13).

In 2005, Mr. Golden began attending the University of Pennsylvania Law School.  Golden Decl. ¶ 2.  During the 2006-2007 academic year, Ms. Golden continued to be enrolled at the University of Pennsylvania Law School.  *Id.* ¶ 4.  Ms. Golden contends that she borrowed $27,500

---

[1] On this motion, all the evidence and all inferences therefrom must be viewed in the light most favorable to PHEAA.  Any evidence that would preclude judgment for Golden must be credited.  *See Packer v. Raging Capital Management*, *LLC*, No. 19-2703, (2d Cir. Nov. 23, 2020) (vacating summary judgment ruling where the district court made determinations as to the credibility of factual evidence); *In re Dana Corp.*, 574 F.3d 129 (2d Cir. 2009) (vacating grant of summary judgment where bankruptcy court ignored evidence favorable to the non-movant).

in federal student loans to fund her education for the year.[2]  *Id.* ¶ 4; First Amended Complaint ¶ 27.

At the beginning of 2006-2007 academic year, Ms. Golden borrowed $7,103.83 from JPMorgan Chase, formerly Bank One, under the Education One Graduate Loan Program, a part of the Education One Loan Program.  Haveles Decl., Ex. 3 (Education One Loan Request/Credit Agreement of Tashanna Golden ("Golden Credit Agreement"), at PHEAA0000664-665), Ex. 4 (2006-4 Pool Supplement by Bank One, N.A., at 2006-4_Golden_000543).  Only Ms. Golden's Education One loan is serviced by PHEAA.  *Id.*, Ex. 2 (Golden Dep. Tr. at 176:20-25).  Ms. Golden received $19,440 in grants and scholarships during the same academic year, as set forth in records provided to Ms. Golden by the University of Pennsylvania.[3]  *Id.*, Ex 2 (Golden Dep. Tr. 89:11-90:22), Ex. 5 (Emails between Bonnie Coulter and Tashanna Golden, at Golden _00229).

Ms. Golden executed the loan agreement with JP Morgan Chase for the Education One Loan on September 28, 2006, and she agreed to be bound the loan agreement, including a guaranty by The Education Resources Institute ("TERI") (the "2006 Loan").  *Id.*, Ex. 2 (Golden Dep. Tr. at 134:12-135:24), Ex. 3 (Golden Credit Agreement at PHEAA0000664-665); Ex. 6 (Education One Loan Request/Credit Agreement ("Credit Agreement"), at PHEAA0000650-651).  At the time that she signed the agreement, Ms. Golden reviewed the terms of the loan agreement, including paragraph 12, which states:

> I acknowledge that the requested loan is subject to the limitations on dischargeability in bankruptcy contained in Section 523(a)(8) of the United States Bankruptcy Code because either or both of the following apply: (a) this loan was made pursuant to a program funded in whole or in part by The Education Resources Institute,

---

[2] Ms. Golden submits no documentary evidence proving this assertion.
[3] The University of Pennsylvania's record reveal that the amount of grants and scholarships for the 2006-2007 year are materially less than what Ms. Golden contends in her papers.  *See* this Memo at III.B, *infra*.

> Inc. ("TERI"), a non-profit institution, or (b) this is a qualified
> education loan as defined in the Internal Revenue Code.

*Id.*, Ex. 6 (Credit Agreement, at PHEAA0000650-651), Ex. 2 (Golden Dep. Tr. at 132:2-5, 210:11-16).

As of that time, Ms. Golden had completed one year of law school, which included a contracts class, and had spent two months working at a law firm. *Id.*, Ex. 2 (Golden Dep. Tr. at 57:23-58:18). At her deposition, Ms. Golden stated, "At the time I signed the loans, I assumed that no student loans were dischargeable." *Id.*, Ex. 2 (Golden Dep. Tr. at 232:10-19).

Ms. Golden's aunt, Daneen Stephens, cosigned the loan. *Id.*, Ex. 2 (Golden Dep. Tr. at 232:10-19), Ex. 3 (Golden Credit Agreement, at PHEAA0000664-665). Paragraph 9 of Section L of Ms. Golden's loan agreement states:

> The Borrower and the Cosigner each agrees that any communication between you and the Borrower or the Cosigner will be binding on the Borrower and the Cosigner. The Borrower and Cosigner intend to be treated as principals of this Credit Agreement and not as sureties. To the extent the Borrower or the Cosigner may be treated as a surety, the Borrower and the Cosigner waive all notices otherwise required or available by law, and all suretyship defenses that might be available (including, without limitation, contribution, subrogation and exoneration). The Cosigner agrees that the Borrower may agree to any forbearance or other modification of the repayment schedule and that such agreement will be binding on the Cosigner. It shall not be necessary for you to resort to or exhaust your remedies against the Borrower before calling upon the Cosigner to make repayment.

*Id.*, Ex. 3 (Golden Credit Agreement, at PHEAA0000664-665).

Ms. Golden's Education One loan was guaranteed by The Education Resources Institute ("TERI"). *Id*, Ex. 6 (Credit Agreement, at PHEAA0000650-651); Ex. 7 (Golden Loan Financial Activity, 2006-4_Golden_001242). At the time of the guarantee, TERI was a not-for-profit institution, with Section 501(c)(3) status, that guaranteed student loans for certain loan programs. *Id.*, Ex. 8 (Deposition of Richard Neely, at 25:9-26:14). One of those programs was the Education One Loan Program, under which Ms. Golden's loan was issued. *Id.*, Ex. 9 (Guaranty Agreement,

2006-4_Golden_001099).  TERI's guaranty of Ms. Golden's loan was issued under a loan guaranty agreement that Bank One first executed with TERI in 2002, pursuant to which TERI agreed to guarantee loans made under the Education One Loan Program.  *Id.*

On May 1, 2002, Bank One entered into an Amended and Restated Note Purchase Agreement for the Education One Loan Program to allow Bank One to sell Education One loans to First Marblehead Corporation.  *Id.*, Ex. 10 (National Collegiate Student Loan Form 8-K/A, 2006-4_Golden_000554).  Subsequently, First Marblehead entered in a securitization enabling the National Collegiate Student Loan Trust 2006-4 (an asset-backed trust that issued notes) to purchase those student loans in 2006.  *Id.*, Ex. 11 (First Marblehead Press Release, 2006-4_Golden_000033).  As part of the securitization, the TERI guaranty agreements for all of the loan programs that were part of the securitization (including the Education One Loan Program) were assigned.  *Id.*, Ex. 12 (NCT 2006-4 Deposit and Security Agreement, 2006-4_Golden_000012).

In addition, Ms. Golden's 2006 Loan did not exceed the cost of attendance at The University of Pennsylvania Law School for the 2006-2007 academic year.  According to the University of Pennsylvania, the cost of attendance for the 2006-2007 academic year was $56,380.  Haveles Decl.*,* Ex. 13 (Declaration of Anthony Henry, at ¶ 5, Ex. 1); *see also id.*, Ex. 14 (University of Pennsylvania website printout, at Golden_00056), Ex. 15 (Deposition of Anthony Henry at 161:1-7, 162:15-18).  Collectively, Ms. Golden's loans, grants and scholarships for the 2006-2007 academic year, prior to taking the 2006 Loan, totaled $46,940—leaving her with $9,440 available in loans before reaching the cost of attendance, according to the totals provided by the University of Pennsylvania.  *Id.*, Ex. 2 (Golden Dep. Tr. 89:11-90:22; 92:21-93:12).  Ms. Golden could have taken out the full $9,440 that remained available to her, but instead took the 2006 Loan for only

just over $7,100.  *See id.*  Ms. Golden was thus still entitled to receive over $2,000 more in loans

than she took out before she would have surpassed the cost of attendance.  *See id.*

On February 29, 2016, Ms. Golden filed a voluntary petition for relief under Chapter 7 of

the Bankruptcy Code in this Court.  No. 16-40809, Dkt. 1; Golden Decl. ¶ 6.

Prior to filing for bankruptcy, Ms. Golden discussed the loan with her aunt.  Haveles Decl.*,*

Ex. 2 (Golden Dep. Tr. at 125:19-126:15).   At her deposition, when asked if she and her aunt

discussed who would pay off the debt on the loan, Ms. Golden stated, "No. I had assumed that I

would pay off the debt on the loan because, you know, based off of my understanding of loans,

student loans, they were not dischargeable in bankruptcy."  *Id*., Ex. 2 (Golden Dep. Tr. at 127:4-

11).  Ms. Golden was also concerned about her aunt's credit, stating:

> Q. What did you discuss with her regarding your bankruptcy?
> A. Well, prior to filing bankruptcy, I talked to her about it, about me potentially
> filing for bankruptcy because I had another loan that my father had co-signed for
> me; and when he filed for bankruptcy, even though I was paying the loan, the loan
> immediately went into default, and I was not able to continue paying it and it
> messed up my credit. And so --
> Q. Okay.
> A. I did not know if that would happen if I filed for bankruptcy, and I wanted to
> talk to her about that because, obviously, she should know if that happened.

*Id*., Ex. 2 (Golden Dep. Tr. at 125:22-126:15).

On March 3, 2016, shortly after PHEAA received notice of Ms. Golden's petition, Ms.

Golden received a letter from PHEAA notifying her that PHEAA would cease billing and

collections on her loan for the duration of the bankruptcy.  *Id*., Ex. 16 (AES Letter to Golden, dated

March 2, 2016, PHEAA0000300).  The letter stated, in relevant part:

> If you have privately-insured loan(s), forbearance may be applied at
> the discretion of the owner.  However, billing and collection
> activities have been suspended for the duration of the bankruptcy.

*Id.*  Yet, Ms. Golden nevertheless on her own initiative continued to make all the monthly payments to PHEAA during the pendency of her bankruptcy code.  *Id.*, Ex. 2 (Golden Dep. Tr. at 187:16-20; 189:4-9).

This Court subsequently issued the form general discharge order in Ms. Golden's bankruptcy proceeding on August 3, 2016.  No. 16-40809, Dkt. 17.  The discharge order states: "Some of the common types of debts which are not discharged in a chapter 7 bankruptcy case are . . . debts for most student loans."  Haveles Decl., Ex. 2 (Golden Dep. Tr. at 166:11-17); Ex. 17 (Order of Discharge and Final Decree as to Tashanna Golden, PHEAA0000719).  Regardless of the general discharge order, Ms. Golden's aunt remained fully liable for repayment of the 2006 Loan.  *Id.*, Ex. 2 (Golden Dep. Tr. at 215:11-21, 216:10-16).

