February 2, 2021

# Expert Report by Mark Kantrowitz

## Table of Contents

Expert Report by Mark Kantrowitz ................................................................................................... 1

   I. Introduction ................................................................................................................................ 1

   II. Cost of Attendance is a Term of Art ........................................................................................... 2

   III. School Certification is Not a Safe Harbor for Lenders............................................................... 7

   IV. Bar Study Loans Are Not Qualified Education Loans ................................................................ 9

   V. Incorrect Characterization of IRS Reporting Requirements .................................................... 13

   VI. Reductions in Qualified Higher Education Expenses Are Not Limited to Tax-Free Education Benefits ....................................................................................................................................... 14

   VII. Conclusion.............................................................................................................................. 15

   Qualifications ............................................................................................................................... 16

## I. Introduction

This report summarizes my findings and opinions formed to date in the matter of *Tashanna B. Golden fka Tashanna B. Pearson v. National Collegiate Student Loan Trust 2005-3, National Collegiate Student Loan Trust 2006-4, GS2 2016-A, Pennsylvania Higher Education Assistance Agency d/b/a American Education Services, Firstmark Services*, (Case No. 16-40809 (ESS), Chapter 7, Adv. Pro. No. 17-1005 (ESS)). My review and analysis of the facts and circumstances of the case continues. I reserve the right to supplement and amend my opinions to take into account information learned up to and throughout the trial. I am being paid on an hourly basis for this engagement, and my billing rate is $500 per hour.

I have reviewed Defendant Nelnet Servicing, LLC's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Memorandum"), Pennsylvania Higher Education Assistance Agency Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment ("PHEAA"), Trust Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Trust"), as well as Trust Defendants' and Firstmark's Supplemental Memorandum of Law in Further Opposition to Plaintiff's Motion for Partial Summary Judgment ("Supplemental Memo") and Trust Defendants' and Firstmark's Supplemental Local Rule 7056-1(c) Statement of Additional Facts ("Supplemental Statement"), and identified several fatal flaws.

My expertise concerning student loans is detailed in the section titled "Qualifications."

February 2, 2021

## II. Cost of Attendance is a Term of Art

On page 5 of PHEAA, Defendant Pennsylvania Higher Education Assistance Agency asserts

> *"According to the University of Pennsylvania, the cost of attendance for the 2006-2007 academic year was $56,380. Haveles Decl., Ex. 13 (Declaration of Anthony Henry, at ¶ 5, Ex. 1); see also id., Ex. 14 (University of Pennsylvania website printout, at Golden_00056), Ex. 15 (Deposition of Anthony Henry at 161:1-7, 162:15-18)."*

On page 7 of Trust, the Trust Defendants assert

> *The University of Pennsylvania reports that the cost of attendance for academic year 2006-07 was $56,380. (Add'l F., ¶ 1).*

The term "cost of attendance" is a term of art, expressly defined in the Higher Education Act of 1965 at 20 USC 1087ll.

Exhibit F refers to "THE ESTIMATED COST OF A YEAR AT PENN LAW" for academic year 2006-2007. Exhibit F does not refer to the "cost of attendance" or "student budget."

In fact, Exhibit F shows that the $56,380 figure cited by the Defendants includes (emphasis added)

> *Clothing, laundry, personal expenses, **medical insurance**            4,729*

Medical insurance is not part of the cost of attendance as defined by the Higher Education Act of 1965.

Colleges and universities are required to report their cost of attendance to the Integrated Postsecondary Education Data Systems (IPEDS) as part of the program participation agreement. This is mandated by 20 USC 1094(a)(5), (7) and (17), 20 USC 1092, 34 CFR 668.14(b)(19) and 34 CFR 668.43(a)(1).[1] In particular, 20 USC 1092(a)(1)(E) mandates consumer information disclosures to students concerning "the cost of attending the institution, including (i) tuition and fees, (ii) books and supplies, (iii) estimates of typical student room and board costs or typical commuting costs, and (iv) any additional cost of the program in which the student is enrolled or expresses a specific interest." The regulatory language at 34 CFR 668.43(a)(1) is similar, but also specifies that the cost of books and supplies is an estimate.

Institutional Reporting and Disclosure Requirements are specified in Appendix F of the 2019-2020 Federal Student Aid Handbook, which states (emphasis added):

> This appendix provides postsecondary educational institutions with a comprehensive summary of reporting and disclosure requirements related to the Higher Education Act (HEA). In general, reports are submitted to the Department of Education, and disclosures are made to students and the public. However, in some cases — for example, the annual security statistics —

---

[1] Colleges and universities can be fined or subject to other administrative actions, including limitation, suspension or termination of eligibility to participate in Title IV federal student aid programs, for failure to complete and submit the IPEDS surveys accurately, per the regulations at 34 CFR 668.84, 34 CFR 668.85 and 34 CFR 668.86.

February 2, 2021

information must be provided to students, the public, and to the institution's faculty and staff. **This summary lists the reports and disclosures, their statutory and regulatory authority, a description of what is required in each report/disclosure and other pertinent information**, the due date, the method of transmittal or distribution, and the recipient of the report/disclosure. The publication of this document complies with section 482(e) of the HEA, which requires the Secretary to provide institutions with a "compliance calendar" of all reports and disclosures required under the HEA.

Page F-6 of Appendix F discusses the requirement that colleges submit data to IPEDS (emphasis added).

**Institutions are required to submit data to the National Center for Education Statistics.** The multiple IPEDS surveys provide the Department of Education a wide variety of open-access data on higher education. Among the information gathered from IPEDS reporting, the Secretary will publish annual college affordability and transparency lists related to college costs including information on tuition and fees for full-time undergraduate students, **cost of attendance**, and the number of undergraduate students receiving each type of financial aid. In addition, institutions must report the following: average annual cost of tuition, fees, room and board, books, supplies, and transportation; the net price of the institution, and the average annual cost of tuition and fees.

