**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Golden,<br><br>                    Debtor. | **Chapter 7**<br><br>**Case No. 16-40809 (ESS)** |
| Tashanna B. Golden f/k/a Tashanna B. Pearson,<br><br>                    Plaintiff,<br><br>          v.<br><br>National Collegiate Student Loan Trust 2006-4, GS2 2016-A, Pennsylvania Higher Education Assistance Authority d/b/a American Education Services and Firstmark Services,<br><br>                    Defendants. | **Adv. Pro. No. 17-1005 (ESS)** |

**TRUST DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

LOCKE LORD LLP
200 Vesey Street, 20th Floor
New York, New York 10281

*Attorneys for Defendants*
*National Collegiate Student Loan Trust 2006-4*
*and Goal Structured Solutions Trust 2016-A*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS .................................................................................... 3

ARGUMENT ......................................................................................................... 5

I.     The Proposed Class Is Not Ascertainable. ...................................................... 7

     A.     Mini-Trials Are Necessary To Determine Who Is  (And Is Not) A Member Of The Proposed Class ............................................................. 9

          1.     "Cost Of Attendance" Is A Student-Specific Number  And Requires Individualized Inquiries. ........................................... 10

               a.     Section 1087*ll* Makes Clear That  "Cost Of Attendance" Is Individualized. .............................................. 10

               b.     The Testimonial Evidence Confirms That Every Student Has An Individual "Cost Of Attendance." .................................. 13

          2.     Student-Specific Analysis Is Also Required To  Calculate A Student's Loans And Scholarships. .......................................... 14

     B.     Plaintiff's Proposed Method For Ascertaining Who Is In The Putative Class Relies On A Mischaracterization Of Both The Law And The Facts. ........ 18

          1.     Plaintiff Misstates The Law And Shifts Rule 23's Burdens. .................... 18

          2.     Plaintiff Tries To Manipulate What "Cost Of Attendance" Means And Misrepresents What Information Exists About It. ........................... 19

               a.     Plaintiff Denies The Individualized  Nature Of "Cost of Attendance." .................................................. 20

               b.     Plaintiff Misrepresents What Makes Up  A Student's "Cost Of Attendance." .................................................. 22

               c.     Plaintiff Mischaracterizes What IPEDS Is. .................................. 24

          3.     Plaintiff Mischaracterizes The Information Available. ........................... 27

II.     Plaintiff Does Not Satisfy The Express Requirements Of Rule 23(a). ............................. 29

     A.     Plaintiff Fails The Typicality And Adequacy Requirements Of Rule 23(a)(3) and (4); She Is Not A Member Of Her Own Proposed Class. ............... 29

          1.     The NCT Loan ........................................................................ 31

**PAGE**

2.      CitiAssist Grad./Prof. Loan................................................................... 34

3.      The Bar Loan ........................................................................................ 34

B.      Plaintiff Fails The Commonality Requirement Of Rule 23(a)(2). ........................ 35

C.      Plaintiff Does Not Establish Numerosity Under Rule 23(a)(1). ........................... 37

III.    Plaintiff's Proposed Class Does Not Meet The Requirements Of Rule 23(b)................. 38

A.      Plaintiff Does Not Meet The Requirements For A  Damages Class Under
        23(b)(3). ................................................................................................................ 38

1.      Individualized Questions Of Law And Fact Predominate. ....................... 39

a.      Every Potential Plaintiff Has A Different  "Cost Of
        Attendance" And Loan Stack......................................................... 40

b.      Each Loan's Tax And Bankruptcy Treatment Will  Impact
        Whether They Are Qualified Loans............................................... 42

c.      Whether Or Not A Loan Was Guaranteed Informs
        Whether It Even Matters If It Was Qualified................................ 44

2.      A Class Action Is Not Superior To Other Available Methods For
        Pursuing Claims Against Defendants. ...................................................... 45

a.      Plaintiff's Proposed Class Action Is Not Administratively
        Feasible. ........................................................................................ 46

b.      Individual Plaintiffs Have An Interest In Controlling Their
        Own Cases. .................................................................................... 48

B.      Plaintiff Does Not Meet The Requirements For An Injunction/Declaratory
        Relief Class Under 23(b)(2)................................................................................... 49

C.      Plaintiff Does Not Meet The Requirements For A "Prejudice Class" Under
        23(b)(1)(A)............................................................................................................ 51

CONCLUSION.........................................................................................................................53

# TABLE OF AUTHORITIES

PAGE

CASES

Adkins v. Morgan Stanley,
    307 F.R.D. 119 (S.D.N.Y. 2015) ................................................................. 35, 48

Albert v. Blue Diamond Growers,
    151 F. Supp. 3d 412 (S.D.N.Y. 2015) ............................................................ 50

Allee v. Medrano,
    416 U.S. 802 (1974) ....................................................................................... 35

Amchem Prods., Inc. v. Windsor,
    521 U.S. 591 (1997) ................................................................................ passim

Audet v. Fraser,
    332 F.R.D. 53 (D.Conn. 2019) ...................................................................... 40

Barnes v. American Tobacco Co.,
    161 F.3d 127 (3d Cir. 1998) ........................................................................... 50

Bell v. PNC Bank, Nat. Ass'n,
    800 F.3d 360 (7th Cir. 2015) ...................................................................... 6, 38

Bentley v. Verizon Business Global, LLC,
    No. 07-cv-9590-DC, 2010 WL 1223575 (S.D.N.Y. March 31, 2010) .............. 30, 35

Brecher v. Republic of Argentina,
    806 F.3d 22 (2d Cir. 2015) ...................................................................... passim

Brooks v. Roberts,
    251 F. Supp. 3d 401 (N.D.N.Y. 2017) ............................................................ 51

Brown v. Kelly,
    609 F.3d 467 (2d Cir. 2010) ....................................................................... 7, 38

Califano v. Yamasaki,
    442 U.S. 682 (1979) ........................................................................................ 5

Carollo v. United Capital Corp.,
    --- F. Supp. 3d ----, 2021 WL 11152947 (N.D.N.Y. Mar. 24, 2021) ...................... 52

Castano v. Am. Tobacco Co.,
    84 F.3d 734, 745 (5th Cir. 1996) ................................................................ 7, 46

Cent. States Southeast & Southwest Areas Health & Welfare Fund v.
    Merck–Medco Managed Care, L.L.C.,
    433 F.3d 181 (2d Cir. 2005) ........................................................................ 35, 50

**PAGE**

*Cohn v. Mass. Mut. Life Ins. Co.*,
  189 F.R.D. 209 (D. Conn. 1999) .................................................................. 46

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ............................................................................ 7, 37

*Conti v. Arrowood Indem. Co.*,
  No. 20-1597, 2021 WL 2637894 (June 28, 2021) ................................................ 18

*Demarco v. Edens*,
  390 F.2d 836 (2d Cir, 1968) .................................................................... 37

*Dodge v. Cty. of Orange*,
  103 Fed.Appx. 688 (2d Cir. 2004) ............................................................... 50

*Dunnigan v. Metropolitan Life Ins. Co.*,
  214 F.R.D. 125 (S.D.N.Y. 2003) ................................................................ 46

*East Tex. Motor Freight System, Inc. v. Rodriguez*,
  431 U.S. 395 (1977) ............................................................................ 30

*Easterling v. Collecto, Inc.*,
  692 F.2d 229 (2d Cir. 2012) .................................................................... 18

*Eisen v. Carlisle and Jacquelin*,
  417 U.S. 156 (1974) ............................................................................ 47

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ............................................................................. 7

*Gates v. Rohm & Haas Co.*,
  655 F.3d 255 (3d Cir. 2011) .................................................................... 51

*Gen. Tel. Co. of the Northwest v. EEOC*,
  446 U.S. 318 (1980) .......................................................................... 6, 36

*Gen. Tel. Co. of the Southwest v. Falcon*,
  457 U.S. 147 (1982) ............................................................................. 6

*Gulino v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*,
  No. 96-cv-8414-KMW, 2013 WL 4647190 (S.D.N.Y. Aug. 29, 2013) ................................. 35

*Hayes v. Wal-Mart Stores, Inc.*,
  725 F.3d 349 (3d Cir. 2013) .................................................................... 37

*Heerwagen v. Clear Channel Commc'ns.*,
  435 F.3d 219 (2d Cir. 2006) ................................................................. 30, 40

*Honda Motor Co. v. Oberg*,
  512 U.S. 415 (1994) ............................................................................ 48

iv

**PAGE**

*Huntley v. Law Office of Richard Clark, PLLC,*
    262 F.R.D. 203 (E.D.N.Y. 2009) ................................................................................. 37

*Hygh v. Jacobs,*
    961 F.2d 359 (2d Cir.1992) ....................................................................................... 20

*In re Desormes,*
    No. 10-cv-50079, 2012 WL 4106765 (Bankr. D. Conn. Sept. 18, 2012) ................................ 43

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
    574 F.3d 29 (2d Cir. 2009) ....................................................................................... 30

*In re Foreign Exch. Benchmark Rates Antitrust Litig.,*
    407 F. Supp. 3d 422 (S.D.N.Y. 2019) ........................................................................ 24

*In re IPO Sec. Litig.,*
    471 F.3d 24 (2d Cir. 2006) ......................................................................................... 6

*In re Literary Works in Elec. Databases Copyright Litig.,*
    654 F.3d 242 (2d Cir. 2011) ..................................................................................... 30

*In re Mallett,*
    625 B.R. 553 (Bankr. M.D. Fla. 2021) ....................................................... 42, 43, 49

*In re Murphy,*
    282 F.3d 868 (5th Cir. 2002) ................................................................................... 12

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
    827 F.3d 223 (2d Cir. 2016) ..................................................................................... 30

*In re Petrobras,*
    862 F.3d 250 (2d Cir. 2017) ............................................................................. *passim*

*In re Renshaw,*
    222 F.3d 82, 86 (2d Cir. 2000) ................................................................................ 18

*In re Rezulin Prod. Liab. Litig.,*
    210 F.R.D. 61 (S.D.N.Y. 2002) ............................................................................... 50

*In re Tingling,*
    990 F.3d 304 (2d Cir. 2021) .................................................................................... 18

*In re Visa Check/Mastermoney Antitrust Litig.,*
    280 F.3d 124 (2d Cir. 2001) .................................................................................... 40

*In re WorldCom, Inc.,*
    358 B.R. 585 (Bankr. S.D.N.Y. 2006) ............................................... 30, 34, 35, 50

**PAGE**

*Jeffries v. Pension Trust Fund of the Pension,*
  *Hospitalization & Benefit Plan of the Elec. Indus.*,
  172 F. Supp. 2d 389, 394 (S.D.N.Y. 2001)................................................................. 37

*Johnson v. Nextel Communications Inc.*,
  780 F.3d 128 (2d Cir. 2015)....................................................................................... 38

*Kamar v. Radio Shack Corp.*,
  375 Fed.Appx. 734 (9th Cir. 2010)............................................................................ 41

*Langbecker v. Elec. Data Sys. Corp.*,
  476 F.3d 299 (5th Cir. 2007) ..................................................................................... 24

*Laumann v. Nat'l Hockey League*,
  105 F. Supp. 3d 384 (S.D.N.Y. May 14, 2015) ......................................................... 50

*Marcial v. Coronet Ins. Co.*,
  880 F.2d 954 (7th Cir. 1989) ..................................................................................... 37

*Marcus v. BMW of N. Am., LLC*,
  687 F.3d 583 (3rd Cir. 2012) ..................................................................................... 37

*Mazzei v. Money Store*,
  288 F.R.D. 45 (S.D.N.Y. 2012) ................................................................................. 41

*Mielo v. Steak 'n Shake Operations, Inc.*,
  897 F.3d 467 (3d Cir. 2018)....................................................................................... 37

*Myers v. Hertz Corp.*,
  624 F.3d 537 (2d Cir. 2010)................................................................................. *passim*

*Nationwide Life Ins. Co. v. Haddock*,
  460 Fed.Appx. 26 (2d Cir. 2012)............................................................................... 49

*Newman v. RCN Telecom Servs., Inc.*,
  238 F.R.D. 57 (S.D.N.Y. 2006).................................................................................. 30

*Nicosia v. Amazon.com, Inc.*,
  84 F. Supp. 3d 142 (E.D.N.Y. 2015) ......................................................................... 50

*O'Brien v. First Marblehead Education Resources, Inc. (In re O'Brien)*,
  419 F.3d 104 (2d Cir. 2005)....................................................................................... 44

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ............................................................................................ 35, 50

*Parker v. Time Warner Entm't Co.*,
  331 F.3d 13 (2d Cir. 2003)......................................................................................... 46

**PAGE**

*Petrolito v. Arrow Fin. Servs., LLC,*
    221 F.R.D. 303 (D. Conn. 2004).............................................................. 52

*Phillips Petroleum Co. v. Shutts,*
    472 U.S. 797 (1985) .................................................................................. 5

*Randleman v. Fidelity Nat'l Title Ins. Co.,*
    646 F.3d 347 (6th Cir.2011) ................................................................... 41

*Roach v. T.L. Cannon Corp.,*
    778 F.3d 401 (2d Cir. 2015) .................................................................... 39

*Royal Park Investments SA/NV v. Deutsche Bank National Trust Company,*
    No. 14-cv-4394-AJN, 2018 WL 1750595 (S.D.N.Y. April 11, 2018) ....................................... 8

*Royal Park Invs. SA/NV v. Bank of New York Mellon,*
    No. 1:14-cv-6502-GHW, 2019 WL 652841 (S.D.N.Y. Feb. 15, 2019) ................................. 39

*Ruffo v. Adidas America, Inc.,*
    No. 15-cv-5989, 2016 WL 4581344 (S.D.N.Y. Sept. 2, 2016) ...................................... 6, 7, 29

*Russell v. Kohl's Department Stores, Inc.,*
    No. 15-cv-01143-RGK, 2015 WL 12748629 (C.D. Cal. Dec. 4, 2015) ................................... 52

*Schwarzschild v. Tse,*
    69 F.3d 293 (9th Cir.1995) ...................................................................... 47

*Scott v. Chipotle Mexican Grill, Inc.,*
    954 F.3d 502 (2d Cir. 2020) ............................................................. 38, 39, 40

*Spagnola v. Chubb Corp.,*
    264 F.R.D. 76 (S.D.N.Y. 2010).................................................................. 46

*Sparkman v. Zwicker & Assocs., P. C.,*
    374 F. Supp. 2d 293 (E.D.N.Y. 2005) ........................................................... 46

*Spread Enterprises, Inc. v. First Data Merchant Services Corp.,*
    298 F.R.D. 54 (E.D.N.Y. 2014).................................................................. 41

*Sullivan v. Saint-Gobain Performance Plastics Corporation,*
    No. 5:16-cv-125, 2019 WL 8272995 (D. Vt. Aug. 23, 2019) .................................... 51

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,*
    546 F.3d 196 (2d Cir. 2008) ........................................................... 6, 7, 8, 38

*Tennessee Student Assistance Corp. v. Hood,*
    541 U.S. 440 (2004) ............................................................................ 18

*Tyson Foods, Inc. v. Bouaphakeo,*
    577 U.S. 442 (2016) ......................................................................... 36, 39

PAGE

*Vengurlekar v. Silverline Technologies, Ltd.*,
   220 F.R.D. 222 (S.D.N.Y. 2003) ....................................................................... 30

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) ............................................................................. 39

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................................ *passim*

*Weiner v. Snapple Beverage Corp.*,
   No. 07-cv-8742-DLC, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010). ................................. 8, 10

*Young Advocates for Fair Education v. Cuomo*,
   359 F. Supp. 3d 215 (E.D.N.Y. 2019) .................................................................. 50

STATUTES

11 U.S.C. § 523(a)(8)................................................................................... *passim*

20 U.S.C. § 1087*ll*..................................................................................... *passim*

20 U.S.C. § 1232f ............................................................................................ 41

26 U.S.C. § 221........................................................................................... *passim*

28 U.S.C. § 2072 ............................................................................................. 48

29 U.S.C. § 213 ............................................................................................... 17

OTHER AUTHORITIES

FED. R. CIV. P. 23 Advisory Committee Notes,
   1966 Amendment, 28 U.S.C.A. Rule 23, at 385. ...................................................... 45

Newberg on Class Actions § 4:34 ........................................................................... 50

Pub. L. 109–171, §8016(2)–(4)............................................................................. 22

Evan M. Tager, *The Constitutional Limitations on Class Actions*,
   Mealy's Litig. Rpt.: Class Actions, January 2001 ................................................... 48

RULES

FED. R. CIV. P. 23 ...................................................................................... *passim*

REGULATIONS

26 C.F.R. § 1.221–1 ......................................................................................... 42

29 C.F.R. § 541.2 ........................................................................................... 17

Defendants National Collegiate Student Loan Trust 2006-4 and Goal Structured Solutions Trust 2016-A, incorrectly sued as GS2 2016-A, (collectively, the "Trust Defendants") submit this Memorandum of Law in Opposition to Plaintiff Tashanna Golden's Motion for Class Certification (the "Motion"):[1]

## PRELIMINARY STATEMENT

This putative class action involves Plaintiff's sweeping allegations that Defendants have systematically and unlawfully sought to collect on certain student loans that should have been discharged in bankruptcy because the loans exceeded the borrowers' "costs of attendance" at the institutions they attended. As a result, Plaintiff contends, the loans were not "qualified education loans" and were not exempt from discharge under Bankruptcy Code Section 523(a)(8)(B). Plaintiff now asks the Court to certify the following litigation class:

> Individuals who received private loans owned, held, or serviced by Defendants which were not within the cost of attendance at Title IV institutions as defined in 26 U.S.C. § 221(d); who obtained bankruptcy discharges after October 17, 2005; who were subsequently subjected to Defendants' acts to collect on the loans; and who have not reaffirmed their loans.

