UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br>Tashanna B. Golden<br>*fka* Tashanna B. Pearson,<br><br>                              Debtor, | Chapter 7<br><br><br><br>Case No. 16-40809 (ESS) |
| Tashanna B. Golden<br>*fka* Tashanna B. Pearson,<br><br>                              Plaintiff,<br><br>          v.<br><br>National Collegiate Student Loan Trust 2006-4, Goal Structured Solutions Trust 2016-A, Pennsylvania Higher Education Assistance Agency d/b/a American Education Services and Firstmark Services,<br><br>                              Defendants. | <br><br><br><br>Adv. Pro. No. 1-17-01005(ESS) |

---

**PLAINTIFF TASHANNA GOLDEN'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF HER MOTION FOR CLASS CERTIFICATION**

---

Dated:  September 2, 2021

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................................... iii

PRELIMINARY STATEMENT .................................................................................... 1

ARGUMENT ............................................................................................................ 6

I.      THE BURDEN OF ESTABLISHING NONDISCHARGEABILITY IS ON
        DEFENDANTS ............................................................................................... 6

II.     THIS COURT CAN CERTIFY THE CLASS WITHOUT JOINING THE OWNERS OF
        ALL THE LOANS SERVICED BY THE DEFENDANTS ............................................ 9

III.    TASHANNA GOLDEN IS A PROPER CLASS REPRESENTATIVE ........................... 11

        A.      Ms. Golden's Bank One Loan Exceeds the Cost of Attendance and Her
                Bar Loan is Not a Qualified Education Loan ......................................... 11

        B.      The Fact that Class Members Received Loans from Different Lenders
                Does Not Disqualify Ms. Golden as a Class Representative ................... 13

        C.      Defendants Sought to Collect on the NCT Loan after Tashanna Golden Declared
                Bankruptcy ...................................................................................... 14

        D.      Plaintiff Did Not Waive Her Right to Participate in the Class Action ......... 16

IV.     INDIVIDUAL ISSUES DO NOT PREVENT CLASS CERTIFICATION ...................... 17

        A.      Cost of Attendance Can Be Objectively Ascertained ........................... 19

        B.      Defendants and Their Principals Deliberately Chose Not to Determine
                Cost of Attendance When They Made Their Loans ............................... 21

        C.      All Loans, Scholarships and Grants Need to be Deducted from Cost of
                Attendance ...................................................................................... 26

        D.      Whether or Not a Class Member Took a Tax Deduction for Interest Paid
                on a Student Loan is Irrelevant to the Scope of the Class ..................... 28

        E.      Payments Made by Class Members Post-Discharge are Not Voluntary ...... 30

        F.      Other Factual Issues Defendants Raise are Irrelevant .......................... 32

V.      THE CLASS IS NOT A "FAIL-SAFE" CLASS ..................................................... 33

VI.     THERE IS NO CREDIBLE ARGUMENT THAT NUMEROSITY HAS NOT BEEN
        MET HERE ................................................................................................... 36

VII.    A DETERMINATION AS TO WHETHER ANY OF DEFENDANTS ARE SUBJECT
TO CONTEMPT AND PUNITIVE DAMAGES CANNOT DEFEAT CLASS
CERTIFICATION ...........................................................................................................37

VIII.   THIS COURT HAS JURISDICTION TO CERTIFY A NATIONAL CLASS ................38

CONCLUSION.....................................................................................................................38

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ajasa v. Wells Fargo* (*In re Ajasa*),
   627 B.R. 6 (E.D.N.Y. 2021) ................................................................................ 38

*Anderson v. Mt. Clemens Pottery, Co.*,
   328 U.S. 680 (1946) ......................................................................................... 23

*Ass'n Against Discrimination in Emp't, Inc. v. City of Bridgeport*,
   647 F.2d 256 (2d Cir. 1981) ............................................................................ 22

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011) ......................................................................................... 17

*Audet v. Fraser*,
   332 F.R.D. 53 (D. Conn. 2019) ...................................................................... 17

*Bethpage Fed. Credit Union v. Furio* (*In re Furio*),
   77 F.3d 622 (2d Cir. 1996) ............................................................................... 6

*Bock v. Salt Creek Midstream LLC*,
   2020 WL 3989646 (D. N.M. July 15, 2020) .................................................. 17

*Borecki v. Raymours Furniture Co., Inc.*,
   2017 WL 5900288 (S.D.N.Y. June 21, 2017) ................................................ 16

*Bradley v. Fina* (*In re Fina*),
   550 F. App'x 150 (4th Cir. 2014) ................................................................... 25

*Bronsdon v. Educ. Credit Mgmt. Ass'n* (*In re Bronsdon*),
   435 B.R. 791 (B.A.P. 1st Cir. 2010) ................................................................ 7

*Brunner v. N.Y. State Higher Educ. Servs. Corp.*,
   831 F.2d 395 (2d Cir. 1987) ............................................................................. 8

*Butto v. Collecto Inc.*,
   290 F.R.D. 372 (E.D.N.Y. 2013) ................................................................... 22

*Cazares v. Ava Restaurant Corp.*,
   2017 WL 1229727 (E.D.N.Y. Mar. 31, 2017) ............................................... 22

*Cazenovia Coll. v. Renshaw* (*In re Renshaw*),
   222 F.3d 82 (2d Cir. 2000) ............................................................................... 7

*Cohen v. Westhaven Bd. of Police Comm'rs*,
   638 F.2d 496 (2d Cir. 1980) ................................................................................... 22

*Cunningham v. Cornell Univ.*,
   2019 WL 275827 (S.D.N.Y. Jan. 22, 2019) ........................................................... 14

*Dietrich v. C.H. Robinson Worldwide, Inc.*,
   2020 WL 635972 (N.D. Ill. Feb. 11, 2020) ........................................................... 18

*DiGeronimo v. Weissberg* (*In re DiGeronimo*),
   354 B.R. 625 (Bankr. E.D.N.Y. 2006) ..................................................................... 9

*Falberg v. Goldman Sachs Grp., Inc.*,
   2020 WL 3893285 (S.D.N.Y. July 9, 2020) ........................................................... 13

*Garcia v. Execu/Search Group, LLC*,
   2019 WL 689084 (S.D.N.Y. Feb. 19, 2019) ........................................................... 34

*Golden v. Discover Bank* (*In re Golden*),
   2021 WL 3051896 (Bankr. E.D.N.Y. July 19, 2021) ............................................. 38

*Golden v. Nat'l Collegiate Trust* (*In re Golden*),
   587 B.R. 414 (E.D.N.Y. 2018) ............................................................................... 16

*Golden v. Nat'l Collegiate Trust* (*In re Golden*),
   596 B.R. 239 (Bankr. E.D.N.Y. 2019) ..................................................................... 6

*Grogan v. Garner*,
   498 U.S. 279 (1991) ................................................................................................. 7

*Hamilton v. Herr* (*In re Hamilton*),
   540 F.3d 367 (6th Cir. 2008) ................................................................................... 9

*Hardgers-Powell v. Angels in Your Home LLC*,
   330 F.R.D. 89 (W.D.N.Y. 2019) ...................................................................... 33, 34

*Harte v. Ocwen Fin. Corp.*,
   2018 WL 1830811 (E.D.N.Y. Feb. 8, 2018) ..................................................... 21, 22

*Haynes v. Chase Bank USA, N.A.* (*In re Haynes*),
   2014 WL 3608891 (Bankr. S.D.N.Y. July 22, 2014) ............................................. 38

*Homaidan v. Sallie Mae, Inc.* (*In re Homaidan*),
   3 F.4th 595 (2d Cir. 2021) ............................................................................. 6, 7, 32

*Hudson v. Central Bank* (*In re Hudson*),
   168 B.R. 368 (Bankr. S.D. Ill. 1994) ..................................................................... 31

iv

*Hurt v. Shelby County Board of Education*,
 2014 WL 4269113 (N.D. Ala. Aug. 21, 2014)........................................................ 34

*In re Digital Music Antitrust Litigation*,
 321 F.R.D. 64 (S.D.N.Y. 2017) .......................................................................... 18

*In re Ferris*,
 611 B.R. 701 (Bankr. M.D. Fla. 2019) ............................................................... 26

*In re Haroon*,
 313 B.R. 686 (Bankr. E.D. Va. 2004) .............................................................. 7, 9

*In re Mallett*,
 625 B.R. 553 (Bankr. M.D. Fla. 2021) ............................................................... 30

*In re Nassoko*,
 405 B.R. 515 (Bankr. S.D.N.Y. 2009).......................................................... 25, 31

*In re Starling*,
 617 B.R. 208 (Bankr. S.D.N.Y. 2020)................................................................. 25

*Jensen v. Cablevision Systems Corp.*,
 372 F. Supp. 3d 95 (E.D.N.Y. 2019) .................................................................. 17

*Kawaauhau v. Geiger*,
 523 U.S. 57 (1998) .............................................................................................. 6

*Kivett v. Flagstar Bank, FSB*,
 333 F.R.D. 500 (N.D. Cal. 2019) .................................................................. 23, 24

*Kopaleishvili v. Uzbek Logistics, Inc.*,
 2019 WL 6609212 (S.D. Ohio Dec. 5, 2019)...................................................... 24

*Lamar, Archer & Coffrin, LLP v. Appling*,
 138 S. Ct. 1752 (2018)......................................................................................... 6

*Leber v. Citigroup 401(K) Plan Inv. Comm.*,
 323 F.R.D. 145 (S.D.N.Y. 2017)........................................................................ 14

*Macarz v. Transword Sys., Inc.*,
 193 F.R.D. 46 (D. Conn. 2000) .......................................................................... 22

*Marini v. Adamo* (*In re Adamo*),
 560 B.R. 642 (Bankr. E.D.N.Y. 2016) .................................................................. 7

*Matter of Hellums*,
    772 F.2d 379 (7th Cir. 1985) .......................................................................... 31, 32

*May v. Midland Funding, LLC (In re May)*,
    595 B.R. 894 (Bankr. E.D. Ark. 2019) .................................................................. 17

*Mazzei v. The Money Store*,
    288 F.R.D. 45 (S.D.N.Y. 2012) ............................................................................. 34

*McNamee v. Nationstar Mortg., LLC*,
    2018 WL 1557244 (S.D. Ohio Mar. 30, 2018) .................................................... 22

*Meyer v. Kalanick*,
    185 F. Supp. 3d 448 (S.D.N.Y. 2016) .................................................................. 16

*Meyer v. Uber Technologies, Inc.*,
    868 F.3d 66 (2d Cir. 2017) ................................................................................... 17

