UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

In re:                                                    Chapter 7

TASHANNA B GOLDEN                                          Case No. 16-40809-ess
*fka* TASHANNA B PEARSON,

                         Debtor.

------------------------------------------------------------------------x

TASHANNA B GOLDEN,                                        Adv. Pro. No. 17-01005-ess
*fka* TASHANNA B. PEARSON ON BEHALF OF
HERSELF AND ALL OTHERS SIMILARLY SITUATED,

                         Plaintiffs,

v.

NATIONAL COLLEGIATE STUDENT LOAN
TRUST 2006-4 (NCT 2006), GS2 2016-A (GS2),
PENNSYLVANIA HIGHER EDUCATION ASSISTANCE
AGENCY *dba* AMERICAN EDUCATION SERVICES,
FIRSTMARK SERVICES LLC,

                         Defendants.

------------------------------------------------------------------------x

## MEMORANDUM DECISION ON THE PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

*Appearances*:
George F. Carpinello, Esq.                    H. Peter Haveles, Jr., Esq.
Adam Shaw, Esq.                               Akerman LLP
Jenna Smith, Esq.                             1251 Avenue of the Americas
Boies Schiller Flexner LLP                    37th Floor
30 South Pearl Street (11th Floor)            New York, NY 10020
Albany, NY 12207                              *Attorneys for Defendant Pennsylvania*
   *Attorneys for Plaintiff Tashanna B. Golden*   *Higher Education Assistance Agency*

Lynn E. Swanson, Esq.
Peter Freiberg, Esq.
Jones Swanson Huddell & Daschbach LLC
601 Poydras Street (Suite 2655)
New Orleans, LA 70170
 *Attorneys for Plaintiff Tashanna B. Golden*

Jason W. Burge, Esq.
Fishman Haygood LLP
201 Saint Charles Avenue (46th Floor)
New Orleans, LA 70130
 *Attorneys for Plaintiff Tashanna B. Golden*

Joshua B. Kons, Esq.
Law Offices of Joshua B. Kons, LLC
50 Albany Turnpike (Suite 4024)
Canton, CT 06019
 *Attorneys for Plaintiff Tashanna B. Golden*

Gregory T. Casamento, Esq.
R. James DeRose III, Esq.
Locke Lord LLP
Brookfield Place
200 Vesey Street (20th Floor)
New York, NY 10281
*Attorneys for Defendants National Collegiate
Student Loan Trust 2006-4 (NCT 2006) and
GS2 2016-A (GS2)*

J. Matthew Goodin, Esq.
Locke Lord LLP
111 South Wacker Drive, Suite 4100
Chicago, IL 60606
*Attorneys for Defendants National Collegiate
Student Loan Trust 2006-4 (NCT 2006) and
GS2 2016-A (GS2)*

Charles F. Kaplan, Esq.
Perry, Guthery, Haase & Gessford P.C.
L.L.O.
233 South 13th Street (Suite 1400)
Lincoln, NE 68508
*Attorneys for Defendant Firstmark Services
LLC*

Barbara L. Seniawski, Esq.
The Seniawski Law Firm PLLC
1460 Broadway (4th Floor)
New York, NY 10036
*Attorneys for Defendant Firstmark Services
LLC*

May 7, 2025

**HON. ELIZABETH S. STONG**
**UNITED STATES BANKRUPTCY JUDGE**

## Introduction

Before the Court is the motion for a preliminary injunction of Tashanna B. Golden, f/k/a

Tashanna B. Pearson, for an order, on behalf of herself and all others similarly situated in a

putative class, directing defendants National Collegiate Student Loan Trust 2006-4 (NCT 2006)

(the "2006-4 Trust") and GS2 2016-A (the "GS2 2016-A Trust," and together with the 2006-4

Trust, the "Trust Defendants"), Pennsylvania Higher Education Assistance Agency d/b/a

American Education Services ("PHEAA"), and Nelnet Servicing, LLC d/b/a Firstmark Services

("Firstmark") (collectively, the "Defendants") immediately to cease their collection efforts on

certain loans held by Ms. Golden and the members of the putative class.

Ms. Golden seeks this relief on grounds that private student loans that either exceeded the

cost of attendance at a Title IV institution or were not made to cover the cost of attendance at a

Title IV institution in the first place, are within the scope of an individual debtor's bankruptcy

discharge. She asserts that the Defendants have disregarded that fact and have continued their

efforts to collect on these discharged debts for many years, including during the more than seven

years that this action has been pending.

In particular, Ms. Golden argues that certain of her private student loans were discharged

in her Chapter 7 bankruptcy case because these loans do not meet the requirements to be

nondischargeable under Bankruptcy Code Section 523(a)(8)(B) – that is, these loans are not

"qualified education loan[s]" pursuant to Internal Revenue Code Section 221(d)(1). She asserts

that these loans do not meet Internal Revenue Code Section 221(d)'s requirement that a loan

must be within cost of attendance at a Title IV institution to be a "qualified education loan,"

either because the loan exceeded the "cost of attendance," as that term is defined in section 472

of the Higher Education Act of 1965, or because it was made for purposes other than covering the cost of attendance at a Title IV institution, such as the loan she received to support her living expenses while studying for the bar exam after she graduated from law school.  Higher Education Act of 1965, Pub. L. No. 89-329, Title IV § 472 (codified as amended at 20 U.S.C. § 1087*ll*) (2024).  And she argues that because these loans do not meet the requirements for nondischargeability, they were in fact discharged.

As a consequence, she argues, the Defendants' ongoing collection efforts violate the statutory bankruptcy discharge contained in Bankruptcy Code Section 524(a)(2).  And at this stage in these proceedings, Ms. Golden argues that the requirements for injunctive relief have been met, and the Court should enter appropriate relief, including a declaratory judgment that these loans are within the scope of Bankruptcy Code Section 727's discharge and an injunction against further collection, on behalf of the entire class.

The Defendants oppose the Preliminary Injunction Motion, on several grounds.  They argue that Ms. Golden cannot seek relief on behalf of the putative class because defendants PHEAA and Firstmark service loans not only on behalf of the Trust Defendants but also on behalf of dozens of other loan owners, who have not been joined as parties to this proceeding and have not had the opportunity to represent their own interests.  The Defendants also argue that these loan owners are required parties under Federal Rule of Civil Procedure 19, and relief affecting their rights is inappropriate at this stage.

In addition, the Defendants argue that Ms. Golden has not met the requirements for a preliminary injunction.  They state that she is not likely to succeed on the merits of her claim because her loans are outside the scope of her bankruptcy discharge for one of two independent reasons – either under Section 523(a)(8)(A)(i) because they were "funded, in whole or in part,"

through a guaranty by a nonprofit institution, or under Section 523(a)(8)(B) because they were within the cost of attendance and meet the requirements to be "qualified education loans." And the Defendants argue that Ms. Golden, who is making voluntary payments on her loans, cannot show an imminent irreparable injury. They also argue that under the Second Circuit's recent decision in *Bruce v. Citigroup Inc.*, 75 F.4th 297 (2d Cir. 2023), *cert. denied*, --- U.S. ---, 144 S. Ct. 565, 217 L. Ed. 2d 300 (2024), this Court does not have the authority to enforce discharge injunctions issued by other courts. For these reasons, among others, the Defendants argue that Ms. Golden cannot meet her burden, and that the Preliminary Injunction Motion should be denied.

This Preliminary Injunction Motion calls for the Court to address a veritable cornucopia of issues, ranging from this Court's authority to enter the requested relief, to the applicable standards for that relief, to the elements of the claims and defenses that have been advanced, and within those elements, the relevant criteria to be considered. Equitable considerations including the likelihood of irreparable injury and the balance of hardships, as well as the public interest, are also part of the picture.

To be sure, these issues are complex in many ways, and they have been addressed by the parties in written submissions and arguments that are extensive, thorough, and thoughtful. But it is worth noting that at its core, the question presented by this Preliminary Injunction Motion is a simple one: has Ms. Golden shown that the student loan debts at issue here are within the scope of her Chapter 7 bankruptcy discharge? If not, then injunctive relief is not warranted. But if so, then injunctive relief is appropriate, and any acts to collect on those loans must cease.

## Jurisdiction

This Court has jurisdiction over this adversary proceeding pursuant to Judiciary Code

Sections 157(b)(1) and 1334(b), and the Standing Order of Reference dated August 28, 1986, as amended by the Order dasted December 5, 2012, of the United States District Court for the Eastern District of New York.  In addition, this Court may adjudicate these claims to final judgment to the extent that they are core proceedings pursuant to Judiciary Code Section 157(b).

## Background

This case and Ms. Golden's related individual Chapter 7 case have an extensive procedural history in this Court and the District Court, and familiarity with that history is assumed.  For the sake of context, this Court summarizes some of the significant aspects of those matters below.

### *Ms. Golden's Bankruptcy Case*

On February 29, 2016, Ms. Golden filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.  On August 3, 2016, Ms. Golden received a discharge in her bankruptcy case.  On December 6, 2016, Ms. Golden filed a motion to reopen her bankruptcy case to permit her to seek a determination of the dischargeability of her student loan debt, and related relief.  Case No. 16-40809; ECF No. 19.  That motion was heard and granted by the Court on January 5, 2017, and on January 10, 2017, the Court entered an order reopening Ms. Golden's bankruptcy case to permit her "to seek a determination of [the] dischargeability of her student loan debt."  Case No. 16-40809; ECF No. 21.

### Ms. Golden's Loans at Issue:  The NCT Loan and the Bar Loan

On September 28, 2006, while enrolled as a student at the University of Pennsylvania Law School ("Penn Law"), Ms. Golden received a private loan of $7,103 from Bank One.  Supplemental Memorandum of Law in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction, ECF No. 620 (the "Preliminary Injunction

Motion" or "Prelim. Inj. Mem.") at 3.  This loan was later securitized into an NCT Trust, and it is now serviced by PHEAA (the "NCT Loan").  Prelim. Inj. Mem. at 3.  Ms. Golden states that it is undisputed that The Education Resource Institute ("TERI") is the "purported guarantor" of the loans in the NCT Trust, including the NCT Loan.  Prelim. Inj. Mem. at 4.

According to the Defendants, TERI is "'a private nonprofit corporation organized under . . . Massachusetts General Laws' . . . and . . . 'operated exclusively for charitable and educational purposes.'"  Trust Defendants' Opposition, ECF No. 627, at 4-5 (quoting Trust Defendants' Combined Response, ECF No. 338, at 19-20).  And according to Ms. Golden, TERI is "an entity that, under any objective factual analysis, is not a *bona fide* nonprofit within the terms of § 523(a)(8)(A)(i).  Reply at 3.  Declaration of George F. Carpinello in Support of Plaintiff's Motions for Summary Judgment, Class Certification, and a Preliminary Injunction, ECF No. 245 ("Carpinello Decl.") Exh. K (Deposition of Richard Neely) at 32:15-17.

The First Marblehead Corporation ("First Marblehead"), a for-profit corporation, purchased TERI's operating assets in 2001, and TERI operated out of First Marblehead's offices in Boston, Massachusetts.  Carpinello Decl. Exh. K (Deposition of Richard Neely) at 35:9-37:4; 38:10-39:18; Carpinello Decl. Exh. M (2004 Form 10-K) at 12-13.  Courts have described this as a "close business relationship" between First Marblehead and TERI.  *In re First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 149 (D. Mass. 2009).  Ms. Golden states that TERI did not seek certification from the school that direct-to-consumer loans were within the school's cost of attendance, and that TERI did not determine the other amounts of funding that student borrowers received.  Prelim. Inj. Mem. at 4.

Ms. Golden graduated from Penn Law in May 2008.  Prelim. Inj. Mem. at 3.  On February 26, 2008, before her graduation, she received a loan of $11,000 from Citibank to cover living

expenses while she studied for the Pennsylvania bar exam (the "Bar Loan"). Prelim. Inj. Mem. at 3. Ms. Golden states that Penn Law never certified that the Bar Loan was within its cost of attendance. Prelim. Inj. Mem. at 5. Golden Tree Asset Management purchased the Bar Loan on October 24, 2015, and placed it in the GS2 Trust, and Firstmark is now the servicer of the Bar Loan. Prelim. Inj. Mem. at 3. Firstmark states that it services Ms. Golden's Bar Loan, and that Ms. Golden, "applied for the [Bar Loan], and that the [Bar Loan] was disbursed, while Plaintiff was actively enrolled at [Penn Law] as a third-year law student." Firstmark Opposition to the Preliminary Injunction Motion, ECF No. 637 at 32.

_This Adversary Proceeding_

On January 18, 2017, Ms. Golden commenced this adversary proceeding by filing the Complaint. ECF No. 1. On October 17, 2017, she filed an Amended Complaint (the "Am. Compl."), adding class action allegations and additional defendants. ECF No. 32. In this action, Ms. Golden seeks "a determination that certain debts that she incurred as a student are not nondischargeable student loan debts under Bankruptcy Code Section 523(a)(8)(B)." Mem. Decision on Firstmark Serv.'s Mot. to Compel or Dismiss at 2, ECF No. 88 (citing Complaint).

On December 8, 2017, Firstmark filed a motion to compel arbitration or, in the alternative, to dismiss the Adversary Proceeding (the "Motion to Compel or Dismiss") and a Memorandum of Law in Support of the Motion to Compel or Dismiss (the "Mot. to Compel or Dismiss Mem."). ECF Nos. 41, 42. There, Firstmark argues that Ms. Golden contractually agreed to arbitrate each of the claims that she asserts here, and that her agreement to arbitrate is "valid, irrevocable, and enforceable." Mot. to Compel or Dismiss Mem. at 3.

On July 25, 2018, the Court issued a memorandum decision on the Motion to Compel or Dismiss, and denied the motion to the extent it sought to compel arbitration of Ms. Golden's

claims. *Golden v. JP Morgan Chase Bank* (*In re Golden*), 587 B.R. 414 (Bankr. E.D.N.Y. 2018). And on January 31, 2019, the Court issued a second memorandum decision on the Motion to Compel or Dismiss, and denied the motion to the extent it sought to dismiss the Adversary Proceeding. *Golden v. JP Morgan Chase Bank* (*In re Golden*), 596 B.R. 239 (Bankr. E.D.N.Y. 2019).

On July 13, 2020, Ms. Golden filed a motion for partial summary judgment (the "Summary Judgment Motion" or "Summ. J. Mot."). ECF No. 244. And Ms. Golden filed affidavits of Ms. Golden and George F. Carpinello in support of the Class Certification Motion. ECF Nos. 245-47. That motion remains pending. And on July 13, 2020, Ms. Golden filed the initial, and now superseded, Motion for a Preliminary Injunction (ECF No. 254) and the initial, and now superseded, Motion for Class Certification (ECF No. 255).

From time to time, the Defendants filed a series of letters identifying supplemental authority in support of their respective positions. Letter dated Nov. 8, 2021, ECF No. 440 (Firstmark citing *DiDonato v. GC Servs. Ltd. P'ship*, 2021 WL 4219504 (S.D.N.Y. Sept. 16, 2021), addressing class certification); Letter dated Apr. 28, 2023, ECF No. 581 (Trust Defendants citing *Deason v. Nat'l Collegiate Student Loan Tr. 2006-2* (*In re Deason*), Adv. Pro. No. 22-1008 (Bankr. E.D. La.), ECF No. 43, addressing dischargeability of private student loans guaranteed by TERI under Section 523(a)(8)(A)(i)); Letter dated July 24, 2023, ECF No. 610 (Trust Defendants citing *Haley v. Teachers Ins. & Annuity Ass'n*, 344 F.R.D. 284 (S.D.N.Y. 2023), addressing class certification).

On August 2, 2023, the Second Circuit rendered its decision in *Bruce v. Citigroup Inc.*, 75 F.4th 297 (2d Cir. 2023). In *Bruce*, the Second Circuit held that a "bankruptcy court's civil contempt authority does not extend to other bankruptcy courts' discharge orders in a nationwide

class action." *Bruce*, 75 F.4th at 306.  On August 14, 2023, the Court held a conference with the parties, and requested that the parties address *Bruce* and any other relevant developments in supplemental briefs.

On September 15, 2023, Ms. Golden filed the Preliminary Injunction Motion, as well as a Supplemental Memorandum of Law in Support of Plaintiff's Motion for Class Certification (the "Class Certification Motion" or "Class Cert. Mot.").  ECF Nos. 620, 621.  In the Class Certification Motion, Ms. Golden seeks to certify a class pursuant to Federal Rule of Civil Procedure 23(b)(1)(A), a declaratory and injunctive relief class pursuant to Federal Rule of Civil Procedure 23(b)(2), and a damages class pursuant to Federal Rule of Civil Procedure 23(b)(2), consisting of:

> Individuals who received private loans owned, held, or serviced by Defendants which were not within the cost of attendance at Title IV institutions as defined in 26 U.S.C. § 221(d); who obtained bankruptcy discharges after October 17, 2005; who were subsequently subjected to Defendants' acts to collect on the loans; and who have not reaffirmed their loans.

Class Cert. Mot. at 7.

On October 27, 2023, the Trust Defendants, PHEAA, and Firstmark filed Opposition to the Preliminary Injunction Motion (the "Trust Defs. Opp.," "PHEAA Opp.," and "Firstmark Opp.").  ECF Nos. 627, 630, 637.  And PHEAA, the Trust Defendants, and Firstmark filed Opposition to the Class Certification Motion (the "PHEAA Class Cert. Opp.," "Trust Defs. Class Cert. Opp.," and "Firstmark Class Cert. Opp.").  ECF Nos. 631, 635, 638.  Finally, PHEAA filed a separate Memorandum of Law regarding the impact of *Bruce* on the Class Certification Motion and the Preliminary Injunction Motion (the "PHEAA *Bruce* Brief").  ECF No. 634.

On November 20, 2023, Ms. Golden filed a Reply Memorandum of Law in Further Support of Her Motion for a Temporary Restraining Order and a Preliminary Injunction (the

"Reply") and a Reply Memorandum of Law in Further Support of Her Motion for Class Certification (the "Class Cert. Reply").  ECF Nos. 648, 647.

On November 29, 2023, the Court held a pre-trial conference and heard oral argument on these matters, at which the parties appeared and were heard.  At oral argument, the parties addressed whether it would be appropriate to consider the record in the context of Ms. Golden's request for relief in the form of a preliminary injunction or a temporary restraining order simultaneously.  Transcript of November 29, 2023, hearing, ECF 657, 185:2-6.  And on January 11, 2024, Ms. Golden filed a letter confirming that, "all counsel agree that the pending motion for a temporary restraining order/preliminary injunction may be treated for all purposes as a motion for a preliminary injunction."  ECF No. 660.  From time to time, and on November 25, 2024, the Court held a continued pre-trial conference and hearings on the Preliminary Injunction Motion, and thereafter, from time to time and on April 14, 2025, the parties filed letters to supplement the record with additional authorities.

*The Allegations of the Amended Complaint*

In view of the nature of the relief sought in this Preliminary Injunction Motion, it is helpful to summarize the principal allegations of the Amended Complaint.

Ms. Golden alleges that the Defendants have knowingly "appropriated a legal presumption for a class of debt" – including certain loans that she took out while she was a student at Penn Law – that they know is not entitled to a presumption of nondischargeability. Am. Compl. ¶ 1.  She claims that the "Defendants . . . originated and serviced dischargeable consumer loans but have disguised them as non-dischargeable student loans."  *Id.*  Ms. Golden advances these allegations on behalf of an alleged class of similarly situated "individuals who have declared bankruptcy since 2005 in . . . the United States with loans originated and/or

serviced by Defendants."  Am. Compl. ¶ 7.  And she alleges that these loans "do not meet the definition of a non-dischargeable qualified education loan" as set forth in Bankruptcy Code Section 523(a)(8)(B) and Internal Revenue Code Section 221(d).  *Id.*

Ms. Golden alleges that she attended Penn Law during the 2006-07 academic year, and that the "cost of attendance" for that year was $53,500.  Am. Compl. ¶¶ 27-28.  She also alleges that she received $22,440 in scholarship funds and grants from Penn Law, borrowed $27,500 in loans from the federal government, and borrowed an additional $7,103 in private loans from National Collegiate Trust – the NCT Loan – and that the NCT Loan was serviced by PHEAA.  Am. Compl. ¶¶ 29-30.  Ms. Golden claims that "the NCT Loan was originated in excess of the published 'cost of attendance' and was not a qualified education loan under section 523(a)(8)(B)."  Am. Compl. ¶ 30.  And she claims that the NCT Loan "was not 'made, insured, or guaranteed by a governmental unit' or made under a 'program funded in whole or part by' a non-profit[] and thus was not non-dischargeable under section 523(a)(8)(A)(i)."  Am. Compl. ¶ 32.

In her bankruptcy petition, Ms. Golden listed on Schedule F certain "student loans" that she owes, including the loans described in the Amended Complaint, that the Defendants made to her in excess of Penn Law's published cost of attendance for the 2006-07 and 2007-08 academic years.  Am. Compl. ¶ 40.  She alleges that these loans are not nondischargeable student loans or conditional educational grants under Bankruptcy Code Section 523(a)(8).  Am. Compl. ¶ 41. And she alleges that she received a discharge on or about August 5, 2016, and that her creditors likewise "received notice of discharge."  Am. Compl. ¶ 43.

Ms. Golden alleges that rather than treat these debts as discharged, as required under bankruptcy law, the Defendants resumed their collection efforts after the conclusion of her

bankruptcy case. Am. Compl. ¶ 44. She argues that they "fraudulently informed [her] that the [d]ebts were not discharged and demanded . . . and accepted payment." *Id*. Ms. Golden alleges that the "Defendants' abusive, deceptive and illegal collection efforts after [her d]ebts were discharged were made knowingly and willfully in violation of this Court's discharge orders." Am. Compl. ¶ 45.

Ms. Golden alleges that the Defendants and other creditors represented to her and to similarly situated student debtors that the Bankruptcy Code prohibited discharge of "*any* loan made to any person for any educational purpose," when they knew that "only private loans that [meet] the requirements of section 523(a)(8)(B) [are] nondischargeable." Am. Compl. ¶ 22. She claims that while the Defendants and other lenders informed borrowers such as herself that their loans were nondischargeable, these lenders securitized these same obligations for sale on the secondary market. Am. Compl. ¶ 25. And she asserts that the prospectuses for these asset-backed securities cautioned investors that, pursuant to Bankruptcy Code Section 523(a)(8), "only private loans made for qualified expenses were excepted from discharge." *Id*.

Ms. Golden requests a declaratory judgment, pursuant to Judiciary Code Section 2201 and Bankruptcy Rule 7001(i), that her debts were discharged by operation of law on August 3, 2016, the date of her bankruptcy discharge, because they are not student loans excluded from discharge under Section 523(a)(8). Am. Compl. ¶ 71. She also seeks ancillary relief in the form of a declaratory judgment preventing the collection of those debts. Am. Compl. ¶¶ 70-71. And she seeks similar relief on behalf of a nationwide putative class of similarly situated borrowers. Am. Compl. ¶ 55.

And finally, while Ms. Golden initially sought a nationwide injunction finding the Defendants in contempt of the statutory bankruptcy discharge injunction, on behalf of herself and

a nationwide class, barring the Defendants from collecting on the putative class members' debts by use of dunning letters, e-mails, text messages, and telephone calls, Ms. Golden now acknowledges that, in light of *Bruce*, her "contempt-based national class claims are no longer viable." Class Cert. Mot. at 9. *See* Am. Compl. ¶¶ 74-76.

*Ms. Golden's Memorandum of Law in Support of the Preliminary Injunction Motion*

Ms. Golden requests that the Court grant a preliminary injunction "enjoining Defendants from collecting on all private loans that are not funded by a nonprofit and which were not within the cost of attendance as defined in I.R.C. § 221(d)(2) and 20 U.S.C. § 1087*ll* (as in effect in 1997) at Title IV schools, less all other loans and grants received by the borrower." Prelim. Inj. Mem. at 2. She requests that the Court do so for the same reasons that the Court granted a similar request in *Homaidan v. Sallie Mae, Inc.* (*In re Homaidan*), 640 B.R. 810 (Bankr. E.D.N.Y. 2022) – namely, that she has shown a likelihood of success on the merits of her claims of discharge injunction violations, that she and the putative class are subject to irreparable harm because of "illegal collection efforts," that the balance of the hardships weighs in her favor, and that a preliminary injunction would serve the public interest. Prelim. Inj. Mem. at 1-2.

In support of this argument, Ms. Golden states that the "published cost of attendance" at Penn Law for the 2006-2007 academic year was $48,464, and that she received grants and loans totaling $55,280, including loans that are now owned or serviced by the Defendants. Prelim. Inj. Mem. at 2-3. As to the NCT Loan, she states that it exceeds the cost of attendance and is dischargeable because TERI improperly determined the school costs of attendance by including amounts that were not qualified education expenses and not authorized by statute in its calculations. Prelim. Inj. Mem. at 4-5. And she disputes that TERI qualifies as a bona fide nonprofit institution within the meaning of Section 523(a)(8)(A)(i) because it is "nothing more

than an instrument of First Marblehead," a for-profit entity.  Prelim. Inj. Mem. at 13-14.  As to

the Bar Loan, Ms. Golden states that it is "not a qualified education loan as defined in

§ 221(d)(1) of the Internal Revenue Code because it was not incurred to pay the cost of

attendance at a Title IV institution," and it "therefore, does not come within the terms of

§ 523(a)(8)(B)."  Prelim. Inj. Mem. at 3.  She also states that, because the Bar Loan was made to

cover her living expenses "*after* [she] attended a Title IV institution," it cannot be "within the

cost of attendance."  Prelim. Inj. Mem. at 5 (emphasis in original).

Ms. Golden notes that the standard by which a court considers a request for a temporary

restraining order is "the same as that for a preliminary injunction."  Prelim. Inj. Mem. at 7 (citing

*In re Homaidan*, 640 B.R. at 840).  She argues that, because of the bankruptcy court's equitable

powers under Section 105, she is not required to demonstrate that irreparable harm would result

in the absence of a preliminary injunction.  Prelim. Inj. Mem. at 8-9. (collecting cases).  And she

argues that the Defendants are collecting on discharged debts, and that no further showing of

harm is necessary.  Prelim. Inj. Mem. at 9.

Nevertheless, she argues that she and the putative class "continue to suffer irreparable

injury" because, as in *In re Homaidan* and other cases, they face ongoing attempts to collect on

discharged debts.  Prelim. Inj. Mem. at 9-10 (citing *In re Homaidan*, 640 B.R. at 851).  Such

attempts, Ms. Golden states, are "'not just about money'" but rather "'about the hardships and

burdens that impair a debtor's efforts to achieve the "fresh start" that is the centerpiece of the

bankruptcy system.'"  Prelim. Inj. Mem. at 10 (quoting *In re Homaidan*, 640 B.R. at 851).  Ms.

Golden also points to *Crocker v. Navient Solutions, LLC* (*In re Crocker*), Adv. Pro. No.

16-03175, Mar. 23, 2017 Hearing Tr. at 59:2-9 (Bankr. S.D. Tex. Mar. 23, 2017), where the

court observed "that the harm of continued collection efforts was significant, especially when

compared to the relatively small impact [injunctive relief] would have on [the creditor]'s bottom line."  Prelim. Inj. Mem. at 11.

Ms. Golden also argues that she is likely to succeed on the merits, stating that "[t]his Court held in *Homaidan* that private student loans that are made to students that either exceed the cost of attendance at that institution as defined by the Internal Revenue Code § 221(d) or made to students who did not attend a Title IV institution are dischargeable in bankruptcy."  Prelim. Inj. Mem. at 12 (citing *In re Homaidan*, 640 B.R. at 848; *Homaidan v. Sallie Mae, Inc.* (*In re Homaidan*), 650 B.R. 372, 417 (Bankr. E.D.N.Y. 2022)).  She states that the Defendants "have no legal basis to justify collecting on debts that exceed the debtors' cost of attendance, nor do they have any valid defense for doing so," and therefore they have violated the Section 524 discharge injunction.  Prelim. Inj. Mem. at 12.  Ms. Golden states that she "seeks a declaration declaring her and the putative class members' debts discharged under § 523, and has clearly demonstrated that her loans and the class members' loans [all] are subject to such a discharge." Prelim. Inj. Mem. at 12.  She argues that as the creditors, the Defendants "bear the burden of establishing whether any of their loans are non-dischargeable under the terms of § 523(a)(8)." Prelim. Inj. Mem. at 12-13 (collecting cases).

Ms. Golden argues that the TERI-guaranteed loans are not rendered nondischargeable under Section 523(a)(8)(A)(i) because "TERI is not a bona fide nonprofit institution . . . , nor has TERI funded any of the loans that are the subject of the litigation."  Prelim. Inj. Mem. at 13. And she states that, separate from the loans in which TERI has a role, "there are literally thousands of loans in Defendants' portfolios that are not within the scope of either § 523(a)(8)(A)(i) or § 523(a)(8)(B)."  Prelim. Inj. Mem. at 14.

Ms. Golden argues that the balance of hardship weighs in her favor for the same reasons

as this Court identified in *In re Homaidan.* Prelim. Inj. Mem. at 14.  Specifically, she states that in the absence of injunctive relief, she and the putative class members will be subject to continuing collection efforts, which may lead to stress and financial hardship, injuring their legal interests in the bankruptcy discharge's "fresh start." Prelim. Inj. Mem. at 14 (citing *In re Homaidan*, 640 B.R. at 856; *In re Homaidan*, 650 B.R. at 429).  By contrast, Ms. Golden states that the Defendants here, like Navient in *In re Homaidan*, have no legal interest in collecting on discharged debts.  *Id*.

Ms. Golden argues that "[a]s this Court held in *Homaidan*, the public interest would be furthered by the entry of a [preliminary injunction] enjoining the continued collection of discharged debts" because of the "strong public interest in furthering the principal interest of the Bankruptcy Code, which is to grant a fresh start to the 'honest but unfortunate debtor.'"  Prelim. Inj. Mem. at 15 (quoting *In re Homaidan*, 640 B.R. at 858; *In re Homaidan*, 650 B.R. at 431). That is, "'the public interest is not served by the collection of a discharged debt, and the public interest is not disserved by enjoining that activity.'"  Prelim. Inj. Mem. at 15 (quoting *In re Homaidan*, 640 B.R. at 845; *In re Homaidan*, 650 B.R. at 431).

Finally, as to *Bruce*, Ms. Golden states that, "*Bruce* dealt with contempt and a court's power to punish parties for violations of the bankruptcy court discharge order."  Prelim. Inj. Mem. at 2.  And Ms. Golden states, "the Second Circuit's decision in *Bruce* . . . does not prevent this Court from granting injunctive relief ancillary to the declaratory relief" sought by Ms. Golden.  *Id*.  Specifically, Ms. Golden states that she seeks, "prospective injunctive relief for the class prohibiting the further collection of discharged debts."  *Id*.

Ms. Golden also argues, in her Class Certification Motion, that in *Bruce*, the Second Circuit considered only the plaintiff's motion for contempt.  Class Cert. Mot. at 8 (citing *Bruce*,

75 F.4th at 299).   And Ms. Golden states that it was the *Bruce* plaintiff's "'nationwide class action contempt proceeding' that the Court found to be inconsistent with the 'equitable principle that civil contempt proceedings leave the offended judge *solely responsible* for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct.'"   Class Cert. Mot. at 8 (citing *Bruce*, 75 F.4th at 303) (emphasis in original).   Accordingly, Ms. Golden acknowledges that her contempt-based national class claims are no longer viable.   Class Cert. Mot. at 9.

Ms. Golden states that here, by contrast, she continues to seek a declaratory judgment to determine the dischargeability of a debt.   Class Cert. Mot. at 9.   And she observes, "a determination of dischargeability may be made on a class-wide basis pursuant to Bankruptcy Rule 7023."   Class Cert. Mot. at 10 (collecting cases).   Ms. Golden states that *Bruce* does not limit this Court's ability to issue such a declaration on a class-wide basis because "*Bruce's* entire analysis was based upon the principle that, in determining contempt of a discharge order, the adjudication should be made by the court that issued that order."   Class Cert. Mot. at 10.