At the time of the discharge order, Ms. Golden had graduated from law school, passed the bar exam and was a practicing attorney.  *Id.*, Ex. 2 (Golden Dep. Tr. at 58:19-23).  At that time, even after consulting with other attorneys, Ms. Golden did not believe that the 2006 Loan was discharged.  *Id.*, Ex. 2 (Golden Dep. Tr. at 166:23-167:8; 186:15-24).  Ms. Golden has continued to make payments on her loans to this day, including the 2006 Loan serviced by PHEAA.  *Id.*, Ex. 2 (Golden Dep. Tr. at 284:8-285:14).  She continued to make these payments because she assured her aunt she would continue to pay.  *Id.*, Ex. 2 (Golden Dep. Tr. at 213:5-11).

On October 17, 2017, Ms. Golden filed the First Amended Complaint in this adversary proceeding.  No. 17-01005, Dkt. 32.  However, neither in connection with obtaining the August 2016 discharge order nor prior to commencing this proceeding did Ms. Golden seek an order from the Court that the 2006 Loan was not subject to Section 523(a)(8) and should be discharged. Haveles Decl., Ex. 2 (Golden Dep. Tr. at 166:18-167:8).

# ARGUMENT

## POINT I

### MS. GOLDEN IS NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE THE OWNERS OF THE LOANS ARE NECESSARY PARTIES TO ANY ADJUDICATION REGARDING DISCHARGE AND DISGORGEMENT.

Ms. Golden is seeking summary judgment with respect to literally every student loan serviced by PHEAA for which the borrower filed a petition in bankruptcy and obtained a general discharge order. The party, however, that is adversely affected by the request for summary judgment is not PHEAA, but is the owner of each loan that is the subject of Ms. Golden's sweeping motion. As a servicer, PHEAA has no legal interest in the fate of all these loans, whereas the owners of the loans are only the party that will lose their property rights to receive principal and interest payments going forward. In other words, the loan owners are necessary parties to any determination that the various student loans are discharged under Section 523(a)(8) of the Bankruptcy Code.

Yet, Ms. Golden has not named any of the loan owners (other than the two trusts) as defendants. The 2006-4 and 2016-A Trusts cannot represent the interests of the other loan owners. Rule 19 precludes this Court from granting any relief in response to Ms. Golden's motion without those necessary parties being present in this adversary proceeding. Consequently, Ms. Golden's failure compels denial of her motion for summary judgment in all respects.

It is axiomatic that, when a necessary party has not been joined as a party to the action, the court may not determine the merits of the dispute unless and until that party is joined. Under Rule 19(a) of the Federal Rules of Civil Procedure, if a party is subject to service of process in the

action, the court is required to direct that the party be joined as a party to the action.[4]  Until there

is joinder, the court does not have the discretion or authority to determine the merits of the dispute.

The pertinent provision of Rule 19 is found in paragraph (a), which is entitled "Persons

Required to Be Joined if Feasible".  It states in pertinent part:

> (1) ***Required Party*. A person who is subject to service of process
> and** whose joinder **will not deprive the court of subject matter
> jurisdiction must be joined** as a party if:
>
> (A) In that persons absence, the court cannot accord complete relief
> among existing party; or
>
> (B) That person claims an interest relating to the subject of the action
> and is so situated that disposing of the action in the person's absence
> may:
>
> (i) As a practical matter impair or impede the person's ability to
> protect the interest; or
>
> (ii) Leave an existing party subject to a substantial risk of incurring
> double, multiple, or otherwise inconsistent obligations because of
> the interest.
>
> (2) ***Joinder by Court Order***. If a person has not been joined as
> required, the court must order that the person be made a party.  A
> person who refuses to join as a plaintiff may be made either a
> defendant or, in a proper case, an involuntary plaintiff.

(Emphasis added).

In the Second Circuit, the courts consistently enforce paragraph (a)'s requirement because

the rule explicitly gives the trial court no discretion.  The only issue for the court under paragraph

(a) is whether the party satisfies either subparagraph (A) or (B).  Once that question is answered

yes for a party who can be joined, joinder of the missing party is mandatory before the dispute

may be determined -- the party "must be joined".

---

[4] Paragraph (b) of Rule 19 applies only when joinder is not possible. *See* Fed. R. Civ. P. 19. Thus, when
joinder is feasible (as prescribed in subparagraph (a)(1)), no consideration is given to paragraph (b) of Rule
19 and the discretion conferred in paragraph (b) is not available to a court.

The courts consistently hold that, when the rights or obligations under a contract are at issue, a party to the contract is a necessary, indispensable party to the litigation seeking to make such a determination. That principle was first articulated in the seminal decision by the Court of Appeals for the District of Columbia in *Ward v. Deavers*, 203 F.2d 72 (D.C. Cir. 1953).

In *Ward*, the plaintiff brought an action to terminate various contracts, and the action went to trial despite the fact that one of the parties to the contract (Deavers) had not been served with process. At the end of the trial, the district court found that the contracts should be rescinded and entered an award for damages. *Id*. at 74-75. On appeal, the Court of Appeals vacated that judgment. *Id.* at 76-77. Although the court issued its ruling well before the 1966 adoption of modern version of Rule 19, consistent with the current requirements of Rule 19, the court stated: "It is settled that Rescission of a contract, or declaration of its invalidity, as to some of the parties, but not as to others, is not generally permitted." *Id.* at 75 (internal quotations omitted). The court went on to hold:

> **Nor could the remainder of the transaction** -- the Manager's Agreement, signed by Deavers -- **be rescinded in the absence of Deavers**. "[T]here is a general rule that where rights sued upon arise from a contract all parties to it must be joined." Under the agreement, Deavers was entitled, *inter alia*, to prompt monthly payment of $250 for 13 1/2 months, or, failing this, restoration of the premises "with all of the equipment, furnishings, stock in trade or other chattels therein contained***," unencumbered and in good condition. He was an indispensable party because a final decree rescinding the agreement could hardly be made without "affecting" his interests. **Because the transaction could not be rescinded as to Deavers, it could not be rescinded at all**.

*Id*. (emphasis added, citations omitted). Since the 1966 revision of Rule 19, courts have routinely cited to the *Ward* decision when holding that a party to a contract in a necessary party for the purposes of Rule 19(a). *See, e.g., Ragan Henry Broadcast Group, Inc. v. Hughes*, Civ. A. No. 91-

CV-6157, 1992 WL 151308, at *2 (E.D. Pa. June 19, 1992); *Travelers Indemnity Co. v. Household International, Inc*., 775 F. Supp. 518, 527 (D. Conn. 1991).

The courts throughout the Second Circuit have enforced the principle articulated by the *Ward* court.  For instance, in *2 Montauk Highway LLC v. Global Partners LP*, 296 F.R.D. 94 (E.D.N.Y. 2013), Judge Wexler confronted the same issue.  In that case, the plaintiff brought an action against the operators of a gas station, contending that the plaintiffs and not the defendants owned certain equipment located on the premises.  *Id*. at 96, 98.  The defendants moved to dismiss under Rule 19, contending that they were not the real owners of the property and that the actual owners were necessary parties.  Judge Wexler held:

> The Court notes that the current Defendants in this case are not party to the original sublease nor the bills of sale, and are merely involved as innocent bystanders who happen to operate the premises currently.  **Determining the issue of ownership requires that Getty Properties and Gettymart be in the case**.  Thus, it is clear to the Court that it "cannot accord complete relief among the existing parties." *See* Fed. R. Civ. P., Rule 19(a)(1)(A).  While the rule is disjunctive, the Court nevertheless further finds that Getty Properties and Gettymart are also required to be joined under Rule 19(a)(1)(B) because they claim an interest to the subject matter of this action – the USTs and related equipment – and "disposing of the action in [their] absence" would impair their right to protect that interest.  If Plaintiffs were successful on their claims, they would be deemed owners of the equipment, which is exactly opposed to Getty Properties and Gettymart's interest.  Furthermore, such a result could leave defendants Global Partners and BP Products "subject to substantial risk of incurring double, multiple, or otherwise inconsistent obligations" since should they lose here, it is likely that Getty properties and/or Gettymart would likely seek additional recovery from them for losing the property to these Plaintiffs.  This result is what Rule 19(a)(1)(B) seeks to prevent.  Accordingly, Getty properties and Gettymart are parties required to be joined to this action under Rule 19(a).

*Id*. at 100.

The courts in the Southern District have reached similar conclusions.  *See Berkeley Acquisitions, LLC v. Mallow, Konstam and Hager, PC*., 262 F.R.D. 269, 273 (S.D.N.Y. 2009) (the

defendant escrow agent was not a real party in interest, and BPC and Grove, parties to the original contract of sale, are necessary parties regarding ownership of the funds held in escrow); *Delcon Construction Corp. v. United States Department of Housing, and Urban Development*, 205 F.R.D. 145, 147 (S.D.N.Y. 2002) (the plaintiff's damages claim required determination of the rights and obligation under a construction contract, and "Russand, as a party to the underlying contract, is a necessary party"); *Global Discount Travel Services, LLC V. Trans World Airlines, Inc*., 960 F. Supp. 701, 707-09 (S.D.N.Y. 1997) (Sotomayor, J.) (the third party to the contract at issue was a necessary party both because that party's presence was necessary to accord complete relief and because that party's ability to protect its own interests may be impaired or impeded).  Likewise, the courts in Connecticut and the Western District of New York have reached the same conclusions.  *See Sunset Homeowners Association, Inc. v. DeFrancesco*, 386 F. Supp. 3d 299, 304-05 (W.D.N.Y. 2019) (the court denied preliminary injunctive relief because of the absence of a necessary party, *i.e.*, the owner of the property for which the defendant was a tenant, regarding compliance with covenants and restrictions to which the property owner had agreed); *Travelers Indemnity Co.*, 775 F. Supp. at 527 ("the court's research has failed to find any case on similar facts that has held that a party to a contract is not an indispensable party.  In fact, the precedent supports the proposition that a contracting party is the paradigm of an indispensable party.").  *See also Crouse-Hinds Co. v. InterNorth*, *Inc.*, 634 F.2d 690, 700-01 (2d Cir. 1980); *Known Litigation Holdings, LLC v. Navigators Insurance Co.*, 934 F. Supp. 2d 409, 421-22 (D. Conn. 2013); *Town of Huntington v. American Manufacturers Mutual Insurance Co.*, 267 F.R.D. 449, 452-53 (E.D.N.Y. 2010); *Ente Nazionale Idrocarburi v. Prudential Securities Group, Inc.,* 744 F. Supp. 450, 457-58 (S.D.N.Y. 1990).