The IPEDS reporting includes graduate and professional degree programs, not just undergraduate degree programs. The information that the University of Pennsylvania reported to IPEDS did not include the medical insurance charges.

Exhibit 3 from the deposition of Elaine Varas on January 8, 2021 presents a copy of the IPEDS survey completed by the University of Pennsylvania for the 2007-2008 award year.[2] The following is a quote from Section 11 on page 17 of the exhibit: ▌

▌[3] If it was a required fee, it should have been reported to IPEDS. Elaine Varas, who was appointed University Director of Financial Aid at the University of Pennsylvania in 2016, did not provide the 2007-2008 cost of

---

[2] It is important to note that the ▌

▌ See Ex. A. to Golden declaration of July 6, 2020.

[3] On page 121 of the transcript of her deposition, Elaine Varas confirmed that the only way medical insurance can be included in the cost of attendance is if it is a required fee. If it's not a required fee, it is not included in the term "cost of attendance."

attendance figures to IPEDS and cannot explain why this document differs from the cost of attendance reported to IPEDS because she did not work for the University of Pennsylvania in 2007-2008.[4]

Moreover, the definition of cost of attendance does not allow a *required* fee to be selectively waived for some students. The definition of cost of attendance at 20 USC 1087ll includes tuition and fees "**normally assessed** a student carrying the same academic workload … **required** of all students in the same course of study" (emphasis added). Note that this refers to the tuition and fees "normally assessed" and not the tuition and fees that are actually assessed. Nor can it refer to possible individual adjustments for particular students. While college financial aid administrators may make such adjustments for a particular student's eligibility for financial aid, those adjustments do not apply to 26 USC 221(d).

Aside from the choice of the student's course of study and the choice of one of the three room and board options (On Campus, With Parent, Off Campus), all of which is reported to IPEDS, there is no individualization of a student's cost of attendance with regard to whether a loan is a qualified education loan. The other components of the applicable definition of the cost of attendance are specified as allowances or estimates, not actual expenses. The definition of qualified higher expenses at 26 USC 221(d)(2) is in terms of the cost of attendance as defined at 20 USC 1087ll as of August 4, 1997. In contrast, for purposes of determining student eligibility for federal student aid, college financial aid administrators are authorized "to make adjustments on a case-by-case basis to the cost of attendance or the values of the data items required to calculate the expected student or parent contribution (or both) to allow for treatment of an individual eligible applicant with special circumstances" when supported by adequate documentation at 20 USC 1087tt. Accordingly, a college financial aid administrator can exercise professional judgment to make adjustments to the cost of attendance for federal student aid purposes, but such adjustments do not affect the definition of the cost of attendance that applies to the determination of whether a loan is a qualified education loan.[5] That definition of cost of attendance is the cost of attendance that is reported to IPEDS.[6]

Even if the definition of qualified higher education expenses at 26 USC 221(d)(2) permitted individualization in the definition of cost of attendance, use of professional judgment to adjust the cost of attendance is relatively rare, in my experience. The Office of the Inspector General at the U.S. Department of Education reported that professional judgment was exercised nationally in between 2.25% to 2.42% of cases (*Audit of Saint Louis University's Use of Professional Judgment*, Office of the Inspector General, U.S. Department of Education, February 10, 2005). A survey of college financial aid administrators by the College Board and the National Association of Student Financial Aid Administrators showed that in those cases where applications for exercise professional judgment occurred, only 10% asked for modification of cost of attendance (*2001 Survey of Undergraduate*

---

[4] On page 123 of the transcript of her deposition, Elaine Varas confirmed that she has "no personal knowledge of how these numbers were arrived at."

[5] On pages 156-157 and 169 of the transcript of her deposition, Elaine Varas confirms that the purpose of providing to a bank her understanding of the cost of attendance is for the purpose of determining the student's eligibility for financial aid and not for the purpose of any kind of guarantee or assurance to the bank that the loan is a qualified education loan under the Internal Revenue Code and non-dischargable in bankruptcy.

[6] Of course, excluding any changes to the statutory definition of cost of attendance after August 4, 1997.

*Financial Aid Policies, Practices, and Procedures*). This suggests that the use of professional judgment to modify the cost of attendance occurs in less than 0.3% of cases. All such individualization is at the discretion of the college financial aid administrator, not the student or the lender.

Accordingly, the $56,380 figure cited by Defendants is not the real cost of attendance figure that is used for determining whether a loan is a qualified education loan. If a loan was made to pay for medical insurance, it is not a qualified education loan.

The National Collegiate Trust (NCT) Loan for $7,103, which was made under the Bank One EducationOne Loan Program, is a direct-to-consumer loan, was not school certified and was disbursed directly to the borrower. This loan exceeded the cost of attendance after subtracting scholarships, grants and other loans and therefore could not have been borrowed solely to pay for qualified higher education expenses. Accordingly, it is not a qualified education loan. The lender could have consulted the college's financial aid office to determine whether it exceeded the cost of attendance minus other aid, but did not. Although school certification is not a legal safe harbor, it would have provided the lender with some comfort as to whether the loan is a qualified education loan. With regard to the Bank One loan, the lender would have learned through school certification that their loan did not satisfy the requirements to be considered a qualified education loan.

One page 171 of the transcript of her deposition, Elaine Varas confirms that she does not consider a direct-to-consumer loan, where "the bank lends money directly to the student and the student does not … file an application with the school, the bank doesn't ask the student to file an application to the school, the bank doesn't send anything to the school and the bank sends a check to the student", to be an "educational loan at all" and that it is just "a private loan".