(Pl. Br., p. 6).[2] She claims certification is proper under Federal Rules of Civil Procedure 23(b)(1)(A), Rule 23(b)(2), or Rule 23(b)(3). (*Id.* at p. 8).

The Court should deny Plaintiff's motion because Plaintiff fails to demonstrate that her proposed class meets even the threshold requirements of Rule 23(a), much less the heightened requirements of any subsection of Rule 23(b).

*First*, Plaintiff fails to define an ascertainable class of student borrowers on whose behalf she would pursue these claims. Her class definition turns on "cost of attendance," an amount that

---

[1] In addition to the arguments raised below, the Trust Defendants adopt and incorporate by reference the arguments and statements of fact set forth by co-defendants in their respective oppositions to the Motion.

[2] References to "Pl. Br." are to Plaintiff's Memorandum of Law in Support of Her Motion for Class Certification, Dkt. 255.

is individualized for every student borrower. In order to determine any student borrower's "cost of attendance," the Court and the parties will need to undertake a series of mini-trials and make a series of individual determinations on a borrower-by-borrower basis. The same type of inquiry will then need to be made to determine whether a borrower has a loan that exceeded his or her "cost of attendance" and, if so, which loan. These investigations must be done before a borrower can even be identified as a member of the proposed class. Despite three years of discovery and contested litigation, the parties still dispute whether Plaintiff herself has a loan that exceeded her applicable "cost of attendance" – a number that Plaintiff has not calculated consistently.

Plaintiff's attempts to convince the Court otherwise wither under scrutiny. Her claim that all student loans are presumptively discharged in bankruptcy and that Defendants need to prove a debtor's loan was not discharged is legally incorrect. In fact, student loans are presumptively non-dischargeable. Plaintiff is improperly trying to shift the burden to Defendants to prove who is not in the class instead of carrying her burden, imposed by Rule 23, to properly define who is.

Plaintiff also fails in her attempts to manufacture common sources of information about "cost of attendance" and individual student borrowers' loan details. The supposed "cost of attendance" information Plaintiff points to does not in fact reflect what "cost of attendance" actually is. The common loan information Plaintiff claims exists, does not. And, she provides nothing more than her unsubstantiated assertions as support that it does.

*Second*, Plaintiff does not satisfy the explicit requirements of Rule 23(a). Plaintiff fails to demonstrate that she would adequately represent the class. Plaintiff does not demonstrate that she has a loan that exceeded her "cost of attendance," which means that she does not demonstrate that she is a member of her own proposed class. And, because it will require mini-trials to determine who is a potential class member, there are no common issues. Plaintiff fails even to demonstrate

that the class as she has defined it – borrowers with loans that exceeded their individual "cost of attendance" – is sufficiently numerous.

*Third*, the proposed class does not fit within any subsection of Rule 23(b).

Rule 23(b)(3) is not applicable because individualized questions predominate. These questions include not just those relating to "cost of attendance" and what loans a potential class member had, but also questions relating to individual borrowers' tax and bankruptcy treatment of their loans and whether or not a specific loan is non-dischargeable under other provisions of Section 523(a)(8). It also means that class treatment is not superior. The ramifications of the answers to some of these questions demand that individual borrowers have the ability to control their own cases.

Rule 23(b)(2) is also not satisfied. The main thrust of Plaintiff's case is money damages. Plaintiff herself does not have standing to seek an injunction. And, because there are no common issues, the class is not cohesive in a way that permits an injunction class.

Nor can a class be certified under Rule 23(b)(1). Again, the case seeks restitution and money damages, which precludes this type of class. The proposed class is also rife with individual issues. Plaintiff's request to certify under Rule 23(b)(1) is a clear attempt to end run the obvious individualized questions that are present everywhere in this case.

For these reasons certification is unwarranted and Plaintiff's motion must be denied.

## STATEMENT OF FACTS

Plaintiff attended the University Pennsylvania Carey School of Law ("Penn Law School") between 2005 and 2008. (Declaration of Tashanna Golden ("Golden Decl."), Dkt. No. 247, ¶ 2). To finance her education, Plaintiff took out a number of private and federal education loans each year. (Amended Complaint ("Am. Compl."), Dkt. No. 32, ¶¶ 29-30, 36-37). Plaintiff also received various grants and scholarships during the course of her time in law school. (*Id.*, ¶¶ 29, 36).

Plaintiff alleges that three of her private education loans she exceeded her "cost of attendance" for Penn Law School during academic years 2006-07 and 2007-08. (*Id.*, ¶¶ 30, 36-37).

Those three loans are:

- $6,500 from JPMorgan Chase for academic year 2006-07, which totalled $7,103 once fees were included (the "NCT Loan").

- $583 from Citibank for academic year 2007-08 (the "CitiAssist Grad./Prof. Loan").

- $11,000 from Citibank in February 2008 to pay for the costs of her preparation for the bar examination (the "CitiAssist Bar Loan").[3]

In 2017, Plaintiff filed this adversary proceeding, alleging that these loans were discharged in bankruptcy because with her federal loans and scholarships they exceeded the cost of attendance for Penn Law School and are therefore not "qualified education loans." (*Id.*).

As it concerns Plaintiff, and her Penn Law School loans, she alleges that the cost of attendance for the 2006-07 academic year was $53,500. (*Id.* at ¶ 28). In her declaration in support of her motion for summary judgment, she states that the cost of attendance for that year was $48,464. (Golden Decl., ¶ 3). Penn Law School reports that its average Estimated Student Budget, which it equates to "cost of attendance," for academic year 2006-07 was $56,380. (Ex. G, ¶ 5).[4]

So far as her 2006-07 federal loans, Plaintiff alleges in her Amended Complaint and repeats in her declaration that she obtained $27,500 in federal loans. (Am. Compl., ¶ 29; Golden Decl., ¶ 4). But, Penn Law School's records show that she only borrowed $24,500 in federal loans. (Ex. F). Plaintiff also alleges in her Amended Complaint that she received $22,440 in scholarships and grants for academic year 2006-07. (Am. Compl., ¶ 29). But, she states in her Declaration that she

---

[3] These loans are described in greater detail in the Trust Defendants' Memorandum in Opposition to Plaintiff's Motion For Partial Summary Judgment. (*See* Dkt. No. 336, pp. 3-8). The Trust Defendants incorporate those descriptions by reference here.

[4] Citing references to "Ex.__" refer to the exhibits attached to the Declaration of Gregory T. Casamento, dated June 29, 2021, submitted in support of this memorandum.

received $21,640 in scholarships and grants. (Golden Decl., ¶ 4). Penn Law School's records reflect that Plaintiff in fact received $19,440. (Ex. F).

For the 2007-08 academic year Plaintiff alleges Penn Law School's cost of attendance was $56,380. (Am. Compl., ¶ 35). Plaintiff's declaration is silent regarding the 2007-08 cost of attendance. But, again, Penn Law School reports a materially higher number: $59,660. (Ex. G, ¶ 6). Plaintiff alleges in her Amended Complaint that she borrowed "$52,347 from the federal government in student loans and received another $12,850 in scholarships and grants" in 2007-08. (Am. Compl., ¶ 36). Although Plaintiff's declaration is silent about her 2007-08 federal loans, scholarships and grants, Penn Law School's records show she had received $26,500 in federal loans and $12,150 in grants and scholarships that academic year. (Ex. F). Plaintiff alleges that she was never issued a 1098-E tax form to deduct the interest payments made on any of the above-referenced private student loans. (Am. Compl., ¶ 38). However, for 2013 to 2016, the four years leading up to this suit Plaintiff took substantial deductions pursuant to IRS Code Section 221. (*See* Ex. A). Plaintiff does not recall which student loans those deductions were tied to, but, when asked directly, she cannot not deny that the deduction was claimed on one or more of the three loans at issue here. (*Id.*).

## ARGUMENT

Class action lawsuits are an exception to the general rule "that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–701 (1979)). As such, they implicate numerous due process concerns for both the putative class members and the defendants. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 806-14 (1985).

Rule 23 ensures that these risks, for both groups, are minimized by imposing certain requirements for certification. A plaintiff must demonstrate that she and the proposed class meet

all the requirements of Rule 23(a), and at least one of the requirements of Rule 23(b), before a class may be certified. *Dukes*, 564 U.S. at 345; *see also Gen. Tel. Co. of the Northwest v. EEOC*, 446 U.S. 318, 330 (1980); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201-202 (2d Cir. 2008); *In re IPO Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006); *Ruffo v. Adidas America, Inc.*, No. 15-cv-5989, 2016 WL 4581344, at *1 (S.D.N.Y. Sept. 2, 2016).

Rule 23(a) imposes four requirements. *See* FED. R. CIV. P. 23 (a). These requirements—numerosity, commonality, typicality, and adequate representation—"effectively 'limit the class claims to those fairly encompassed by the named plaintiff's claims.'" *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 156 (1982) (quoting *Gen. Tel. Co. of the Northwest*, 446 U.S. at 330). In the Second Circuit, a plaintiff must also meet Rule 23's implicit, threshold requirement that the members of the class be ascertainable and definite. *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017); *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015).

If a plaintiff can satisfy the requirements of Rule 23(a), a court will then analyze whether the requirements of Rule 23(b) have been met. Courts will only turn their "attention to Rule 23(b) after [they are] certain that all of Rule 23(a)'s requirements ha[ve] been met." *Bell v. PNC Bank Nat'l Ass'n*, 800 F.3d 360 (7th Cir. 2015). Rule 23(b) enumerates three categories of class action lawsuits that may be maintained. *See* FED. R. CIV. P. 23 (b).

Importantly, "Rule 23 does not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350; *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). The party seeking certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met. *Myers*, 624 F.3d at 547 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *Teamsters Local 445*, 546 F.3d at 202—03). It is a strict burden that requires "evidentiary proof." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). A court may not blindly rely on

conclusory allegations to certify a class. *See Dukes*, 564 U.S. at 351-352; *Ruffo,* 2016 WL 4581344, at *2; *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010); *Teamsters Local 445*, 546 F.3d at 204.[5]

Plaintiff has not provided any evidence that there is an ascertainable class. In fact, the evidence demonstrates the opposite. Determining who is a class member requires extensive discovery and a mini-trial for everyone who obtained a private student loan now owned by the Trust Defendants, and who completed bankruptcy. This failing echoes through every Rule 23(a) requirement. And, it means that Plaintiff's proposed class does not meet any of the requirements of Rule 23(b). Plaintiff's motion should be denied.

## I.     The Proposed Class Is Not Ascertainable.

The Second Circuit requires a proposed class to be objectively defined and definite. *Petrobras*, 862 F.3d at 264; *Brecher*, 806 F.3d at 24. There can be no class litigation "without a clear sense of who is suing about what." *Petrobras*, 862 F.3d at 269. This requirement is known as "ascertainability." *Id.* at 264. It is an absolute standard. *Id.* at 269. That means a class is ascertainable or it is not; it is not a comparative exercise.

The "touchstone of ascertainability is whether the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Brecher*, 806 F.3d at 24 (internal quotations omitted). This means a class must be:

> "sufficiently definite" *and* "defined by objective criteria" so that "it is administratively feasible for the court to determine whether a particular individual is a member" (a superiority concern) and so that "identifying [the class's] members would not require a mini-hearing on the merits of each case" (a predominance concern).

---

[5] The analysis must "begin[], of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co*., 563 U.S. 804, 809 (2011). A "court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Castano v. American Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996).

*Petrobras*, 862 F.3d at 269 n. 20 (citing *Brecher*, 806 F.3d at 24) (emphasis added). The ascertainabilty requirement resolves "a particularly vexing type of class defect that would cause a proposed class to founder on the shoals of predominance, superiority, or both." *Id.* It is "a guiding principle for the otherwise murky analysis of classes that, though ostensibly defined by objective criteria, nonetheless present fatal challenges of determinability." *Id.*

Stated more simply: the members of a class must be "identifiable, such that the court can determine who is in the class and, thus, bound by the ruling" without the need to assess each putative class member's entitlement to be part of the class. *Weiner v. Snapple Beverage Corp.*, No. 07-cv-8742-DLC, 2010 WL 3119452, at *12 (S.D.N.Y. Aug. 5, 2010). A court may not certify a class "if there is no focused target for litigation, [because] the class itself cannot coalesce, rendering the class action an inappropriate mechanism for adjudicating any potential underlying claims." *Petrobras*, 862 F.3d at 269.

As with all the other aspects of Rule 23, the party seeking class certification bears the burden of establishing by a preponderance of the evidence that a class is ascertainable. *See Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-cv-4394-AJN, 2018 WL 1750595, * 2 (S.D.N.Y. April 11, 2018); *Myers*, 624 F.3d at 547 (citing *Amchem Prods.*, 521 U.S. at 614; *Teamsters Local 445*, 546 F.3d at 202–03).

While ascertainability is oftentimes a modest hurdle – *e.g.*, a group that includes everyone who entered into a certain form contract or paid a certain fee – it is one that Plaintiff fails to clear here. Plaintiff fails to demonstrate how she will show who actually had a student loan (or loans) that "were not within the cost of attendance" – the defining characteristic of her proposed class. Indeed, if the Court certifies Plaintiff's proposed class, it will require borrower-by-borrower litigation, including discovery to third parties like the school the borrower attended, to determine

8

who qualifies to be in the class before notice of the lawsuit can even be sent to those potential members. Plaintiff's own pending summary judgment motion, where Plaintiff has been unable to articulate a consistent "cost of attendance" that she believes her loans exceeded, illustrates the flaws and hurdles presented by Plaintiff's proposed class definition. (*See generally*, Dkt. No. 336). Plaintiff's proposed class is a perfect example of the "particularly vexing type of class defect" that causes a "proposed class to founder on the shoals of predominance, superiority, or both." *Petrobras*, 862 F.3d at 269, n. 20.