*Moreno v. Deutsche Bank Americas Holding Corp.*,
    2017 WL 3868803 (S.D.N.Y. Sept. 5, 2017) ....................................................... 14

*Reddy v. Melnik (In re Melnik)*,
    592 B.R. 9 (Bankr. N.D.N.Y. 2018) ................................................................... 6, 7

*Rikos v. Proctor &Gamble Co.*,
    799 F.3d 497 (6th Cir. 2015) ............................................................................... 24

*Smilow v. Southwestern Bell Mobile Systems, Inc.*,
    323 F.3d 32 (1st Cir. 2003) .................................................................................. 18

*Spread Enterprises, Inc. v. First Data Merchant Services Corp.*,
    298 F.R.D. 54 (E.D.N.Y. 2014) ........................................................................... 34

*Taggart v. Lorenzen*,
    139 S. Ct. 1795 (2019) ........................................................................................... 3

*Tingling v. Educational Credit Management Corporation (In re Tingling)*,
    990 F.3d 304 (2d Cir. 2021) ................................................................................... 8

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ............................................................................................. 23

*Venture Bank v. Lapides*,
    800 F.3d 442 (8th Cir. 2015) ............................................................................... 31

*Wang v. Guo (In re Guo)*,
    548 B.R. 396 (Bankr. E.D.N.Y. 2016) ................................................................... 7

*Watkins v. Guardian Loan Co. of Massapequa, Inc.* (*In re Watkins*),
    240 B.R. 668 (Bankr. E.D.N.Y. 1999) ......................................................................... 31

*Webb v. Door Dash, Inc.*,
    451 F. Supp. 3d 1360 (N.D. Ga. 2020) ...................................................................... 17

*Williams v. CitiFinancial Servicing LLC* (*In re Williams*),
    612 B.R. 682 (M.D. N.C. 2020) ................................................................................. 25

*Young v. Nationwide Mutual Ins. Co.*,
    693 F.3d 532 (6th Cir. 2012) ............................................................................... 24, 25

## Statutes

11 U.S.C. § 523 ................................................................................................................... 7

11 U.S.C. § 523(a) .............................................................................................................. 7

11 U.S.C. § 523(a)(8) ............................................................................................ 1, 6, 7, 8

11 U.S.C. § 523(a)(8)(A)(i) ................................................................................................ 8

11 U.S.C. § 523(a)(8)(B) .................................................................................................... 4

11 U.S.C. § 524 ................................................................................................................... 1

11 U.S.C. § 727 ................................................................................................................... 6

20 U.S.C. § 1092(a)(1)(E) ................................................................................................ 20

20 U.S.C. § 1094(5) and (7) ............................................................................................. 20

26 U.S.C. § 221(d) ....................................................................................................... 4, 28

26 U.S.C. § 221(d)(1) ......................................................................................... 11, 12, 26

## Rules

Federal Rule of Bankruptcy Proceeding 4007(a) ............................................................... 9

Federal Rule of Civil Procedure 23 .................................................................................... 8

## Regulations

34 CFR § 668.14(b)(19) ................................................................................................... 20

34 CFR § 3668.43(a)(i)............................................................................................................ 20

Plaintiff Tashanna Golden ("Plaintiff") respectfully submits this Reply Memorandum of Law in Further Support of Her Motion for Class Certification.

## PRELIMINARY STATEMENT

Defendants' prolix briefs merely resuscitate the same arguments made in support of their motions to dismiss, their opposition to Plaintiff's motion for partial summary judgment, and arguments already made by Navient, many of which have already been rejected by the Court. Despite filing over 180 pages of briefing in opposition to Plaintiff's motion for class certification, Defendants fail to establish any credible reason for denying class treatment of the claims brought by Plaintiff and the class.

*First*, Defendants misstate their respective burdens in this case.  It is firmly established that creditors and their agents bear the burden of establishing that debts are nondischargeable.  Student loans are only presumptively nondischargeable when they come within one of the narrow exceptions to discharge contained in 11 U.S.C. § 523(a)(8).  As Plaintiff has repeatedly explained, and as case law makes abundantly clear, it is the creditor's burden to show that particular student loans are within the scope of that section.   Defendants' misstatement of the burden is the foundation on which they build their arguments, but that foundation is incorrect.

*Second*, Defendants again argue that the case cannot proceed because necessary parties have not been joined.  Thus, Defendants contend that they are immune from judicial action, even while collecting on discharged debts, so long as the owners of the debts have not been sued.  That is not the law.  Section 524 of the Bankruptcy Code bars any person from collecting on discharged debts, regardless of whether or not they are the actual owner of the debts.  Defendants are not immune from court action ordering such conduct to cease and directing that the funds collected by illegal means be paid back to the debtors.  The owners of the loans are free to intervene but have chosen not to do so, no doubt because the Defendants currently before the Court are capable of

defending their interests and providing all relief. The owners' decisions not to intervene cannot preclude this Court from taking appropriate action to end Defendants' illegal conduct.

*Third*, Defendants claim that Tashanna Golden lacks standing because her loans are nondischargeable, and because her loans are not factually identical to the loans of other class members. Both arguments lack merit. As pointed out in Plaintiff's reply brief in support of her motion for summary judgment, Ms. Golden's NCT loan is dischargeable because it exceeds the cost of attendance when taking into account the other loans and scholarships she received. Her Citibank bar loan is dischargeable because it was not a loan within the cost of attendance to a student attending a Title IV institution. Moreover, Tashanna Golden's standing as the class representative is not affected by differences in the boilerplate of the various loans within Defendants' portfolio. This Court has already held that such boilerplate does not and cannot convert a dischargeable loan into a nondischargeable one. Finally, Defendants' contention that Ms. Golden is not entitled to an injunction is perplexing given their acknowledgement that she is facing potential liability of over $30,000 on debts that Defendants assert are nondischargeable and that they have billed her for those debts post-discharge; and that she is paying them. Should this Court determine that those loans are dischargeable, she is clearly entitled to injunctive relief enjoining Defendants from taking any steps to collect on those debts.

*Fourth*, Defendants argue that some of the loans held in their portfolios were funded or guaranteed by a governmental entity or nonprofit. Insofar as any of the loans were funded or guaranteed by a governmental entity, they are not within the class. The class is limited to *privately-funded loans.* Thus, that issue is totally irrelevant. To the extent that any loans may have been funded by a nonprofit entity, Defendants did not submit any evidence of such nonprofit involvement (other than TERI) in response to the motion for partial summary judgment. Having

failed to raise a material question of fact concerning that issue, that claim is now barred. Should this Court, nonetheless, allow Defendants to belatedly raise this defense, the identity of loans funded by bona fide nonprofits can be easily identified and is not a basis on which to deny class certification.

*Fifth*, Defendants manufacture a variety of "individual" issues in an attempt to defeat class certification. But virtually all the facts referenced are irrelevant both to certification of the class and ultimate determination on the merits. For example, whether or not a borrower had a co-borrower is irrelevant to the issues in the case and does not affect dischargeability. In addition, whether or not an individual sought a deduction for interest paid on any of the loans is legally irrelevant. For a wide variety of reasons explained below, the fact that a borrower took a deduction for interest paid on a loan does not convert the loan from dischargeable to nondischargeable.

*Sixth*, Defendants' attack on whether the class is sufficiently numerous is disingenuous. There is no bona fide question that the class greatly exceeds 40 individuals. Defendants challenge the findings in the declarations of John DeBois, but there is no dispute that there are at least 3,000 individuals in PHEAA's portfolio that are presumptively within the class. Similarly, Firstmark concedes that it has at least 3,000 loans within its portfolio that are private loans, not funded by a nonprofit or government entity.

*Seventh*, the Supreme Court's decision in *Taggart v. Lorenzen*, 139 S. Ct. 1795 (2019) does not prevent class certification for several reasons: (i) this Court does not have to make a determination as to whether any Defendant is liable for contempt before certifying a class; (ii) whether or not a Defendant should be held in contempt is not a question that is appropriately decided on an individual, loan-by-loan basis. Rather, the question with regard to contempt and the award of putative damages is whether the common *policies* of Defendants to collect on discharged

debts was justified under an objective, good faith standard; and (iii) whether or not an individual debtor made payments on a loan after bankruptcy is irrelevant to Defendants' liability for knowingly collecting on discharged debts. No payment is "voluntary" when it is made to a creditor that asserts that the debt was not discharged in bankruptcy and is still due and owing. In any event, that is at most a common defense that does not defeat certification.

*Finally*, Defendants once again misstate the definition of "cost of attendance." "Cost of attendance," as that term applies to the Bankruptcy Code, is never based upon the actual cost incurred by an individual to attend college. That is clear from the language of the relevant statutes. Section 523(a)(8)(B) specifies that a loan is nondischargeable only it if is a qualified education loan under § 221(d) of the Internal Revenue Code. Section 221(d), in turn, defines a qualified education loan as a loan made for a "qualified education expense." A qualified education expense is an expense incurred as defined in § 10877ll of the Higher Education Act. Section 10877ll of the Higher Education Act refers to the expenses "normally assessed" by the relevant college or the university. Cost of attendance is <u>not</u> the individual expenses incurred by each student but is rather a number that the school "normally assesses" a student in similar circumstances. It is a number that is easily ascertained by relying on objective criteria. It is true that particular students may come within the scope of one or more of the subdivisions of § 1087ll, such as students with disabilities or students incurring dependent care costs, but those numbers are "reasonable allowance" numbers, not individual numbers.

The task of determining which individuals are members of the class is not nearly as onerous as Defendants suggest and the common questions of Defendants' collection efforts, dischargeability, and the asserted defenses clearly predominate over individual issues related to cost of attendance. Whether or not a student attended a Title IV institution is easily determined

because those schools are identified on an annual basis by the federal government. With regard to Title IV students, Defendant Firstmark admits that it already has the cost of attendance on file for many of the loans in its portfolio. A large percentage of class members have received loans for amounts that, on their face, are in excess of the cost of attendance, even without deducting other loans, financial aid, and grants the student received. Further, Defendants can determine all the direct and guaranteed federal loans held by either student by accessing an available data source.

Defendants, who have never submitted an expert report, cannot rebut any of these facts. Indeed, their own papers demonstrate that the lenders could have obtained information from the universities to determine an individual student's scholarships, loans, and grants. And Defendants can obtain that information now. To the extent that Defendants claim that the data is no longer available (a fact for which they provide absolutely no support or expert opinion), that is the result of their own actions and those of their principals. As Firstmark admits, at the time of making their loans, all the lenders could have made a determination as to the cost of attendance for each individual student, but chose not to do so. The need to make individual factual determinations with regard to each class member is not unusual in class actions and does not defeat class certification where the common questions predominate and the individual issues can be resolved by looking to objective proof.