But here, Ms. Golden states, a declaratory judgment, "does not seek a determination of contempt, but merely seeks a legal ruling that the loans at issue . . . are automatically discharged by virtue of § 523(a)(8)."   Class Cert. Mot. at 10-11.   And she states that a declaration of dischargeability does not require the Court to "evaluate the propriety of Defendants' conduct and does not require the Court to fashion a sanction" based upon the "circumstances and nature of Defendants' particular conduct."   Class Cert. Mot. at 11.   Ms. Golden argues that this distinction and the relief that she now seeks here is consistent with *Bruce*, where the Second Circuit "found that an evaluation of the seriousness of the contemnor's conduct and the appropriateness of a remedy should be determined by the court that issued the discharge order."   Class Cert. Mot. at 11 (citing *Bruce*, 75 F.4th at 305).

Ms. Golden also points to the advisory committee notes to Bankruptcy Rule 4007, which state that "'[t]he bankruptcy court has exclusive jurisdiction to determine dischargeability of'" debts in the context of Bankruptcy Code Section 523(a)(2), (4) or (6) – relating to debts that may be excluded from a debtor's discharge because they arise from intentional torts or fraud.  She argues that this confirms that courts other than the court that issued a particular debtor's discharge may determine the dischargeability of a student loan debt.  Class Cert. Mot. at 11 (quoting Fed. R. Bank. P. 4007(c) advisory committee's note on rules 1983).  Finally, Ms. Golden notes that state courts, as opposed to the bankruptcy courts that issue discharge orders, regularly address the question of the dischargeability of a debt.  Class Cert. Mot. at 11-12 (citing *Taggart v. Lorenzen* (*In re Taggart*), 587 U.S. 554, 564 (2019)).

### *The Trust Defendants' Opposition to the Preliminary Injunction Motion*

The Trust Defendants oppose the Preliminary Injunction Motion, on several grounds.  Trust Defs. Opp. at 1-3.  They state that "this action is fundamentally different" from *In re Homaidan* because "[t]he Trust Defendants have established indisputable facts and unique defenses that were not at issue in *Homaidan*."  Trust Defs. Opp. at 1.  They also state that Ms. Golden's request for injunctive relief is untimely and does not meet the requirements necessary to obtain a preliminary injunction.  *Id*.

The Trust Defendants point to differences in the likelihood of success on the merits between this case and *In re Homaidan*.  Trust Defs. Opp. at 1-3.  They note circumstances including the TERI guaranty, the payment of loan proceeds directly to schools, and the school certifications that loans were within the cost of attendance.  Trust Defs. Opp. at 2.  They also argue that in requesting to enjoin the Defendants from "continuing collection efforts," Ms.

Golden seeks to "disrupt the status quo, rather than merely maintain it," and must demonstrate a "clear or substantial likelihood" of success on the merits.  Trust Defs. Opp. at 13.

The Trust Defendants also argue that this Court has not yet addressed the question of dischargeability of the loans at issue here.  Trust Defs. Opp. at 13.  As to the loans held in the 2006-4 Trust, they argue that "*all* of the loans in the 2006-4 Trust, including Plaintiff's, were made as part of programs guaranteed by TERI, a nonprofit institution," and therefore are exempt from discharge under Section 523(a)(8)(A)(i) – which was not an issue in *In re Homaidan*.  Trust Defs. Opp. at 14 (emphasis in original).  And they note that in *O'Brien v. First Marblehead Education Resources*, the Second Circuit "has specifically held that loans made under loan programs that were guaranteed by TERI are exempt from discharge under Section 523(a)(8)(A)(i)."  Trust Defs. Opp. at 15 (citing *O'Brien v. First Marblehead Educ. Res.* (*In re O'Brien*), 419 F.3d 104, 106 (2d Cir. 2005)) (emphasis omitted).  They also note that it is not disputed that TERI guaranteed the loans at issue.  Trust Defs. Opp. at 4.

As to loans held in the GS2 2016-A Trust, the Trust Defendants argue that "virtually every loan in the GS2 2016-A Trust was certified *by the debtor's school* as within the debtor's cost of attendance – including Plaintiff's loan," and therefore the loans do not deviate from the definition of a "qualified education loan" under Section 523(a)(8)(B).  Trust Defs. Opp. at 19 (emphasis in original).  They state that, "[a]ccording to Plaintiff's own proffered expert, if a debtor's school certifies the loan amount as being within the debtor's cost of attendance (as was required by the CitiAssist Loan Program) it is by definition within the cost of attendance" and this distinction "makes this case fundamentally different than *Homaidan*."  Trust Defs. Opp. at 20.  And the Trust Defendants state that the reasoning that led Ms. Golden to dismiss her "nearly identical claims against Discover Bank" applies here too.  Trust Defs. Opp. at 21, n.17 (citing

*Golden v. Discover Bank* (*In re Golden*), Adv. Pro. No. 20-01051 (Bankr. E.D.N.Y. Apr. 7, 2022), ECF No. 80).

The Trust Defendants also argue that Section 105(a) does not excuse Ms. Golden from making a showing of irreparable harm, because the rationale for injunctive relief that preserves the status quo – for example, to protect a debtor's estate or to enforce the automatic stay – is not present here.  Trust Defs. Opp. at 22-24.

And in all events, the Trust Defendants argue that Ms. Golden "is already free from any risk of the harm she claims the [preliminary injunction] will prevent" because she is not subject to any collection efforts relating to her loans in the GS2 2016-A Trust because of servicer Firstmark's "bankruptcy suppression" on her account, and she has chosen to make voluntary payments on her loan in the 2006-4 Trust, even after her bankruptcy discharge and commencement of this adversary proceeding, to avoid shifting repayment obligations to her co-signor.  Trust Defs. Opp. at 24-25.

As to the putative class, the Trust Defendants argue that Ms. Golden's rationale that a preliminary injunction would prevent irreparable harm to the bankruptcy process's "fresh start" is circular, when the putative class members are not entitled to a "fresh start" with respect to nondischargeable debts in the first place.  Trust Defs. Opp. at 26.  And even if the debts were dischargeable, the Trust Defendants argue that any harm "would be solely monetary in nature," and such pecuniary losses are not irreparable harm.  Trust Defs. Opp. at 27.  They assert that there is "nothing imminent" to support a preliminary injunction in an adversary proceeding that began in 2017, and Ms. Golden's unexplained delay in seeking injunctive relief "is tantamount to an admission that there is no likelihood of irreparable injury and that no [preliminary injunction] is necessary or appropriate in this action."  Trust Defs. Opp. at 28-29.

The Trust Defendants additionally argue that Ms. Golden has not met her burden to demonstrate that the balance of equities weighs in her favor and to show that a preliminary injunction would not disserve the public interest, based on her "one page argument" relying on *In re Homaidan* and the policy of the "fresh start." Trust Defs. Opp. at 29. They argue that this "unsupported and circular" reasoning "improperly presupposes . . . that her and the putative class members' loans were discharged," when in fact dischargeability "is the ultimate issue to be decided in this case." Trust Defs. Opp. at 29-30. And the Trust Defendants assert that the preliminary injunction that Ms. Golden seeks "actually *harms* equity and the public interest" because some borrowers may not consent to the injunctive relief, may have concerns about the tax or credit score implications, or may not wish for their co-signors to take over payment. Trust Defs. Opp. at 30.

Finally, to the extent that the Court grants any injunctive relief against the Trust Defendants, they request that Ms. Golden post a bond of "at least $60,000, subject to upward adjustment periodically to account for the Trusts Defendants' increasing potential damages over time." Trust Defs. Opp. at 33. The Trust Defendants reason that a bond is necessary here, even though the Court stated in *In re Homaidan* that "the costs of Navient to comply with its injunction 'should be no greater than the costs of complying with the requirements of the Bankruptcy Code,'" because here, there is "no legitimate dispute" that the Trust Defendants have the right to collect on their loans. Trust Defs. Opp. at 33 (quoting *In re Homaidan*, 650 B.R. at 444).

With respect to the implications of *Bruce* for the relief requested here, the Trust Defendants argue that "the Second Circuit's *Bruce* decision forecloses all avenues to obtain relief for the proposed nationwide class." Trust Defs. Opp. at 11. They state that "*Bruce*

precludes this Court from certifying a nationwide class here because '[t]he viability of [Plaintiff's] nationwide pursuit depends on the authority of one bankruptcy court [i.e., this Court] to enforce the discharge orders and injunctions entered by other bankruptcy courts from across the country.'" Trust Defs. Opp. at 11 (quoting *Bruce*, 75 F.4th at 302). And they note that "[w]here a plaintiff cannot obtain final relief on behalf of a class, any attempt to seek intermediate relief for that class must fail." Trust Defs. Opp. at 11.

As to Ms. Golden's request for a declaratory judgment, the Trust Defendants state, "Plaintiff does not have an implied private right of action under Section 524 of the Bankruptcy Code, and the Declaratory Judgment Act does not confer upon this Court the authority to create such a remedy." Trust Defs. Opp. at 12. And they state that Ms. Golden's request for nationwide declaratory relief "nonetheless asks this Court to police and enforce discharge injunctions from bankruptcy courts throughout the country – something *Bruce* expressly precludes." *Id.* Accordingly, the Trust Defendants conclude that Ms. Golden cannot obtain nationwide injunctive relief because it is not "'of the same character as that which relief may be granted finally.'" Trust Defs. Opp. at 12 (citing *Williams v. N.Y.C. Dep't of Corr.*, 2020 WL 7079497, at *2 (S.D.N.Y. Dec. 3, 2020)).

The Trust Defendants also point to their opposition to the Plaintiff's Motion for Class Certification, for their further response to the consequences of the Second Circuit's decision in *Bruce*. Trust Defs. Opp. at 12 (citing Trust Defs. Class Cert. Opp.). There, the Trust Defendants argue that while Ms. Golden "now characterizes her suit as one for declaratory judgment and 'restitution' of the amounts she claims were collected in violation of the putative class members' discharge injunctions," her "claim remains a contempt claim." Trust Defs. Class Cert. Opp. at 11 (citation omitted). And they state, "[t]here is no way to get to the result Plaintiff seeks without

interpreting individual discharge injunctions from other courts and determining whether Defendants violated them, which is by definition a contempt claim of the type precluded by *Bruce*." Trust Defs. Class Cert. Opp. at 11-12.  In support of this argument, the Trust Defendants state, "[n]umerous Circuits have held that violations of discharge injunctions 'are enforceable *only* by the bankruptcy court and *only* by a contempt citation.'"  Trust Defs. Class Cert. Opp. at 13 (emphasis added) (quoting *Anderson v. Credit One Bank, N.A.* (*In re Anderson*), 884 F.3d 382, 391 (2d Cir. 2018)).

And the Trust Defendants state that in *Bruce*, the Second Circuit rejected the plaintiff's suggestion that she had asserted separate and distinct claims for declaratory relief and damages because:

> 1) plaintiff's characterization of her complaint was contrary to the complaint itself, which asserted a single cause of action claiming that "defendants have violated § 524(a)(2) and are in contempt of this Court"; 2) plaintiff had previously referred to this action as "a proceeding for contempt"; and 3) the courts had previously treated the action as one for contempt.

Trust Defs. Class Cert. Opp. at 14 (citing *Bruce*, 75 F.4th at 299).

They argue that these same considerations are present here because the Amended Complaint contains only a "narrow declaratory judgment claim," because Ms. Golden has "characterized her own case as being one for contempt," and because "this Court has treated Plaintiff's case as one for contempt."  Trust Defs. Class Cert. Opp. at 14-16 (citing *In re Golden*, 596 B.R. at 259 (stating that "Ms. Golden . . . alleges that the Defendants' collection efforts violated this Court's Discharge Order, warranting a finding of civil contempt.")).

Because Ms. Golden seeks a declaratory judgment that her loans at issue were discharged, the Trust Defendants also argue that the additional nationwide class relief that Ms. Golden seeks "could only be achieved if the Court issues a series of individual, class-member-

by-class-member and loan-by-loan declarations of dischargeability" and accordingly, "that claim still cannot be certified as a class."  Trust Defs. Class Cert. Opp. at 17.

The Trust Defendants further state that to the extent that Ms. Golden seeks a declaration that:

> loans that exceed a borrower's cost of attendance are not qualified education loans, without applying it to individual plaintiffs – that would simply be a restatement of the law on an issue which has not been disputed.  This type of declaration does not reach the issue of whether a particular loan is discharged and serves no useful purpose in settling any issue.

Trust Defs. Class Cert. Opp. at 21.

Finally, the Trust Defendants argue that a declaratory judgment class is not appropriate where a court would "need to determine the separate monetary recoveries to which individual plaintiffs are entitled from the funds disgorged."  Trust Defs. Class Cert. Opp. at 21.  They argue that here, Ms. Golden requests that the Defendants "be ordered to pay 'restitution' for any amount they collected in violation of the discharge injunction."  Trust Defs. Class Cert. Opp. at 22.  This relief, they state, would involve individual factual determinations, since putative class members paid different amounts, and would render class certification inappropriate.  Trust Defs. Class Cert. Opp. at 22.

### *Defendant PHEAA's Opposition to the Preliminary Injunction Motion*

PHEAA, the servicer for the NCT Loan, argues that Ms. Golden's request for injunctive relief is barred first by *Bruce*, second by the TERI guaranty, and third by laches.  PHEAA Opp. at 1-2.  In addition, PHEAA argues that since Ms. Golden seeks damages, and because of her own voluntary payments, "Ms. Golden cannot establish irreparable injury for herself, let alone the putative class."  PHEAA Opp. at 2.

PHEAA argues that Ms. Golden has not shown a likelihood of success on the merits

because the NCT Loan, which PHEAA services, was "guaranteed by not for profit entities such as TERI and thus is not discharged." PHEAA Opp. at 1. And it argues that Ms. Golden has not provided sufficient evidence of a likelihood of success on behalf of the putative class because of the "substantial disputed evidence regarding cost of attendance and the unreliability of the cost of attendance evidence submitted by Ms. Golden." PHEAA Opp. at 2.

PHEAA notes that this adversary proceeding has been pending since January 2017, and that PHEAA has been a defendant since Ms. Golden filed the Amended Complaint that year, but Ms. Golden "did not seek any provisional injunctive relief" at that time. PHEAA Opp. at 2-3. Rather, it states, Ms. Golden moved for a preliminary injunction in July 2020. PHEAA Opp. at 2-3.

And PHEAA states that because it is a servicer and not a loan owner, it acts "in accordance with the loan owners' servicing agreements and guidelines" and "does not engage in collection efforts as a loan owner would." PHEAA Opp. at 4. It also states that Ms. Golden has not produced evidence of collection letters, phone calls, or harassment from PHEAA. PHEAA Opp. at 4.

PHEAA also states that discovery has shown that Ms. Golden received the $7,103.83 NCT Loan from JPMorgan Chase, formerly Bank One, under the Education One Graduate Loan Program, which is part of the Education One Loan Program, and that this loan is now serviced by PHEAA. PHEAA Opp. at 5. It states that Ms. Golden received $19,440 in grants and scholarships for the 2006-07 academic year, and that she executed a credit agreement in connection with the NCT Loan in which she agreed to be bound by its terms, including the limitation on dischargeability resulting from the TERI guaranty. PHEAA Opp. at 5. And it notes that Ms. Golden's aunt cosigned the NCT Loan. PHEAA Opp. at 6. It states that TERI

guaranteed all of the loans made under the Education One Loan Program, and that TERI's guaranty agreements were assigned to the NCT Trust upon the NCT Trust's securitized purchase of the Education One loans. PHEAA Opp. at 6-7. And it states that Penn Law published its 2006-07 cost of attendance as $56,380. PHEAA Opp. at 37. PHEAA asserts that, because Ms. Golden's other loans, grants, and scholarships totaled $46,940 at the time she took out the NCT Loan, she could have borrowed up to $9,440 before exceeding the cost of attendance – and the NCT Loan was for less than that. PHEAA Opp. at 37.

PHEAA further notes that while it "cease[d] billing and collections on [the NCT Loan] for the duration of the bankruptcy in accordance with the automatic stay," Ms. Golden "nevertheless on her own initiative continued to make all the monthly payments to PHEAA during the pendency of the bankruptcy proceeding." PHEAA Opp. at 7-8. It points out that Ms. Golden's General Discharge Order, issued August 3, 2016, stated that "'most student loans'" would not be discharged in a chapter 7 bankruptcy case, and that despite the General Discharge Order, Ms. Golden's aunt remained fully liable for the NCT Loan. PHEAA Opp. at 8. PHEAA states that Ms. Golden continues to pay her loans, including the NCT Loan, voluntarily, so that her aunt will not be required to pay that debt. *Id.*

PHEAA further argues that Ms. Golden has not provided sufficient evidence of the putative class's likelihood of success, and that the DeBois Declaration is deficient in several ways. PHEAA Opp. at 8-9. It states that these deficiencies include that Mr. DeBois does not distinguish between the borrowers that are currently making payments to PHEAA and those who are not; that he calculates whether a loan exceeds the cost of attendance using first-year undergraduate data reported on IPEDS, even though some loans were made to graduate students with higher costs of attendance; that he does not deduct loan origination fees in his calculations,

"thereby overstating the amount of the loans"; that he fails to exclude federal loans from his analysis; that he applies an arbitrary July 1 cutoff date to determine the academic year; and that he does not manually verify whether certain schools are Title IV schools.  PHEAA Opp. at 9-10.

PHEAA points out that Ms. Golden has sued the two owners of three of her law school loans, along with two servicers of those loans and that she seeks an injunction directed at loans owned by 258 entities who are not parties to this adversary proceeding.  PHEAA Opp. at 11. PHEAA argues that "Rule 19 mandates that the Court may not adjudicate" claims that affect the loan owners' rights, as they are not parties here.  PHEAA Opp. at 10.  And it argues that courts in the Second Circuit "consistently hold that a nonjoined party to the contract is necessary and indispensable to any action involving a determination of rights or obligations under that contract."  PHEAA Opp. at 13.  It states that the Court cannot grant a preliminary injunction affecting any of the loan owners other than the NCT Trust "absent joinder of those loan owners." PHEAA Opp. at 18 (collecting cases).  PHEAA argues that "federal courts have consistently held that, when only a student loan servicer is sued regarding dischargeability, the action may not proceed without the loan owner."  PHEAA Opp. at 20.

PHEAA acknowledges that Ms. Golden has joined both the owners and servicers of her own loans.  PHEAA Opp. at 11.  Nevertheless, it states that as to the loans held by putative class members, under Rule 19, the Court cannot bind loan owners who are not parties to this proceeding and, since Ms. Golden asks this Court to determine the loan owners' rights with the putative class members, "complete relief cannot be accorded in their absence."  PHEAA Opp. at 16.  It asserts that "any ruling in this proceeding may impair or impede the rights of the loan owners to the extent that PHEAA stops collecting loan payments, and it may also create liability for PHEAA vis-à-vis the loan owners."  PHEAA Opp. at 16.  PHEAA notes that "courts must

26

dismiss a case when a necessary and indispensable party has not been joined in the action, including a class action."  PHEAA Opp. at 17 (citing *Mattera v. Clear Channel Commc'ns, Inc.*, 239 F.R.D. 70 (S.D.N.Y. 2005)).  And it argues that because it is only the servicer of Ms. Golden's loans, "which, unlike the loan owner, has nothing at stake," PHEAA is not the proper defendant or real party in interest.  PHEAA Opp. at 18.

In addition, PHEAA notes that "[w]hen an injunction would alter the status quo, injunctive relief should not be granted absent 'a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from the denial of preliminary relief.'"  PHEAA Opp. at 31 (quoting *Christa McAuliffe Intermediate School PTO, Inc. v. De Blasio*, 364 F. Supp. 3d 253, 274 (S.D.N.Y. 2019)).  The same is true for class actions. PHEAA Opp. at 32 (citing *Cooper v. TWA Airlines, LLC*, 274 F. Supp. 2d 231, 240-51 (E.D.N.Y. 2003); *Mandrigues v. World Savs., Inc.*, 2009 WL 160213, at *1 (N.D. Cal. Jan. 20, 2009)).  And PHEAA argues that Ms. Golden cannot satisfy this burden.  PHEAA Opp. at 2.

As to Ms. Golden's likelihood of success on the merits, PHEAA states that she "misrepresents PHEAA's defense on the merits" because, PHEAA asserts, the NCT Loan is not only nondischargeable under Section 523(a)(8)(A)(i) because of the TERI guarantee, but also under Section 523(a)(8)(B) since it did not exceed Ms. Golden's cost of attendance.  PHEAA Opp. at 32.  It points to two different figures representing Ms. Golden's total scholarships and grants for the 2006-07 academic year:  $22,440 in scholarships and grants, as stated in the Amended Complaint and $19,440 in scholarships and loans, as reported by Penn Law.  PHEAA Opp. at 37.  And it states that "[t]he evidence from the university supports a finding at trial that Ms. Golden's Education One loan serviced by PHEAA did not exceed the cost of attendance." *Id*.  PHEAA argues that "[w]hen such a situation exists, a party seeking an injunction fails to

satisfy the high burden for likelihood of success imposed by the Second Circuit." *Id*.

PHEAA argues that as a matter of law, Ms. Golden's loan was guaranteed by a not for profit entity and is therefore exempt from discharge under Section 523(a)(8)(A)(i).  PHEAA Opp. at 36.  It states that the Second Circuit's decision in *O'Brien* establishes that, "as a matter of law, a guarantee by TERI constitutes a guarantee by a non-profit within the meaning of Section 523(a)(8)(A)(i), making a TERI guaranteed loan non-dischargeable."  PHEAA Opp. at 33 (citing *O'Brien*, 419 F.3d at 106-07).  Specifically, PHEAA states, the Second Circuit found that TERI's guaranty of the loan program at issue in *O'Brien* "constituted funding of the program" because TERI devoted financial resources to supporting the program, and as a result, the TERI-guaranteed loans were exempt from discharge.  PHEAA Opp. at 33 (citing *O'Brien* 419 F.3d at 106-07).  And PHEAA cites a recent decision in this District finding that, because TERI is a nonprofit under *O'Brien*, the defendants in that case "'met their burden of proving that the loans are nondischargeable pursuant to 523(a)(8)(A)(i).'"  PHEAA Opp. at 34 (quoting Transcript of Oral Ruling, *Contreras v. Nat'l Collegiate Student Loan Tr. 2005-1* (*In re Contreras*), No. 22-01017-JMM (Bankr. E.D.N.Y. Sept. 12, 2023), ECF No. 30).

PHEAA argues that Ms. Golden must also demonstrate a substantial likelihood of success on the merits with respect to the putative class members' loans, and that she "does not attempt to address" this.  PHEAA Opp. at 38.  It states that Mr. DeBois's calculations purporting to show thousands of discharged loans within the Defendants' portfolios are "not reliable and are not entitled to any weight."  PHEAA Opp. at 38.  PHEAA argues that Mr. DeBois's flawed analysis results from his lack of "independent judgment" and reliance on directions from counsel.  PHEAA Opp. at 40.  The result, PHEAA asserts, is that "Mr. DeBois consistently overstates the amount of a borrower's loans and in many instances understates the cost of attendance,"

28

resulting in "calculations that numerous loans exceeded the cost of attendance, when such is not the case." *Id.*

One asserted deficiency that PHEAA identifies is that IPEDS is not a reliable indicator of cost of attendance, as it is "mainly a tool used to provide students with an estimate of their anticipated education costs," which "never claims to be 100 percent accurate."  PHEAA Opp. at 41 (citing Jeff Webb, Revised IPEDS Graduation Rates, 2004-2017, Mar. 10, 2017).  And PHEAA argues that Mr. DeBois, at the direction of counsel, relied on IPEDS' undergraduate cost of attendance figures, when investigation would have revealed "substantial and material differences between the cost of undergraduate and graduate attendance," such as the $18,632 difference between undergraduate and law school at New York University.  PHEAA Opp. at 43. It also notes that by relying on a July 1 cutoff date to determine the academic year applicable to a given loan, Mr. DeBois may have "overstate[d] the amount of loans received for the prior academic year."  PHEAA Opp. at 43-44.  And PHEAA states that Mr. DeBois erroneously listed a schedule of "schools that he concluded were not Title IV schools" that in fact "includes numerous prominent private and public universities and colleges."  PHEAA Opp. at 44.  Finally, it points out that Mr. DeBois did not include loans made between 1996 and 2000 or after 2014 in his analysis.  PHEAA Opp. at 45.

In addition, PHEAA asserts that this Court's reasoning in *In re Homaidan* is inapplicable here, because "[t]here are major differences both between Navient and PHEAA, as well as the issues raised on the motion [in] *Homaidan* as compared to Ms. Golden's Motion," and that PHEAA raises unique defenses that Navient did not.  PHEAA Opp. at 46.  Specifically, PHEAA states that the Rule 19 issue was not present in *In re Homaidan*, because Navient was both servicer and lender, that PHEAA, unlike Navient, has argued that the loans at issue did not in

fact exceed the cost of attendance, and that there was no nonprofit funding of Navient's loans. PHEAA Opp. at 46-47.

And PHEAA argues that Ms. Golden must make a showing of irreparable injury and that her cited cases, which were decided before *Taggart*, do not address this issue in the context of alleged discharge violations.  PHEAA Opp. at 48.  It states that "*Taggart* makes clear that 'traditional standards of equity practice' are incorporated into Section 105, which necessarily means that irreparable injury remains a critical element to consider in any action for injunctive relief brought under Section 105."  PHEAA Opp. at 48 (quoting *Taggart*, 587 U.S. at 561).  And PHEAA argues that, because there is insufficient evidence that it is collecting on discharged debts as Navient may have done in *In re Homaidan*, "the conduct that PHEAA is engaged in does not pose the same threat to the bankruptcy process or the Court."  PHEAA Opp. at 49, 52.

PHEAA argues that Ms. Golden has not demonstrated that she would suffer irreparable harm in the absence of injunctive relief, as "[a]ny potential injury to Ms. Golden would be monetary in nature," and she "does not identify any concrete harm that she might suffer." PHEAA Opp. at 50.  PHEAA further states that there is no evidence of emotional harm to borrowers, and it has not engaged in the same kinds of collection activities as the parties in the cases that Ms. Golden cites, because "PHEAA is only the servicer of the loans, not the owner or debt collector."  PHEAA Opp. at 51-52.

PHEAA also argues that the balance of the equities "tips heavily against a class-wide preliminary injunction."  PHEAA Opp. at 53.  It states that this is the case because "there is no evidence that PHEAA engaged in any behavior to collect money on the loans held by Ms. Golden or any putative class members, let alone any 'harassing' behavior," as PHEAA is a servicer, "not a collection agency," and sends loans in default back to the loan owners for

collection.  PHEAA Opp. at 53.  And PHEAA contends that "a class-wide preliminary injunction would likely cause more confusion than anything else," requiring notice that borrowers may not understand and that will not be sufficient to address individual circumstances.  PHEAA Opp. at 54.  For example, PHEAA states that notice may lead to questions regarding issues such as accrual of interest, forbearance or deferment, obligations of co-signers, voluntary repayments, effects of further court proceedings, and communications with the servicers and loan owners. PHEAA Opp. at 54-55.  And PHEAA argues that a class-wide injunction would harm the absent loan owners.  PHEAA Opp. at 55.

And PHEAA argues that Ms. Golden's delay in bringing the Preliminary Injunction Motion "defeats her request for provisional relief" because "[i]t is an axiomatic principle of equity that a party's delay in seeking relief undercuts her argument that she is entitled to injunctive relief."  PHEAA Opp. at 56 (citing *Williams v. Rosenblatt Sec. Inc.*, 136 F. Supp. 3d 593, 618 (S.D.N.Y. 2015); *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985)).  And PHEAA states that "[c]ourts in the Second Circuit have routinely denied requests for preliminary injunctions brought after a much shorter delay than Ms. Golden's multi-year delay."  PHEAA Opp. at 57.

Finally, PHEAA argues that, in the event the Court decides to grant Ms. Golden's requested injunctive relief, it should require that Ms. Golden post a bond pursuant to Federal Rule of Civil Procedure 65(c).  PHEAA Opp. at 57-58.  It points to the "expansive" scope of the proposed relief, with a "vast . . . economic magnitude," and it states that given "[t]hese circumstances, and the obvious financial impact of complying with such an injunction, PHEAA is entitled to substantial security reflecting the aggregate amount of payments that will be lost for the duration of any preliminary injunction."  PHEAA Opp. at 58-59.  Because of the unknown

scope of any potential relief, PHEAA cannot estimate its costs and damages and requests the opportunity to file a supplemental brief, if necessary.  PHEAA Opp. at 59.

Addressing the Second Circuit's decision in *Bruce*, PHEAA argues that "neither Ms. Golden nor the putative class may obtain any injunctive relief or economic relief . . . unless they do so via a contempt proceeding."  PHEAA *Bruce* Brief at 2.  In support of that position, PHEAA first argues that discharge orders can "be enforced only by a court in the district that issued the discharge order."  PHEAA *Bruce* Brief at 3 (citing *Bruce*, 75 F.4th at 302-06).  It states that the Second Circuit considered the broad body of case law regarding contempt proceedings, and "observed that the 'old soil' included the 'long standing equitable principle that "civil contempt proceedings leave the offended judge *solely responsible* for identifying, prosecuting, adjudicating and sanctioning the contumacious conduct.""  PHEAA *Bruce* Brief at 3 (quoting *Bruce*, 75 F.4th at 302-06) (emphasis in original).  And the Second Circuit stated, "a straightforward application of long-standing civil contempt principles suggests that only the issuing court may exercise its civil contempt powers to enforce its discharge order, and the injunction which springs from it."  PHEAA *Bruce* Brief at 4 (citing *Bruce*, 75 F.4th at 305).

PHEAA also cites to earlier decisions from the Second and Fifth Circuits that "sent clear signals" that a "national class was not valid with respect to an attempt to enforce discharge orders on a national basis."  PHEAA *Bruce* Brief at 6-7 (citing *In re Anderson*, 884 F.3d 382; *Belton v. GE Capital Retail Bank* (*In re Belton*), 961 F.3d 612 (2d Cir. 2020); *Crocker v. Navient Sols., LLC* (*In re Crocker*), 941 F.3d 206 (5th Cir. 2019)).  And PHEAA states that *Bruce* overruled this Court's "holdings and reasoning" in each of *Homaidan v. Sallie Mae, Inc.* (*In re Homaidan*), 2023 WL 2922576 (Bankr. E.D.N.Y. Apr. 11, 2023), *Ajasa v. Wells Fargo Bank N.A.* (*In re Ajasa*), 627 B.R. 6 (Bankr. E.D.N.Y. 2022), and *Golden v. Discover Bank* (*In re*

*Golden*), 630 B.R. 896 (Bankr. E.D.N.Y. 2021).  PHEAA *Bruce* Brief at 8-9.

Next, PHEAA argues that relief in response to any violation of a discharge order may be obtained only via a contempt proceeding, and not through the alternative declaratory judgment procedure proposed by Ms. Golden.  PHEAA *Bruce* Brief at 9.  Like the Trust Defendants, it argues that Bankruptcy Code Section 524 does not create an implied private right of action, and the Declaratory Judgment Act does not grant this Court the authority to create such a remedy. PHEAA *Bruce* Brief at 9-10.  And PHEAA states that the Declaratory Judgment Act provides an alternative remedy for an existing claim, but it does not empower a court to create a substantive right.  PHEAA *Bruce* Brief at 10.  It argues that a declaratory judgment that Ms. Golden's loans were discharged is relief that is "not available under Section 524" and the ancillary relief of restitution and an injunction would require "a determination that the discharge order was violated."  PHEAA *Bruce* Brief at 11.  Instead, PHEAA argues that the only vehicle by which a debtor may obtain relief for a discharge violation is through a contempt proceeding, not a declaratory judgment.  PHEAA *Bruce* Brief at 12-14 (collecting cases).  And it states that Ms. Golden cannot obtain relief under Bankruptcy Rule 4007 or Bankruptcy Code Sections 362 or 523(c).  PHEAA *Bruce* Brief at 15.