PHEAA is merely the servicer for the 2006-4 Trust's loan to Ms. Golden. Ex. 2 (Golden Dep. Tr. at 171:6-9, 172:11-14).  Further, with respect to the loans of the putative class members with which PHEAA has any involvement, PHEAA is again only the servicer.  *See* Ex. 1 (Mosko Dep. Tr. 20:8-23).  PHEAA does not own, or otherwise have any ownership or equity stake in, any of the private loans made to members of the putative class.  *Id.*

The only parties that have an interest in the rights and obligations under those loans are the loan owners themselves.  Haveles Decl., Ex. 1 (Mosko Dep. Tr. 20:8-23).  PHEAA sends only to the loan owners the entirety of payments made by the borrowers who are members of the putative class.  *Id*.  Ex. 1 (Mosko dep. Tr. 152:15-153:2).  If this Court were to hold that the PHEAA-serviced loans made to members of the putative class were discharged in those individuals' bankruptcy proceedings, only the loan owners would be harmed, as they (and no one else) would cease to receive the payments of principal and interest due on the loans from the members of the putative class.

Consequently, as the courts have held, because PHEAA is only the servicer, PHEAA is not a "real party in interest".  *See Grabis v. Navient Solutions, LLC*, No. 13-10669-JLG, 2018 WL 1508754, at *5 (Bankr. S.D.N.Y. Mar. 26, 2018) (Garrity, J.) ("Thus, the only proper defendants in an action to determine the dischargeability of student loan indebtedness are the parties who hold that indebtedness."); *Aalabdulrasul v. ACS*, No. 11-09089, 2012 WL 1597277,at *1-2 (Bankr. N.D. Iowa May 27, 2012) (dismissing American Education Services [*i.e.*, PHEAA] under Rule 21, as the debt was not owed to PHEAA); *Srinivasan v. Sallie Mae, Inc.*, No. 10-1545(RTL), 2010 WL 3633062, at *3 (Bankr. D.N.J. Sept. 7, 2010) ("Sallie Mae, Inc. has merely been the servicer of [the plaintiff's] consolidated student loan.  Since there is no debt due from the Plaintiff/Debtor to the Defendant, Sallie Mae, Inc., no purpose would be served in declaring the debt dischargeable");

*cf. Kish v. Verniero*, 221 B.R. 118, 132-33 (Bankr. D.N.J. 1998) (non-creditors dismissed in proceeding to determine dischargeability under Section 523 of the Bankruptcy Code).   For instance, when the court was asked to address the dischargeability of a loan in an action in which both the loan owner and the servicer were named as defendants, the court dismissed the servicer under Rule 21 of the Federal Rules of Civil Procedure.   Despite the debtor's concern in *Aalabdulrasul* that a discharge determination might not stop PHEAA's further collection efforts, the court stated:

> As in *Srinivasan* [2010 WL 3633062, at* 3], the Defendant here, [PHEAA], is not owed a debt by the Debtor.   Accordingly, [PHEAA] cannot provide the relief Debtor seeks under 11 U.S.C. § 523(a)(8).   Consequently, [PHEAA's] Motion to Dismiss will be granted and [PHEAA] will be dismissed from the above-captioned adversary.   Additionally, should this adversary be resolved in Debtor's favor, Defendants Chase-JP Morgan Chase Bank NA and Suntrust will be directed to notify [PHEAA] of the outcome immediately to guard against any further potential collection efforts-thus curing Debtor's concerns.

*Aalabdulrasul*, 2012 WL 1597277 at * 2.

Accordingly, the owners of the PHEAA-serviced loans made to the members of the putative class are necessary parties.   As was the case in *Global Travelers* (when then Judge Sotomayor reviewed the requirements of paragraph (a) of Rule 19), the loan owners here are necessary parties because they satisfy each of the two alternative components of subparagraph (a)(1).   Assuming that the Court were to hold that the PHEAA-serviced loans are discharged, that order would not bind the loan owners since they are not parties to this adversary proceeding, and therefore complete relief cannot be accorded.   Further, any ruling here may impair the rights of the loan owners to the extent that PHEAA stops collecting, and it may also create liability for PHEAA vis a vis the loan owners, thereby satisfying the alternative standard in subparagraph (1)(B).

When the courts have been confronted with this very situation in the student loan discharge context, the courts have agreed with this analysis and held that the loan owners (as opposed to the servicer) were necessary parties regarding determination of the issue of dischargeability. *See Lajkem v. JP Morgan Chase Bank*, No. 11-5060, 2011 WL 3236085, at *4 (Bankr. N.D. Cal. Jul. 27, 2011). In *Lajkem*, the plaintiff borrower/debtor made a motion to dismiss one of the defendants, Educational Credit Management Corporation ("ECMC"). *Id*. at *4. The court denied that motion, after conducting an analysis under Rule 19 (a)(1) regarding ECMC. The court stated:

> ECMC has submitted evidence that ECMC is the assignee of some of Plaintiffs' student loan debt. Because the other parties have no financial incentive to represent ECMC adequately in this proceeding, ECMC must be a party to Plaintiffs' dischargeability adversary proceeding. In other words, because this proceeding involves property in which ECMC has an interest, ECMC must be a party in order to represent ECMC's financial interest adequately.

*Id.*

Finally, there is no question that the loan owners are all subject to service of process in this adversary proceeding. PHEAA has previously identified all of the loan owners of the PHEAA-serviced loans to Ms. Golden's counsel, when PHEAA produced the databases in 2019 and 2020 of the borrowers who filed bankruptcy from 2005 to the present as well as the various Compass-system tables produced in June 2020. Haveles Decl. ¶ 23. Moreover, all of those owners are based in the United States, *id*., and are subject to the jurisdiction of this Court (which has nationwide jurisdiction with respect to core matters).

In her reply papers in support of her Motion for a Preliminary Injunction, plaintiff attempts to evade the bar that Rule 19 imposes on her request for relief on a class-wide basis in this case, including in connection with this Motion for Summary Judgment. *See* Plaintiff's Reply Memorandum in Support of Her Motion for a Preliminary Injunction ("Reply Memo") at 9-13. Her arguments are fundamentally wrong and should be disregarded in their entirety.

In the first instance, plaintiff misreads and misrepresents paragraph (a) of Rule 19.  As reflected in the quote above, Rule 19 provides that a party is a necessary party if, in the disjunctive, (A) the court cannot accord complete relief among the existing parties in the absence of the party in question, **or** (B) the party in question claims an interest relating to the subject of the action.  Plaintiff wrongly reads paragraph (a) to be limited to only the second of those two alternatives.  Neither the Rule nor the case law supports that narrow interpretation of Rule 19(a).  Indeed, the case law cited by plaintiff proves the flaw in plaintiff's specious interpretation of paragraph (a).  The courts always consider each of the two parts separately and distinctly.  *See, e.g., Nassau & Suffolk County Taxi Owners Association, Inc. v. State of New York*, 336 F. Supp. 3d 50, 72-74 (E.D.N.Y. 2018); *Edrich v. Festinger*, No. 12-CV-4069 (MKB), 2017 WL 3575238, at * 4-5 (E.D.N.Y. Aug. 17, 2017).[5]

Further, plaintiff wrongly insists that relief can be accorded without the loan owners, arguing that is necessary to show how the missing party will be injured and that such a showing cannot be made.  *See* Reply Memo at 10-11.  Plaintiff ignores the substantial case law that holds without exception that an owner of property or a party to a contract is always a necessary party.  *See* this Memo at 10-12, *supra*.  Plaintiff also ignores the fact that, if this Court were to hold that the student loans of the putative class members are discharged by virtue of the general discharge orders issued in the putative class members' bankruptcy proceedings, the property interests of those parties would be destroyed and extinguished altogether.  Contrary to plaintiff's description of the relief that she seeks (*i.e.*, she is merely seeking declaratory judgment about the right of PHEAA to collect on the debt), plaintiff is asking for a declaratory judgment that the indebtedness

---

[5] For instance, in *DDK Hotels, LLC v. Williams- Sonoma, Inc.*, No. 19-CV-00226, 2020 WL 4194195 (E.D.N.Y. July 20, 2020), one of the decisions cited by plaintiff, the court specifically limited its analysis to the second alternative, clause (B), solely because that was the only basis of the defendants' motion under Rule 12(b)(7) to dismiss the complaint as against them.  *Id*. at *5.

is discharged in its entirety, which would bar the loan owner from receiving any further payments under the loan from the putative class members and thus destroy the loan owner's property rights. It is for such reasons that the courts have consistently held that the party to a contract or the owner of property is always a necessary party under alternative (A).  *See id.*, *supra*; *E&T Skyline Construction, LLC v. Talisman Casualty Insurance Company, LLC*, No. 19-CV-08069 (AT)(SN), 2020 WL 6531108, at *9-10 (S.D.N.Y. Jul. 30, 2020).  It is only when the court is dealing with a declaration regarding a particular party's obligations or rights under a contract that the court holds that the other party is not necessary under clause (A).  *E.g.*, *Liberty Mutual Insurance Company v. Sterling Insurance Company*, No. 19-CV-3374 (LDH)(CLP), 2020 WL 6699872, at *2-3 (E.D.N.Y. Nov. 12, 2020).  That contrast is illustrated by the court's decision as to the Rule 19 defense asserted by different defendants in the *E&T* decision cited to by plaintiff.  *See E&T*, 2020 WL 6531108, at *8-10.

Plaintiff also ignores the case law that holds that a servicer such as PHEAA is not a party that is empowered to defend the loan owners' property interests.  *See* this Memo at 13, *supra*. Contrary to the assertion that the parties are aligned, *see* Reply Memo at 12, the courts hold to the contrary.  Servicers provide contract services to collect debts due under the loans – servicers are not a privy or agent of the loan owner.  *See* this Memo at 13, *supra*.  Indeed, plaintiff can point to no evidence or case law, *see* Reply Memo at 12, despite the case law advanced by defendants standing for the contrary proposition.[6]

To compensate for that fatal failure, plaintiff repeats her argument that, if the loan owners were interested, they could always have shown up and intervened.  *See* Reply Memo at 12-13.

---

[6] Plaintiff makes a generalized argument that asset-burdened trusts operate via their agents.  Yet, she proffers no evidence that PHEAA is an agent of such trusts.  Moreover, a high proportion of the loan owners are banks and not trusts.  Haveles Decl. ¶ 22.