Item #6 on page 3 of Supplemental Statement asserts that "The Department of Education completed an audit of the University of Pennsylvania in 2018 and did not find that the way which it calculates its cost of attendance incorrect or improper" and cites pages 62-64 of the Elaine Varas deposition. With regard to this program review, included the following assertions on pages 63 and 64:

> *Q. And did one of the identified findings relate to the calculation of the student budget and the cost of attendance?*
> *A. It did not.*
> *Q. Was there any discussion of the student budgeting and cost of attendance process in the identified findings?*
> *A. There was no discussion in the findings.*
> *…*
> *Q. Well, let me ask it this way: In the audit process, did they review how the student budget was calculated and how the cost of attendance was calculated?*
> *A. Yes, they did.*
> *Q. Okay. And because they had no identified findings with respect to how that process was done, does that indicate to you that it was being done correctly?*
> *A. That's correct, yes.*

*Q. So the fact that there were no identified findings with respect to calculations of the student budget/cost of attendance, it's your belief that that's being done properly?*
*A. Yes.*

These assertions are contracted by the Final Program Review Determination (PRCN: 201720329561) dated June 13, 2019 concerning the June 28, 2017 program review.[7] As a result of this program review, University of Pennsylvania was assessed a fine of $173,523.60. One of the program review's findings was that the University of Pennsylvania had "Conflicting Cost of Attendance/Budgets" (Finding 10) and it noted that the University of Pennsylvania had revised its policies and procedures "to ensure that the cost of attendance for all students is consistent." In addition, the final program review determination includes the following disclaimer on the bottom of page 3:

*Although the review was thorough, it cannot be assumed to be all-inclusive. The absence of statements in the report concerning Penn's specific practices and procedures must not be construed as acceptance, approval, or endorsement of those specific practices and procedures. Furthermore, it does not relieve Penn of its obligation to comply with all of the statutory or regulatory provisions governing the Title IV, HEA programs.*

Moreover, Defendants do not present any evidence that the U.S. Department of Education reviewed Exhibit F as part of the program review, as opposed to relying on IPEDS.

Item #14 on page 5 of Supplemental Statement asserts that "IPEDS does not request – and the University of Pennsylvania and other institutions do not report to IPEDS – information that is specific "by school, by program, by class" (*id*. At 90:20-91:5), or information relating to any specific student's or category of students' "housing [or] living" circumstances. *Id.*" and item #15 asserts "Thus, the cost of attendance that any institution reports to IPEDS is "a general number that is not unique to a profession or student." *Id*. At 103:6-8.

These assertions (and the deposition upon which they are based) are contradicted by the indisputable fact that IPEDS does have separate fields for tuition and required fees for each program. For example, the University of Pennsylvania's IPEDS survey for 2007-08 (Exhibit 3) ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

---

[7] https://studentaid.gov/sites/default/files/fsawg/datacenter/library/FPRD/University_of_Penn_PA_003378_06132019_FPRD_Redacted.pdf

# III. School Certification is Not a Safe Harbor for Lenders

On page 15 of the Memorandum, Defendant states that

> *As Plaintiff acknowledges, certification in this manner "provides a safe harbor for the lender" by "ensur[ing] that the loan amounts … do not exceed the cost of attendance." (ECF No. 246-4 at 3.)*

Defendant's excerpt omits the beginning of the quoted sentence, which reads "In effect, school certification provides a safe harbor for the lender because the college financial aid office ensures that the loan amounts in combination with other financial aid do not exceed the cost of attendance."

The omitted words "in effect" make clear that the term "safe harbor" was being used descriptively as providing lenders with some reassurance but not statutory or regulatory protection. School certification does not provide a legal safe harbor.

Also, as discussed in this report, Bank One did not seek certification of the $7,103 loan and the CitiAssist Bar Loan was not certified as being within the cost of attendance.

Although school certification reduces the likelihood that a private student loan will exceed the cost of attendance minus other aid, and thus might be described informally as providing the lender with a safe harbor, the statute and regulations do not establish this safeguard as a legal safe harbor.

The Higher Education Act of 1965 and the regulations do not establish a safe harbor for school-certified loans to be considered qualified education loans. Importantly, the requirement at 20 USC 1094(a)(6) for school certification is limited to **federal education loans** and does not apply to private student loans. It prohibits colleges from certifying federal education loans in excess of the amount that the student is eligible to borrow.

The safe harbor established in the Truth in Lending Act (TILA) at 15 USC 1638(e)(5)(C) concerns the disclosure requirements established by the Student Loan Sunshine Act (Section 1021 of the Higher Education Opportunity Act of 2008, P.L. 110-315). Thus, this safe harbor does not refer to whether or not the private loans are qualified education loans, but rather to whether the lender satisfied the disclosure requirements. School certification does not ensure that private student loans meet the statutory definition of a qualified education loan.

The purpose of school certification is to help college financial aid administrators award federal student aid funds while avoiding over-awards for federal student aid purposes, not to provide a safe harbor for private lenders. School certification does not certify that the loan is a qualified education loan, just that the loan does not cause an over-award for federal student aid purposes.

When a college financial aid administrator issues a school certification for a private student loan, they use the current definition of cost of attendance, not the definition that is applicable to whether the loan is a qualified education loan. The focus of the financial aid administrator is on the student's eligibility for

federal student aid, for which the current definition of cost of attendance is appropriate. Lenders must use a stricter test for determining whether a loan is a qualified education loan.