> **A.    Mini-Trials Are Necessary To Determine Who Is (And Is Not) A Member Of The Proposed Class.**

Plaintiff's claims sit at the intersection of Section 1187*ll* of the Higher Education Act (20 U.S.C. § 1087*ll*), Section 221 of the IRS Code (26 U.S.C. § 221), and Bankruptcy Code § 523(a)(8)(B) (11 U.S.C. § 523(a)(8)(B)). Plaintiff contends that her claims depend on a simple arithmetic question – subtract a loan from the "cost of attendance" – and only require a simple, ministerial process. (Pl. Br., p. 27). In reality, it is anything but simple.

In order to be able to do Plaintiff's math there are at least six individualized questions that need to be answered *for each potential class member*. First, the Court must calculate a borrower's "cost of attendance" based on the definition contained in Section 1087*ll*. Second, the Court must determine the borrower's stack of student loans. Third, the Court must determine what scholarships and grants the borrower had. Fourth, the Court must order and classify each of the loans the borrower had to determine which loans have priority over which. Fifth, the Court must assess where each loan fits in relation to the others and in relation to the borrower's "cost of attendance." Sixth, the Court must then compare the "cost of attendance," the scholarships and grants, and each

individual loan to determine whether a particular loan exceeded the borrower's "cost of attendance."[6]

All of these inquiries must be resolved *before* a borrower can say whether they have a loan that exceeded their "cost of attendance" and they are in the class. And, that assumes the information necessary to make such calculations is even available. As demonstrated by Defendants' inquiries to Plaintiff, and outlined more fully below, Plaintiff could not provide the information necessary to complete this analysis.  If Plaintiff is typical, each of the inquiries will be contested.

This Court cannot determine "who is in the class and, thus, bound by the ruling" without making the above series of determinations on a *potential* class member by *potential* class member basis. *Weiner*, 2010 WL 311942, at *12; *Brecher*, 806 F.3d at 24. Each plaintiff specific set of determinations is a mini-proceeding to determine who is even in the class.

      **1.**      **"Cost Of Attendance" Is A Student-Specific Number
And Requires Individualized Inquiries.**

 "Cost of attendance" is the defining component of Plaintiff's proposed class. The text of Section 1087*ll* and the evidence adduced, however, demonstrate that "cost of attendance" is a highly individualized number for each student borrower. This means that in order to determine a student's "cost of attendance," the Court must make a student-specific, fact-intensive inquiry.

      **a.**      **Section 1087*ll* Makes Clear That
"Cost Of Attendance" Is Individualized.**

Section 1087*ll* lists thirteen different categories of expenses, some including sub-categories, which are used to calculate an individual student's "cost of attendance." *See* 20 U.S.C. § 1087*ll*.[7] That means a student's "cost of attendance" is constructed from up to thirteen different

---

[6] Beyond these six inquiries, the Court must also determine whether a loan that exceeded the "cost of attendance" is non-dischargeable under a provision of Section 523(a)(8) besides Section 523(a)(8)(B), *e.g.*, Section 523(a)(8)(A)(i).

[7] The text of 20 U.S.C. 1087*ll* is too long to reasonably quote in its entirety. A copy of the current version of the statute is attached this brief as Appendix A.

variables (not including sub-categories). Not every student will have expenses in every category. And, different students who were at the same school at the same time will check different boxes. For example, one student may have dependent care expenses allowable under Section 1087*ll* (8), while another may not. But, that second student may have a disability and be entitled to include expenses related to that disability under Section 1087*ll* (9) and may have loans with origination fees allowed under Section 1087*ll* (12). These students – attending the same school at the same time – will have different "costs of attendance." The categorical variation that is possible borrower to borrower from these thirteen inputs is massive.

A review of the individual categories in Section 1087*ll* show there is further variability within each particular category. For example, Section 1087*ll*(1) permits inclusion of:

> (1)    tuition and fees normally assessed a student carrying the same academic workload as determined by the institution, and including costs for rental or purchase of any equipment, materials, or supplies required of all students in the same course of study

An allowance for a student's tuition is part of "cost of attendance," but that allowance is not set across a particular institution. Instead it reflects "tuition and fees normally assessed a student carrying the same academic workload … *in the same course of study*." 20 U.S.C. 1087*ll* (1) (emphasis added). Students in different courses of study at the same school can have different allowances for tuition.

The dependent care allowance may have even greater variability. Section 1087*ll* (8) states:

> (8)    for a student with one or more dependents, an allowance based on the estimated actual expenses incurred for such dependent care, based on the number and age of such dependents, except that—
>
> > (A)    such allowance shall not exceed the reasonable cost in the community in which such student resides for the kind of care provided; …

This language clearly contemplates multiple allowances. It looks to number of dependents ("one or more"), the "estimated *actual* expense incurred" and "the kind of care provided." *Id.* (emphasis added). A student with multiple dependents who require specialized services will be entitled to a larger allowance than a student with a single child who requires no services; they will both be entitled to a greater allowance than a student with no dependents.

The allowance for a student with disability drives the point home. Section 1087*ll*(9) allows:

> (9)     for a student with a disability, an allowance (as determined by the institution) for those expenses related to the student's disability, including special services, personal assistance, transportation, equipment, and supplies that are reasonably incurred and not provided for by other assisting agencies;

Thus, in determining the "cost of attendance" for a student with a disability the school must account for the specific expenses associated with that student's particular disability, which includes a review of what aid the student is eligible for from "other assisting agencies." A student diagnosed with an anxiety disorder will have very different allowable expenses than a student who has a physical disability and requires assistance in order to attend class.

And, it makes perfect sense that the statute would operate to individualize a student's "cost of attendance." If it did not, students with dependents (or for that matter disabilities) would be disadvantaged in financing their education and would not be able to deduct the interest on their loans. *See In re Murphy*, 282 F.3d 868, 872 (5th Cir. 2002) (noting Federal loan programs calculate "the 'costs of attendance' by including allowances for 'room and board,' 20 U.S.C. § 1087*ll*(3), 'miscellaneous personal expenses,' 20 U.S.C. § 1087*ll*(2), and child care, 20 U.S.C. § 1087*ll*(8). The [Federal Family Education Loan Program]'s need analysis assumes that loans must cover a full-time student's living expenses so that he has the time and energy to study and attend classes.") The variation is meant to ensure that a student who has family obligations, or is disabled, or even simply has the opportunity to study abroad, still has the ability to fund his or her education.

**b.    The Testimonial Evidence Confirms That Every Student Has An Individual "Cost Of Attendance."**

Given the plain language of Section 1087*ll,* it is no surprise that the witness testimony supports the individualized and variable nature of students' "costs of attendance." It also demonstrates how "cost of attendance" actually functions in the real world.

Elaine Varas, the Senior University Director of Financial Aid at the University of Pennsylvania, where Plaintiff attended law school, testified that a student's cost of attendance is the amount that a particular student is determined to be eligible to receive to pay for his or her education. According to Ms. Varas, who has more than thirty-six years' experience administering financial aid at four different institutions,[8] a student's cost of attendance includes:

> components such as tuition, required fees, room and board, which is housing and dining, and then miscellaneous expenses, which include things like personal allowances and transportation.

(*See* Ex. B, p. 24:12-18). Ms. Varas testified that it can include childcare expenses and medical expenses not covered by insurance. (*See* Ex. B, pp. 44:23-45:8, 44:17-22). She testified that it can include health insurance.[9] (*See* Ex. B, pp. 119:19-120:7, 121:3-8).

This leads to different, student-specific "costs of attendance." Ms. Varas agreed that students in different colleges at a university, and even students in different degree programs within the same school, might have different tuitions and fees, and thus different "costs of attendance" depending on what they are studying. [10] (*See* Ex. B, p. 35:8-25). Room charges vary depending on

---

[8] University of Pennsylvania, Drexel University, Rutgers University Biomedical Health Sciences, and the University of Medicine and Dentistry of New Jersey. (*See* Ex. B, pp. 22:5-10, 15:5-16:25).

[9] At the University of Pennsylvania, students who do not have health insurance are required to purchase it from the university, which can run into the thousands of dollars and thereby increase that individual students cost of attendance by that amount. (*See* Ex. B, pp. 44:12-45:8).

[10] Plaintiff suggests that these differences are rare and refers to them as administrators using "professional judgment." "Professional judgment" refers to situations where the allowance that is tied to a particular category of Section 1087*ll* is changed for an individual student. Plaintiff misses the point. There are different allowances that are set by schools in a single category. For example, the tuition allowance an engineering student might get is different than the tuition allowance a theater major might get. The Trust Defendants are not talking about the "professional judgment" that

whether a student lives on campus, off campus or at home; the charges can vary even within the same category. (*See* Ex B, pp. 39:10-41:20). Dining charges also differ; at the University of Pennsylvania, where Plaintiff attended and obtained the loans at issue, there is a variation of *up to $9,000* per year between meal plans. (*See* Ex. B, pp. 41:21-42:13). This is significant because, although she concedes little, Plaintiff acknowledges that room and board is part of a student's "cost of attendance" per Section 1087*ll*.

This is entirely consistent with the conclusions reached above about the variability in "cost of attendance" based on the plain language of Section 1087*ll*. The school is putting the provisions of the statute into practice. Each student is assigned his or her own specific "cost of attendance," and when determining the "cost of attendance" for a particular student the financial aid office ensures that it assessed the correct amounts to that student. (*See* Ex. B, pp. 86:15-87:9). If there were a one-size-fits-all cost of attendance, like Plaintiff claims, none of this would be necessary.

### 2. Student-Specific Analysis Is Also Required To Calculate A Student's Loans And Scholarships.

The second critical component necessary to determine if a borrower can be a class member is the body of loans, scholarships and grants that borrower received. This is what needs to be compared to the student's "cost of attendance" in order to determine whether one of the student loans exceeded his or her "cost of attendance." The loan component of the comparative calculation is subject to variation as well. That variation comes not just from the number of loans, or their amounts, but also the type of loans and when they were made. Scholarships and grants create the same issue.

---

might be applied to raise Engineering Student A's tuition allowance above what Engineering Students B's through Z's normal tuition allowances are because Student A has a special circumstance not enumerated in Section 1087*ll*. That is an entirely different individualized inquiry.

Take Plaintiff as an example. On her bankruptcy schedules, she lists 18 student loans. (Golden Decl., Dkt. No. 247-2, Ex. B). This "loan stack" is important because whether or not one particular loan exceeds her "cost of attendance" depends on its relationship to the other loans in the stack. Some of the loans in the stack will not exceed the "cost of attendance," but others might.[11] Per Plaintiff's view, the loan that exceeds the "cost of attendance" by "one penny" is not a "qualified education loan" and is dischargeable. (*See* Ex. C, p. 62:3-5). That makes it critical to determine which loan, if any, is the one that exceeded the "cost of attendance" because that will determine if the borrower is a potential class member and has a potential claim against any of the Defendants. Loans may be held and serviced by different entities, who may not be parties here.

Determining which loan is the one that exceeded the student's "cost of attendance" requires looking beyond the number of loans and their amounts. Plaintiff asserts that the timing and type of each loan also matters. Plaintiff has retained a consultant, Mark Kantrowitz, who testified that the timing of one loan in relation to another affects which loan exceeds a student's "cost of attendance." (*See* Ex. C, p. 66:18-22). He stated the loan disbursed first takes precedence over and gets applied before the one disbursed later. (*Id.*). But, he also testified that whether a loan is certified by the school affects the analysis. (*See* Ex. C, p. 68:23-69:6). He testified that a certified loan is given precedence over an uncertified loan; his logic was that by certifying a loan a school is essentially guarantying that loan fits within the "cost of attendance." (*See* Ex. C, p. 41:21-24) ("In effect, a school certified loan provides a safe harbor, where the school is confirming it's under the cost of attendance."). And, he testified that, in certain instances, certified loans that come later can retroactively take precedence and convert a previous, uncertified loan, which had been within

---

[11] Plaintiff alleges that she has loans which do not exceed her "cost of attendance" (*See, e.g.*, Am. Compl., ¶ 36), but claims that the NCT Loan is the loan in her stack that pushed past her 2006-07 "cost of attendance." (*Id.* at ¶ 37).

the "cost of attendance" when made, into one that exceeds the student's "cost of attendance." (*See* Ex. C, p. 76:14-77:21). All of this means that there must by an intensive investigation in the characteristics of each loan individually and an investigation into the entire loan stack together to see how the loans interact before anyone can tell if a borrower has a loan (and if so, which one) that qualifies them for membership within the class.

Realizing the complexity of this inquiry, Plaintiff has started to waffle on the effect of a school certification. Mr. Kantrowitz has walked away from his statement that, "a school certified loan provides a safe harbor, where the school is confirming it's under the cost of attendance." (*See* Ex. C, p. 41:21-24). In a report issued after his deposition, he states that school certification only "reduces the likelihood that a private loan will exceed the cost of attendance minus other aid." (*See* Ex. D, p. 7). But, by introducing uncertainty about whether a certification has meaning, Plaintiff is making it even more difficult to determine if a borrower can be a class member. It adds another issue into the mini-trials that must take place before the Court can tell if individual borrowers are in or out of the proposed class.[12]

Similar issues exist when it comes time to determine what scholarships or grants a student had to offset against his or her individual cost of attendance. That is also student specific information. In the present instance, Plaintiff could not say for certain what scholarships and grants she received from Penn Law School (*See* Ex. E, pp. 87:15-88:8, 89:11-90:22, 116:8-11), let alone any other scholarships she may have had from other sources. Plaintiff alleged in the Amended Complaint that for 2006-07 she "received … $22,440 in scholarships and grants" (Am. Compl. ¶ 29); stated in a declaration that she received $21,460 in scholarships (Golden Decl., ¶

---

[12] A further complication is that litigation over which particular loan is the one that exceeds a borrower's "cost of attendance" implicates the rights of loan holders who are not a party to this case. For example, if Holder A can demonstrate that its loan comes before Holder B's loan, Holder A has potentially  saved its loan from discharge and/or avoided liability at Holder B's expense in an action that Holder B might not have even been aware of.

4); and admitted, when confronted with records obtained via a subpoena to the University of Pennsylvania, that she received $19,440 in scholarships. (*See* Ex. E, p. 116:8-11).

Plaintiff's proposed class ultimately suffers from a defect similar to the one discussed in *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). In *Myers*, like here, a "simple" question contained much more complex subsidiary questions. Specifically in *Myers*, the claims required resolving "1) whether plaintiffs were denied overtime and 2) whether plaintiffs were entitled to overtime under [federal law]. While the first [was] a simple factual matter … the second [was] a complex, disputed issue, and its resolution … [would] require the district court to decide a number of subsidiary questions" about whether putative plaintiffs met certain criteria. *Id.,* at 548 (citing 29 U.S.C. § 213 (a)(1)). Like here, the claims in *Myers* involved a statutory framework that made "clear that these questions should be resolved by examining the [putative plaintiffs'] actual" characteristics and "require a court to 'determine [ ]' the 'exempt or nonexempt status of any particular [putative plaintiff] ... on the basis of whether the [putative plaintiff]'s salary and duties meet the requirement of the regulations' defining 'executive employees.'" *Myers*, 624 F.3d at 548 (citing 29 C.F.R. § 541.2). The Second Circuit affirmed the denial of class certification because the claims could not have been resolved with common proof for all prospective class members. *Myers*, 624 F.3d at 548.