The most important common question for each member of the class is clear: are loans that are made to students not attending Title IV institutions, or loans that exceed the cost of attendance at Title IV institutions dischargeable? And are Defendants collecting on these discharged debts? Requiring thousands of former debtors to each file individual actions to obtain such a determination makes absolutely no sense when this Court can easily make that determination for the entire class.

## **ARGUMENT**

**I.    THE BURDEN OF ESTABLISHING NONDISCHARGEABILITY IS ON DEFENDANTS.**

Defendants misstate the law when they assert that student loans are presumptively nondischargeable.  *See, e.g.*, Trust Br. (Dkt. 406) at 18-19.  Under 11 U.S.C. § 727 the "court shall" discharge the debtor's debts unless a specifically enumerated reason for denying discharge is present, none of which are at play here.  Here, Plaintiff and the class have properly alleged that their debts were discharged through the bankruptcy process.

In the context of student loans, § 523(a)(8) of the Bankruptcy Code provides three narrow exceptions to discharge. Those exceptions to discharge detail the requirements for a debt to be considered non-dischargeable. "Because the federal bankruptcy system is designed to 'aid the unfortunate debtor by giving him a fresh start in life,' *Lamar, Archer & Coffrin, LLP v. Appling*, --U.S.--, 138 S. Ct. 1752, 1758 (2018), discharge exceptions such as § 523(a)(8) are 'confined to those plainly expressed in the Bankruptcy Code.'" *Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595, 600 (2d Cir. 2021) (quoting *Bethpage Fed. Credit Union v. Furio* (*In re Furio*), 77 F.3d 622, 624 (2d Cir. 1996)); *see also Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998). In addition to being confined to those plainly expressed, exceptions to discharge are narrowly construed and, where ambiguous, are resolved in favor of the debtor.  *In re Furio*, 77 F.3d at 624; *Golden v. Nat'l Collegiate Trust* (*In re Golden*), 596 B.R. 239, 260 (Bankr. E.D.N.Y. 2019); *Itria Ventures LLC v. O'Keefe* (*In re O'Keefe*), No. 19-30173, 2020 WL 9215966, at *5 (Bankr. N.D.N.Y. Sept. 11, 2020) (citations omitted). "This fresh start policy drives the allocation of the burden of proof in nondischargeability proceedings." *Reddy v. Melnik* (*In re Melnik*), 592 B.R. 9, 21 (Bankr. N.D.N.Y. 2018) (Davis, J.)

As creditors, Defendants bear the burden of establishing whether their debt to Plaintiff is non- dischargeable. *Grogan v. Garner*, 498 U.S. 279, 283 (1991) (referring to the burden a creditor

must meet to avoid dischargeability); *Homaidan*, 3 F.4th at 600 (holding that the "creditor bears the burden of establishing that a debt is excepted from discharge"); *Cazenovia Coll. v. Renshaw* (*In re Renshaw*), 222 F.3d 82, 86 (2d Cir. 2000) ("creditor [must] prove by a preponderance of the evidence that its claim is one that is not dischargeable."); *Bronsdon v. Educ. Credit Mgmt. Ass'n* (*In re Bronsdon*), 435 B.R. 791, 796 (B.A.P. 1st Cir. 2010) ("creditor bears the initial burden of establishing that the debt is of the type excepted from discharge under § 523(a)(8)."); *In re Melnik*, 592 B.R. at 21 (stating that the creditor "bears the burden of proving, by a preponderance of the evidence, that the particular debt falls within one of the exceptions to discharge enumerated in § 523(a)."); *In re Haroon*, 313 B.R. 686, 688 (Bankr. E.D. Va. 2004) ("in the case of a student loan, [the creditor] bears the initial burden of proving that the debt was incurred for educational purposes."); *Marini v. Adamo* (*In re Adamo*), 560 B.R. 642, 648 (Bankr. E.D.N.Y. 2016) ("[t]he burden of proof in an action to determine dischargeability is on the creditor to prove the elements of its nondischargeability complaint by a preponderance of the evidence."); *Wang v. Guo* (*In re Guo*), 548 B.R. 396, 401 (Bankr. E.D.N.Y. 2016) ("the creditor objecting to dischargeability bears the burden of proof by a preponderance of the evidence."). "When determining whether a debt is excepted from discharge, a bankruptcy court must construe the evidence strictly against the creditor and liberally in favor of the debtor." *In re Melnik*, 592 B.R. at 21.

Defendants misstate the law with respect to the parties' respective burdens and argue that student loan debt is treated differently than other debts. Defendants are wrong. Student loan debt is treated as any other debt subject to proof of discharge under § 523. Defendants rely on hardship cases where there is no dispute that the student loan at issue comes within the terms of § 523(a)(8). For example, they rely on the Second Circuit's decision in *Tingling v. Educational Credit Management Corporation* (*In re Tingling*), 990 F.3d 304 (2d Cir. 2021). But, in that case, there

was no dispute that the loan was a federal loan within § 523(a)(8)(A)(i)—in fact, it was issued by the Department of Education itself.  Thus, the only issue was whether the plaintiff could show undue hardship under the test set forth in *Brunner v. N.Y. State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987).  *In re Tingling*, 990 F.3d at 309.  Here, in contrast, it is Defendant's burden to demonstrate that each loan comes within § 523(a)(8).

Of course, the burden of establishing that the requirements of Federal Rule of Civil Procedure 23 are met rests with Plaintiff.  But the burden of demonstrating that an individual borrower's loans are exempt from discharge clearly rests with the Defendants.  Thus, if Defendants cannot establish that any particular loan is within the cost of attendance at a Title IV school, then, under the Bankruptcy Code, the debt shall be dischargeable.

This is important because Defendants rely heavily on the purported difficulty of determining cost of attendance.  But Defendants and their principals could have easily established that number with regard to any particular loan when they made the loan.  They could have sought that information from a variety of sources.  *See* Mark Kantrowitz Reply Decl. dated September 1, 2021 (hereinafter "Kantrowitz Reply Decl.")  They specifically chose not to do that.  Thus, any inability to learn those facts now cannot insulate Defendants from meeting their burden of proof or from certification of the class.

It is also important to note that Defendants have continued to collect on all these debts for years without determining whether the debts were, in fact, discharged in bankruptcy.  A debtor who collects on a debt without knowing whether it is dischargeable obviously assumes the risk of such conduct.  That is the core structure of the Bankruptcy Code and is the essence of providing a fresh start.

The bankruptcy court's discharge order operates to enjoin the collection of all properly scheduled and dischargeable debts. *Hamilton v. Herr* (*In re Hamilton*), 540 F.3d 367, 372 (6th Cir. 2008) (noting that the Bankruptcy Code's discharge provision, which governs the effect of the discharge injunction, "was designed to effectuate the discharge and make it unnecessary to assert it as an affirmative defense in a subsequent state court action."); *see also* 4 Collier on Bankruptcy ¶ 524.LH [1] at 524-57 (15th ed. rev. 2005).  A creditor can avoid liability for collecting on a discharged debt by bringing an adversary proceeding to get a determination from the bankruptcy court as to whether a particular debt was discharged.  *See* Fed. R. Bankr. Proc. 4007(a); *see also In re Haroon*, 313 B.R. at  689 ("If a creditor wants to avoid the adverse consequences of an erroneous analysis, he can come to this court at any time, even after the case has been closed, and seek an adjudication of this dischargeability issue.") (citing 4 Collier on Bankruptcy, § 523.04 (15th ed. rev. 2005)).  Defendants chose not to do that. They, therefore, proceeded at their own risk. *DiGeronimo v. Weissberg* (*In re DiGeronimo*), 354 B.R. 625, 641 (Bankr. E.D.N.Y. 2006) ("In sum, the Court finds that the Defendants proceeded at their peril when they continued their collection efforts against the Debtor despite knowing that there had been entry of the Discharge."); *In re Haroon*, 313 B.R. at 689 ("[A] creditor who attempts to collect the debt proceeds at his own peril and accepts the consequences of his own actions.").

## II.    THIS COURT CAN CERTIFY THE CLASS WITHOUT JOINING THE OWNERS OF ALL THE LOANS SERVICED BY THE DEFENDANTS.

Defendants once again assert that the Court can take no action in this case without joining all the owners of the loans serviced by Firstmark and PHEAA.  Of course, the Trust is itself the owner of the subject loans so, with regard to the Trust, this argument has no merit.

Plaintiff will not repeat the arguments previously made on this issue, such as those in her Reply Brief in Support of Her Motion for Partial Summary Judgment (hereinafter "S.J. Reply

Brief", Dkt. 369, at 21-26) which she incorporates here by reference. Plaintiff merely notes the following obvious facts:

*First*, this case has been pending for four years and none of the absent owners have chosen to intervene to protect any purported interest they have in a determination of whether the subject loans are dischargeable in bankruptcy. They have continued to accept the payments collected by Defendants on these loans, but apparently have no interest in coming in and defending the nondischargeability of these loans.

*Second*, Defendants in these four years have never made a motion to join the owners of the loans nor have they even made a motion to dismiss for failure to join these owners as necessary parties.

*Third*, it is undisputed that Firstmark and PHEAA, as agents of the owners, have been assigned responsibility to collect on the subject loans and to protect the owners' interests. Thus, it is clear that the interests of the owners are adequately represented.

*Fourth*, to accept Defendants' argument that this Court is powerless to enforce the Bankruptcy Code to stop these Defendants' illegal collection of discharged debts would drastically undermine the Court's equitable powers to enforce the fresh start.

For these reasons and the reasons set forth already by Plaintiff, this Court can proceed without the joinder of the owners of the loans. However, should the Court conclude that these owners are, in fact, necessary parties, the proper remedy is to join them.

## III.    TASHANNA GOLDEN IS A PROPER CLASS REPRESENTATIVE.

### A.    Ms. Golden's Bank One Loan Exceeds the Cost of Attendance and Her Bar Loan is Not a Qualified Education Loan.

Defendants once again attempt to obfuscate the facts and assert that Plaintiff's Bank One loan was within the cost of attendance. That is demonstrably false. As explained in Plaintiff's S.J.

Reply Brief (Dkt. 369) at 5-6, the total loans and grants Ms. Golden received, other than her Bank One loan, was $55,280.  The cost of attendance *as asserted by Defendants* is $56,380.[1]  This would leave a balance of $1,100 that a creditor could lend to Ms. Golden and claim its loan was a qualified education loan.  The Bank One loan of $7,300 clearly exceeds that number by over $6,000.