Finally, PHEAA argues that the Second Circuit in *Bruce* held that a bankruptcy court does not have the power to "enforce" a discharge order issued by a different court.  PHEAA *Bruce* Brief at 18 (citing *Bruce*, 75 F.4th at 302).  PHEAA highlights the Second Circuit's concern with leaving "'enforcement of the injunctive order of a bankruptcy court in one district to *the interpretative whims* of a bankruptcy court in another district.'"  PHEAA *Bruce* Brief at 18 (quoting *Bruce*, 75 F.4th at 304 (emphasis added)).  It concludes that "only the bankruptcy court that issues the discharge order has the authority to interpret that form discharge order" and to

determine whether particular student debts were discharged.  PHEAA *Bruce* Brief at 20.

### *Defendant Firstmark's Opposition to Ms. Golden's Motion for a Preliminary Injunction*

Firstmark, the servicer of Ms. Golden's Bar Loan, opposes the Preliminary Injunction

Motion for many of the same reasons advanced by PHEAA.  Firstmark Opp. at 1-5.  It also

distinguishes the circumstances here from those present in *In re Homaidan*.  *Id.*  Firstmark

argues that, unlike the vertically-integrated Navient, which functions as both lender and servicer,

Firstmark is a servicer performing "limited administrative functions" for loans involving many

other parties, including different originators, makers, and often purchasers, each of whom may

be a for-profit or nonprofit entity.  Firstmark Opp. at 2.  It asserts that the relief sought here is

much broader than that in *In re Homaidan*, where the preliminary injunction was limited to a

single loan program, as opposed to "dozens of unique loan programs," including programs that

required school certification of the amounts and programs where the funds were disbursed

directly to the institution.  Firstmark Opp. at 2-3.

Firstmark also argues that Ms. Golden does not propose a method to determine whether

Section 523(a)(8)(A)(i) applies to the loan programs at issue, including her own loans.  Firstmark

Opp. at 3-4.  And it asserts that Ms. Golden has not justified her delay in seeking this relief, and

that she "has not been subject to any communications from Firstmark that could possibly be

construed as 'acts to collect' for over six years," meaning that she cannot demonstrate "any

'irreparable harm' absent" injunctive relief.  Firstmark Opp. at 4.

Firstmark notes that a party seeking injunctive relief "must satisfy an even greater burden

to obtain 'a mandatory injunction – that is, an injunction commanding a positive act, as opposed

to one that merely maintains the status quo'" and make a "'clear showing that the moving party

is entitled to the relief requested'" or alternatively that there will be serious consequences from a

denial of relief.  Firstmark Opp. at 5 (quoting *Gala v. Kavanagh*, 2023 WL 2356025, at *6 (E.D.N.Y. Mar. 2, 2023)).

And Firstmark states that Ms. Golden is not entitled to a preliminary injunction as to herself, and therefore cannot establish a basis for class-wide relief.  Firstmark Opp. at 16. Specifically, Firstmark argues that Ms. Golden does not show how injunctive relief "would impact her at all" and points to her three-year delay from the commencement of the case before bringing the Preliminary Injunction Motion.  *Id*.  It points out that "[n]umerous courts within the Second Circuit have denied motions for TROs and/or preliminary injunctions in the face of far shorter delays than Plaintiff's here."  Firstmark Opp. at 16 (citing *Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 439 (E.D.N.Y. 2013)).  And Firstmark states that Ms. Golden does not provide a justification for this delay.  Firstmark Opp. at 17.  It distinguishes these circumstances from the years-long delay in *In re Homaidan* by noting that *In re Homaidan* involved "a series of interlocutory appeals" and "court-annexed mediation," neither of which are present here.  *Id*.

Apart from the delay, Firstmark states that Ms. Golden has not identified "any cognizable harm she has suffered during the past six years or will likely suffer in the absence of injunctive relief."  Firstmark Opp. at 18.  It asserts that Ms. Golden lacks "any evidence that Firstmark is engaging in any 'collection' against her that the Court could enjoin."  *Id*.  This is because "in January of 2017, Firstmark placed a 'bankruptcy suppression' on Plaintiff's account in order to cease normal servicing communications during the pendency of this action."  *Id*.  Therefore, Firstmark argues, Ms. Golden does not face any risk of harm, let alone irreparable harm, in the absence of injunctive relief.  Firstmark Opp. at 19.  And Firstmark argues that this alone is grounds to deny the Preliminary Injunction Motion.  Firstmark Opp. at 20 (quoting *Gala*, 2023 WL 2356025, at *7-8 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008))).

Firstmark disagrees with Ms. Golden's argument that she "'need not show irreparable harm,'" stating that "the majority of cases she cites for that proposition" are not related to Rule 65 injunctions but rather "bankruptcy courts' statutory power to stay parallel state court proceedings which threatened debtors' reorganization efforts in a way that would have defeated or impaired the bankruptcy courts' jurisdiction."  Firstmark Opp. at 22 (collecting cases).  And Firstmark states that, even if Section 105 excused Ms. Golden from showing irreparable harm as to herself, the Court would still need to find an interest in vindicating its own authority, which is not present when "Firstmark is not taking any 'acts to collect' on Plaintiff's loans."  Firstmark Opp. at 23.

Firstmark notes that, in seeking a preliminary injunction, Ms. Golden "bears the burden of demonstrating likelihood of success . . . regardless of whether her creditors . . . bear the burden of establishing an exception to discharge at trial."  Firstmark Opp. at 24 (citing *In re Homaidan*, 640 B.R. at 840).  And Firstmark states that Ms. Golden's argument "focused solely on whether her loans were 'qualified education loans' under § 523(a)(8)(B), without any credible argument or evidence addressing § 523(a)(8)(A)(i)" – in other words, she did not address whether her loans were "made under a program funded in whole or in part by a governmental unit or nonprofit institution" within the meaning of the statute.  Firstmark Opp. at 31-32, n.16.

As to the Bar Loan, Firstmark argues that Ms. Golden has not explained why, under the Bankruptcy Code, it would be dischargeable, and her "theory about the *sui generis* nature of bar loans necessarily means that conventional, non-bar loans . . . require an entirely different set of considerations and analysis that she has not undertaken with respect to any loans in Firstmark's servicing portfolio."  Firstmark Opp. at 32.

And Firstmark opposes class-wide relief, on several grounds.  It states that a "glaring

problem" with the Preliminary Injunction Motion is that it seeks relief against "dozens of absent loan owners . . . whose joinder is necessary under Rule 19." Firstmark Opp. at 8. Firstmark argues that "[a] creditor constitutes a paradigmatic necessary party to a dischargeability proceeding." Firstmark Opp. at 9 (collecting cases). Firstmark argues that each of the disjunctive requirements of Rule 19(a)(1) is met in this case: under Rule 19(a)(1)(A), the Court cannot accord complete relief absent the "actual creditors," the student loan owners; under Rule 19(a)(1)(B)(i), the student loan owners are necessary because the Court cannot grant relief that would "impair or impede the absent loan owners' ability to enforce their debts;" and under Rule 19(a)(1)(B)(ii), the student loan owners are necessary because a ruling for Ms. Golden could expose Firstmark to a risk of "double, multiple or otherwise inconsistent obligations" if the loan owners determine that compliance with a preliminary injunction breaches Firstmark's obligations as loan servicer. Firstmark Opp. at 9, 25. Finally, Firstmark disagrees with Ms. Golden's argument that, by failing to intervene in this adversary proceeding, the loan owners have waived their rights. Firstmark Opp. at 11.

Firstmark, like the other Defendants, argues that the DeBois Declaration is insufficient evidence for the relief requested because, for example, it uses "inflated" loan figures and considers incorrect figures for a student's cost of attendance. Firstmark Opp. at 35. And separately, Firstmark argues that the Preliminary Injunction Motion must also be denied because it seeks relief on behalf of a putative class that fails to meet Rule 23's certification requirements. Firstmark Opp. at 38.

Firstmark points to this Court's decision in *In re Homaidan* and notes that there, the Court declined to grant injunctive relief "on behalf of a broader putative class than defined in the complaint." Firstmark Opp. at 39 (citing *In re Homaidan*, 640 B.R. at 866-68). Here, it argues,

Ms. Golden's Amended Complaint "defines the putative class strictly in terms of whether their loans exceeded the cost of attendance," while the Preliminary Injunction Motion "redefines and expands the putative class to encompass anyone with "'private loans *that are not funded by a nonprofit* and which were not within the cost of attendance as defined in I.R.C. § 221(d)(2) and 20 U.S.C. § 1087*ll* (as in effect in 1997) at Title IV schools, *less all other loans and grants received by the borrower.*'" Firstmark Opp. at 40 (quoting Am. Compl. ¶ 56; Prelim. Inj. Mem. at 2) (emphasis in original). Firstmark argues that, as in *In re Homaidan*, the Court should not enlarge the scope of relief at this stage. Firstmark Opp. at 41.

Firstmark also argues that Ms. Golden has not established that she or the putative class members will suffer irreparable harm absent an injunction. Firstmark Opp. at 21. Rather, it states, a preliminary injunction would disrupt the status quo, and therefore, Ms. Golden must make a heightened showing on this element. Firstmark Opp. at 5. Firstmark argues that Ms. Golden "fails to account for a number of circumstances that would prevent a finding of irreparable harm, or would actually inflict greater harm than maintaining the existing *status quo*." Firstmark Opp. at 21. These circumstances include payments currently being made by a co-signer, the possibility that responsibility for payments would shift to a currently non-paying co-signer, a borrower making voluntary payments, and borrowers with loans that are no longer actively serviced by Firstmark. Firstmark Opp. at 21. Firstmark further argues that the "wide variety of loan programs with distinct characteristics" also weighs against Ms. Golden's ability to establish a likelihood of success on the merits. Firstmark Opp. at 33.

In the event and to the extent that the Court grants the Preliminary Injunction Motion, Firstmark argues that the Court should require Ms. Golden to post a bond sufficient "to cover the amount of forborne payments owed to the various nonparty loan owners and the Trust

Defendants, plus the amount of lost servicing fees owed to Firstmark."  Firstmark Opp. at 42.

With respect to the Second Circuit's decision in *Bruce*, Firstmark states that *Bruce* "prevents this case from being certified for class adjudication (and, in turn, precludes the issuance of a class-wide [preliminary injunction])."  Firstmark Opp. at 1.  Specifically, Firstmark argues that *Bruce* rejected the viability of a nationwide class "'to enforce the discharge orders and injunctions entered by other bankruptcy courts from across the country.'"  Firstmark Opp. at 7 (citing *Bruce*, 75 F.4th at 302).  And Firstmark concludes that even if this Court were to "authorize a private right of action under the Declaratory Judgment Act to enforce the discharge injunction . . . the logic of *Bruce* maintains its full force with respect to the nationwide class question" because "the underlying issue centers on whether Firstmark violated the discharge injunction and, if so, what remedy is appropriate."  Firstmark Opp. at 8.  Firstmark states that these questions must be left to the courts that issued the underlying discharge injunctions.  *Id.*

<u>*Ms. Golden's Reply in Support of the Preliminary Injunction Motion*</u>

Ms. Golden replies that she has shown a likelihood of success on the merits or, at least, sufficiently serious questions going to the merits to justify preliminary injunctive relief at this time.  Reply at 10.

Ms. Golden replies that she does not seek to alter the status quo.  Instead, as in *In re Homaidan*, she seeks to return to the status quo of the "'last actual, peaceable uncontested status which preceded the pending controversy.'"  Reply at 4 (quoting *In re Homaidan*, 650 B.R. at 409).  And that time, Ms. Golden states, "'is the situation that existed *before* [the Defendants] undertook collection efforts on the Plaintiffs' and the Putative Class Members' outstanding student loans and *after* the Plaintiffs and the Putative Class Members received their bankruptcy discharges.'"  *Id.*

Ms. Golden replies that she has shown a likelihood of success on the merits because, as in *In re Homaidan*, to the extent that the Defendants offered private loans to student borrowers that were not within the cost of attendance at Title IV schools, those loans fall outside of Bankruptcy Code Section 523(a)(8) because, "(1) only loans funded by the government or a nonprofit or loans guaranteed by the government are within § 523(a)(8)(A)(i); (2) no student loans come within § 523(a)(8)(A)(ii); and (3) private loans that are not within the cost of attendance at a Title IV school are not qualified education loans within § 523(a)(8)(B)."  Reply at 4 (citing *In re Homaidan*, 640 B.R. at 846-49).

Ms. Golden replies that the NCT Loan "indisputably" exceeded her cost of attendance at Penn Law.  Reply at 5.  She argues that even using the Defendants' figures, Ms. Golden's cost of attendance for the 2006-2007 school year was $56,380, and she was approved for loans and grants in the amount of $55,280 before she applied for the NCT loan.  Reply at 5 (citing PHEAA Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment, ECF No. 327 ("PHEAA Summ. J. Opp."), at 24).  Thus, there remained "a balance of $1,100 that a creditor could lend to Ms. Golden and still be in the cost of attendance, *as defined by Defendants.*"  Reply at 6 (emphasis in original).  And consequently, the majority of the $7,300 NCT Loan exceeded the cost of attendance.  Reply at 6.  She also notes that PHEAA has acknowledged that Penn Law did not certify this loan as within the cost of attendance.  *Id.*

And Ms. Golden replies that the Bar Loan cannot come within the terms of Section 523(a)(8), because that loan was made for living expenses incurred after Ms. Golden's graduation from a Title IV institution.  Reply at 6.  She also notes that Penn Law never certified the Bar Loan as within the cost of attendance.  *Id.*  She argues that post-graduation loans like the Bar Loan "are specifically identified by the [Consumer Financial Protection Bureau] as

discharged debts." Reply at 7 (citing CFPB Guidance, Mar. 16, 2023, 2023 WL 2898365, Unfair Billing and Collection Practices After Bankruptcy Discharges of Certain Student Loan Debts).

Ms. Golden further replies that Mr. DeBois's analysis is not undermined by the fact that he reviewed a sample, but not all, of the loans in the Defendants' portfolios, for several reasons. Reply at 7-8. She observes that even taking into account the possibility that "some borrowers could have been attending graduate school," his analysis nevertheless shows that "there are enough loans to make joinder impracticable." Reply at 8. And she argues that "a complete analysis would only *increase* the number of discharged loans." Reply at 7 (emphasis in original).

Ms. Golden further replies that a guarantee by TERI does not mean that a loan is nondischargeable under the meaning of Section 523(a)(8)(A)(i), both because a guarantee is not "funding" as required by the statute, and because TERI is "not a nonprofit within the terms of that section." Reply at 8. And she argues that the Second Circuit's *O'Brien* decision does not require a different result, because TERI's nonprofit status was "uncontested" in that case, and not addressed or argued by the parties. Reply at 9 (citing *O'Brien*, 419 F.3d at 104).

She also notes that the Defendants have not responded substantively to her argument that the acquisition of TERI by First Marblehead, a commercial entity, undermines its nonprofit status. Reply at 8. She states, "Defendants have not submitted any proof in support of their contention that TERI is in fact a *bona* fide nonprofit. Indeed, they have consistently avoided addressing these undisputed facts . . . and dismiss them as 'surmised' and 'specious assertions.'" Reply at 8. And she points to decisions finding that "merely being registered as a nonprofit does not resolve this issue." Reply at 8-9 (citing *McEwen v. Nat'l Rifle Assoc.*, 2021 WL 1414273, at

*4-5 (D. Maine April 14, 2021) (citing *Zimmerman v. Cambridge Credit Counseling Corp.*, 409 F.3d 473 (1st Cir. 2005))).

In reply to Firstmark's assertion that the "bankruptcy hold" on her account means that she is not at risk of imminent harm, Ms. Golden replies that there is no indication that Firstmark's hold will continue, that the hold does not apply to any putative class members, and that "a Defendant cannot pick off the claims of a class representative by changing its practice only with respect to the class representative while continuing the offending conduct with respect to the proposed class." Reply at 10-11. And she states that her voluntary payments do not affect the Defendants' obligations to comply with the law and to refrain from collecting on discharged debts. Reply at 12.

As to the Second Circuit's decision in *Bruce*, Ms. Golden replies that *Bruce* precludes only this Court's ability to certify a national class for contempt, not its ability to order declaratory or injunctive relief. Reply at 13. Ms. Golden states, "any bankruptcy court under Rule 4007(a) can declare that a particular debt has been discharged, and § 105(a) of the Bankruptcy Code gives this Court broad and clear equity power to ensure that collection on that debt ceases." Reply at 13-14.

Ms. Golden notes that she first sought preliminary injunctive relief in July 2020, and that the Court deferred action on her Preliminary Injunction Motion at the Defendants' request, as the parties engaged in extensive motion practice and disputes over the Defendants' discovery requests. Reply at 14.

And Ms. Golden replies that the balance of hardships tips in her favor here for the same reasons identified by this Court in *In re Homaidan* – that is, the collection of a discharged debt violates the primary purpose of the Bankruptcy Code, which is ensuring a fresh start free from

such collection, and the Defendants have no valid interest in collecting on such debts.  Reply at 15 (citing *In re Homaidan*, 640 B.R. at 855-56).  She states that a preliminary injunction would serve the public interest by enjoining the collection of discharged debts and promoting a fresh start for the honest but unfortunate debtor.  Reply at 15-16 (citing *In re Homaidan*, 640 B.R. at 858).  And Ms. Golden argues that a bond is not appropriate here, for the same reasons recognized by this Court in *In re Homaidan*.  Reply at 16-17 (citing *In re Homaidan*, 650 B.R. at 444).

### *Defendant PHEAA's January 17, 2025, Letter*

On January 17, 2025, PHEAA filed a letter to bring to the Court's attention several recent decisions which, PHEAA suggests, are pertinent to the Preliminary Injunction Motion, the Class Certification Motion, and the arguments that it makes in the context of those motions.  PHEAA Letter Regarding Pertinent Decisions, ECF No. 674 (the "PHEAA January 2025 Letter").  In the letter, PHEAA identifies three decisions which are relevant to the Preliminary Injunction Motion, and five decisions relevant to the Class Certification Motion.  PHEAA January 2025 Letter at 1-2.  Each of the decisions identified by PHEAA as pertinent to this motion address the question of whether a party is necessary under Rule 19(a).  *Id.*  And each of the decisions PHEAA posits to be relevant to the Class Certification Motion address the question of what type of claim arises from an asserted discharge violation.  PHEAA January 2025 Letter at 2.

### *Ms. Golden's February 5, 2025, Letter*

On February 5, 2025, Ms. Golden filed a reply to the PHEAA January 2025 letter addressing the two groups of cases.  Golden Reply Letter to PHEAA Letter, ECF No. 675 (the "Golden February 2025 Letter").  Ms. Golden responds that the cases PHEAA argues are relevant to the Preliminary Injunction Memo are factually irrelevant to this case, that the

servicers in this case are properly before the Court, and that the Court is well within its jurisdiction to enter an injunction enjoin the servicers. Golden February 2025 Letter at 1. As to the cases PHEAA identifies as relevant to the Class Certification Motion, Ms. Golden argues that these cases simply stand for the proposition that a violation of a discharge order is property punishable by contempt, but that none addresses the questions "specifically reserved in *Bruce* . . . of whether this Court has the power to declare the student loans at issue here to be discharged and whether it can do so for a national class." *Id.*

### Ms. Golden's March 31, 2025, Letter

On March 31, 2025, Ms. Golden filed a letter to bring to the Court's attention a recent decision entered by the bankruptcy court in *Anderson v. Credit One Bank, N.A.* (*In re Anderson*), 2025 WL 957097 (Bankr. S.D.N.Y. Mar. 28, 2025). Ms. Golden's Letter Regarding Pertinent Decisions, ECF No. 676 (the "Golden March 2025 Letter"). In the letter, she states that the decision is pertinent to the Preliminary Injunction Motion, the Class Certification Motion, and the arguments that she makes in the context of those motions. Golden March 2025 Letter at 1. *See Anderson v. Credit One Bank, N.A.* (*In re Anderson*), 2025 WL 957097 (Bankr. S.D.N.Y. Mar. 28, 2025). She also states that the decision in *In re Anderson* "affirms that a plaintiff may bring a nationwide class action seeking [declaratory] relief." Golden March 2025 Letter at 1.

### Defendant PHEAA's April 9, 2025, Letter

On April 9, 2025, PHEAA filed a response to the Golden Letter that addresses the bankruptcy court's recent decision in *In re Anderson.* PHEAA Response Letter to Golden Letter, ECF No. 677 (the "PHEAA April 2025 Letter"). In its letter, PHEAA responds that the decision in *In re Anderson* is not relevant precedent in the context of this case. PHEAA April 2025 Letter at 1. Specifically, PHEAA states that the arguments at issue in *In re Anderson* are materially

different from those raised by Ms. Golden in the Preliminary Injunction Motion and the Class

Certification Motion, and that the bankruptcy court's recent holding in *In re Anderson* is

"inconsistent and contradictory with a holding that a declaratory judgment regarding violation of

the discharge order can be issued on a class-wide basis."  PHEAA April 2025 Letter at 1-2.

*Ms. Golden's April 14, 2025, Letter*

On April 15, 2025, Ms. Golden filed a reply to the PHEAA April 2025 Letter.  Ms.

Golden's Reply Letter ECF No. 679 (the "Golden April 2025 Letter").  In her letter, Ms. Golden

replies to PHEAA's arguments concerning the bankruptcy court's decision in *In re Anderson*,

and argues that the court's reasoning in *In re Anderson* is not "internally inconsistent," and, in

fact, is consistent with a bankruptcy court having the power to declare whether a debt has been

discharged, and to "issue appropriate ancillary relief."  Golden April 2025 Letter at 2.

The record is now closed.

## The Applicable Legal Standards

*The Categories of Nondischargeable Debt Under Bankruptcy Code Section 523(a)(8)*

Bankruptcy Code Section 523(a)(8) outlines several categories of student debt that may

be excluded from discharge.  It states that a debtor is not discharged from any debt that

constitutes:

> (A)(i)  an educational benefit overpayment or loan made, insured, or guaranteed
> by a governmental unit, or made under any program funded in whole or in
> part by a governmental unit or nonprofit institution; or
>
> (A)(ii)  an obligation to repay funds received as an educational benefit,
> scholarship, or stipend; or
>
> (B)  any other educational loan that is a qualified education loan, as defined in
> section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a
> debtor who is an individual.

11 U.S.C. § 523(a)(8).  Stated otherwise, Section 523(a)(8) "protects four categories of

educational loans from discharge." *Rumer v. Am. Educ. Servs.* (*In re Rumer*), 469 B.R. 553, 561 (Bankr. M.D. Pa. 2012).

The first and second categories of debt excluded from discharge are described in Section 523(a)(8)(A)(i).  These are "two types of educational claims:  (1) educational benefit overpayments or loans made, insured, or guaranteed by a governmental unit; and (2) educational benefit overpayments or loans made under any program partially or fully funded by a governmental unit or nonprofit institution." *Decena v. Citizens Bank* (*In re Decena*), 549 B.R. 11, 12 (Bankr. E.D.N.Y. 2016), *rev'd in part on other grounds*, *Citizens Bank v. Decena*, 562 B.R. 202 (E.D.N.Y. 2016).  A third category of student debt that is excluded from discharge is described in Section 523(a)(8)(A)(ii).  This category encompasses "funds received as an educational benefit, scholarship, or stipend." 11 U.S.C. § 523(a)(8)(A)(ii).  And finally, Section 523(a)(8)(B) excludes from discharge any "qualified education loan as defined in section 221(d)(1) of the Internal Revenue Code of 1986." 11 U.S.C. § 523(a)(8)(B).

*The Elements of a Discharge Violation Claim*

Bankruptcy Code Section 524 describes the effect of a discharge.  It states that a bankruptcy discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived." 11 U.S.C. § 524(a)(2).  To establish a claim for a violation of the bankruptcy discharge injunction, a plaintiff-debtor must show that the debtor received a discharge, the defendant received notice of the discharge, and the defendant intended the acts that violated the discharge. *Motichko v. Premium Asset Recovery Corp.* (*In re Motichko*), 395 B.R. 25, 31 (Bankr. N.D. Ohio 2008).  *See In re Homaidan*, 650 B.R. at 404.

46

Of course, for a bankruptcy discharge violation claim to lie, the debt at issue must be within the scope of the debtor's dischargeable debt. *See In re Eppolito*, 583 B.R. 822, 826 (Bankr. S.D.N.Y. 2018) (stating that "[t]he discharge injunction survives the closure of a bankruptcy case and applies permanently to every debt *that is discharged*" (emphasis added)); *In re Azevedo*, 506 B.R. 277, 283 (Bankr. E.D. Cal. 2014) (observing that "[s]howing a violation of a discharge order by definition requires showing specifically that the order applies to the debt on which the violation is premised") (citing 11 U.S.C. § 524(a)(1)-(2)); *Otten v. Majesty Used Cars, Inc.* (*In re Otten*), 2013 WL 1881736, at *7-8 (Bankr. E.D.N.Y. May 3, 2013) (analyzing the scope of a discharge injunction issued in the plaintiff's bankruptcy case in the context of determining whether the defendants' actions violated the discharge injunction). *See In re Homaidan*, 650 B.R. at 404.

And there are boundaries to what kinds of relief are available on a classwide basis in the context of a violation of the bankruptcy discharge injunction. As the Second Circuit explained in *Bruce*, where a bankruptcy court grounds its authority to issue a contempt citation relating to a discharge injunction in Bankruptcy Code Sections 524 and 105, the bankruptcy court "cannot exercise its civil contempt authority to enforce another court's injunction." *Bruce*, 75 F.4th at 305. As the court stated, "[a] bankruptcy court's civil contempt authority does not extend to other bankruptcy courts' discharge orders in a nationwide class action." *Bruce*, 75 F.4th at 306.

*Bankruptcy Jurisdiction Under Judiciary Code Section 1334*

Judiciary Code Section 1334 sets forth the grounds for federal jurisdiction over bankruptcy matters. Section 1334(a) provides that "[e]xcept as provided in [Section 1334(b)], the district courts shall have original and exclusive jurisdiction of all cases under title 11." 28 U.S.C. § 1334(a).

Section 1334(b) confers original but not exclusive jurisdiction upon district courts in all civil proceedings "arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Significantly, Section 1334(b) provides the bankruptcy courts with the ability to reach beyond the assets of a particular bankruptcy estate – as one court noted in considering a motion to dismiss a putative nationwide class, "[a] court no longer is restricted to dealing only with assets under its control; it also has the ability to deal with other matters affecting debtors." *Noletto v. Nationsbanc Mortg. Corp.* (*In re Noletto*), 244 B.R. 845, 849 (Bankr. S.D. Ala. 2000).

And Section 1334(e) confers exclusive jurisdiction upon the district courts over the debtor's property, that is, the property of the estate. 28 U.S.C. § 1334(e)(1). As the court observed in *In re Noletto*, Section 1334(e) "vests the 'home court' with the exclusive power to control and distribute property of the estate." *In re Noletto*, 244 B.R. at 854. But equally, "[Section] 1334(e) does not make the 'home court' the exclusive forum to hear debtor complaints regarding violations of the Bankruptcy Code." *Id*. *See Harker v. Wells Fargo Bank, NA* (*In re Krause*), 414 B.R. 243, 255-56 (Bankr. S.D. Ohio 2009) (finding that "[Section] 1334(e) must be read narrowly to limit the 'home court' exclusive jurisdiction of bankruptcy courts strictly to *in rem* matters involving property of the debtor or property of the estate and not as a restriction on nationwide jurisdiction over claims for violations of provisions of the [Bankruptcy] Code, other federal statutory provisions, or other remedies"). *See In re Homaidan*, 650 B.R. at 405.

*The Declaratory Judgment Act*

The Declaratory Judgment Act addresses the availability of declaratory relief in federal courts. *Hall v. IRS* (*In re Hall*), 629 B.R. 124, 142 (Bankr. E.D.N.Y. 2021). Section 2201 of the Act, entitled "Creation of a Remedy," provides:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).  And Section 2202 of the Declaratory Judgment Act, entitled "Further Relief," provides, "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."  28 U.S.C. § 2202.

Courts agree that a bankruptcy court is a "Court of the United States" and accordingly, has the power to hear and decide matters under the Declaratory Judgment Act.  As one court in this Circuit has found, "[t]he Bankruptcy Court is a 'Court of the United States' and has power to hear declaratory matters pursuant to 28 U.S.C. §§ 2201-2202."  *Katz v. Wagner* (*In re Metiom, Inc.*), 2002 WL 433588, at *1 (S.D.N.Y. Feb. 25, 2002).  And as another court observed, pursuant to the Declaratory Judgment Act, "the bankruptcy court has the power to issue declaratory judgments when the matter in controversy regards the administration of a pending bankruptcy estate."  *Sears, Roebuck and Co. v. O'Brien*, 178 F.3d 962, 964 (8th Cir. 1999).

Courts also agree that the Declaratory Judgment Act has "'a broad, remedial purpose and, therefore, should be construed liberally.'"  *In re Metiom*, 2002 WL 433588, at *2 (quoting *Akzona Inc. v. E.I. duPont de Nemours & Co.*, 662 F. Supp. 603, 615 (D. Del. 1987).  *See Treemond Co. v. Schering Corp.*, 122 F.2d 702, 705 (3d Cir. 1941) (rejecting a narrow interpretation of "case or controversy" in patent actions under the Declaratory Judgment Act).  *See generally* 4 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1238 (4th ed. 2024) (stating that "[i]n order to effectuate the purpose of the [Declaratory Judgment] Act . . . complaints should be construed liberally").

At the same time, the Declaratory Judgment Act does not provide an independent basis for subject matter jurisdiction. As the Supreme Court has stated, in the Declaratory Judgment Act, "Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). And as the Second Circuit has observed, "[t]he Declaratory Judgement Act permits declaratory relief only in cases presenting 'actual controvers[ies],' 28 U.S.C. § 2201(a), a requirement that incorporates into the statute the case or controversy limitation on federal jurisdiction found in Article III of the Constitution." *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d Cir. 1996). That is, the Declaratory Judgment Act permits a court to issue declaratory relief in those cases where there is otherwise a basis for the court to act.

### The Bankruptcy Court's Authority Under Section 105

Bankruptcy Code Section 105 grants the bankruptcy court power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105. It also provides that the court is not precluded from "*sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." *Id*.

As the Supreme Court found, Section 105(a) grants "broad authority" to bankruptcy courts to exercise their jurisdiction, even in the absence of a particular statutory provision conferring it, as an "inherent power of every federal court." *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 375-76 (2007).

And as the Second Circuit has recently observed, "§ 105 is an omnibus provision phrased in such general terms as to be the basis for a broad exercise of power in the administration of a bankruptcy case . . . § 105(a) confer[s] authority to fill the gaps left by the statutory language and

to exercise equity in carrying out the provisions of the Bankruptcy Code." *Windstream Holdings, Inc. v. Charter Commc'ns Operating, LLC* (*In re Windstream Holdings, Inc*.), 105 F.4th 488, 494 n.5 (2d Cir. 2024) (alteration in original).

While Section 105 is often viewed as a broad grant of authority, it is similarly well established that this Section also "limits the bankruptcy court's equitable powers, which 'must and can only be exercised within the confines of the Bankruptcy Code.'" *FDIC v. Colonial Realty Co.* (*In re Colonial Realty*), 966 F.2d 57, 59 (2d Cir. 1992) (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988)).

As the Second Circuit has explained:

> The equitable power conferred on the bankruptcy court by section 105(a) is the power to exercise equity in carrying out the *provisions* of the Bankruptcy Code, rather than to further the purposes of the Code generally, or otherwise to do the right thing.  This language "suggests that an exercise of section 105 power be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective."