Again plaintiff cites no authority in support of that proposition, as that is not the law under Rule 19.  By Rule 19(a)'s express language, the obligation is on the plaintiff to join the parties, not on the loan owners to come running to join the adversary proceeding on their own initiative.

Accordingly, before the Court may rule on the motion for summary judgment with respect to any of the PHEAA-serviced loans other than Ms. Golden's loan, all of the owners of those loans must be joined as defendants to this adversary proceeding.  Rule 19(a) denies the Court the authority to render any merits-based determination unless and until all of those parties are joined.  Thus, at this juncture, because the necessary parties are missing for all the loan owed by the members of the putative class other than Ms. Golden, the motion for summary judgment as to all loans except the loans owed by the 2006-4 Trust and 2016-A Trust should be denied without prejudice.

### POINT II

### PLAINTIFF MAY NOT USE A MOTION UNDER RULE 56 TO OBTAIN AN ADVISORY OPINION ABOUT THE SCOPE OF SECTION 523(a)(8)

Ms. Golden takes the position that, because defendants bear the burden of establishing that a student loan is not dischargeable under Section 523(a)(8), she is entitled to a ruling that any loan that exceeds the cost of attendance (as that term is employed in the pertinent statutes) is per se nondischargeable.  Ms. Golden does not seek such a ruling based on a factual record, but instead seeks such a declaration in the abstract, without coming forward with undisputed evidence to establish that such a ruling may be made with respect to anyone (be it Ms. Golden or the putative members of the alleged class).  In effect, Ms. Golden is asking this Court to make an advisory ruling as to the meaning of Section 523(a)(8)(B) of the Bankruptcy Code, while foreclosing the possibility of any other exception set forth in Section 523(a)(8).  Such a request is improper,

especially on a motion for summary judgment under Rule 56 (under which relief may be granted only on the basis of material undisputed facts).

As an initial note , Ms. Golden incorrectly asserts, without citing to any authority, that defendants bear the burden of establishing that her loan is not dischargeable under Section 523(a)(8).  That assertion, in fact has no support.   For instance,  *Lewis v. Pennsylvania Higher Education Assistance Agency*, No. 17-5317, 2018 U.S. App. LEXIS 1873 (6th Cir. Jan. 24, 2018), the Sixth Circuit  held  that the plaintiff  erroneously sought to place the burden on his creditors by alleging that the creditors bore the responsibility for commencing an adversary proceeding to contest the dischargeability of his loans.  *Id.* at *6-7.  The court rejected this assertion, which the court held did not accurately reflect how a student loan is treated in a bankruptcy proceeding.  *Id.* Rather, Congress created an elaborate statutory scheme with the clear intent that student loans are presumptively nondischargeable unless the debtor can show they fit into an exception under Section 523(a)(8).  The Sixth Circuit in *Andrews University v. Merchant*, 958 F.2d 738 (6th Cir. 1992), the Sixth Circuit explained:

> The legislative history of the 11 U.S.C. § 523(a)(8) teaches us that the exclusion of educational loans from the discharge provisions was designed to remedy an abuse by students who, immediately upon graduation, filed petition for bankruptcy and obtained a discharge of their educational loans. This was due to the fact that unlike commercial transactions where credit is extended based on the debtor's collateral, income, and credit rating, student loans are generally unsecured and based solely upon the belief that the student-debtor will have sufficient income to service the debt following graduation.

*Id.* at 740; *see also In re Traversa*, 444 Fed. Appx. 472, 474 (2d Cir. 2011) ("§523(a)(8) exhibits a 'clear congressional intent . . . to make the discharge of student loans more difficult than that of other nonexcepted debt'" (internal citations omitted)).  Ms. Golden's loans, however, are presumptively nondischargeable under Section 523(a)(8).  The only way for Ms. Golden to challenge that presumption is to move for discharge of the loan and show the loan is within a noted

exception in Section 523(a)(8), which she did not do until she commenced this adversary proceeding.

Consequently, Ms. Golden seeks an advisory opinion as to the meaning of Section 523(a)(8)(B). This Court, however, may not provide such relief under Rule 56. The Court may determine the issues related to Section 523(a)(8)(B) and the cost of attendance only as applied to the facts before it. Ms. Golden, however, may not seek a ruling that the statutes says what the statutes says, untethered from the facts at issue in this case, even in the context of a class action.

A court may not issue an opinion as to the meaning of a statute without applying the statute to the controversy before it. In *KM Enterprises, Inc. v. McDonald*, 518 Fed. Appx. 12 (2d Cir. 2013), the Second Circuit affirmed the district court's finding that plaintiff's request for a declaratory judgment stating the requirements of a federal infrastructure funding regulation constituted a request for an impermissible advisory opinion. *Id.* at 13-14. The court held that KM Enterprises sought nothing more than a restatement by the court that the regulations require the acceptance of the lowest submitted bid for highway projects and that the court did not have the authority to render such an advisory opinion. *Id.*; *see also Tessema v. United Steel*, No. 2:13–CV–01782–APG–VCF, 2015 WL 3441176, at *3 (D. Nev. May 29, 2015) (declining to issue an opinion as to the meaning of a state statute because doing so would constitute an impermissible advisory opinion).

Rather, the court may make rulings regarding only the application of a statute to the facts at issue in the action. The decision in *Zammit v. Shire US, Inc.*, No. 05-70247, 2005 WL 8155121 (E.D. Mich. May 11, 2005), underscores this limitation. This court declined to interpret a state statute, describing the plaintiff's requested relief a "potentially advisory opinion." *Id.* at *1. The court stated:

> Rather, the Court will make such a ruling only if it is necessary to
> do so, and only when the record is sufficiently developed to permit
> a determination as to how (and whether) this Michigan statute
> applies to the facts of this particular case. The federal courts do not
> exist to issue sweeping pronouncements, but only to decide the
> specific cases before them.

*Id.*; *see also Valero Energy Corp. v. U.S. Department of Energy*, 509 F. Supp. 644, 651 (W.D.

Tex. 1980) (explaining plaintiffs must seek review of regulations and their interpretations as

applied to their contract).

Indeed, such a ruling would also be problematic, as it would foreclose consideration and

application of the other exceptions to discharge set forth in Section 523(a)(8)(A), particularly with

respect other possible putative class members given that the class has not yet been certified.  Courts

typically decline to render advisory opinions as to the rights of possible future putative class

members before the class is certified.  *See Christoffersen v. V. Marchese, Inc.*, No. 19-CV-1481,

2020 WL 4926663, at *3 (E.D. Wis. Aug. 21, 2020).

Here, Ms. Golden asks this Court to interpret the meaning of Section 523(a)(8)(B)

generally, rather than as the statute applies to Ms. Golden's factual assertions.  In her motion for

summary judgment, Ms. Golden states:

> Plaintiff seeks an order from this Court declaring that any loan held
> or serviced by Defendants that either exceeded the cost of
> attendance or was issued to someone not attending a Title IV
> institution has been discharged and that the continued collection on
> such a loan is a violation of § 524 of the Bankruptcy Code and the
> discharge orders."

Golden's Memo at 3.

In effect, the relief sought by Ms. Golden is a declaration that subparagraph (B) says what

it says, without reference to the factual dispute joined by the pleadings.  She is not seeking a ruling

from this Court as to whether her own loans exceeded the cost of attendance or whether they were

issued to someone not attending a Title IV institution.  The Court may not grant this relief and

broadly declare that any loan that exceeds the cost of attendance or was issued to someone not attending a Title IV institution is discharged and not subject to the exceptions set forth in Section 523(a)(8) of the Bankruptcy Code.  Such a determination can be made only and on the particular factual situation before the court.

**POINT III**

**THERE ARE MATERIAL ISSUES OF DISPUTED FACT AS
TO WHETHER MS. GOLDEN'S LOAN EXCEEDED THE
COST OF ATTENDANCE FOR THE
<u>2006-2007 ACADEMIC YEAR</u>**

Ms. Golden contends that the loan that she obtained for the 2006- 2007 academic year that PHEAA services exceeds the cost of attendance and therefore is not within the exceptions to discharge set forth in Section 523(a) of the Bankruptcy Code.  However, Ms. Golden does not, and cannot, come forward with undisputed admissible evidence establishing as a matter of law that her September 2006 loan exceeded the cost of attendance.

**A.      The Exceptions from Discharge under Section 523(a)(8)**

Section 523(a)(8) sets forth several circumstances when a student loan will not be discharged in connection with the general discharge issued on a borrower's bankruptcy case.  Here, two of those exceptions to discharge are pertinent: (i) the loan was made as part of a program by a not for profit institution, and (ii) the loan did not exceed the cost of attendance.  Each of these bases are separate and independent ground for exempting the student loan from a general discharge order.

Section 523(a)(8)(A)(i) excepts from discharge any "educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution."  Under subparagraph (a)(i), any loan that is backed by the government or a non-profit institution is entitled to the discharge

exception.  Courts have held that "[t]his language applies to all situations of student loans funded by the government or nonprofit institutions," *In re Rezendes*, 324 B.R. 689, 692 (Bankr. N.D. Ind. 2004) and that "for there to have been a loan 'there must be (i) a contract, whereby (ii) one party transfers a defined quantity of money, goods, or services, to another, and (iii) the other party agrees to pay for the sum or items transferred at a later date.'" *In re Tucker*, 560 B.R. 206, 208 (Bankr. W.D.N.Y. 2016) (quoting *In re Renshaw*, 222 F.3d 82, 88 (2d Cir. 2000)).

Section 523(a)(8) defines the term "qualified education loan" by reference to Section 221 of the Internal Revenue Code, 26 U.S.C. § 221. Under Section 221, a "qualified education loan" is any indebtedness incurred by the taxpayer solely to pay "qualified higher education expenses"—

> (A) which are incurred on behalf of the taxpayer, the taxpayer's spouse, or any dependent of the taxpayer as of the time the indebtedness was incurred,
>
> (B) which are paid or incurred within a reasonable period of time before or after the indebtedness is incurred, and
>
> (C) which are attributable to education furnished during a period during which the recipient was an eligible student.