26 USC 221(d)(1) limits qualified education loans to loans that were borrowed solely to pay for qualified higher education expenses. 26 USC 221(d)(2) specifies that qualified higher education expenses are based on the definition of cost of attendance in the Higher Education Act of 1965 [20 USC 1087ll] **that was in effect on August 4, 1997**. Subsequent changes to the Higher Education Act of 1965's definition of cost of attendance apply to a student's eligibility for federal student aid, but not to the definition of a qualified education loan nor to a loan's eligibility for the student loan interest deduction.

Thus, although school certification can reduce the likelihood that a private student loan is not a qualified education loan, school certification does not guarantee that the student's expenses fall within the cost of attendance that determines whether a loan is a qualified education loan. Even if a student is not over-awarded for federal student aid purposes, as certified by the college financial aid administrator, their private student loan might not be a qualified education loan, because the 1997 definition of cost of attendance is narrower than the current definition. Therefore, school certification might give the lender some comfort, but school certification does not guarantee that the private student loan is a qualified education loan.[8]

The lender bears the responsibility for ensuring that the private student loan is a qualified education loan, not the college financial aid administrator. A private education lender should also consider other sources of information to ensure that the loan is a qualified education loan, such as:

- Asking the borrower about individualization of cost of attendance by the college financial aid administrator (e.g., housing status, differential tuition based on academic major, dependency care costs, disability-related expenses, and study abroad costs)
- Asking the borrower about certain post-1997 inclusions in the cost of attendance (e.g., purchase of a personal computer, professional licensing and certification fees) that should be excluded from the cost of attendance figures that apply to determining whether a loan is a qualified education loan
- Asking the borrower about the various exclusions from EFA
- Confirming with the three credit reporting agencies – TransUnion, Experian and Equifax – that the borrower does not have any other private education loans

---

[8] On pages 108-111 of her deposition, Elaine Varas said that a lender could seek certification of a private student loan from the college financial aid office, and the financial aid office would provide the cost of attendance and confirm the student's enrollment. Bank One did not do this. Elaine Varas also said "Students are not allowed to exceed the cost of attendance under any circumstances."

February 2, 2021

## IV. Bar Study Loans Are Not Qualified Education Loans

On page 3 of the Memorandum, Defendant Firstmark claims that

> *Plaintiff's loans are nondischargeable "qualified education loans" within the meaning of Section 523(a)(8)(B) because: … (2) Plaintiff's CitiAssist Bar Loan was used to finance the costs necessary to obtain her first professional licensure.*

On pages 14-15, Defendant Firstmark provides additional detail concerning this claim

> *Plaintiff's CitiAssist Loans Are "Qualified Education Loans" within the Meaning of Section 523(a)(8)(B).*
>
> *Section 523(a)(8)(B) creates an exception to discharge for any "educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual." Section 221(d)(1) of the Internal Revenue Code defines the term "qualified education loan" to mean "any indebtedness incurred by the taxpayer solely to pay qualified higher education expenses." In turn, "qualified higher education expenses" are those expenses which comprise a student's "cost of attendance," as defined by 20 U.S.C. § 1087ll, at an "eligible educational institution." See 26 U.S.C. §221(d)(2). A student's "cost of attendance" includes not only direct educational expenses such as tuition, fees, books, and supplies, but also indirect and incidental costs like personal transportation, miscellaneous personal expenses, room and board, dependent care, and professional licensure costs, among other things. See20 U.S.C.§1087ll. And finally, an "eligible educational institution" is generally one which qualifies for participation in federal student aid programs under Title IV of the Higher Education Act of 1965.Here, the evidence demonstrates that both of Plaintiff's CitiAssist Loans are nondischargeable "qualified education loans."*

Defendant cites the current definition of "cost of attendance" from the Higher Education Act of 1965. This is not the applicable definition of "cost of attendance."

"Qualified education loans" are defined in 26 USC 221(d)(1) as "indebtedness incurred by the taxpayer solely to pay for qualified higher education expenses."

"Qualified higher education expenses" are defined at 26 USC 221(d)(2) as the cost of attendance as defined at 20 USC 1087ll **"as in effect on the day before the date of enactment of the Taxpayer Relief Act of 1997"** (emphasis added). The Taxpayer Relief Act of 1997 (P.L. 105-34) was enacted on August 5, 1997. Accordingly, it is the version of the definition of "cost of attendance" as of August 4, 1997 that is applicable in this case, not the current definition.

There have been several changes to the statutory definition of "cost of attendance" subsequent to August 4, 1997. These changes are irrelevant to the present case. The 1997 definition of "cost of attendance" does not include any of these allowances. **In particular, it does not include the cost of obtaining first professional credentials and licensing, contrary to Defendant's assertion.** The cost of obtaining first

professional credentials and licensing was added by the Deficit Reduction Act of 2005 (P.L. 109-171) on February 8, 2006, *after* August 4, 1997. Thus, if a student loan includes any of these expenses, it is not a "qualified education loan" and therefore is not excepted from bankruptcy discharge.

Even if the applicable definition of cost of attendance included the cost of obtaining first professional credentials and licensing, which it does not, those costs do not include living expenses while getting first professional credentials and licensing.

The Federal Student Aid Handbook ("FSA Handbook") is a source of sub-regulatory guidance from the U.S. Department of Education to college financial aid administrators. It is reviewed and approved by appropriate offices in Federal Student Aid (FSA) and the Office of Postsecondary Education (OPE) in the U.S. Department of Education before publication.