The logic of *Myers* applies here. Weighing the individual characteristics of potential class members, their loans and their "cost of attendance" *vis-à-vis* whether the loans are "qualified education loans" is qualitatively no different than weighing the actual characteristics of a worker's employment *vis-a-vis* whether they are entitled to overtime.[13] Like in *Myers*, Plaintiff cannot

---

[13] The *Myers* Court reached its decision as part of a predominance analysis. *Myers*, 624 F.3d at 551. That distinction is irrelevant. The ascertainability requirement deals with defects "that would cause a proposed class to founder on the shoals of predominance, superiority, or both." *Petrobras*, 862 F.3d at 269 n. 20.

determine who is in her proposed class without mini-trials directed at prospective members' individual characteristics. Her motion should be denied for this reason.

### B. Plaintiff's Proposed Method For Ascertaining Who Is In The Putative Class Relies On A Mischaracterization Of Both The Law And The Facts.

Plaintiff realizes she has a serious ascertainability problem with a class defined by "cost of attendance." The solution she offers to that problem does not stand up to scrutiny.

#### 1. Plaintiff Misstates The Law And Shifts Rule 23's Burdens.

Plaintiff posits that her proposed class is "objectively" ascertainable because "every loan that was subject to discharge is presumptively discharged unless Defendants prove the loan was exempt from discharge." (Pl. Br., p. 15) (citing *In re Renshaw*, 222 F.3d 82, 86 (2d Cir. 2000)). First, Plaintiff is wrong about student loans being presumptively discharged. Second, it is Plaintiff who bears the burden of establishing that a particular loan was discharged.

The Second Circuit has clearly and unequivocally stated that "[s]tudent loans are presumptively *nondischargeable* in bankruptcy." *In re Tingling*, 990 F.3d 304, 308 (2d Cir. 2021) (citing *Easterling v. Collecto, Inc.*, 692 F.2d 229, 231 (2d Cir. 2012)) (emphasis added). Pursuant to Section 523(a)(8), a student bears the burden of rebutting this presumption. *In re Tingling*, 692 F.3d at 309. In fact, "Section 523(a)(8) is self-executing." *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 450 (2004) (internal quotations omitted).[14]

Here, there is no dispute that the loans at issue are student loans. That is what this entire case is about. Moreover, Plaintiff scheduled the loans at issue as student loans in her bankruptcy.

---

[14] Plaintiff's dismissal here of binding Second Circuit authority contradicting her assertion that student loans are presumptively dischargeable is squarely at odds with the position her former counsel, Austin Smith, recently took in a Petition for Certiorari filed in *In re Conti*, 982 F.3d 445, 447 (6th Cir. 2020), *cert. denied sub nom. Conti v. Arrowood Indem. Co.*, No. 20-1597, 2021 WL 2637894 (June 28, 2021). In that Petition, Smith argued that review was warranted because of a purported circuit split, specifically citing the Second Circuit's use of "absolute language" in *Tingling* to hold that "[s]tudent loans are presumptively nondischargeable in bankruptcy." *See Conti v. Arrowood Indem. Co.*, No. 20-1597, 2021 WL 1987059, at *3 (May 13, 2021). The Conti petition was denied on June 28, 2021. *See Conti v. Arrowood Indem. Co.*, No. 20-1597, 2021 WL 2637894 (June 28, 2021).

(Golden Decl., Ex. B). That means that they were presumptively non-dischargeable and she bears the burden of rebutting that presumption.

There is another problem. What Plaintiff tries to do here is fundamentally contrary to Rule 23. By claiming there is no ascertainability problem because everyone is presumptively in the class until Defendants prove otherwise, Plaintiff attempts to shift to Defendants her own evidentiary burden to establish that each of Rule 23's requirements are satisfied. *See Myers*, 624 F.3d at 547; *Amchem Prods.*, 521 U.S. at 614. It is not Defendants' burden to prove the requirements of Rule 23 are *not* met for Plaintiff's proposed class, even *if* they would ultimately bear the burden on the merits (which Defendants do not, as explained above). Plaintiff has failed to satisfy her burden of demonstrating that a sufficiently and objectively ascertainable class exists and that is an insurmountable failing.

### 2.    Plaintiff Tries To Manipulate What "Cost Of Attendance" Means And Misrepresents What Information Exists About It.

While trying to justify her proposed class, Plaintiff struggles to articulate a common method of determining putative class members' "costs of attendance." Plaintiff's case depends on the existence of an ascertainable and definite group of borrowers who have educational loans that exceeded what it cost for them to attend school, who completed bankruptcy, and who have continued to be subject to collection on their loans. Plaintiff ultimately settles on the idea that the Court can visit a government website and look-up "costs of attendance" for everyone and that there is a second government resource that has information about everybody's student loans. (Pl. Br., p. 16). Plaintiff is wrong in both instances.

Plaintiff asserts that information reported by schools to the Integrated Postsecondary Education Data System ("IPEDS"), but only certain categories, can be used as a proxy to determine students' individual "costs of attendance." (Pl. Br., p. 16; Ex. D, p. 4; Declaration of George

Carpinello ("Carpinello Decl."), Dkt. No. 245, Ex. HH, p. 4).[15] But the average, student-agnostic numbers reported to IPEDS do not mean what Plaintiff says they mean and they do not cure the issues Plaintiff's proposed class suffers from.

In making her assertions about IPEDS, Plaintiff does three things. First, she subverts the idea of "cost of attendance," mischaracterizing it as a *school*-specific number as opposed to a *student*-specific number. Second, she attempts to impose a limitation on the categories that can be included in a school's cost of attendance, eliminating nine or ten of the thirteen categories of expense listed in Section 1087*ll*. Third, she simply mischaracterizes what IPEDS is, attempting to distract the Court from the individualized components required by the relevant statutes.

There is no way to determine individual borrowers' costs of attendance to ascertain whether a particular individual is a member of the class without mini-trials. No such group is ascertainable without a potential-member-by-potential-member inquiry.

Moreover, as noted above, it is Plaintiff's burden to demonstrate by a preponderance of the evidence that her proposed class is ascertainable. *Myers*, 624 F.3d at 547. She provides nothing that does this. Her theories are both incorrect and unsupported.

### a.    Plaintiff Denies The Individualized Nature Of "Cost of Attendance."

On the first page of her brief, Plaintiff states "Defendants know … many of their loans were dischargeable because they exceeded *the* cost of attendance." (Pl. Br., p. 1) (emphasis added).

---

[15] Defendants have moved to strike the Report of Mark Kantrowitz submitted in support of Plaintiff's motion for partial summary judgment because it consists entirely of impermissible legal conclusions. (Dkt. Nos. 384, 389). The earlier report of Mr. Kantrowitz (Carpinello Decl., Ex. HH), which was originally submitted in a different case, and which Plaintiff relies on for this motion, suffers from many of the same defects as his second report. Because application of the Federal Rules of Evidence are not strictly applied to Rule 23 motions, defendants are not moving to strike the first report. Nevertheless, for the same reasons the Court should strike the second report in its entirety (*see* Dkt. Nos. 384, 389), the Court should disregard and not give any weight to any of the impermissible legal conclusions or arguments that Mr. Kantrowitz offers in his first report. *See Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992).

She further states "[t]here are thousands of borrowers with loans that … exceed *the* cost of attendance." (Pl. Br., p. 2) (emphasis added). And, she claims the "published Cost of Attendance at Penn was $48,464." (Pl. Br., p. 3). These three instances occur on the first three pages of her brief; there are myriad other instances throughout the remainder of her brief and her other filings. Every time Plaintiff does this, she suggests there is a single "cost of attendance" at an institution that is not a student specific number. Plaintiff's reliance on IPEDS is predicated on this contention as well. (*See* Carpinello Decl., Ex. HH, p. 4) ("IPEDS has institution specific data, but not student specific data.").

Plaintiff's position that "cost of attendance" is considered on the institutional level, not the student level, is not supported by the language of Section 1087*ll*. (*See* Section I.A.1., *supra*). Nor is it supported by IRS Code Section 221, which is the fulcrum of Plaintiff's theory of liability. That provision, which creates the tax deduction for student loans, speaks in terms of "an individual" and allows for "a deduction for the taxable year an amount equal to the interest paid by the taxpayer during the taxable year on any qualified education loan." *See* 26 U.S.C. § 221(a). "Qualified education loan" is in turn defined as "any indebtedness incurred by the taxpayer solely to pay qualified higher education expenses … which are incurred on behalf of the taxpayer." 26 U.S.C. § 221(d). The statute allows a deduction based on what allowable expenses the individual taxpayer/student incurred and borrowed to pay for their education, not some average number.

Plaintiff tries to subvert the nature of "cost of attendance" in order to minimize the individualized inquiries described throughout this brief. It is an attempt to remedy the failings endemic to her proposed class. And, it should be rejected.

### b.    Plaintiff Misrepresents What Makes Up
### A Student's "Cost Of Attendance."

Faced with the individualized nature of a student's "cost of attendance" as set forth in Section 1087*ll*, Plaintiff attempts to limit the categories of expense that can be included in a student's "cost of attendance." Plaintiff argues that in order to be a "qualified education loan," it must be used to pay "qualified higher education expenses," which "means the cost of attendance (as defined in section 472 of the Higher Education Act of 1965, 20 U.S.C. 1087ll, as in effect on the day before the date of the enactment of the Taxpayer Relief Act of 1997)."[16] (*See* Ex. D, p. 8). Plaintiff then claims, without explanation, that the 1997 version of Section 1087*ll* limits "cost of attendance" to tuition, required fees, miscellaneous expenses, and room and board. (*See* Ex. D, p. 7; Ex. C, pp. 108:13-109:7; Carpinello Decl., Ex. HH, p. 4).

Whether "cost of attendance" should be defined by the 1997 version of Section 1087*ll* or the current one does not change the above analyses. A comparison of the 1997 version of Section 1087*ll* and the current version shows that twelve of the thirteen categories remain substantively unchanged between the two. (*See* Appendix C).[17] The notable difference is the addition of Section 1087*ll*(13), which was added when the statute was amended in 2006. *See* Pub. L. 109–171, §8016(2)–(4). The dependent and disability expenses set forth in Sections 1087*ll*(8) and (9), the two categories the Trust Defendants focused on above (*see* Section I.A.1.a., *supra*), both appear in the 1997 and current versions of Section 1087*ll*. The text of these provisions is unchanged between the two versions. (*See* Appendix C).

---

[16] The date of the enactment of the Taxpayer Relief Act of 1997 was August 5, 1997.

[17] A comparison of the historical version of Section 1087*ll* in effect on August 5, 1997 and the current version is attached as Appendix C. The version of Section 1087*ll* in effect on August 5, 1997 is attached as Appendix B. As noted above, the current version is attached as Appendix A.

Nonetheless, Plaintiff argues that the 1997 version of Section 1087*ll* controls and that it allows for certain, but not all, categories listed in that version to count toward "cost of attendance." (Ex. C, pp. 108:13-109:7; Ex. D, p. 7; Pl. Br., p. 16; Carpinello Decl., Ex. HH, p. 4). Mr. Kantrowitz denied during his deposition that dependent care expenses, medical expenses and loan origination fees are included in the 1997 version of Section 1087*ll*, even though the 1997 text includes them. (Appendix B; Ex. C, pp. 115:23-119:25). Plaintiff provides no justification for his view that these categories should be read out of the statute.

Even if Plaintiff were correct that tuition, required fees, miscellaneous expenses and room and board were the only permissible categories of expense that could be included in a student's "cost of attendance" – and she is not – that does not eliminate the need for individualized inquiries. Each of these categories still has an inherent variability. As noted above, tuition is assessed by "course of study." This means an institution can have numerous tuition allowances. (*See* Ex. B, p. 35:8-25). It also means that the tuition allowance is tied to a student's particular characteristics. (*See* Ex. B, pp. 35:8, 86:15-87:9). There are multiple categories of room and board. *See* 20 U.S.C. § 1087*ll*(3); (Carpinello Decl. Ex. HH, p. 11). These categories do not include the different meal plans that a university might have in place, which (at the University of Pennsylvania, for example) can vary by thousands of dollars. (*See* Ex. B, pp. 41:21-42:13). The "allowance for books, supplies, transportation, and miscellaneous personal expenses," will contain different transportation costs for a student who lives on campus as opposed to a commuter student. All of this means, even with the limitations Plaintiff tries to impose on "cost of attendance, different students at the same school at the same time will still have different "costs of attendance."

Faced with these problems, Plaintiff now seems to be abandoning her original contention that Section 1087*ll* sets forth the definition of "cost of attendance." Specifically, Mr. Kantrowitz

claims in the report issued after his deposition (and the deposition of Ms. Varas) that there is a distinction between the use of the definition contained in Section 1087*ll* to determine "qualified higher expenses [sic] at 26 USC 221(d)(2)" and "for purposes of determining student eligibility for federal student aid." (*See* Ex. D, p. 4). This idea is not based in some distinction between the August 1997 and current versions of Section 1087*ll*; there are no meaningful differences. (*See* Appendix C). The idea is completely unsupported. But, it is necessary to Plaintiff because without this made up distinction, her class descends into mini-trials.

What Plaintiff is ultimately saying is that the numbers being used to award financial aid are not the numbers allowed by the IRS Code. This argument is especially pernicious. The evidence shows that schools are certifying "costs of attendance" based on expenses that fall within the categories of Section 1087*ll*, but outside of the limited categories that Plaintiff approves. (*See, e.g.*, Ex. B, pp. 28:14-32:11, 119:19-120:7). According to Plaintiff, none of those certified loans are "qualified education loans" because they include amounts for categories Plaintiff deems improper. If they are not "qualified education loans" they do not qualify for a deduction under IRS Code Section 221(d). In a stroke Plaintiff transforms loans that were certified to be tax deductible, "qualified education loans" into non-tax deductible loans. Plaintiff's interpretation of "cost of attendance" and the way it intersects with the tax code, potentially creates tax liability for innocent and unaware borrowers who may or may not be class members.[18]

### c.    Plaintiff Mischaracterizes What IPEDS Is.

Finally, Plaintiff simply mischaracterizes what IPEDS is and refuses to acknowledge what it is not. IPEDS collects some average student cost information from schools, but it does not collect

---

[18] This also creates internal conflict among the class and divides those who may have taken a deduction from those who did not. This further precludes certification of Plaintiff's proposed class. *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 315 (5th Cir. 2007); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d 422, 439 (S.D.N.Y. 2019).

data for every category of expense permitted by Section 1087*ll*. Plaintiff attempts to limit "cost of attendance" to tuition, required fees and room and board because she is trying to bring her definition of "cost of attendance" in line with categories of information that IPEDS does collect. (*See, e.g.*, Ex. D, p. 3). Plaintiff is hoping to transform IPEDS into the centralized repository of "cost of attendance" she needs to avoid the ascertainability, predominance and superiority problems discussed throughout this memorandum. In doing this, not only does Plaintiff warp the meaning of "cost of attendance," she also tries to substitute averages reported to IPEDS for actual "costs of attendance."

Plaintiff's purported expert contends that the definition of "cost of attendance" used to define a "qualified education loan" is "the cost of attendance that is reported to IPEDS." (*See* Ex. D, p. 4). This is simply wrong, especially because it relies on the idea that only tuition, fees, and room and board can be part of a student's "cost of attendance" and ignores all of the remaining categories set forth in Section 1087*ll*.