Defendants once again attempt to mislead the Court by ignoring the fact that Ms. Golden received a private loan from Citibank (now owned by Discover) in the amount of $11,340, which was certified and recorded in the University of Pennsylvania's financial aid office records.  S.J. Reply Brief (Dkt. 369) at 6 and documents cited therein.  As previously noted, this loan was approved and recorded in the University's records before the Bank One loan was even applied for.  Thus, Bank One was on notice when it made the direct-to-consumer loan to Ms. Golden.  Both PHEAA and the Trust concede that other loans must be deducted from cost of attendance to determine whether a direct-to-consumer loan like Bank One's is a qualified education loan.  PHEAA Br. (Dkt. 398) at 42; Trust Br. (Dkt. 406) at 15-17.  Yet, they simply ignore the Citibank loan.[2]

---

[1] As pointed out in Plaintiff's S.J. Reply Brief, the cost of attendance for the purpose of the Internal Revenue Code § 221(d)(1) is $48,640 not $56,380, based on what the University of Pennsylvania reported to IPEDs.  *See* Pltf's S.J. Reply Brief (Dkt. 369) at 6 and infra at 19-21.  But even using Defendants' figures, the loan exceeds the cost of attendance.

[2] Defendants argue that taking into account other loans a student received from other lenders creates an undue burden for a lender contemplating making a student loan.  Trust Br. (Dkt. 406) at 16, n.12.  This is a red herring.  As Ms. Golden's case demonstrates, a lender who makes a loan directly to a student (as Bank One did here), rather than going through the financial aid office, assumes the risk that there are other loans that the student has received to cover his or her cost of attendance.  If Bank One had bothered to check with the University of Pennsylvania's financial aid office, it would have learned of the preexisting Citibank loan, which was received by the University and recorded in Ms. Golden's file. For this reason, the Trust's assertion that a lender would not have information about other loans a borrower might take out (Dkt. 406 at 28) is demonstrably false.

The Trust also makes the false statement that Plaintiff Golden could not be an adequate class representative because her bar loan is within the cost of attendance.  Dkt. 406 at 34-35.  This statement is false for two fundamental reasons:  *First*, a loan made to a student for expenses incurred after graduation cannot be a qualified education loan because it is not within the cost of attendance at a Title IV institution.  As the University of Pennsylvania's financial aid officer testified, she does not even consider such bar loans to be educational loans at all.  S.J. Reply Br. (Dkt. 369) at 8.

*Second*, the Trust's reliance on § 1087ll(13) is misplaced.  That section was adopted after 1997 and is, therefore, not within the definition of qualified education expenses for purposes of § 523(a)(8).  I.R.C. § 221(d)(1) makes clear that a qualified higher education expense means cost of attendance as defined by § 1087ll "at or before the date of enactment of the Taxpayer Relief Act of 1997."  In any event, that section only applies to actual costs for obtaining a professional license or credentials and clearly does not apply to living expenses incurred while studying for a professional credential such as a bar exam.

Firstmark also suggests that Ms. Golden's Citibank bar loan may have been funded in whole or in part by nonprofits because certain Citi Assist loans are covered by risk sharing agreements with certain schools and universities.  Firstmark Br. (Dkt. 402) at 41-42.  No details are given other than the sparse reference to such programs in Ex. T to the Kaplan Decl.  There is no evidence anywhere to suggest that these risk sharing agreements include any bar study loans, let alone Plaintiff Golden's.  By presenting no credible evidence that Plaintiff's Citi Assist bar loan was in fact funded by a nonprofit, Firstmark fails to meet its burden of showing by a preponderance of the evidence that an exception to discharge applies.

**B.    The Fact that Class Members Received Loans from Different Lenders Does Not Disqualify Ms. Golden as a Class Representative.**

Defendants also assert that Plaintiff Golden cannot be a class representative because not all class members received their loans from Bank One.  But the identity of the lenders, or even the terms of their notes, are of no material relevance to the issues before the Court and Defendants can point to no factors that would prevent Plaintiff's claim from being typical of the claims common to the class.  The typicality lies in the Defendants' collection of a student loan post discharge.  Any difference in the boilerplate of the various notes is legally irrelevant because such boilerplate cannot make a dischargeable loan nondischargeable.  Plaintiff's S.J. Reply Brief at 15-19.

Each of the cases cited by Defendants with regard to this issue are clearly distinguishable because in each of the cases, the plaintiff sought to assert claims for individuals whose status raised different factual or legal issues from those of the plaintiff.  Here, Defendants simply fail to show how the identity of the different banks raises separately legal or factual issues.  Here, there is no dispute that Defendants are collecting on discharged debts held by Plaintiff Golden and the proposed class.  The factual and legal issues asserted by Plaintiff Golden and the proposed class, regardless of their particular lenders, are identical and are capable of resolution based on class-wide, objective proof.  Where a plaintiff's claim is representative in all material respects of those of the class the fact that those class members' loans may be owned by a different creditor is irrelevant.  *See Brice v. Haynes Inv., LLC*, No. 18-cv-01200, 2021 WL 1916466, at *6 (N.D. Cal. Apr. 23, 2021) (holding that the fact that class members' loans had different terms does not defeat class certification because those terms were not material to the claims at issue); *Falberg v. Goldman Sachs Grp., Inc*., No. 19-Civ. 9910, 2020 WL 3893285, at *7-8 (S.D.N.Y. July 9, 2020) (rejecting argument that class representative who only invested in three of five funds at issue somehow lacked standing to represent class where injuries and conduct at issue were the same);

*Cunningham v. Cornell Univ.*, No. 16-cv-6525, 2019 WL 275827, at *7 (S.D.N.Y. Jan. 22, 2019) (noting that the typicality and commonality inquiries "tend to merge" and holding that the "variations between Plan participants' individual account choices do not destroy the typicality of plaintiffs' claims"); *Leber v. Citigroup 401(K) Plan Inv. Comm.*, 323 F.R.D. 145, 156-58 (S.D.N.Y. 2017) (rejecting argument that named plaintiff's losses were incurred by investment in different funds and finding typicality where material aspects of the claim are uniform among plaintiff and class); and *Moreno v. Deutsche Bank Americas Holding Corp*., No. 15 Civ. 9936, 2017 WL 3868803, at *10 (S.D.N.Y. Sept. 5, 2017) (finding typicality where claims arose from same course of events).

### C.     Defendants Sought to Collect on the NCT Loan after Tashanna Golden Declared Bankruptcy.

Defendants argue that Ms. Golden is not an adequate representative because no effort was made to collect on her loans after she declared bankruptcy. That is also a demonstrably false statement.  Attached as Ex. A to the George F. Carpinello Reply Decl. dated September 2, 2021 (hereinafter "Carpinello Reply Decl.") is a post-discharge statement sent by Firstmark stating that her discharged loan was still due and owing.  Attached as Ex. E to the Declaration of Tashanna Golden dated July 6, 2020 (Dkt. 247-5) are statements sent by PHEAA to Plaintiff after she declared bankruptcy indicating that her loans were still due and owing.  And, as Ms. Golden

explained, she is still paying on those loans.  *See* Ex. A to Kaplan Decl. (Dkt. 403-1) at 284:16-285:14.[3]  PHEAA concedes she is making such payments.  PHEAA Br. (Dkt. 398) at 8.[4]

Defendants also argue that Ms. Golden is not an adequate representative because she made payments on her loans after discharge in bankruptcy, partly for the purpose of ensuring that her aunt, who was the co-borrower, was not required to make payments or that any delinquency would not affect her aunt's credit rating.  The individual motivations of Ms. Golden or any other debtor to make payments post discharge is not relevant to the dischargeability of her loan.  If Defendants sought to collect from a debtor on a discharged debt (which they did), they violated § 524.  Plaintiff is entitled to a declaration to that effect and restitution of all funds paid as a result of these collection efforts.  Whether or not Ms. Golden might have paid in a hypothetical world in which Defendants abided by § 524 is legally irrelevant.  It is clear that a debtor's payments post discharge do not convert a dischargeable loan into a nondischargeable one.  As is more fully explained below, Ms. Golden's payments were not voluntary.  A post-discharge payment can only be voluntary if it is not influenced by any of the creditor's actions and if the debtor is fully aware that they are making a payment on a discharged debt.  Neither applies here.  Ms. Golden was sent statements indicating that, despite her discharge in bankruptcy, she was still fully obligated to pay the loans.  Those notices obviate any argument that her payments were voluntary.  Moreover, Ms. Golden's payments could not be voluntary payments by a person knowing that the debts were discharged

---

[3] Firstmark completely misrepresents Ms. Golden's testimony to suggest that she is not interested in receiving injunctive relief.  Firstmark Br. (Dkt. 402), at 44-45.  Clearly, that was not her testimony.  She merely acknowledged Firstmark had "pressed pause" on her loan *pending resolution of her action*.  *See* Ex. A to Kaplan Declaration (Dkt. 403-1) at 285:24-285:15.

[4] Paradoxically, Firstmark asserts that Ms. Golden lacks sufficient incentive or interest to act as class representative.  Firstmark Br. (Dkt. 402) at 44-45, but it then argues that she has over $30,000 in debt to Defendants and, therefore, has great incentive to bring an individual action.  *Id*. at 62.

because, as Defendants concede, Ms. Golden did not know that her debts were discharged until she was so advised by present counsel. Firstmark Br. (Dkt. 402) at 43.

Finally, her decision to make payments during the pendency of this action cannot possibly be construed as any form of acknowledgement of nondischargeability because she expressly asserts the opposite in this proceeding.

### D.    Plaintiff Did Not Waive Her Right to Participate in the Class Action.

Defendant Firstmark argues that Plaintiff is not an adequate representative because she waived her right to participate in a class action. Dkt. 402 at 45. But that waiver only applies if "any party has elected arbitration." *Id.* This Court has already determined that the arbitration clause is not enforceable. *Golden v. Nat'l Collegiate Trust* (*In re Golden*), 587 B.R. 414 (Bankr. E.D.N.Y. 2018). Moreover, this same argument was met with skepticism from the Court when it was made in *Homaidan v. Sallie Mae*, Adv. Pro. 17-1085:

> The court: You are saying even if you have a dead-on non-arbitrable claim. But if you say, 'oh, golly, we want to get out of the class action; let's elect arbitration. And even though we don't get it, we get this thing that comes with it.' That obviously is not a persuasive argument. I think you'd have to agree."