*New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc.* (*In re Dairy Mart Convenience Stores, Inc*.), 351 F.3d 86, 92 (2d Cir. 2003) (quoting 2 Collier on Bankruptcy ¶ 105.01[1] (15th ed. 2003)) (emphasis in original).  *See In re Homaidan*, 650 B.R. at 405.

And as this Court has recognized, "Bankruptcy Code Section 105 grants the bankruptcy court power to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.'" *In re Golden*, 630 B.R. at 914 (quoting 11 U.S.C. § 105).  *See In re Homaidan*, 640 B.R. at 840.

*The Standard for the Entry of a Preliminary Injunction*

Preliminary injunctive relief, whether in the form of a temporary restraining order or a preliminary injunction, calls for the movant to meet a high standard, and several elements must be shown.  "In this Circuit, 'the standard for an entry of a temporary restraining order is the same

as for a preliminary injunction.'" *3M Co. v. CovCare, Inc.*, 2021 WL 7162292, at *2 (E.D.N.Y.

Apr. 7, 2021) (alteration omitted) (quoting *Andino v. Fischer*, 555 F. Supp. 2d 418, 419

(S.D.N.Y. 2008)).  A party seeking a preliminary injunction must demonstrate:

> (1) "a likelihood of success on the merits or . . . sufficiently serious questions
> going to the merits to make them a fair ground for litigation and a balance of
> hardships tipping decidedly in the plaintiff's favor"; (2) a likelihood of
> "irreparable injury in the absence of an injunction"; (3) that "the balance of
> hardships tips in the plaintiff's favor"; and (4) that the "public interest would not
> be disserved" by the issuance of an injunction.

*Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (omission in

original) (quoting *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010)).  *See In re Homaidan*,

650 B.R. at 406.

As to the question of likelihood of success on the merits, courts agree that a "party

seeking injunctive relief 'need only show a likelihood of success on the merits of at least one of

its claims.'" *3M Co.*, 2021 WL 7162292, at *2 (quoting *Home It, Inc. v. Wen*, 2020 WL 353098,

at *5 (E.D.N.Y. Jan. 21, 2020)).  In addition, "a plaintiff 'need not show that success is an

absolute certainty.  He need only make a showing that the probability of his prevailing is better

than fifty percent.'"  *Home It, Inc.*, 2020 WL 353098, at *5 (quoting *Broker Genius, Inc. v.

Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018)).  *See In re Homaidan*, 650 B.R. at 406.

As to the question of irreparable injury, "[i]rreparable injury has been defined as harm

where 'remedies available at law, such as monetary damages, are inadequate to compensate' the

plaintiff." *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 334 (S.D.N.Y. 2011) (quoting

*Salinger*, 607 F.3d at 80).  "'Thus, if it appears that the potential harm to the moving party is

simply a monetary loss, the potential injury is normally not deemed irreparable and hence does

not justify injunctive relief.'" *Silber*, 950 F. Supp. 2d at 439 (quoting *Sperry Int'l Trade, Inc. v.

Gov't of Isr.*, 670 F.2d 8, 12 (2d Cir. 1982)).  The showing of irreparable injury is "the most

important prerequisite for the issuance of a preliminary injunction." *NAACP v. Town of East Haven*, 70 F.3d 219, 224 (2d Cir. 1995) (citing *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir 1990)). *See In re Homaidan*, 650 B.R. at 406.

And the irreparable harm must be more than speculative or remote. Instead, to succeed on an application for a preliminary injunction, the moving party must generally show that, "on the facts of their case, the failure to issue an injunction would actually cause [them] irreparable harm." *Salinger*, 607 F.3d at 82.

At the same time, in the bankruptcy context, a limited exception exists where the "irreparable harm requirement" will be met if the action that the debtor seeks to enjoin "threatens the reorganization processor . . . impair[s] the court's jurisdiction with respect to a case before it." *Alert Holdings, Inc. v. Interstate Prot. Servs.* (*In re Alert Holdings, Inc.*), 148 B.R. 194, 200 (Bankr. S.D.N.Y. 1992) (collecting cases). More specifically, the court may issue a preliminary injunction if the action that the debtor seeks to enjoin "would embarrass, burden, delay or otherwise impede the reorganization proceedings or if the stay is necessary to preserve or protect the Debtor's estate and reorganization prospects." *In re Alert Holdings*, 148 B.R. at 200. *See In re Homaidan*, 650 B.R. at 406.

As to the balance of hardships, "a court 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Main Street Baseball, LLC v. Binghamton Mets Baseball Club, Inc.*, 103 F. Supp. 3d 244, 262 (N.D.N.Y. 2015) (quoting *Winter*, 555 U.S. at 24). The party moving for a preliminary injunction "must establish that the 'balance of hardships tips in their favor regardless of the likelihood of success.'" *Main Street Baseball*, 103 F. Supp. 3d at 262 (citing *Salinger*, 607 F.3d at 79-80). And in this context, "[t]he relevant harm is the harm that . . . occurs to the parties'

legal interests" and "cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger*, 607 F.3d at 81 (footnote omitted). *See In re Homaidan*, 650 B.R. at 407.

And finally, as to the question of the public interest, "[i]n considering the public interest element for granting an injunction, the focus is generally on how the parties' specific actions would impact the public at large." *Roman Catholic Diocese of Syracuse, N.Y. v. LG 35 Doe* (*In re Roman Catholic Diocese of Syracuse, N.Y.*), 628 B.R. 571, 582 (Bankr. N.D.N.Y. 2021) (citing *Winter*, 555 U.S. at 13-14). "Courts have long recognized that public interest is a 'supple principle' with 'as many and as variegated applications . . . as the situations that have brought it into play.'" *In re Roman Catholic Diocese*, 628 B.R. at 583 (omission in original) (quoting *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941)). *See In re Homaidan*, 650 B.R. at 407.

## Discussion

This motion places several questions before the Court.

At the outset, the Court first determines whether the preliminary injunction sought by Ms. Golden is prohibitory or mandatory.

Next, the Court considers whether Ms. Golden has satisfied each of the elements necessary for the entry of a preliminary injunction, as to the NCT Loan and separately, as to the Bar Loan. These are, "(1) 'a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor'; (2) a likelihood of 'irreparable injury in the absence of an injunction'; (3) that 'the balance of hardships tips in the plaintiff's favor'; and (4) that the 'public interest would not be disserved' by the issuance of an injunction." *Benihana*, 784 F.3d at

895 (omission in original) (quoting *Salinger*, 607 F.3d at 79-80).

The Court also considers whether it may enter relief on behalf of a nationwide class of putative class members.  And this, in turn, calls for the Court to address certain questions identified by the Defendants – whether Ms. Golden may seek injunctive relief without joining all of the loan owners here, and whether, in light of the Second Circuit's decision in *Bruce*, it may enter a declaratory judgment with ancillary injunctive relief on behalf of a nationwide class of putative class members.

The Court addresses each of these questions in turn.

### *Whether Ms. Golden Must Meet a Higher Standard To Show a Likelihood of Success on the Merits*

As a threshold matter, the parties dispute whether, in the Preliminary Injunction Motion, Ms. Golden seeks relief that is prohibitory or mandatory.  This is a distinction with a difference, because it affects the legal standard that a plaintiff must meet to be entitled to relief.

As the Second Circuit has observed, "[c]ourts refer to preliminary injunctions as prohibitory or mandatory.  Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *N. Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, 883 F.3d 32, 36-37 (2d Cir. 2018) (citing *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995)).  "Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" *N. Am. Soccer League*, 883 F.3d at 37 (quoting *N.Y. Civ. Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)).

The Defendants argue that when a preliminary injunction would disrupt the status quo, rather than maintain it, "'a party seeking one must meet a heightened legal standard by showing a clear or substantial likelihood of success on the merits.'"  Trust Defs. Opp. at 10 (quoting *N.*

*Am. Soccer League*, 883 F.3d at 37).  Ms. Golden responds that she does not seek to alter the status quo, and therefore does not need to meet a heightened standard of likelihood of success. Reply at 4 (citing *In re Homaidan*, 650 B.R. at 409).

Here, the Court finds that Ms. Golden is not seeking to disrupt the status quo, which is the "'last actual, peaceable uncontested status which preceded the pending controversy.'"  *In re Homaidan*, 650 B.R. at 409 (quoting *N. Am. Soccer League*, 883 F.3d at 37).  Importantly, the "'status quo' in preliminary-injunction parlance is really a 'status quo ante.' . . .  This special 'ante' formulation of the status quo in the realm of equities shuts out defendants seeking shelter under a current 'status quo' precipitated by their wrongdoing."  *N. Am. Soccer League*, 883 F.3d at 37 n.5 (citation omitted) (quoting *Holt v. Cont'l Grp., Inc.*, 708 F.2d 87, 90 (2d Cir. 1983)).

And here, the "last actual, peaceable uncontested status which preceded the pending controversy" is the situation that existed *before* the Defendants resumed, or in Firstmark's circumstance, had the ability to resume, their collection activities on Ms. Golden's and the putative class members' outstanding student loans that are the subject of this Preliminary Injunction Motion, unencumbered by the bankruptcy case's automatic stay, and *after* she and the putative class members received their bankruptcy discharges.  *N. Am. Soccer League*, 883 F.3d at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014)).

Viewed another way, it is the fact or the prospect of the Defendants' resumption of collection efforts on Ms. Golden's and the putative class members' assertedly discharged student loans that gives rise to this dispute.  *See, e.g.*, *General Mills, Inc. v. Chobani, LLC*, 158 F. Supp. 3d 106, 117-18 (N.D.N.Y. 2016) (finding that the "last peaceable uncontested status" was immediately before an advertising campaign was launched, because the campaign assertedly constituted false advertising in violation of the Lanham Act, "since the claims made in that

advertising are what give rise to the underlying dispute"). And the preliminary injunction sought by Ms. Golden on behalf of herself and the putative class members with outstanding loan balances subject to collection does neither more nor less than restore the status quo to the point before the Defendants' collection of those assertedly discharged debts began.

Accordingly, Ms. Golden does not need to meet a heightened standard to show a likelihood of success on the merits.

### *Whether Ms. Golden Has Shown a Likelihood of Success on the Merits, or Sufficiently Serious Questions Going to the Merits To Make Them a Fair Ground for Litigation, as to the NCT Loan*

The Court first considers whether Ms. Golden has established a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation, on her request for a declaratory judgment and ancillary injunctive relief that the NCT Loan is within the scope of her bankruptcy discharge.

The first element that a plaintiff must establish to be entitled to preliminary injunctive relief is "'a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor.'" *Benihana*, 784 F.3d at 895 (omission in original) (quoting *Salinger*, 607 F.3d at 79)).

The Court first considers whether Ms. Golden has established a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation. And next, the Court considers whether, to the extent that Ms. Golden has established "'sufficiently serious questions going to the merits to make them a fair ground for litigation,'" but not a likelihood of success on the merits, she has established that the balance of hardships tips decidedly in her favor." *Benihana*, 784 F.3d at 895 (quoting *Salinger*, 607 F.3d at 79).

Ms. Golden asserts that the NCT Loan is not excluded from her bankruptcy discharge by any of the subsections of Bankruptcy Code Section 523(a)(8), which restricts the dischargeability of certain categories of education debt.  First, Section 523(a)(8)(A)(i) restricts the dischargeability of education debts that are "educational benefit overpayments or loans made, insured, or guaranteed by a governmental unit; [or] educational benefit overpayments or loans made under any program partially or fully funded by a governmental unit or nonprofit institution."  *Mazloom v. Navient Sols., LLC* (*In re Mazloom*), 648 B.R. 1, 7 (Bankr. N.D.N.Y. 2023) (citing *In re Golden*, 596 B.R. at 257).  Next, Section 523(a)(8)(A)(ii) restricts from dischargeability funds received as an educational benefit, scholarship, or stipend.  11 U.S.C. § 523(a)(8)(A)(ii).  And finally, Section 523(a)(8)(B) restricts from dischargeability "qualified educational loans as defined in § 221(d)(1) of the Internal Revenue Code."  *In re Mazloom*, 648 B.R. at 7 (citing *In re Golden*, 596 B.R. at 257).

It is evident that one pathway to nondischargeability is enough – that is, "Section 523(a)(8) is written in the disjunctive, meaning a loan need only fall within one of these four categories to be non-dischargeable." *In re Mazloom*, 648 B.R. at 7.  At the same time, because bankruptcy aims to provide "a fresh start to the honest but unfortunate debtor, courts have long recognized that exceptions to discharge . . . must be narrowly construed against the creditor."  *In re Mazloom*, 648 B.R. at 8 (citing *Campbell v. Citibank, N.A.* (*In re Campbell*), 547 B.R. 49, 54 (Bankr. E.D.N.Y. 2016) (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998))).

Here, the parties dispute whether Ms. Golden's NCT Loan is nondischargeable under Bankruptcy Code Section 523(a)(8)(A)(i), as the Defendants assert it is a loan "made under any program *funded* in whole or in part by a governmental unit or *nonprofit* institution."  11 U.S.C. § 523(a)(8)(A)(i) (emphasis added).

As a consequence, to demonstrate a likelihood of success on the merits of her claim as to the NCT Loan, Ms. Golden must show that she is likely to succeed on the merits of her assertion that the NCT Loan is *not* within the scope of Section 523(a)(8)(A)(i) as a loan that was "funded in whole or in part by a governmental unit or nonprofit institution." 11 U.S.C. § 523(a)(8)(A)(i).

And this points to two questions – whether, as a matter of fact, TERI is a "nonprofit institution," and whether, as a matter of law, a guaranty amounts to "fund[ing] in whole or in part" of a "program." As these questions make clear, one is a question of fact, specific to TERI and its attributes, and the other is a question of law, addressing whether a "guaranty" by any nonprofit institution amounts to "fund[ing] in whole or in part."

This too is a distinction with a difference, because as to conclusions of law, Second Circuit precedent is, of course, controlling. But as to findings of fact, the situation is different. The Defendants assert that TERI is, for purposes of Section 523(a)(8)(A)(i), a "nonprofit institution," and Ms. Golden disagrees. Trust Defs. Opp. at 14; Reply at 8. The Defendants point to decisions of bankruptcy and district courts that have made that factual finding, and to decisions of appellate courts, including the Second Circuit's decision in *O'Brien*, that recite that same factual determination. Trust Defs. Opp. at 15; PHEAA Opp. at 33-34. And in response, Ms. Golden notes that the Defendants do not offer a persuasive response, or even dispute, her assertions that "First Marblehead, which is unquestionably a commercial enterprise, acquired TERI and completely took over its operations for the sole purpose of creating a nonprofit cover for its for-profit business." Reply at 8. And she points to decisions of district and appellate courts that recognize that registration as a nonprofit is not dispositive of an entity's status. Reply at 8-9. *See* Summ. J. Mot. at 23-24.

Viewed another way, the findings of other courts on a disputed factual issue may well be informative, and even persuasive, depending on the record that was made. But those findings are not binding on the parties here, who were not the parties there, or controlling on this Court. They would not be binding or controlling even if they predominantly favored one side or the other's position, even overwhelmingly. *See Twitter, Inc. v. Taamneh*, 598 U.S. 471, 507 (2023) (Jackson, J., concurring) (noting that a court's "view of the facts . . . properly rests on the particular allegations" of the particular case's complaint, and that "[o]ther cases presenting different allegations and different records may lead to different conclusions").

Of course, those decisions should not be overlooked. But it also should not be overlooked that in many, or perhaps most, of those cases, the question of the nonprofit status of TERI was not contested. And again, factual determinations made in those cases do not bind the parties here, including Ms. Golden and the members of the putative class, who were not present there.

### Whether Ms. Golden Has Shown a Likelihood of Success on the Merits, or Sufficiently Serious Questions Going to the Merits To Make Them a Fair Ground for Litigation, as to Her Assertion that TERI Is Not a Bona Fide Nonprofit Institution Under Section 523(a)(8)(A)(i)

Ms. Golden argues that the NCT Loan, and TERI-guaranteed loans more generally, do not qualify as nondischargeable student loans under Bankruptcy Code Section 523(a)(8)(A)(i) because "TERI is not a bona fide nonprofit institution." Prelim. Inj. Mem. at 13. Instead, she states, "TERI was nothing more than an instrument of First Marblehead, a for-profit enterprise that markets TERI as a means of avoiding the discharge of First Marblehead's student loans." Prelim. Inj. Mem. at 13. Therefore, she argues, any "funding" by TERI would not bring her loan within the scope of Section 523(a)(8)(A)(i). Prelim. Inj. Mem. at 13-14.

The Defendants respond that "[t]here can be no 'serious question' about the legal impact of the TERI guarantee."  PHEAA Opp. at 33.  They point to the Second Circuit's decision in *O'Brien*, where that court observed that Section 523(a)(8) "includes within its meaning loans made pursuant to loan programs that are guaranteed by non-profit institutions."  PHEAA Opp. at 33 (quoting *O'Brien*, 419 F.3d at 107).  And they point to decisions within the Second Circuit that have viewed *O'Brien* as binding precedent on this point and concluded that a TERI-guaranteed student loan is nondischargeable.  *See* PHEAA Opp. at 34 (collecting cases); Trust Defs. Opp. at 14-16.  They also cite "[n]umerous courts outside the Second Circuit [that] have concurred with and followed *O'Brien*."  PHEAA Opp. at 34-35 (collecting cases).

Ms. Golden replies that "First Marblehead, which is unquestionably a commercial enterprise, acquired TERI and completely took over its operations for the sole purpose of creating a nonprofit cover for its for-profit business."  Reply at 8.  And she states that the Defendants "have not submitted any proof in support of their contention that TERI is in fact a bona fide nonprofit."  Reply at 8 (emphasis omitted).

As set forth above, the question of whether TERI is a "nonprofit institution" is a question of fact.  The answer depends on the definition of a "nonprofit institution," and whether TERI meets those requirements as set forth in that definition.  And on this Preliminary Injunction Motion, the question that the Court addresses is whether Ms. Golden has shown, at this stage in these proceedings, that she is likely to succeed on the merits of her argument that TERI was not acting as a bona fide nonprofit in connection with its guaranty, or has raised sufficiently serious questions going to the merits to make them a fair ground for litigation.

The starting point for the Court's consideration of this question is the language of Section 523(a)(8)(A)(i), and in particular, the term "nonprofit institution."  Ms. Golden urges the Court

to consider how TERI operated in assessing whether it was, for these purposes, a bona fide "nonprofit institution." She points to the relationship between TERI and First Marblehead, and notes that First Marblehead is, indisputably, a for-profit entity. And she states that TERI was, in substance, operated as "a nonprofit cover" for the business operations of First Marblehead. Reply at 8.

In response, the Defendants state that "Ms. Golden cannot evade the Second Circuit's ruling" in *O'Brien*, and note that courts both within and outside this Circuit apply *O'Brien* to address the question of whether TERI-guaranteed student loans are nondischargeable under Section 523(a)(8)(A)(i). PHEAA Opp. at 34. They cite one court's observation that "'[a] majority of the courts considering the dischargeability of TERI-guaranteed loans have held that a TERI guarantee comes under the broad definition of "funded" as that term appears in § 523(a)(8)(A)(i).'" PHEAA Opp. at 35 (quoting *In re Duits*, 2020 WL 256770, at *2 (Bankr. S.D. Ind. Jan. 15, 2020)). And the Defendants assert that "[b]ased on the indisputable facts on which those courts relied, there is no basis for this Court to conduct an inquiry as to whether TERI is a nonprofit institution for the purposes of Section 523(a)(8) in order to evade *O'Brien*'s mandate." PHEAA Opp. at 35-36.

But the Defendants' arguments miss the mark, in several ways. First, they correctly note that *O'Brien* remains valid and vibrant authority both within and outside the Second Circuit for the question of law that it addresses – that is, the question of whether a guaranty amounts to "funding" for purposes of Section 523(a)(8)(A)(i)'s exclusion of a student loan from a debtor's discharge. But the Second Circuit's description of the record before the court below, including its observation that "[t]he district court noted that it is undisputed that O'Brien's loan was made through a program that in turn was funded by a nonprofit institution," does not amount to

62

controlling authority on the factual question of whether TERI is a bona fide nonprofit.  *O'Brien*, 419 F.3d at 106.  As this Court has observed, "[i]n *O'Brien*, the Second Circuit's conclusion was based on the 'undisputed' and 'uncontested' fact, as noted by the district court, that the loan at issue was made by a program funded at least in part by TERI, and the loan at issue was exempt from discharge pursuant to Bankruptcy Code Section 523(a)(8)(A)(i)."  *In re Golden*, 596 B.R. at 266 (citing *O'Brien*, 419 F.3d at 106-07).

Next, the decisions of courts within and outside this District and Circuit on a factual question that is disputed before this Court, by these parties, may well be informative and even persuasive – but those findings of fact are not controlling on parties who were not present there. Nor are they controlling on this Court.  This seems particularly warranted where the factual question of TERI's bona fide nonprofit status was not contested by the parties in many, and perhaps most, of those cases.  As one bankruptcy court thoughtfully observed, "[d]efendant is cautioned that a summary judgment in this case requires admissible evidence *in this case*.  The conclusions of other courts on the record then before them is interesting, but not dispositive." *Medina v. Nat'l Collegiate Student Loan Tr. 2*, 2020 WL 5553858, at *4 (Bankr. S.D. Cal. Mar. 10, 2020) (emphasis in original).  Instead, those courts made determinations and findings of fact based on the records before them, sometimes disputed, other times undisputed – and this Court is obliged to do the same.

Finally, it is worth noting that, in concluding that *O'Brien* does not foreclose this Court from considering the factual question of whether TERI is a bona fide nonprofit institution within the scope of Section 523(a)(8)(A)(i), this Court is not attempting "to evade *O'Brien*'s mandate." PHEAA Opp. at 35-36.  In *O'Brien*, the Second Circuit plainly held that a "guaranty" amounts to "funding" for purposes of Section's Section 523(a)(8)(A)(i)'s exclusion of a student loan from a

debtor's discharge, and that legal conclusion applies here. *O'Brien*, 419 F.3d at 107. But Ms. Golden and the Defendants disagree starkly on the factual question of whether TERI is a bona fide nonprofit, and they are entitled to their day in court on that factual dispute.

So, how should this Court proceed in considering whether, as a matter of fact, an entity is a bona fide or legitimate nonprofit institution? Some guidance may be gleaned from the First Circuit's decision in *Zimmerman v. Cambridge Credit Counseling Corp.* ("*Zimmerman I*"), 409 F.3d 473 (1st Cir. 2005), and subsequent decisions.

In *Zimmerman I*, the court considered whether a credit counseling firm was a nonprofit organization for purposes of the application of the federal Credit Repair Organizations Act ("CROA"), a remedial statute that "creates a cause of action for consumers harmed by the unscrupulous business and advertising practices on the part of credit repair organizations." *Zimmerman I*, 409 F.3d at 473-74.

First, that court noted that "a determination that an organization is not operating as a nonprofit for purposes of the CROA will not directly impact the organization's tax-exempt status under [Internal Revenue Code] section 501(c)(3)." *Zimmerman I*, 409 F.3d at 477. Next, the court found that "it is already common for courts and administrative agencies to examine whether an entity actually operates as a nonprofit, irrespective of its tax-exempt status." *Zimmerman I*, 409 F.3d at 478 (collecting cases). And finally, the court stated:

> In sum, to be excluded from the CROA . . . a credit repair organization must actually operate as a nonprofit organization *and* be exempt from taxation . . . Having reached this conclusion, we must identify the standard to be applied in deciding whether an entity satisfies the "nonprofit" component of the exclusion.

*Zimmerman I*, 409 F.3d at 478.

Turning to the question of what amounts to "nonprofit" entity status, the First Circuit looked to situations where "Congress left 'nonprofit' undefined in an exclusion from another

statutory scheme," and stated that "'nonprofit' status depended primarily on proof that the entity did 'not distribute profits to stockholders or others.'" *Zimmerman I*, 409 F.3d at 478 (quoting *Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir. 1981)). It also observed that "[t]his is consistent with the standard definition of the term: a nonprofit corporation is 'a corporation organized for some purpose other than making a profit.'" *Zimmerman I*, 409 F.3d at 478 (quoting Black's Law Dictionary at 367 (8th ed. 2003)). The court concluded that the plaintiffs sufficiently alleged "that Cambridge [Credit Counseling Corp. ("Cambridge")] was not, in fact operating as a nonprofit organization," vacated the underlying judgment of dismissal, and remanded the matter to the district court. *Zimmerman I*, 409 F.3d at 478-79.

The district court subsequently considered, on summary judgment, whether Cambridge was in fact operating as a nonprofit. *Zimmerman v. Cambridge Credit Counseling Corp.* ("*Zimmerman II*"), 529 F. Supp. 2d 254, 277-78 (D. Mass. 2008). Applying the First Circuit's test in *Zimmerman I*, the court first found that Cambridge was registered as a nonprofit organization under Section 501(c)(3). *Zimmerman II*, 529 F. Supp. 2d at 277.

The district court next considered whether Cambridge actually operated as a nonprofit organization, and found that the owners of Cambridge had arranged numerous non-arm's-length transactions between their for-profit entities and Cambridge, that Cambridge had, in substantial part, taken over the activities of those for-profit entities, that funds were comingled between Cambridge and the for-profit entities, and that Cambridge made payments to the owners' for-profit entities despite the absence of evidence that those for-profit entities provided goods or services to Cambridge. *Zimmerman II*, 529 F. Supp. 2d at 277-78. The district court also pointed to an IRS report "detailing the myriad ways in which [Cambridge]'s behavior was not

that of a nonprofit and recommending that its 501(c)(3) status be revoked." *Zimmerman II*, 529 F. Supp. 2d at 278.

The district court concluded that Cambridge "did not operate as a nonprofit organization because it disbursed profits to [its owners] through suspect transactions with their other, for-profit companies." *Id*. And this conclusion was echoed on review by the First Circuit, which found that "Cambridge was not exempt under CROA's provision for nonprofit organizations because it did not 'in fact and as a matter of law, operate as a nonprofit.'" *Zimmerman v. Puccio* ("*Zimmerman III*"), 613 F.3d 60, 68 (1st Cir. 2010) (quoting *Zimmerman II*, 529 F. Supp. 2d at 277)).

To similar effect, in *Town of Brookline v. Gorsuch,* the First Circuit considered whether a power plant was a nonprofit organization and therefore exempt from certain requirements of the Prevention of Significant Deterioration of Air Quality provisions of the Clean Air Act that "[do] not apply, . . . to 'new or modified facilities which are nonprofit health . . . institutions.'" *Brookline*, 667 F.2d at 219 (quoting 42 U.S.C. § 7479(1)).

The court found:

> What constitutes a nonprofit institution for these purposes would appear to depend on only the most general features identified with nonprofit institutions. The two principal features of nonprofit institutions are that they do not distribute profits to stockholders and, usually, that they are organized for limited purposes, although this second feature is becoming less common.

*Brookline*, 667 F.2d at 221 (citing Hansmann, The Role of Nonprofit Enterprise, 89 Yale L.J. 835, 838-40 (1980)). It also observed that nonprofit status did not turn on "whether a corporate entity exists or on how it might be classified" but rather "the nature of the institution" and, therefore, that it could "properly consider the nature of the owner institution as a factor in determining the nonprofit status of the facility." *Brookline*, 667 F.2d at 221.

To the same effect, in *McEwen v. National Rifle Association*, the court considered whether, under the federal Telephone Consumer Protection Act, a remedial statute that "provide[s] a bulwark against a tidal wave of telephone solicitations / telemarketing calls," the defendant there was a "'tax exempt nonprofit organization'" for purposes of exclusion from the statute's coverage. *McEwen*, 2021 WL 1414273, at *3-4 (quoting 47 U.S.C. § 227(a)(4)). The court concluded that by using the term "nonprofit organization," and not, for example, "a definition stating that 'nonprofit organization' means an organization determined by the Secretary of the Treasury to be an organization described in [Internal Revenue Code] section 501(c)," it would be necessary "for a finder of fact to determine whether the [defendant] is, in fact, a 'nonprofit organization'" for purposes of the application of the statute and its exclusions. *McEwen*, 2021 WL 1414273, at *5 (quotation marks omitted).

Some guidance as to how to address the question of the nonprofit status of an entity can also be gleaned from cases that interpret Bankruptcy Code Section 303(a) in the context of an entity's eligibility to be the subject of an involuntary bankruptcy petition. That section excepts an entity "that is not a moneyed, business, or commercial corporation" from those entities against whom an involuntary bankruptcy case may be commenced. 11 U.S.C. § 303(a).

In *Official Committee of Unsecured Creditors v. Archdiocese of St. Paul & Minneapolis* (*In re Archdiocese of St. Paul & Minneapolis*), 888 F.3d 944 (8th Cir. 2017), the court considered a request for substantive consolidation of the debtor and more than two hundred affiliated entities, including "187 parish corporations, several primary and secondary schools, the Catholic Community Foundation of Minnesota, the Francophone African and Gichitwaa Kateri Chaplaincies, Segrado Corizon de Jesus, the Newman Center and Chapel, The Catholic Cemeteries, and the Catholic Finance Corporation." *In re Archdiocese of St. Paul*, 888 F.3d at

948.  Specifically, the court considered whether the bankruptcy court correctly concluded that

the party seeking substantive consolidation did not plausibly negate the non-profit, non-debtor

status of those entities for purposes of eligibility to be an involuntary debtor under Section

303(a).  *In re Archdiocese of St. Paul*, 888 F.3d at 952-54.

      The court first found that the "plain and ordinary meaning" of Section 303(a)'s exclusion

was "the equivalent of 'non-profit' or 'not-for-profit' corporation."  *In re Archdiocese of St.*

*Paul*, 888 F.3d at 952.  The court also looked to the legislative history of Section 303(a), noting

that it specifically identified "'churches, schools, and charitable organizations'" as entities that

were "'*exempt from involuntary bankruptcy*.'"  *In re Archdiocese of St. Paul*, 888 F.3d at 952

(emphasis in original) (quoting S. Rep. No. 95-989, at 32 (1978)).  The court also looked to

Black's Law Dictionary and noted that the relevant definitions identified nonprofit entities as

"'[a] nonprofit corporation that is dedicated to benevolent purposes and thus entitled to special

tax status under the Internal Revenue Code.'"  *In re Archdiocese of St. Paul*, 888 F.3d at 952

(alteration in original) (quoting Black's Law Dictionary (10th ed. 2014)).  And the court noted

that "[t]here is no dispute as to the religious organization and non-profit status of the [non-debtor

entities] under Minnesota law."  *In re Archdiocese of St. Paul*, 888 F.3d at 953.  Finally, the

court "[left] for another day the issue of whether a non-profit non-debtor that is the alter ego,

under state law, of the debtor, or has been formed as part of a fraudulent scheme, such as a Ponzi

scheme, can be consolidated."  *In re Archdiocese of St. Paul*, 888 F.3d at 953.

      In *In re Yehud-Monosson USA, Inc.*, 458 B.R. 750 (B.A.P. 8th Cir. 2011), the court

similarly considered whether a corporation was eligible to be a debtor in an involuntary

bankruptcy case, and found that "the test for whether a debtor is a moneyed, business, or

commercial corporation is determined by a consideration of the classification of the corporation

by the state; the powers conferred upon it; and the character and extent of its main activities." *In re Yehud-Monosson USA, Inc.*, 458 B.R. at 755 (quotation marks omitted).

Other courts considering the question of eligibility to be an involuntary debtor agree that this kind of inquiry – the corporate form, the powers held, and the nature of the entity's activities – is not only appropriate, but necessary, to ascertain whether an entity is a nonprofit.  For example, in *In re MAEDC Mesa Ridge, LLC*, 334 B.R. 197 (Bankr. N.D. Tex. 2005), the court described a two-step inquiry:  "the first step . . . is to consider the nature and character of the corporation," as established by "'the powers and characteristics imposed upon it by the law of the state of its incorporation.'"  *In re MAEDC Mesa Ridge, LLC*, 334 B.R. at 200 (quoting *Gutrick v. Quinn* (*In re Grace Christian Ministries, Inc.*), 287 B.R. 352, 355 (Bankr. W.D. Pa. 2002)).