Section 221(d)(2) defines the term "qualified higher education expenses" to mean the "cost of attendance (as defined in section 472 of the Higher Education Act of 1965, 20 U.S.C. 1087ll, as in effect on the day before the date of the enactment of the Taxpayer Relief Act of 1997) at an eligible educational institution," reduced by educational expenses paid under certain other programs.  In turn, Section 472 of the Higher Education Act, 20 U.S.C.1087ll, includes, among others, the following categories of costs within the definition of "cost of attendance":

> (1) tuition and fees normally assessed a student carrying the same academic workload as determined by the institution, and including costs for rental or purchase of any equipment, materials, or supplies required of all students in the same course of study; [and]
>
> (2) an allowance for books, supplies, transportation, and miscellaneous personal expenses, including a reasonable allowance for the documented rental or purchase

of a personal computer, for a student attending the institution on at least a halftime basis, as determined by the institution[.]

(3) an allowance (as determined by the institution) for room and board costs incurred by the student which:

> (A) shall be an allowance determined by the institution for a student without dependents residing at home with parents;
>
> (B) for students without dependents residing in institutionally owned or operated housing, shall be a standard allowance determined by the institution based on the amount normally assessed most of its residents for room and board;
>
> (C) for students who live in housing located on a military base or for which a basic allowance is provided under section 403(b) of title 37, shall be an allowance based on the expenses reasonably incurred by such students for board but not for room; and
>
> (D) for all other students shall be an allowance based on the expenses reasonably incurred by such students for room and board

20 U.S.C. § 1087ll; *In re Grabis*, No. 13-10669-JLG, 2018 WL 6132045, at *4 (Bankr. S.D.N.Y. Nov. 20, 2018).   The school itself determines the cost of attendance figure and no other entity or organization is empowered to it.

**B.     There is Disputed Evidence regarding Ms. Golden's Cost of Attendance for 2006-2007 Academic Year**

There is substantial disputed evidence in the record about what Ms. Golden's cost of attendance for the 2006- 2007 academic year was.  In her declaration, Ms. Golden states that the cost of attendance for that year was $48,464, Golden Decl. ¶ 3, Ex. A, in contrast to the allegation in her Complaint that the cost of attendance was $53,500.  First Amended Complaint ¶ 28.  The only authoritative evidence as to the cost of attendance, however, is the information developed by and obtained from The University of Pennsylvania Law School.  According to the University, Ms. Golden's cost of attendance for that academic year was $56,380.   Henry Decl. ¶ 5.   That information from the University of Pennsylvania is corroborated by a website screenshot that Ms.

Golden made in January 2018.  Haveles Decl., Ex. 14 (University of Pennsylvania website printout, at Golden_00056).

Ms. Golden's September 30, 2020 deposition testimony highlights the disputed issues of fact regarding the amount of the cost of attendance.

> Q. So in paragraph 28, you report the cost of attendance at U Penn for the '06/'07 academic year as $53,500.  Do you see that?
> A. Yes.
> Q. Your declaration in paragraph 3 reports it as $48,464. We just looked at that and I just asked you to put that number into your calculator, correct?
> A. Yes.
> Q. Can you explain to me the discrepancy here between those two numbers?
> A. I cannot.
> Q. You don't know why your Complaint says one thing and your declaration says another?
> A. No.
> Q. At the time you signed your declaration, did you know about this discrepancy?
> A. I did not -- I did not.
> Q. Let me ask it another way. So based on this printout from the U Penn website that came from your document production, does it appear that the estimated cost of a year at Penn Law School is $56,380?
> Mr. Carpinello: Objection.
> Q. You can answer.
> A. Yes, it appears to be that.
> Q. Do you know why the Complaint lists 53,500 and not 56,380?
> A. I don't know why.

Haveles Decl., Ex. 2 (Golden Dep. Tr. 77:22-78:9).

> Q.  So here that says in paragraph 3 that the cost of attendance was 48,600 -- sorry.  Strike that. It says in paragraph 3 – you just read into the record -- the cost of attendance was $48,464. Do you see that?
> A. Yes.
> Q. How did you come up with that number?
> A. I assume looking at Exhibit A that's attached.
> Q. All right.  Well, let's go to Exhibit A. I'm going to go to help you here. I'm going to go to the page that lists -- well, before I help you. Let me ask you this because maybe you don't need help.  Do you know

from this document how you determined what the cost of attendance
was? If I scroll through it, can you tell me how you did it?
A. No.
Q. Okay.  If you can't recall how you did it, why do you think it's
accurate?
A. Because I would have relied on -- it looks like my attorney may
have dropped off again.· Are either of them on?
BREAK
Q. So Ms. Golden, I'm going to ask you that same question again.
If you can't recall how you came up with the cost of attendance
number in paragraph 3 of your declaration -- Can we go to paragraph
3, please?  So if you can't recall, how do you know the number in
paragraph 3 is correct?
A. I would have relied on the – I would have relied on my attorneys,
and I would have reviewed the documentation ·and -- you know, at
the time --
Q. So --
A. -- to be true. Sorry.
Q. It's okay.  If I let you review Exhibit A all day long, would you
be able to come up with the way you came up with the $48,460
number?
A. I don't know.

*Id*. Ex. 2 (Golden Dep. Tr. 106:5-108:23).

Ms. Golden bases her cost of attendance assertions on the figures provided on The

Integrated Postsecondary Education Data System ("IPEDS") database.  *See* Golden Decl. Ex. A.

IPEDS, however, is a secondhand, unreliable source and is hearsay.[7]  IPEDS is a tool to provide

students with an estimate of their anticipated education costs.   Jeff Webb, Revised IPEDS

Graduation Rates, 2004-2017, Mar. 10, 2017.  Although it is useful for learning about the cost of

attendance, IPEDS never claims to be 100 percent accurate.  *Id.*

The National Center for Education Statistics ("NCES") oversees the administration of the

IPEDS database.   At an April 30, 2013 session of the American Educational Research

---

[7] Summary judgment cannot be obtained on the basis of hearsay evidence.  The data on the IPED database
is not developed by IPEDS itself, but, as noted above, is submitted to IPEDS by third parties (*i.e*., various
colleges and universities) and is classic hearsay.  There is no hearsay exception that applies to the IPEDS
database.

Association's annual meeting, NCES Commissioner Jack Buckley explained that the IPEDS data set allows for one year of revisions (after the initial collection year) and then "locks" that year's data forever.    Jill Barshay, *The Accuracy of Federal Education Data*. May 9, 2013, http://educationbythenumbers.org/content/the-accuracy-of-federal-education-data_119/.    This practice leads to significant errors across the platform.

An investigation in 2014 by the WICHE Cooperative for Educational Technologies ("WCET") found numerous shortcoming in the IPEDS database.  Phil Hill & Russ Poulin*, Investigation of IPEDS Distance Education Data: System Not Ready for Modern Trends*, WCET Frontiers, Sept. 25, 2014, https://wcetfrontiers.org/2014/09/25/ipeds/.[8]    This investigation concluded, in part, that:

> [a]fter billions of dollars spent on administrative computer systems and billions of dollars invested in ed tech companies, the U.S. higher education system is woefully out of date and unable to cope with major education trends such as online & hybrid education, flexible terms, and the expansion of continuing and extended education. Based on an investigation of the recently released distance education data for IPEDS, the primary national education database maintained by the National Center for Education Statistics (NCES), we have found significant confusion over basic definitions of terms, manual gathering of data outside of the computer systems designed to collect data, and, due to confusion over which students to include in IPEDS data, the systematic non-reporting of large numbers of degree-seeking students.

*Id.*

Even IPEDS trainers admit that the data is merely illustrative of an institution's financial information.  *See* Presentation of The American Association of Collegiate Registrars and

---

[8] WICHE Cooperative for Educational Technologies ("WCET") is a national, member-driven, non-profit that brings together colleges and universities, higher education organizations and companies to collectively improve the quality and reach of technology-enhanced learning programs.  WICHE itself is a regional, nonprofit organization, made up of the 15 western states and the U.S. Pacific Islands and Freely Associated States. WICHE and its 15 member states work to improve access to higher education and ensure student success.  *See* https://wcet.wiche.edu/

Admissions Officers, May 17, 2016, https://www.aacrao.org/resources/newsletters-blogs/aacrao-connect/article/is-your-ipeds-data-accurate-, quoting Kristina Powers, Associate Vice President of Institutional Research Services, Bridgepoint Education, and IPEDS Trainer: "[IPEDS] serves as representative information for your institution.").  Further, the data reported on IPEDS is inconsistent with the data reported by University of Pennsylvania for the 2006-2007 year.  IPEDS reported room and board was $9,800, Haveles Decl., Ex. 14 (National Center for Education Statistics IPEDS Data Center printout for the University of Pennsylvania, at Golden_00053), whereas the University of Pennsylvania has  such  reported that the cost was $11,000, *id.*, Ex. 14 (University of Pennsylvania website printout, at Golden_00056), a $1,200 difference.

**C.    There Is Disputed Evidence regarding the Amount of Ms. Golden's Scholarships and Grants**

There is also disputed evidence regarding the amount of Ms. Golden's scholarships and grants for the 2006 and 2007 academic year.  Again, the evidence shows a disparity between Ms. Golden's assertions and what the University of Pennsylvania (the authoritative source) has recorded as the amount of scholarship and grants.  This disputed issue is material because that figure must be deducted from the cost of attendance to determine the amount of private loans that are excluded from the general discharge order pursuant to Section 523(a)(8)(b).

The First Amended Complaint alleges that Ms. Golden's scholarships and grants for the 2006-07 academic year were $22,440.  First Amended Complaint ¶ 29.  Ms. Golden's declaration lists these amounts as $21,640.  Golden Decl. ¶ 4.  Meanwhile, the University of Pennsylvania advised Ms. Golden that the actual amount was $19,440 in response to a direct inquiry by Ms. Golden on November 28, 2016.  Haveles Decl., Ex. 5 (Emails between Bonnie Coulter and Tashanna Golden, at Golden _00229).  Ms. Golden acknowledged this disputed issue during her deposition.

Q.  So your loan statements might provide the data for your federal government student loans, but what about the scholarships and grants?

A. Oh, I had to have had something from the school showing it.

Q. What did you have?

A. Likely a printout. I'm not sure.

Q. Okay. So you came up with a number of 3,560.  Can you read that last sentence into the record?

A. "Thus, Golden was entitled to borrow an additional $3,560 in qualified education loans (the sum of the two loans was $3,560 less than the cost of attendance at Penn)."

Q. Okay. So what does that $3,560 number represent to you?

A. The difference between my federal loans, internal school financial aid, and the difference between that –the total of that and the cost of attendance.

Q. Okay. So if any of the numbers that you used, for example, the cost of attendance, was wrong, then the $3,560 number would change, correct?