Chapter 2 of Volume 3 of the 2019-2020 Federal Student Aid Handbook is entitled "Cost of Attendance (Budget)". This excerpt is from pages 3-42 to 3-44 of the Allowable Costs section of Chapter 2:

> A student's cost of attendance is the sum of the following. If a cost is not mentioned in these categories (which are derived from the only source on COA components, Section 472 of the HEA), it is not to be included as COA:
>
> ...
>
> - **An allowance for the one-time direct costs of obtaining a first professional license or certificate for students who are enrolled in a program that requires such professional licensure or certification.** This allowance may only be provided one time per student per eligible academic program. Examples of allowable costs include fees charged to take a licensing exam, costs of applying for and obtaining the license or certification, and, at the discretion of the school, costs incurred in traveling to a residency interview for a medical student. Under this provision, the costs must be incurred during (not after) a period of enrollment, even if the exam is after the end of the period. You may include costs of attending a required conference, but only if these costs are included in the standard cost of the program for which the conference is required. Including these costs does not require exercising professional judgment, as they will be included as a cost of the program for all students in the program.

On page 3-47, in discussing limitations to the tuition and fees component, the FSA Handbook states, "You may not include in a student's COA the costs for a test prep class which is not part of the student's eligible program."

In addition, living expenses incurred after the student graduates are not considered part of the cost of attendance, since the student is no longer an eligible student, as required by 26 USC 221(d)(1)(C).

Thus, neither professional licensing fees nor living expenses while studying for the bar are part of the applicable cost of attendance.

**School certification of the CitiAssist Bar Loan is irrelevant, as bar study loans cover expenses incurred and paid after the student has graduated and these expenses are not part of a college's cost of attendance.**

26 USC 221(d)(1)(C) limits qualified education loans to "indebtedness incurred by the taxpayer solely to pay qualified higher education expenses … which are attributable to education furnished during a period during which the recipient was an eligible student." Eligible student is defined at 26 USC 221(d)(3) in terms of the definition at 26 USC 25A(b)(3), which requires the student to be enrolled on at least a half-time basis in a degree or certificate program at an institution of higher education.  A student who has graduated is no longer enrolled in degree or certificate program at an institution of higher education.

Defendant Firstmark concedes this point in a footnote on page 17 of the Memorandum, but inexplicably asks the Court to ignore the statutory language. Yet, Congress was very clear that post-1997 changes were not to be considered in defining the cost of attendance.[9]

Therefore, these expenses are not qualified higher education expenses within the scope of the definition at 26 USC 221(d)(2).

The borrower's agreement in the promissory note to use the loan proceeds for tuition and other educational expenses does not thereby make the loan a qualified education loan, as it flies in the face of the nature of a bar study loan in general and the CitiAssist Bar Loan in particular to cover expenses that are incurred after the student **is no longer enrolled in an institution of higher education** and no longer

---

[9] Congress clearly intended to exclude subsequent changes to the definition of cost of attendance. If they had intended otherwise, then they would not have included this language in the statute, language that the Defendant would like to ignore.

This language is mirrored in the regulations at 26 CFR 1.221-1(e)(2) and 26 CFR 1.221-2(f)(2).

As further evidence that this language was intentional, consider that the Taxpayer Relief Act of 1997 (P.L. 105-34) adopted a different definition of qualified higher education expenses in Section 203(b), *Penalty-Free Withdrawals from Individual Retirement Plans for Higher Education Expenses*, and Section 213, *Education Individual Retirement Accounts*, than it adopted in Section 202, *Deduction for Interest on Education Loans*. Sections 203(b) and 213 defined qualified higher education expenses in terms of the definition at 26 USC 529(e)(3) and not 20 USC 1087ll.

An earlier version of the legislation defined qualified higher education expenses for the student loan interest deduction in terms of 26 USC 529(e)(3), but this was subsequently replaced with the reference to 20 USC 1087ll in the enrolled legislation. Note that the Taxpayer Relief Act of 1997 also changed the definition of qualified higher education expenses in 529(e)(3), in Section 211 of the law. This not only demonstrates that the definition of qualified higher education expenses was a specific focus of the law, but also that the legislators who drafted the language for the student loan interest deduction were keen on excluding any changes to the definition that were then under consideration.

paying for qualified higher education expenses. A bar study loan cannot be made a qualified education loan by declaring it to be a qualified education loan. It must satisfy the statutory requirements, which the CitiAssist Bar Loan does not. If a dog quacks like a duck, it is still a dog.

On page 18 of Citibank N.A.'s Responses to Written Questions, Citibank N.A. states that Penn's Financial Aid Office made the following statement concerning ███████████████████████████



In addition, school certified loans are paid to the college, not direct to the consumer.

The fact that the CitiAssist Bar Study Loan was not used to pay for qualified education expenses is confirmed by statements the Defendants have made in their motion. On page 18 of the Memorandum, they argue that food, rent and other life expenses are

> *expressly provided for within UPenn Law School's standard $59,660 cost of attendance, which includes allowances for room, board, and "miscellaneous personal expenses."*

UPenn Law School did not certify that the bar study loan plus other aid fell within the cost of attendance, but rather that the bar study loan was within the lender's aggregate loan limit. Moreover, these expenses were incurred after Ms. Golden was no longer enrolled at UPenn Law School and therefore were not "attributable to education furnished during a period during which the recipient was an eligible student" as required by 26 USC 221(d)(1)(C).

In addition, page 18 of the Memorandum implies that the BARBRI bar preparation course is a qualified higher education expense. But, the BARBRI bar preparation course is not offered by "an eligible educational institution" as required by 26 USC 221(d)(2).

On page 159 of her deposition, Elaine Varas confirmed that **"The cost of attendance was not used by Penn Law to calculate loan eligibility for graduating students who received the bar loans."** She also confirmed that the bar loan is "a private loan, which is a loan that is strictly between the lender and the student, and the only thing that the institution may need to do is verify enrollment." She added that bar study loans and residency and relocation loans "are not educational loans because that piece does not happen during their education. It happens after their education or it's a requirement after their education." She agreed that "it would be inconsistent with the nature of the loan to certify a private loan for needs they have after graduation … as within the cost of attendance because they're no longer attending."