Plaintiff's class remains unascertainable because even accepting Plaintiff's theory that you look at the 1997 version of Section 1087*ll*, there are still twelve categories (not counting sub-categories) of permissible expense that make up a student's "cost of attendance." None of the expenses relating to those remaining categories is collected by IPEDS. Even denying the variability within Section 1087*ll*'s categories, a student's "cost of attendance" is still constructed using twelve categories and one needs to know which of those categories were counted in order to determine a particular student's "cost of attendance." (*See* Ex. B, pp. 164:14-166:3).

Moreover, the data collected by IPEDS reflects average costs. The IPEDS report Plaintiff attached to her declaration expressly states that it reflects "*average*" costs for "first-time, full-time undergraduate students," along with "*typical* tuition and required fees" for "full-time first-

professional" students at the institutional level. (*See* Golden Decl., Ex. A pp. 11-14) (emphasis added). IPEDS does not contain information broken down to the student level. Because Plaintiff is attempting to use an average, by definition a group of students is going to have actual "costs of attendance" that exceed IPEDS' purported "costs of attendance." (Carpinello Decl. Ex. HH, p. 11). This is important because under Plaintiff's theories a loan that exceeds a student's "cost of attendance" by a single penny render that entire loan dischargeable. (*See* Ex. C, p. 62:3-5). There will be class members who benefit from this imprecision and others who lose out. Loan holders will fall into those same categories, too.

The testimonial evidence confirms that the data reported to IPEDS is not detailed enough to be able to ascertain individual students' "cost of attendance." (*See* Ex. B, pp. 164:14-166:3). This makes sense because accumulating that data is not one of IPEDS' purposes. Instead, IPEDS is an annual report that is:

> provided by each educational institution to provide *general average information* on funding received by students, need available to students, type of students that are receiving funding, cost of education on an average, trends, number of students who've received federal versus institutional funding. So it really provides a general snapshot so that organizations can then create trends based on similar types of institutions.

(*See* Ex. B, p. 88:5-14) (emphasis added).

The forms IPEDS uses to gather information demonstrate as much, using the words "'typical' and 'average' … throughout the document." (*See* Ex. B, p. 164:15-21). Thus, while IPEDS might ask for tuition charges by school, it does not ask by class or course of study. (*See* Ex. B, pp. 90:20-91:5). This means that a university's office of institutional research

> will have to take an average of required fees to put it on the listing of by school and by program. IPEDS does not ask by school, by program, by class; housing, living information. So in that regard, institutional research again has to provide averages based on housing for both undergraduate and graduate students.

(*See* Ex. B, p. 90:22-91:5). The university ends up providing to IPEDS "a general number that is not unique to a profession or a student." (*See* Ex. B, p. 103:5-7).

Ultimately, Ms. Varas – a financial aid administrator with "[p]robably 30 some-odd years" experience using IPEDS – unequivocally rejected Plaintiff's proposed use of IPEDS' data. (*See* Ex. B, pp. 22:5-10, 15:5-16:25, 98:24-25). Specifically:

> Q.      [W]ould you ever use cost of attendance numbers for IPEDS in performing a student eligibility analysis for borrowing a private student loan?
>
> A.      No.
>
> Q.      Why not?
>
> …
>
> A.      … It's too much of an average. It's too generic. We need – our analysis is much more specific and closer to the reality.

(*See* Ex. B, p. 94:9-24).

Finally, in assessing Plaintiff's argument that average amounts are somehow "close enough," the Court should pause to consider the statutes at issue. The IRS Code provides the definition of "qualified education loan," which rests on the definition of "cost of attendance." *See* 26 U.S. Code § 221. It does this in Section 221, which allows for an individual taxpayer to take a tax deduction based on the interest paid on student loans. It seems very odd that an individual deduction would be based on borrowing that does not correlate to that taxpayers' actual "cost of attendance." Taxpayers who spent less than the averages reported to IPEDS could reap a tax benefit on loans for amounts in excess of what it cost for them to go to school.

### 3.      Plaintiff Mischaracterizes The Information Available.

In tandem with attempting to limit what is part of a student's "cost of attendance," Plaintiff also makes a series of statements about what information is available to the parties. Plaintiff cites no evidence to support any of these statements. Accordingly, she has not carried her burden.

27

Specifically, Plaintiff represents that:

> Defendants have detailed information about each borrower, including the amount of their loan and school attendance status. In addition, the cost of attendance at each institution, the other loans and financial aid each borrower received and the school's Title IV status can be ascertained from the relevant schools and publicly available records. The cost of attendance for each student who has applied for federally-guaranteed financial aid is in a database maintained by the federal government known as the Federal Student Financial Application File. Defendants have access to this file as lenders and servicers of federally-guaranteed student loans.

(Pl. Br., p. 16). There are no such databases that Defendants have access too. Plaintiff does not provide anything that demonstrates that there are (besides her lawyers' surmise). She has certainly not met her burden on this point.

Moreover, the statements Plaintiff makes about the availability of such information do not logically cohere as her own circumstances illustrate. According to her bankruptcy schedules, for the academic years in question Plaintiff had numerous federal and private loans, which funded at different points in time that year. (Golden Decl., Ex. B). While a lender might have information about the loan it made to her – and the Trusts Defendants are not lenders – it does not follow that the lender would have information about all other loans a borrower might have taken out. And, it does not follow that a database of federal loans would reflect a borrower's private loans or that the parties to this matter have access to such a database, if it existed. Plaintiff's assertion that the Trusts have access to "this file as lenders and servicers of federally-guaranteed student loans" is unsubstantiated by any record evidence. It is also simply wrong because the Trust Defendants hold only private loans and do not service any loans. That leaves Defendants with only the borrowers themselves and the schools as sources of information. This creates an entirely different problem because it is impossible to determine which borrowers to seek information about without first knowing if they have loans that exceed their "cost of attendance."

Plaintiff's assertion that any uncertainty about whether a loan exceeds a borrower's individual "cost of attendance" was created by "Defendants' own conduct" is just convenient nonsense. So too is the idea that Defendants have somehow waived the right to defend themselves against a class action lawsuit based on the individualized nature of "cost of attendance." As shown above, Plaintiff asserts positions that lead to the conclusion that the amounts a school certifies as being within the cost of attendance cannot be taken at face value. In doing so, she denies the accuracy and relevance of the very information she claims lenders should have relied upon.

* * * * *

For the reasons explained above, Plaintiff has failed to articulate a sufficiently definite and objectively identifiable class of individual borrowers whose claims can be adjudicated on a class-wide basis. Her motion must therefore be denied.

## II.    Plaintiff Does Not Satisfy The Express Requirements Of Rule 23(a).

Besides failing Rule 23's threshold requirement that she demonstrate an ascertainable class exists, Plaintiff also fails to meets Rule 23(a)'s four explicit requirements.

In order for a court to consider certifying a class, a plaintiff must establish: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation with regard to the putative class. FED. R. CIV. P. 23(a); *Ruffo*, 2016 WL 4581344, at *1. Plaintiff does not meet any of these requirements. The Trust Defendants will address these requirements in reverse order.

### A.    Plaintiff Fails The Typicality And Adequacy Requirements of Rule 23(a)(3) and (4); She Is Not A Member Of Her Own Proposed Class.

Ms. Golden, the only named plaintiff, has never demonstrated that she has a loan that exceeded her "cost of attendance" at Penn Law School. Indeed, the evidence affirmatively shows

she is *not* a member of the class she seeks to certify. (*See* Dkt. No. 336). This means she is not typical of her proposed class nor an adequate representative.[19]

Rule 23(a)(3) requires the claims or defenses of the class representative be typical of the claims of other putative class members. FED. R. CIV. P. 23 (a)(3); *Amchem Prods.*, 521 U.S. at 607 n. 11; *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 34 (2d Cir. 2009); *see also Vengurlekar v. Silverline Technologies, Ltd.*, 220 F.R.D. 222, 226—27 (S.D.N.Y. 2003). Rule 23(a)(4) requires a class representative must "fairly and adequately protect the interests of the class." A proposed class representative satisfies Rule 23(a)(4) only if she has "an interest in vigorously pursuing the claims of the class." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011). There must be no difference between a class representative and some class members that undermines that incentive. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 231 (2d Cir. 2016).

It is fundamental that "a class representative must be part of the class and '… suffer the same injury' as the class members." *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (internal quotations omitted); *see also Heerwagen v. Clear Channel Commc'ns.*, 435 F.3d 219, 225 (2d Cir. 2006). If the named plaintiff is not a member of the proposed class, she is not a typical or adequate representative and no class can be certified; the court need not even consider the other Rule 23 requirements. *Bentley v. Verizon Business Global, LLC*, No. 07-cv-9590-DC, 2010 WL 1223575, * 4 (S.D.N.Y. March 31, 2010) (citing *In re WorldCom, Inc.*, 358 B.R. 585, 595 (Bankr. S.D.N.Y. 2006)); *Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 63 (S.D.N.Y. 2006)).

---

[19] Adequacy and typicality in a Rule 23(a) analysis are related enough concepts that they tend to merge. *See Amchem Prods.*, 521 U.S. at 626 n. 20.

The class Plaintiff seeks to certify is: "Individuals who received private loans owned, held, or serviced by Defendants which were not within the cost of attendance at Title IV institutions as defined in 26 U.S.C. § 221(d)." (Pl. Br., p. 6). Plaintiff has three loans at issue in this case: the NCT Loan; the CitiAssist Grad./Prof. Loan; and the Bar Loan. None of Plaintiff's loans fit within the category necessary for her to be a member of the class because she does not, and cannot, demonstrate that any of them have exceeded her "cost of attendance" at Penn Law School. In fact, three years into this case she cannot articulate a definite and consistent cost for her attendance at Penn Law School. Consequently, she has not met her burden of demonstrating that she is a member of the class she is attempting to certify and her motion should be denied.

### 1.    The NCT Loan

The NCT Loan was for $7,103 and was taken out to pay for educational expenses during the 2006-07 academic year.[20] Plaintiff asserts that, when considered with her federal loans and scholarships, this loan exceeded her "cost of attendance" at Penn Law School and is, therefore, not a "qualified education loan." (Am. Compl., ¶ 30).

Plaintiff alleges that she had $27,500 in federal guaranteed loans for academic year 2006-07 and also received $21,640 in scholarships and grants that year. (Golden Decl., ¶ 4). According to Penn Law School records, Ms. Golden received $24,500 in federal guaranteed loans not $27,500 for 2006-07. (*See* Ex. F). During her deposition, Plaintiff acknowledged that she only received $19,440 in scholarships and grants, not $21,640. (*See* Ex. E, p. 86:2-88:16). Plaintiff's amounts are off by more than $5,000.

---

[20] The NCT Loan documentation states: "I understand and agree that this loan is an education loan and certify that it will be used only for costs of attendance at the School." (*See* Ex. I).

The average "cost of attendance" at Penn Law School for academic year 2006-2007[21] was $56,380. (*See* Ex. G, ¶ 5; Ex. H, pp. 161:1-7, 162:15-164:10; Ex. E, p. 73:3-78:9). This is the amount Penn Law School calculated to be an average student's "Estimated Student Budget," which it the term the university uses synonymously with "cost of attendance."[22] (*See* Ex. G, ¶ 5; Ex. H, pp. 161:1-7, 162:15-164:10; *see also* Carpinello Decl., Ex. HH, p. 4 ("The cost of attendance (also called a 'student budget' …").

Thus, according to the calculation that Plaintiff sets forth in her Amended Complaint, Plaintiff could borrow $12,440 in private loans for 2006-07 ($56,380 average cost of attendance, minus $24,500 in federal guaranteed loans, minus $19,440 in scholarships and grants) without exceeding the cost of attendance for that academic year.[23] The NCT Loan was for $7,103, which is significantly less than what remains after Plaintiff's federal loans and her scholarships are subtracted from Penn Law School's average cost of attendance. (*See* Ex. J; Ex. K; Ex. I).

As a brief aside, this calculation does not account for any loan fees or origination fees. The amounts of these types of fees are added to a student's "cost of attendance" under both the 1997 and current versions of Section 1087*ll*(12). (*See* Appendices A and B). The $7,103 NCT Loan amount includes a $653 origination fee. (*See* Ex. J; Ex. K; Ex. I). Plaintiff has provided no evidence regarding loan or origination fees for any of her other loans. These amounts are important because they increase her "cost of attendance."

---

[21] The Trust Defendants are using the average "cost of attendance" provided by the school because Plaintiff has not put forth any evidence which demonstrates what her individual "cost of attendance" was.

[22] It is worth noting, the fact that Penn Law School provides an "estimated" number logically demonstrates that there is variability in "cost of attendance" student by student and actual amounts will vary.

[23] Even using Plaintiff's unsupported, incorrect numbers for her federal loans and scholarships and grants, the NCT Loan still fit within Penn Law's average "cost of attendance."

Plaintiff disputes Penn Law School's own cost estimate. She claims her cost of attendance was not $56,380 but $48,464. She calculates this number from information reported by the University to Pennsylvania to IPEDS. As shown, the amounts reported to IPEDS are averages and do not accurately reflect her "cost of attendance." Plaintiff also only accounts for the average amounts of tuition, required fees, and room and board reported to IPEDS.

Putting aside that Plaintiff is incorrect in her assertion that only these costs can be included in calculating a student's "cost of attendance" the amounts she relies on to calculate her $48,464 "cost of attendance" at Penn Law School are not what she says they are. Ms. Golden, a law student who lived off campus (*See* Ex. E, p. 14:24-15:13), calculates her $48,464 "cost of attendance" using a room and board amount for "full time, first time" undergraduate students who lived in on-campus, university controlled housing.

The IPEDS document Plaintiff relies on for her numbers states as much. (Golden Decl. Ex. A). It states that if "all *full-time, first-time* degree/certificate-seeking students [are] require[d] to live on campus" the school will not be "asked to report off-campus room and board." (Golden Decl., Ex. A, Part D, Question 3) (emphasis in original). The University of Pennsylvania stated that its full-time, first-time undergraduates were required to live on campus. (*Id.*). Accordingly, the IPEDS data that Plaintiff points to does not include any reported amounts for off-campus room and board, let along off-campus room and board for graduate students.

### 2.    CitiAssist Grad./Prof. Loan

For the 2007-2008 academic year, Plaintiff borrowed $583 under the CitiAssist Grad./Prof. Loan Program. Plaintiff alleges that this loan is a direct-to-consumer loan that exceeds her "cost of attendance" at Penn Law School.[24]

When Plaintiff applied for the CitiAssist Grad./Prof. Loan, she applied for a loan in the amount of $2,294. (*See* Ex. L; Ex. M; Ex. N; Ex. O). Citibank only loaned her $583, however, because that is the amount that Penn Law School certified. (*Id.*).

The declaration of Plaintiff's own consultant submitted in support of her motion states that "school certification provides a safe harbor for the lender because the financial aid office ensures that the loan amounts … do not exceed the cost of attendance, i.e., the requirements for the loans to be qualified education loans." (*See* Ex. C, p. 42:10-25; Carpinello Decl., Ex. HH, p. 3). This should be dispositive with respect to determining that this loan is a "qualified education loan." Plaintiff does not provide anything that shows otherwise.

### 3.    The Bar Loan

Plaintiff also has put the Bar Loan at issue.

Under the definition of cost of attendance in Section 1087*ll*, which Plaintiff points to as the source of determining what can be counted towards a student's cost of attendance, bar exam expenses can be included.

Specifically, Section 1087*ll*(13), allows:

(13)    at the option of the institution, for a student in a program requiring professional licensure or certification, the one-time cost of obtaining the first professional credentials (as determined by the institution).