Ex. B to Carpinello Reply Decl. at 148:21-149:1. If the arbitration agreement itself is not enforceable, then the class action waiver within that agreement is not enforceable either. *Borecki v. Raymours Furniture Co., Inc*., No. 17-CV-01188, 2017 WL 5900288, at *5 (S.D.N.Y. June 21, 2017) ("Because the Agreement's class action waiver is applicable only to arbitrable claims, and because . . . the Arbitration Agreement does not require [Plaintiff] to arbitrate his TCPA claim, [Plaintiff's] TCPA claim may be asserted as a class action."); *Meyer v. Kalanick*, 185 F. Supp. 3d 448, 459 (S.D.N.Y. 2016) (holding that the class action waiver was unenforceable because it was an integral part of the arbitration provision which defendants had waived; court also held that, in any event, the class action waiver was unconscionable under California law), *rev'd on other*

grounds by *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66 (2d Cir. 2017); *Brice*, 2021 WL 1916466 at *2 (finding that class waiver is inextricably bound up with arbitration agreement and is therefore unenforceable).[5]

## IV.    INDIVIDUAL ISSUES DO NOT PREVENT CLASS CERTIFICATION.

As Plaintiff pointed out in her moving brief, a class should be certified when there are clearly common questions applicable to the class that predominate over any individual issues and where the individual issues can be determined on a reasonable and objective basis that do not require mini trials.  *See* Pltf's Motion for Class Certification (Dkt. 255) at 21-29.  It is not fatal for a class definition to require some inquiry into individual records, so long as the information is available through a "ministerial review" rather than "arduous individual inquiry." *Audet v. Fraser*, 332 F.R.D. 53, 72-73 (D. Conn. 2019) (predominance found where class membership was proposed to be shown through various records such as emails, public bitcoin block chain wallets, and credit card data related to Plaintiffs' "purchases, activities and subsequent losses [uploaded] to a website" because "membership may be established by reference to more than one type of

---

[5] The cases relied on by Firstmark are all distinguishable.  In *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 347-51 (2011) the Supreme Court simply upheld the arbitration clause under the FAA and the class action waiver was also enforceable because it was part of the arbitration provision.  In *May v. Midland Funding, LLC* (*In re May*), 595 B.R. 894, 902 (Bankr. E.D. Ark. 2019) the class action waiver was by its term applicable whether or not the case was arbitrated and the court simply held that the class action waiver was enforceable under the applicable state law. In *Jensen v. Cablevision Systems Corp.*, 372 F. Supp. 3d 95, 123 (E.D.N.Y. 2019) the court held that the plaintiff was not an adequate or typical class representative because most of the class was subject to an arbitration agreement that was enforceable under the FAA.  In *Webb v. Door Dash, Inc.*, 451 F. Supp. 3d 1360, 1369 (N.D. Ga. 2020) as in *May*, the class action waiver applied whether or not the case was arbitrated and the court held that the class action waiver was enforceable under relevant state law.  Unlike this case, the class action waiver in *Webb* and *May* was not part and parcel of the arbitration agreement.  Finally, in *Bock v. Salt Creek Midstream LLC*, No. 19-1163, 2020 WL 3989646 at *11 (D. N.M. July 15, 2020) the class action waiver was clearly independent of the arbitration provision and the court held that plaintiff failed to adequately address the validity of the waiver in his legal briefs.  Thus, the court held that the waiver was enforceable.

document, and as long as proposed class members can show proof of purchase by submitting such documentation during the claims stage, individual inquiries will not predominate."); *In re Digital Music Antitrust Litigation*, 321 F.R.D. 64, 90 (S.D.N.Y. 2017) (predominance found because Plaintiff could show membership in class through "credit card payments, confirmatory emails, records kept by digital retailers, and the Digital Music product itself" such that individual inquiries did not overwhelm common ones); *Brice*, 2021 WL 1916466 at *5 (finding that calculations of how much each individual class member was overcharged is "simple math" and does not defeat certification); and *see Smilow v. Southwestern Bell Mobile Systems, Inc*., 323 F.3d 32, 39-40 (1st Cir. 2003) (courts are reluctant to deny class status based on the fact that certain affirmative defenses may be available to individual members.).

In *Dietrich v. C.H. Robinson Worldwide, Inc*., No. 18 C 4871, 2020 WL 635972, at *5 (N.D. Ill. Feb. 11, 2020) the court certified a class of individuals who did not receive overtime pay. The employees had different job titles and descriptions. The court noted that the common question, *i.e.*, whether an administrative exemption applied to all members of the class, was an issue common to the entire class that predominated over the issue of the individual determinations of each person's job title and how much each class member might be owed. "While damages may differ across class members, not every issue must be amenable to common resolutions; individual inquires may be required after the class phase. It has long been recognized that the need for individual damages determinations at a later stage of a litigation does not itself justify the denial of certification." *Id.* (internal citations and quotations omitted).

Here, the individual issues clearly do not overwhelm the common issues and are objectively obtainable. Other issues raised by the Defendants are simply not relevant to the issue of class certification at all.

### A.    Cost of Attendance Can Be Objectively Ascertained.

As pointed out in Plaintiff's Motion for Class Certification, Defendants have consistently attempted to obfuscate the cost of attendance issue so as to exaggerate the difficulty of determining whether the individual loans exceed the cost of attendance.

*First*, as Defendants themselves now concede, they actually have cost of attendance information for many members of the class, although they fail to disclose to the Court the actual number.  *See* Declaration of Christy Phillips, dated June 29, 2021 (Dkt. 404) at ¶¶ 14 and 17 and Ex. I (Dkt 404-9) thereto.[6]  ("Firstmark may be provided with student level 'cost of attendance' data provided either directly by the school during the school certification process, or by the Lender Servicing Client during the placement of a portfolio of previously-originated Private Student Loans with Firstmark for servicing.").  They also concede that Firstmark and many lenders actually obtained certification from the school that each loan was with the cost of attendance.  *Id*. at ¶¶ 12-13, 17.  (It is Firstmark's custom and practice to obtain school certification from a financial aid officer at the applicant's school that the amount of the loan does not exceed the applicant's 'cost of attendance' less other financial aid." ¶ 12); Firstmark "understands that many of its Lender Servicing Clients did, the fact, obtain school certification during the private student loan organization process." ¶ 17.

---

[6] Notably, both Ex. I and Ex. L to the Phillips Declaration were not provided to Plaintiff in discovery and, therefore, bear no Bates number, despite the fact that Plaintiff, in her Second Request for Production of Documents dated March 27, 2019, specifically asked for documents relating to both the certification of loans by any of the Defendants or their lenders and the responses to questionnaires provided by Firstmark.  *See* Ex. C to Carpinello Reply Decl. and Ex. D to Carpinello Reply Decl. at Request Nos. 3, 5 and 6.

This confirms that the Trust and Firstmark's and PHEAA's principals clearly had an opportunity to determine cost of attendance and, in fact, did so with regard to some loans and chose not to do so with regard to others.

*Second*, Defendants could have determined other private and federal loans obtained by each student not only from the school, but from other sources, including the credit reporting agencies that regularly report student loans. Other data sources, such as NSLDS, are still available today to show that some of Defendants' loans are within the cost of attendance. *See* Kantrowitz Reply Decl. Defendants have provided no expert report or other evidence to rebut these facts.

*Third*, Defendants consistently attempt to confuse the Court with regard to the meaning of cost of attendance. The relevant statutes are clear that a qualified education loan does not depend upon the individual cost incurred by any particular student, rather, the cost of attendance is an "allowance" or "estimate" for a typical student. It is the "normally assessed" number that is relevant. *See* § 10877ll of the Higher Education Act and Kantrowitz Reply Decl. While schools will sometimes modify cost of attendance numbers in calculating a particular student's aid eligibility, those instances are rare (*id*.) and do not affect cost of attendance for determining qualified education loans under § 523(a)(8)(B).

*Fourth*, the applicable cost of attendance figures are those reported in IPEDS. This is because universities are required by law to publish their cost of attendance and the method of publication sanctioned by the government is to report them in IPEDS. *See* 20 U.S.C. § 1094(5) and (7); 20 U.S.C. § 1092(a)(1)(E); 34 CFR § 668.14(b)(19); 34 CFR § 3668.43(a)(i); Ex. E to Carpinello Reply Decl. (Federal Student Aid Handbook) at F-6. The fact that a financial aid office may use a slightly different number when determining whether to award a student financial aid is legally irrelevant. For purposes of determining whether a loan is a qualified education loan, it is

the published numbers produced by the universities in IPEDS that control.  It is true that certain special students such as those with disabilities or veterans may claim additional expenses in addition to cost of attendance.  For those few individuals, determination from the university of that student's specific cost of attendance would be necessary.  But in every case, the individual determination is an actual, historical number and does not require a mini-trial.  Defendants contend that it would be laborious for them to obtain these numbers now, but they provide the Court no evidence or expert report demonstrating that they would have any difficulty in collecting the numbers.  In any event, any difficulty now is the result of the lenders' decision not to collect the information when they made the loans.

In the end, any cost of attendance is an objective number.  It is not a subjective determination like the amount of pain and suffering or degree of reliance, that often complicate individual inquiries in class actions.

**B.      Defendants and Their Principals Deliberately Chose Not to Determine Cost of Attendance When They Made Their Loans.**

Any difficulty in determining cost of attendance now is a problem of Defendants' own making.  Defendants and their principals purposefully made loans without determining whether the loan would meet the conditions of § 523(a)(8)(B).  They also declined to exercise any of their rights at the time of the bankruptcy filing or thereafter to determine whether the loans met the conditions of the statute or to contest the dischargeability of the loans.  For Defendants to argue that they could not possibly uncover this information now because it does not suit their purposes is "at best, a treacherous defense."  *Harte v. Ocwen Fin. Corp.*, No. 13-CV-5410, 2018 WL 1830811, at *32 (E.D.N.Y. Feb. 8, 2018).  They cannot avoid class-wide liability based upon uncertainties created by their own conduct.  As the *Harte* Court noted:

> That Ocwen may have created a system that it can readily maneuver when *it* needs to find a borrower against whom to file foreclosure—but not when the government,

21

> a court, an auditor, or a regulator seeks accounting of how many and which
> Borrowers it has sent correspondence to regarding foreclosure filings—is, at best,
> a treacherous defense.  To the degree that Ocwen belabors the arduous steps it will
> have to undertake to identify members of each class by deciphering code entries,
> viewing attached images, reviewing comment logs, and the likes, Ocwen's system
> is a Frankenstein of its own creation.  (emphasis in original)

*Id.* at *32.  Similarly, in *Cazares v. Ava Restaurant Corp.*, No. 15-CV-0477, 2017 WL 1229727,

at *7 (E.D.N.Y. Mar. 31, 2017) the court found that the class of employees was easily identifiable

from defendants' own records but also noted that:

> to the extent that plaintiffs may not know the exact function of each class member
> during relevant days of the Class Period, that is largely attributable to defendants'
> failure to preserve the payroll records after the commencement of this litigation.
> Thus, the court will not permit defendants to benefit from their conduct by finding
> that plaintiffs' are unable to carry their burden of showing ascertainability.