And "the next step . . . is to consider what activities the corporation actually performs. . . . This second step is required because courts have held that *state law organization or registration as [a] non-profit corporation is not decisive*."  *In re MAEDC Mesa Ridge, LLC*, 334 B.R. at 200 (alteration in original) (emphasis added).  As the court concluded, the entity must be "evaluated based upon the nature and character of its organization and the activity in which it actually engages."  *In re MAEDC Mesa Ridge, LLC*, 334 B.R. at 202.  *See, e.g.*, *In re Prudence Co.*, 79 F.2d 77, 79 (2d Cir. 1935) (rejecting the argument that an entity was a "banking corporation" solely because it was incorporated under state banking law).

And finally, the Court notes that guidance on the question of whether separate entities are functioning, in substance, as a single organization may be gleaned from decisions addressing whether to pierce the corporate veil.  As one example, in *Zimmerman III*, the court observed that in *Zimmerman II*, the district court found that the owners of Cambridge betrayed their clients'

69

trust when Cambridge transferred their accounts after their creation, thereby "misleading consumers into thinking they were doing business with a non-profit corporation, when, in fact, their accounts were being wholly serviced by a for-profit." *Zimmerman III*, 613 F.3d at 73 (citing *Zimmerman II*, 529 F. Supp. 2d at 279-80).

And in *Freeman v. Complex Computing Co.*, 119 F.3d 1044 (2d Cir. 1997), the Second Circuit identified several factors to be considered in determining whether one entity has complete control over another, as follows:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*Freeman*, 119 F.3d at 1053 (citing *William Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991)).

So, in order to meet her burden to show that TERI is not a bona fide nonprofit for purposes of Section 523(a)(8)(A)(i), what must Ms. Golden establish? Here, as in other cases, including *Zimmerman I*, the Court's analysis in interpreting the meaning of this statute "begins with the language of the statute" – and notably, the statute does not define "nonprofit." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (quotation marks omitted). And the First Circuit's analysis in *Zimmerman I* provides a helpful framework for considering this question – but it is not the end of this Court's inquiry. While in *Zimmerman I*, the statute at issue "limit[ed] the excluded group [of all nonprofit organizations] to a smaller group of nonprofit organizations 'which are tax-exempt under section 501(c)(3),'" here, that limiting criterion is missing. *Zimmerman I*, 409 F.3d at 475. That is, Bankruptcy Code Section 523(a)(8)(A)(i) states neither

more nor less than that the entity at issue be a "nonprofit," without reference to the entity's tax-exempt status under Internal Revenue Code Section 501(c)(3).

In *Zimmerman I*, the court established a two-part test to determine whether an entity was a nonprofit entity under the CROA, and found that "a credit repair organization must actually [(1)] operate as a nonprofit organization *and* [(2)] be exempt from taxation under section 501(c)(3)." *Zimmerman I*, 409 F.3d at 478.

Other courts have recognized this distinction.  For example, in *FTC v. Financial Education Services*, 2023 WL 8101841 (E.D. Mich. Nov. 21, 2023), the district court noted, in the context of a motion to dismiss, that:

> [The plaintiff] is not challenging [the defendant's] section 501(c)(3) tax-exempt status [but] exclusively contests whether [the defendant] "actually operates as a nonprofit organization" . . . [and] may ultimately show that [the defendant] does in fact operate as a for-profit business . . . without ever challenging its section 501(c)(3) designation.

*Fin. Educ. Servs.*, 2023 WL 8101841, at *4.  *See Medina*, 2020 WL 5553858, at *4 (holding that "tax exempt status does not on its own establish nonprofit for the purposes of § 523(a)(8)(i)").

Here, in the context of Bankruptcy Code Section 523(a)(8)(A)(i), this Court follows the path traced by the more general initial criterion set forth in *Zimmerman I* – whether the entity at issue operates, in substance, as a nonprofit organization.  To be sure, tax-exempt status under Section 501(c)(3) is a valuable piece of information, and it is hard to conceive of circumstances where an entity would meet Section 523(a)(8)(A)(i)'s standards in the absence of this status.  But while that tax-exempt status may well be necessary for a finding of nonprofit status for purposes of Section 523(a)(8), it is simply not sufficient if the entity did not "actually operate as a nonprofit" entity.  *Zimmerman I*, 409 F.3d at 478.

So, to determine whether an entity "actually operates as a nonprofit organization," the Court considers the following non-exhaustive list of factors:

(1)      whether the entity distributes profits to shareholders or others, *Brookline*, 667 F.2d at 221; *Zimmerman II*, 529 F. Supp. 2d at 277-78;

(2)      whether, if the entity is a subsidiary or affiliate to another entity, the parent or affiliate entity is a for-profit entity, *Brookline*, 667 F.2d at 221;

(3)      whether, and to what extent, if the entity is a subsidiary or affiliate of another entity that is for-profit, the operations at issue are carried out by the subsidiary or by the owner or affiliate entity, *see, e.g.*, *Zimmerman III*, 613 F.3d at 73; *Freeman*, 119 F.3d at 1052-53; *Brookline*, 667 F.2d at 221; *Zimmerman II*, 529 F. Supp. 2d at 277-78; and

(4)      whether the entity is registered as a tax-exempt entity under Section 501(c)(3) of the Internal Revenue Code, *Zimmerman I*, 409 F.3d at 478; *Zimmerman II*, 529 F. Supp. 2d at 277-78.

And in order to establish that she is entitled to preliminary injunctive relief, Ms. Golden must establish a likelihood of success on the merits as to this aspect of her claim, or at a minimum, that there are "'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in [her] favor.'" *Benihana*, 784 F.3d at 895 (quoting *Salinger*, 607 F.3d at 79-80). The Court considers these factors in turn.

<u>Whether Ms. Golden has shown a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation, as to whether TERI distributes profits to shareholders or others.</u>  The Court first considers whether Ms. Golden has shown that TERI distributed profits to shareholders or others.

Ms. Golden argues that TERI distributed profits to First Marblehead, and indeed, that "providing a commercial and private benefit to [First Marblehead] was not only a 'substantial purpose' of TERI, but was *the* overwhelming purpose after its takeover by [First Marblehead]." Summ. J. Mot. at 2, 30. She also points to evidence including the testimony of Richard Neely, who testified at his deposition that student loan asset-backed securitization was a "primary source of revenue" for First Marblehead, and that TERI's guaranty was important to the securitization process. Summ. J. Mot. at 9-10; Carpinello Decl. Exh. K (Deposition of Richard Neely) at 98:15-99:7.

She also points to the testimony of John Hupalo, Senior Executive Vice President and Chief Financial Officer of First Marblehead, who testified, in substance, that the volume of loans that could be securitized was a primary or highly important factor in First Marblehead's profitability and, historically, was First Marblehead's sole source of financing, and that TERI's guarantees were an integral part of it. *See* Summ. J. Mot. at 9-10; Carpinello Decl. Exh. L (Deposition of John Hupalo) at 32:23-33:3, 34:22-36:15. In addition, she notes, Mr. Hupalo testified that First Marblehead "securitized almost 100 percent TERI guaranty loans." Summ. J. Mot. at 1; Carpinello Decl. Exh. L (Deposition of John Hupalo) at 35:10-16.

In response, the Defendants assert that the relationship between TERI and First Marblehead is simply not relevant to the question of whether TERI is a bona fide nonprofit institution for purposes of determining the dischargeability of Ms. Golden's education debt. As PHEAA states, "[w]hether TERI was an honorable not-for-profit institution . . . is irrelevant to the issue under Section 523(a)(8)(A)(1)"). PHEAA Summ. J. Opp. at 40. Instead, they argue, TERI always maintained its status as a Section 501(c)(3) tax-exempt entity, and that should be the end of the inquiry. *Id*. That is, as PHEAA notes, "the only requirement was that TERI be a

501(c)(3) entity. . . . [And] it is undisputed that TERI maintained (and indeed never lost) its status as a not-for-profit institution at all relevant times." *Id.*

Here, the record shows that there are sufficient business contacts, and sufficiently regular and substantial financial relationships, between TERI and First Marblehead to create, at a minimum, sufficiently serious questions going to the merits to make them a fair ground for litigation, as to whether, in substance, TERI distributed profits to its shareholder, namely, First Marblehead. These include the uncontroverted testimony that TERI was a key component of First Marblehead's student loan securitization business, and that the guaranty that it provided was important to that business activity. These also include the uncontroverted testimony that First Marblehead "securitized almost 100 percent TERI guaranty loans." Summ. J. Mot. at 1; Carpinello Decl. Exh. L (Deposition of John Hupalo) at 35:10-16.

Accordingly, the Court finds and concludes that Ms. Golden has shown a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation, as to whether TERI distributes profits to shareholders or others, and specifically whether, in substance, TERI distributed profits to First Marblehead, its parent entity.

<u>Whether Ms. Golden has shown a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation, as to whether TERI's parent, First Marblehead, is a for-profit entity.</u> The Court next considers whether Ms. Golden has shown that TERI's parent, First Marblehead, is a for-profit entity.

Ms. Golden argues that TERI was taken over by First Marblehead in 2001, and that First Marblehead is a for-profit entity. Summ. J. Mot. at 2, 7. In addition, she argues that TERI is controlled by First Marblehead, has transferred its employees to a First Marblehead subsidiary, and makes an annual payment to First Marblehead to cover their salaries. Summ. J. Mot. at 2,

8-10; Carpinello Decl. Exh. M at 12-13.  Additionally, she points to evidence that TERI moved its offices to the same building that houses First Marblehead Education Resources, a First Marblehead entity, including the testimony of Richard Neely that after TERI moved in 2003, it was located on the same floor of the same office building as First Marblehead Education Resources.  Summ. J. Mot. at 9; Carpinello Decl. Exh. K (Deposition of Richard Neely) at 35:9-37:4; 38:10-39:18.  And she asserts that First Marblehead was in a precarious financial situation prior to its acquisition of TERI in 2001, and that this was resolved when First Marblehead began to market securitized education loans guaranteed by TERI.  Summ. J. Mot. at 9-10.  She points to the testimony of Richard Neely and John Hupalo to the effect that "First Marblehead's profitability depend[ed] . . . on the securitization of the[] loans" guaranteed by TERI.  Carpinello Decl. Exh. K (Deposition of Richard Neely) at 97:13-17; 99:8-11, Exh. L (Deposition of John Hupalo) at 32:23-33:3.

In response, the Defendants do not dispute that First Marblehead is a for-profit entity, and, in substance, assert that the relationship between TERI and First Marblehead is not relevant here.  *See* PHEAA Summ. J. Opp. at 40 (arguing that "[w]hether TERI was an honorable not-for-profit institution . . . is irrelevant to the issue under Section 523(a)(8)(A)(1)").

Here, the record shows that First Marblehead is a for-profit entity.  Indeed, it appears from the record that the question of whether First Marblehead is a for-profit entity is not disputed by Ms. Golden and the Defendants.

Accordingly, the Court finds and concludes that Ms. Golden has shown a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation, as to whether TERI's parent entity, First Marblehead, is a for-profit entity.

<u>Whether Ms. Golden has shown a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation, as to whether TERI's operations are carried out by First Marblehead.</u>  The third factor that the Court considers is whether Ms. Golden has shown that TERI's operations are carried out by its parent, First Marblehead.

Here again, Ms. Golden argues that TERI was taken over by First Marblehead in 2001, is controlled by First Marblehead, has transferred its employees to a First Marblehead subsidiary, and makes an annual payment to First Marblehead to cover their salaries.  Summ. J. Mot. at 2, 8-10.  She also argues that TERI has operated primarily to assist First Marblehead's business, devoted its assets and personnel to do so, transferred assets and personnel between the entities, transferred funds between themselves to reimburse various functions and salaries, and shared office space.  Summ. J. Mot. at 2, 7-11.

In particular, she asserts that TERI ceded virtually all of its assets and control to First Marblehead, and that between 2002 and 2008, it paid First Marblehead Education Resources substantial sums to reimburse it for undertaking several functions on its behalf, including originating education loans.  Summ. J. Mot. at 9-11.  And she points to Richard Neely's testimony that TERI sold or outsourced to First Marblehead "all of its origination staff support and administrative functions," "its operating divisions" performing both loan underwriting and originating, its "marketing personnel," and "its claims management personnel," and that "TERI reimbursed [First Marblehead Education Resources] for . . . administer[ing] the day-to-day operations of TERI."  Carpinello Decl. Exh. K (Deposition of Richard Neely) at 83:9-84:10, 88:10-13.

In response, and here again, the Defendants assert, in substance, that the relationship between TERI and its parent First Marblehead is not relevant to the question of whether TERI is a bona fide nonprofit institution for purposes of Bankruptcy Code Section 523(a)(8)(A)(i).

Here, the record shows that there are several indicators that support the conclusion that TERI does not function independently from its parent, First Marblehead. These indicators include the asserted transfer of TERI's personnel, assets, and daily operations from TERI to First Marblehead or an affiliate. They also include business contacts and regular and substantial financial relationships between TERI and First Marblehead. Taken together, these create, at a minimum, sufficiently serious questions going to the merits to make them a fair ground for litigation, as to the question of whether, and to what extent, TERI's operations are carried out by First Marblehead.

Accordingly, the Court finds and concludes that Ms. Golden has shown a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation, as to whether TERI's operations are carried out by First Marblehead.

<u>Whether Ms. Golden has shown a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation, as to whether TERI is registered as a tax-exempt entity under Section 501(c)(3).</u> Finally, the Court considers the question of whether TERI is a registered tax-exempt entity under Section 501(c)(3).

Here, the record shows that the parties are in accord. That is, Ms. Golden does not dispute that TERI is registered as a tax-exempt entity under Section 501(c)(3). Summ. J. Mot. at 23. The Defendants concur. PHEAA Opp. at 6. This is also consistent with the record. *See, e.g.*, Carpinello Decl. Exh. K (Deposition of Richard Neely) at 32:15-17.

Accordingly, the Court finds and concludes that the record shows that TERI is registered as a tax-exempt entity under Section 501(c)(3).

*      *      *

In sum, and based on the entire record, the Court finds and concludes that four factors merit consideration in assessing the factual question of whether TERI is a bona fide nonprofit institution for purposes of Bankruptcy Code Section 523(a)(8)(A)(i).  This is because the Court must consider the *substance* of TERI's operations, and not just the label or *form* that it adopts. Those four factors are (1) whether the assertedly nonprofit entity distributes profits to shareholders or others; (2) whether, if the entity is a subsidiary or affiliate of another entity, that other entity is a for-profit entity; (3) whether, and to what extent, if that other entity is a for-profit entity, the operations at issue are carried out by the for-profit entity; and (4) whether the entity is registered as a tax-exempt entity under Section 501(c)(3).

And here, the record shows that two of these factors are undisputed:  Ms. Golden and the Defendants do not dispute that TERI is a subsidiary or affiliate of First Marblehead, a for-profit entity.  Nor do they dispute that TERI is registered as a tax-exempt entity under Section 501(c)(3).

But the parties do not agree as to whether the relationship between TERI and First Marblehead has any bearing on the question of whether TERI is a bona fide nonprofit institution. This Court finds and concludes that the relationship between TERI and First Marblehead is relevant to whether TERI is a bona fide nonprofit institution, in at least two ways:  whether TERI distributes profits to First Marblehead or an affiliate, and whether TERI's operations are, in substance, carried out by First Marblehead.

And as to these two factors, the Court finds and concludes that Ms. Golden has shown "a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation." *Benihana, Inc.*, 784 F.3d at 895 (omission in original) (quoting *Salinger*, 607 F.3d at 79-80).

<u>Whether Ms. Golden Has Shown a Likelihood of Success on the Merits, or Sufficiently Serious Questions Going to the Merits To Make Them a Fair Ground for Litigation, as to Her Assertion that the NCT Loan Exceeded the Cost of Attendance</u>

Ms. Golden argues that the NCT Loan does not qualify as a nondischargeable student loan under Bankruptcy Code Section 523(a)(8)(A)(i) because it exceeded her "cost of attendance," as that term is defined in Internal Revenue Code Section 221(d)(2). Prelim. Inj. Mem. at 2. And because it exceeded her cost of attendance, she states, it "is therefore dischargeable" and does "not come within the terms of § 523(a)(8)." Prelim. Inj. Mem. at 3, 5.

In particular, Ms. Golden asserts that the NCT Loan "indisputably" exceeded her cost of attendance at Penn Law because, even using the Defendants' figures, her cost of attendance for the 2006-2007 school year was $56,380, and she was approved for loans and grants in the amount of $55,280 before she applied for the NCT loan. Reply at 5 (citing PHEAA Opp. at 24). Thus, there remained "a balance of $1,100 that a creditor could lend to Ms. Golden and still be in the cost of attendance, *as defined by Defendants*." Reply at 6 (emphasis in original). As a result, she states, the majority of the $7,300 NCT Loan exceeded the cost of attendance. Reply at 6. She also notes that PHEAA has acknowledged that Penn Law did not certify this loan as within the cost of attendance. *Id.*

The Defendants respond, in substance, that the NCT loan "is nondischargeable pursuant to Section 523(a)(8)(B) because it did not exceed [Ms. Golden's] cost of attendance at [Penn

Law] for the 2006-07 academic year." Defendants' Joint Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction, ECF No. 306 at 14. *See* PHEAA Opp. at 36-37.

To determine whether the NCT Loan exceeded Ms. Golden's "cost of attendance," the Court considers three different figures: the NCT Loan, the "cost of attendance," and the amount of Ms. Golden's other loans and grants.

First, the Court considers the amount of the NCT Loan. And here, the record shows that Ms. Golden and PHEAA agree that the amount of the NCT Loan is $7,103. *See* Prelim. Inj. Mem. at 3 (stating that Ms. Golden "received a private loan of $7,103 from Bank One on or about September 28, 2006"); PHEAA Opp. at 5 (stating that "Ms. Golden borrowed [the $7,103.83 NCT Loan] from JPMorgan Chase, formerly Bank One"). This figure is also reflected in the record. Declaration of Tashanna Golden, ECF No. 247 at ¶ 4; Declaration of H. Peter Haveles, Jr. in Opposition to Plaintiff's Motion for a Temporary Restraining Order, ECF No. 565, Exh. 4. Accordingly, the Court finds that the amount of the NCT Loan is $7,103.

Next, the Court assesses the applicable "cost of attendance." Here, the parties point to different figures. Ms. Golden states that the "published cost of attendance" at Penn Law for the 2006-2007 academic year was $48,464, based upon "the amount UPenn reported to IPEDS." Reply at 5 n.2.

And PHEAA asserts that "[a]ccording to the University of Pennsylvania, the cost of attendance for the 2006-2007 academic year was $56,380." PHEAA Opp. at 37. It derives this figure from Penn Law's website, which estimated a "Total Budget" – a term that, PHEAA argues, Penn Law uses "as a synonym for the cost of attendance" for students in the 2006-2007 school year of $56,380. Declaration of H. Peter Haveles, Jr. on Behalf of Pennsylvania Higher Education Assistance Agency, ECF No. 343, Exh. 13.

As the Court has previously found:

> "[C]ost of attendance" is not a description of an individual student's personal cost of completing a year of education. Rather, as the court explained in *In re Conti*, "20 U.S.C. § 1087*ll* lists a series of expenses that comprise the 'cost of attendance,' including sums for tuition & fees, room & board, books, materials, supplies, transportation, and 'miscellaneous personal expenses' for enrolled students, in amounts determined by the university."

*Homaidan v. Navient Solns., LLC* (*In re Homaidan*), 646 B.R. 550, 589 (Bankr. E.D.N.Y. 2022)

(quoting *Conti v. Arrowood Indemnity Co.* (*In re Conti*), 982 F.3d 445, 448 (6th Cir. 2020)).

To the same effect, this Court has observed that "cost of attendance" does not account for all possible expenses by the student, but rather consists of "the 'amounts determined by the university' based on specified criteria including tuition and fees, room and board, 'books, materials, supplies, transportation, and "miscellaneous personal expenses"' [which] are 'determined by the university' and reported on the IPEDS data system." *In re Homaidan*, 650 B.R. at 417.

And so here. That is, the appropriate figure for "cost of attendance" is not a particular student's likely "total budget," but the amount that is determined by the university based on the relevant criteria and reported on the IPEDS data system. Accordingly, the Court finds that the "cost of attendance" is $48,464.

Third, the Court determines the amount of the other loans and grants received by Ms. Golden for the 2006-2007 academic year. As to grants, Ms. Golden states that she received $19,440 in grants and scholarships from Penn Law. Reply at 5. And PHEAA agrees with this $19,440 figure. PHEAA Opp. at 5.

And as to other loans, Ms. Golden itemizes $24,500 in federal government loans for the 2006-2007 school year, and a private loan of $11,340 from Citibank (the "Private Loan"), totaling $35,840. Reply at 5. Specifically, as set forth in her Reply:

> [D]uring the 2006-2007 academic year, Ms. Golden received the following financial aid:
>
> • $6,000 in federal Perkin Loans ($3,000 per semester)
> • A grant of $19,440 ($9,720 per semester)
> • A federal Stafford Subsidized Loan of $8,500 ($4,250 per semester)
> • A federal unsubsidized Stafford Loan of $10,000 ($5,000 per semester)
> • A private loan from Citibank in the amount of $11,340 ($5,670 per semester)

Reply at 5, citing Reply Declaration of George F. Carpinello ("Carpinello Reply Decl."), dated Feb. 5, 2021, ECF No. 373, at ¶ 2; Carpinello Reply Decl. at Exh. A (Deposition of Elaine Varas) at 141:21-151:24; 154:14-155:24.

Accordingly, the Court finds that Ms. Golden's other loans and grants total $35,840 in other loans and $19,440 in grants and scholarships, for a total of $55,280 in grants, scholarships, and other loans for the 2006-2007 school year.

In sum, when measured against the $48,464 "cost of attendance" as reported to IPEDS, it is plain that a private education loan in *any* amount, taken together with Ms. Golden's grants, scholarships, and other loans, exceeded the cost of attendance. And as Ms. Golden notes, even using the "cost of attendance" urged by PHEAA of $56,380, it remains plain that the NCT Loan exceeded Ms. Golden's "cost of attendance" by a wide margin.

For these reasons, the Court finds and concludes that as to the question of whether the NCT Loan exceeded the cost of attendance, Ms. Golden has shown "a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation." *Benihana, Inc.*, 784 F.3d at 895 (omission in original) (quoting *Salinger*, 607 F.3d at 79-80).

<u>Whether Ms. Golden Has Shown a Likelihood of Success on the Merits, or Sufficiently Serious Questions Going to the Merits To Make Them a Fair Ground for Litigation, as to Her Assertion that the NCT Loan Was Not "Funded" by a Governmental Unit or Nonprofit Institution as a Consequence of the TERI Guaranty</u>

Ms. Golden argues that, even if TERI is a nonprofit institution within the scope of Section 523(a)(8)(A)(i), the NCT Loan is nevertheless within the scope of Ms. Golden's bankruptcy discharge because TERI has not "funded any of the loans that are the subject of the litigation" because TERI did no more than provide a guarantee.  Prelim. Inj. Mem. at 13.

The Defendants respond that in *O'Brien*, the Second Circuit held that programs guaranteed by nonprofit institutions are, as a matter of law, "funded" by those entities within the meaning of the statute.  PHEAA Opp. at 33 (quoting *O'Brien*, 419 F.3d at 107); Trust Defs. Opp. at 15-16 (citing *O'Brien*, 419 F.3d at 106-07).  And PHEAA states, "[t]he Second Circuit rejected plaintiff's argument that a TERI guaranty is not 'funding' and concluded the TERI guaranty constituted funding of the program because 'TERI was clearly devoting some of its financial resources to supporting the program.'"  PHEAA Opp. at 33.  Other courts have similarly concluded, as a matter of law, that a guaranty amounts to funding for purposes of Bankruptcy Code Section 523(a)(8)(A)(i).  *See, e.g.*, *Andrews Univ. v. Merchant* (*In re Merchant*), 958 F.2d 738, 740 (6th Cir. 1992) (finding that a university's loan guaranty amounted to funding for purposes of dischargeability under Section 523(a)(8)(A)(i)).

Here, the record shows that the legal question of whether a guaranty amounts to "funding" for purposes of the dischargeability of an education loan under Bankruptcy Code Section 523(a)(8)(A)(i) has been addressed by the Second Circuit in *O'Brien*.  And there, the Second Circuit concluded that courts should look to whether the nonprofit or governmental unit made "any meaningful contribution" to the program to satisfy Section 523(a)(8)(A)(i).  *In re O'Brien*, 419 F.3d at 105.

The Second Circuit also found that it was sufficient, for purposes of Section 523(a)(8)(A)(i), for the nonprofit entity to have guaranteed loans in the program under which the debtor's loan was made, because the nonprofit "was clearly devoting some of its financial resources to supporting the program." *In re O'Brien*, 419 F.3d at 106. As a recent decision in this District noted, "[o]ther courts around the country have accepted a broad range of evidence to establish that a particular loan was made under a program funded in whole or in part by a non-profit or governmental unit." *In re Mazloom*, 648 B.R. at 9.

And here, the record also shows that TERI guaranteed the program under which the NCT Loan was made, and indeed, Ms. Golden and the Defendants do not dispute the existence of the TERI guaranty. Summ. J. Mot. at 8-9. They do, of course, dispute whether TERI is a bona fide nonprofit institution – but that is a different question, and a question of fact.

For these reasons, the Court finds and concludes that as to the legal question of whether the guaranty by TERI of the NCT Loan does not amount to "funding" of that loan for purposes of Bankruptcy Code Section 523(a)(8)(A)(i), Ms. Golden has not shown "a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation." *Benihana, Inc.*, 784 F.3d at 895 (omission in original) (quoting *Salinger*, 607 F.3d at 79-80).

Whether Ms. Golden Has Shown that the Balance of Hardships Tips Decidedly in Her Favor

One more question must be addressed in the context of the first requirement for preliminary injunctive relief. To the extent that Ms. Golden has established "'sufficiently serious questions going to the merits to make them a fair ground for litigation,'" but not a likelihood of success on the merits, she must also demonstrate that "'a balance of hardships [tips] decidedly in [her] favor.'" *Benihana*, 784 F.3d at 895 (quoting *Salinger*, 607 F.3d at 79)).

84

Ms. Golden argues that the balance of hardships tips decidedly in her favor because, among other reasons, she may be subject to collection efforts on loans that have been discharged in her bankruptcy case. She argues that the hardships that stem from such collection efforts are "'not just about money'" but rather "'about the hardships and burdens that impair a debtor's efforts to achieve the "fresh start" that is the centerpiece of the bankruptcy system.'" Prelim. Inj. Mem. at 10 (quoting *In re Homaidan*, 640 B.R. at 851).

And Ms. Golden argues that, as this Court found in *In re Homaidan*, the collection of a discharged debt violates the primary purpose of the Bankruptcy Code, which is to ensure a fresh start free from the collection of discharged debts. Reply at 15 (citing *In re Homaidan*, 640 B.R. at 855-56). And she notes that the Defendants have no valid or legitimate interest in collecting on such debts. *Id*.

The Defendants respond that in fact, Ms. Golden will not suffer any hardship in the absence of preliminary injunctive relief, for several reasons. They note that she has not been subject to collection efforts on the loans at issue, and indeed, has elected to make voluntary payments on her loans. *See* PHEAA Opp. at 53; Firstmark Opp. at 21 (arguing that "a putative class member who has been voluntarily continuing to make post-discharge payments . . . has not suffered, and is not at risk of suffering, irreparable harm"); Trust Defs. Opp. at 24-25 (stating that Ms. Golden "is not subject to any collection [and] faces no risk of any harm, let alone irreparable harm"). They also argue that "there is no evidence that PHEAA engaged in any behavior to collect money on the loans held by Ms. Golden or any putative class members, let alone any 'harassing' behavior." PHEAA Opp. at 53. *See* Firstmark Opp. at 18 (averring that Ms. Golden "has not identified any cognizable harm she has suffered during the past six years or will likely suffer in the absence of a TRO [and] does not (and cannot) adduce any evidence that

Firstmark is engaging in any 'collection' against her that the Court could enjoin"); Trust Defs. Opp. at 24 (arguing that Ms. Golden "has not been subject to any collection efforts whatsoever on her loans in the 2016-A Trust. And, she has chosen to voluntarily continue making payments on her loan in the 2006-4 Trust. Thus, Plaintiff faces absolutely no risk of being subjected to collection on her allegedly discharged loans").

Here, the record shows that, as this Court found in *In re Homaidan*, the collection of a discharged debt, or even the collection of a debt as to which there are "sufficiently serious questions" going to the question of dischargeability "to make them a fair ground for litigation," is "not just about money." *In re Homaidan*, 640 B.R. at 845. It is, instead, "about the hardships and burdens that impair a debtor's efforts to achieve the 'fresh start' that is the centerpiece of the bankruptcy system." *In re Homaidan*, 640 B.R. at 851. And these hardships weigh far more heavily upon the borrower who has succeeded in gaining a bankruptcy discharge of her dischargeable debt than they do on the servicer or lender that may be collecting on a discharged debt.

For these reasons, the Court finds and concludes that to the extent that Ms. Golden has established "'sufficiently serious questions going to the merits to make them a fair ground for litigation,'" but not a likelihood of success on the merits, she has shown that "'a balance of hardships [tips] decidedly in [her] favor.'" *Benihana*, 784 F.3d at 895 (quoting *Salinger*, 607 F.3d at 79)).

*          *          *

For these reasons, and based on the entire record, the Court concludes that Ms. Golden, on behalf of herself and the putative class members, has shown a likelihood of success on the merits of her request for a declaratory judgment and ancillary injunctive relief with respect to the

NCT Loan.

That is, Ms. Golden has shown a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation, that the NCT Loan does not meet the nondischargeability requirements of Bankruptcy Code Section 523(a)(8), and is therefore within the scope of her bankruptcy discharge. To the extent that she has shown sufficiently serious questions going to the merits to make them a fair ground for litigation, but not a likelihood of success on the merits, she has shown that a balance of hardships tips decidedly in favor of herself and the putative class members.

### _Whether Ms. Golden Has Shown a Likelihood of Success on the Merits, or Sufficiently Serious Questions Going to the Merits To Make Them a Fair Ground for Litigation, as to the Bar Loan_

The Court next considers whether Ms. Golden has established a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation, on her request for a declaratory judgment and ancillary injunctive relief that the Bar Loan is within the scope of her bankruptcy discharge.

Here, as with the NCT Loan, the Court first considers whether Ms. Golden has established a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation. And next, the Court considers whether, to the extent that Ms. Golden has established "'sufficiently serious questions going to the merits to make them a fair ground for litigation,'" but not a likelihood of success on the merits, she has established that the balance of hardships tips decidedly in her favor." _Benihana_, 784 F.3d at 895 (quoting _Salinger_, 607 F.3d at 79).

The starting point for this inquiry is the nature of the Bar Loan. Unlike the NCT Loan, the Bar Loan is a private loan that does not involve a nonprofit or governmental entity. That is, here the record does not show, or even suggest, that the Bar Loan is excluded from Ms. Golden's

bankruptcy discharge under Section 523(a)(8)(A)(i) because it was "funded, in whole or in part," through a guaranty by a nonprofit institution.  Accordingly, Bankruptcy Code Section 523(a)(8)(A)(i) is not at issue here.