Mr. Carpinello: Objection.

Q. You can answer.

A. Yeah.

Haveles Decl., Ex. 2 (Golden Dep. Tr. 81:3-82:10).

Q. In that exhibit, you state that you received 22,440 in scholarships and grants.  Do you see that?

A. Yes.

Q. But in Exhibit 4 for that academic year, it says 19,440, correct?

A. Yes.

Q. Why doesn't the Complaint – can you explain to me the difference between the two numbers? Meaning, U Penn reported to you that you had $19,440 in scholarship and aid, but the Complaint lists 22,440 in scholarships and grants.  Can you explain to me the difference here?

A. No.

Q. Okay. Certainly, if U Penn only received -- oh, so sorry.  Strike that.  Certainly, if you had only received $19,440 in scholarships and aid, then you would need to add another $3,000 to your qualified education loan amount, correct?

Mr. Carpinello· Objection.

Q. You can answer.

Mr. Carpinello: You're calling for a legal conclusion.

Mr. Casamento: No, I'm not.  I'm calling for math.

A. Perhaps.

Q. Why do you say perhaps?

A. I mean, I guess it would really depend on what -- I mean, based off of paragraph 29, yes, there is a difference of the $3,000.

*Id.* (Golden Dep. Tr. 89:11-90:22).

> Q. So Ms. Golden, if the budget reflected on the U Penn website is the cost of attendance and that number is $56,380, and your scholarships and grants are only $19,440, your qualified education loans that you would be entitled to take would be $9,440, correct?
>
> Mr. Carpinello: Objection.
>
> A. Yes.
>
> Q. Do you know why the Complaint says 22,440, when the number reported from U Penn is 19,440?
>
> A. No.
>
> Q. Why did you have to go to U Penn for the amount of grants and scholarships that you had received for the time period during which you were in law school?
>
> A. Because all this money it's like -- it feels like Monopoly money. $20,000 loan this year; $20,000 loan the next year.  I don't remember all of that off the top of my head.
>
> Q. Right, because you didn't have records that you kept from law school that showed you what you got in grants and scholarships, right?
>
> A. Not at the ready.

*Id.* (Golden Dep. Tr. 93:4-94:7).

> Q. Why does the Complaint in paragraph 6 list scholarships and grants in the amount of 12,850 if the University of Pennsylvania told you for that academic year you only received 12,150 in grants and scholarships?
>
> A. I don't know.
>
> Q. So would you agree with me that the Complaint overstates that number by $700?
>
> Mr. Carpinello: Objection.
>
> Q. You can answer.
>
> A. I would say there's a difference between the Complaint and this document.
>
> Q. Oh, well now, let's not – the Complaint says 12,850, correct?
>
> A. Yes.
>
> Q. The email that you got from UPenn says 12,150, correct?
>
> A. Yes.
>
> Q. So the Complaint is $700 higher than what's in the email, correct?
>
> A. Yes.

*Id.* (Golden Dep. Tr. 98:5-99:3).

**D.     There Is Disputed Evidence regarding Whether Ms. Golden's Loan Exceeded the Cost of Attendance for the 2006-2007 Academic Year**

Because there are disputed issues of fact regarding the cost of attendance as well as the amount of scholarships and grants that Ms. Golden received, there are also disputed issues of fact regarding the amount of loans that could be protected and treated as nondischargeable. Ms. Golden contends that only $ 3,560 is available, and that, if the amount of the private loans exceeded that figure, the private loans are dischargeable under Section 523(a)(8). *See* Complaint ¶ 29. The disputed evidence, however, shows that a substantially larger amount was available for private loans that would be exempted from the general discharge order. Here, based on that evidence, the September 2006 loan serviced by PHEAA falls within that allowable amount. Therefore, the evidence enables the trier of fact to find that Ms. Golden's 2006-2007 loan is exempted under Section 523(a)(8)(B).

The evidence discussed above and Ms. Golden's testimony establishes, and a trier of fact could conclude, that Ms. Golden's September 2006 loan of $7,000 for the 2006-2007 academic year is less than the $9,440 that she could receive without the discharge exemption in subparagraph (B) being lost. *See* Haveles Decl., Ex. 3 (Golden Credit Agreement, at PHEAA0000665). Simple arithmetic calculations performed during Ms. Golden's deposition confirmed that the trier of fact could find that the amount of private loans that Ms. Golden could receive was $9,440.

> Q. In that exhibit, you state that you received 22,440 in scholarships and grants. Do you see that?
> A. Yes.
> Q. But in Exhibit 4 for that academic year, it says 19,440, correct?
> A. Yes.
> Q. Why doesn't the Complaint – can you explain to me the difference between the two numbers? Meaning, U Penn reported to you that you had $19,440 in scholarship and aid, but the Complaint lists 22,440 in scholarships and grants. Can you explain to me the difference here?
> A. No.
> Q. Okay. Certainly, if U Penn only received -- oh, so sorry. Strike that. Certainly, if you had only received $19,440 in scholarships

and aid, then you would need to add another $3,000 to your qualified education loan amount, correct?

Mr. Carpinello· Objection.

Q. You can answer.

Mr. Carpinello: You're calling for a legal conclusion.

Mr. Casamento: No, I'm not.  I'm calling for math.

A. Perhaps.

Q. Why do you say perhaps?

A. I mean, I guess it would really depend on what -- I mean, based off of paragraph 29, yes, there is a difference of the $3,000.

Haveles Decl., Ex. 2 (Golden Dep. Tr. 89:11-90:22).

Q. If the number on the U Penn website or the budget for students is equivalent to the cost of attendance, so it's 56,380, and the amount in scholarships and grants that you receive was only 19,440, the net difference for qualified education loans -- So Ms. Golden, if the budget reflected on the U Penn website is the cost of attendance and that number is $56,380, and your scholarships and grants are only $19,440, your qualified education loans that you would be entitled to take would be $9,440, correct?

Mr. Carpinello: Objection.

A. Yes.

*Id.* (Golden Dep. Tr. 92:21-93:12).

In other words, for the 2006-2007 academic year, Ms. Golden was entitled to receive over $2,000 more in loans than Ms. Golden, in fact, did receive before she would have crossed the cost of attendance threshold.  Thus, the trier of fact could (and indeed should) conclude that the September 2006 loan is not dischargeable.

**E.    There Is Disputed Evidence regarding Whether Ms. Golden's September 2006 Loan Was Issued by a Program Funded by a Not for Profit Institution**

Ms. Golden contends that her September 2006 loan serviced by PHEAA was not made under a loan program that was funded by a nonprofit.  *See* Golden's Memo at 22-31.  Other than attacking the status of TERI, however, Ms. Golden offers no evidence to support her contention.  There is substantial evidence that establishes that the September 2006 loan was guaranteed by

TERI, a not for profit institution.   That guaranty constitutes funding for purposes of Section

523(a)(8)(A)(i).

TERI's guaranty of Ms. Golden's loan was issued under a loan guaranty agreement that

Bank One first executed with TERI in 2002 to guaranty loans made under its Education One Loan

Program.   Haveles Decl., Ex. 9 (Guaranty Agreement, 2006-4_Golden_001099).   The Guaranty

Agreement states, in relevant part:

> Bank One is willing to make Loans to eligible Borrowers under the
> Program, and TERI is willing to guaranty the payment of principal
> and interest against Borrowers' default or certain other events as
> more fully described below, in accordance with the terms and
> conditions set forth in this agreement.

*Id.*   The agreement also states: "During the term of this Agreement, however, Bank One shall use

the EDUCATION ONE trademark and service mark only for Loans guaranteed hereunder."   *Id.* §

6.10.   On May 1, 2002, Bank One entered into an Amended and Restated Note Purchase

Agreement for the Education One Loan Program to allow Bank One to sell Education One loans

to First Marblehead Corporation.   Haveles Decl., Ex. 10 (The National Collegiate Student Loan

Form 8-K/A, at 2006-4_Golden_000554).   In 2006, First Marblehead entered in a securitization

enabling the National Collegiate Student Loan Trust 2006-4 to purchase notes in an asset-backed

trust owing those student loans.    *Id.*, Ex. 11 (First Marblehead Press Release, 2006-

4_Golden_000033.)  The securitization also included assignment of the TERI guaranty agreements

for all of the loan programs included in the securitization, including the Education One Loan

Program.  *Id.* Ex. 12 (NCT 2006-4 Deposit and Security Agreement, 2006-4_Golden_000012.)

BankOne eventually merged with JPMorgan Chase Bank, N.A., which assumed the Education One

Loan Program loans in 2006.  *Id.*, Ex. 4 (2006-4 Pool Supplement, 2006-4_Golden_000543.)

On September 28, 2006, Ms. Golden executed a loan agreement to borrow $7,103.83 from

JPMorgan Chase explicitly pursuant to the Education One Graduate Loan Program, a part of the

Education One Loan Program that is guaranteed by TERI.  *Id.*, Ex. 3 (Golden Credit Agreement, at PHEAA0000664-665).   By signing the loan agreement with Bank One, Ms. Golden acknowledged and agreed to be bound by the loan agreement.  *Id.*, Ex. 2 (Golden Dep. Tr. at 134:12-135:24); *see In re Medina*, No. 19-90065-LT, 2020 WL 5553451, at *2 (Bankr. S.D. Cal. Sept. 10, 2020) (plaintiff's loan was guaranteed by TERI under the Education One Loan Program when the terms and conditions included the same language).  Paragraph 12 stated:

> I acknowledge that the requested loan is subject to the limitations on dischargeability in bankruptcy contained in Section 523(a)(8) of the United States Bankruptcy Code because either or both of the following apply: (a) this loan was made pursuant to a program funded in whole or in part by The Education Resources Institute, Inc. ("TERI"), a non-profit institution, or (b) this is a qualified education loan as defined in the Internal Revenue Code.

Haveles Decl., Ex. 6 (Credit Agreement, at PHEAA0000650-651).  The account statements that Ms. Golden received are further evidence that TERI, in fact, guaranteed Ms. Golden's loan -- each statement that Ms. Golden received for her Education One loan stated that TERI was the guarantor. *E.g.*, *id.*, Ex. 7 (Golden Loan Financial Activity, at 2006-4_Golden_001242); *see In re Mata*, 2020 WL 5543716, at *8 (Bankr. C.D. Cal. July 31, 2020) (finding no material issue of fact as to whether TERI guaranteed plaintiff's loan where the Loan Financial Activity pages listed TERI as the guarantor alongside plaintiff's name and Social Security number).