# V. Incorrect Characterization of IRS Reporting Requirements

On page 23 of the Memorandum, Defendant claims that

> *The Internal Revenue Service (the "IRS")—the government agency tasked with interpreting, applying, and enforcing Section 221 of the Internal Revenue Code—has likewise endorsed the purpose of the loan test by permitting student loan creditors to rely on borrowers' self-certifications when determining whether a particular loan is a "qualified education loan." Specifically, IRS regulations governing student loan creditors' duty to report amounts of interest paid on "qualified education loans" describe the accepted process for creditors to "request a certification from the [borrower] that the loan will be used solely to pay for qualified education expenses." 26 C.F.R. 1.6050S-2(e)(2).*

Note that the correct regulatory citation is 26 CFR 1.6050S-3(e)(2), not 26 CFR 1.6050S-2(e)(2).

Defendant fails to note that the cited regulations limit the determination of whether a loan is a qualified education loans to IRS reporting requirements. These regulations do not address whether a loan is a qualified education loan for the purposes of 26 USC 221(d) or the regulations at 26 CFR 1.221-1 and 26 CFR 1.221-2.

The full text of 26 CFR 1.6050S-2(e)(2) is as follows (emphasis added):

> Qualified education loan certification. If a loan is not subsidized, guaranteed, financed, or is not otherwise treated as a student loan under a program of the Federal, state, or local government or an eligible educational institution, a payee must request a certification from the payor that the loan will be used solely to pay for qualified higher education expenses. A payee may use Form W-9S, "Request for Student's or Borrower's Social Security Number and Certification," to obtain the certification. A payee may establish an electronic system for payors to submit Forms

> W-9S electronically as described in applicable forms and instructions. A payee may also develop a separate form to obtain the payor certification or may incorporate the certification into other forms customarily used by the payee, such as loan applications, provided the certification is clearly set forth. **If the certification is not received, the loan is not a qualified education loan for purposes of section 6050S and this section.**

The highlighted language limits the discussion of a qualified education loan certification to the purposes of section 6050S, that is, deductibility from income for tax purposes. Note also that the cited regulation specifies when a loan *is not* a qualified education loan and does not affirmatively specify when a loan *is* a qualified education loan.

# VI. Reductions in Qualified Higher Education Expenses Are Not Limited to Tax-Free Education Benefits

On page 26 of the Memorandum, Defendant claims that

> *Thus, Plaintiff's proposed method of calculating a qualified higher education expenses contravenes the text of Section 221(d) of the Internal Revenue Code. Contrary to Plaintiff's suggestion, when calculating qualified higher education expenses, cost of attendance is not offset by amounts received in student loans, non-qualified scholarships, and other forms of "financial assistance" not enumerated in Section 221(d)(2)(A) and (B). Instead, adhering to the letter of Section 221(d), qualified higher education expenses must be calculated by reducing cost of attendance by only five narrow categories of non-taxable income.*

26 USC 221(d)(1) defines a qualified education loan as "indebtedness incurred by the taxpayer solely to pay for qualified higher education expenses." 26 USC 221(d)(2) defines qualified higher education expenses in terms of the definition of cost of attendance in the Higher Education Act of 1965, as of August 4, 1997, reduced by five categories of tax-free financial assistance.

The purpose of the reduction in 26 USC 221(d)(2) is to prevent double-dipping for tax purposes, so that the taxpayer cannot receive two or more education tax benefits based on the same qualified education expenses. Such coordination restrictions are common throughout the Internal Revenue Code. So, it is not surprising that the reductions in the cost of attendance would specify just other tax-free education tax benefits.

But, this does not preclude subtracting other financial aid and other types education benefits, including taxable education benefits, from the qualified higher education expenses when determining whether a private student loan is qualified. The subtraction of other scholarships, grants and loans comes from 26 USC 221(d)(1). Specifically, 26 USC 221(d)(1) limits qualified education loans that are used "**solely** to pay qualified higher education expenses" (emphasis added). If a qualified education loan, in combination with other financial aid, exceeds the cost of attendance as reduced by 26 USC 221(d)(2)(A) and (B), it cannot have been incurred solely to pay for qualified higher education expenses.

February 2, 2021

For example, the cost of attendance includes room and board. If a student receives a non-qualified scholarship to pay for room and board, the student cannot also use a private student loan to pay for room and board. The student can't pay for the same expenses twice. If the student's qualified higher education expenses are already paid for by "federal loans, financial assistance and scholarships and any school-certified loans made prior", then there are no qualified expenses left to be paid by the private student loan.

Similarly, if the student received a student loan and a work-study job, following Example 5 in the regulations at 26 CFR 1.25A-5(c)(4), the education loan and work-study wages are not subtracted from the cost of attendance in 26 USC 221(d)(2), when determining the amount of qualified higher education expenses. Rather, the education loan and work-study wages are subtracted from the qualified higher education expenses in 26 USC 221(d)(1) when determining if a private student loan satisfies the requirements for it to be considered a qualified education loan, specifically, that it is less than the remaining qualified higher education expenses.

This is why a private student loan that exceeds cost of attendance minus other aid is non-qualified, since the excess cannot be used to pay for qualified higher education expenses and therefore the loan is not incurred *solely* to pay for qualified higher education expenses.

# VII. Conclusion

As discussed above, the Memorandum is flawed in numerous respects.