---

[24] This loan is alleged in the Amended Complaint. However, Plaintiff made no reference to it in her Motion for Partial Summary Judgment. The Trust Defendants include it for the sake of completeness..

Passing the bar exam is a prerequisite for obtaining a law license. Accordingly, it logically follows that the expense of specialized preparation to pass that exam and obtain that license falls within Section 1087*ll*.

Plaintiff provides nothing to indicate that Penn Law School has not exercised its option to allow a student to include bar exam expenses in its calculation of his or her cost of attendance.

All of this shows that Plaintiff is asking the Court to certify a class that she cannot demonstrate membership in. She cannot even prove her "cost of attendance" at Penn Law School. Her motion should be denied for this reason. *See, e.g., Bentley*, 2010 WL 1223575 at *4. Plaintiff's failure to demonstrate that she is part of her proposed class is not an excusable defect. If the named plaintiff purporting to represent a class does not establish "the requisite of a case or controversy with the defendant [...], none may seek relief on behalf of himself or any other member of the class." *In re WorldCom, Inc.*, 358 B.R. at 597 (quoting *Cent. States Southeast & Southwest Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 433 F.3d 181, 199 (2d Cir. 2005); *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (internal citations omitted)). "A named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs . . ." *In re WorldCom, Inc.*, 358 B.R. at 597 (quoting *Allee v. Medrano*, 416 U.S. 802, 828–29 (1974)).

### B.    Plaintiff Fails The Commonality Requirement Of Rule 23(a)(2).

The commonality element of Rule 23(a) requires "both at least one *question* common to the class, and also that a class action 'has the capacity to generate common *answers* apt to drive the resolution of the litigation.'" *Adkins v. Morgan Stanley*, 307 F.R.D. 119, 137 (S.D.N.Y. 2015) (quoting *Gulino v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, No. 96–cv–8414-KMW, 2013 WL 4647190, at *6 (S.D.N.Y. Aug. 29, 2013) (emphases in original). "[A] common question is one where the same evidence will suffice for each member to make a *prima facie* showing or the

issue is susceptible to generalized class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal quotations omitted). Here, there is no common question that has the ability to generate a common answer using common proof to resolve the claims of the putative class members.

Plaintiff contends that this requirement is satisfied because the Court need only make a simple determination whether loans to borrowers who went through bankruptcy should have been discharged because they exceeded that borrower's "cost of attendance." However, as explained in detail above, there is no common proof that answers this question for each borrower and permits class-wide resolution of the putative class' claims. (*See* Section I.B., *supra*.)

The contours of Plaintiff's problem on this point come into view when she argues that there is commonality because "it does not matter that the class members had different loan amounts or went to different schools with different costs of attendance." (Pl. Br., p. 11). This statement theorizes a world where there is a single "cost of attendance" at each *institution*. Neither the controlling statute, Section 1082*ll*, nor the evidence gathered in the case supports Plainitff's theory. Plaintiff ignores the fact that class members who went to the same school at the same time could have each had a different "costs of attendance." That very difference is implicit in Plaintiff's use of IPEDS data for on-campus University of Pennsylvania undergrads to calculate her "cost of attendance" as an off-campus graduate student. The very data she tries to use highlights a categorical difference between groups of students at the same school. The IPEDS data does not cover her individual characteristics. This demonstrates that there is no common evidence that allows class members to make a *prima facie* showing of liability.[25] *See Myers*, 624 F.3d at 548.

---

[25] It comes back to the individualized inquiries described in the ascertainability arguments, and the predominance argument. This is not surprising. Ascertainability implicates predominance, *Petrobras,* 862 F.3d at 269 n. 20, and predominance subsumes commonality. *Amchem Prods.*, 521 U.S. at 609. Ascertainability is dealt with in Section I., s*upra*. Predominance is dealt with in Section III.1.A., *infra*.

### C.    Plaintiff Does Not Establish Numerosity Under Rule 23(a)(1).

Finally, Plaintiff provides no evidence that demonstrates the proposed class is "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1); *see also Gen. Tel. Co. of the Northwest*, 446 U.S. at 330.

A plaintiff must produce some evidence or otherwise establish by reasonable estimate the number of class members who may be involved. *Comcast*, 569 U.S. at 33; *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591–92 (3rd Cir. 2012) (even though "[i]t is tempting to assume that the . . . class meets the numerosity requirement," a finding of numerosity in the absence of actual evidence impermissibly "crossed the line separating inference and speculation"). A plaintiff cannot rely on  speculation as to the size of the class in order to prove numerosity. *Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989); *see also Demarco v. Edens*, 390 F.2d 836, 845 (2d Cir. 1968); *Jeffries v. Pension Trust Fund of the Pension, Hospitalization & Benefit Plan of the Elec. Indus.*, 172 F. Supp. 2d 389, 394 (S.D.N.Y. 2001); *Huntley v. Law Office of Richard Clark, PLLC*, 262 F.R.D. 203, 205 (E.D.N.Y. 2009). If a putative class is some subset of a larger pool, the trial court must find, on a preponderance of the evidence, that the specific subset is sufficiently numerous. *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 358 (3d Cir. 2013) (quotations omitted). It is Plaintiff's burden to prove this. *Id.* at 357; *see also Mielo v. Steak 'n Shake Operations, Inc.* 897 F.3d 467, 484-86 (3d Cir. 2018).

The only evidence Plaintiff submitted regarding numerosity are the Declarations of John DeBois. In them, Mr. DeBois compares the limited data he obtained from IPEDS with a PHEAA produced spreadsheet showing the loans PHEAA services, whose borrowers filed for bankruptcy. (*See* Exs. P, R).  Mr. DeBois "assumed" the data from "IPEDS was the cost of attendance for that school for a given year …." (*See* Ex. Q, pp. 71:12-24, 104:7-8.)

As explained above, IPEDS is not a source for accurate "cost of attendance" data. The calculations Mr. DeBois did using IPEDS data are therefore meaningless in determining how many borrowers had loans that exceeded their "costs of attendance." Accordingly, Mr. DeBois does not demonstrate that there is even one borrower who fits within the class definition, let alone a sufficiently numerous group to satisfy Rule 23(a)(1). Nor does Mr. DeBois say anything about the number of loans held by the Trust Defendants that might fall within the proposed class definition.

Ultimately, Plaintiff is simply asking the Court to "assume" that the proposed class is sufficiently numerous. The Court cannot and should not make such an assumption.

### III. Plaintiff's Proposed Class Does Not Meet The Requirements Of Rule 23(b).

Courts will "only turn . . . attention to Rule 23(b) after [they are] certain that all of Rule 23(a)'s requirements ha[ve] been met." *Bell*, 800 F.3d at 374.

If Plaintiff had satisfied Rule 23(a), she must then demonstrate that her proposed class meets the various requirements under one of the three categories set forth in Rule 23(b). *Brown*, 609 F.3d at 476; *Teamsters Local 445*, 546 F.3d at 202. Plaintiff has moved to certify, alternatively, under Rule 23(b)(1)(A), (b)(2), or (b)(3). (Pl. Br., p. 7). There is no basis to certify a class under any of the three.

#### A. Plaintiff Does Not Meet The Requirements For A Damages Class Under 23(b)(3).

In order to certify a damages class under Fed. R. Civ. P. 23(b)(3) a plaintiff must meet two criteria beyond those contained in Rule 23(a). She must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b); *see also Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 512 (2d Cir. 2020); *Johnson v. Nextel Communications Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

Unsurprisingly, given the ascertainability issues Plaintiff's proposed class presents, Plaintiff likewise fails to demonstrate that she meets the predominance or superiority requirements of Rule 23(b)(3). *See Petrobras*, 862 F.3d at 269 n. 20.

### 1.    Individualized Questions Of Law And Fact Predominate.

As described above, there are serious and insurmountable threshold barriers to determining who is and is not a member of Plaintiff's proposed class, which is defined using a concept, "cost of attendance," that is inherently individualized. (*See* Section I.A., *supra*.) These same, individualized questions plus others – including how each individual putative class member characterized her loans for tax and bankruptcy purposes – predominate over any common questions or issues and precludes certification. *See* FED. R. CIV. P. 23(b)(3).

A court examining predominance must assess (1) the elements of the claims and defenses to be litigated, (2) whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief, and (3) whether the common issues can properly be tried on a class-wide basis, or whether they will be overwhelmed by individual issues. *Scott*, 954 F.3d at 512.

As the Second Circuit, has explained:

> An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized class-wide proof."

*Petrobras*, 862 F.3d at 270 (quoting *Bouaphakeo*, 577 U.S. at 453 (internal marks ommitted)).

The requirements of Rule 23(b)(3) are satisfied only if the issues that can be resolved through generalized proof "are more substantial than the issues subject only to individualized proof.'" *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) (quoting *Roach v. T.L. Cannon Corp.,* 778 F.3d 401, 405 (2d Cir. 2015)); *see also Scott*, 954 F.3d at 512; *Myers*, 624

F.3d at 547; *Royal Park Invs. SA/NV v. Bank of New York Mellon*, No. 1:14-cv-6502-GHW, 2019 WL 652841, at *7 (S.D.N.Y. Feb. 15, 2019) (individual issues predominate where court must "engage in a multi-step analysis" to "determine whether an alleged class member has standing to assert its claims.").

As with the other requirements of Rule 23, it is the Plaintiff's burden to show that the issues in the proposed action that are subject to generalized proof outweigh those issues that are subject to individualized proof. *See In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001). If she cannot, no class can be certified. *See Heerwagen*, 435 F.3d at 226.

### a.      Every Potential Plaintiff Has A Different "Cost of Attendance" And Loan Stack.

For every member of Plaintiff's proposed class, the Court will need to conduct a mini-proceeding to determine at a minimum: 1) what the borrower's "cost of attendance" was at the school he or she attended for the year in question; and 2) the borrower's loan stack. This individualized information must be known before any decisions can be made about whether or not a plaintiff is part of the class entitled to even seek relief. *See Scott*, 954 F.3d at 512; *see* Section I.A., *supra*.

What has not yet been addressed is just how difficult these individualized questions will be to resolve. Plaintiff admits that it is fatal for a class definition to require an "arduous individual inquiry" into individual records rather than a "ministerial review." (Pl. Br., p. 16) (citing *Audet v. Fraser*, 332 F.R.D. 53, 72-72 (D.Conn. 2019)). What has been described above is an "arduous individual inquiry." After more than three years of active litigation, Plaintiff has still not been able to prove what her "cost of attendance" at Penn Law School was. (*See* Dkt. No. 336). Nor has she proven what her loan stack was. There will be a similar dispute for every potential class member. If Plaintiff's case is like others, discovery will entail a subpoena to every school that a

borrower attended as well as discovery regarding how that school calculated "costs of attendance" for its students and what its loan certification process was when the student attended. Because the class reaches so far back into the past, there will be document retention issues, depending on the policy each school has. *See* 20 U.S.C. § 1232f(a) (institutions receiving federal funds need only retain related documentation for three years). There will also need to be discovery directed at every putative class member to understand their loan stacks. There will be discovery directed at every putative class member's tax and bankruptcy treatment of their loans as well.

No common evidence can provide the above information. Accordingly, the Court cannot get to any other issues without individualized inquiries, which overwhelm any common issue.

There is second failing that also grows out of the individualized nature of each claim. If the Court were to do the necessary individualized inquiries, any class that was ascertained would be an impermissible "fail-safe class." "A fail-safe class is one whose definition 'shields the putative class members from receiving an adverse judgment....'" *Mazzei v. Money Store*, 288 F.R.D. 45, 55 (S.D.N.Y. 2012) (*quoting Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011)). In such a class, "either the class members win or, by virtue of losing, they are not in the class, and therefore not bound by the judgment." *Spread Enterprises, Inc. v. First Data Merchant Services Corp.,* 298 F.R.D. 54, 69 (E.D.N.Y. 2014) (*quoting Mazzei*, 288 F.R.D. at 55). A "fail-safe" class is problematic "because the members of the class could only be known after a determination of liability." *Mazzei*, 288 F.R.D. at 55 (citing *Randleman*, 646 F.3d at 352; *Kamar v. Radio Shack Corp.,* 375 Fed.Appx. 734, 736 (9th Cir. 2010)).

That is precisely what the Court is faced with here. Plaintiff's class requires the Court to determine if each member has a loan which exceeded their "cost of attendance" so Defendants can be held liable for collecting on a loan that was discharged because it exceeded the member's "cost

of attendance." The class members either "win or, by virtue of losing, they are not in the class, and therefore not bound by the judgment." *Spread Enterprises, Inc.*, 298 F.R.D. at 69.

In *Spread Enterprises* Judge Spatt rejected two class definitions that stated "class members 'were charged excessive fees.' [Because, i]n the Court's view, this language makes these subclasses impermissible fail-safe classes, since class membership would depend on whether or not the Defendants were found liable for overcharging." 298 F.R.D. at 69. Judge Spatt rewrote the definitions to remove reference to "excessive fees" because whether or not the fees were excessive "remains an unresolved and disputed issue." *Id.* at 70. Here, however, Plaintiff's entire class definition rests on loans exceeding their "costs of attendance." Unlike in *Spread Enterprises*, the class definition cannot be rewritten. Without "cost of attendance" there is no class.

> **b.      Each Loan's Tax And Bankruptcy Treatment Will Impact Whether They Are Qualified Loans.**

Beyond "cost of attendance" and loan stacks, there are individualized questions relating to each borrower's individual decisions about the tax and bankruptcy treatment of their loans.

Plaintiff's theory of liability depends on only "qualified education loans" as defined in IRS Code Section 221(d) being non-dischargeable under Section 523(a)(8)(B). (*See generally*, Pl. Br.). There is an individualized question lurking in the intersection of these two statutes. The chief purpose of Section 221 is to allow for a borrower to deduct the interest he or she pays on a "qualified education loan." *See*, *e.g.*, 26 C.F.R. § 1.221–1. In order to deduct interest on a loan it must be a "qualified education loan." *See* 26 U.S.C. § 221(a); *see also In re Mallett*, 625 B.R. 553, 554 (Bankr. M.D. Fla. 2021). Accordingly, the way an individual borrower treated his or her loans for tax purposes informs that loans status as a "qualified education loan."

Whether or not a particular class member has taken the Section 221 deduction can be dispositive of whether or not the loan is a "qualified education loan." *Id*. As the *Mallett* court explained:

> The Debtor could not have claimed that tax deduction unless the loan … met the definition of a "qualified education loan" under Internal Revenue Code § 221(d). The Debtor's statements on her tax returns are therefore an evidentiary admission that the loan … is a "qualified education loan."
>
> Put another way, the Debtor's representation on her tax returns – under the penalty of perjury – that the interest on her loan … was tax deductible is the equivalent of her sitting on the stand and testifying under oath that the loan … met all the requirements of a "qualified education loan" under Internal Revenue Code § 221(d)(1).

*Id.*[26]

Similar issues arise with respect to how each class member treated the loan claimed to have exceeded his or her "cost of attendance" in their bankruptcy. Determining the effect of bankruptcy treatment requires answering: (i) whether the debtor's petition listed his or her loan as a non-dischargeable "student loan;" (ii) whether the debtor filed an adversary proceeding seeking a determination as to whether her debt was in fact dischargeable under § 523(a)(8); and (iii) whether the debtor acknowledged that her loan was a qualified education loan by making an undue hardship motion or any other representation to the court. *See In re Desormes*, No. 10-cv-50079, 2012 WL 4106765, at *2 (Bankr. D. Conn. Sept. 18, 2012) ("It is not insignificant that in the plaintiff's bankruptcy Schedule F …, the plaintiff listed the Note as the "2008 Promissory Note[,] ***Tuition Debt***")" (emphasis in original)). These questions cannot be answered on a class wide basis employing common proof. They would need to be answered on a debtor by debtor basis, which requires the Court to review each putative class member's bankruptcy.