*See also Butto v. Collecto Inc.*, 290 F.R.D. 372, 383 (E.D.N.Y. 2013) ("Should a debt collection

company as large and as sophisticated as [Collecto] be able to avoid class action liability by mere

fact of inadequate record-keeping, the Congressional purpose behind the statute would indeed be

thwarted.") (quoting *Macarz v. Transword Sys., Inc.*, 193 F.R.D. 46, 57 (D. Conn. 2000));  *Ass'n*

*Against Discrimination in Emp't, Inc. v. City of Bridgeport*, 647 F.2d 256, 289 (2d Cir. 1981) ("[t]o

the extent that it is uncertain whether a candidate would have met the City's nondiscriminatory

requirements, any uncertainty should be resolved against the defendant, the party responsible for

the lack of certainty") (quoting *Cohen v. Westhaven Bd. of Police Comm'rs*, 638 F.2d 496, 502

(2d Cir. 1980) ("when the defendant has attempted to prove the existence of a nondiscriminatory

reason for the failure to hire but it remains uncertain whether the plaintiffs would have been hired

in the absence of the discriminatory practice, and the uncertainty flows from that practice, the issue

should be resolved against the defendant, the party responsible for the lack of certainty.");

*McNamee v. Nationstar Mortg., LLC*, No. 2:14-CV-1948, 2018 WL 1557244, at *4 (S.D. Ohio

Mar. 30, 2018) ("The Court need not deny class certification due to the need to review individual

files. Otherwise, defendants against whom claims of wrongful conduct have been made could escape class-wide review due solely to the size of their business or the manner in which their business records were maintained.") (internal citations and quotation marks omitted).

In *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016), the Supreme Court allowed certification of a class of employees working at a meatpacking plant who were denied overtime for the time they spent putting on and taking off protective gear. Because the defendant had failed to record the time as it was required to by law, the Court allowed an expert to present a representative sample that estimated the time it took employees to dress themselves in the protective gear. *Id*. at 547. Citing its earlier decision in *Anderson v. Mt. Clemens Pottery, Co*., 328 U.S. 680 (1946) the Court said this:

> The court in *Mt. Clemens* held that when employers violate their statutory duty to keep proper records and employees, thereby, have no way to establish the time spent doing uncompensated work, the "remedial nature of [the FLSA] and the great public policy which it embodies. . . militate against making" the burden of proving uncompensated work "an impossible hurdle for employees."

577 U.S. at 456.

In *Kivett v. Flagstar Bank, FSB*, 333 F.R.D. 500 (N.D. Cal. 2019), the court certified a class of individuals who had been denied interest on their escrow accounts despite the fact that the bank argued that variances among the borrowers required examination of individual loan accounts and that it had affirmative defenses that applied to some borrowers but not others. The court rejected these arguments and held that, despite such individual inquiries, common questions clearly predominated over the individualized issues. The court concluded by noting the following, which is equally applicable here:

> In sum, this is a classic and textbook issue of the class action device. The law required interest to be paid but the Savings Association did not do so to its borrowers, all allegedly cheated by the Savings Association. These borrowers now join together to vindicate their right to interest under the law. The miscellaneous differences thrown out by the Savings Association are just that—miscellaneous—

23

and cannot obfuscate the main point that the Savings Association allegedly cheated thousands of borrowers out of the interest due to them and pocketed the money for itself.  It is hard to imagine a case more worthy of class treatment.

333 F.R.D. at 507.

In *Kopaleishvili v. Uzbek Logistics, Inc*., No. 1:17-cv-702, 2019 WL 6609212 (S.D. Ohio Dec. 5, 2019), the plaintiff sought to certify a class of drivers who were paid by the mile based upon MapQuest rather than the actual miles traveled.  Defendants argued that the class could not be certified because of the difficulty in reconstructing the actual miles driven for each driver and that defendant had affirmative defenses that applied to some class members.  The court held that this presented an evidentiary issue, not a class certification issue and that the necessary factual determinations could be overcome in a variety of ways even though they may entail individual inquiry for each driver.  *Id.* at *11-12.  Moreover, the court noted that "poor record keeping on the part of a defendant generally does not excuse him from potential liability [and] [t]o allow that same systematic failure to defeat class certification would undermine the very purpose of class action remedies."  *Id.* at *4; citing *Rikos v. Proctor &Gamble Co.*, 799 F.3d 497, 525 (6th Cir. 2015) (internal quotations omitted).

In *Rikos*, the Sixth Circuit relied on an earlier decision, *Young v. Nationwide Mutual Ins. Co*., 693 F.3d 532, 540 (6th Cir. 2012), which held that "the need to manually review files is not dispositive [of the class certification issue].  If it were, defendants against whom claims of wrongful conduct had been made could escape class-wide review due solely to the size of their businesses or the manner in which their business records are maintained," quoting from lower court opinion.  In *Young*, the court affirmed the certification of a class of policyholders, all of whom were charged local government taxes on their premiums.  *Id*. at 541. The fact that the taxes differed, depending on where the policyholders lived, was not a basis to deny certification. Defendants argued that certain geocoding software proposed by plaintiffs to identify local tax

jurisdictions would be inaccurate.  The court held that that was defendants' problem:  "it is difficult to understand why Defendants should be able to avoid a class suit even if Plaintiffs did not offer a means to escape the burden of identifying class members." *Id.*

Defendants argue, however, that they are not the original lenders or originators of the loans and, therefore, they are not responsible for the failure of those entities to obtain adequate information about cost of attendance at the time the loans were made.  They also argue that they lack access to the relevant information now.  *See, e.g.*, Trust Br. (Dkt. 406) at 28-29.  But it is the Defendants—the Trust as owner and PHEAA and Firstmark as servicers—that are violating § 524 by attempting to collect on discharged debts and they clearly have a responsibility to determine whether a debt has been, in fact, discharged before they seek to collect on it.  This is precisely the scenario the Court rejected in *In re Nassoko*, 405 B.R. 515, 522 (Bankr. S.D.N.Y. 2009).  "To avoid violation of the discharge injunction, a creditor could simply collect on a discharged debt indirectly by selling it to a third party, aware that the third party intended to pursue collection of the debt.  The third party could then plead ignorance of the discharge, thereby purporting to insulate all parties from liability." *Id.*; *see also In re Starling*, 617 B.R. 208, 222 (Bankr. S.D.N.Y. 2020) (finding that both Internal Revenue Service and its servicer, Continental Service Group, Inc., a private collection agency, liable for violating § 524 and noting that the time to object to a debt's dischargeability is prior to the entry of discharge, not after attempting to collect on it); *Williams v. CitiFinancial Servicing LLC* (*In re Williams*), 612 B.R. 682, 693 (M.D. N.C. 2020) (holding current and former mortgage servicers liable under § 524 and noting that the purpose of the discharge injunction is to "eliminate any doubt concerning the effect of the discharge as to total prohibition on debt collection effort, and to ensure that once a debt is discharged, *the debtor will not be pressured in any way to repay it*." (quoting *Bradley v. Fina* (*In re Fina*), 550 F. App'x 150,

155 (4th Cir. 2014)); *see also In re Ferris*, 611 B.R. 701, 706 (Bankr. M.D. Fla. 2019) (holding both transferring and transferee servicers liable for willful violation of § 524 for taking steps to collect on a discharged debt).  Defendants can look to the lenders and originators for indemnity, but they have no defense in this action where they are the parties collecting on discharged debts.

Similarly, Defendants have the same access to information as the lenders:  they can obtain information from the relevant data bases or subpoena information from the schools.

C.    **All Loans, Scholarships and Grants Need to be Deducted from Cost of Attendance.**

Firstmark continues to make the erroneous argument that, to determine whether a loan is a qualified education loan, it is not necessary to deduct all other loans, grants and scholarships received by the student.  Firstmark Br. (Dkt. 402) at 24, n.20.  This assertion is clearly mistaken. It is necessary to deduct other financial aid scholarships, grants and loans because 26 U.S.C. § 221(d)(1) specifically limits qualified education loans to those used "solely to pay qualified higher education expenses."  Thus, if other grants and loans are not deducted and a lender issues a loan that, when combined with other financial aid, exceeds the cost of attendance, it is clear that loan would not be solely for educational purposes.  *See* Expert Report of Mark Kantrowitz dated February 5, 2021 (Dkt. 372) at 14-15.

Moreover, Firstmark's argument is rejected by its own co-Defendant.  PHEAA expressly states that it "[t]he total amount of a borrower's loans and grants for an academic year is critically important to analyzing whether a putative class member's loans exceeded the cost of attendance." "[I]t is necessary to that dischargeability inquiry to determine the total amount of federal loans, grants, scholarship and other private loans that the student received in order to determine whether the loan at issue in this proceeding exceeded the cost of attendance -- *that amount must be subtracted from the cost of attendance*."  PHEAA Br. (Dkt. 398) at 41-42. (emphasis added.)

In addition, Firstmark's *own papers* demonstrate that Firstmark does not believe the argument. First, Firstmark's own brief notes on page 28 that "a significant number of putative class member' [sic] loan amounts were certified by their respective schools as falling within their COA *minus other aid*." (emphasis added.) In the Declaration of Christy Phillips, the Managing Director of Firstmark, (Dkt. 404), Firstmark admits that it deducts all other loans, grants and scholarships when it obtains school certification from the financial aid officer at an applicant's school to insure "that the amount of the loan does not exceed the applicant's 'cost of attendance' *less other financial aid*." Philips Decl. at ¶¶ 12 and 14. (emphasis added.)

Phillips goes on to explain (in ¶ 16) that under federal law, if students receive funds in excess of the cost of attendance *less other funds received*, they are required to make a refund of any federally obtained loans that exceed the cost of attendance. And, Ex. J (Dkt. 404) to her declaration, the Private Education Loan Applicant Self Certification, makes it clear that the student eligibility for federal loans is determined by the cost of attendance less all other sources of financial aid. Finally, Ex. DD to the Kaplan Decl. (Dkt. 403-30) at 4-75 is an excerpt from Federal Student Aid Handbook stating that schools should "[r]emember when packaging subsidized or need-based aid, the basic formula is COA minus Expected Family Contribution (EFC) *minus* Estimated Financial Aid (EFA) equals need." (emphasis added)

Firstmark also falsely asserts that some bar loans may be qualified education loans because schools may specifically increase their cost of attendance to cover the living costs incurred while studying for the bar exam. (Dkt. 402) at 30. Firstmark provides no support for this assertion. Firstmark cites nothing more than a news article which merely notes that Northwestern University may increase cost of attendance for *registration and administration* of the bar exam. This

obviously does not include loans for cost of living expenses incurred while the student is studying for the bar exam, such as the $11,000 loan Plaintiff received from Citibank.