Nor is the question of dischargeability under Section 523(a)(8)(A)(ii) at issue here.  That Section addresses "funds received as an educational benefit, scholarship, or stipend."  As the Second Circuit has explained, Section 523(a)(8)(A)(ii) does not have a role to play in the analysis of the dischargeability of private student loans made to cover expenses incurred while – or after – attending eligible Title IV institutions, because "by constructing a statute with three distinct subsections, 'Congress intended each [one] to have a distinct function and to target different kinds of debt[].'"  *Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595, 603 (2d Cir. 2021) (alterations in original) (quoting *Inst. of Imaginal Stud. v. Christoff* (*In re Christoff*), 527 B.R. 624, 634 (9th Cir. B.A.P. 2015) (finding that private student loans do not qualify for an exclusion from discharge under Section 523(a)(8)(A)(ii), because these loans are not an "educational benefit" under that Section)).  As the Second Circuit has also found, "'[e]ducational benefit' is therefore best read to refer to conditional grant payments similar to scholarships and stipends." *Homaidan*, 3 F.4th at 605.  As a private loan, the Bar Loan is not a conditional grant, a scholarship, or a stipend, and therefore does not come within the scope of Section 523(a)(8)(A)(ii).

As a consequence, the Bar Loan will be excluded from the scope of Ms. Golden's bankruptcy discharge as a nondischargeable debt only if it is a "qualified education loan" under Bankruptcy Code Section 523(a)(8)(B), which incorporates Internal Revenue Code Section 221(d)(1).

"Establishing the contours of [Section 528(a)(8)(B)] first requires delving into a nesting

doll of statutory definitions." *In re Mazloom*, 648 B.R. at 11.  Specifically, the Bankruptcy Code

provides that an educational loan may be excepted from discharge if it is "a qualified education

loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor

who is an individual."  11 U.S.C. § 523(a)(8)(B).

In turn, the Internal Revenue Code states:

> The term "qualified education loan" means any indebtedness incurred by the taxpayer solely to pay qualified higher education expenses –
>
> (A)    which are incurred on behalf of the taxpayer, the taxpayer's spouse, or any dependent of the taxpayer as of the time the indebtedness was incurred,
> (B)    which are paid or incurred within a reasonable period of time before or after the indebtedness is incurred, and
> (C)    which are attributable to education furnished during a period during which the recipient was an eligible student.

26 U.S.C. § 221(d)(1)(A)-(C).

The definition of "qualified higher education expenses" refers to the "cost of attendance

. . . at an eligible educational institution" as defined in Section 1087*ll* of the Higher Education

Act, less "the amount excluded from gross income under section 127, 135, 529, or 530 by reason

of such expenses" and "the amount of any scholarship, allowance, or payment described in

section 25A(g)(2)."  26 U.S.C. § 221(d)(2).  And Section 1087*ll* of the Higher Education Act

lists a number of costs comprising the "cost of attendance," including tuition, fees, books, and

room and board in amounts as determined by the institution.  20 U.S.C. § 1087*ll*.[1]

---

[1]  Section 1087*ll*, as amended in 2022, codified as of July 1, 2024, and presently in effect, also includes in the "cost of attendance," "for a student in a program requiring professional licensure, certification, or a first professional credential, the cost of obtaining the license, certification, or first professional credential."  20 U.S.C. § 1087*ll*(a)(13)(2024).  But this is not relevant here, because the Internal Revenue Code defines "cost of attendance" by reference to "section 472 of the Higher Education Act of 1965, 20 U.S.C. 1087*ll*, *as in effect on the day before the date of the enactment of the Taxpayer Relief Act of 1997*."  26 U.S.C. § 221(d)(2) (emphasis added).  That version of Section 472 did not include subsection 13.  Even if that provision were applicable here, it includes this cost as part of the "cost of attendance" "*at the option of the institution*" and for a cost "*as determined by the institution*."  20 U.S.C. § 1087*ll*(13) (emphasis added).  And

The statute also includes in the "cost of attendance," "at the option of the institution, for a student in a program requiring professional licensure or certification, the one-time cost of obtaining the first professional credentials (as determined by the institution)." 20 U.S.C. § 1087*ll*(13).

Finally, an "eligible student," as defined in Internal Revenue Code Section 25A(b)(3), is one who "is carrying at least ½ the normal full-time workload for the course of study the student is pursuing." 26 U.S.C. § 25A(b)(3)(B). And an "eligible educational institution" must be "eligible to participate in a program under title IV" of the Higher Education Act. 26 U.S.C. § 25A(f)(2). Therefore, the Court turns to the question of whether Ms. Golden's Bar Loan is a "qualified education loan" under Section 523(a)(8)(B).

<u>Whether Ms. Golden Has Shown a Likelihood of Success on the Merits, or Sufficiently Serious Questions Going to the Merits To Make Them a Fair Ground for Litigation, as to Her Assertion that the Bar Loan Is Not a "Qualified Education Loan"</u>

Ms. Golden's argument as to the Bar Loan begins with the plain terms of the statute. She states that she entered into the Bar Loan to cover her living expenses "*after* [she] attended a Title IV institution," that is, Penn Law. Prelim. Inj. Mem. at 5 (emphasis in original). Accordingly, she argues, the Bar Loan is "not a qualified education loan as defined in § 221(d)(1) of the Internal Revenue Code because it was not incurred to pay the cost of attendance at a Title IV institution." Prelim. Inj. Mem. 3. For these reasons, Ms. Golden concludes, the Bar Loan "does not come within the terms of § 523(a)(8)(B) and is fully dischargeable." *Id.*

Firstmark, as the servicer of the Bar Loan, responds that Ms. Golden cannot show that she has a likelihood of success on the merits of her claim, because she has not addressed whether

---

here, the record shows that Penn Law did not include or determine that cost, or certify the Bar Loan.

the Bar Loan was made under a program funded in whole or in part by a governmental unit or

nonprofit institution within the meaning of Section 523(a)(8)(A)(i).  Firstmark Opp. at 31-32.

While Firstmark does not assert that Section 523(a)(8)(A)(i) is applicable to the Bar Loan, it

points to "several public filings" by the originator of" Ms. Golden's CitiAssist loans which

"appear to suggest a reasonable probability that those loans are excepted from the discharge by

§ 523(a)(8)(A)(i)."  Firstmark Opp. at 31 n.16.  Notably, Firstmark does not identify those public

filings, or the role of any governmental unit or nonprofit institution, in the Bar Loan.

Firstmark also responds that Ms. Golden has characterized her Bar Loan as "*sui generis*,

completely different from a typical student loan."  Firstmark Opp. at 32.  And Firstmark states

that Ms. Golden has not provided sufficient or persuasive statutory analysis as to the

dischargeability of the Bar Loan in light of what it claims Ms. Golden asserts is its "*sui generis*

nature."  *Id*.

Ms. Golden replies that Penn Law never certified the Bar Loan as within the "cost of

attendance."  Reply at 6.  And she notes the Bar Loan, by definition, could not be certified as

within the cost of attendance because it was issued for living expenses after graduation.  Reply at

6-7.  As she states, "[t]he Citibank bar loan, which is held by Defendant GS2 and serviced by

Firstmark, is clearly dischargeable, because the loan was made for living expenses received after

Ms. Golden attended a Title IV institution."  Reply at 6.  She also points to the CFPB Guidance

and argues that post-graduation loans like the Bar Loan "are specifically identified by the CFPB

as discharged debts."  Reply at 7 (citing CFPB Guidance, 2023 WL2898365).

As this Court has previously observed in *In re Homaidan*, Section 523(a)(8)(B) plainly

excludes certain private student loans – described as "qualified education loan[s], as defined in

[Internal Revenue Code] section 221(d)(1)," from the scope of a debtor's bankruptcy discharge –

but only where specified criteria are met.  *In re Homaidan*, 596 B.R. at 91.  These criteria include that the eligible student borrower attended a Title IV institution and received a private loan that is within the cost of attendance at that institution as defined by Internal Revenue Code Section 221(d).  And as this Court also concluded, "just as plainly, and as a matter of logic, if those criteria are *not* met, then the exclusion from discharge does *not* apply."  *In re Homaidan*, 650 B.R. at 416.

That is, there are two essential factors that determine whether a private loan is a "qualified education loan" and outside the scope of a debtor's bankruptcy discharge:  that the student borrower was receiving an education as an eligible student at a Title IV institution, and that the loan was incurred to pay qualified education expenses at a Title IV institution – that is, expenses of the kind enumerated in the statute that are within the "cost of attendance" at the institution.  And to show a likelihood of success on the merits, Ms. Golden must show that the Bar Loan does not satisfy at least one of these factors.

For the Bar Loan to be a qualified education loan, it must be "indebtedness incurred by the taxpayer solely to pay qualified higher education expenses . . . attributable to education furnished during a period during which the recipient was an eligible student."  26 U.S.C. § 221(d)(1).  "Qualified higher education expenses" are defined as the "cost of attendance . . . at an eligible educational institution" as reduced by certain other scholarships, income, and loans. 26 U.S.C. § 221(d)(2).  And an eligible educational institution is defined as an institution which is described in Section 481 of the Higher Education Act, as in effect on August 5, 1997, and which is eligible to participate in a program under title IV of the Act.  26 U.S.C. § 25A(f)(2). Section 481 of the Higher Education Act, as in effect on August 5, 1997, described educational institutions, including institutions of higher education, proprietary institutions of higher

education, and postsecondary vocational institutions.  20 U.S.C. § 1088.  An "institution of higher education" is defined to encompass an educational institution that offers an educational program for which it awards bachelor's degrees or credit toward bachelor's degrees.  20 U.S.C. § 1141(a).  The term "proprietary institution of higher education" is defined to include schools that are accredited by a nationally recognized accrediting agency.  20 U.S.C. § 1141(b).  A "postsecondary vocational institution" is defined to include a public or nonprofit school that has met certain accreditation standards.  20 U.S.C. § 1141(c).

And an eligible student is one that is "enrolled or accepted for enrollment in a degree, certificate, or other program . . . leading to a recognized educational credential at an institution of higher education that is an eligible institution" and is "carrying at least ½ the normal full-time workload for the course of study the student is pursuing."  26 U.S.C. § 25A(b)(3).  *See* 20 U.S.C. § 1091(a)(1).

Here, the record shows that the Bar Loan does not come within the definition of "qualified education loan," for at least two reasons.

First, here, the record shows that the Bar Loan was not incurred to pay a qualified higher education expense.  26 U.S.C. § 221(d)(1).  Firstmark correctly notes that the Bar Loan was disbursed to Ms. Golden while she was enrolled as a student at Penn Law.  Firstmark Opp. at 32.  But the Bar Loan was not incurred to pay the cost of attendance at an eligible educational institution, as required by the definition of "qualified higher education expense."  26 U.S.C. § 221(d)(2).  Instead, as the record shows, bar loans are used for expenses incurred after attendance at an eligible educational institution.  As Penn Law assistant dean for financial aid Anthony Henry testified, "the cost of attendance is not" relevant to Penn Law's bar loan certification process, rather, only "enrollment and graduation date, and maybe disbursement

date" are.  Reply at 6; Carpinello Reply Decl. Exh. E (Deposition of Anthony Henry) at 65:22-66:19.

Second, the Bar Loan does not fall within the definition of "qualified education loan" because it was not "attributable to education furnished during a period during which the recipient was an eligible student."  26 U.S.C. § 221(d)(1)(C).  The Bar Loan was intended to pay for Ms. Golden's cost of living as she studied for the bar exam.  And at that time, Ms. Golden was no longer enrolled in a program "leading to a recognized educational credential at an institution of higher education."  26 U.S.C. § 25A(b)(3).  Instead, as the record shows, the Bar Loan is "attributable to education furnished" after her graduation, rather than at the time Ms. Golden incurred the indebtedness.  Reply at 6; Carpinello Reply Decl. Exh. A (Deposition of Elaine Varas) at 159:3-11 (stating that "the bar loan is [like] a medical loan, . . . [they are] for students who are now pursuing their practices and . . . are not educational loans because that piece does not happen during their education.  It happens after their education or it's a requirement after their education").

Other courts viewing similar facts have reached the same conclusion.  For example, as the court found in *Teran v. Navient Solutions, LLC* (*In re Teran*), a loan taken out by a debtor during the period that they were studying for the bar exam is "not a qualified educational loan" because the bar preparation program did not "meet the attendance, accreditation, or course offering standards of an eligible educational institution" under Section 523(a)(8)(B), and the student was not "an eligible student" under that section, while studying for the bar exam.  *Teran v. Navient Sols., LLC* (*In re Teran*), 638 B.R. 620, 627-27 (Bankr. N.D. Cal. 2022).

And in *In re Campbell*, the court explained that a "Bar Loan, a product of an arm's-length agreement on commercial terms, is not an 'educational benefit' under § 523(a)(8)(A)(ii)" for

purposes of a nondischargeability analysis.  *In re Campbell*, 547 B.R. at 61.  *See Campbell v. Citibank, N.A.* (*In re Campbell*), Adv. Pro. No. 15-01038 (Bankr. E.D.N.Y. 2016), ECF No. 57 (declaring the debtor's bar loan discharged "because it is not a student debt obligation of the kind excepted from discharge under section 523(a)(8) of the Bankruptcy Code").

In addition, here, the record shows that the Bar Loan is not within the "cost of attendance at an eligible educational institution" because it was not issued or used by Ms. Golden to pay the kinds of expenses that are within the "cost of attendance," including, in relevant part:  (1) tuition and fees, including equipment, materials, or supplies required of all students in the same course of study; (2) "an allowance for books, supplies, transportation, and miscellaneous personal expenses for a student attending the institution on at least a half-time basis, as determined by the institution;" (3) "an allowance (as determined by the institution) for room and board costs incurred by the student." 20 U.S.C. § 1087*ll*.  Instead, the Bar Loan was not issued or used by Ms. Golden to pay for tuition or fees at Penn Law, nor was it intended to pay for materials or supplies during Ms. Golden's course of study at Penn Law.  Reply at 6-7 (citing Carpinello Reply Decl. Exh. A (Deposition of Elaine Varas) at 159:3-11; Carpinello Reply Decl. at Exh. F ("Citibank's Responses to Written Questions") at 17-19; Carpinello Reply Decl. at Exh. G (Citibank loan form FM 0020)).

And because the Bar Loan was intended for personal expenses after graduation, it was not an allowance for personal expenses "for a student attending the institution on at least a half-time basis."  That is, because the Bar Loan was never certified by Penn Law as within the cost of attendance, it could not be an allowance as determined by Penn Law for room and board costs incurred by Ms. Golden.  Reply at 6; Carpinello Reply Decl. Exh. E (Deposition of Anthony Henry) at 65:22-66:19.

Finally, and notably, this is consistent with the recent guidance issued by the CFPB on the dischargeability of these kinds of education debts.  *See* CFPB Guidance, 2023 WL 2898365 (noting that "some loans for educational purposes" like "[l]oans made to cover fees and expenses incurred while studying for the bar exam" are "not exempt from the general order of discharge").

For these reasons, Ms. Golden has shown a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation, as to her claim that the Bar Loan is not excluded from her bankruptcy discharge, on the basis that it was not a "qualified education loan" made to an "eligible student" within the "cost of attendance" at a Title IV institution.

### Whether Ms. Golden Has Shown that the Balance of Hardships Tips Decidedly in Her Favor

As with the NCT Loan, a second question must be addressed in the context of the first requirement for preliminary injunctive relief.  To the extent that Ms. Golden has established "'sufficiently serious questions going to the merits to make them a fair ground for litigation,'" but not a likelihood of success on the merits, she must also demonstrate that "a balance of hardships [tips] decidedly in [her] favor."  *Benihana*, 784 F.3d at 895 (quoting *Salinger*, 607 F.3d at 79).

As described above, in the context of the NCT Loan, Ms. Golden argues that the balance of hardships tips decidedly in her favor because, among other reasons, she may be subject to collection efforts on loans that have been discharged in her bankruptcy case.  The hardships that stem from these collection efforts are "'not just about money'" but rather "'about the hardships and burdens that impair a debtor's efforts to achieve the "fresh start" that is the centerpiece of the bankruptcy system.'"  Prelim. Inj. Mem. at 10 (quoting *In re Homaidan*, 640 B.R. at 851).

She also argues that, as this Court found in *In re Homaidan*, the collection of a discharged debt runs afoul of the Bankruptcy Code's promise of a fresh start. Reply at 15 (citing *In re Homaidan*, 640 B.R. at 855-56). And she notes that there can be no valid or legitimate interest in collecting on such debts. *Id.*

As also described above, the Defendants respond that Ms. Golden will not suffer any hardship in the absence of preliminary injunctive relief because she has not been subject to collection efforts on these loans, and has elected to make voluntary payments on her loans. *See* PHEAA Opp. at 53; Firstmark Opp. at 21; Trust Defs. Opp. at 24-25.

And here again, as this Court found in *In re Homaidan*, the prospect of the collection of a discharged debt – whether the NCT Loan or the Bar Loan – or even the collection of a debt as to which there are "sufficiently serious questions" going to the question of dischargeability "to make them a fair ground for litigation," is "not just about money." *In re Homaidan*, 640 B.R. at 845. Rather, it is "about the hardships and burdens that impair a debtor's efforts to achieve the 'fresh start' that is the centerpiece of the bankruptcy system." *In re Homaidan*, 640 B.R. at 851. These hardships weigh far more heavily upon the borrower who has succeeded in gaining a bankruptcy discharge of her dischargeable debt than they do on the servicer or lender that may be collecting on a discharged debt. That is, here too, this Court finds and concludes that under these circumstances, the balance of hardships tips decidedly in Ms. Golden's favor.

For these reasons, the Court finds and concludes that to the extent that Ms. Golden has established "'sufficiently serious questions going to the merits to make them a fair ground for litigation,'" but not a likelihood of success on the merits, she has shown that "'a balance of hardships [tips] decidedly in [her] favor.'" *Benihana*, 784 F.3d at 895 (quoting *Salinger*, 607 F.3d at 79)).

*          *          *

For these reasons, and based on the entire record, the Court concludes that Ms. Golden, on behalf of herself and the putative class members, has shown a likelihood of success on the merits of her request for a declaratory judgment and ancillary injunctive relief with respect to the Bar Loan.

That is, Ms. Golden has shown a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation, that the Bar Loan does not meet the nondischargeability requirements of Bankruptcy Code Section 523(a)(8), and is therefore within the scope of her bankruptcy discharge.  To the extent that she has shown sufficiently serious questions going to the merits to make them a fair ground for litigation, but not a likelihood of success on the merits, she has shown that a balance of hardships tips decidedly in favor of herself and the putative class members.

*          *          *

### Whether Ms. Golden Has Shown a Likelihood of Irreparable Injury in the Absence of Relief

The second element that a plaintiff must establish to be entitled to preliminary injunctive relief is "a likelihood of 'irreparable injury in the absence of an injunction.'"  *Benihana*, 784 F.3d at 895 (quoting *Salinger*, 607 F.3d at 79-80).

At the outset, Ms. Golden asserts that the requirement of individual irreparable injury may not even apply in this situation, because the relief that she seeks will protect her and the putative class members from continued violations of their bankruptcy discharges.  She states that "a bankruptcy court, pursuant to its powers under § 105, may grant a preliminary injunction to protect the debtor or the estate without a showing of irreparable injury."  Prelim. Inj. Mem. at 8 (collecting cases).  This is because, in substance, the injunctive relief that is sought "'vindicates

the interests of the *Court*, as much as (and perhaps more than) it vindicates the interest of an individual litigant.'" Prelim. Inj. Mem. at 9 (emphasis in original) (quoting *NWL Holdings, Inc. v. Eden Center, Inc.* (*In re Ames Dep't Stores, Inc.*), 317 B.R. 260, 274 (Bankr. S.D.N.Y. 2004)). And Ms. Golden asserts that it is "undisputed" that she and every member of the putative class obtained discharges in bankruptcy protecting all properly scheduled dischargeable debts and that the Defendants may continue to collect on those debts, so that she "need not make any additional showing of irreparable harm to warrant" injunctive relief. Prelim. Inj. Mem. at 9.

And separately, Ms. Golden argues that she has established that she and the putative class members "continue to suffer irreparable injury as a result of Defendants' illegal collection activity." *Id*. She points to the "virtually identical facts" in *In re Homaidan*, where this Court held that plaintiffs had established irreparable injury sufficient to grant injunctive relief in the form of a temporary restraining order and a preliminary injunction, finding that "'[a]n attempt to collect on a discharged debt is not just about money – it is about the hardships and burdens that impair a debtor's efforts to achieve the 'fresh start' that is the centerpiece of the bankruptcy system.'" Prelim. Inj. Mem. at 9-10 (quoting *In re Homaidan*, 640 B.R. at 851). And she notes that another bankruptcy court similarly found that "'any action or attempt to collect [the debt] in spite of a discharge is a clear violation of the permanent injunction included in the discharge,'" and concluded that injunctive relief was necessary to prevent "'irreparable harm.'" Prelim. Inj. Mem. at 10 (quoting *Daniel v. Oaks* (*In re Daniel*), 98 B.R. 73, 75 (Bankr. M.D. Fla. 1989)).

The Defendants respond that Ms. Golden must make a showing of irreparable injury, in light of *Taggart*'s holding that "'traditional standards of equity practice' are incorporated into Section 105." PHEAA Opp. at 48 (quoting *Taggart*, 139 S. Ct. at 1801). They argue that the cases where bankruptcy courts have excused showings of irreparable harm did not arise in the

context of Rule 65 and requests for preliminary injunctive relief.  Firstmark Opp. at 22-23.

PHEAA and Firstmark argue that, as servicers, they are not engaging in abusive communications

with Ms. Golden, or even any "acts to collect" at all.  *See* PHEAA Opp. at 52; Firstmark Opp. at

23.  The Defendants point out that Ms. Golden is making voluntary payments.  PHEAA Opp. at

8.  And they argue that her delay in seeking relief is unjustified and suggests that she is not, in

fact, facing any imminent, irreparable injury.  Firstmark Opp. at 4; Trust Defs. Opp. at 16-19.  As

to the putative class members, the Defendants argue that Ms. Golden must meet a heightened

standard to show irreparable harm, as injunctive relief would disrupt the status quo in place

before the commencement of this adversary proceeding.  Firstmark Opp. at 5.

Ms. Golden replies that she first sought a preliminary injunction in July 2020, and the

delay in litigating the Preliminary Injunction Motion is based on the Defendants' requests for

discovery and the many disputes and procedural hurdles associated with discovery, including

multiple document productions and depositions.  Reply at 14.

As a threshold matter, Ms. Golden is not required to meet a heightened standard to show

irreparable harm, for the same reasons that she is not required to meet a heightened standard to

show a likelihood of success on the merits.  The "last actual, peaceable uncontested status which

preceded the pending controversy" is not the moment before Ms. Golden filed the initial

complaint in this action, but rather the situation that existed *before* the Defendants were able to

resume their collection efforts on Ms. Golden's and the putative class members' outstanding

post-graduation student loans and *after* Ms. Golden and the putative class members received

their bankruptcy discharges.  *N. Am. Soccer League*, 883 F.3d at 37 (quoting *Mastrio*, 768 F.3d

at 120).  *See In re Homaidan*, 650 B.R. at 409 (holding that "[h]ere, the 'last actual, peaceable

uncontested status which preceded the pending controversy' is the situation that existed *before*

Navient engaged in collection efforts on the Plaintiffs' and the Putative Class Members' outstanding student loans and *after* the Plaintiffs and the Putative Class Members received their bankruptcy discharges. *N. Am. Soccer League*, 883 F.3d at 37 (quoting *Mastrio*, 768 F.3d at 120).").

<u>Whether Ms. Golden Has Shown that There Is a Likelihood of Irreparable Injury</u>

Next, the Court turns to the question of whether Ms. Golden is required to demonstrate a likelihood of irreparable injury in the absence of preliminary injunctive relief. The Court has already concluded that Ms. Golden has shown a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation, as to her claims that the NCT Loan and the Bar Loan are within the scope of her bankruptcy discharge. As the bankruptcy court found in *In re Ames Department Stores*, she has described conduct that poses a threat to the bankruptcy process, and the declaratory judgment that Ms. Golden seeks "'vindicates the interests of the *Court*, as much as (and perhaps more than) it vindicates the interest of an individual litigant.'" Prelim. Inj. Mem. at 9 (quoting *In re Ames Dep't Stores*, 317 B.R. at 274 (emphasis in original)).

And separately, in the alternative, Ms. Golden has shown that there is "a likelihood of 'irreparable injury in the absence of an injunction.'" *Benihana*, 784 F.3d at 895 (quoting *Salinger*, 607 F.3d at 79-80).

As a starting point, Ms. Golden has shown a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation, as to her request for a declaratory judgment and ancillary injunctive relief that the NCT Loan and the Bar Loan are each within the scope of her bankruptcy discharge. That is, she has shown that she is likely to establish that these are discharged debts.

As this Court observed in *In re Homaidan*, an attempt to collect on a discharged debt is not just about money – it is about the hardships and burdens that impair a debtor's efforts to achieve the "fresh start" that is a centerpiece of the bankruptcy system.  As Ms. Golden notes:

> In the absence of injunctive relief, Plaintiff and the class members will continue to be harassed by Defendants for payments on debts that have actually been discharged in bankruptcy.  This will not only cause them to endure the stress of receiving harassing phone calls and letters, but also the financial hardship and pressure of continuing to make payments on these discharged loans.

Prelim. Inj. Mem. at 14.  That is, the prospect of acts by the Defendants to collect on these debts amounts to irreparable harm, and an award of damages after the fact is not sufficient to remedy that harm.

This conclusion is consistent with widely accepted principles of bankruptcy law, including the importance of a debtor's "fresh start."  As this Court and others have observed, "'[o]ne of the fundamental principles of bankruptcy law is that a bankruptcy discharge enables a debtor to receive a "fresh start.""'  *In re Golden*, 630 B.R. at 911 (quoting *McKenzie-Gilyard v. HSBC Bank Nevada, N.A.* (*In re McKenzie-Gilyard*), 388 B.R. 474, 480 (Bankr. E.D.N.Y. 2007)).  Accordingly, the Court finds that Ms. Golden has shown that there is "a likelihood of 'irreparable injury in the absence of an injunction.'"  *Benihana*, 784 F.3d at 895 (quoting *Salinger*, 607 F.3d at 79-80).

Whether Ms. Golden's Request for a Preliminary Injunction Is Inexcusably Delayed

The Court next turns to the question of whether Ms. Golden's request for an injunction was not made in a timely fashion.  Courts in this Circuit note that "it is well established that a court 'must consider a plaintiff's delay in seeking relief when analyzing whether the plaintiff will suffer irreparable harm in the absence of relief.'"  *Coscarelli v. ESquared Hospitality LLC*, 364 F. Supp. 3d 207, 222 (S.D.N.Y. 2019) (quoting *Ingber v. N.Y.C. Dep't of Educ.*, 2014 WL

2575780, at *2 (S.D.N.Y. June 9, 2014)).  This is because preliminary injunctions "are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights [and d]elay in seeking enforcement of those rights . . . tends to indicate at least a reduced need for such drastic, speedy action."  *CitiBank*, 756 F.2d at 276.

Accordingly, such delay "may, 'standing alone, . . . preclude the granting of preliminary injunctive relief,' *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985), because the 'failure to act sooner . . . suggests that there is, in fact, no irreparable injury.'"  *Tough Traveler*, 60 F.3d at 968 (quoting *Citibank*, 756 F.2d at 277).  Nevertheless, "[i]f the movant can provide a credible explanation for its inactivity," long delays may be excused.  *Gidatex, S.r.L. v. Campaniello Imps., Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998) (citing *King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir. 1992); *MGM-Pathe Commc'ns Co. v. Pink Panther Patrol*, 774 F. Supp. 869, 873 (S.D.N.Y. 1991)).

The Defendants argue that this request for relief is long overdue – that is, that Ms. Golden has waited too long to seek declaratory and injunctive relief for herself and the putative class members.  This delay, the Defendants assert, shows that preliminary injunction is not warranted here because it shows that there is "nothing imminent" happening in this case, and it "is tantamount to an admission that there is no likelihood of irreparable injury and that no [preliminary injunction] is necessary or appropriate in this action."  Trust Defs. Opp. at 28-29. And the Defendants point to the three years that passed from the commencement of this adversary proceeding to the filing of the Preliminary Injunction Motion.  PHEAA Opp. at 2-3.

The Defendants correctly note that much time has passed since this Adversary Proceeding was commenced in 2017.  And in some circumstances, courts have found that the passage of time, without more, weighs against the granting of temporary or preliminary

injunctive relief.  As one court observed, "'[w]hile delay does not always undermine an alleged need for preliminary relief, months-long delays in seeking preliminary injunctions have repeatedly been held by courts in the Second Circuit to undercut the sense of urgency accompanying a motion for preliminary relief.'"  *Silent Gliss Inc. v. Silent Gliss Int'l Ltd.*, 2022 WL 1525484, at *8 (E.D.N.Y. May 13, 2022) (quoting *Silber*, 950 F. Supp. 2d at 439).  And as another court found, "[b]ecause preliminary injunctions are predicated upon 'urgent need for speedy action,' delay in seeking the remedy suggests that the remedy is not really needed, or that the harm is not really irreparable." *Minzer v. Keegan*, 1997 WL 34842191, at *6 (E.D.N.Y. Sept. 22, 1997) (citation omitted) (quoting *CitiBank*, 756 F.2d at 276).

At the same time, "[c]ourts may excuse delays '[i]f the movant can provide a credible explanation for its inactivity.'"  *Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.*, 2021 WL 535485, at *6 (S.D.N.Y. Feb. 12, 2021) (quoting *Gidatex*, 13 F. Supp. 2d at 419).  As one example, "[c]ourts have excused delays where the parties diligently pursue settlement negotiations."  *Hodnett*, 2021 WL 535485, at *6 (citing *Marks Org.*, 784 F. Supp. 2d at 333).

And similarly, a delay caused by a plaintiff's good faith investigation of their claims does not weigh against a finding of irreparable harm.  *Tom Doherty*, 60 F.3d at 39 (citing *King*, 976 F.2d at 831).  "The existence of prejudice to the non-movant caused by the movant's delay is also a relevant factor."  *Gidatex*, 13 F. Supp. 2d at 419 n.1 (citing *Tom Doherty*, 60 F.3d at 39). And "delay alone" does not require denial of preliminary injunctive relief.  *Marks Org.*, 784 F. Supp. 2d at 333 (citing *Marcy Playground, Inc. v. Capitol Records, Inc.*, 6 F. Supp. 2d 277, 282 (S.D.N.Y. 1998)).

The Court "thus begins its analysis by recognizing the Second Circuit's instruction that '[a] . . . court should *generally* consider delay in assessing irreparable harm,' even if it is not

dispositive of the issue." *Marks Org.*, 784 F. Supp. 2d at 333 (quoting *Tom Doherty*, 60 F.3d at 39). And the starting point for this analysis is the timeline of this Adversary Proceeding, including the time spent in dispositive motion practice, the prospect of arbitration of Ms. Golden's claims and a motion to dismiss, discovery motion practice and appeals, and an extended period of fact and expert discovery.

On January 18, 2017, Ms. Golden commenced this Adversary Proceeding by filing the complaint, followed some ten months later, on October 17, 2017, by the Amended Complaint. On December 8, 2017, Firstmark brought the Motion to Compel or Dismiss, and the briefs and oral argument on their motion proceeded over a period of several months, first on the question of arbitration, and then on the question of dismissal for failure to state a claim upon which relief can be granted. On July 25, 2018, the Court issued its first memorandum decision on the Motion to Compel or Dismiss, and denied the motion to the extent it sought to compel arbitration of Ms. Golden's claims. *Golden v. JP Morgan Chase Bank* (*In re Golden*), 587 B.R. 414 (Bankr. E.D.N.Y. 2018). And on January 31, 2019, the Court issued a second memorandum decision on the Motion to Compel or Dismiss, and denied the motion to the extent it sought to dismiss the Adversary Proceeding. *Golden v. JP Morgan Chase Bank* (*In re Golden*), 596 B.R. 239 (Bankr. E.D.N.Y. 2019). On February 14, 2019, the Defendants filed their Answers to the Amended Complaint, and the parties commenced discovery.