## POINT IV

### AS A MATTER OF LAW, TERI IS A NOT FOR PROFIT INSTITUTION UNDER SECTION 523(a)(8)(A)(I).

Ms. Golden argues that TERI both is not a not for profit institution and does not fund loans. She therefore asserts that TERI-guaranteed loans do not fall within the exception under Section 523(a)(8)(A)(i).  Golden's Memo at 22-36.  Ms. Golden ignores, however, the long-standing and consistent line of decisions, including controlling authority from the Second Circuit, holding that

TERI is a not for profit institution and that a guaranty of a loan program by a not for profit institution is sufficient to constitute "funding" under Section 523(a)(8)(A)(i).

A.      **This Court Is Required to Hold that a TERI Guaranty Is Funding by a Not for Profit Institution under Section 523(a)(8)(i)**

Ms. Golden asserts that the statute does not permit a guaranty of a loan program by a not for profit institution sufficient to constitute "funding" pursuant to the statute. She instead urges this Court to ignore controlling Second Circuit case law holding that a guaranty by TERI constitutes a loan program "funded" by a not for profit institution pursuant under Section 523(a)(8)(A)(i). *See* Golden's Memo at 31.

This Court is bound by the Second Circuit's controlling precedent set out in *O'Brien v. First Marblehead Education Resources*, 419 F.3d 104 (2d Cir. 2005). The Second Circuit held "that § 523(a)(8) includes within its meaning loans made pursuant to loan programs that are guaranteed by non-profit institutions." *Id.* at 107. The court further held that a guarantee of a loan is a "meaningful contribution" that is encompassed in the funding of a loan. *Id.* at 105. The plaintiff explicitly argued that a TERI guaranty is not "funding" pursuant to Section 523(a)(8)(A)(i). *Id.* The Second Circuit rejected that argument, and held that the statute does not require that the individual loan be funded by a nonprofit, but rather made under a program funded by a nonprofit. *Id.* The Second Circuit concluded that TERI's guaranty of the Law Access Loan Program, which made O'Brien's loan, constituted funding of the program pursuant to the statute. *Id.* at 106. It stated that "TERI was clearly devoting some of its financial resources to supporting the program." *Id.* Therefore, the Second Circuit held that the plaintiff's loans were exempt from discharge. *Id.* at 107.

Ms. Golden's insistence that this Court must disregard this controlling Second Circuit precedent is improper and should be rejected. The entirety of Ms. Golden's argument against

*O'Brien*'s holding is based on the premise that the Second Circuit considered the wrong arguments in reaching its decision. *See* Golden's Memo at 31-32, 35-36. Ms. Golden therefore asks this Court to re-decide the Second Circuit's decision. This Court is not empowered to reject the holding in *O'Brien* -- only the Second Circuit itself may reconsider the *O'Brien* decision. *See Jones v. Coughlin*, 45 F.3d 677, 679 (2d Cir. 1995) ("A decision of a panel of this Court is binding unless and until it is overruled by the Court *en banc* or by the Supreme Court."); *In re WorldCom, Inc.*, 2006 WL 693370, *5 (Bankr. S.D.N.Y. Mar. 13, 2006) (noting this court is bound by Second Circuit precedent). [9]

As much as Ms. Golden attempts to misrepresent the Second Circuit's holding, *O'Brien* is directly on point here. The Second Circuit explicitly held: "For the reasons discussed herein, we hold that § 523(a)(8) includes within its meaning loans made pursuant to loan programs that are guaranteed by non-profit institutions." *O'Brien*, 419 F.3d at 107. This issue is precisely the question at issue before this Court. Regardless of whether this Court agrees with the Second Circuit's ruling or logic in this Court, it is bound by the Second Circuit's decision and must adhere to it.

In addition to the Second Circuit, numerous other courts have uniformly concluded that a guaranty of a loan program by a not for profit institution qualifies as "funded" for purposes of Section 523(a)(8)(A)(i). *See In re Medina*, No. 19-90065-LT, 2020 WL 5553451 (Bankr. S.D. Cal. Sept. 10, 2020) (a guaranty of a loan program by TERI constitutes funding); *In re Mata*, No. 6:18-ap-01089-MH, 2020 WL 5543716 (Bankr. C.D. Cal. July 31, 2020) (adopting the Second Circuit's reasoning in *O'Brien*); *In re Duits*, No. 14-05277-RLM-13, 2020 WL 256770 (Bankr. S.D. Ind. Jan. 15, 2020) ("A majority of the courts considering the dischargeability of TERI-

---

[9] Because the Second Circuit's ruling in *O'Brien* is controlling authority, this Court is bound to follow it, and can only express any disagreement with the ruling or its logic.

guaranteed loans have held that a TERI guarantee comes under the broad definition of 'funded' as that term appears in § 523(a)(8)(A)(i)."); *In re Taratuska*, 2008 WL 4826279 (D. Mass. Aug. 25, 2008) (reversing the bankruptcy court's determination that TERI's guaranty did not constitute funding of the loan program under Section 523(a)(8)(i)). These courts have also emphasized that the financial contribution of guaranteeing a loan is essential to funding a loan program. *See, e.g., In re Greer-Allen*, 602 B.R. 831, 838 (Bankr. D. Mass. 2019) ("A guaranty helps fund a program because it encourages a lender to extend credit that may not otherwise be available.").

Additionally, Ms. Golden's argument that Congress did not intend for a guaranty by a nonprofit to render the loan excepted from discharged has been rejected by multiple courts. In the recent decision in *In re Mata,* the court considered how to balance Congress' intent that discharge requires material funding by a nonprofit with the broad language explaining how that funding occurs. 2020 WL 5543716, at *6-7. Analyzing the plethora of case law, including *O'Brien*, the court concluded that "funding" is defined more broadly than directly providing funds by which the loan is made. *Id.* at *7; *see also In re McClain*, 272 B.R. 42, 46 (Bankr. D.N.H. 2002) ("Further, the language 'made under any program funded in whole or in part by ... a nonprofit institution,' indicates that 'Congress intended to include within section 523(a)(8) all loans made under a program in which a nonprofit institution plays any meaningful part in providing funds.'")

The only decision to which Ms. Golden points is *In re Wiley*, 579 B.R. 1 (Bankr. D. Me. 2017). *See* Golden's Memo at 35-36. That decision, however, is distinguishable. There, the defendant moved for summary judgment, seeking a finding that plaintiff's loans were not dischargeable pursuant to Section 523(a)(8)(A)(i). *Id.* at * 6. Although a number of facts were undisputed, the court denied summary judgment because there was not sufficient evidence to establish indisputably that the debtor's loan was issued by a program funded by a nonprofit. *Id.*

Unlike in *Wiley*, here, there is substantial undisputed evidence that TERI guaranteed Ms. Golden's loan apart from the loan agreement itself (the only evidence submitted is *Wiley*).   *See* this Memo at III.E, *infra*.   Additionally, the *Wiley* court mistakenly interpreted Section 523(a)(8)(A)(i) as requiring the nonprofit to guarantee *and* directly provide the funds for the loan.  579 B.R. at 6-7. The plain language of the statute, however, does not require a not for profit institution to do both. Further, the *Wiley* court's holding is not the law in this Circuit.  The Second Circuit and the vast majority of courts, have rejected the Wiley court's reading of the statute and have held a guaranty alone is sufficient to constitute funding of the program without actually providing the funds for the loan.  *See O'Brien*, 419 F.3d at 107.  The *O'Brien* court did not distinguish "funding" and "guaranteeing" a loan program as two distinct ideas, but instead defined a guaranty as one way to fund a loan program.  *In re Mata*, 2020 WL 5543716 at *8.  Furthermore, the *Wiley* court's reliance on the reasoning in *In re Hammarstrom*, 95 B.R. 160, 165 (Bankr. N.D. Cal. 1989), is misplaced, as the Bankruptcy Code was amended after that 1989 decision, and such an interpretation has been rejected  by numerous courts in light of the amendments.  *See id*.

Thus, as a matter of law, in this Circuit, a guaranty by a not for profit institution of a loan program, including a guaranty by TERI, constitutes "funding" pursuant to Section 523(a)(8)(A)(i).

Ms. Golden also argues without any authority that TERI is not a not for profit institution pursuant to Section 523(a)(8)(A)(i).  *See* Golden's Memo at 22-31.  But, again, Ms. Golden cannot escape the Second Circuit's binding decision in *O'Brien*.  The Second Circuit and other courts have consistently held that TERI is a not for profit institution.

TERI was a registered 501(c)(3) nonprofit organization.  *In re Rodriguez*, 319 B.R. 894, 896 (Bankr. M.D. Fla. 2005).  TERI's earnings did not benefit its directors or employees.  *Id.* at 895.  The inquiry as to whether TERI is a not for profit institution need not continue any further

based on these facts alone. *See Zimmerman v. Cambridge Credit Counseling Corp.*, 409 F.3d 473, 478 (1st Cir. 2005) ("Where Congress left 'nonprofit' undefined in an exclusion from another statutory scheme, we concluded that 'nonprofit' status depended primarily on proof that the entity did 'not distribute profits to stockholders or others.'"); *In re Rosen*, 179 B.R. 935, 940 (Bankr. D. Or. 1995) (the trust was a nonprofit institution pursuant to Section 523(a)(8), as it received tax exempt status pursuant to 501(c)(3) and did not distribute earnings to employees). Even so, the Second Circuit unambiguously held in *O'Brien* that TERI is a nonprofit. *O'Brien,* 419 F.3d at 105. The plaintiff debtor disputed whether a guarantee by TERI was sufficient to constitute funding of his loan. *Id.* at 106. The Second Circuit, however, rejected his argument, and affirmed the District Court's finding "that it is undisputed that O'Brien's loan was made through a program that in turn was funded by a nonprofit institution." *Id.* at 106-07.

Ms. Golden misrepresents the relationship between First Marblehead and TERI in an unsuccessful attempt to discredit TERI's status as a nonprofit. She contends that since First Marblehead's acquisition of TERI, it has operated only to serve the private, commercial business interests of First Marblehead. Golden's Memo at 22-23. She asserts that allowing First Marblehead to control its assets has harmed TERI's status as a nonprofit. *Id.* at 23. According to Ms. Golden, TERI's registration as a § 501(c)(3) entity is insufficient to prove it is a nonprofit, yet she points to irrelevant case law where the IRS denied § 501(c)(3) status to suggest TERI is not a nonprofit. *Id.* at 26-30. Finally, she contends that TERI did not pursue its charitable purpose by failing to provide scholarships it supposedly promised to provide. *Id.* at 30-31.[10]

---

[10] The factual basis for these claims are set forth in paragraphs 19 to 44 of Plaintiff's Statement of Material Facts Not in Dispute. Yet, these citations are disingenuous. Virtually none of the citations dispute the factual assertions. For example (but by no means exhaustive), the citations for paragraphs 31 though 33 have nothing to do plaintiff's factual assertions – they are *non sequiturs*. As a result, plaintiff's assertions in those paragraphs must be wholly disregarded and accorded no weight whatsoever.