I. First, a college's "estimated cost" is not necessarily (and, in Ms. Golden's case, is not) the same as the "cost of attendance" which is defined by the statute.
II. Second, the definition of qualified higher education expenses for the purpose of determining whether a loan is a qualified education loan refers to the statutory definition of cost of attendance, which may be individualized only according to the student's course of study and choice of the three room and board budgets. All other applicable components of the cost of attendance are specified as allowances or estimates and not as actual expenses. ████████████
████████████████████████████████████████████████████████████████████████████████
The definition of qualified higher education expenses does not refer to the authority of college financial aid administrators to make adjustments to the cost of attendance.
III. Third, it is private student loan lenders – not college financial aid administrators – that bear the responsibility of determining whether a loan is a qualified education loan.
IV. Fourth, school certification is not established as a safe harbor in law or regulation with regard to the determination of whether a loan is a qualified education loan.
V. Fifth, bar study loans are not qualified education loans because the borrower is not enrolled on at least a half-time basis in a degree or certificate program at an institution of higher education and a bar study loan pays for expenses that are not part of a college's cost of attendance.

VI. Sixth, Defendants' Memorandum relies on the current definition of "cost of attendance" rather than the statutory definition as enacted in 1997, which excludes the cost of professional licensing or certification.
VII. Seventh, the Defendants' Memorandum incorrectly characterizes IRS reporting requirements as determining whether a loan is a qualified education loan for purposes other than the reporting requirements.
VIII. Lastly, the Defendants' Memorandum incorrectly excludes several types of financial aid from the determination of whether a loan was used solely to pay for qualified higher education expenses.

# Qualifications

I am President of Cerebly, Inc. (formerly MK Consulting, Inc.), a consulting firm focused on computer science, artificial intelligence and statistical and policy analysis. Cerebly's clients have included the Advisory Committee on Student Financial Assistance (ACSFA), a committee established by Congress to advise it on student financial aid policy. Cerebly, Inc. also publishes the web site PrivateStudentLoans.guru, among several other web sites.

In the last four years, I have testified or given a deposition in the following cases:

- Eric Eberts v. Deborah R. Eberts (Case No. 07-FA-450, State of Wisconsin Circuit Court, Winnebago County Branch IV). This testimony concerned the definition of qualified higher education expenses for 529 college savings plans. The definition of qualified higher education expenses for 529 plans is defined in the Internal Revenue Code of 1986 at 26 USC 529(e)(3)(A) as including tuition, fees, books, supplies, and equipment, expenses for special needs services, expenses for the purchase of a computer, peripheral equipment, computer software and internet access, as well as room and board for students who are enrolled on at least a half-time basis. This definition differs from the definition of the cost of attendance in the Higher Education Act of 1965 at 20 USC 1087ll, which also includes the cost of transportation, miscellaneous personal expenses, dependent care costs, cooperative education program costs, study abroad expenses, loan fees and the cost of first-professional licensing and certification.
- Evan Brian Crocker, et al. v. Navient Solutions, LLC, et al. (Case No. 15-35586(DRJ), U.S. Bankruptcy Court, Southern District of Texas, Houston Division). This testimony concerned the definition of qualified education loans.

Until October 31, 2020, I was Publisher and Vice President of Research for Saving for College, LLC. Savingforcollege.com is the most popular web site about saving and paying for college. Savingforcollege.com includes 564 articles about student loans, all of which I either wrote or edited.

Before serving as Publisher and VP of Research for Savingforcollege.com, I was Publisher and Vice President of Strategy for Cappex.com LLC from 2016 to 2017. Cappex.com is a free consumer-facing web site about college admissions and financial aid.

February 2, 2021

Before serving as Publisher and VP of Strategy for Cappex.com, I was Senior Vice President and Publisher of Edvisors Network, Inc. from 2013 to 2015. Edvisors Network, Inc. publishes several consumer-facing web sites, including Edvisors.com, ScholarshipPoints.com and PrivateStudentLoans.com.

Before serving as Senior Vice President and Publisher of Edvisors Network, Inc., I was VP of Advanced Projects for Monster Worldwide and Publisher of FinAid, Fastweb and other consumer-facing web sites owned by Monster Worldwide, from 2001 to 2013. I founded FinAid in 1994. FinAid and Fastweb merged in 2009 and were acquired by Monster Worldwide in 2001

I have also previously worked as a Research Scientist for Just Research, a Software Engineer for the MIT AI Laboratory, a Software and Digital Typography Consultant in the Advanced Development Group of Bitstream Inc., and an Assistant Programmer Analyst for the Planning Research Corporation.

I served on the editorial board of the Journal of Student Financial Aid from 2011 to the present. I served on the editorial board of the Council on Law in Higher Education from 2004 to 2011. I was a member of the board of directors of the National Scholarship Providers Association from 2009 to 2015 and am still a member of the research and advocacy committees.

I discovered the early repayment status loophole, which allowed millions of students to consolidate their federal student loans while they were still in school in May 2005, saving them billions of dollars of interest over the life of their loans.

I was involved in the design of income-based repayment (IBR) and public service loan forgiveness, which were enacted by Congress as part of the College Cost Reduction and Access Act of 2007 [P.L. 110-84]. In particular, I developed a parametrized calculator that allowed policymakers to explore various options in the design of these repayment plans. I was nominated for the Above & Beyond Citizen Honors of the Congressional Medal of Honor Society for this work in 2008, and named the Pennsylvania Finalist.

I reported on the possibility of a contagion effect from the subprime mortgage credit crisis to student loans in early 2007, long before most people recognized the existence of the subprime mortgage credit crisis. I began tracking lenders leaving federal and non-federal student loan programs in July 2007 and started publishing a list of loan program exits and lender layoffs in August 2007.[10] I published a white paper, *Solving the Student Loan Credit Crunch*, in March 2008 and testified before the Senate Banking Committee in April 2008, leading to passage of the Ensuring Continued Access to Student Loans Act of 2008 [P.L. 110-227]. This helped avert a complete meltdown of the student loan industry.