---

[26] Although the *Mallett* court acknowledge that "an evidentiary admission, of course, can be controverted or explained away," *In re Mallett*, 625 B.R. at 554, that controversion would of course require a fact-intensive mini-trial that cannot and should not occur in a class proceeding.

For the purposes of a predominance analysis, bankruptcy and tax treatment raise a second set of individualized questions for every borrower who claims they have an educational loan that is not a "qualified education loan" because it exceeded their "cost of attendance."

### c.    Whether Or Not A Loan Was Guaranteed Informs Whether It Even Matters If It Was Qualified.

There is finally an individualized question about whether or not the loans a borrower claims exceeded his or her "cost of attendance" are even subject to the analysis Plaintiff asserts. The NCT Loan illustrates this in concrete terms. It was made under a program guaranteed by a non-profit.

While Section 523(a)(8)(B) requires that a loan be a "qualified education loan" to be non-dischargeable, Section 523(a)(8)(A)(i) does not. It exempts from discharge:

> (i)    an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; …

The NCT Loan was made as part of the Bank One EducationOne® Loan Program. (*See* Exs. S, T). That loan program was guaranteed by The Education Resources Institute ("TERI"), a non-profit. (*See* Dkt. No. 338, ¶ 6). The Second Circuit has held that TERI guarantying a loan program constitutes partial funding of that program sufficient to meet the requirements of Section 523(a)(8)(A)(i) such that loans made under the program are non-dischargeable. *See O'Brien v. First Marblehead Education Resources, Inc. (In re O'Brien*), 419 F.3d 104, 107 (2d Cir. 2005). Accordingly, the NCT Loan is non-dischargeable under Section 523(a)(8)(A)(i) independent of Plaintiff's "cost of attendance" and the requirements of Section 523(a)(8)(B).

On a granular level, this means that Plaintiff's claims on the NCT Loan are not part of the class she seeks to certify. (*See* Section II.A., *supra*). On a class-wide level, it means that there is an inquiry that needs to take place plaintiff-by-plaintiff, loan-by-loan to determine whether a loan is part of a program that is guaranteed by a non-profit. This is not a simple inquiry, as demonstrated

by the objections that Plaintiff has attempted to raise regarding TERI's status on her individual motion for partial summary judgment. (*See* Dkt. No. 244, pp. 18-39; Dkt. No. 336, pp. 22-38). It is a necessary inquiry, however, because it affects who can bring a claim since it obviates the theory behind Plaintiff's causes of action for many loans. Moreover, it is not a TERI specific inquiry; it is not a common question. As detailed in the servicer defendants' briefing, many non-profits guaranty loan programs. The details of those guaranties, the programs they were made to cover, and the non-profits themselves would all need to be investigated on an individual basis.

### 2.    A Class Action Is Not Superior To Other Available Methods For Pursuing Claims Against Defendants.

The individualized questions that predominate around each putative class member regarding 1) their "cost of attendance" and loan stack, 2) the tax and bankruptcy treatment of their loans, and 3) whether their loans were guaranteed by a non-profit, are also relevant to the superiority requirements of Rule 23(b)(3).

In order to certify a class under Rule 23(b)(3), the Court must determine that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." FED.R.CIV.P. 23(b)(3). Superiority asks courts to balance, in terms of fairness and efficiency, the advantages of a class action against those of alternative available methods of adjudication, *e.g.*, individual actions. *See* FED. R. CIV. P. 23 Advisory Committee Notes, 1966 Amendment, 28 U.S.C.A. Rule 23, at 385. The factors relevant in determining whether the "superiority" requirement is met include:

> (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

FED. R. CIV. P. 23(b)(3); *see also Parker v. Time Warner Entm't Co.*, 331 F.3d 13, 21 (2d Cir. 2003).

Two of these factors have outsized importance in this case. The difficulties in managing this case as a class action make it administratively unfeasible. And, the members of the class have a very specific interest in controlling their own actions.

### a. Plaintiff's Proposed Class Action Is Not Administratively Feasible.

Plaintiff's proposed class action is not superior to other methods of adjudicating the claims alleged because of the numerous individualized issues discussed thus far. Each one of those issues will require a mini-trial to resolve. The management issues created by those, and the resulting administrative infeasibility, are another reason why class action treatment is improper here.

When individualized inquiries are central to the case, a class action is extremely difficult to manage. *Sparkman v. Zwicker & Assocs., P. C.*, 374 F. Supp. 2d 293, 298 n. 2 (E.D.N.Y. 2005). The "greater the number of individual issues, the less likely superiority can be established." *Cohn v. Mass. Mut. Life Ins. Co.*, 189 F.R.D. 209, 219 (D. Conn. 1999) (alteration omitted) (quoting *Castano*, 84 F.3d at 745 n. 19); *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 99 (S.D.N.Y. 2010).

If a court is required to conduct a series of mini-trials in order to determine whether each participant has been damaged, a class action is not a feasible, let alone superior, method for the adjudication of the putative class' claims. *Dunnigan v. Metropolitan Life Ins. Co.*, 214 F.R.D. 125, 142 (S.D.N.Y. 2003). As shown throughout this brief, this case is rife with individual factual and legal issues. Certification will still leave numerous defenses to be decided on an individual basis. But, more concerning, the threshold question of determining who is a member of the class requires individualized inquiries to determine who is and who cannot be a class member.

The intractable manageability problem this creates is thrown into stark relief when the Court considers the notice required by Rule 23(c)(2)(B), which requires:

> *For (b)(3) Classes.* For any class certified under Rule 23(b)(3) – or upon ordering notice under Rule 23(e)(1) to a class proposed to be certified for purposes of settlement under Rule 23(b)(3) – the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.

Notice is not discretionary. *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 176 (1974). It is a requirement rooted in the fact that Rule 23 "was intended to insure that the judgment, whether favorable or not, would bind all class members who did not request exclusion from the suit." *Id.* Accordingly, "each class member who can be identified through reasonable effort must be notified that he may request exclusion from the action and thereby preserve his opportunity to press his claim separately …." *Id*. This mandatory notice and the corollary right for a putative class member to opt out is one of the "procedural protections attending the (b)(3) class." *Dukes,* 564 U.S. at 362. This notice must be given before the merits of the case are adjudicated. *Schwarzschild v. Tse*, 69 F.3d 293, 296 (9th Cir. 1995). That notice is impossible to give here.

Class members are not even ascertainable to be given notice of this suit without individualized merits determinations. It is, therefore, not "administratively feasible for the court to determine whether a particular individual is a member" of the proposed class. *Petrobras,* 862 F.3d at 266 (citing *Brecher,* 806 F.3d at 24). The individualized questions that predominate throughout this case echo again.

This is not simply some technical defect that can be remedied or managed "down the road." It implicates questions of due process. The Supreme Court has made clear that Rule 23(b)(3)'s manageability test is satisfied only if trial of the case as a class action can be accomplished "without sacrificing procedural fairness" and without "abridg[ing], enlarging] or modifying] any substantive right." *Amchem Prods.*, 521 U.S. at 613, 615. The Rules Enabling Act guarantees a

class action defendant's due process right to assert a defense against each and every class member. *See* 28 U.S.C. § 2072; *see also Amchem Prods.*, 521 U.S. at 613; *Dukes,* 564 U.S. at 367; *Honda Motor Co. v. Oberg*, 512 U.S. 415, 430 (1994). "What this means, as a practical matter, is that, in an effort to achieve manageability, courts may not relieve plaintiffs of the burden of proving the individualized elements of their claims … and may not deprive defendants of the right to put on individualized evidence, to raise individualized defenses, and to receive a verdict on the individualized facts of each class member's claims." Evan M. Tager, *The Constitutional Limitations on Class Actions*, Mealy's Litig. Rpt.: Class Actions, January 2001, at 35.

In the present instance this means Defendants must be given the opportunity to fully litigate the issues relating to each borrower's "cost of attendance," loan stack, tax and bankruptcy treatment of their loans, and whether or not each loan is non-dischargeable under a different provision of Section 523(a)(8). For the past three years, the Defendants have been litigating some of these issues with the named Plaintiff. It has involved extensive discovery from numerous third parties, including depositions. If Plaintiff is correct that her class runs into the thousands, this means that process would need to be repeated thousands of times, after which the Court would need to conduct a trial that would presumably take years to complete, Plaintiff's failure to present a detailed notice or trial plan in this case is telling and should cause the Court to carefully scrutinize what comes next if the proposed class is certified.

### b.    Individual Plaintiffs Have An Interest In Controlling Their Own Cases.

The problems endemic to determining who is a member of Plaintiff's proposed class take on an added dimension in light of the potential fallout from Plaintiff's causes of action. This implicates "the interest of the members of the class in individually controlling the prosecution or defense of separate actions." *See* Fed. R. Civ. P. 23(b)(3)(A); *see also, e.g.*, *Adkins*, 307 F.R.D. at

147 (no superiority when "various factors have different effects on borrowers and lenders in combination than they have in isolation.").

As touched on above, there is an individualized issue regarding the manner in which a potential class member treated their student loans for tax purposes. (*See* Section III.A.1.b., *supra*). But the relief Plaintiff is seeking and the theories she is relying on will also have an effect on putative class members. There will be borrowers swept up into Plaintiff's proposed class, who took a tax deduction under IRS Code Section 221(a) and in doing so affirmed that the loan was a "qualified education loan." *See In re Mallett*, 625 B.R. at 554. As part of the class, they would be taking the position that loans they swore were "qualified education loans" are not. They are unwittingly transformed into potential perjurers. This is another reason why the individualized issues and notice are so important here. No one can identify the class members without an individualized inquiry to even ask if this is a risk they want to take.

Clearly a party has an interest in maintaining the prosecution of his or her own action if that action can result in tax penalties or worse.

**B.    Plaintiff Does Not Meet The Requirements For An Injunction/Declaratory Relief Class Under 23(b)(2).**

A Rule 23(b)(2) class will only be certified if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(2) classes are mandatory. *Dukes*, 564 U.S. at 360. Plaintiff's request for certification under Rule 23(b)(2) falls short in three distinct ways.

First, a Rule 23(b)(2) class will not be certified if "monetary relief is not incidental to the injunctive or declaratory relief." *Id.*; *see also Nationwide Life Ins. Co. v. Haddock*, 460 Fed. Appx. 26, 29 (2d Cir. 2012). Monetary relief is not incidental when providing it "entail[s] complex

individualized determinations." *Dukes*, 564 U.S. at 366. Plaintiff seeks monetary relief. (*See* Am. Compl.). It is the main thrust of this case. Plaintiff asks, among other forms of relief, that every class member be repaid the amount that was collected from that individual on the loan that is purported to have been discharged. This is precisely the type of individual determination that precludes a finding that the monetary damages are incidental under 23(b)(2).

Second, where the named plaintiff does not have standing to seek an injunction, she cannot seek injunctive relief on behalf of a putative class. *Albert v. Blue Diamond Growers*, 151 F. Supp. 3d 412, 417 (S.D.N.Y. 2015) (citing *Dodge v. Cty. of Orange*, 103 Fed. Appx. 688, 690 (2d Cir. 2004))); *Nicosia v. Amazon.com, Inc.*, 84 F. Supp. 3d 142, 158 (E.D.N.Y. 2015) (holding plaintiff "must personally have standing to secure prospective relief on behalf of a class" and the named plaintiff lacked personal standing). "To establish standing for an injunction, a plaintiff must not merely allege past injury, but also a risk of future harm." *Young Advocates for Fair Education v. Cuomo*, 359 F. Supp. 3d 215, 230 (E.D.N.Y. 2019) (quotation omitted).

Plaintiff cannot demonstrate that she has any loans that exceeded her "cost of attendance" at Penn Law School. This is the reason why she does not fit within her own class. It also means that she does not allege a past injury or any risk of future harm and, thus, has no standing to seek injunctive relief for herself or a Rule 23(b)(2) class. *See In re WorldCom, Inc.*, 358 B.R. at 597 (quoting *Cent. States Southeast & Southwest Areas*, 433 F.3d at 199; *O'Shea*, 414 U.S. at 494).

Third, classes certified under Rule 23(b)(2) must also be cohesive. *Laumann v. Nat'l Hockey League*, 105 F. Supp. 3d 384, 395 (S.D.N.Y. May 14, 2015) (citing Newberg on Class Actions § 4:34; *Barnes v. American Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998)); *see also In re Rezulin Prod. Liab. Litig.*, 210 F.R.D. 61, 75 (S.D.N.Y. 2002) ("In short, although there is no

predominance or superiority requirement under Rule 23(b)(2), classes certified pursuant to it must be cohesive.").

Cohesiveness is another way of addressing in the context of Rule 23(b)(2) the requirement that common questions of law or fact common to class members predominate. *Sullivan v. Saint-Gobain Performance Plastics Corporation*, No. 5:16-cv-125, 2019 WL 8272995, *13 (D. Vt. Aug. 23, 2019) (*citing Amchem Prods.*, 521 U.S. at 623); *Brooks v. Roberts,* 251 F. Supp. 3d 401, 420 (N.D.N.Y. 2017) (Rule 23(b)(2)'s requirement of cohesiveness ensures that the commonality requirement of Rule 23(a) is respected in a Rule 23(b)(2) analysis.). Courts have raised cohesiveness concerns in instances where there are "significant questions, not only of damages but of liability and defenses of liability, … affecting the individuals in different ways." *Amchem Prods.*, 521 U.S. at 625 (citations omitted); *see also Gates v. Rohm & Haas Co.*, 655 F.3d 255, 271 (3d Cir. 2011).

Here, as shown above, Plaintiff does not – and cannot – demonstrate that there are common questions such that she meets the requirements of Rule 23(a). That means that there is no cohesive group to justify certifying a class under Rule 23(b)(2).

### C.      Plaintiff Does Not Meet The Requirements For A "Prejudice Class" Under 23(b)(1)(A).

Rule 23(b)(1)(A) allows class certification where separate actions by individual class members would risk "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class[.]" FED. R. CIV. P. 23(b)(1)(A). "Rule 23(b)(1)(A) takes in cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian

owner using water as against downriver owners).” *Amchem Prods.*, 521 U.S. at 614 (quotation omitted).

“[I]nconsistent verdicts on liability or damages do not alone give rise to incompatible standards of conduct.” *Carollo v. United Capital Corp.*, --- F. Supp. 3d ----, 2021 WL 11152947, *11 (N.D.N.Y. Mar. 24, 2021) (quotation omitted). Otherwise, any circumstance in which a defendant's course of action could have harmed multiple plaintiffs would be entitled to class certification under Rule 23(b)(1)(A) as a matter of course. *Id.* (citing *Petrolito v. Arrow Fin. Servs., LLC*, 221 F.R.D. 303, 313 (D. Conn. 2004) (“[I]f compensatory damage actions can be certified under Rule 23(b)(1)(A), then all actions could be certified under the section, ... making the other sub-sections of Rule 23 meaningless”).

Plaintiff argues that Rule 23(b)(1)(A) applies because:

> The issues before the Court are common legal questions that are the same for the entire class. They should be answered the same for everyone in the class. … Separate adjudications could result in some loans being declared discharged and other loans, under virtually identical facts, and under the same Bankruptcy Code provisions, being declared nondischargeable. Some courts may hold that the exact same loans are discharged and others may not, or that debtors are entitled to restitution and others may not.

(Pl. Br., p. 21). She gives her game away with this argument.