### D. Whether or Not a Class Member Took a Tax Deduction for Interest Paid on a Student Loan is Irrelevant to the Scope of the Class.

Defendants argue that determining the scope of the class is complicated by the fact that certain class members may have taken a deduction for interest on their student loans and that such a deduction estops that class member from asserting that their loan is dischargeable.

The theory underlying this argument is that the same section that determines whether student loan interest is deductible, I.R.C. § 221(d), is also the section that is referred to in § 523(a)(8)(B) for determining whether a private loan is nondischargeable.  Thus, Defendants argue, if an individual takes a deduction on a student loan, that individual is representing that the loan is nondischargeable.[7]  This argument is meritless for several reasons:

*First*, the particular borrower's intent or understanding of whether his or her loan is nondischargeable is irrelevant to determining dischargeability. A loan is either within the cost of attendance at a Title IV institution or it is not.  What the borrower understood to be the status of the loan has no relevance to determining the issue of dischargeability.

*Second*, the borrower's understanding is particularly irrelevant given the fact that borrowers are misled by lenders as to the nondischargeability status of their loans.  Defendants falsely advise all student borrowers, after they have gone through bankruptcy, that their private loans are nondischargeable, despite the fact that they have received a discharge in bankruptcy.

---

[7] With regard to Plaintiff Golden, Defendants assert that she *may* have taken an interest deduction on one or more of the subject loans.  Dkt. 406 at 5.  Yet, they concede that Plaintiff also had substantial federally guaranteed student debt, the interest of which is fully deductible and there is no evidence in the record that she took an interest deduction on either the BankOne loan or the Citibank bar loan.  In any event, for the reasons stated in the body of the brief, whether or not she took such a deduction is legally irrelevant.

They do this by sending statements to borrowers, after discharge, that those student loans are still due and owing.  Indeed, Defendants' own exhibits, prove this fact.  *See* Ex. L to the Phillips Decl.[8] (Dkt. 404) ("account will be brought current upon discharge," noted in red ink); Ex. A to Carpinello Reply Decl.  Thus, Defendants are (falsely) representing to the borrower that his or her loan is nondischargeable and they must continue to pay.  If the borrower acts upon that advice, they naturally may seek a deduction for interest payments on what they *are told* is a nondischargeable loan.  The lay borrower would have no knowledge of the intricacies of the interplay between the Bankruptcy Code and the Internal Revenue Code.  Defendants, of course, understand the intricacies, but they do not advise the borrowers of these facts.  Thus, many borrowers continue to pay on discharged loans and the fact that they are doing so, based on Defendants' incorrect advice and collection efforts, could not possibly be a basis to bar them from now asserting that the loans were actually discharged.

*Third*, Defendants, having made a false representation that the loans were nondischargeable, actually send a Form 1098-E to class members again falsely advising them they paid deductible interest on a dischargeable student loan.  Phillips Decl. (Dkt. 404) at ¶ 21.

*Fourth*, debtors are expressly advised, at the time they receive an order of discharge, that "most" student loans are nondischargeable.  *See, e.g.*, Ex. F to Carpinello Reply Decl.  Thus, it is not surprising that an individual who receives such a discharge may believe that his or her particular loan is nondischargeable even though it is fully dischargeable.

*Finally*, whether a taxpayer paid a tax properly is a matter between the IRS and the taxpayer.  Entities outside that relationship do not get the benefit (or burdens) if a taxpayer

---

[8] As noted in footnote 6, Firstmark failed to produce this document in discovery even though it clearly comes within the scope of Plaintiff's request.

improperly or properly claimed a tax benefit.  A tax filing simply cannot create a non-dischargeable loan.  Again, the loan is dischargeable or non-dischargeable based on the facts of the loan as between the lending parties.  Either party's separate filings to the IRS cannot change the fundamental nature of the loan.

For these reasons, Defendants reliance on *In re Mallett*, 625 B.R. 553, 558 (Bankr. M.D. Fla. 2021) is misplaced.  In that case, the plaintiff argued that the loan was dischargeable because she used the loan for purposes other than education.  In that context, the court found that her taking of an interest deduction was a rebuttable admission that the loan was nondischargeable.  *Id.*  The court further found that there was no other evidence in the record as to whether or not the loan was dischargeable.  Here, each class member's status as part of the class will depend upon the objective facts of whether their loan was within the cost of attendance at a Title IV school.  Those objective facts govern the status of the loan.  Any individual class member's belief as to dischargeability is legally irrelevant.  To the extent that *In re Mallett* stands for the proposition that a lay debtor's understanding as to the legal status of his or her loan is evidence of whether it comes within § 523(a)(8), its holding should be rejected.

### E.    Payments Made by Class Members Post-Discharge are Not Voluntary.

Defendants claim that a class cannot be certified because the Court must make individual determinations as to whether some class members made post-discharge payments voluntarily.  This is a non-issue, because, with regard to any class member, Defendants have sent collection notices, post-discharge, demanding payment.

When a person whose debts have been discharged in bankruptcy receives a notice from Defendants that their debt is not discharged; that they have an obligation to make the payment; that their payment is subject to collection; and that they will receive a derogatory notation on their

credit report if they do not make payment, any payment subsequently made cannot, under any sense of the word, be "voluntary."

The payment of a discharged debt cannot be voluntary unless it is entirely free from creditor influence or inducement. *In re Nassoko*, 405 B.R. 515, 524 (Bankr. S.D.N.Y. 2009) ("Whether it is possible to 'induce' a 'voluntary' repayment, however, is highly questionable" and noting that "voluntariness must be analyzed objectively 'as referring to repayment that is free from creditor influence or inducement'") (quoting *Hudson v. Central Bank* (*In re Hudson*), 168 B.R. 368, 371-72 (Bankr. S.D. Ill. 1994); *Watkins v. Guardian Loan Co. of Massapequa, Inc.* (*In re Watkins*), 240 B.R. 668, 678 (Bankr. E.D.N.Y. 1999) (holding that an agreement to repay a pre-petition debt as a condition for obtaining further credit is not by any "stretch of the imagination" voluntary); *Venture Bank v. Lapides*, 800 F.3d 442, 447-48 (8th Cir. 2015) (holding that in order for a payment to be voluntary, it must be entirely free from creditor influence or inducement; in the case at hand the debtor agreed to continue payments on a mortgage because the bank encouraged him to believe that if he made such payments it would consider helping him refinance his home.)

In *Matter of Hellums*, 772 F.2d 379 (7th Cir. 1985), a creditor argued that it was free to keep post-petition wages it had garnished in satisfaction of a pre-petition debt because the debtor had failed to take steps to end the garnishment and, therefore, was making a "voluntary" payment. The court emphatically rejected that argument in the following language:

> An automatic wage assignment that lulls an unthinking debtor into paying-off a dischargeable debt defeats [the purpose of halting collection efforts] no less than threats and intimidation from sophisticated creditors. Congress broadly sought to prevent creditors from attempting in any way to collect a pre-petition debt. (emphasis added), and expressed special concern for [i]nexperienced frightened, [and] ill-counseled debtors. . . . such debtors are precisely the sort who would not know to contact their employers to halt automatic wage assignments in satisfaction of pre-petition debts.

*Id*. at 381 (internal quotations omitted).

The Court went on to hold that a creditor cannot continue garnishing wages to pay a pre-petition debt unless the creditor receives a positive indication that the debtor intends to voluntarily assume their pre-petition debts.  *Id.* at 382.  The same reasoning applies here.

F.    **Other Factual Issues Defendants Raise are Irrelevant**.

Defendants raise a litany of individual factual issues to try to avoid class certification.  All of these are legally irrelevant.  For example, they assert that a determination needs to be made (1) as to whether a debtor's petition listed his or her loan as a nondischargeable student loan; (2) whether the debtor filed an adversary proceeding; and (3) whether the debtor acknowledged that the loan was a qualified education loan by making it an undue hardship motion.  *First*, how a debtor listed their debt is not determinative of whether the debt is discharged in bankruptcy.  Again, a debt is discharged in bankruptcy unless it comes within the exceptions of § 523.  *In re Homaidan*, 3 F.4th at 600-601.  *Second*, if an individual debtor has already filed an adversary proceeding and has a court determination concluding that the debt is nondischargeable, that is easily determinable on Pacer and does not preclude certification of the class.  The number of individuals who have unsuccessfully brought adversary proceedings challenging the dischargeability of a private loan made or serviced by these Defendants is probably within the single digits if it exists at all.

*Third*, making an undue hardship claim is not at all determinative of whether the loan is nondischargeable.  Defendants cite the unreported decision *Desormes v. Charlotte School of Law, Inc.* (*In re Desormes*), Adv. Pro. No. 10-5014, 2012 WL 4106765, at *2 (Bankr. D. Conn. 2012). (Dkt. 406) at 43.  That decision does not in any way hold that making an undue hardship application is a concession that a loan is nondischargeable.

## V.    THE CLASS IS NOT A "FAIL-SAFE" CLASS.

Firstmark and the Trust assert that the class definition creates an impermissible fail-safe class.  Firstmark Br. (Dkt. 402) at 35-37; Trust Br. (Dkt. 406) at 41.  This is clearly wrong.

A fail-safe class is a class that is defined by the legal issue to be determined in the case. Thus, if the court rules against the class on the liability issue at hand, there is no class that is bound by the adverse decision.  This is obviously unfair to the defendant.  Here, Defendants assert that Plaintiff proposes a fail-safe class because the class definition depends on determining cost of attendance (and also a school's Title IV status).  Dkt. 406 at 41.  But that is a factual determination —not a legal one—and all classes have to be defined by relevant facts.  Whether that determination governs dischargeability and whether the defenses to dischargeability are viable, are legal conclusions that will bind all members of the class.  Thus, it is not true, as Defendants assert, that there are no class members that are at legal risk of an adverse decision.  What Defendants seem to be saying, in effect, is that they have no defense and that the private loans they made that were not within the cost of attendance at a Title IV school are, as a matter of law, dischargeable.  That is true, but it does not make the class definition fail-safe.  It just means that Defendants have no viable legal defense as to those particular class members.