On July 13, 2020, Ms. Golden filed the Class Certification Motion, the Summary Judgment Motion, and the Preliminary Injunction Motion. Those motions led to discovery requests, and on December 6, 2021, Ms. Golden filed a Motion to Compel certain discovery from the Defendants. ECF No. 444. On June 13, 2022, the Court entered an Order directing PHEAA and Firstmark to respond to certain discovery requests in the Motion to Compel, which

PHEAA timely appealed to the District Court on June 21, 2022.  ECF Nos. 501, 503.  And on August 10, 2022, the District Court dismissed PHEAA's appeal of this Court's order granting in part the Motion to Compel and denied as moot PHEAA's accompanying motion to stay its discovery obligations pending appeal.  ECF No. 519.  On October 4, 2022, the Court entered an Order directing PHEAA and Firstmark to respond to certain discovery requests in the Motion to Compel.  ECF No. 530.

At each step of this long procedural path, the parties have – quite appropriately – made motions, conducted discovery, and sought appellate review, and each of these steps took time.  Some took considerable time.  But at this stage in these proceedings, and based on this record, it is simply not accurate to suggest that Ms. Golden somehow delayed or waited too long to bring this Preliminary Injunction Motion and seek injunctive relief.  It was the Defendants, not Ms. Golden, that brought motions to compel arbitration, and to dismiss this Adversary Proceeding.  And in those requests for relief, the Defendants sought final and dispositive relief, on legal grounds.  Had they been successful, this case would be over.  Therefore, the Court finds that there was not inexcusable delay in Ms. Golden's filing of the Preliminary Injunction Motion.

Notably, the Defendants do not assert that they have been prejudiced by this passage of time.  Nor does the record suggest that Ms. Golden brought the Preliminary Injunction Motion as a litigation tactic.  Indeed, in the eight years that this Adversary Proceeding has been pending, as many as ninety-six additional monthly payments have come due on Ms. Golden's and the putative class members' debts that may well have been discharged in bankruptcy.

*          *          *

For these reasons, and based on the entire record, the Court concludes that Ms. Golden, on behalf of herself and the putative class members, has shown a likelihood of irreparable injury

in the absence of relief.

<u>*Whether Ms. Golden Has Shown that the Balance of Hardships Tips in Her Favor*</u>

The third element that a plaintiff must establish to be entitled to preliminary injunctive relief is that "'the balance of hardships tips in the plaintiff's favor.'"  *Benihana*, 784 F.3d at 895 (quoting *Salinger*, 607 F.3d at 80).

Ms. Golden argues that the balance of hardships tips in the favor of herself and the putative class members because, absent injunctive relief, they "will continue to be harassed by Defendants for payments on debts that have actually been discharged in bankruptcy."  Prelim. Inj. Mem. at 14.  This harms their interest in the "fresh start" of a bankruptcy discharge.  Prelim. Inj. Mem. at 14 (citing *In re Homaidan*, 640 B.R. at 856).  By contrast, Ms. Golden argues that the Defendants cannot have a legal interest in collecting on discharged debts.  Prelim. Inj. Mem. at 14 (citing *In re Homaidan*, 640 B.R. at 856).

The Defendants respond that the balance of hardships actually weighs against Ms. Golden and the putative class, for several reasons.  First, they note that they have not been engaging in any collections against Ms. Golden – and as servicers, PHEAA and Firstmark do not deal with loans in default.  PHEAA Opp. at 53; Firstmark Opp. at 21.  And they argue that they have do not have legal interests in the debts that they service.  PHEAA Opp. at 21; Firstmark Opp. at 24.  The Defendants note that dischargeability "is the ultimate issue to be decided in this case," and they argue that Ms. Golden's rationale is circular, improperly presupposing discharge.  Trust Defs. Opp. at 29-30.

Ms. Golden replies that "Firstmark offers nothing more than the representation that they have stopped collecting on Ms. Golden's loan, without any legally binding agreement to that effect, and without any promise to cease collection against proposed class members."  Reply at

10.  She also replies that a defendant cannot invalidate the claims of a class representative by "changing its practice only with respect to the class representative while continuing the offending conduct with respect to the proposed class." Reply at 11 (citing *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 86 (2013) (Kagan, J., dissenting) (noting that it is a class representative's choice, "and not the defendant's or the court's, whether satisfaction of her individual claim, without redress of her viable classwide allegations, is sufficient to bring the lawsuit to an end")).  Ms. Golden suggests that this is "precisely what the Defendants are attempting to do here by ceasing to collect on Ms. Golden's loans, without any similar cessation toward absent class members." Reply at 12.  And Ms. Golden further argues that by not ceasing to collect these discharged debts from the absent class members, the Defendants are causing irreparable harm that will impair these debtors' "efforts to achieve the 'fresh start' that is a centerpiece of the bankruptcy system." Reply at 13 (citing *In re Homaidan*, 640 B.R. at 851).

Here, the Court addresses a very particular task.  It must "'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Main Street Baseball*, 103 F. Supp. 3d at 262 (quoting *Winter*, 555 U.S. at 24).  In this context, "[t]he relevant harm is the harm that . . . occurs to the parties' *legal interests*." *Salinger*, 607 F.3d at 81 (emphasis added) (footnote omitted).  And notably, this is distinct from the question of likelihood of success on the merits.  That is, the party seeking this relief "must establish that the 'balance of hardships tips in their favor regardless of the likelihood of success.'" *Main Street Baseball*, 103 F. Supp. 3d at 262 (quoting *Salinger*, 607 F.3d at 79-80).

And here, the balance of hardships tips in favor of Ms. Golden and the putative class members, for several reasons.

The legal interests of Ms. Golden and the putative class members are grounded in their bankruptcy discharges and opportunity for a "fresh start." Indeed, as the Supreme Court has observed, "[t]he principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'" *Marrama*, 549 U.S. at 367 (quoting *Grogan v. Garner*, 498 U.S. 279, 286, 287 (1991)). Those legal interests, and those bankruptcy discharges, are injured by the prospect of the Defendants' ongoing debt collection efforts.

Viewed another way, Ms. Golden and the putative class members whose debts have been discharged in their bankruptcy cases because they do not meet the stringent criteria of Section 523(a)(8)'s exclusions from discharge have a significant legal interest that is protected by the Bankruptcy Code – to have their dischargeable debts declared discharged. This legal interest is straightforward. As one bankruptcy court observed, "'[t]he discharge of a debt pursuant to § 727 triggers the operation of § 524, which protects the debtor from any personal liability on the debt.'" *In re Nassoko*, 405 B.R. 515, 519 (Bankr. S.D.N.Y. 2009) (quoting *Green v. Welsh*, 956 F.2d 30, 33 (2d Cir. 1992)). And more generally, the continued collection of a debt that has been discharged threatens and may well violate both these statutory legal interests and the broader relief that is encompassed by the bankruptcy discharge and "fresh start."

By contrast, the Defendants – and by extension, any loan owners for whom Defendants PHEAA and Firstmark act as servicers –do not have a cognizable legal interest in continuing to collect on a loan that is likely to have been discharged. There simply cannot be a legal interest in continuing to collect on a discharged debt, and the Defendants have no legal interest that would be harmed by preliminary injunctive relief preventing them from collecting such debts.

*          *          *

For these reasons, and based on the entire record, the Court concludes that Ms. Golden,

on behalf of herself and the putative class members, has shown that the balance of hardships tips in her favor.

*Whether Ms. Golden Has Shown that the Public Interest Would Not Be Disserved by a Preliminary Injunction*

The fourth element that a plaintiff must establish to be entitled to preliminary injunctive relief is that "the 'public interest would not be disserved' by the issuance of an injunction." *Benihana*, 784 F.3d at 895 (quoting *Salinger*, 607 F.3d at 80).

Ms. Golden argues that preliminarily enjoining the continued collection of discharged debts would further the public interest for the same reasons that this Court recognized in *In re Homaidan*: the "strong public interest in furthering the principal interest of the Bankruptcy Code, which is to grant a fresh start to the 'honest but unfortunate debtor.'" Prelim. Inj. Mem. at 15 (quoting *In re Homaidan*, 650 B.R. at 431).

The Defendants respond that the public interest would in fact be harmed by a preliminary injunction, for several reasons. They note that injunctive relief is likely to cause confusion to borrowers, who may lack notice or the legal sophistication to understand the application of any preliminary injunction to their own specific situations. PHEAA Opp. at 54. They also note that borrowers may have concerns about injunctive relief for various reasons, including tax and credit score implications, or effects on co-signers, and point to one borrower in the *In re Homaidan* matter who expressed concerns that, following this Court's entry of an injunction, her loan "'disappeared'" when she attempted to pay it. Trust Defs. Opp. at 30 (quoting January 18, 2023, e-mail from borrower, *In re Homaidan*, Case No. 17-1085 (Bankr. E.D.N.Y.), ECF No. 433-1). And the Defendants argue that the absent loan owners' interests would be harmed as well. PHEAA Opp. at 55.

Here, the Court considers not just the interests of the parties, but the broader question of

the public interest, and whether the public interest would be disserved by the entry of the relief that Ms. Golden seeks. As one bankruptcy court observed, "the focus is generally on how the parties' specific actions would impact the public at large." *In re Roman Catholic Diocese*, 628 B.R. at 583 (citing *Winter*, 555 U.S. at 13-14). And the facts and circumstances must be considered in the context of the particular situation. "Courts have long recognized that public interest is a 'supple principle' with 'as many and as variegated applications . . . as the situations that have brought it into play.'" *In re Roman Catholic Diocese*, 628 B.R. at 583 (quoting *Railroad Comm'n*, 312 U.S. at 500).

Still, a piece of the picture is the interests of the parties that are at stake, and this includes interests that are widely recognized, including by the Supreme Court – the interests reflected in "[t]he principal purpose of the Bankruptcy Code," which is "to grant a 'fresh start' to the 'honest but unfortunate debtor.'" *Marrama*, 549 U.S. at 367 (quoting *Garner*, 498 U.S. at 286, 287). When the fresh start is improperly obstructed by a creditor collecting on a debt that should be declared discharged, that purposes of the Bankruptcy Code are undermined not only to the detriment of the discharged debtor, but also to the detriment of the public interest.

Courts recognize this in a variety of contexts. As one bankruptcy court observed, in finding that the public interest weighed against issuing a stay to halt an adversary proceeding in favor of arbitration, "there is . . . a strong policy in protecting a debtor's fresh start after their bankruptcy proceedings are resolved." *In re Anderson*, 560 B.R. at 93. And as this Court has found, "'[o]ne of the fundamental principles of bankruptcy law is that a bankruptcy discharge enables a debtor to receive a "fresh start."'" *In re Golden*, 630 B.R. at 911 (alteration in original) (quoting *In re McKenzie-Gilyard*, 388 B.R. at 480). As a consequence, where the public interest in this "fresh start" is threatened, "[b]ased on the . . . importance of protecting the 'fresh start'

111

which Chapter 7 offers the honest but unfortunate debtor, a preliminary injunction is not only warranted but necessary to preserve the integrity of the bankruptcy process." *Archambault v. Hershman* (*In re Archambault*), 174 B.R. 923, 936 (Bankr. W.D. Mich. 1994).

That is, the public interest in "protecting a debtor's fresh start after their bankruptcy proceedings are resolved" would not be disserved by the entry of a preliminary injunction that enjoins the Defendants from the collection of loans that this Court has determined are likely to be within the scope of the borrower's bankruptcy discharge. *In re Anderson*, 560 B.R. at 93. Simply put, the public interest is not served by the collection of a discharged debt, and the public interest is not disserved by enjoining that activity.

*          *          *

For these reasons, and based on the entire record, the Court concludes that Ms. Golden, on behalf of herself and the putative class members, has shown that the public interest would not be disserved by a preliminary injunction.

### *Whether Ms. Golden Has Shown that this Court May Enter a Preliminary Injunction on Behalf of All Putative Class Members*

The next question that the Court considers is whether, on this Motion, Ms. Golden is entitled to a preliminary injunction on behalf of a nationwide class of putative class members, as she requests.

The Defendants argue first that Ms. Golden cannot seek relief on behalf of putative class members whose loans are serviced by PHEAA and Firstmark, but owned by entities other than the Trust Defendants that are not joined as parties in this action. The Defendants state that these loan owners are mandatory parties under Federal Rule of Civil Procedure 19 and must be joined before the Court adjudicates any issues affecting their rights.

In addition, the Defendants argue that, to the extent Ms. Golden seeks relief on behalf of the putative class members, the Court may enter an injunction affecting only those debtors who received their statutory bankruptcy discharges in this judicial district.

The Court considers these issues in turn.

<u>Whether Ms. Golden May Seek Injunctive Relief Without Joining All Loan Owners</u>

One threshold issue is whether the Court can consider the Preliminary Injunction Motion on a class-wide basis without joining the absent loan owners.

The Defendants argue that under Federal Rule of Civil Procedure 19, the Court cannot grant a preliminary injunction affecting any of the loan owners other than the Trust Defendants "[b]ecause they are necessary parties under Rule 19(a)." PHEAA Opp. at 11. *See* Firstmark Opp. at 9. They state that courts "routinely" dismiss student debt dischargeability actions for misjoinder under Federal Rule of Civil Procedure 21. PHEAA Opp. at 21. And they argue that a debtor cannot ultimately "obtain restitution from a student loan servicer who is compensated in the form of servicing fees paid by the loan owner" and who acts as a conduit for payments that are immediately forwarded to the loan owner. Firstmark Opp. at 28-29 (collecting cases). They also assert that the Court cannot accord complete relief in the absence of these loan owners, and that they are necessary parties whose rights may be impaired. Firstmark Opp. at 15.

Ms. Golden responds that the Defendants have not met their burden to prove that joinder is necessary. Class Cert. Reply at 18-19 (citing *Greenwich Life Settlements, Inc. v. Viasource Funding Grp.*, 742 F. Supp. 2d 446, 455 (S.D.N.Y. 2010)). She points to decisions in the Second Circuit holding that a named party cannot claim an interest on behalf of an absent party – rather, the absent party must claim the interest itself. Class Cert. Reply at 19 (collecting cases). And she states that the very fact that the loan owners remain absent several years after this action was

commenced weighs against a finding that they are necessary parties. Class Cert. Reply at 19-20 (citing *In re Homaidan*, 2023 WL 2922576, at *44).

As to the Defendants' argument that restitution cannot properly be sought from a servicer who has not retained the funds, Ms. Golden responds that the cases cited by Firstmark miss the mark, because they do not address "the issue raised here, i.e., whether a servicer who wrongfully collects on a post-discharge debt can be absolved from returning those funds simply because it is the servicer and not the original owner." Class Cert. Reply at 20.

Federal Rule of Civil Procedure 19 provides three disjunctive paths to the conclusion that a party is "required" and must be joined:

> (1)    Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
> (A)    in that person's absence, the court cannot accord complete relief among existing parties; or
> (B)    that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
> (i)    as a practical matter impair or impede the person's ability to protect the interest; or
> (ii)    leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a).

At the outset, the Court notes that "the Rule 19 inquiry is a fact specific and practical one, which 'should not be based on formalistic or mechanistic grounds but rather on pragmatic analysis of the effect of a potential party's absence.'" *Polargrid LLC v. Videsh Sanchar Nigam Ltd.*, 2006 WL 2266351, at *9 (S.D.N.Y. Aug 7, 2006) (quoting *Southeastern Sheet Metal Joint Apprenticeship Training Fund v. Barsuli*, 950 F. Supp. 1406, 1414 (E. D. Wis. 1997)).

As the Supreme Court has observed in a decision that predates Rule 19 and the Federal Rules of Civil Procedure, "[t]here is no prescribed formula for determining in every case whether a person or corporation is an indispensable party or not." *Niles-Bement-Pond Co. v. Iron Moulders' Union, Local No. 68*, 254 U.S. 77, 80 (1920).  And the determination of indispensability is necessarily case-specific.  As the Supreme Court has also noted, "whether a person is 'indispensable' . . . can only be determined in the context of particular litigation." *Provident Tradesmen Bank & Tr. v. Patterson*, 390 U.S. 102, 118-19 (1968) (citing *Niles-Bement-Pond Co.*, 254 U.S. at 80.  And as one court of appeals has observed, Rule 19 is "a practical [rule] and fact specific, and is designed to avoid the harsh results of rigid application." *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990).

As an initial matter, "as the plain language of the provision indicates, to be a 'required' party under Rule 19(a)(1)(B), a party must 'claim[] an interest relating to the subject of the action.'" *Nassau & Suffolk Cty. Taxi Owners Ass'n v. New York*, 336 F. Supp. 3d 50, 74 (E.D.N.Y. 2018) (alteration in original) (quoting Fed. R. Civ. P. 19(a)(1)(B)) (citing *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 49 (2d Cir. 1996)).

As one court in this Circuit has found:

> A party named in the litigation cannot assert an interest on behalf of those absent; "[i]t is the absent party that must claim an interest." *Peregrine Myanmar Ltd.*, 89 F.3d at 49.  Therefore, "a party cannot qualify as 'required' under either subsection of Rule 19(a)(1)(B) if it does not 'claim[] an interest relating to the subject of the action.'"  Fed. R. Civ. P. 19(a)(1)(B).

*BNP Paribas v. Bank of N.Y. Tr. Co.*, 2012 WL 13059498, at *12 (S.D.N.Y. Mar. 28, 2012) (alterations in original) (citations omitted).

Here, the absent loan owners have had ample time to take notice of this adversary proceeding, and ample opportunity to "claim" an interest in these proceedings.  And so far as the

record of this case reflects, they have elected not to do so.  It is simply not enough for a third

party "to have an interest, even a very strong interest, in the litigation," nor even "to be adversely

affected by the outcome of the litigation," for Rule 19's standards to be met.  *MasterCard Int'l*

*Inc. v. Visa Int'l Serv. Ass'n*, 471 F.3d 377, 387 (2d Cir. 2006).  "Rather, necessary parties . . .

are only those parties whose ability to protect their interests would be impaired *because of* that

party's absence from the litigation."  *MasterCard*, 471 F.3d at 387 (emphasis in original) (citing

Fed. R. Civ. P. 19(a)(2)).

Viewed another way, any impairment to their interests that the absent loan owners may

suffer would not be caused by their absence from the litigation, but rather by their asserted pre-

litigation conduct in connection with their activities and those of the loan servicers to collect on

discharged debts.  As the court in *MasterCard* observed, "the harm Visa may suffer is not *caused*

*by* Visa's absence from this litigation" and that "[a]ny such harm would result from FIFA's

alleged conduct in awarding Visa sponsorship rights it could not legally give."  *MasterCard*, 471

F.3d at 387 (emphasis in original).

In addition, here, the Defendant loan servicers and the absent loan owners have a

substantial identity of interests – and those interests have been zealously represented by the

Defendants.  In this context, several courts have considered the close relationship between a loan

servicer and a loan owner, and have concluded that a creditor may be liable for discharge

violations if it does not "maintain adequate procedures to prevent a violation of the discharge

injunction," including by its agents or assignees.  *In re Nassoko*, 405 B.R. at 521.  Viewed

another way, courts do not countenance a creditor's "outsourcing" of responsibility for collecting

on a discharged debt by shifting that task to a servicer, and similarly, courts should not permit a

servicer to engage in conduct that violates a debtor's discharge by pointing to the fact that it does not own the debt at issue.

For example, in *In re Roush*, 88 B.R. 163 (Bankr. S.D. Ohio 1988), the court considered a creditor's obligation to maintain adequate procedures to prevent a discharge violation where the debtor's obligation to a bank had been discharged and the bank's agents later sought to collect on that obligation.  The court found that "the burden of establishing procedures adequate to minimize or eliminate [possible violations of the discharge] was upon the [bank]."  *In re Roush*, 88 B.R. at 165.

And in *In re Conti*, 50 B.R. 142 (Bankr. E.D. Va. 1985), the court considered the question of this burden where the IRS mailed a discharged debtor a "past due notice" on a tax liability that had been previously discharged in bankruptcy.  *In re Conti*, 50 B.R. at 143-44.  The court observed that "impracticality, lack of manpower, and lack of appropriate procedures is not a sustainable defense to a motion for a finding of civil contempt," and concluded that "the IRS may be held in civil contempt for violation of [a discharge]" because "[t]he IRS is not privileged to ignore the dischargeability of certain taxes because of the burden or inconvenience it may cause."  *In re Conti*, 50 B.R. at 145-46.

The cases relied upon by the Defendants do not point to a different conclusion here. Instead, those matters arose in bankruptcy courts outside this Circuit, more than a decade ago, in different procedural contexts, and addressed different claims, under different legal standards. *See* PHEAA Opp. at 19 (*quoting Hubbard v. Pa. Higher Educ. Assistance Agency* (*In re Hubbard*), 2014 WL 1654703 (Bankr. E.D. Tenn. Apr. 25, 2014); *Aalabdulrasul v. ACS* (*In re Aalabdulrasul*), 2012 WL 1597277 (Bankr. N.D. Iowa May 7, 2012)); PHEAA January 2025 Letter at 1-2.

As one example, in *In re Hubbard*, the plaintiff and debtor commenced an action against PHEAA under Bankruptcy Code Section 523(a)(8), seeking a determination that his student loans should be discharged because it would be an undue hardship for him to repay them. *In re Hubbard*, 2014 WL 1654703, at *1. As the court explained, "[i]n the Complaint the Debtor describes his financial difficulties, including the financial obligations he is incurring to help support his permanently disabled mother. He asserts that his mother is unable to work and receives no governmental or private income to pay her living expenses or for her medical care." *In re Hubbard*, 2014 WL 1654703, at *1 (citation omitted).

PHEAA moved to dismiss on grounds that it was not the owner or guarantor of the loans at issue, and therefore was not a proper defendant in an action addressing whether a hardship discharge of the loans was warranted. *In re Hubbard*, 2014 WL 1654703, at *2. In response, the plaintiff did not contest the issue of ownership, and instead, requested leave "to join the proper party, the U.S. Department of Education through the use of [Federal Rule] 19." *In re Hubbard*, 2014 WL 1654703, at *4. Taking a practical approach, the court viewed PHEAA's motion as one for summary judgment, found that there was no genuine issue of material fact as to the issue of loan ownership, and granted PHEAA's motion. *Id*. At the same time, the court allowed the plaintiff 45 days to amend his complaint to name the proper defendant. *Id*.

That is, in *In re Hubbard*, the court addressed the question of whether the proper defendant in a *hardship dischargeability* action was named. The plaintiff did not seek, and the court did not address, the availability of an injunction against the collection of a discharged debt against PHEAA as the servicer of the loan.

Similarly, in *In re Aalabdulrasul*, the court considered the question of whether a servicer was a proper defendant in an action to determine the *dischargeability* of several student loans, in

which the loan owner banks were also named as defendants.  *In re Aalabdulrasul*, 2012 WL 1597277, at *1.  The servicer defendant moved to dismiss on grounds of misjoinder under Rule 21 and argued that it was not a party in interest for purposes of a dischargeability action.  *Id*.  The court agreed and granted the motion, noting that the servicer was not "owed a debt by the Debtor."  *In re Aalabdulrasul,* 2012 WL 1597277, at *2.

But here again, the court took a practical approach.  It noted that the action would continue against the bank defendants, and directed those defendants "to notify [the servicer] of the outcome immediately to guard against any further potential collection efforts."  *Id*.  And as in *In re Hubbard*, the plaintiff did not seek, and the court did not address, the availability of an injunction against the servicer to prevent the collection of a discharged debt.

To the same effect, in *Feldman v. American Asset Finance, LLC*, 534 B.R. 627 (E.D. Pa. 2015), the district court addressed a creditor's assertion that its claim against the debtor should be excluded from his bankruptcy discharge under Bankruptcy Code Section 523(a)(6) on grounds that it arose from a willful and malicious injury.  There, the court explained that in the context of a Section 523 dischargeability action, the question of the dischargeability of a debt "is declaratory and would amount to a ruling that [the] debt is nondischargeable."  *Feldman*, 534 B.R. at 641.  And the court continued:

> [T]o the extent [the debtor] argues that it may be forced into inconsistent obligations if [an absent creditor] is not joined to this case, the Court notes that this is not a collection lawsuit.  The Bankruptcy Court did not rule on the allocation [of the debtor's] liabilities vis-à-vis [different creditors].  Rather, it merely declared that [the loan at issue] was not dischargeable.

*Id*.

It is also worth noting that it is not unusual for a loan servicer, rather than a loan owner, to assert its rights and, indirectly, the rights of the loan owner, in a bankruptcy case.  Servicers

are not strangers to the bankruptcy court, and they appear regularly in contested matters to seek affirmative relief against debtors, including relief from the automatic stay, limited prospective or *in rem* stay relief, dismissal of the case, and bars to the filing of future bankruptcy cases. It would be odd indeed, and without legal, equitable, or logical justification, if the path to the bankruptcy court was somehow a one-way street, permitting a servicer to seek relief from the automatic stay to resume collection on a debt, but insulating a servicer from an action to stop it from doing so in violation of a debtor's discharge.

For example, in *In re Conde-Dedonato*, the court considered the question of whether the servicer of a debtor's mortgage had standing to file a proof of claim. *In re Conde-Dedonato,* 391 B.R. 247 (Bankr. E.D.N.Y. 2008). There, the court held that "[a] servicer of a mortgage is clearly a creditor and has standing to file a proof of claim against a debtor pursuant to its duties as a servicer." *In re Conde-Dedonato*, 391 B.R. at 250. *See Densmore v. Litton Loan Servicing* (*In re Densmore*), 445 B.R. 307, 311 (Bankr. D. Vt. 2011) (finding that a servicer had authority to file a proof of claim); *In re Minbatiwalla*, 424 B.R. 104, 108-09 (Bankr. S.D.N.Y. 2010) (same).

And in *In re Alcide*, the court considered whether the servicer of a mortgage had standing to seek relief from the automatic stay. *In re Alcide*, 450 B.R. 526, 529 (Bankr. E.D. Pa. 2011). There, the debtor argued that the servicer had not established that it had the legal authority to enforce the mortgage. *Id*. The court found that a party in interest in a bankruptcy case "must have some legally protected interest that either has been adversely affected . . . or that is in actual danger of being adversely affected." *In re Alcide*, 450 B.R. at 535. And it recognized that the servicer could, in effect, act on behalf of the loan owner:

> A number of courts have upheld the authority of a mortgage loan servicer to file a proof of claim on behalf of the mortgage holder. Most of the reported decisions

> also hold that a mortgage loan servicer has standing and is a party in interest
> entitled to prosecute a motion for relief from the automatic stay.

*In re Alcide*, 450 B.R. at 537 (footnote omitted).

The court concluded that "a servicer's financial interest in the debtor's unpaid stream of mortgage payments satisfies the initial, and most fundamental, requirement for 'party in interest' status . . . but does not automatically meet the prudential requirement that the movant assert its own legal rights, not that of a third party." *In re Alcide*, 450 B.R. at 538.

Other courts have also considered this question. For example, in *In re Lopez*, the debtor questioned the standing of a mortgage servicer as a party in interest to pursue a motion for stay relief. *In re Lopez*, 446 B.R. 12, 17-19 (Bankr. D. Mass. 2011). The court stated that a party in interest must have a "legal right which is sought to be enforced or [be] the party entitled to bring suit," and that it "need only demonstrate 'a colorable claim to the property of the estate'" to have standing to seek relief from the stay. *In re Lopez*, 446 B.R. at 17, 19 (quoting *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 32 (1st Cir. 1994). It also noted:

> "[A] motion to lift the stay is not a proceeding for determining the merits of the
> underlying substantive claims, defenses, or counterclaims. Rather, it is *analogous
> to a preliminary injunction hearing*, requiring a speedy and necessarily cursory
> determination of the reasonable likelihood that a creditor has a legitimate claim or
> lien as to a debtor's property."

*In re Lopez*, 446 B.R. at 17 (emphasis added) (quoting *Grella*, 42 F.3d at 33-34). *See In re Hayes*, 393 B.R. 259, 267 (Bankr. D. Mass. 2008) (noting that courts "have held that mortgage servicers are parties in interest with standing by virtue of their pecuniary interest in collecting payments under the terms of the notes and mortgages they service").

And in *In re Hwang*, 438 B.R. 661 (C.D. Cal. 2010), the district court found that the bankruptcy court had abused its discretion in holding that a servicer was not a real party in interest with standing to move for stay relief. *In re Hwang*, 438 B.R. at 665-66. In particular,

the district court found that the bankruptcy court abused its discretion in determining that "Rule 19 require[d] the Note's owner to join the [Servicer]'s [stay relief m]otion," as "the owner does not itself have the right to enforce the Note." *Hwang*, 396 B.R. at 667-68.

In all events, where there has been a failure to join a necessary party, the solution is not to deny otherwise appropriate relief, or to allow the collection of a debt to continue in the face of a valid claim that the debt is discharged. Debtors, parties, and courts should not be helpless in such a situation, and each has tools at their disposal to join those parties that they assert are necessary to affording complete relief.

A plaintiff may plead a reason for nonjoinder under Rule 19(c), if the absent parties are "needed for a just adjudication of the action but . . . have not been joined and give the reasons for failing to join them." 7 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1625 (4th ed. 2024). And Rule 15(a)(2) permits a plaintiff who has not named a necessary party to seek the opposing parties' consent or leave of court to amend the pleadings. Fed. R. Civ. P. 15(a)(2).

A defendant may address nonjoinder by filing a pre-answer motion to dismiss on grounds of nonjoinder under Federal Rule of Civil Procedure 12(b)(7), or by asserting the defense of nonjoinder in its answer. *See* 7 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1609 (4th ed. 2024); 4 James Wm. Moore et al., Moore's Federal Practice § 19.02[4][b][i] (3d ed. 2024). It is worth noting that here, Firstmark asserted the affirmative defense of lack of joinder in its Answer to the Amended Complaint, but PHEAA and the Trust Defendants do not do so. *See* Firstmark Answer to the Amended Complaint, ECF No. 125, at 18-19.

And where the affirmative defense of nonjoinder of a necessary party is advanced, a court may order the absent party to be brought into the action.  As one commentator explains, when nonjoinder is raised by a party, and the "burden is on the party raising the defense to show that the absentee is required to be joined under Rule 19 . . . the court initially will determine if the absentee should be joined as a party . . . [and i]f it decides in the affirmative, the court will order the absentee brought into the action."  7 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1609 (4th ed. 2024).  *See* 4 James Wm. Moore et al., Moore's Federal Practice § 19.02[3][b] (3d ed. 2024) (stating that "[i]f the court determines that the absentee is necessary and that joinder is feasible, it may permit the plaintiff to effect it or may order that the absentee be joined.")

To be sure, a court also has options to address a situation that raises issues under Rule 19.  For example, in situations where not all parties can be joined due to "limitations on service of process, subject matter jurisdiction, and venue," a court has the discretion to make a practical and pragmatic choice "between the alternatives of proceeding with the action in the absence of particular interested persons, and dismissing the action."  Fed. R. Civ. P. 19 Advisory Committee's Note to 1966 Amendment.  *See* 4 James Wm. Moore et al., Moore's Federal Practice § 19.06[1] (3d ed. 2024) (stating that "Rule 19 prescribes a pragmatic process for determining whether an absentee's joinder must be compelled").

Viewed another way, courts and commentators note that a party's absence does not "negate the court's power to adjudicate as between the parties who have been joined."  *Id*.  That is, joinder "should not be compelled when meaningful relief can be granted without the absentee," and as one example, "courts often can grant complete relief in the absence of an assignor."  4 James Wm. Moore et al., Moore's Federal Practice § 19.03[2][d] (3d ed. 2024).

And courts may balance "[the] attempt to avoid multiplicity of litigation . . . [against the] somewhat contradictory judicial desire to resolve legitimate disputes brought before the court rather than leaving the parties without a remedy."  7 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1602 (4th ed. 2024).

In addition, there is no fixed timetable for the court to address these matters.  Indeed, a court may defer decision of the indispensability of a party until even "the trial itself," and "is free to reconsider a . . . question of indispensability if there is a showing of changed circumstances." 7 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1609 (4th ed. 2024). A court "may raise compulsory party joinder on its own motion" as well.  4 James Wm. Moore et al., Moore's Federal Practice § 19.02[4][a] (3d ed. 2024).