Since its acquisition by First Marblehead, TERI has always maintained its status as a nonprofit, nor has anyone attempted to revoke its 501(c)(3) status. *See* Haveles Decl., Ex. 8 (R. Neely Dep. Tr. at 25:9-26:14). Even after emerging from bankruptcy, TERI retained its nonprofit status. *See In re Medina*, 2020 WL 5553451 at *6. Whether TERI was an honorable not-for-profit institution, or whether TERI fulfilled its various voluntary commitments as a not-for-profit institution to make scholarship grants, is irrelevant to the issue under Section 523(a)(8)(A)(1), as the only requirement was that TERI be a 501(c)(3) entity. In addition, the intertwined relationship that TERI had with First Marblehead after First Marblehead acquired TERI also is irrelevant to the issue under Section 523(a)(8). *See In re Medina*, 2020 WL 5553451 at *7 ("The fact that FMC may have benefited from the relationship does not render TERI a for-profit institution as a matter of law."). Because it is undisputed that TERI maintained (and indeed never lost) its status as a not-for-profit institution at all relevant times, including at the time that the 2006 Loan was made to Ms. Golden,[11] and did not distribute profits to employees, any loan program in which TERI participated constituted a loan program recognized for the exception in subparagraph (A)(i). *See, e.g.*, *In re Rosen*, 179 B.R. at 940.

Ms. Golden incorrectly asserts she is the first party to challenge TERI's nonprofit status pursuant to Section 523(a)(8)(A)(i). *See* Golden's Memo at 31-32. Recently, however, the court in *In re Medina* performed the precise analysis that Ms. Golden argues that this Court should undertake—the *Medina* court rejected the same arguments made by Ms. Golden and held that TERI is a not for profit institution. 2020 WL 5553451 at *4. There, the plaintiff disputed TERI's status as a not for profit institution under Section 523(a)(8)(A)(i) on summary judgment. *Id.* The court held as a matter of law that TERI is a not for profit institution because 1) TERI declared

---

[11] Even the TERI financial records exhibited by plaintiff substantiates that fact. *See* Carpinello Decl., Exs. CC, DD.

itself a not for profit institution in its Equity Security Holder Statement; 2) TERI's Disclosure Statement identified it as a not for profit institution; 3) the findings of fact and conclusions of law in the Order confirming its Fourth Amended Plan in bankruptcy held that the then Reorganized TERI will maintain its not for profit status; and 4) "[t]he same Order found that TERI 'complied with all applicable state and federal restrictions on transfers by not for profit entities.'" *Id.*

Numerous courts have likewise held that TERI is a nonprofit. *See In re Mata*, 2020 WL 5543716 (applying Section 523(a)(8)(A)(i) to a loan made through a program guaranteed by TERI); *In re Duits*, 2020 WL 256770, at *2 ("[The loans] were initially funded by a private lender but were guaranteed by TERI, a nonprofit institution."); *In re Greer-Allen*, 602 B.R. at 837 ("The third requirement is satisfied because the Education One Undergraduate Loan Program was funded in part by TERI, a nonprofit institution."); *In re McClain*, 272 B.R. at 46 (TERI is a nonprofit and the exception in Section 523(a)(8)(A)(i) applies); *In re Taratuska*, 2008 WL 4826279, at *1 (TERI is a not for profit institution and guaranteed the principal and interest of plaintiff's loan); *In re Varma*, 149 B.R. 817, 818 (N.D. Tex. 1992) (TERI as a not for profit institution created under Massachusetts law).

Ms. Golden's wrongly assumes that "institution" under Section 523(a)(8)(A)(i) is limited to an "educational" institution. *See* Golden's Memo at 32. The statute imposes no such limitation, and private not for profit institutions such as TERI are within the statute's ambit. *See In re Greer-Allen*, 602 B.R. at 838 ("The plain text is unambiguous and offers no reason to suggest that only certain nonprofit institutions satisfy the exception."), *In re Roberts*, 149 B.R 547, 550 (C.D. Ill. 1993) ("When the plain language of the Bankruptcy Code is clear, the court need not inquire beyond the text of the statute."). Ms. Golden points to the legislative history in making her argument, but she misleadingly fails to acknowledge critical aspects of that history. In amending

Section 523(a)(8) in 1984, Congress specifically and consciously removed the language "of higher education" following "institution" from the statute, thereby intentionally expanding the type of organizations within the scope of the provision.[12]  *See In re Medina*, 2020 WL 5553451, at *5 (citing Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98–353, § 454(a)(2), 98 Stat. 333 (Supp.1984) (amending 11 U.S.C. § 523(a)(8) (1982)).  Ms. Golden's suggestion that "institution" as used in the Bankruptcy Code is derived from the Higher Education Act is likewise without support.  *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.")

## B.      TERI's Bankruptcy Did Not Void its Guaranty of Ms. Golden's Loan

Ms. Golden incorrectly argues TERI's guaranty of her loan is void *nunc pro tunc* because TERI went bankrupt.  *See* Golden's Memo at 36-37.  She, however, cites no authority whatsoever to support such a claim.  Indeed, such an argument runs contrary to the fundamental tenets of the Bankruptcy Code.

When a business files a petition under the Bankruptcy Code, contracts are not found to be invalid or void.  Rather, under Section 365 of the Bankruptcy Code, the debtor must go through the process to accept or reject the contract in the bankruptcy proceeding.  Even if the contract is rejected, the contract obligations are only terminated, but not expunged -- the debtor still owes

---

[12] It is a well-established rule of statutory construction that, when Congress deliberately omits language from a draft statute or a draft amendment, Congress' intent must be read as intentionally choosing not to include such language in the statute.  *See Maine Community Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020) ("This Court generally presumes that when Congress includes particular language in one section of a statute but omits it in another, Congress intended a difference in meaning." (internal quotations omitted)).  Consequently, when a limitation is deleted from the statute's text, the rules of statutory construction compel the conclusion that the deletion was intentional and that the limitation may not be read as part of the statute.

damages as an unsecured claim.  *See National Labor Relations Board v. Bildisco and Bildisco*, 465 U.S. 513, 531 (1984) ("Damages on the contract that result from the rejection of an executory contract, as noted, must be administered through bankruptcy and receive the priority provided general unsecured creditors."); *In re Lavigne*, 114 F.3d 379, 386-87 (2d Cir. 1997) ("While rejection is treated as a breach, it does not completely terminate the contract.  Thus, '[r]ejection merely frees the estate from the obligation to perform; it does not make the contract disappear.'" (internal citations omitted)).

Contrary to Ms. Golden's assertion, numerous courts have held that TERI guarantees are valid for the purpose of Section 523(a)(8)(A)(i) even after TERI's filed for bankruptcy.  *See e.g.*, *In re Medina*, 2020 WL 5553451, at *7; *In re Duits*, 2020 WL 256770, at *2-3.  Courts have likewise concluded that whether the loan was made by a program funded by a not for profit institution pursuant to Section 523(a)(8)(A)(i) is determined at the time that the loan was created, and not some later time (such as when the guarantor petitions for bankruptcy).  *In re Mata*, 2020 WL 5543716, at *10.  Furthermore, the court in *In re Mata* stated:  "it is abundantly clear that the resolution of the guarantees in TERI's bankruptcy, including the Loans at issue, does not retroactively affect the characterization of the Loans as being 'funded' by a non-profit."  *Id.* Similarly, TERI's guaranty of Ms. Golden's loan continued past TERI's bankruptcy in 2008.  The Loan Financial Activity statements for Ms. Golden's loan list TERI as the guarantor well past its 2008 bankruptcy filing.  *E.g.*, Haveles Decl., Ex. 18 (Golden Loan Financial Activity, 2006-4_Golden_001249).

Ms. Golden comes forward with no support or justification to override these decisions or the established law set forth in Section 365 of the Bankruptcy Code regarding the acceptance or rejection of a contract.  Since Ms. Golden does not come forward with any evidence establishing

a recognized legal basis to rescind a contract (such as on the basis of fraud in the inducement), as a matter of law, Ms. Golden may not contend that the TERI guarantee is void *ab initio* because of TERI's bankruptcy filing.

## POINT V

**THERE ARE MATERIAL ISSUES OF DISPUTED FACT
THAT PRECLUDE SUMMARY JUDGMENT REGARDING
MS. GOLDEN'S ENTITLEMENT TO RESTITUTION.**

As PHEAA has demonstrated, supra, material issues of fact exist as to whether Defendants violated any discharge order, improperly collected any funds, nor contravened any provision of §532(a)(8).   Therefore, restitution is not appropriate.   The Supreme Court held in *Taggart v. Lorenzen*, that a court can only "impose civil contempt sanctions when there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful under the discharge order." 139 S.Ct. 1795, 1801 (2019).  Further, in *Taggart*, the Court stated, "[a] court may hold a creditor in civil contempt for violating a discharge order where there is not a "fair ground of doubt" as to whether the creditor's conduct might be lawful under the discharge order." *Id*. at 1804. Throughout this submission PHEAA has made it clear that, not only were their actions in accordance with the law, but even if this Court maintains some doubt, there is no question that material issues of fact remain.  With material facts still at issue, there can be no finding that PHEAA's conduct meets the Supreme Court's standard for civil contempt sanctions.   In accordance with the Supreme Court's guidance, Ms. Golden's request for restitution must be denied.

**CONCLUSION**

For the foregoing reasons, plaintiff's Motion For Summary Judgment should be denied in its entirety.

Dated:  December 4, 2020                    McDERMOTT WILL & EMERY LLP


                                            By:  /s/ H. Peter Haveles, Jr.
                                                 H. Peter Haveles, Jr.

                                            340 Madison Avenue
                                            New York, New York, 10173
                                            Telephone: (212) 547-5400
                                            Facsimile: (212) 547-5444
                                            phaveles@mwe.com

                                            Attorneys for Defendant Pennsylvania
                                            Higher Education Assistance Agency