I was the first to report that student loan debt outstanding had exceeded credit card debt for the first time in 2010, auto loan debt in 2011 and reached the $1 trillion mark in 2012.

I have been quoted in more than 10,000 newspaper and magazine articles and have written for the *New York Times, Wall Street Journal, Washington Post, Reuters, Huffington Post, U.S. News & World Report, Money Magazine, Bottom Line/Personal, Forbes, Newsweek* and *Time Magazine*. I was named a Money Hero by *Money Magazine* in 2012. I served as the curator for the Student Loans Topics Page for the *New York Times* from 2009 to 2010. I served as the Student Loan Guru for FiLife.com, a Dow Jones/IAC property, from 2008 to 2010. I have served on the editorial advisory board of various

---

[10] http://www.finaid.org/loans/lenderlayoffs.phtml

February 2, 2021

Boardroom Inc. publications, such as Bottom Line/Personal and Bottom Line/Wealth, from 2008 to the present. I am a Quora Top Writer with more than 4 million answer views on Quora.

I am the author of five bestselling books about student financial aid, including *How to Appeal for More College Financial Aid, Twisdoms about Paying for College*, *Filing the FAFSA* and *Secrets to Winning a Scholarship*. Two of these books won Excellence in Financial Literacy Education (EIFLE) Awards from the Institute for Financial Literacy.

I hold seven patents involving novel statistical methods and their applications, including patents for spelling and grammar correction, affect analysis, language identification, plagiarism detection, statistical text summarization and optimizing the scheduling of diagnostic tests for cancer screening and post-treatment follow-up. A patent application about improving the effectiveness of investment glide paths is still pending.

I have testified before Congress, federal/state agencies and national professional organizations about student loan debt on several occasions, including:

- *Trends in Student Loan Debt*, Keynote Address, NAGTRI/SABA Bankruptcy Seminar, National Association of Attorneys General (NAAG), November 14, 2017.
- *Pay Me Now or Pay Me Later*, College Savings Plan Network Conference, National Association of State Treasurers (NAST), May 13, 2015.
- *The Challenge of Rising Student Loan Debt*, California Student Aid Commission, Symposium on Student Debt, November 14, 2014.
- U.S. Senate Committee on Banking, Housing and Urban Affairs, hearing entitled *Turmoil in U.S. Credit Markets: Impact on the Cost and Availability of Student Loans*, April 15, 2008. My testimony and white paper lead to passage of the Ensuring Continued Access to Student Loans Act of 2008 (P.L. 110-227 and 110-359).

I have written more than 150 student aid policy analysis papers (available at www.studentaidpolicy.com), including several about student loans, such as:

- *Student Loan Debt Causes Delays in Achieving Major Financial Goals*, June 28, 2019.
- *Growth in student loan debt at graduation slows as borrowers hit loan limits,* June 29, 2018.
- *Who Graduates College with Six-Figure Student Loan Debt?,* August 1, 2012.
- *Characteristics of College Students Who Graduate with No Debt*, August 24, 2011.
- *Improving Borrower Satisfaction and Compliance by Adopting a Better Communication Strategy*, December 23, 2010.
- *Relationship of Default Rates to Debt and Income*, August 17, 2010.
- *Calculating the Contribution of Demographic Differences to Default Rates*, April 5, 2010.
- *Parent PLUS Loan Denial Rates in the FFEL and Direct Loan Programs*, August 31, 2009.
- *Characteristics of Private Student Loan Borrowers Who Do Not Use Federal Education Loans*, June 7, 2009.
- *Analysis and Evaluation of Iowa Student Loan Practices*, September 19, 2008. (Report prepared at the request of the Iowa Attorney General, Thomas J. Miller.)
- *Solving the Student Loan Credit Crunch*, March 10, 2008.

February 2, 2021

- *Impact of the Bankruptcy Exception for Private Student Loans on Private Student Loan Availability*, August 14, 2007.

I have won numerous awards, including Distinguished Speaker from the National Scholarship Providers Association (NSPA), College Financing Ace from *Investment Advisor Magazine*, Excellence in Financial Literacy Education (EIFLE) from the Institute for Financial Literacy, Money Hero from *Money Magazine*, Creative Leadership Award from the California Association of Student Financial Aid Administrators (CASFAA), Special Award from the College Board, the Jefferson Medal from the American Institute for Public Service and a Meritorious Achievement Award from the National Association of Student Financial Aid Administrators (NASFAA).

Profiles of me written by journalists include:

- Bernice Napach, [Mark Kantrowitz: College Financing Ace — The 2016 IA 25](#), Investment Advisor Magazine, May 24, 2016.
- Steve Rosen, [Expert discusses the rising cost of college and student loan debt](#), Kansas City Star, May 29, 2015.
- Beckie Supiano, [Everybody's Go-To Methodical Mind](#), Chronicle of Higher Education, July 15, 2013.
- Jane J. Kim, [Student-Loan Gadfly Gets a Starring Role as the U.S. Pushes Out the Private Lenders](#), Wall Street Journal, July 3, 2010.

I earned two Bachelor of Science degrees from the Massachusetts Institute of Technology in 1989, one in mathematics and one in philosophy, and a Master of Science degree in computer science from Carnegie Mellon University in 1991. I am an alumnus of the Rickover Science Institute (RSI) in 1984.

_____
Signature (Mark Kantrowitz, President, Cerebly Inc.)