First, the “entitlement to restitution” Plaintiff envisions is compensatory damages. Classes seeking compensatory damages are not appropriate for certification under Rule 23(b)(1)(A). *See, e.g., Russell v. Kohl's Department Stores, Inc.*, No. 15-cv-01143-RGK, 2015 WL 12748629, * 3 (C.D. Cal. Dec. 4, 2015) (class certification is inappropriate under Rule 23(b)(1)(A) when relief sought contains request for restitution).

Second, when Plaintiff states there is the possibility of “some loans being declared discharged and other loans, under virtually identical facts, and under the same Bankruptcy Code provisions, being declared nondischargeable” she acknowledges that there will need to be

individualized inquiries into each borrower's situation. There are not "virtually identical facts" if the comparison is simply a dollar to dollar comparison of two numbers. Plaintiff is seeking to certify a 23(b)(1)(A) precisely to end run the individualized questions that keep her from demonstrating an ascertainable class that meets any of the requirements of Rule 23(a).

## **CONCLUSION**

For the reasons stated above the Court should deny Plaintiff's motion.


Dated: June 29, 2021

**LOCKE LORD LLP**

By:  */s/ Gregory T. Casamento*
Gregory T. Casamento
R. James DeRose, III
Brookfield Place
200 Vesey Street, 20th Floor
New York, New York 10281
(212) 415-8600
gcasamento@lockelord.com
rderose@lockelord.com

J. Matthew Goodin
111 South Wacker Drive, Suite 4100
Chicago, Illinois 60606
(312) 443-0700
jmgoodin@lockelord.com

*Attorneys for Defendants*
*National Collegiate Student Loan Trust*
*2006-4 and Goal Structured Solutions*
*Trust 2016-A*

# **<u>APPENDIX A</u>**

20 U.S.C. § 1087*ll* (Current Version)

---

United States Code Annotated
  Title 20. Education
    Chapter 28. Higher Education Resources and Student Assistance (Refs & Annos)
      Subchapter IV. Student Assistance (Refs & Annos)
        Part F. Need Analysis (Refs & Annos)

20 U.S.C.A. § 1087*ll*

§ 1087*ll*. Cost of attendance

Effective: July 1, 2010
Currentness

For the purpose of this subchapter, the term "cost of attendance" means--

**(1)** tuition and fees normally assessed a student carrying the same academic workload as determined by the institution, and including costs for rental or purchase of any equipment, materials, or supplies required of all students in the same course of study;

**(2)** an allowance for books, supplies, transportation, and miscellaneous personal expenses, including a reasonable allowance for the documented rental or purchase of a personal computer, for a student attending the institution on at least a half-time basis, as determined by the institution;

**(3)** an allowance (as determined by the institution) for room and board costs incurred by the student which--

  **(A)** shall be an allowance determined by the institution for a student without dependents residing at home with parents;

  **(B)** for students without dependents residing in institutionally owned or operated housing, shall be a standard allowance determined by the institution based on the amount normally assessed most of its residents for room and board;

  **(C)** for students who live in housing located on a military base or for which a basic allowance is provided under section 403(b) of Title 37, shall be an allowance based on the expenses reasonably incurred by such students for board but not for room; and

  **(D)** for all other students shall be an allowance based on the expenses reasonably incurred by such students for room and board;

**(4)** for less than half-time students (as determined by the institution), tuition and fees and an allowance for only--

  **(A)** books, supplies, and transportation (as determined by the institution);

**(B)** dependent care expenses (determined in accordance with paragraph (8)); and

**(C)** room and board costs (determined in accordance with paragraph (3)), except that a student may receive an allowance for such costs under this subparagraph for not more than 3 semesters or the equivalent, of which not more than 2 semesters or the equivalent may be consecutive;

**(5)** for a student engaged in a program of study by correspondence, only tuition and fees and, if required, books and supplies, travel, and room and board costs incurred specifically in fulfilling a required period of residential training;

**(6)** for incarcerated students only tuition and fees and, if required, books and supplies;

**(7)** for a student enrolled in an academic program in a program of study abroad approved for credit by the student's home institution, reasonable costs associated with such study (as determined by the institution at which such student is enrolled);

**(8)** for a student with one or more dependents, an allowance based on the estimated actual expenses incurred for such dependent care, based on the number and age of such dependents, except that--

**(A)** such allowance shall not exceed the reasonable cost in the community in which such student resides for the kind of care provided; and

**(B)** the period for which dependent care is required includes, but is not limited to, class-time, study-time, field work, internships, and commuting time;

**(9)** for a student with a disability, an allowance (as determined by the institution) for those expenses related to the student's disability, including special services, personal assistance, transportation, equipment, and supplies that are reasonably incurred and not provided for by other assisting agencies;

**(10)** for a student receiving all or part of the student's instruction by means of telecommunications technology, no distinction shall be made with respect to the mode of instruction in determining costs;

**(11)** for a student engaged in a work experience under a cooperative education program, an allowance for reasonable costs associated with such employment (as determined by the institution);

**(12)** for a student who receives a loan under this or any other Federal law, or, at the option of the institution, a conventional student loan incurred by the student to cover a student's cost of attendance at the institution, an allowance for the actual cost of any loan fee, origination fee, or insurance premium charged to such student or such parent on such loan, or the average cost of any such fee or premium charged by the Secretary, lender, or guaranty agency making or insuring such loan, as the case may be; and

**(13)** at the option of the institution, for a student in a program requiring professional licensure or certification, the one-time cost of obtaining the first professional credentials (as determined by the institution).

### CREDIT(S)

(Pub.L. 89-329, Title IV, § 472, as added Pub.L. 99-498, Title IV, § 406(a), Oct. 17, 1986, 100 Stat. 1454; amended Pub.L. 102-325, Title IV, § 471(a), July 23, 1992, 106 Stat. 585; Pub.L. 103-208, § 2(g)(1), Dec. 20, 1993, 107 Stat. 2471; Pub.L. 105-244, Title IV, § 471, Oct. 7, 1998, 112 Stat. 1729; Pub.L. 109-171, Title VIII, § 8016, Feb. 8, 2006, 120 Stat. 172; Pub.L. 110-315, Title IV, § 471(a), Aug. 14, 2008, 122 Stat. 3269.)

20 U.S.C.A. § 1087*ll*, 20 USCA § 1087ll
Current through PL 117-17 with the exception of PL 116-283, Div. A, Title XVIII, which takes effect January 1, 2022.

**End of Document**                                                © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# **APPENDIX B**

20 U.S.C. § 1087*ll* (Version in Effect on August 5, 1997)

---

United States Code Annotated
  Title 20. Education
    Chapter 28. Higher Education Resources and Student Assistance (Refs & Annos)
      Subchapter IV. Student Assistance (Refs & Annos)
        Part E. Need Analysis (Refs & Annos)

This section has been updated. Click here for the updated version.

20 U.S.C.A. § 1087*ll*

§ 1087*ll*. Cost of attendance

Effective: [See Text Amendments] to October 6, 1998

For the purpose of this subchapter and part C of subchapter I of chapter 34 of Title 42, the term "cost of attendance" means--

**(1)** tuition and fees normally assessed a student carrying the same academic workload as determined by the institution, and including costs for rental or purchase of any equipment, materials, or supplies required of all students in the same course of study;

**(2)** an allowance for books, supplies, transportation, and miscellaneous personal expenses for a student attending the institution on at least a half-time basis, as determined by the institution;

**(3)** an allowance (as determined by the institution) for room and board costs incurred by the student which--

   **(A)** shall be an allowance of not less than $1,500 for a student without dependents residing at home with parents;

   **(B)** for students without dependents residing in institutionally owned or operated housing, shall be a standard allowance determined by the institution based on the amount normally assessed most of its residents for room and board; and

   **(C)** for all other students shall be an allowance based on the expenses reasonably incurred by such students for room and board, except that the amount may not be less than $2,500;

**(4)** for less than half-time students (as determined by the institution) tuition and fees and an allowance for only books, supplies, and transportation (as determined by the institution) and dependent care expenses (in accordance with paragraph (8));

**(5)** for a student engaged in a program of study by correspondence, only tuition and fees and, if required, books and supplies, travel, and room and board costs incurred specifically in fulfilling a required period of residential training;

**(6)** for incarcerated students only tuition and fees and, if required, books and supplies;

**(7)** for a student enrolled in an academic program in a program of study abroad approved for credit by the student's home institution, reasonable costs associated with such study (as determined by the institution at which such student is enrolled);

**(8)** for a student with one or more dependents, an allowance based on the estimated actual expenses incurred for such dependent care, based on the number and age of such dependents, except that--

---

(A) such allowance shall not exceed the reasonable cost in the community in which such student resides for the kind of care provided; and

(B) the period for which dependent care is required includes, but is not limited to, class-time, study-time, field work, internships, and commuting time;

(9) for a student with a disability, an allowance (as determined by the institution) for those expenses related to the student's disability, including special services, personal assistance, transportation, equipment, and supplies that are reasonably incurred and not provided for by other assisting agencies;

(10) for a student receiving all or part of the student's instruction by means of telecommunications technology, no distinction shall be made with respect to the mode of instruction in determining costs, but this paragraph shall not be construed to permit including the cost of rental or purchase of equipment;

(11) for a student placed in a work experience under a cooperative education program, an allowance for reasonable costs associated with such employment (as determined by the institution); and

(12) for a student who receives a loan under this or any other Federal law, or, at the option of the institution, a conventional student loan incurred by the student to cover a student's cost of attendance at the institution, an allowance for the actual cost of any loan fee, origination fee, or insurance premium charged to such student or such parent on such loan, or the average cost of any such fee or premium charged by the Secretary, lender, or guaranty agency making or insuring such loan, as the case may be.

## CREDIT(S)

(Pub.L. 89-329, Title IV, § 472, as added Pub.L. 99-498, Title IV, § 406(a), Oct. 17, 1986, 100 Stat. 1454.)

(As amended Pub.L. 102-325, Title IV, § 471(a), July 23, 1992, 106 Stat. 585; Pub.L. 103-208, § 2(g)(1), Dec. 20, 1993, 107 Stat. 2471.)

20 U.S.C.A. § 1087*ll*, 20 USCA § 1087ll
Current through PL 117-17 with the exception of PL 116-283, Div. A, Title XVIII, which takes effect January 1, 2022.

   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   2

# <u>APPENDIX C</u>

20 U.S.C. § 1087*ll* (Comparison Between Current Version and
the Version in Effect on August 5, 1997)

Showing differences between versions effective [See Text Amendments] to October 6, 1998 and July 1, 2010 [current]

**Key:** ~~deleted text~~ **added text**

**12** deletions · **16** additions

**20 U.S.C.A. § 1087*ll***

**§ 1087*ll*. Cost of attendance**

For the purpose of this subchapter ~~and part C of subchapter I of chapter 34 of Title 42~~ , the term "cost of attendance" means--

**(1)** tuition and fees normally assessed a student carrying the same academic workload as determined by the institution, and including costs for rental or purchase of any equipment, materials, or supplies required of all students in the same course of study;

**(2)** an allowance for books, supplies, transportation, and miscellaneous personal expenses **, including a reasonable allowance** for **the documented rental or purchase of** a **personal computer, for a** student attending the institution on at least a half-time basis, as determined by the institution;

**(3)** an allowance (as determined by the institution) for room and board costs incurred by the student which--

**(A)** shall be an allowance ~~of not less than $1,500~~ **determined by the institution** for a student without dependents residing at home with parents;

**(B)** for students without dependents residing in institutionally owned or operated housing, shall be a standard allowance determined by the institution based on the amount normally assessed most of its residents for room and board ~~; and~~

**(C) for students who live in housing located on a military base or for which a basic allowance is provided under section 403(b) of Title 37, shall be an allowance based on the expenses reasonably incurred by such students for board but not for room; and**

**(** ~~C~~ **D** **)** for all other students shall be an allowance based on the expenses reasonably incurred by such students for room and board ~~, except that the amount may not be less than $2,500~~ ;

**(4)** for less than half-time students (as determined by the institution) **,** tuition and fees and an allowance for only ~~books, supplies, and transportation (as determined by the institution) and dependent care expenses (in accordance with paragraph (8));~~ **--**

**(A) books, supplies, and transportation (as determined by the institution);**

**(B) dependent care expenses (determined in accordance with paragraph (8)); and**

**(C) room and board costs (determined in accordance with paragraph (3)), except that a student may receive an allowance for such costs under this subparagraph for not more than 3 semesters or the equivalent, of which not more than 2 semesters or the equivalent may be consecutive;**

**(5)** for a student engaged in a program of study by correspondence, only tuition and fees and, if required, books and supplies, travel, and room and board costs incurred specifically in fulfilling a required period of residential training;

**(6)** for incarcerated students only tuition and fees and, if required, books and supplies;

**(7)** for a student enrolled in an academic program in a program of study abroad approved for credit by the student's home institution, reasonable costs associated with such study (as determined by the institution at which such student is enrolled);

**(8)** for a student with one or more dependents, an allowance based on the estimated actual expenses incurred for such dependent care, based on the number and age of such dependents, except that--

  **(A)** such allowance shall not exceed the reasonable cost in the community in which such student resides for the kind of care provided; and

  **(B)** the period for which dependent care is required includes, but is not limited to, class-time, study-time, field work, internships, and commuting time;

**(9)** for a student with a disability, an allowance (as determined by the institution) for those expenses related to the student's disability, including special services, personal assistance, transportation, equipment, and supplies that are reasonably incurred and not provided for by other assisting agencies;

**(10)** for a student receiving all or part of the student's instruction by means of telecommunications technology, no distinction shall be made with respect to the mode of instruction in determining costs, ~~but this paragraph shall not be construed to permit including the cost of rental or purchase of equipment~~ ;

**(11)** for a student ~~placed~~ engaged in a work experience under a cooperative education program, an allowance for reasonable costs associated with such employment (as determined by the institution); ~~and~~

**(12)** for a student who receives a loan under this or any other Federal law, or, at the option of the institution, a conventional student loan incurred by the student to cover a student's cost of attendance at the institution, an allowance for the actual cost of any loan fee, origination fee, or insurance premium charged to such student or such parent on such loan, or the average cost of any such fee or premium charged by the Secretary, lender, or guaranty agency making or insuring such loan, as the case may be. ; and

**(13) at the option of the institution, for a student in a program requiring professional licensure or certification, the one-time cost of obtaining the first professional credentials (as determined by the institution).**

**Credits**

~~(Pub.L. 89-329, Title IV, § 472, as added~~ Pub.L. 99-498, Title IV, § 406(a), ~~Oct. 17, 1986, 100 Stat. 1454.)~~

(~~As~~ Pub.L. 89-329, Title IV, § 472, as added Pub.L. 99-498, Title IV, § 406(a), Oct. 17, 1986, 100 Stat. 1454; amended Pub.L. 102-325, Title IV, § 471(a), July 23, 1992, 106 Stat. 585; Pub.L. 103-208, § 2(g)(1), Dec. 20, 1993, 107 Stat. 2471 ; Pub.L. 105-244, Title IV, § 471, Oct.  7, 1998, 112 Stat. 1729; Pub.L. 109-171, Title VIII, § 8016, Feb. 8, 2006, 120 Stat. 172; Pub.L. 110-315, Title IV, § 471(a), Aug. 14, 2008, 122 Stat. 3269.)

20 U.S.C.A. § 1087*ll*, 20 USCA § 1087ll

**End of Document**                                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 29th day of June, 2021, I caused a true and correct copy of the foregoing document to be served via CM/ECF upon all parties entitled to notice.

*<u>/s/ Gregory T. Casamento</u>*
Gregory T. Casamento