In contrast, where classes are defined by objective criteria, as they are here, there is no fail-safe issue.  For example, in *Carrillo v. Wells Fargo Bank, N.A.*, 18-CV-3095, 2019 WL 3714801, at *13 (E.D.N.Y. May 10, 2019), the plaintiff alleged that Wells Fargo charged a higher interest rate than that agreed in the contract.  The court held that class discovery could occur to determine how many people were charged the same higher interest rate without predetermining the ultimate legal issue of whether the subject contract required a lower interest rate to be applied.  Similarly, in *Hardgers-Powell v. Angels in Your Home LLC*, 330 F.R.D. 89, 101-02 (W.D.N.Y. 2019),

subclass membership was defined based upon each employee's particular rate of overtime pay rather than based upon whether that rate of pay was illegal or inadequate. "In short, the subclass is defined in terms of readily ascertainable, objective criteria that do not implicate concerns of a fail-safe class. The mere fact that the subclass definition includes the factual predicates for a successful claim does not, by itself, present a barrier to certification." *Id.* at 102. (internal quotations and citations omitted).

Defendants' cases are not to the contrary. Rather, they illustrate the key distinction between fail-safe classes and classes, such as the one proposed by Plaintiff, that define their membership based on common objective proof. In *Garcia v. Execu/Search Group, LLC*, No. 17-cv-9401, 2019 WL 689084, at *2 (S.D.N.Y. Feb. 19, 2019), the court actually drew the distinction between the class that relies upon the ultimate legal definition determined and the objective factual criteria that defined the scope of the class, finding that the amended class definition was appropriate. In *Mazzei v. The Money Store*, 288 F.R.D. 45, 55-56 (S.D.N.Y. 2012). *aff'd* 829 F.3d 260 (2d Cir. 2016), the class was defined as borrowers who were charged fees "that were not permitted under the [applicable agreements]." Thus, the class was defined in terms of the ultimate legal issue to be decided. Similarly, in *Lawrence v. New York City Medical Practice P.C.*, 2021 U.S. Dis. LEXIS at *18-20 (S.D.N.Y. 2021). the court found that a class defined by individuals who did not receive the required time and a half pay was not a fail-safe class because the definition of the class depended upon a determination of who was entitled to receive such time and a half. In *Spread Enterprises, Inc. v. First Data Merchant Services Corp*., 298 F.R.D. 54, 69 (E.D.N.Y. 2014) the class was defined to include all merchants that have been "charged excess fees." Thus, again, the class was defined by the ultimate legal issue to be decided and was impermissible. The same was true in *Hurt v. Shelby County Board of Educ*ation, No. 2:13-cv-230, 2014 WL 4269113, at *2-3

(N.D. Ala. Aug. 21, 2014), where the class was defined by all individuals who had been sexually abused or harassed by a particular individual.  Rather than defining the class by objective criteria, the class was defined by the ultimate legal issue to be decided.[9]

Firstmark also argues that the class is fail-safe because it is limited to those who were subjected to Defendants' acts to collect on their loans.  Firstmark Br. (Dkt. 402) at 37.  This is also erroneous.  While an act to collect may be subject to a legal definition, whether or not a particular individual was subject to an act of collection is a factual question.  According to Firstmark's logic, a class action against a peanut butter manufacturer would involve a fail-safe class if it defined the class as all the people who bought a specific brand of peanut butter during a certain period of time.  Under Firstmark's logic, that is a fail-safe class because people who bought the peanut butter would get recovery and people who did not buy the peanut butter would not.  But that is true of every class action; a class must be defined by a factual definition but whether or not the class gets recovery is determined by the success or failure of the legal arguments they make.

If, instead of defining the class by objective facts, Plaintiff defined the class as all individuals who filed bankruptcy and whose student loans were dischargeable, that would be a fail-safe class, because the Court would have to decide the legal issue (*i.e.*, what makes a loan

---

[9] *Fennell v. Navient Solutions, LLC*, No. 6:17-cv-2083, 2019 WL 3854185, at *4 (M.D. Fla. June 14, 2019) is an outlier and should be rejected. In that case, the court held that a class in a Telephone Consumer Protection Act case that was defined by cellular telephone users called by the defendant with an automatic telephone dialing system without their consent was a fail-safe class because the class was defined by the elements of the offense.  Respectfully, this reasoning is erroneous.  The class was defined by factual, objective criteria.  The fact that each member of the class, properly identified, would receive recovery does not make it a fail-safe class.  The court seems to imply that this class definition could only be rectified by adding in people who clearly would not be entitled to recovery such as those called by a manual dialing system or those called on a landline phone, but such individuals clearly would not be entitled to recovery.  What makes a class fail-safe is that the court has to decide the ultimate legal issue before defining a class, not the fact that everyone in the class may ultimately receive a recovery.

nondischargeable) before determining who was within the class.  By definition, every class member would be entitled to recovery.

Since the class here is defined by ascertainable, objective facts and not legal conclusions, it is not a fail-safe class.

## VI.    THERE IS NO CREDIBLE ARGUMENT THAT NUMEROSITY HAS NOT BEEN MET HERE.

Defendants provide no credible argument or evidence that there are less than 40 individuals who would be within the subject class.  Although Defendants attack the two DeBois declarations submitted by Plaintiff, they do not challenge their fundamental conclusions.  In his first declaration (Dkt. 252) John DeBois demonstrated, using PHEAA's own data, that, at the very least, there were almost 8,000 individuals whose loans either exceed the cost of attendance who did not attend Title IV institutions.  As noted in that declaration, because of inaccuracies in PHEAA's data, his estimate greatly under counts all the individuals who likely come within the class.  After that declaration was submitted, Plaintiff's counsel learned that the PHEAA data had other deficiencies which rendered some of Mr. DeBois's conclusions inaccurate. Mr. DeBois, therefore, submitted a second declaration in which he demonstrated that even a subset of the individuals in the PHEAA portfolio numbered approximately 4,000.  (Dkt. 374) at ¶¶ 8-10.

On this issue, as on so many other issues, Defendants play hide the ball.  PHEAA asserts a "high percentage" of the loans that PHEAA services were guaranteed by TERI.[10]  But it fails to disclose how many out of the 125,000 loans it services come within that category.  Similarly, it asserts that other third-party nonprofits provide guarantees with regard to some of the 125,000 loans but fails to provide any number.  *See* Decl. Jennifer Minsker (Dkt. 400), at ¶¶ 6-7.

---

[10] Of course, Plaintiff asserts that any guarantee provided by TERI is insufficient to render a private student loan nondischargeable.  *See* Plaintiff's Memorandum of Law in Support of Her Motion for Summary Judgement (Dkt. 244) at 18-38.

Firstmark also challenges numerosity but, at the same time, concedes that, of the 9,740 loans that Firstmark has identified as subject to Chapter 7 bankruptcy, over 6,900 were held by state agencies or nonprofits, leaving approximately 3,000 loans presumptively within the class. Firstmark Br. (Dkt. 402) at 25.  Firstmark also asserts that some of the loans were certified by the schools as coming within the cost of attendance but, like PHEAA, hides the ball and fails to disclose how many loans among the 3,000 were certified as within the cost of attendance.  *Id*. at 28-29.

In any event, it is clear that thousands of individuals come within the class, even taking into account the potential exclusion of loans supposedly guaranteed by nonprofits or because of purported certifications of cost of attendance. None of Defendants even suggests otherwise.

## VII.   A DETERMINATION AS TO WHETHER ANY OF DEFENDANTS ARE SUBJECT TO CONTEMPT AND PUNITIVE DAMAGES CANNOT DEFEAT CLASS CERTIFICATION.

Defendants argue that the Court cannot certify the class because it would have to make an individual inquiry as to how each Defendant treated each debtor in order to determine whether that Defendant is liable under *Taggart* for contempt.  This argument is without merit for two reasons:

*First*, this Court can certify the class and make a determination as to dischargeability of the subject student loans and to determine whether restitution and injunctive relief are appropriate without ever reaching the issue whether the Defendants are guilty of contempt.

*Second*, whether or not Defendants should be held in contempt is appropriately determined on a class-wide, rather than on an individual, basis.  The issue is not how any Defendant treated a particular debtor but whether the *policies* adopted by that Defendant to intentionally collect on debts it knew were discharged should subject that Defendant to a contempt citation under the standards of *Taggart*.  Thus, it is entirely proper that the *Taggart* determination be made in a class context.  A Defendant's actions with regard to any individual class member may be relevant

evidence with regard to that Defendant's policies, but it is the policies that are at issue here, not how Defendants treated a particular debtor.

## VIII.    THIS COURT HAS JURISDICTION TO CERTIFY A NATIONAL CLASS.

This Court has already decided in two separate opinions that it has jurisdiction to certify a national class.  *See Ajasa v. Wells Fargo* (*In re Ajasa*), 627 B.R. 6 (E.D.N.Y. 2021); *Golden v. Discover Bank* (*In re Golden*), Adv. Pro. No. 20-01051, --B.R.--, 2021 WL 3051896 (Bankr. E.D.N.Y. July 19, 2021).  In addition, Judge Drain in *Bruce v. Citigroup, Inc.*, Adv. Pro. No. 14-08224 (Bankr. S.D.N.Y.), recently agreed with the reasoning of this Court in *Ajasa* and *Golden* and reaffirmed its own opinion in *Haynes v. Chase Bank USA, N.A.*, Adv. Pro. No. 13-08370, 2014 WL 3608891 (Bankr. S.D.N.Y. July 22, 2014) that bankruptcy courts have jurisdiction to certify a national class for violation of the discharge injunction and discharge orders.  *See* Ex. G to Carpinello Reply Decl. Defendants present no new argument that would justify this Court revisiting this issue.

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that her motion for class certification be granted.

Dated: September 2, 2021                                Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**

By:    */s/ George F. Carpinello*
        George F. Carpinello
        Adam R. Shaw
        Jenna C. Smith
        30 South Pearl Street
        Albany, NY  12207

**JONES SWANSON HUDDELL & DASCHBACH LLC**

Lynn E. Swanson (admitted *pro hac vice*)
Peter Freiberg (admitted *pro hac vice*)
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130

**FISHMAN HAYGOOD LLP**
Jason W. Burge (admitted *pro hac vice*)
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170

**LAW OFFICES OF JOSHUA B. KONS, LLC**
Joshua B. Kons (Ct. Bar No. 29159)
50 Albany Turnpike, Suite 4024
Canton, Connecticut 06019

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I, George F. Carpinello, hereby certify that on the 2nd day of September 2021, I served the

forgoing document on all counsel of record via ECF and electronic mail.

*/s/ George F. Carpinello*
George F. Carpinello