And finally, here, the Court is satisfied that it can afford meaningful relief among the parties to this action.  Ms. Golden seeks neither more nor less than a declaration as to the dischargeability of her student loans, and the ancillary relief of an injunction against collecting a discharged debt.  If she prevails, the Defendants – like any creditors – should cease their collection activities.  The Defendants, not the note owners, as the servicers of the student loans at issue, are the entities with the capacity to collect on these debts.

And if Ms. Golden succeeds in showing a likelihood of success on the merits of her claims, or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in her favor, then preliminary injunctive relief is warranted.  The note owners simply do not have a legitimate interest in the collection of a discharged debt, and the Defendants have not shown that the note owners' interests are impaired by their absence from this action.  To qualify as a necessary party under Rule 19(a)(1)(B)(i), "the impairment of the party's ability to protect its interest must be caused by that

party's absence from the litigation," and here the loan owners' absence has little effect on the Defendants' ability to enforce payment on the loans. *In re Hwang*, 438 B.R. at 668. Nor, in the many years that this action has been pending, have the loan owners asserted an interest in this action, or the Defendants taken any steps to bring them in.

For these reasons, the Defendants have not shown that joinder of the loan owners other than the Defendants is necessary for the Court to consider the Preliminary Injunction Motion on a classwide basis.

### Whether this Court May Enter a Declaratory Judgment and Ancillary Relief that Affects Debtors Outside of this District

The Defendants argue that this Court does not have enforcement authority over bankruptcy discharge injunctions issued outside of the Eastern District of New York. As they state, "[i]n *Bruce*, the Second Circuit made plain that this Court may not enforce discharge orders issued in districts outside of this District and that this Court may not hear contempt proceedings regarding any alleged noncompliance with the discharge orders issued in other districts." PHEAA *Bruce* Brief at 2. Instead, they argue that a debtor's "sole recourse for alleged violations of the discharge injunction is to move for contempt sanctions" in the bankruptcy court that issued the debtor's discharge injunction. Firstmark Opp. at 30. And they state that the Second Circuit has precluded "the certification of a nationwide class seeking to enforce alleged violations of the discharge injunction." Firstmark Opp. at 7. Finally, they argue that Ms. Golden has not shown how this proceeding could be certified as a nationwide class action under Rule 23. Firstmark Opp. at 38.

Ms. Golden responds that she and the class have suffered irreparable injury and are entitled to injunctive relief for substantially the same reasons that this Court set forth in *In re Homaidan*. Reply at 12. She argues that Mr. DeBois's analysis, even if incomplete,

demonstrates that there is a sufficiently large number of affected borrowers to make joinder impracticable.  Reply at 7-8.  And while Ms. Golden acknowledges that, in light of *Bruce*, "a contempt citation is no longer available," she argues that, "nothing in *Bruce* prevents this Court from declaring the class members' loans to have been discharged because they do not come within the terms of § 523(a)(8), and to provide injunctive relief which is ancillary to that declaration."  Reply at 13.

In *Bruce*, the Second Circuit was careful to explain that the decision addressed *only* the plaintiff's motion for contempt.  It declined the plaintiff's invitation in the course of the appellate proceedings to view her requests more broadly, to include distinct claims for declaratory relief and damages, in addition to her claim for contempt, because, among other reasons, "the complaint itself . . . assert[ed] a single cause of action claiming that '[d]efendants have violated § 524(a)(2) and are in contempt of this Court.'"  *Bruce*, 75 F.4th at 299.  The court also noted that the plaintiff herself characterized the matter as "'a proceeding for contempt.'"  *Id.*

The Second Circuit also took care to explain what it was *not* deciding in *Bruce*.  As the court found, the plaintiff's arguments on appeal that "she (and her proposed fellow class members) are entitled to declaratory relief and damages" presented an issue that it need not reach or determine.  *Bruce*, 75 F.4th at 306 n.9.  As the court observed, "[w]hether and to what extent relief short of contempt sanctions is available in the case of a discharge violation for which a fair ground of doubt remains is *a question for another day*."  *Bruce*, 75 F.4th at 306 n.9 (emphasis added).

And the Second Circuit's distinction as drawn in *Bruce* has recently been noted by the bankruptcy court in *In re Anderson*.  There, the court observed that, while in *Bruce*, the Second Circuit discussed "whether a declaratory judgment claim had been asserted and whether such a

claim could be maintained on a class-wide basis," it also found that whether the plaintiff was "'entitled to declaratory relief and damages'" was "'an issue [the court] need not decide,'" and that it remained "'a question for another day.'"  *In re Anderson*, 2025 WL 957097, at *19 (quoting *Bruce*, 75 F.4th at 306 n.9)).

The analysis in *Bruce* follows from case law both within and beyond the Second Circuit. As the Supreme Court has observed, "[s]anctions for violations of an injunction . . . are generally administered by the court that issued the injunction." *Baker v. Gen. Motors Corp.*, 522 U.S. 222, 236 (1998).  And as the Second Circuit has stated, "[v]iolation of an injunctive order is cognizable in the court which issued the injunction, regardless of where the violation occurred." *Stiller v. Hardman*, 324 F.2d 626, 628 (2d Cir. 1963).  As the Second Circuit explained, "[t]he civil contempt power is, at its core, uniquely personal to each court; by providing a mechanism to mandate compliance when a court is confronted with disobedience, it is a necessary corollary to a court's authority to issue binding orders." *Bruce*, 75 F.4th at 303-04.

And in *Bruce*, the Second Circuit found that the plaintiff sought, "[a]t bottom . . .  a bankruptcy-specific expansion of the civil contempt power beyond its longstanding limits at equity." *Bruce*, 75 F.4th at 305.  And it "decline[d] to expand the availability of a bankruptcy court's civil contempt authority to any similarly aggrieved party, anywhere in the country, that comes before one court seeking relief from an alleged contemnor's comparable affront to a different court." *Bruce*, 75 F.4th at 304.

The Second Circuit also noted that the *Bruce* complaint states "a single cause of action," entitled "Failure to Abide By the Injunction Contained In § 524(a)(2)," and alleges that "'[d]efendants have violated § 524(a)(2) and are in contempt of this court.'" *Bruce*, 75 F.4th at 299 (quoting Amended Class Action Adversary Complaint, *Bruce v. Citigroup Inc.* (*In re*

*Bruce*), No. 14-08224 (Bankr. S.D.N.Y.) (ECF No. 39), at *18). That is, in *Bruce*, the plaintiff

sought to pursue claims for contempt, on behalf of a nationwide class, on a nationwide basis.

Here, by contrast, the record shows that Ms. Golden now asserts two requests for relief

on behalf of herself and the putative class. These are her request for a declaratory judgment that

the loans at issue here were discharged, and her request for ancillary injunctive relief, against all

Defendants.[2] *See* Complaint, at ¶¶ 21-37; Am. Compl. ¶¶ 70-86.

In support of her request for a declaratory judgment, Ms. Golden states, "Plaintiff

requests declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Bankruptcy

Procedure [7001(i)] that the Debts were discharged by operation of law on August 3, 2016

because they were not student loans protected by any subsection of section 523(a)(8)." Am.

Compl. ¶ 71. As the Amended Complaint states, "Plaintiff requests that Defendants be cited to

appear and judgment be entered against Defendants for: (1) declaratory and injunctive relief."

Am. Compl. at 15. *See* Prelim. Inj. Mot. at 5, ECF No. 254 (requesting "that the court grant [Ms.

Golden's] motion for preliminary injunction").[3]

Ms. Golden seeks a declaratory judgment that the "Debts," defined as loans that were

made in excess of the cost of attendance, be declared discharged. She cites to Judiciary Code

Section 2201, which provides:

> In a case of actual controversy within its jurisdiction, . . . any court of the United
> States, upon the filing of an appropriate pleading, may declare the rights and other
> legal relations of any interested party seeking such declaration, whether or not

---

[2] Ms. Golden also asserted a Fair Debt Collection Practices Act claim against Firstmark, but has
withdrawn that claim. *See* Am. Compl. ¶¶ 77-86; Combined Memorandum of Law in
Opposition to Defendants' Motions to Dismiss, ECF No. 57, at 3 (noting that "Plaintiff hereby
withdraws her claim against Firstmark against the Fair Debt Collection Practices Act").

[3] As noted above, Ms. Golden additionally requested that the Defendants be cited for civil
contempt and ordered to pay damages pursuant to Bankruptcy Code Section 105. Am. Compl.
¶ 76. Ms. Golden now acknowledges that, in light of *Bruce*, her "contempt-based national class
claims are no longer viable." Class Cert. Mot. at 9. *See* Am. Compl. ¶¶ 74-76.

further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201.

At the outset, a declaratory judgment action, including in connection with a proceeding to determine the dischargeability of a debt, is specifically contemplated in the Bankruptcy Rules. Bankruptcy Rule 7001(f) provides that a proceeding to determine the dischargeability of a debt is an adversary proceeding. Fed. R. Bankr. P. 7001(f). And Bankruptcy Rule 7001(i) provides that a proceeding to obtain a declaratory judgment relating to the determination of the dischargeability of a debt is also an adversary proceeding. Fed. R. Bankr. P. 7001(i).

As one court in this District has explained:

There are four avenues to obtain a judicial determination of dischargeability post-discharge and case closure:  i) if the creditor pursues a lawsuit on the claim, the debtor can assert the bankruptcy discharge as an affirmative defense . . .  ii) the debtor may be able to remove the collection effort to the bankruptcy court, iii) either the debtor or the creditor can move to reopen the bankruptcy case pursuant to Fed. R. Bankr. P. 4007(b) for the purpose of filing a complaint to determine dischargeability, and iv) the debtor can bring an action against the creditor in the bankruptcy court to enforce the § 524(a)(2) discharge injunction.

*In re Candidus*, 327 B.R. 112, 118 (Bankr. E.D.N.Y. 2005). That is, a determination of the dischargeability of a debt is a separate and distinct avenue of relief from an action to enforce the bankruptcy discharge injunction.

In addition, jurisdiction to determine the dischargeability of a debt that is assertedly in a category identified as nondischargeable under Bankruptcy Code Section 523(a)(8) is "held concurrently by the bankruptcy court and any appropriate nonbankruptcy forum." Fed. R. Bankr. P. 4007 Advisory Committee's Note to 1983 Amendment. In practice, determinations of dischargeability of a debt may be made not only by the bankruptcy court that issued the applicable discharge injunction, but also by other state and federal courts.

That is, while *Bruce* makes plain that a finding of *contempt* may be made only by the court that entered a debtor's discharge, federal and state courts within and outside that court's boundaries may have concurrent jurisdiction to address the *dischargeability* of a debt.  As a bankruptcy court in this circuit recently held, "in *Bruce*:  (i) the class-action relief sought was denied solely with respect to a contempt claim; and (ii) the *Bruce* court did not foreclose the possibility of relief (including a declaratory judgment) for violation of the Section 524(a)(2) Injunction outside of a claim for contempt." *In re Anderson*, 2025 WL 957097, at *19.  And, as one New York state appellate court has found, "[s]tate courts have concurrent jurisdiction to determine dischargeability" of certain debts statutorily excepted from discharge under Section 523, including those arising of student loans. *State Higher Educ. Servs. Corp. v. Quell*, 104 A.D.2d 11, 14, 482 N.Y.S.2d 373, 376 (N.Y. App. Div. 3d Dep't 1984).

And as a bankruptcy court has observed, "a state court may adjudge, not only the underlying liability, but also the dischargeability question" in the context of Bankruptcy Code Section 523(a)(8) claims. *Craig v. Loan Servicing Center* (*In re Craig*), 56 B.R. 479, 480 (Bankr. W.D. Mo. 1985).  *See* 4 Collier on Bankruptcy ¶ 523.03 (16th ed. 2023) (explaining that, for Section 523(a)'s exceptions to discharge, other than determinations under subsections 523(a)(2), (4), and (6), "jurisdiction may be exercised by either the bankruptcy court or the state or other nonbankruptcy court").

Moreover, courts have certified class actions relating to determinations of dischargeability under Bankruptcy Code Section 523.  For example, in *Turner v. Talbert* (*In re Talbert*), the bankruptcy court found that "dischargeability proceedings may be prosecuted as class actions." *Turner v. Talbert* (*In re Talbert*), 347 B.R. 804, 807 (Bankr. E.D. La. 2005).  And in *Santa v. Lebner* (*In re Lebner*), the bankruptcy court explained that "[t]he majority of courts

addressing the issue of the permissibility of class actions in discharge litigation under section 523(a) has determined that class actions are permissible." *Santa v. Lebner* (*In re Lebner*), 197 B.R. 180, 188 (Bankr. D. Mass. 1996).

And as this Court found in *In re Homaidan*, "nationwide settlements of class actions asserting statutory bankruptcy discharge injunction violations have been approved by bankruptcy and district courts in several cases within the Second Circuit." *In re Homaidan*, 640 B.R. at 863. As this Court noted, "one court observed in denying a motion to dismiss a putative nationwide class action asserting violations of the statutory bankruptcy discharge, '[t]he Court has the power to provide all of the relief requested.'" *In re Homaidan*, 640 B.R. at 863 (alteration in original) (quoting *Vick v. NCO Fin. Sys., Inc.*, 2010 WL 1330637, at *4 (E.D. Tex. Mar. 15, 2010), *report and recommendation adopted*, 2010 WL 1328830 (E.D. Tex. Mar. 30, 2010))).

Other courts are in accord. *See, e.g.*, *Lerch v. Iomazzo* (*In re Iomazzo*), 149 B.R. 767, 775 (Bankr. D.N.J. 1993) (stating that "[t]his court concludes that the more persuasive view is that class actions are permitted by Fed. R. Bankr. P. 7023 in adversary proceedings under Bankruptcy Code § 523(c)"); *Rosario v. Livaditis* (*In re Livaditis*), 132 B.R. 897, 901 (Bankr. N.D. Ill. 1991) (observing that "a class dischargeability action may proceed under 11 U.S.C. § 523"); *Dickinson v. Duck* (*In re Duck*), 122 B.R. 403, 405 (Bankr. N.D. Cal. 1990) (holding that a class dischargeability action may be maintained in bankruptcy court because, among other reasons, "Bankruptcy Rule 7023 contains no exception for nondischargeability actions").

And as a court in this circuit recently held, "a claim seeking declaratory judgment for a violation of the Bankruptcy Code, and specifically in this case Section 524, would not be futile." *In re Anderson*, 2025 WL 957097, at *26. Applying the "old soil" analysis in *Taggart*, under which statutes that specify "'that a discharge order "operates as an injunction" . . . bring with

them the "old soil" that has long governed how courts enforce injunctions,'" the *Anderson* court

observed that "federal courts have often used a declaratory judgment as a remedy for violation of

a federal statute in the class-action context," and therefore held that the "'old soil' also brings

with it (in addition to civil contempt) a claim for declaratory judgment for a violation of a statute

on a class-wide basis." *In re Anderson*, 2025 WL 957097, at *26 (quoting *Taggart*, 587 U.S. at

560) (citing *Gulino v. Board of Educ.*, 907 F. Supp. 2d 492, 506-07 (S.D.N.Y. 2012)).

Firstmark also argues that the statutory discharge injunction effected by Bankruptcy Code

Section 524(a)(2) does not confer a private right of action for alleged violations of a bankruptcy

discharge injunction.  Firstmark Opp. at 6.  It points to a decision in this district where the court

found that "'a "request for a declaratory judgment is not a cause of action; it is a request for a

remedy that does not exist independent of a plausible underlying claim for relief."'"  Firstmark

Opp. at 6 (quoting *Travis v. Navient Corp.*, 460 F. Supp. 3d 269, 286 (E.D.N.Y. 2020) (quoting

*Lisa Coppola, LLC v. Higbee*, 2020 WL 1154749, at *10 (W.D.N.Y. Mar. 10, 2020))).

But Firstmark does not address Bankruptcy Rule 4007, which provides a procedural

entitlement to "[a] debtor or any creditor" to "file a complaint to obtain a determination of the

dischargeability of any debt."  Fed. R. Bankr. P. 4007(a).  Complaints to determine

dischargeability are generally brought under Bankruptcy Code Section 523, and actions to

enforce a discharge injunction through contempt are generally brought under Bankruptcy Code

Section 524.  *Teran v. Navient Sols., LLC* (*In re Teran*), 649 B.R. 794, 803 (Bankr. N.D. Cal.

2023) (stating that "whether Navient has done anything contemptuous or not, [the debtor] is

entitled to a judicial determination of the extent and reach of his discharge.  So, too, are others

within his proposed class.").  *See generally New York v. Suarez* (*In re Suarez*), 367 B.R. 332, 360

(Bankr. E.D.N.Y. 2007) (declaring a debt excepted from the debtor's discharge under

Bankruptcy Code Section 523(a)).

Firstmark points out that the Declaratory Judgment Act does not create new substantive rights in the absence of a cognizable cause of action.  Firstmark Opp. at 6.  But, while "[t]he [Declaratory Judgment Act] is procedural in nature, and merely offers an additional remedy to litigants," this does not mean that a declaratory judgment is somehow not available to Ms. Golden, or appropriate for consideration by this Court.  *Nat'l Union Fire Ins. Co. v. Karp*, 108 F.3d 17, 21 (2d Cir. 1997).  This is because, while the Declaratory Judgment Act "does [not] provide an independent cause of action," a court still may "enter a declaratory judgment in favor of a party who has a substantive claim of right to . . . relief."  *Keene Corp. v. Fiorelli* (*In re Joint E. & S. Dist. Asbestos Litig.*), 14 F.3d 726, 731 (2d Cir. 1993).

And here, Ms. Golden has shown that she has a substantive claim, in the nature of a right to a determination as to whether the NCT Loan and the Bar Loan is within the scope of her bankruptcy discharge under Bankruptcy Code Section 523 and Bankruptcy Rule 4007.  In addition, here, a declaratory judgment would "offer[] an additional remedy" that is appropriate under those circumstances.  *Nat'l Union Fire Ins. Co.*, 108 F.3d at 21.  As the Supreme Court explained in *Wilton v. Seven Falls Co.*, "[b]y the Declaratory Judgment Act, Congress sought to place a remedial arrow in the [federal courts'] quiver; it created an opportunity . . . to grant a new form of relief to qualifying litigants."  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995).  And so here.  Where Ms. Golden has demonstrated that she is a "qualifying litigant," the Court may draw that arrow.

More generally, courts agree that the "plain meaning" of Section 105(a) gives broad authority to bankruptcy courts to "'issue any order necessary or appropriate to carry out the provisions of the bankruptcy code.'"  *Placid Ref. Co. v. Terrebonne Fuel & Lube, Inc.* (*In re*

*Terrebonne Fuel & Lube, Inc.*), 108 F.3d 609, 613 (5th Cir. 1997) (quoting *Burd v. Walters* (*In re Walters*), 868 F.2d 665, 669 (4th Cir. 1989)). As this Court has noted, "Bankruptcy Code Section 105 grants the bankruptcy court power to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.'" *In re Golden*, 630 B.R. at 914 (quoting 11 U.S.C. § 105). And this includes "any 'judgment' necessary or appropriate to carry out the requirements of the bankruptcy code" and "any remedy available in a private cause of action." *Rodriguez v. Countrywide Home Loans, Inc.* (*In re Rodriguez*), 396 B.R. 436, 458 (Bankr. S.D. Tex. 2008). *See In re Jewish Mem'l Hosp.*, 13 B.R. 417, 419 (Bankr. S.D.N.Y. 1981) (citing *Young v. Higbee Co.*, 324 U.S. 204, 214 (1945)) (observing that "[i]t is well established that the Bankruptcy Court is a court of equity and that its proceedings are inherently proceedings in equity").

Another piece of the picture is the source of the Court's jurisdiction, including its subject matter jurisdiction. Here, Ms. Golden's claims arise under the Bankruptcy Code, and specifically, under Bankruptcy Code Sections 727, 523(a)(8), and 105(a). *See In re Golden*, 630 B.R. at 920. "As a consequence, for purposes of this adversary proceeding, Judiciary Code Section 1334(b) is the source of this Court's subject matter jurisdiction, because the claim is a 'civil proceeding[] arising under title 11.'" *In re Golden*, 630 B.R. at 920 (quoting 28 U.S.C. § 1334(b)).

Notably, other courts have certified class actions, including nationwide class actions, to address a range of bankruptcy claims where the class as certified extended outside of the bankruptcy court's home district. And courts have correctly observed that where jurisdiction is lacking, they are required – even *sua sponte* – to dismiss the case. *See, e.g.*, *Merchant's Bank v. C.R. Davidson Co.* (*In re C.R. Davidson Co.*), 232 B.R. 549, 551 (B.A.P. 2d Cir. 1999) (citing

*Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1908)) (observing that "[w]hen such jurisdiction is lacking, and although no party has raised the issue, we have the duty to dismiss sua sponte."). *See Receivables Exch., LLC v. Hotton*, 2011 WL 239865, at *1 (E.D.N.Y. Jan. 21, 2011) (citations omitted) (stating that "when a complaint fails to plead subject matter jurisdiction, the Court is obligated to dismiss it *sua sponte*").

And this Court and others "have similarly recognized that the jurisdiction to enter a nationwide remedy is part of the court's jurisdiction over the putative class." *In re Golden*, 630 B.R. at 922 (citing *Vick*, 2010 WL 1330637, at *4; *Rojas v. Citi Corp. Tr. Bank FSB* (*In re Rojas*), 2009 WL 2496807, at *10 (Bankr. S.D. Tex. Aug. 12, 2009)). For example, in *Sheffield v. HomeSide Lending, Inc.* (*In re Sheffield*), 281 B.R. 24 (Bankr. S.D. Ala. 2000), the bankruptcy court certified a nationwide class with respect to claims arising from a creditor's failure to disclose post-petition, pre-confirmation attorney fees in its proofs of claim. *See In re Noletto*, 281 B.R. at 46-48 (same); *Dean v. First Union Mortg. Corp.* (*In re Harris*), 280 B.R. 876 (Bankr. S.D. Ala. 2001) (same).

"Bankruptcy courts have also noted, in different contexts, that in the appropriate circumstances, the certification of a nationwide class may be permitted, particularly when the relief sought is not solely *in rem* in nature." *In re Golden*, 630 B.R. at 921. For example, in *Chiang v. Neilson* (*In re Death Row Records, Inc.*), 2012 WL 952292 (B.A.P. 9th Cir. Mar. 21, 2012), the Ninth Circuit Bankruptcy Appellate Panel permitted certification of a nationwide class as to "turnover, declaratory and injunctive relief claims" noting that they "are not solely *in rem* claims." *In re Death Row Records*, 2012 WL 952292, at *12.

As this Court and others have observed:

[Section] 1334(e) must be read narrowly to limit the "home court" exclusive jurisdiction of bankruptcy court *strictly to in rem matters involving property of the*

> *debtor or property of the estate* and not as a restriction on nationwide jurisdiction
> over claims for violation of provisions of the Code, other federal statutory
> provisions, or other remedies that might be available to debtors and trustees.

*In re Golden*, 630 B.R. at 921 (emphasis added) (quoting *In re Krause*, 414 B.R. at 255-56).

And as this Court has previously noted, "'[Judiciary Code Section] 1334(b) grants subject

matter jurisdiction over any debtor claims that fall within the court's "related to," "arising in," or

"arising under" jurisdiction, regardless of where the claimant's bankruptcy petition was filed.'"

*In re Golden*, 630 B.R. at 921 (alteration in original) (quoting *Cano v. GMAC Mortg. Corp.* (*In*

*re Cano*), 410 B.R. 506, 551 (Bankr. S.D. Tex. 2009)).

These nationwide class actions addressed a variety of matters that are fundamental to the

bankruptcy system, including the disclosure of fees in a proof of claim and other asserted

violations of the Bankruptcy Code and other statutes. In each circumstance, the court concluded

that a nationwide class was both possible and appropriate. As stated by this Court and others,

"'this conclusion advances the goals and purpose of the class action mechanism. Class actions

promote efficiency and economy in litigation. Their design permits numerous parties to

collectively litigate claims that might be uneconomical to litigate individually.'" *In re Golden*,

630 B.R. at 921-22 (quoting *Bank United v. Manley*, 273 B.R. 229, 249-50 (N.D. Ala. 2001)).

Moreover, "'if bankruptcy court jurisdiction is not permitted over a class action of

debtors, Rule 7023 is virtually read out of the rules. This would ascribe to Congress the intent to

categorically foreclose multi-debtor class actions arising under the Bankruptcy Code without a

clear indication of such intent.'" *In re Golden*, 630 B.R. at 922 (quoting *Wilborn v. Wells Fargo*

*Bank, N.A.* (*In re Wilborn*), 609 F.3d 748, 754 (5th Cir. 2010)). As one court observed in

denying a motion to dismiss a putative nationwide class action asserting violations of the

statutory bankruptcy discharge, "[t]he Court has the power to provide all of the relief requested."

*Vick*, 2010 WL 1330637, at *4.

Further, here, "these claims 'arise under' the Bankruptcy Code, are separate and distinct from any *in rem* basis for the bankruptcy court's jurisdiction, and go to the heart of one of the fundamental protections of the bankruptcy system – that is, the debtor's discharge and opportunity for a fresh start." *In re Golden*, 630 B.R. at 926. As the court in *Haynes* explained:

> While it is true that a substantial portion of bankruptcy jurisdiction is *in rem*, that is, jurisdiction over the debtor's estate wherever located, it is not the only basis for bankruptcy jurisdiction, which, under 28 U.S.C. Section 1334(b), extends to "all civil proceedings arising under title 11," including under 11 U.S.C. Sections 524 and 727. In fact, . . . these fundamental, if not the fundamental, provisions of the Bankruptcy Code have nothing to do with the debtor's estate or *in rem* jurisdiction. They have everything to do with prohibiting the collection of *in personam* debts that, before the bankruptcy discharge, were owed by the debtor.

*Haynes v. Chase Bank USA, N.A.* (*In re Haynes*), 2014 WL 3608891, at *6 (Bankr. S.D.N.Y. July 22, 2014).

Ms. Golden seeks, for herself and for all of the putative class members, neither more nor less than a declaration regarding the dischargeability of these debts, and ancillary injunctive relief related to such a determination. Their claims do not concern "'property of the estate, as of the commencement of the case,' or 'property of the estate,' as addressed by Judicial Code Section 1334(e)(1)." *In re Golden*, 630 B.R. at 927.

*          *          *

For these reasons, and based on the entire record, the Court concludes that Ms. Golden, on behalf of herself and the putative class members, has shown that this Court may enter a preliminary injunction on behalf of the putative class members, whether or not their bankruptcy discharge was entered in this District.

*          *          *

In this Preliminary Injunction decision, the Court has addressed several questions.

137

At the outset, the Court first determined whether the preliminary injunction sought by Ms. Golden is prohibitory or mandatory. And here, the Court finds and concludes that Ms. Golden is not seeking to disrupt the status quo – that is, the "last actual, peaceable uncontested status which preceded the pending controversy," which is the situation that existed *before* the Defendants had the ability to resume their debt collection activities. *In re Homaidan*, 650 B.R. at 409 (quoting *N. Am. Soccer League*, 883 F.3d at 37). So, the relief that Ms. Golden seeks is prohibitory, not mandatory, and she does not need to meet a heightened standard to show a likelihood of success on the merits.

Next, the Court considered whether Ms. Golden has satisfied each of the elements necessary for the entry of a preliminary injunction. These are, "(1) 'a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor'; (2) a likelihood of 'irreparable injury in the absence of an injunction'; (3) that 'the balance of hardships tips in the plaintiff's favor'; and (4) that the 'public interest would not be disserved' by the issuance of an injunction." *Benihana*, 784 F.3d at 895 (omission in original) (quoting *Salinger*, 607 F.3d at 79-80).

With respect to the NCT Loan, the Court finds and concludes that Ms. Golden has satisfied each of these requirements. This is because, among other reasons, she has shown a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation, on her claim that the NCT Loan does not meet the nondischargeability requirements of Bankruptcy Code Section 523(a)(8), including her assertion that TERI is not a bona fide nonprofit institution for purposes of Section 523(a)(8)(A)(1). And to the extent that she has shown sufficiently serious questions going to the merits to make them a

138

fair ground for litigation, but not a likelihood of success on the merits, she has shown that a balance of hardships tips decidedly in favor of herself and the putative class members.

With respect to the Bar Loan, the Court likewise finds and concludes that Ms. Golden has satisfied each of these requirements. This is because, among other reasons, she has shown a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation, on her claim that the Bar Loan does not meet the nondischargeability requirements of Bankruptcy Code Section 523(a)(8), including her claim that it was not a "qualified education loan" made to an 'eligible student" within the "cost of attendance" at a Title IV institution. And to the extent that she has shown sufficiently serious questions going to the merits to make them a fair ground for litigation, but not a likelihood of success on the merits, she has shown that a balance of hardships tips decidedly in favor of herself and the putative class members.

With respect to the NCT Loan and the Bar Loan, the Court finds and concludes that Ms. Golden has also satisfied the balance of the requirements for preliminary injunctive relief. That is, she has shown that there is a likelihood of irreparable injury in the absence of an injunction; that the balance of hardships tips in her favor; and that the public interest will not be disserved by the entry of an injunction.

The Court also considered whether it may enter relief on behalf of a nationwide class of putative class members. In this regard, the Court addressed whether, in light of the requirements of Federal Rule of Civil Procedure 19, Ms. Golden may seek injunctive relief without joining all of the loan owners. And here, the Court finds and concludes that the absence of these parties from this action does not prevent the Court from affording meaningful relief among the parties to this action. This is because, among other reasons, "the Rule 19 inquiry is a fact specific and

practical one." *Polargrid LLC*, 2006 WL 2266351, at *9.  And "[a] party named in the litigation cannot assert an interest on behalf of those absent; '[i]t is the absent party that must claim an interest.'"  *BNP Paribas*, 2012 WL 13059498, at *12 (quoting Fed. R. Civ. P. 19(a)(1)(B)).  And over the time that this action has been pending, those loan owners have not sought to "claim an interest," nor have the Defendants taken any steps to bring them in.

And the Court considered whether, in light of the Second Circuit's decision in *Bruce*, it may enter a declaratory judgment with ancillary injunctive relief on behalf of a nationwide class of putative class members.  As to this, the Court finds and concludes that, while the Declaratory Judgment Act "does [not] provide an independent cause of action," it permits a party to seek, and a court to "enter a declaratory judgment in favor of a party who has a substantive claim of right to . . . relief."  *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d at 731.  And here, Ms. Golden has shown that she has a substantive claim to a determination that the NCT Loan and the Bar Loan are within the scope of her bankruptcy discharge.  To be sure, in *Bruce*, the Second Circuit held that a bankruptcy court may not consider a request for a finding of contempt of a bankruptcy discharge whether that discharge was entered outside of the district.  But as the Second Circuit noted, "[w]hether and to what extent relief short of contempt sanctions is available in the case of a discharge violation for which a fair ground of doubt remains is a question for another day." *Bruce*, 75 F.4th at 306 n.9.

## Conclusion

For the reasons stated herein, and based on the entire record, Ms. Golden's Motion for a Preliminary Injunction is granted.

The Defendants are restrained and enjoined from taking any acts to collect on loans that exceed the cost of attendance as defined by Internal Revenue Code § 221(D), irrespective of

whether those loans were guaranteed by TERI, that are held by Ms. Golden and the Putative

Class Members, as the class is described in the Amended Complaint, that have an outstanding

balance subject to collection.

The Defendants are also restrained and enjoined from taking any acts to collect on post-

graduation loans incurred to pay for living expenses while pursuing professional licensure, that

are held by Ms. Golden and the Putative Class Members, as the class is described in the

Amended Complaint, that have an outstanding balance subject to collection.

An order in accordance with this Memorandum Decision shall be entered simultaneously

herewith.



Dated: Brooklyn, New York
May 7, 2025

_____
Elizabeth S. Stong
United States Bankruptcy Judge